IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the community as LIANA SHANTI,<br><br>          Plaintiffs/Counterclaim Defendants,<br><br>     vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, JANE DOES 1-10, and JOHN DOES 1-10,<br><br>          Defendants/Counterclaimants. | CIVIL NO. 1:25-CV-00297-JAO-RT<br><br>**DECLARATION OF AMANDA BRADY** |

**DECLARATION OF AMANDA BRADY**

I, Amanda Brady, hereby declare as follows:

1.     I make this Declaration based on my personal knowledge and am competent to testify as to the matters in this declaration. I am over 18 years old.

2.     I was directly involved in Liana Shanti's online community beginning in January 2017, and my involvement continued through April 2025. Over the course of approximately eight years, I participated extensively in her programs and community, including Facebook group discussions, Signal group and private chats, Instagram live sessions and Q&As, and private direct-message

conversations across Instagram, Facebook, and Signal. I purchased numerous programs totaling tens of thousands of dollars and, most recently, was a paid subscriber to her application, *Liana Life*. Through this sustained and direct participation, I have firsthand knowledge of the structure, practices, and inner workings of her online community.

3.    Below are responses based on my own personal, firsthand knowledge of Liane's statement of facts:

4.    In many direct interactions with Ms. Wilson beginning in 2022 and continuing through to 2024, she spoke on numerous occasions about her creation and authorship of the website known as "Exposing Family Cults," which she later renamed "Exposing Family Abuse." These statements were made both publicly to members of the broader community and privately to me.

5.    Ms. Wilson spoke about these websites both publicly within the broader community and privately to me, describing them as platforms she used to publish information about individuals she considered harmful, and further describing these actions as efforts to damage their reputations. In private communications, she informed me in advance when she intended to upload content about specific individuals, indicating direct awareness of, and involvement in, the timing and substance of postings.

6.　　Throughout this same time period until recent months, I observed Ms. Wilson routinely used her public Instagram stories on her @lianashanti account to identify specific individuals, including Paula Haygarth, as child abusers, often naming multiple additional people in these posts. Within her community, Ms. Wilson repeatedly promoted this narrative and encouraged others to adopt the same characterization.

7.　　During my time in her community and continuing through into 2025, Ms. Wilson routinely posted about Ms. Stefanie Horvath on her own social media (@lianashanti Instagram) and repeatedly spoke about her in a derogatory and disparaging manner. In addition, within closed community spaces controlled by Ms. Wilson - where there was no independent oversight or moderation - she continued to promote negative characterizations of Ms. Horvath and others, reinforcing harmful narratives among members of her community.

8.　　Indeed, from 2022 and ongoing through 2025, Ms. Wilson repeatedly posted extensive sequences of negative, insulting Instagram stories about Paula Haygarth, Byron Horvath, and Stefanie Horvath on her @lianashanti account, often in rapid succession and over sustained periods of time.

9.　　This pattern of social media posting was consistent with how Ms. Wilson publicly targeted individuals she deemed harmful or disloyal, including former students who left her community. In my own direct experience,

after I was removed from Ms. Wilson's community in April 2025, she posted hundreds of Instagram stories about me and other members who removed at the same time, on her @lianashanti Instagram account, containing defamatory content intended to damage my reputation. I directly observed and experienced this conduct.

10.    I reviewed Ms. Wilson's declaration that she submitted to the Court as part of ECF Document 60. The statement made in Paragraph 5 regarding being *falsely* labeled as a Cult leader is inaccurate, in my view. Based on my firsthand experience as a participant in Ms. Wilson's community, the group functioned as a high-control environment characterized by significant influence over members' behavior, beliefs, and social interactions.

11.    In her community, Ms. Wilson clearly positioned herself as the primary authority within the group and exercised control through narrative management, public and private shaming, and the promotion of fear or reputational harm toward individuals who questioned her or left the community. Members who dissented or disengaged were frequently targeted through coordinated negative messaging, both publicly and within closed group spaces.

12.    Based on my experience, these dynamics are inconsistent with a benign mentorship or coaching relationship and align with recognized characteristics of high-control groups.

4

13.    Paragraph 7 of Ms. Wilson's declaration (ECF Docket 60) are misleading and incomplete. Based on my firsthand experience, while letters in support of Ms. Wilson's reputation and business were submitted, the manner in which those letters were solicited was not transparent. Ms. Wilson directed certain students to solicit letters from members of the community without clearly disclosing the purpose for which the letters would be used. The community was not clearly informed that the letters were intended for use in connection with her probation hearing for a proceeding in which she had been convicted of bankruptcy fraud. Instead, the request for letters was framed as a response to vague "attacks" or defamation, leading contributors to reasonably believe the letters were for a different purpose. As a result, individuals who provided letters of support did so without full knowledge of the context or intended use of their statements.

14.    Paragraph 8 of her declaration (ECF Document 60) is also inaccurate and misleading. Based on my firsthand observations, during late 2022 and throughout 2023, Ms. Wilson repeatedly stated—both publicly on her Instagram stories and privately within her closed community—that her life and business were improving as a result of individuals speaking out against her. Ms. Wilson regularly framed this period as financially and energetically beneficial to her, publicly asserting that she was making "millions and millions" and that the attention from those she referred to as an "abuser group" was fueling her success.

She frequently used the phrase "shit to gold" to describe transforming criticism and opposition into personal and business gain. These contemporaneous statements are inconsistent with the claim that she experienced reputational or financial harm as a result of Defendants' actions during this same period.

15. The statements in Paragraph 13 (ECF Document 60) are misleading. Based on my firsthand experience, any decline in Ms. Wilson's educational platform was not the result of actions taken by Defendants, but rather stemmed from internal dynamics within her own community.

16. For instance, I directly observed increasing dissatisfaction among students related to Ms. Wilson's conduct toward members, including coercive pressure to remain financially invested, escalating financial demands, and punitive treatment of individuals who questioned her authority or attempted to disengage. Over time, students began leaving the community after recognizing these patterns and sharing their experiences with others.

17. These factors - not external criticism - were the primary contributors to members withdrawing from her platform and to reputational consequences within her own audience.

18. The statements in Paragraphs 18 through 26 of her declaration (ECF Document 60) are inaccurate and misleading. Based on my firsthand experience within Ms. Wilson's closed community, she regularly made definitive and

disparaging statements about the individuals referenced, particularly in spaces without external oversight, moderation, or accountability.

19. Within these closed group environments, Ms. Wilson spoke with certainty and authority, repeatedly promoting narratives about specific individuals that she now characterizes as misunderstandings or misrepresentations. I personally observed her repeatedly referring to Byron Horvath as a drug addict, including frequent references to a certain "paint chip" story which was told to her by Haley but repeated by her incessantly. She also repeatedly mocked Stefanie Horvath on her @lianashanti Instagram account, including showing and replaying their wedding video on her public Instagram for ridicule.

20. Additionally, Ms. Wilson frequently posted and spoke at length about this group, using varied labels and language that consistently advanced the same underlying narrative: that she positioned herself as aligned with "light" or moral authority, while characterizing those individuals as malicious, corrupt, or aligned with evil forces, including explicit references to Satanic intent. She did all of this under the guise of "teaching" and "exposing evil".

21. In my experience, these statements were not isolated, ambiguous, or misconstrued. They were repeated, deliberate, and delivered with clarity inside spaces Ms. Wilson controlled. Her present characterization that she was merely

misunderstood is inconsistent with the content, frequency, and certainty of the narratives she actively promoted.

22. Ms. Wilson's statements in paragraph 15 of ECF Document 63 are inaccurate and misleading. Based on my firsthand experience, the absence of formal complaints against Ms. Wilson is not reflective of the absence of complaints or concerns, but rather a result of the way dissent and criticism were handled within Ms. Wilson's community.

23. I directly observed that individuals who raised concerns, questioned Ms. Wilson's conduct, or attempted to complain were promptly removed from the community. Following their removal, Ms. Wilson would create and disseminate alternative narratives about those individuals, portraying them as malicious, unstable, or harmful, which effectively discredited their concerns and discouraged others from speaking out.

24. As a result, complaints were not documented or preserved in any formal manner, and members were aware that raising concerns would result in expulsion and reputational harm. In my experience, this environment prevented complaints from being acknowledged, rather than demonstrating that no complaints existed.

25. Ms. Wilson's statements in Paragraph 16 of ECF Document 63 are also inaccurate and misleading. Based on my firsthand experience over a period

of years within Ms. Wilson's community, I directly observed her actively shaping and reinforcing narratives of abuse for multiple students.

26. In particular, I witnessed instances in which students who had not previously identified themselves as abuse survivors began to report supposed memories of abuse only after participating in Ms. Wilson's community and teachings. I also observed Ms. Wilson correct or redirect students' accounts when they questioned the identity of an alleged abuser, responding by definitively naming a different individual.

27. Additionally, Ms. Wilson regularly conducted "psychic" question-and-answer sessions, both within closed community spaces and publicly on Instagram, during which she affirmed or confirmed abuse narratives for students. These affirmations were presented with certainty and authority, and went beyond passive listening or emotional support.

28. Based on these direct observations, Ms. Wilson's characterization of her role as solely supportive and non-directive does not accurately reflect the conduct I personally witnessed.

29. Based on my firsthand experience within Ms. Wilson's community, she repeatedly encouraged members to "disconnect" from people in their lives whom she characterized as being "tethered to darkness." Members who cut off family members or close relationships were publicly praised, affirmed, and

9

showered with attention within the group, reinforcing this behavior. This dynamic intensified during the COVID-19 pandemic. Ms. Wilson promoted heightened fear narratives that caused members to avoid leaving their homes and to sever contact with individuals she framed as unsafe, including people who had received COVID-19 vaccinations. I personally observed members being encouraged to avoid or cut off contact with family members, including adult children, based on these teachings.

30.    As I observed in Ms. Wilson's community, while Ms. Wilson would periodically make generalized statements such as "do not do anything illegal," her actual influence occurred through broader discussions, live chats, and ongoing conversations inside environments she controlled. Within these spaces, there was significant social pressure and a clear set of unspoken rules governing acceptable beliefs and behavior. Guidance and direction were regularly given through indirect but influential phrasing, including statements such as "I'm not telling you what to do, but if it were me…" or similar constructions that framed advice as optional while strongly steering members toward particular conclusions or actions.

31.    I also observed Ms. Wilson consistently communicate to members that their husbands and intimate partners were unsafe, spiritually corrupt, or obstacles to personal healing and growth. I personally observed that women who

10

left their spouses, initiated separation, or went no-contact with partners or family members were praised, affirmed, and elevated within the group. Conversely, remaining in a marriage or maintaining close family relationships with persons that were not part of Ms. Wilson's community was frequently characterized as choosing "darkness," stagnation, or lack of spiritual progress.

32.   No-contact with partners and family members was regularly presented as a necessary step toward healing or personal ascension. While Ms. Wilson may not have issued direct commands, the cumulative messaging, praise for compliance, and negative framing of dissent created meaningful pressure that influenced members' decisions regarding marriages, custody, and family relationships.

33.   These dynamics contradict the claim that Ms. Wilson did not influence or encourage such outcomes.

34.   Contrary to Ms. Wilson's statement in paragraph 30 of ECF document 63, I am personally aware of no fewer than six women who relocated themselves and their families from Canada to the United States following sustained influence and pressure within Ms. Wilson's community. In Ms. Wilson's closed groups and private Signal chats, I observed an ongoing narrative that remaining in Canada was increasingly dangerous or "dark," and that leaving Canada was necessary for safety, healing, and spiritual alignment.

Ms. Wilson repeatedly conveyed that there was a narrowing "window" to leave, stating on multiple occasions that the end of 2021 represented a critical deadline to do so. Remaining in Canada was framed as choosing a life sentence of darkness, stagnation, or harm.

35.    Ms. Wilson conducted private Signal sessions with a number of women who were actively planning to leave Canada, including myself. During these sessions, Ms. Wilson discussed which U.S. states purportedly held the best "energy," strategies for dealing with ex-spouses or co-parents, and considerations related to border crossings. These discussions went beyond general encouragement and involved individualized guidance related to relocation.

36.    Ms. Wilson's communications and guidance about leaving Canada, combined with group reinforcement and praise for those who complied, created significant pressure that materially influenced relocation decisions for me and others in the community (I personally relocated from Canada to Florida with my family in December 2021). These dynamics directly contradict Ms. Wilson's claim that she did not influence or encourage cross-border relocation of members and their families.

37.    When a student was removed from or left Ms. Wilson's community, Ms. Wilson routinely initiated a coordinated response that included a live group call framed as a "processing" session. During these calls, Ms. Wilson used the

collective group setting to construct and reinforce a negative narrative about the departed individual. Following these calls, Ms. Wilson would campaign publicly on her social media platforms, sharing private direct messages and personal information that had been disclosed to her in confidence while she was acting in a mentoring capacity. This information was presented selectively and without consent to portray the former student in a harmful light.

38.    I personally observed this pattern occur with multiple students over the years and experienced it directly myself. These actions were not isolated incidents, nor were they misunderstandings; they reflected a repeated practice of retaliatory narrative-building after a student's removal or departure. These firsthand observations directly contradict the claim in Paragraph 34 of ECF Document 63 that such conduct did not occur.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Saskatchewan, Canada, on January 20, 2026.

AMANDA BRADY

13