CIRCUIT COURT OF THE FIFTH CIRCUIT

IN AND FOR THE COUNTY OF HAWAII

LIFE MASTERY NETWORK LLC, A
NEVADA LIMITED LIABILITY
COMPANY DBA ILLIANA SHANTI
ENTERPRISE AND LIANE WILSON,
ALSO KNOWN IN THE COMMUNITY AS
LIANA SHANTI,

        PLAINTIFFS/
        COUNTERCLAIM
        DEFENDANTS,

   vs.                 No.  5CCV-22-0000107

PAULA HAYGARTH, BYRON HORVATH,
JANE DOES 1-10, and JOHN
DOES 1-10,

        DEFENDANTS/
        COUNTERCLAIMANTS.
_____

30(B)(6) DEPOSITION OF
SOURCED INTELLIGENCE LLC
(ALEXANDER FEIL)
Friday, January 10, 2025
REPORTED REMOTELY VIA ZOOM

Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR
12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
(Via Zoom Videoconference)

Page 1

**EXHIBIT K**

30(B)(6) DEPOSITION OF

SOURCED INTELLIGENCE LLC

(ALEXANDER FEIL)

BE IT REMEMBERED that on Friday, January 10, 2025, commencing at the hour of 8:31 a.m. Pacific Time thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared ALEXANDER FEIL, remotely via Zoom videoconference, a witness in the above-entitled court and cause, who, being by me first remotely duly sworn, was thereupon examined as a witness in said action.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300    www.veritext.com

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:
     (Via Zoom Videoconference)
     CADES SCHUTTE
     1000 Bishop Street, Suite 1200
     Honolulu, Hawaii 96813
     BY:  JEFFREY S. PORTNOY, ESQ.
          TROY C. YOUNG, ESQ.
     Telephone:  (808) 521-9221
     Email:  Jportnoy@cades.com
             Tcyoung@cades.com
FOR THE DEFENDANTS/COUNTER CLAIMANTS:
     (Via Zoom Videoconference)
     DENTONS US LLP
     1001 Bishop Street Suite 1800
     Honolulu, Hawaii 96813
     BY:  GLENN T. MELCHINGER, ESQ.
          LOUISE K.Y. ING, ESQ.
          LAURA P. MORITZ, ESQ.
     Telephone:  (808) 441-6117
     E-mail:  Glenn.melchinger@dentons.com
              louise.ing@dentons.com
              laura.moritz@dentons.com
ALSO PRESENT:
     (Via Zoom Videoconference)
     Paula Haygarth
     Nicholas Yagi, Cades Schutte

Page 3

JANUARY 10, 2025                    8:31 A.M. PACIFIC TIME

P R O C E E D I N G S


MORNING SESSION


MR. MELCHINGER:  I'm Glenn Melchinger. I'm the attorney who will be taking the deposition, and we'll go through the sort of spiel of what happens on the record in a second.

ALEXANDER FEIL,

having been duly remotely sworn,

was examined and testified as follows:

EXAMINATION BY MR. MELCHINGER

BY MR. MELCHINGER:

Q.   Thank you, sir.

Can you just state your full name again for the record, please?

A.   Sure.  My name is Alexander, last name is Feil, F, as in Frank, E-I-L.

Q.   And you are here today as a representative of Sourced Intelligence, LLC; is that correct?

A.   Yes, sir.

Q.   You've seen the deposition notice, as I understand it.  I can put it up on the screen just to make sure.  I don't know if I need to really

Page 7

doing that ever since.

Q.   Thank you.

In terms of your training in intelligence, specifically, what kind of training have you had?

A.   So numerous forms of training.   Of course, on-the-job training has been the most vital throughout the years.   I was -- I received a certificate of the Advanced Threat Assessment Academy from Gavin de Becker and Associates, and that was after the Marine Corps.   In the Marine Corps, I was selected and attended numerous cite exploitation courses, open source intelligence courses, graduated in the top 90 percent of my class at -- in the Marine Corps's, the basic school, after which graduated from intelligence officer course, scout sniper platoon commander course, infantry officer course, light armor vehicles reconnaissance course and several other courses as well, primarily in intelligence.   My job was targeting open source intelligence attribution and, of course, going out into the field and detaining and interrogating individuals.

Q.   Thank you.

So I guess your Fordham University and your psychology degree, you graduated when from

Page 14

BY MR. MELCHINGER:

Q.   Let me try and ask something else that is not objectionable here before we go off the record.

Let's see.  And, again, I was trying to start with something where I didn't expect you would have much information based on what you've testified to so far in your level of involvement, which is damages.

Would you be testifying about the plaintiffs' damages or the defendants' damages alleged in this case, to your knowledge?

A.   I think any reference to the -- to the testimony, I would say would be speculation.  I have no idea what I would be testifying for with regards to damages or other facts.

Q.   Okay.  You have no -- all right.  Let's ask for something more specific, then.

You're saying -- well, do you have any information about the harm that plaintiffs have suffered, allegedly?

A.   No, I do not.

Q.   Do you have any evidence of -- or testimony to offer about the harm that plaintiffs have suffered?

A.   No, I do not.

Page 64

Q.   Do you have any evidence of -- or testimony about the harm that defendants have alleged in their counterclaim?

A.   I do not.

Q.   All right.  So -- all right.  Do you have any testimony about any alleged monetary losses to either the plaintiffs or the defendants have suffered in this case?

A.   I do not.

Q.   All right.  And that's what I mean by "damages."  You're saying you're speculating, but it doesn't sound like you have information about damages.  Maybe I just wasn't clear enough about what damages might mean.

All right.  So I'll try and ask more specific questions.  Let's see.

Let me ask, in terms of your investigation for Drew and Amanda Brady, and what you did in your report, were you ever asked as part of that investigation to look into sort of the truth or falsity of the specific social media posts or what was being said in those posts?

A.   No.  The context of what's being said in those posts was not really -- I mean, contextually, it's part of the overall investigation, but that was

Page 65

meaning on paper or kind of just in the back of our minds using the methodology to approach the investigation or specifically the word "reference"?

Q. You didn't look at it physically and say oh, here's what I should do next, or plan out based on whatever that book was, for example?

A. No, I did not.

Q. All right. So it's fair to say you used a methodology that you had in your head or something like that?

A. From experience, yes.

Q. Okay.

A. I believe.

Q. I asked this, but just to make sure, before today, have you spoken to anybody from the Cades Schutte law firm about this case?

A. I have not.

Q. Have you spoken to anybody from the Cades Schutte law firm ever?

A. Not that I'm aware of. I would have to check back to see, but no, not that I am aware of.

Q. All right. Let's see.

Let me ask, I guess, do you have any personal knowledge about Paula Haygarth?

A. I do not.

Page 69

Q.    Do you have any personal knowledge about Byron Horvath?

A.    I do not.

Q.    Sorry, I got to turn my -- turn share on here again, sorry.

Hopefully, my screen is displaying for you and you can see it, if not, let me know.

So I just want to ask a little more about what I'm calling Exhibit 6, the Buckingham report.

When you -- when you reviewed this or skimmed through, as you said, did you note the investigative findings on page 8?

A.    I did not.

Q.    Okay.  Did you -- so you didn't note that it said this investigation is considered inconclusive at this point?

A.    I don't recall reading that, no.

Q.    I guess you said the main thing you looked at was this chart, the sort of association chart on page 9, right?

A.    Correct.

Q.    And I'm just trying to understand, because you had a copy of this report from your clients, did you rely on it at all otherwise -- other than this chart, did you rely on it at all in doing your

Page 70

say the categorical individuals that are involved in this case.

Q.   When you say, "categorical individuals involved in this case," do you mean -- by "this case," the investigation for Drew and Amanda Brady?

A.   That's correct, yes.

Q.   All right.  So you're not talking about the lawsuit that is why we're sitting here today, correct?

A.   That's correct.

Q.   And just to try to clarify a little bit more, I think, you know, the categorical individuals involved in the -- can I just call it the Brady investigation or something else that you -- you provide?  You can tell me so we can clarify this case versus the investigation in 2022.

Is that okay to call it, say, the Brady investigation?

A.   Yes, please.

Q.   All right.  So for the Brady investigation that you were doing to create the Sourced report that we're talking about, when you say categorical individuals involved, I'm sorry, what does that mean?

A.   Yeah.  Categorical wasn't the right word.

Page 74

I think really looking for any reference to, you know, Drew Brady, Amanda Brady, Liana Shanti, Elise Winter, really all these individuals who were -- who were -- the names were shared by Amanda and Drew Brady with us. So we're looking for all things that are -- I guess categorically would be the correct word, categorically referencing, you know, the cult or, you know, kind of harassing, thematic harassing content that we found online that's pertinent to the Brady report or the Brady case, but really what I mean by that is all the individuals that were really the ones that are referenced in this specific report. So Elise Winter, Byron Horvath, Shannon Glas, and Paula Haygarth.

Q. I'm just trying to get those down. So Elise Winter, Shannon Glas. That's G-L-A-S, I think, with one S; is that right?

A. I believe so.

Q. And then Paula Haygarth, and I'm sorry, anybody else?

A. Really anyone who is referenced in the report. Our primary focus was Paula Haygarth and Byron Horvath. Everyone else I would say was on the periphery and was kind of discovered or -- either discovered by us, meaning the accounts, or the

Page 75

client, you know, provided some information as far as their potential involvement in this incident, or we'll say this -- this harassment, alleged harassment.

Q.  Yeah.  You're saying -- and I appreciate that.  You're saying "alleged harassment."

I mean, you testified before that you were not involved in looking at the substance and whether or not this was actually, you know, defamatory or harassing or whether the statements were false, correct?

A.  That's correct.

Q.  So while we can call it harassment or convenience or efficiency, maybe 'cause that's what it says in the report, you know, know whether or not it was actually harassment or -- or something else, right?

A.  Based on the content that was reviewed, I would characterize it as harassment, but as far as the veracity of the accusations that were being made, I would have no -- no idea of the veracity of that.

Q.  You noted you focused on Elise Winter, Shannon Glas, Paula Haygarth and perhaps most on Paula and Byron.

Page 76

Why did you focus on them?

A.   We focus specifically on Paula Haygarth and Byron, more -- more focus was on Paula Haygarth because the client -- the client in all cases I would argue, in most cases, has the most insight into kind of what's going on and the dynamics of all of that.   So she instructed us and asked us to look specifically into Paula Haygarth and Byron Horvath.

Q.   Again, when you say "us," the royal us, right?

A.   Our company, yes.  Me, yes.

Q.   Okay.  Okay.  And I appreciate that. 'Cause you're right, it is a corporate deposition.

Let's -- let's just look a little bit at -- or think a little bit about how you went about the investigation.

So you went out on to the internet, and you're looking at what in particular?

Do you recall?

A.   Typically when we get -- when we get cases like this, referring to the Brady report, we'll call it an attribution investigation, again, we try not to bias ourselves or kind of look through a funnel. We want to see the bigger picture.

So initially, I believe -- and, again,

Page 77

this was several years back, and we've done thousands of investigations since then. I believe the first step, which it typically is, is really understanding what the -- we'll say the digital terrain looks like. So we typically say, you know, who's talking, what are they talking about and where are they talking. And that's usually the first kind of phase of the investigation to best understand where to look for these individuals.

Q. So specifically, did Amanda and Drew Brady have you or ask you to focus on any particular digital terrain, as you say?

A. Yes. So they did provide us with, we'll call them leads, hey, take a look at this, hey, take a look at that, which we did in addition to our own, we'll say, were our own leads that we discovered took us, so yes.

Q. Anything else that you did to investigate?
Did you conduct interviews, for example, other than on the client?

A. We did not.

Q. If this was roughly 12 hours, was that a long or short time to have for this kind of investigation?

A. For this kind of investigation, I would

Page 78

say it is -- it's a short time.

Q.   Let me -- I'm showing you -- sorry, this is page 3 of the -- I guess we're going to call it the Sourced report or the report rather than continuing to say the May 20 report.

But this page contains your summary of the findings; is that correct?

A.   That's correct.

Q.   I'm sorry, they did go on in the next couple pages, so not only that page, but page 4 and 5 of the report also have further -- further summary, correct?

A.   Correct.

Q.   All right.  And this -- on page 5 of the report, there is -- I think we've been calling it sort of an association diagram.

This is a diagram that you created; is that right?

A.   That's correct.

Q.   And did you base this diagram on page 5 of the report with anything from the diagram -- and I'm switching to Exhibit 6 here, page 9, anything in this other association chart from the Buckingham report?

A.   No, we did not.

Page 79

looked at in your investigation, right?

A.    Correct.

Q.    So when I ask for any kind of information that you found, is there anything that puts Paula Haygarth behind the keyboard for any given post that you investigated or looked at?

A.    I wouldn't feel comfortable stating the words behind the keyboard just because of the nature of open source intelligence.  However, as referenced in the report, there were specific -- there were specific, we'll say, posts and activity that Paula Haygarth -- that we were able to identify from Paula Haygarth that correlated in some ways with this campaign.  We'll call it this harassment.

Q.    So you have correlation.  What I'm asking is, do you have identification or attribution to Paula Haygarth?

Did she make any given post that you investigated?

A.    I think if you're asking me, like, definitively is Paula Haygarth behind these posts, yes or no, I cannot say that with certainty.

Q.    All right.  So no, you can't say that it was her for any of these given posts; is that right?

A.    No.  Nature of any online attribution

Page 86

In the second sentence (as read):

As discussed, I strongly believe that the evidence you have now is strong enough to present to LE and legal.

Right?

A.   Correct.

Q.   And I understand this -- correct me if I'm wrong -- is basically the report that you prepared is, you know, leads or law enforcement and legal to, like, take and do something with; is that right?

A.   Yes.  That's correct.  There's typically two use cases for our reports.  One would be what you just stated, law enforcement and/or legal, and the second is just for informational purposes for the consumer, the end client.

Q.   Let me go back to sort of more where we were here.  But let me just try and clarify.

You have sort of -- as I understand it, a correlation between things that you looked at related to Paula Haygarth and the, again, air quotes, harassing posts that you looked at, right?

A.   Yes.

Q.   And from that, you say that Paula Haygarth has a primary role or you had a high degree of

Page 88

legal standpoint or, you know, at the client's will, if they wanted to file a police report and share it with law enforcement.  Steps beyond that would be pure speculation.

Q.  I'm sorry, when you say "officialize it," what do you mean by that?

A.  So this report was not intended to be a final report.  Telephonically it was communicated that this was a draft.  So -- so, again, if we had more time and the client continued to engage us beyond what they did, we would have refined this report, added more to it, and perhaps made some other adjustments so it was fit for the eyes of an attorney and/or law enforcement.

Q.  I guess for context, if you were able to issue a subpoena or something like that and get other account information, would you have done something like that?

A.  If authorized by the client, yes, we would have -- if this, you know -- we would have probably sent a subpoena to a couple of the social media platforms that are referenced in this report to include Reddit, Instagram and a few others that I can't recall at the moment.  But yes, that most likely would have been the next step.  Of course, we

Page 92

punctuation, right?

A.   Yes.

Q.   And did you look at any actual -- let me ask, did you look at any posts from Liana Shanti at any point?

A.   Not that I recall, no.

Q.   So you didn't look to see whether she also used caps or put commas inside or outside of the quote mark or whether she -- like, whether there's another exception to your rule, right?

A.   That's correct.

Q.   Okay.  And I guess what I'm trying to ask is, in this case, these types of, you know, punctuation usages, do these -- I mean, they don't necessarily tie Paula Haygarth to the accounts that are involved in the, you know, so-called harassment campaign, right?

A.   In looking at each -- we'll call them subcategory independently, I think that -- that provides one vantage point.  When combined all together, I think it's a slightly different vantage point 'cause all of these together, they're all -- we'll say somewhat unique in themselves.  But when you put them all together, I think it makes it even more unique.  That said, you know, our intent of

Page 110

this report was to provide enough information for people to -- for people with resources that we do not have, i.e. law enforcement or, you know, legal resources, to, we'll say, pierce the veil and, you know, subpoenas, whatever, to find the truth as far as who is behind this.

So to answer your question, yeah, I think individually, there's nothing particularly unique about it, but when combined, it does raise some suspicion, hence, why we considered it a lead and decided that it's worthy to report this to the client and -- yeah, to the client.

Q.   One quick question on -- there's this use of characters to encrypt words.  By "encrypt," you mean just kind of -- I mean, you're just replacing characters and words.

Like, if you tried to use a word lookup, it wouldn't find it, right?

A.   That's correct.

Q.   And the two examples you have here from Paula Haygarth, this is on page 27, one of them looks to be F@CK, and the other one, where did it go, is a dollar sign, an SH&TTY, right?

A.   Yes.

Q.   So these are both basically swear words,

Page 111

Alexander Feil, 30(B)(6)
January 10, 2025

Paula Haygarth played a primary role in the harassment campaign targeting the client.  Your report and your summary then goes on to say that additional actors, in parentheses, to some degree, are involved in the campaign to include -- I just want to talk about Byron Horvath, who is a defendant in the case.  You haven't been asked any questions really about Mr. Horvath.

Can you tell me why you have in your summary that you believe that he was involved to some degree, and then we'll talk about what you meant by "some degree"?

A.    Yes.   So Byron Horvath, the communications that he allegedly had with the Bradys or other interested parties, it was a small portion of the investigation that we kind of approached in passing.  It was definitely not the primary focus point of the investigation.  So -- and that's why it uses that word, "to some degree," as far as Elise Winter, Byron Horvath and Shannon Glas.

With further time, we would have been able to deduce those answers better than we did in this particular version of the report.  However, there is very little information, as you see in the report, that refers directly to Mr. Horvath.

Page 163

MR. PORTNOY:  Objection.  The report speaks for itself.

BY MR. MELCHINGER:

Q.   And you can answer.

MR. PORTNOY:  And it's been asked and answered.

MR. MELCHINGER:  Okay.  That's fine.

BY MR. MELCHINGER:

Q.   You can -- you can answer the question.

A.   Can you -- sorry.

Q.   Yeah.

Let me ask, so the report doesn't connect any particular individual mentioned in the report with any particular post necessarily, correct?

A.   Correct.

MR. PORTNOY:  Object.  Go ahead.

THE WITNESS:  Apologies.

No.  Per the report, per the language written in the report, it does not definitely attribute an account to her with 100 percent certainty.

BY MR. MELCHINGER:

Q.   When you say "her," I'm sorry --

A.   Apologies.

Ms. Haygarth.

Page 165

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day: 1/21/25

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

___x___ Re                                    uested.

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212

Page 168