CIRCUIT COURT OF THE FIFTH CIRCUIT

IN AND FOR THE COUNTY OF HAWAII

LIFE MASTERY NETWORK LLC, A
NEVADA LIMITED LIABILITY
COMPANY DBA ILLIANA SHANTI
ENTERPRISE AND LIANE WILSON,
ALSO KNOWN IN THE COMMUNITY AS
LIANA SHANTI,

       PLAINTIFFS/
       COUNTERCLAIM
       DEFENDANTS,

   vs.           No.  5CCV-22-0000107

PAULA HAYGARTH, BYRON HORVATH,
JANE DOES 1-10, and JOHN
DOES 1-10,

       DEFENDANTS/
       COUNTERCLAIMANTS.

_____

30(B)(6) DEPOSITION OF
SOURCED INTELLIGENCE LLC
(ALEXANDER FEIL)
Friday, January 10, 2025
REPORTED REMOTELY VIA ZOOM

Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR
12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
(Via Zoom Videoconference)

Page 1

EXHIBIT "1", PAGE 1

30(B)(6) DEPOSITION OF

SOURCED INTELLIGENCE LLC

(ALEXANDER FEIL)

BE IT REMEMBERED that on Friday, January 10, 2025, commencing at the hour of 8:31 a.m. Pacific Time thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared ALEXANDER FEIL, remotely via Zoom videoconference, a witness in the above-entitled court and cause, who, being by me first remotely duly sworn, was thereupon examined as a witness in said action.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300    www.veritext.com
EXHIBIT "1", PAGE 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:

(Via Zoom Videoconference)

CADES SCHUTTE

1000 Bishop Street, Suite 1200

Honolulu, Hawaii 96813

BY:  JEFFREY S. PORTNOY, ESQ.

TROY C. YOUNG, ESQ.

Telephone:  (808) 521-9221

Email:  Jportnoy@cades.com

Tcyoung@cades.com

FOR THE DEFENDANTS/COUNTER CLAIMANTS:

(Via Zoom Videoconference)

DENTONS US LLP

1001 Bishop Street Suite 1800

Honolulu, Hawaii 96813

BY:  GLENN T. MELCHINGER, ESQ.

LOUISE K.Y. ING, ESQ.

LAURA P. MORITZ, ESQ.

Telephone:  (808) 441-6117

E-mail:  Glenn.melchinger@dentons.com

louise.ing@dentons.com

laura.moritz@dentons.com

ALSO PRESENT:

(Via Zoom Videoconference)

Paula Haygarth

Nicholas Yagi, Cades Schutte

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com
EXHIBIT "1", PAGE 3

INDEX

INDEX OF EXAMINATIONS

                                                    PAGE

Morning Session                                        7

Examination By Mr. Melchinger                          7

Examination By Mr. Portnoy                           162

Further Examination By Mr. Melchinger                164

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

EXHIBIT "1", PAGE 4

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled, "DEFENDANTS/COUNTERCLAIMANTS PAULA HAYGARTH AND BYRON HORVATH'S NOTICE OF TAKING RULE 30(b)(6) DEPOSITION UPON ORAL EXAMINATION VIA ZOOM VIDEO CONFERENCING; EXHIBIT "A"; CERTIFICATE OF SERVICE" | 37 |
| Exhibit 2 | Document entitled, "Subpoena" | 37 |
| Exhibit 3 | Document entitled, "COMPLAINT; SUMMONS" | 37 |
| Exhibit 5 | Document entitled, "PLAINTIFFS' FINAL NAMING OF WITNESSES; CERTIFICATE OF SERVICE" | 61 |
| Exhibit 6 | Document entitled, "-SOCIAL MEDIA HARASSMENT AND HARASSING/THREATENING PHONE CALLS BRADY WEALTH STRATEGIES, April 16, 2022" | 48 |
| Exhibit 7 | Document entitled, "PROPOSAL - Open Source Intelligence (OSINT) INVESTIGATION" | 42 |
| Exhibit 9 | Document entitled, "Attribution Investigation WORKING PRODUCT 1.0" | 72 |
| Exhibit 12 | Email from Alexander Feil, Bates stamped SOURCED_INTEL_00505 | 94 |

Page 5

EXHIBIT "1", PAGE 5

Case 1:25-cv-00297-JAO-RT    Document 120-1    Filed 07/13/26    Page 6 of 167
PageID.2412

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Email with attachment, Bates stamped SOURCED_INTEL_00025 through SOURCED_INTEL_00029 | 147 |

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300    www.veritext.com

EXHIBIT "1", PAGE 6

JANUARY 10, 2025                    8:31 A.M. PACIFIC TIME

P R O C E E D I N G S

MORNING SESSION

MR. MELCHINGER:   I'm Glenn Melchinger.  I'm the attorney who will be taking the deposition, and we'll go through the sort of spiel of what happens on the record in a second.

ALEXANDER FEIL,

having been duly remotely sworn,

was examined and testified as follows:

EXAMINATION BY MR. MELCHINGER

BY MR. MELCHINGER:

Q.   Thank you, sir.

Can you just state your full name again for the record, please?

A.   Sure.  My name is Alexander, last name is Feil, F, as in Frank, E-I-L.

Q.   And you are here today as a representative of Sourced Intelligence, LLC; is that correct?

A.   Yes, sir.

Q.   You've seen the deposition notice, as I understand it.  I can put it up on the screen just to make sure.  I don't know if I need to really

Page 7

EXHIBIT "1", PAGE 7

admit it as an exhibit. Can you hang on a sec.

All right. Someone -- I'm not being allowed to share for some reason on this.

THE REPORTER: Can we go off the record?

MR. MELCHINGER: Yeah, that's fine.

(Discussion held off record.)

BY MR. MELCHINGER:

Q. And so this is the deposition notice. You should have a copy of this as well. And so your deposition notice or the deposition notice, I should say, is what's called a 30(b)(6) notice. It's to the organization, Sourced Intelligence.

Do you understand that?

A. Yes, sir.

Q. There were several topics, 17 topics that were listed, and just before we start, my understanding is that you are the sole designated representative who will be testifying on all of these topics in the notice; is that right?

A. Yes, sir.

Q. Okay. Let's go a little bit through a couple other ground rules and other things. My name is Glenn Melchinger. And I am counsel for the defendants in the case, Paula Haygarth and Byron Horvath. And I will be taking the deposition

Page 8

EXHIBIT "1", PAGE 8

and showing you some documents, and we'll be looking at the exhibits that you have in your possession.

I understand you have about 11 exhibits from your counsel; is that right?

A.    That's correct, sir.

Q.    Okay.  Just to put it on the record, my understanding from your counsel, Jason Hoggan from Sheppard Mullin, is that he will not be attending this deposition; is that right?

A.    Yes, sir.

Q.    But if you need to stop and consult with him at some point, well, that is -- we'll consider that when we come to it.  I would just ask that you not do that when a question is pending and that you answer any question that we have pending before we -- you go and consult with your counsel.

Is that right, you're okay with that, I should say?

A.    Yes, sir.

Q.    Okay.  All right.  So let me just ask a little bit of background, too.

Have you ever had your deposition taken before?

A.    I served as an expert witness in a case back in -- I believe it was -- I'll have to check my

Page  9

EXHIBIT "1", PAGE 9

notes, but I believe it was 2022. I have not had a deposition before.

Q. All right. So do you remember the name of the case from 2022?

A. I would have to refer to my notes. It's escaping me at the moment.

Q. Okay. And you were an expert in that case, you said?

A. Correct.

Q. All right. Did you testify in court as an expert?

A. Yes, sir.

Q. All right. And -- all right. So you've testified in court, but in that case, you were not deposed; is that right?

A. Correct. Yes, sir.

Q. Were -- just a correct is fine. You don't need to say "yes, sir" every time, okay? Not a problem.

I just want to try and understand whether you've had this experience taking -- having your deposition taken before. That's all.

A. I have not.

Q. All right. So let's just talk through then what happens basically in a deposition. And it

Page 10

EXHIBIT "1", PAGE 10

will be similar to what you may have experienced in court, in that, there are -- there's counsel for the plaintiff is also present, Mr. Portnoy there, who is waving his hand.  And you may hear objections to questions, but generally speaking, you just go ahead and answer the question.  The objections may be stated purely so that evidentiary objections can be preserved, and then later on, if this deposition is used somewhere at trial, it's not waived.

Does that make sense?

A.   Yes.

Q.   Okay.  All right.  And basically, what the -- I would repeat what the court reporter said at the outset, which is, because this is on Zoom, it's very important that nobody speak over each other.  We try and give each other enough space to say whatever we're going to say and then stop.  And so we have a clear record.  The court reporter is, of course, going to be taking down every word that is said, and as she noted, if we speak over each other, because she's not in the room with either of us, she won't be able to hear both sides, the audio will only be able to come through garbled words.  So we want to make sure we don't interrupt each other and sort of proceed in orderly fashion.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300    www.veritext.com

EXHIBIT "1", PAGE 11

Understood?

A.    Yes.

Q.    Okay.   So the only other thing is probably -- let's see.   I would say if you need to take a break or if something comes up -- you're in Texas; is that right?

A.    Yes.   In Texas.

Q.    Okay.   'Cause I see your office is in LA, and I'm glad you're not in LA right now, I guess.

So if something comes up and you need to attend to it, et cetera, we can break and go off the record.   But, again, I'd like to make sure that we have an answer to any question that's pending before you do.

All right?

A.    Yes.

Q.    Those are the -- sort of the main ground rules.   Let's talk a little bit about you are -- in terms of your education.

What's your educational background, please, just from about college probably onward?

A.    College onward.   All right.   So in -- I graduated from Fordham University with a Bachelor's Degree in psychology, during which I was recruited to -- or selected, rather, for a 30-student

Page 12

EXHIBIT "1", PAGE 12

counterterrorism fellowship in which we hosted several events and traveled to numerous foreign countries to study terrorism, or counterterrorism, rather.

After university, I went to join the United States Marine Corps.  I became an intelligence officer.  Deployed to Afghanistan supporting Operation Enduring Freedom, during which I served in an infantry battalion in Helmand Province.

After that, I left the Marine Corps and joined a security firm in Los Angeles.  I became the intelligence manager there, providing intelligence support and investigations to the clientele of that specific firm.

After I served in that firm for several years, I think it was about three, four years, I moved over to a nonprofit organization, also performing intelligence operations, physical security and digital security for a community in Los Angeles.

In 2017, I founded a company, which we're referring to today, Sourced Intelligence, LLC, and we have been -- we perform digital security and physical security for our clientele.  And I've been

Page  13

EXHIBIT "1", PAGE 13

doing that ever since.

Q.    Thank you.

In terms of your training in intelligence, specifically, what kind of training have you had?

A.    So numerous forms of training.  Of course, on-the-job training has been the most vital throughout the years.  I was -- I received a certificate of the Advanced Threat Assessment Academy from Gavin de Becker and Associates, and that was after the Marine Corps.  In the Marine Corps, I was selected and attended numerous cite exploitation courses, open source intelligence courses, graduated in the top 90 percent of my class at -- in the Marine Corps's, the basic school, after which graduated from intelligence officer course, scout sniper platoon commander course, infantry officer course, light armor vehicles reconnaissance course and several other courses as well, primarily in intelligence.  My job was targeting open source intelligence attribution and, of course, going out into the field and detaining and interrogating individuals.

Q.    Thank you.

So I guess your Fordham University and your psychology degree, you graduated when from

Page  14

EXHIBIT "1", PAGE 14

that?

A.    Graduated in 2008 -- 2007.   Excuse me.

Q.    So roughly speaking, you started doing sort of intelligence work soon after getting out of college, and then -- I'm sorry.

When did you enter the Marine Corps in particular?

A.    Entered the Marine Corps in 2009.

Q.    All right.   Okay.   Again, you had a certification, I think you said, from Gavin de Becker and Associates.

That was Advanced Threat Assessments, you said?

A.    Yes.

Q.    All right.   Is that -- what does that involve?

Or what does that enable you to do or what kind of certification is that?

A.    Yes.   It is a week-long course that is held in -- well, it's held in numerous places around the country.   For that particular iteration, I believe it was Lake Arrowhead, California.   The training there is a week-long program where they have executives from all over the world and all over the country come in, and they train you on how to

Page 15

EXHIBIT "1", PAGE 15

assess physical threats and digital threats and how to respond to them with regards to -- with regards to how to safely navigate through those situations.

Q.   And the goal there is what?

In service of -- is this, like, personal protection detail-type work or something like that, or ...

A.   Correct.  More on the intelligence investigative side.  So yes, exactly.  It's protective in nature.  So we'll have corporations and executives come out there and understand, you know, how to deal with terminations, stalkers, really anything that presents a threat and how to navigate that landscape.

Q.   When you say "terminations," you mean having an employee be terminated versus the alternative, what you were in the military; is that what you mean?

A.   I'm sorry, can you rephrase the question?

Q.   Yeah.

Terminations means one thing probably to you as a Marine versus -- I'm assuming you mean helping executives understand employees who have been terminated or what the threats are related to that threat?

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300     www.veritext.com

EXHIBIT "1", PAGE 16

A.    Yes, sir.   Exactly.

Q.    Okay.   All right.   And let me just ask then, in terms of your -- I think you said you were in Afghanistan; is that right, Enduring Freedom?

A.    Yes.

Q.    All right.   And what were your -- what was your dates in country for that, please?

A.    Dates in country were -- let's see.   I believe it was October 2010 to June or July 2011.

Q.    And during that time, you were also -- you were an intelligence officer with the Marine Corps?

A.    Yes.   In Afghanistan, I was the intelligence officer for the battalion.

Q.    Did you have a specific rank or something or was that your title, intelligence officer?

A.    Yes.   In Afghanistan, I was a first lieutenant, so an O2.

Q.    All right.   For the purposes of this deposition, is it okay -- you also mentioned your company, Sourced Intelligence.   If you're all right with it, I may call it just SI from time to time or just Sourced.

Is that okay?

A.    Of course.

Q.    All right.   Just for ease of reference.

Page  17

EXHIBIT "1", PAGE 17

And generally, I may slip and say "you" at some point in time.  Generally, I'm going to mean -- because this is a 30(b)(6) deposition, we're talking about Sourced for the most part.  And it's Sourced.  Okay.

Let's see.  Let me ask about the testimony you gave in court in 2022.  If you remember the name of the case, please let me know, okay?

What was the nature of your testimony in that proceeding?

A.    The nature of my testimony -- and it was a while back, so I'm going to do my best to recollect. The case, generally speaking, was a relationship, a man and a woman.  The relationship was deteriorating, and the woman was accused of taking -- in an unauthorized manner, taking a device, in this case, it was an iPad, from the -- from, I guess, my client at the time.  The individual with this iPad took the iPad back to her home, and with the iPad, accessed and -- will say accessed and altered information in specific online accounts that my client had at the time.

So that was the premise of my statements.

Q.    Is this -- to be straight, is this the Oved case, O-V-E-D, versus Matthew Klein, C --

Page 18

EXHIBIT "1", PAGE 18

K-L-E-I-N?

A.    That is it.

Q.    So in that matter, my understanding is that in around June of 2023, you submitted an affidavit; is that right?

A.    Yes, I believe so.

Q.    And that affidavit essentially detailed, in general terms, IP address, research and using the sort of Find My iPhone or Find My Device app.

You located the iPad in her house, and then had the IP addresses for the logins to iCloud plus the logins to another service, they matched, right, so you were basically able to identify where she was and where the device was; is that right?

A.    In essence, yes.  There was some matching of IP addresses with regards to her login, but, again, it was several years ago, I would have to rereview the details of the case to really speak truly confidently on it.

Q.    Understood.

In that case, you were -- let's see.

Were you qualified as an expert by the court?

A.    I believe so.

Q.    You were allowed to testify in any event,

Page 19

EXHIBIT "1", PAGE 19

right?

A.    Yes.

Q.    And did you testify as to your conclusions about your investigation regarding the iPad and the -- I don't know if it was a former spouse or the still spouse, but the ex-wife's or the wife's use of the iPad, right?

A.    Yes.

Q.    Okay.  We may come back to that later.

Are there any other times where you testified in court?

A.    No.

Q.    Are there any other times where you testified in arbitration or some other type of legal proceeding?

A.    No.

Q.    And in terms of perhaps testifying in front of a legislative body or anything else, any other kind of under oath testimony you gave, ever?

A.    No.

Q.    All right.  In terms of -- I think as depositions go, this one, I think you said, was your first, correct?

A.    Correct.

Q.    Let's see.  When you testified in the Oved

Page 20

EXHIBIT "1", PAGE 20

case, again for the court reporter, that's O-V-E-D, what did you understand your sort of -- the standard to which you were testifying to was?

Was it to a professional degree, cyber security certainty or something -- I mean, what was the professional standard to which you were trying to meet when you were testifying in that case?

MR. PORTNOY:  Let me just put an objection on the record as to all of these questions.  Because my understanding is that the witness is not here as an individual.  There's no notice of deposition of him individually.  He's here as a representative of the company to answer specific questions.  So I have a running objection to all of the questions that deal with this individual as a person, not as a representative of the company.

BY MR. MELCHINGER:

Q.    Okay.  And you can answer the question.

So -- or let me ask this:  You are the lead investigator for Sourced Intelligence; is that right?

A.    At the time of the transactions that I had pertaining to this case, yes.  My signature block did read lead investigator.  I -- my signature block now reads -- which it still was back then, it just

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300    www.veritext.com

EXHIBIT "1", PAGE 21

was read differently.  I am the cofounder of Sourced Intelligence.

Q.    And when you just said "this case," you mean the Oved case, right, and not this case that we're talking about today, right?

A.    Apologies.  This case we're talking about today.  I believe -- I'll have to look back at the emails, but I believe the signature block may have read something different.  I may be incorrect, but the signature block as it is today is different than it was back then.

Q.    For the Oved case.  Okay.

A.    Correct.  And correction as well.  Again, I'd have to refer back to the emails between myself and the Brady's to see exactly what the signature block read.  It may have also said lead investigator, but I will have to check.

Q.    Let's try and verify something, then.  I'm showing on the screen -- is this the affidavit that you had -- and I can drop a copy -- well, I think I can drop a copy of this into the chat if that helps.

But does this look like the first page? If I scroll through, it's very short.

MR. PORTNOY:  Is this an exhibit?

MR. MELCHINGER:  No.  This is trying to

Page  22

EXHIBIT "1", PAGE 22

clarify your objection, Jeff.

MR. PORTNOY:  Okay.

BY MR. MELCHINGER:

Q.    So is that your signature at the end?

A.    Is that my -- that is not my signature, but it is probably my digital signature with one of those platforms.  So yes, it does look very familiar, yes, in form.

Q.    Okay.  All right.  And this -- so this looks like your affidavit, but this says that the client engaged Sourced Intelligence on December 15, 2021; is that right?

A.    Referring to the report, to the best of my knowledge, yes, that's correct.

Q.    Okay.  All right.  So I just ask the same question, or your understanding, and I think I'm allowed to exhaust the knowledge of the witness while he's sitting here as a representative as well.

You testified on behalf of Mr. Klein.

What was the sort of professional standard to which you were testifying in the court hearing that you're referring to in 2022, as you understand it?

A.    I guess I don't understand the question exactly.

Page  23

EXHIBIT "1", PAGE 23

Q.   Okay.   When you testified about the iPad location and all of these things, did you do this to sort of a reasonable degree of certainty of some kind or -- or not?

A.   So as it says on the document, the client engaged Source Intelligence on December 15th to recover the referenced text messages.  So initially, when we were engaged by this client, the objective was to recover text messages that he wanted.  So it was much more of a, we'll say, tech-support-related request.

Throughout that process, while we were recovering -- or attempting to recover the text messages, we discovered that this device was not where it should be.  By the "device," I mean, the iPad referenced in the report.

So all of the mechanisms that Apple provides, as far as locating a device and kind of -- as far as locating a device, you know, it's created for, we'll say, the average person.  So with regards to standards, this -- this particular -- particular report -- this particular report was gathered more off of, we'll say, discoveries that are available to all.  They required very little forensic tools or anything along those lines.  It was more, you know,

Page  24

EXHIBIT "1", PAGE 24

Alexander Feil, 30(B)(6)
January 10, 2025

Apple provides this service for exactly this, and it doesn't necessarily take too much to understand, you know, where a specific device -- if it's out of your hands, where -- where it may be.

Does that answer the question?

Q.   I think so, sort of.

In other words, basically, this is sort of -- I mean, this is factual testimony that you found that was put out in this affidavit at least, right?

A.   Correct.

Q.   This is sort of in the nature of an open source investigation, to sources that are available to just about anybody; is that right?

A.   Yes.   If you can, can you scroll up just through --

Q.   Sure.

A.   -- so I can double-check everything.

Q.   Although not anybody, but somebody who had obviously your client's account access obviously as well, right?

A.   Correct.   Yes.   And so all of the screen shots in the descriptions that we're seeing here, all of this was obtained through, we'll say -- we'll say it was all obtained through mediums, which were

Page  25

EXHIBIT "1", PAGE 25

designed for the end user to be able to easily access.

So nothing further was done other than, you know, for example, going into settings, security, and seeing what other devices are logged in. So there was no, you know, we'll say, complex forensic tools used or subscription services. It was really, we'll say, surface-level discovery.

Q. Understood. All right. Thank you.

In -- all right. Let me ask, I guess, you are here also because -- or we have some of these documents from you because of a subpoena, right? And I guess we'll look at that.

Do you recognize this subpoena? I think I had sent it to your counsel yesterday, at least in the file name, it has "Exhibit 2" in it.

A. I do recognize --

Q. Okay. And you had a chance to review and respond to this subpoena, correct?

A. That is correct.

Q. All right. And my understanding from your counsel is that essentially -- well, not essentially -- that -- my understanding is that all the documents that are responsive to the categories that are listed in the subpoena that I'm showing on

Page 26

EXHIBIT "1", PAGE 26

the screen right now were provided; is that right?

A.    To the best of my knowledge, yes.

Q.    So to clarify, I think we had a document production that was -- and I'm just showing the last page of the main corpus of documents that we got. And it was -- this is a Bates stamp on the lower right-hand corner, and it says SOURCED_INTEL_00786.

Do you see that, where I'm indicating?

A.    I do.

Q.    I can make it larger, actually.

And that, from page 1 through page -- I'm sorry, I lost it -- 786 is what I understand to be the main production of the documents that was made from Sourced Intelligence; is that correct?

A.    To the best of my knowledge, yes.

Q.    And I think the only exception is that we got maybe five or six Excel spreadsheets that were produced some weeks -- or about a month after; is that right?

A.    That's correct.

Q.    All right.  And one of those I put as an example.

And my understanding is then there's nothing that was withheld from the production, correct?

Page  27

EXHIBIT "1", PAGE 27

A.    To the best of my knowledge, nothing was withheld.

Q.    Were you -- you're saying to the best of your knowledge.

To -- were you involved in responding to a subpoena and gathering the documents?

A.    Yes.

Q.    And so did you search for documents that were responsive to the subpoena?

A.    Yes.

Q.    And so basically, there's no other working paper or other types of notes or social media scrapes or other things other than what -- I'm sorry, I keep looking up at the screen up here.

Other than what we have in the collection that I showed you; is that right, from the Sourced Intelligence Bates stamped production?

A.    Yes.  Again, to the best of my knowledge, that is everything that we have.  We did three searches for any existing documents, and that is what we have on file.

Q.    Okay.  So in terms of -- I don't want to jump too far ahead, but, for example, it does seem that from some parts of the Sourced Intelligent [sic] report -- and by that, for the record, I mean

Page 28

EXHIBIT "1", PAGE 28

the May 20, 2022 report.

Do you understand what I mean when I say that?

A.    Yes.

Q.    Or what report I'm referring to?

A.    I do.

Q.    Okay.    There are some other -- let's see. I'm showing some things on screen, but there are some -- what seem to be, for example, some screen shots that were taken from, in this case, Paula Haygarth Facebook account, right?

And just for the record, I'm looking at page 779 of -- of the Sourced Intelligence May 2022 report.

Do you see the snip that I'm pointing to here?

A.    I do.

Q.    All right.    So it looks like from this, that although some of the Facebook posts in -- and I'm sorry, this is Hargarth (phonetic.)

I assume this is supposed to be Haygarth?

A.    Yes.    That's correct.

Q.    I assume that somebody looked at Facebook posts, but you don't have, like, a collection of, like, you know, an HTML scrape from that Facebook

Page  29

EXHIBIT "1", PAGE 29

account, right?

A.    That's correct.

Q.    Okay.   Let's -- I'm sorry, let's back up a little bit more.

In this case, have you been retained by anybody for this case?

A.    By "this case," referring to --

Q.    I'm sorry.   I mean, the case that we're sitting here for today, which is -- let me put up -- this -- this is the caption for the case.   This is the Liana Shanti Enterprises and Liana Shanti is plaintiffs against Paula Haygarth and Byron Horvath. I think it should be H-O-R-V-A-T-H, I believe.   So when I say "this case," I mean the case we're here for the deposition today.

Were you retained by anybody for this case to testify?

A.    I was not.

Q.    So to just clarify and delve into that.

So do you understand that Liana Shanti has -- that's not her legal name, to my knowledge. It's Ms. Wilson?   Do you understand that?

Do you understand her legal name is Lianne Wilson?

A.    I think I had heard that in the past, so

Page  30

EXHIBIT "1", PAGE 30

I'm not surprised.  So yes, I do understand.

Q.    So when I -- I think you're maybe more familiar with the name Liana Shanti because it comes out in the report, in the Sourced report, right?

A.    Correct.

Q.    I'll try and refer to that maybe more often, especially since that's also tied with social media accounts.  But let's see.

So you were not retained by Lianne Wilson?

A.    I was not.

Q.    Meaning, you were not retained by Liana Shanti or Liana Shanti Enterprises, correct?

A.    I was not, correct.

Q.    When you created the report -- I apologize for jumping, but -- and I'm just going to the first page of the Sourced report.

When you were retained to do this May 20, 2022 report, it was, down here, Drew and Amanda Brady who retained you for this, correct?

A.    That's correct.

Q.    Was there anybody else who retained you to create this May 20, 2022 report?

A.    Nobody else.

Q.    So the law firm for the plaintiffs, Cades Schutte, has not retained you to -- well, not to

Page  31

EXHIBIT "1", PAGE 31

create this report for sure, because the case was not filed back then.

But let me ask, did Cades Schutte retain you, or Sourced Intelligence, rather, for any other purpose for this case?

A.   No.

Q.   So you are -- and Sourced would be purely a fact witness in this case then?

A.   I'm not familiar with the term "fact witness."  If you could clarify.

Q.   Yeah.

So before you said you were hired as an expert.  So I think you have an understanding of what it means to be hired to maybe give an expert opinion.  So a fact witness is just somebody who has personal knowledge of a particular -- let's try and also drill down here into this.  Okay.

So do you understand that you have been -- Sourced Intelligence have been named -- again, this document is a final naming of witnesses filed on November 8, 2024.

Do you understand that you are named as a nonexpert witness in this document?

A.   Yes.  I understand.

Q.   Okay.  Have you seen this document before?

Page  32

EXHIBIT "1", PAGE 32

A.    Yes, I have.

Q.    All right.   And did you see it before it was sent to your counsel the other day?

A.    I don't believe so, no.

Q.    All right.   Did you ever discuss it with anybody from the Cades Schutte law firm, for example?

A.    No, I did not.

Q.    All right.   So the paragraph on the right, it says "Testimony."   This is the column that describes the testimony that the witness will -- may provide.   This just says (as read):

President, former representatives and Sourced Intelligence, LLC, may be called to testify regarding the allegations of the complaint and counterclaims, the damages and other facts relevant to the claims and defenses asserted in this action.

Do you see that paragraph that I just read?

A.    I do.

Q.    Is it your understanding that you may be called to testify as to some facts in this case at

Page  33

EXHIBIT "1", PAGE 33

trial?

A.    Yes.  That was brought to my attention.

Q.    Who brought that to your attention?

A.    Mr. Jason Hoggan.

MR. PORTNOY:  I want to warn the witness about testifying about any conversations he's had with his attorneys.  He doesn't have his attorney on this call.  He may not be aware of the attorney-client privilege.  And because of that, I move that the court ultimately strike that last answer and that the deponent be advised about any conversations of any kind between himself and any attorneys is privileged, and he has the right to refuse to answer those questions.

MR. MELCHINGER:  While I appreciate the speaking objection, I think we just asked basically whether this had been discussed, yes or no, with anybody.  And he said yes.

MR. PORTNOY:  No, that's not -- wait a minute.  That's not what he said.

MR. MELCHINGER:  He did not --

MR. PORTNOY:  Wait a minute.  Wait a minute.  Please, that's not what he said.  He said he discussed it with his attorney.  You know that that is a privileged communication.  The yes or no

Page  34

is something different.  That's not what he testified to, Glenn.

MR. MELCHINGER:  Okay.  I think I asked whether he -- I'm not going to get into a debate with you on this.  But look --

BY MR. MELCHINGER:

Q.    Mr. Feil, it is true that you have a privilege, and you do not need to disclose whatever it is that you discussed with your counsel, the substance of that.  But at any rate, if you need at some point, as we have said, to consult with your attorney about some question, you can certainly do that.  But let's try and move on here, okay.

My real objective is really to try and find out what facts you may testify about that relate in any way to this case.

And that's what we're going into today, okay?

A.    Yes.

Q.    And it's true I do not want to know whatever it is that you discussed with your counsel. But it does seem that at least you looked at this document, and there was some discussion about it with your counsel.  So we're not going to go into that.

Page 35

EXHIBIT "1", PAGE 35

Alexander Feil, 30(B)(6)
January 10, 2025

So let's --

A.    May I comment on that?

Q.    Okay.

A.    There was no discussion about this document.

Q.    And, again, I would say don't get into anything that your counsel and you talked about, okay, because then you waive that privilege.

A.    Understood.

Q.    All right.  Let's see here.  Let me ask -- all right.

So just to try and clarify this, so you -- you're not retained by anybody in relation to the case that we're here for today between Liana Shanti and my clients, correct?

A.    That is correct.

Q.    And the May 20, 2022 report that Sourced Intelligence did is something that was only through engagement with Amanda and Drew Brady, right?

A.    That is correct.

Q.    Let's see.  So let me ask also about -- I apologize for jumping around here.  I think just for the purposes of the record, I'll probably go back and do some cleanup on the exhibits here.

MR. MELCHINGER:   I think I would have

Page 36

EXHIBIT "1", PAGE 36

the -- just for the record, the deposition notice, call Exhibit 1.

(Whereupon, Deposition Exhibit 1 was marked for identification.)

BY MR. MELCHINGER:   The subpoena we'd call Exhibit 2.

(Whereupon, Deposition Exhibit 2 was marked for identification.)

MR. MELCHINGER:   And the complaint filed in the case, this is the complaint of December 6th, 2022 filed in the Fifth Circuit Court, State of Hawaii, is going to be Exhibit 3.

(Whereupon, Deposition Exhibit 3 was marked for identification.)

MR. MELCHINGER:   And then we'll go -- I think -- well, let me back up a second.

BY MR. MELCHINGER:

Q.   In terms of Exhibit 3, the complaint, did you say you had seen this before it was provided to you the other day at any point?

A.   I don't recall if I saw this particular document before it was provided to me.

Q.   Okay.   And when I'm asking you about documents, another thing, another instruction is obviously you have copies of these, as I understand

Page 37

EXHIBIT "1", PAGE 37

it.  And it's totally fine if you need to, you know, stop, take a look and look at the document and see, okay, you know, understand whether or not you actually saw the thing before.  Okay?  I can just sort of scroll through it on screen.  But I don't know if that helps.

Does that help refresh your recollection as to whether you've seen the -- this complaint before it was delivered by email from your counsel the other day?

A.   I don't remember.  I've seen, obviously, numerous documents associated with this case, but I can't definitively say whether I saw this before it was provided to me.

Q.   And when you say provided to you, it means, like, yesterday by your counsel, 'cause I sent it to your counsel, right?

A.   Correct.

Q.   Okay.  All right.  Are you familiar with the allegations in the complaint, for example, I mean -- if you take a look at it, I just want to confirm whether or not you have any understanding of what's in this complaint.

A.   I have a general understanding of what's in the complaint.  Yes.  So I have a general

Page 38

EXHIBIT "1", PAGE 38

understanding of what's in this complaint, from what I've seen.

Q. Okay. Let's see. Let me just ask also another general question.

In order to prepare for your deposition today, what did you do? I'm sorry. Not your deposition, but essentially, you know, again, I mean, the deposition of Sourced Intelligence in your capacity as representative designated for the questions in the deposition notice in Exhibit Number 1.

A. Yes. Can you rephrase the question one more time.

Q. Yeah. Sure.

I'm just trying to ask what you did to prepare for your deposition today.

A. Understood.

What I did to prepare for the deposition was I reviewed the exhibits that were provided to me. I also reviewed several times the report that was drafted by Sourced Intelligence, in addition to the signal messages that were correspondence between myself, Mr. and Mrs. Brady.

Q. And I guess let me clarify.

Were those signal messages screen shotted

Page 39

EXHIBIT "1", PAGE 39

and produced?

A.    Yes, they were.

Q.    And maybe this will be -- this may solve the mystery of one of the questions I had, actually.

Is this the start -- I'm showing on screen right now, this is SOURCED-INTEL production page 10.

Is this the start of the signal messages, or does this look like that's what that is?

A.    From the screen shot, yes, that is the beginning of what a text or, say, a signal message string looks like, I believe so, yes.

Q.    I'm just trying to clarify.  Because the documents were produced in PDF and not native, so I don't have anything to sort of indicate what necessarily this is or where it came from.  So that's why I'm asking.  But there's about -- from that page 10 through about -- I'm sorry, page 22, there are -- there's a string that goes back and forth between you, it looks like, and Malie Oriana.

That's Amanda Brady's alternative name, right?

A.    Yes.

Q.    For the court reporter, that's -- well, it's on screen, but M-A-L-I-E, first name, and then second name O-R-I-A-N-A.  Okay.  So thanks for

Page  40

EXHIBIT "1", PAGE 40

clarifying what this is.

I'm sorry, so you reviewed the exhibits, you looked over the report several times, and then you looked at the signal messages with the Bradys, you said, I think; is that right?

A.    That is correct.    And to add one more thing to that, also the email correspondence between myself and the Bradys.

Q.    Okay.    And that -- there's a lot of emails in the Sourced Intelligence document production.

I'm assuming that's -- we have that and that's what you're referring to, correct?

A.    That's correct.

Q.    Like the string that I'm jumping on screen, for example.    Okay.    All right.

All right.    That's it?

Anything else that you did to prepare for the deposition?

A.    No.    Nothing else.

Q.    So you didn't speak to any of the attorneys -- this is the first time we've met, correct?

A.    Correct.

Q.    And you didn't speak with any attorneys at Cades Schutte, the counsel for the plaintiffs,

Page 41

EXHIBIT "1", PAGE 41

correct?

A.    I did not.   Correct.

Q.    Are you -- I'm sorry, is Sourced being compensated for your testimony here today at all?

A.    We are not.

Q.    Let's see.

Related to that -- all right.   I'm looking at -- I may have -- I'll apologize for having some of these exhibits sort of not in sequential order, but it's easier just to go with the file name and the numbers that I have.   I'm going to look at exhibit -- what I'm going to put in as Exhibit 7.

(Whereupon, Deposition Exhibit 7 was marked for identification.)

BY MR. MELCHINGER:

Q.    Do you see that on the screen?

A.    I do.

Q.    Okay.   And this was also provided to opposing counsel and to you -- or rather your counsel yesterday.   So this is what?

Can you identify this for me, please?

A.    Yes.   This is a proposal that was drafted by myself and sent to -- I believe the email itself was sent to both Amanda and Drew Brady.

Q.    So this has, on the first page, looks like

Page  42

EXHIBIT "1", PAGE 42

some basic terms of engagement.  And then just going through to the end.

MR. MELCHINGER:  Just for the record, this is Sourced Intelligence production page 748 through 754.

It looks like this is -- is this DocuSigned then at the end?

A.    Yes, that's a DocuSign.

Q.    Okay.  So it looks like Amanda Brady signed for herself and/or Homecoming Studios, LLC, and you signed for the Sourced Intelligence, LLC, correct?

A.    That's correct.

Q.    All right.  And the execution of the -- on page 2 of the document, page 749 of the document production indicates 12 hours work at $350 an hour, correct?

A.    That's correct.

Q.    And AB, I'm assuming this is Amanda Brady's initials on the side approving that term, correct?

A.    Correct.

Q.    Okay.  And is this the total amount of time that was spent on the investigation for the Bradys?

Page  43

EXHIBIT "1", PAGE 43

A.    I don't recollect how much time was spent on it.  I would say, give or take, 12 hours.

Q.    So there may have been a little bit additional time at the end or it may have taken less, fair?

A.    That's fair.

Q.    All right.  Let's see.

So -- apologies.  In relation to sort of the scope, the proposal says "OSINT Investigation," right?

A.    Correct.

Q.    That's an open source intelligence investigation, as it says on the document title; is that right?

A.    That's right.

Q.    Can you describe what that is?

A.    Yes.  Open source intelligence is essentially information that's available to all.  It really spans numerous -- we'll say buckets of information, everything from social media to deep web to dark web to imagery to really anything that's available on the open internet.

Q.    Okay.  And you mentioned the dark web.

For this investigation, did you use, tour and go on dark web sites or something like that?

Page  44

EXHIBIT "1", PAGE 44

A.    We did not.

Q.    I guess the flip side of open source is things that are private or, for example, would require a subpoena or some other process to obtain; is that right?

A.    Correct.

Q.    All right.  And so this was -- this didn't involve subpoenas or anything else; this was not a -- say, part of a lawsuit where anyone was issuing subpoenas, right?

A.    That's correct.

Q.    And just in the -- basically, as set out, it's just public source information.

And that might include perhaps some -- some subscription services or things anyone could pay for; is that right?

A.    Yes.  Exactly.  Precisely.

Q.    Do you recall if there were any other -- I mean, well, let me try and clarify before I go here.

The open source stuff is, for example, public-facing profiles for social media sites like Instagram and Facebook and Reddit, correct?

A.    Correct.

Q.    All right.  And the other side of that, the -- something behind a pay wall might be what?

Page  45

EXHIBIT "1", PAGE 45

Do you recall whether you used any kind of paid subscription services for this investigation?

A.    I don't recall if we did use any paid services for this because -- because a lot of the individuals being investigated were Canadian, we did not use our standard tool sets that really apply more to the United States and its population.

I would have to look back at the report to really confirm or deny whether we possibly utilized third-party tools in order to come to the conclusions or at least gather the information that we gathered.

So my answer is I'd have to really look back at the report and hypothesize, I guess, what tools we might have used.  Typically we use multiple tools for individual queries.

My understanding from my latest recollection of reviewing the report is that we did not use any additional tool sets for what's in the actual report.

Q.    When you say, "additional tool sets," I think my original question was about paid or subscription-type tool sets, correct?

And that's what you mean?

A.    Correct.

Page 46

EXHIBIT "1", PAGE 46

Q.    Okay.

A.    Yes.

Q.    But if there's -- obviously, if there's a free website that analyzes Reddit posts or something, you may have used something like that even though it's a third-party site, correct?

A.    That's a possibility.  I cannot say that that's what we did.  My understanding of the report in the findings is that a vast majority of what we discovered was openly available.

Q.    Okay.  And let me clarify, 'cause you're saying "we."

Who else was involved on this -- or who else helped with the investigation in Sourced Intelligence within your organization?

A.    Apologies.  Yeah, correction.  I'm speaking the collective "we."  As far as your question, I was the sole author and investigator for this report.

Q.    The royal "we."  Okay.

A.    Yes, sir.

Q.    Also just generally, if you, at some point, need to take a break, we can do that.  My hope is we can go sort of the first 90 minutes, and that will be, like, noon your time, and we can take

Page  47

EXHIBIT "1", PAGE 47

a short lunch break.

Does that work?

A.    I'm amicable to everyone else's comfort. I will -- we can push, we can do whatever everybody else feels comfortable with.

Q.    Okay.  And I think you're the witness, so we're amicable to your comfort here.  So we'll -- we do have to make sure that the court reporter gets a break, however.  So we will -- we will probably stop in about another 30 minutes or something and let her take a break.  And then give you a lunch break. That's my -- what I anticipate.  But because -- because we're starting at, like, 10:30 your time, I want to make sure we don't keep you late, if possible, I'll need -- we'll need to keep the breaks short, okay.

All right.  Let's see.  Let me ask another -- there was -- in the beginning of the document production from Sourced was this that I'm showing right now.  I'll put this in as Exhibit 6.

(Whereupon, Deposition Exhibit 6 was marked for identification.)

MR. MELCHINGER:  I'm sorry, I skipped ahead.  This is Sourced Intelligence pages 1 through 9.  And this purports to be -- it looks like

Page  48

another -- it's titled "Inter-" -- well, I'm sorry, it has a -- what do we call this, sort of a watermark, a digital watermark that says "Interim Report, April 23, 2022."

BY MR. MELCHINGER:

Q.    Do you see that on the screen?

A.    I do.

Q.    All right.  And I'll just call this -- these nine pages Exhibit 6 for convenience.  But I also may call it the Buckingham report.

How -- I assume, obviously, since Sourced Intelligence produced this, that you received a copy.

Can you explain how you got a copy of this, please?

A.    Yes.  That report was sent to me via email as a PDF attachment.  I believe it was sent to me by Mr. Drew Brady.  It may be Amanda Brady, but I think it was Drew Brady.

Q.    What did you understand -- well, let me ask, did Amanda or Drew ever explain to you what this was, what this report was?

A.    We spoke over the phone about this report very briefly.  They had just advised me that they had a previous investigative firm that had looked

Page 49

EXHIBIT "1", PAGE 49

into this matter prior to us.  And that was the extent of the description.

Q.    Your understanding is that -- or is it, that Buckingham is licensed in Cal- -- in Canada?

A.    I have no idea who Buckingham is.  I have not researched them.  I have not looked into them.  This is the extent of my knowledge of their existence.

Q.    Your firm is not licensed as a private investigator in any capacity in Canada; is that right?

A.    That's correct.

Q.    Did Amanda and Drew Brady explain -- and I'll do this sort of with reference to the larger document production that was made to us.  I have a file somewhere.  Hang on.  There we go.

There were, in the Sourced Intelligence document production, a lot of various screen shots and things that were produced.  I just want to get a general understanding of what these are or where they came from.

But my question is, do you know whether or not the screen shots that Drew Brady sent to you, such as the ones that I'm showing you right now, some of which just seem to be photographs of a

Page  50

EXHIBIT "1", PAGE 50

computer screen, some of which seem to be digitally captured somehow.

Is it your understanding that these same files were given to the Buckingham firm?

A.   I would not know that -- the answer to that question.

Q.   That's fair.

Okay.   Let's go back to exhibit -- what I'm going to call Exhibit 6, the Buckingham report.

How -- or let me just ask, you had a chance, obviously, to review the Buckingham report, right?

A.   I had a chance to -- I had a chance to review it.   I did have a chance, yes.

Q.   And -- well, did you review it before you started your own investigation at Sourced?

A.   No.   The body of the report, I -- to my knowledge, I scrolled through it very quickly.   I can provide a little bit of context to that.   The only page that I referred to throughout the investigation, just to kind of reorient the family tree, if you will, was the link analysis chart, which is, I believe, the last page of the report.

Q.   This one here, correct?

The one I'm showing you; is that correct?

Page 51

EXHIBIT "1", PAGE 51

A.    That's correct.   The link analysis.

Q.    And so this is Sourced Intelligence page 9, for the record, and it's page 9 of the Buckingham report that is Exhibit 6.   Okay.

So this was -- this -- I'm sorry, you're calling this the link analysis chart; is that right?

A.    That's right.

Q.    Okay.   This link analysis chart on page 9 of the Buckingham report, that's the main thing that you were looking at, correct?

A.    Correct.   I referred back to it, yes.

Q.    All right.   So before I sort of leave the area of OSINT, O-S-I-N-T, the open source intelligence questions that we were talking about, OSINT, is referenced at the top of page, Exhibit 7, are there any specific tools that you do remember using for your investigation?

A.    I don't remember using any specific tools for the investigation as it pertains to the report itself.   However, we did use a tool called PastePixel, which is in the exhibits.   That is one tool that I am aware that we used.

Q.    Can you explain about PastePixel then, please?

What does that tool do?

Page  52

EXHIBIT "1", PAGE 52

A.    Of course.    So PastePixel is a tool that allows you to generate a link or a URL.    You can then put that URL into any medium that you would like that accepts it.    It could be an email, it could be a text message, it could be a social media post.    Whatever it is.    When the user clicks on it, it allows you -- and this is the same marketing methods that Google uses and, you know, most corporations -- when the individual clicks on it, you're able to see specific information with regards to their IP address and what we call the user agent string, as well as the time and date on which that link was clicked.

Q.    And so you used this tool for the investigation how?

A.    Yes.    So from my recollection, again, this case was several years back, we were asked to -- and I believe it's referenced also in the email, or it might be in the signal messages.    Again, I'll have to look back.    But the request was that the clients, Amanda Brady and Drew Brady, believed that, I believe Mr. Byron Horvath could have been traveling from Canada into the United States.    Based on the -- my understanding of recent events that had taken place, Amanda and Brady seemed to be fearful of

Page  53

EXHIBIT "1", PAGE 53

something, and they wanted to know what or where -- excuse me, they wanted to know where he was at that time. And that was the context in which it first came about.

We also sent links to other members of the -- we'll say other participants or -- yeah. We'll say participants of this investigation as well. But specifically, that was the initial context in which it was used.

Q. Let me -- let me clarify then. So it's not -- was it Sourced that sent the emails?

Did you send emails to Mr. Horvath?

A. I don't recall how they were -- let me rephrase that.

I don't recall the full extent of the different emails that were sent out. What I do recall was that we were put in touch with Mrs. Winter. Again, I'd have to refer to which Winter. I believe her name was Elise Winter. No. Excuse me. Haley, I think it was Haley Winter. We were put in contact or put in touch with her, the Bradys facilitated that communication, and she gave us permission to utilize her account to draft the email, and she sent the email from her -- from her inbox.

Page 54

EXHIBIT "1", PAGE 54

Now, I was not privy to the confirmation of the sending, so I am not 100 percent sure or aware of what was in that email after we -- after I provided her with the initial guidance.  But from my understanding and my recollection is that she was the sender of those emails.

Q.   And I'm sorry, because it may get lost in references to Amanda and Haley.

You mean Haley Winter was the one who sent the emails; is that right?

A.   I believe it was Haley, yes.

Q.   She sent them to Byron Horvath; is that right?

A.   From my understanding, that was -- that was our understanding, that was our mutual understanding, yes.

Q.   All right.  So just talk to me a little bit more about the PastePixel.  It has a URL in it, you say, and you paste it into an email; is that right?

A.   That's correct.

Q.   And that -- so you provide to Haley Winter the PastePixel.  What is it?  Is it a digital file that you embed in an email?

How does that work?

Page 55

EXHIBIT "1", PAGE 55

A.    From my understanding, it's a link.   When the user clicks on that link, that's what provides us with the information.

Q.    And so you provided a link to Haley Winter somehow; is that right?

A.    Again, I would have to look back to see if it was an actual URL or what they call a pixel.  We don't have -- I don't have those emails on record, so I cannot definitively say whether it was a URL or what they call a pixel.

Q.    Right.

If it were just a pixel, I mean, is this something that works automatically, as in when the recipient opens the email, that email client of the recipient goes to pull the pixel image from somewhere?

Is that how that works?

A.    Can you rephrase the question for me?

Q.    Well, I'm asking you about the technology that you used.  I mean, start with something else.

You have -- if it were a URL, if nobody clicked on it, then you learn nothing, right?

A.    That's correct.

Q.    What do you mean when you say it could have been a pixel?

Page  56

EXHIBIT "1", PAGE 56

A.    So there's another -- or another technique where you can get a pixel, which is really like the definition of a pixel.  It's a small, we'll say, transparent character within the email, and the purpose of this pixel is that when the recipient receives the email and they open it, it will tell you the general IP address of where they opened it and, again, the user agent string of the device that opened it.

Q.    All right.  And that occurs whether they -- the end user recipient clicks on it or not; is that right?

A.    That's correct.

Q.    So it might be what I was trying to describe where you put the pixel in, it's an image, and then, in this case, Byron's email client goes to pull the image down from somewhere, and that ping to the image server, whatever it is -- I'm calling it an image, but you called it a transparent character or something like that -- that provides the information, the IP address and the -- you're saying what is this, the user agent string; is that right?

A.    Partially.  There's several different platforms and techniques to do this, to gather this information.  Again, I would to have look back.  You

Page  57

EXHIBIT "1", PAGE 57

know, PastePixel -- again, this was years ago, so PastePixel has changed a lot of things.  Things have changed since then.  The platform has changed.

So, again, with regards to exactly how that information was extracted, I don't know if it was -- I don't believe it was an image.  I don't think it was an image.  But like you said, it could have been a transparent pixel or a URL.

Q.    At any rate, it's something that the recipient of the email would not see in the body of the email, right?

A.    If it was a URL, they would see the URL in the email.

Q.    We're talking about the pixel now, right?

A.    Correct.  The recipient would not be able to visibly see the pixel, depending on how it was situated in the email.

Q.    So essentially, you had Haley Winter send sort of an invisible pixel to Byron to try and ascertain his IP address, among other things; is that right?

A.    No.  Again, I can't recall whether it was a pixel, whether it was an image or whether it was a URL.  So I can't definitively say that -- I think you used the word -- I don't recall which word it

Page 58

EXHIBIT "1", PAGE 58

was, but I can't definitively say if it was a transparent pixel, a URL or an image.

Q.    Do you recall whether you ever got confirmation of Byron Horvath's IP address through this technique?

I'm sorry, we spoke over each other at the end.  Let me ask again.

Do you recall whether you obtained any IP address for Byron Horvath through this technique.

A.    I believe we did.  We sent two separate emails to Mr. Horvath.  I don't know if one or both were opened.  But yes, I do recall one of them was at least opened.

Q.    When you say "we sent," you mean -- you mean Haley Winter sent?

A.    Correct.

Q.    With your help, right?

A.    Correct.

Q.    Do you recall what the IP address verification -- what that was or where it was?

A.    I don't recall.  I do recall where it was. I believe, from recollection, it was from Moose Jaw -- I'm not familiar with the area, Moose Jaw is Saskatchewan, Canada.

Q.    Do you have any other sort of recollection

Page 59

EXHIBIT "1", PAGE 59

about any other -- I think we're calling them tools, tools or techniques that you used for this investigation, specific tools?

A.    I don't have any other recollection of using any other tools from my knowledge at the moment.

Q.    And let's just go back quickly to Exhibit 7 on the screen.   In this case, or, you know -- I should be more specific.

In your engagement for Amanda and Drew Brady, you understand that the purpose of this investigation was what's stated in bold in this paragraph on the bottom of the first page of Exhibit 7, basically, that you're trying to provide an assessment or -- of likely attribution to known or unknown suspects; is that right?

A.    Correct.

Q.    And then it says -- deliverable was (as read):

Source will provide a written report or all findings, analysis, provide recommendations.

Right?

A.    Correct.

Q.    And that report is -- that's sort of

Page 60

EXHIBIT "1", PAGE 60

Alexander Feil, 30(B)(6)
January 10, 2025

referenced here is the deliverable, that's the May 20, 2022 report that you sent to Amanda and Drew Brady, correct?

A.   That's correct.

Q.   And you understand that a copy of that was produced in this a lawsuit by the plaintiffs, right?

A.   I do.

Q.   Okay.  I'm sorry, you understand the word "produced," I assume, meaning, like, lawyerese for deliver or provide, right?

A.   Yes.

Q.   Okay.  Let's try to find -- here we are.  So I'm looking again now at Exhibit 5, which is the final naming of witnesses.

             (Whereupon, Deposition Exhibit 5
             was marked for identification.)

BY MR. MELCHINGER:

Q.   And what I want to understand, whether we reference this document or not, I want to understand sort of what's in the right-side column here and what you would testify to at trial related to the facts in this case.  Okay.

             So let me -- let's see.  Let me try and ask a couple questions.

             Is it your understanding you might testify

Page 61

EXHIBIT "1", PAGE 61

Alexander Feil, 30(B)(6)
January 10, 2025

about damages in this case?

A.    Yes.

Q.    You might.  Okay.

What -- what would be your testimony related to damages in this case?

A.    Apologies, I don't think I understood the question when you asked the first time.

Q.    Okay.  I'm trying to -- again, I'm backing up.  I'm trying to figure out the scope of facts that you would testify to, meaning what you have personal knowledge about relating to, again, this case, which is the Liana Shanti versus my clients' case ending in Hawaii court, okay?

Does that make sense?

A.    (Nods head.)

Q.    I'm trying to get that.  And what plaintiffs say, at least in this document, is -- and I don't know whether -- again, and I don't want to know what you discussed with your attorneys, but I want to know what -- this is a general description of what type of testimony anybody may offer.  Sometimes, for example, like the one below, it just says you might testify about liability and damages.  It's very vague.  So what I need to do is try and get an understanding to -- of what you will say in

Page 62

EXHIBIT "1", PAGE 62

this case about anything.

MR. PORTNOY:    Let me interpose an objection here.    This witness --

MR. MELCHINGER:    There's not even a question pending, though, so okay.

MR. PORTNOY:    Yes.    There is a question, about what he's going to testify about.

May I make my objection, please?

MR. MELCHINGER:    Sure.

MR. PORTNOY:    Okay.    Thank you.

My objection is, is this witness has no idea the questions that we intend to ask him, so to ask him to speculate as to what he's going to testify to calls for nothing more than speculation, and that's my objection.

MR. MELCHINGER:    Okay.    You can do that without making speaking objection, Counsel, thanks.

MR. PORTNOY:    No, I can't because your question leads to the objection that I made.

MR. MELCHINGER:    Objection, calls for speculation.    That would do it.

BY MR. MELCHINGER:

Q.    Okay.

MR. PORTNOY:    Thanks for the instruction.

MR. MELCHINGER:    Yeah.

Page 63

EXHIBIT "1", PAGE 63

BY MR. MELCHINGER:

Q.    Let me try and ask something else that is not objectionable here before we go off the record.

Let's see.  And, again, I was trying to start with something where I didn't expect you would have much information based on what you've testified to so far in your level of involvement, which is damages.

Would you be testifying about the plaintiffs' damages or the defendants' damages alleged in this case, to your knowledge?

A.    I think any reference to the -- to the testimony, I would say would be speculation.  I have no idea what I would be testifying for with regards to damages or other facts.

Q.    Okay.  You have no -- all right.  Let's ask for something more specific, then.

You're saying -- well, do you have any information about the harm that plaintiffs have suffered, allegedly?

A.    No, I do not.

Q.    Do you have any evidence of -- or testimony to offer about the harm that plaintiffs have suffered?

A.    No, I do not.

Page 64

EXHIBIT "1", PAGE 64

Q.    Do you have any evidence of -- or testimony about the harm that defendants have alleged in their counterclaim?

A.    I do not.

Q.    All right.  So -- all right.  Do you have any testimony about any alleged monetary losses to either the plaintiffs or the defendants have suffered in this case?

A.    I do not.

Q.    All right.  And that's what I mean by "damages."  You're saying you're speculating, but it doesn't sound like you have information about damages.  Maybe I just wasn't clear enough about what damages might mean.

All right.  So I'll try and ask more specific questions.  Let's see.

Let me ask, in terms of your investigation for Drew and Amanda Brady, and what you did in your report, were you ever asked as part of that investigation to look into sort of the truth or falsity of the specific social media posts or what was being said in those posts?

A.    No.  The context of what's being said in those posts was not really -- I mean, contextually, it's part of the overall investigation, but that was

Page 65

EXHIBIT "1", PAGE 65

not what was being asked of us.  So we did not specifically review the context or the statements that are being made.

Q.    And basically those -- you were looking for posts of a certain type or a certain nature, but you weren't looking underneath to see whether those statements were true or false; is that a fair statement?

A.    That is a fair statement.

Q.    All right.  All right.  Let's see.  It's been about an hour and a half, so I think I want to give the court reporter a break.

Can we go off the record?

(Whereupon, a recess was taken from 9:59 a.m. to 10:14 a.m.)

MR. MELCHINGER:  Back on the record.

BY MR. MELCHINGER:

Q.    Mr. Feil, obviously, you're still under oath.  So we'll get back into it here.  Thanks for agreeing to a shorter break.  Again, if you need to break at some point, obviously, let us know.

So I'll just ask, in terms of -- let me jump around a little bit.  I'm trying to make sure we can try and shorten this.

In terms of the documents that were

Page  66

EXHIBIT "1", PAGE 66

produced pursuant to the subpoena, were there any kind of -- from Sourced Intelligence's internal guidance or methodology, papers on your methodology for doing this kind of investigation or any kind of framework that you follow or anything like that that you referenced to prepare the May 20, 2022 report?

A.    Nothing that was specifically mentioned in the report, no.

Q.    Now, that's -- but my question is whether you looked at it, anything else like that to prepare the report.

Is there anything like that that exists at Sourced Intelligence?

A.    There's not.

Q.    All right.    There's no, say, written methodology for an attribution investigation, we you do this, like checklist or something like that?

A.    There have been authors who have published workflows when it comes to attribution or online investigations.    I've read these documents and these publications in the past, but for this particular report, we did not either reference nor directly utilize those workflows verbatim when it comes to the preparation of this specific report.

Q.    When you mention -- I think you said

Page  67

EXHIBIT "1", PAGE 67

authors or somebody who has published that kind of thing, can you give a, for instance, like, some kind of an example or --

A.    Sure.   Yeah.   There's a gentleman named Michael Bazzell, I believe his last name is B-A-Z-Z-E-L.   He has published numerous books since -- I think it was the mid 2000s, all of which are about online investigations, specifically open source intelligence and online privacy.

Q.    And I'm sorry, was that B-A-Z-Z-E-L, was it?

A.    B-A- -- I'm looking at my book right here. B-A-Z-Z-E-L-L.

Q.    Okay.   Okay.   Thank you.

All right.   Well, you're a digital investigator with a hard copy book on your shelf?

A.    Many hard copy books, yes, sir.

Q.    Okay.   All right.   You didn't reference those for this investigation?

A.    Directly, no.

Q.    When you say, "directly, no," you mean you referenced them indirectly?

Can you explain that answer?

A.    Of course.   Yeah.   When you say -- I guess the question would be, when you say "reference,"

Page 68

EXHIBIT "1", PAGE 68

meaning on paper or kind of just in the back of our minds using the methodology to approach the investigation or specifically the word "reference"?

Q.    You didn't look at it physically and say oh, here's what I should do next, or plan out based on whatever that book was, for example?

A.    No, I did not.

Q.    All right.  So it's fair to say you used a methodology that you had in your head or something like that?

A.    From experience, yes.

Q.    Okay.

A.    I believe.

Q.    I asked this, but just to make sure, before today, have you spoken to anybody from the Cades Schutte law firm about this case?

A.    I have not.

Q.    Have you spoken to anybody from the Cades Schutte law firm ever?

A.    Not that I'm aware of.  I would have to check back to see, but no, not that I am aware of.

Q.    All right.  Let's see.

Let me ask, I guess, do you have any personal knowledge about Paula Haygarth?

A.    I do not.

Page  69

EXHIBIT "1", PAGE 69

Q.    Do you have any personal knowledge about Byron Horvath?

A.    I do not.

Q.    Sorry, I got to turn my -- turn share on here again, sorry.

Hopefully, my screen is displaying for you and you can see it, if not, let me know.

So I just want to ask a little more about what I'm calling Exhibit 6, the Buckingham report.

When you -- when you reviewed this or skimmed through, as you said, did you note the investigative findings on page 8?

A.    I did not.

Q.    Okay.  Did you -- so you didn't note that it said this investigation is considered inconclusive at this point?

A.    I don't recall reading that, no.

Q.    I guess you said the main thing you looked at was this chart, the sort of association chart on page 9, right?

A.    Correct.

Q.    And I'm just trying to understand, because you had a copy of this report from your clients, did you rely on it at all otherwise -- other than this chart, did you rely on it at all in doing your

Page 70

EXHIBIT "1", PAGE 70

investigation?

A.    Other than this chart, we did not rely on it at all in doing the investigation.

Q.    So your -- the Sourced report from May 20, 2022 is not based on the Buckingham report, per se, other than what you just said, right?

A.    That's correct.

Q.    Can you describe how you used this association chart?

Were these, for example, just as leads or something?

A.    Of course.  Yeah.  From the -- from the initial description of the case, obviously, there were many individuals involved, and their relationships were all, you know, a complex overlapped dynamic.  So really we use this as really a reference point just to understand who is who.

Q.    For example, did you investigate -- I don't know how many people there are on this association chart on this page 9 of Exhibit 6, but did you investigate all of them in any way?

A.    We did not investigate all of them.  Very small portion of them.

Q.    Is there anything else that I'm missing here about how you used the Buckingham report in

Page  71

EXHIBIT "1", PAGE 71

Exhibit 6 in either doing your investigation or creating the Sourced report?

Is there something else that we haven't talked about?

A.    Not that I'm aware of.

Q.    All right.  Let's -- let's go to see if I have it open here.  Okay.  So we'll look at what we're going to mark as Exhibit 9.  Again, these may be not in consecutive numbers, so I apologize if there's confusion later, but ...

(Whereupon, Deposition Exhibit 9 was marked for identification.)

BY MR. MELCHINGER:

Q.    This is a 32-page PDF document with a Bates stamps numbers from the bottom of SOURCED_INTEL_755 through 786.  And you have a copy of this that was sent to you if you need to reference it.

This is the final report that was generated for Drew and Amanda Brady; is that right?

A.    This was the report that was sent to Drew and Amanda Brady.

Q.    It was sent to them.  I guess I asked whether it was generated.

Is this the report you authored?

Page  72

EXHIBIT "1", PAGE 72

A.    Correct, I authored it.

Q.    It sounds, I think, from what you testified to, you were the sole person doing this investigation, right?

A.    Correct.

Q.    Let's talk about, just generally, how did you go about starting the investigation that led to this report?

What did you do generally?

A.    So after initial contact with the client, we had several phone calls with them to better understand what was going on.  Our task was, as it's specifically laid out in the -- in this report was to attempt to identify the actors behind some of these -- we'll call them harassing social media accounts.  So our methodology after interviewing the client is first step because we don't want to miss anything, and we don't want to enter the investigation with any bias -- we'll say bias investigative opinions by not looking at certain things or by looking at certain things.

So initially, our first step was to go out on the internet and look for conversations or groups or commentary that reference, in this case, the clients or Liana Shanti or, you know, the -- we'll

Page  73

EXHIBIT "1", PAGE 73

say the categorical individuals that are involved in this case.

Q.    When you say, "categorical individuals involved in this case," do you mean -- by "this case," the investigation for Drew and Amanda Brady?

A.    That's correct, yes.

Q.    All right.  So you're not talking about the lawsuit that is why we're sitting here today, correct?

A.    That's correct.

Q.    And just to try to clarify a little bit more, I think, you know, the categorical individuals involved in the -- can I just call it the Brady investigation or something else that you -- you provide?  You can tell me so we can clarify this case versus the investigation in 2022.

Is that okay to call it, say, the Brady investigation?

A.    Yes, please.

Q.    All right.  So for the Brady investigation that you were doing to create the Sourced report that we're talking about, when you say categorical individuals involved, I'm sorry, what does that mean?

A.    Yeah.  Categorical wasn't the right word.

Page  74

EXHIBIT "1", PAGE 74

I think really looking for any reference to, you know, Drew Brady, Amanda Brady, Liana Shanti, Elise Winter, really all these individuals who were -- who were -- the names were shared by Amanda and Drew Brady with us.  So we're looking for all things that are -- I guess categorically would be the correct word, categorically referencing, you know, the cult or, you know, kind of harassing, thematic harassing content that we found online that's pertinent to the Brady report or the Brady case, but really what I mean by that is all the individuals that were really the ones that are referenced in this specific report.  So Elise Winter, Byron Horvath, Shannon Glas, and Paula Haygarth.

Q.    I'm just trying to get those down.  So Elise Winter, Shannon Glas.  That's G-L-A-S, I think, with one S; is that right?

A.    I believe so.

Q.    And then Paula Haygarth, and I'm sorry, anybody else?

A.    Really anyone who is referenced in the report.  Our primary focus was Paula Haygarth and Byron Horvath.  Everyone else I would say was on the periphery and was kind of discovered or -- either discovered by us, meaning the accounts, or the

Page  75

EXHIBIT "1", PAGE 75

client, you know, provided some information as far as their potential involvement in this incident, or we'll say this -- this harassment, alleged harassment.

Q. Yeah. You're saying -- and I appreciate that. You're saying "alleged harassment."

I mean, you testified before that you were not involved in looking at the substance and whether or not this was actually, you know, defamatory or harassing or whether the statements were false, correct?

A. That's correct.

Q. So while we can call it harassment or convenience or efficiency, maybe 'cause that's what it says in the report, you know, know whether or not it was actually harassment or -- or something else, right?

A. Based on the content that was reviewed, I would characterize it as harassment, but as far as the veracity of the accusations that were being made, I would have no -- no idea of the veracity of that.

Q. You noted you focused on Elise Winter, Shannon Glas, Paula Haygarth and perhaps most on Paula and Byron.

Page 76

EXHIBIT "1", PAGE 76

Alexander Feil, 30(B)(6)
January 10, 2025

Why did you focus on them?

A.     We focus specifically on Paula Haygarth and Byron, more -- more focus was on Paula Haygarth because the client -- the client in all cases I would argue, in most cases, has the most insight into kind of what's going on and the dynamics of all of that.  So she instructed us and asked us to look specifically into Paula Haygarth and Byron Horvath.

Q.     Again, when you say "us," the royal us, right?

A.     Our company, yes.  Me, yes.

Q.     Okay.  Okay.  And I appreciate that. 'Cause you're right, it is a corporate deposition.

Let's -- let's just look a little bit at -- or think a little bit about how you went about the investigation.

So you went out on to the internet, and you're looking at what in particular?

Do you recall?

A.     Typically when we get -- when we get cases like this, referring to the Brady report, we'll call it an attribution investigation, again, we try not to bias ourselves or kind of look through a funnel. We want to see the bigger picture.

So initially, I believe -- and, again,

Page  77

this was several years back, and we've done thousands of investigations since then. I believe the first step, which it typically is, is really understanding what the -- we'll say the digital terrain looks like. So we typically say, you know, who's talking, what are they talking about and where are they talking. And that's usually the first kind of phase of the investigation to best understand where to look for these individuals.

Q. So specifically, did Amanda and Drew Brady have you or ask you to focus on any particular digital terrain, as you say?

A. Yes. So they did provide us with, we'll call them leads, hey, take a look at this, hey, take a look at that, which we did in addition to our own, we'll say, were our own leads that we discovered took us, so yes.

Q. Anything else that you did to investigate? Did you conduct interviews, for example, other than on the client?

A. We did not.

Q. If this was roughly 12 hours, was that a long or short time to have for this kind of investigation?

A. For this kind of investigation, I would

Page 78

EXHIBIT "1", PAGE 78

say it is -- it's a short time.

Q.    Let me -- I'm showing you -- sorry, this is page 3 of the -- I guess we're going to call it the Sourced report or the report rather than continuing to say the May 20 report.

But this page contains your summary of the findings; is that correct?

A.    That's correct.

Q.    I'm sorry, they did go on in the next couple pages, so not only that page, but page 4 and 5 of the report also have further -- further summary, correct?

A.    Correct.

Q.    All right.   And this -- on page 5 of the report, there is -- I think we've been calling it sort of an association diagram.

This is a diagram that you created; is that right?

A.    That's correct.

Q.    And did you base this diagram on page 5 of the report with anything from the diagram -- and I'm switching to Exhibit 6 here, page 9, anything in this other association chart from the Buckingham report?

A.    No, we did not.

Page 79

EXHIBIT "1", PAGE 79

Q.    All right.  So this association chart at page 5 of your report is just based on your own investigation into what in particular?

A.    This particular chart is based on our investigation into several platforms, to include Reddit, the social media platform, Instagram, as well as it looks like, as per the report, a blog called Digital Skeleton, and another -- a website, rather, and then a blog called -- I believe it says Their Cult Education Forum.  Let me correct that, not a blog, but a forum.

So the -- the individuals that we identified operating on those social media platforms, this particular chart says who they are and when the account was either created and other small details with regards to their involvement in this chart.

Q.    And can you explain -- well, let's go back up to the top, I guess, for starters here, actually.

On page 3, there's a couple bullet points at the top that I'm looking at.  And the first one says, just as to scope, on April 28, 2022, Sourced was contacted by the client to do the attribution investigation about online accounts in case harassing behavior and threatening communications,

Page  80

EXHIBIT "1", PAGE 80

right?

You see that point?

A.    I do.

Q.    I'm paraphrasing.  Then there is a bolded summary paragraph and following paragraph.  So -- and that one, I have -- it basically says you have a high degree of confidence.  Not basically, but this is a quote (as read):

You have a high degree of confidence that Paula Haygarth plays a primary role in this harassment campaign.

Right?

A.    Correct.

Q.    And so let me ask, this high degree of confidence, what does that mean?

A.    High degree of confidence, it means -- it means exactly that.  A high degree of confidence.  Not specifically citing any, you know, intelligence documents from the intelligence community, but more specifically, I guess, the word in the vernacular, high degree of confidence meaning exactly that, we had a high degree of confidence, we didn't have a low degree or medium degree of confidence, but it was high.  It was not 100 percent.  It never is.  We

Page 81

EXHIBIT "1", PAGE 81

don't use the value 100 percent in our -- especially in -- well, we don't use that in reporting, 100 percent.  So high degree of confidence would mean exactly that.  We had a high degree of confidence.

Q.    Okay.  Can you put a percentage on it?

A.    Typically, high degree, no.  There's no standards that define the high degree of confidence, but if I were to answer -- in answering your question of what -- if I were to assign a percentage to a high degree of confidence, it would fall between 80 and probably 95 percent.

Q.    You have a specific number -- well, it's a range of 15 percent.

Do you have a specific number related to this --

A.    I do not.

Q.    -- particular report?

All right.  So it's kind of -- it's -- as you say, it's not 100 percent, right?

A.    Correct.  It is not 100 percent.

Q.    And does -- well, I guess my question is also, high degree of confidence, they're in the attributes related to that that you consider that put it into that category such as, you know, the

Page  82

EXHIBIT "1", PAGE 82

sources are verified, you have intel from known and verified accounts or other specific types of -- you know, nodes of information, like IP addresses or any other type of thing that leads you to the high degree of confidence versus a medium degree of confidence.

Is there some kind of breakdown of what constitutes or gets you into that category that you have?

A.    No.    There's no breakdown of what constitutes or, you know, puts us in that high degree of confidence category.    You know, if we went out and based on the client's requests and searched for what they asked us to look for, and we found no evidence that there was connected, I would say we have no confidence or low degree of confidence.    In this case, we found -- as evidenced in the report, we found several indicators that increased the confidence level to that high degree.

Q.    And let's -- we'll come back to that in -- in a minute.    I guess another question before we move to that is, plays a primary role, there's language in the second bullet point about that.

What does that mean, or what did you mean when you wrote that?

Page 83

EXHIBIT "1", PAGE 83

A.    Understood.

When we wrote that, it appeared, based off of the findings in the report, that the -- the findings suggested that Paula Haygarth was behind -- may have been behind some of the posts in the commentary -- or I'd say the likelihood that she was behind the posts in the commentary was higher than the other individuals referenced in the case.  And that the -- a majority of the harassment that -- or, again, the air quotes, harassment that we reviewed indicates that Paula Haygarth, from our understanding, was likely behind that.

Q.    Is there specific -- well, is there a specific role that you understand that Paula Haygarth had based on your review in your investigation?

A.    I don't know what role she would have had other than, you know, the posts that we were able to review contained -- we'll say, contained information that suggested more so that it was her than any other person that was referenced in the case.

Q.    And then when you say, "any other person referenced in the case," is that -- that just means what?

The people who Amanda and Drew Brady

Page  84

EXHIBIT "1", PAGE 84

indicated to you?

A.   Yes.   Anybody -- well, no, not exactly. Anybody who is really listed in this report to include Elise Winter, Byron Horvath, Shannon Glas, all the names that are listed in the report.

Q.   So some of these names in the report did not come from your clients; is that right?

A.   From my understanding, yes.   In this particular bullet point, this summary, no.   Those were all provided by the client.   But further down in the report, there are individuals who were not provided by the client.

Q.   But I guess my question then about sort of primary role is whether that means you were able to attribute -- well, let me ask something more specific.

Do you have information that puts Paula Haygarth behind a keyboard on any given post that you looked at?

A.   By "information," meaning findings in the report or --

Q.   No.   I mean anything in your investigation and anything that you put in the report, all of -- I assume -- well, let me back up.

So what's in the report is stuff that you

Page 85

EXHIBIT "1", PAGE 85

looked at in your investigation, right?

A.    Correct.

Q.    So when I ask for any kind of information that you found, is there anything that puts Paula Haygarth behind the keyboard for any given post that you investigated or looked at?

A.    I wouldn't feel comfortable stating the words behind the keyboard just because of the nature of open source intelligence.  However, as referenced in the report, there were specific -- there were specific, we'll say, posts and activity that Paula Haygarth -- that we were able to identify from Paula Haygarth that correlated in some ways with this campaign.  We'll call it this harassment.

Q.    So you have correlation.  What I'm asking is, do you have identification or attribution to Paula Haygarth?

Did she make any given post that you investigated?

A.    I think if you're asking me, like, definitively is Paula Haygarth behind these posts, yes or no, I cannot say that with certainty.

Q.    All right.  So no, you can't say that it was her for any of these given posts; is that right?

A.    No.   Nature of any online attribution

Page  86

EXHIBIT "1", PAGE 86

investigation, typically, we'd take this information, this is then provided to attorneys or law enforcement, subpoenas are issued and, you know, the truth is eventually discovered through other means.

Q.   So -- and that brings me to, I guess, a related question.  So you wrote in an email to the Bradys later on, on May 20 or so, that you felt strongly -- we can look at the email if you want.

But you felt strongly that you had enough to go to LE or legal, right?

A.   That's correct.

Q.   By "LE," you mean what you just said is law enforcement, right?

A.   That's correct.

Q.   And I'm sorry, it's actually -- I'll put this in as another exhibit to be numbered.  But this is your email to -- you wrote Malie here, but that's Amanda, right?

Or I'm sorry, Malie in Hawaii, I keep saying that it's Miley, it's Malie and Drew, correct?

A.   Correct.

Q.   And this says, you know, also -- let's see.

Page 87

EXHIBIT "1", PAGE 87

In the second sentence (as read):

As discussed, I strongly believe that the evidence you have now is strong enough to present to LE and legal.

Right?

A.    Correct.

Q.    And I understand this -- correct me if I'm wrong -- is basically the report that you prepared is, you know, leads or law enforcement and legal to, like, take and do something with; is that right?

A.    Yes.  That's correct.  There's typically two use cases for our reports.  One would be what you just stated, law enforcement and/or legal, and the second is just for informational purposes for the consumer, the end client.

Q.    Let me go back to sort of more where we were here.  But let me just try and clarify.

You have sort of -- as I understand it, a correlation between things that you looked at related to Paula Haygarth and the, again, air quotes, harassing posts that you looked at, right?

A.    Yes.

Q.    And from that, you say that Paula Haygarth has a primary role or you had a high degree of

Page 88

EXHIBIT "1", PAGE 88

confidence that she played a primary role, right?

A.    Yes.

Q.    And I'm just trying to ask, so, is there a specific role that you identified for her based on your review?

And if so, what is it?

A.    A specific role?  No.  I don't think I could -- I could provide a word that defines her any specific role.  I would say the content that we reviewed not necessary -- I mean, there was content provided for us, to us, rather, from the Brady -- from the Bradys that was content that we found by our own investigation.

So based on what was provided, what we reviewed and what was analyzed, we assessed that Paula Haygarth did play -- when I say "primary role," I mean, based on what we saw, she may have been responsible for a majority of what we saw.  And I'm not saying that we saw everything.  I don't know what we did not see.  But based on what we did see, she seemed to be playing a primary role, meaning if she was removed from the scenario -- let me correct that.

Yes, so we believed that she played a primary role in the harassing messages that we were

Page 89

EXHIBIT "1", PAGE 89

able to discover and/or reviewed.

Q.    My understanding now of what you mean by primary role is more in terms of the -- like, the quantity of involvement, and it doesn't mean you have a specific understanding from the investigation that you did of precisely what she allegedly did; is that right?

A.    If I can ask you, when you say, "what she allegedly did," do you mean in regards to her online activity of prior to --

Q.    No.  It's an attribution investigation, right?

I mean, you're trying to connect her to posts, right?

A.    Correct.

Q.    And so mainly -- I think what you were saying is -- and I'm trying to understand what "primary" means in this context.

It's -- I mean -- it sounds like you're saying she was involved with, in your words, I think a majority of what you saw.

So this is sort of a quantitative assessment; is that right?

A.    Yes.  Given the time allotted to us, which was, you know, 12 hours, yes, she was responsible

Page  90

EXHIBIT "1", PAGE 90

for a -- I don't want to say she was responsible. Correct that. Based on our analysis, she may have been responsible for a majority of what we were able to review in the time that was given to us.

Q. Well, let's ask, I guess.

If you had, you know, no budget or an infinite budget or something, or you had an ideal -- in an ideal world and could you do other things to investigate, what else would you have done to try and follow up and confirm your conclusion in your -- about what Paula Haygarth's involvement was?

A. Per their investigation, so more of what we did, again, 12 hours as referenced prior, is a small amount of time to perform an attribution investigation. To speculate, if we did have more time, we would have done more of what we had already been doing. I can't particularly say, like, other methods we would employ because the findings in a report would dictate next steps.

I think the next step, if we had more time, would have been the following two steps. One, as mentioned, additional investigation, and second would be working, facilitating and working with the client to take this report, officialize it and have that provided to either their representatives from a

Page 91

EXHIBIT "1", PAGE 91

legal standpoint or, you know, at the client's will, if they wanted to file a police report and share it with law enforcement.  Steps beyond that would be pure speculation.

Q.    I'm sorry, when you say "officialize it," what do you mean by that?

A.    So this report was not intended to be a final report.  Telephonically it was communicated that this was a draft.  So -- so, again, if we had more time and the client continued to engage us beyond what they did, we would have refined this report, added more to it, and perhaps made some other adjustments so it was fit for the eyes of an attorney and/or law enforcement.

Q.    I guess for context, if you were able to issue a subpoena or something like that and get other account information, would you have done something like that?

A.    If authorized by the client, yes, we would have -- if this, you know -- we would have probably sent a subpoena to a couple of the social media platforms that are referenced in this report to include Reddit, Instagram and a few others that I can't recall at the moment.  But yes, that most likely would have been the next step.  Of course, we

Page  92

EXHIBIT "1", PAGE 92

wouldn't have anything to do with that other than providing that guidance. We would not have anything to do with the actual, of course, filing of the subpoena. But yes, that would likely be a smart next step.

Q. Let me ask, I guess, also, so there -- in the -- we're still on the second bullet point here in bold. There are these other names, Elise Winter, Byron Horvath, Shannon Glas and others.

Others is, again, just people -- the other people mentioned inside this report; is that correct?

A. Not necessarily -- I mean, no, not necessarily. "And others" would be other -- 'cause, again, it was a working product, so -- "and others," I guess that is us kind of tipping our hat to the client saying that we know there's other people possibly involved that they had mentioned telephonically or shared via email, and per the scope of this investigation, we did not look into those other people, unless they're referenced in the report.

Q. So -- I'm sorry, others could mean people in the report plus -- other people mentioned in a call with the Bradys or somebody else if you took

Page 93

EXHIBIT "1", PAGE 93

the report further; is that -- is that fair?

I'm trying to understand what you just said.

A.    I don't know what you said for third one. I think you said others took the report further.

Q.    Others -- other people you might identify if the report was taken out of draft form.

A.    Correct.  That's accurate, yes.

Q.    All right.  Let's see.  In terms of -- hang on a sec.

Let's just look again quick at this email. This is a May 24 email.  Because I've given you exhibits already 1 through 11, I may use -- I'm just going to call this Exhibit 12 for convenience. Maybe out of the context, but this is the 5-24-2022 email that you sent to Amanda and Drew.

(Whereupon, Deposition Exhibit 12 was marked for identification.)

BY MR. MELCHINGER:

Q.    And hang on a second.  I'll get the -- the Bates stamp number is SOURCED_INTEL_505.

So in this document, just to be clear, I mean, were you performing some kind a legal analysis on sufficiency of the information that you were providing to state a claim or anything like that, as

Page 94

EXHIBIT "1", PAGE 94

you understood it?

A.    No.

Q.    Have you been involved in, like, some kind of an investigation of this kind of attribution for -- in a criminal case at all, like for law enforcement or something like that?

A.    Yes.  Many.

Q.    So sometimes you work with or for law enforcement then?

A.    Correct.

Q.    How does that work?  They would retain -- they, like -- a police department or -- is this like a military intelligence thing or something like that or -- I don't know if you can say.  Maybe you can't.

But the type of organization that would engage you is what?

A.    So yeah, there's certain things that are -- that are, you know, compartmentalized.  I'd say as it pertains to this, what we have had occur in the past is we'll have a client come to us requesting an online attribution investigation similar to this, and the intent is that instead of them going to law enforcement and saying, officer, here's 500 screen shots, go to work, which obviously is not conducive to solving the case, so we

Page  95

EXHIBIT "1", PAGE 95

essentially prepare it for them.

We liaise with law enforcement and provide it to them and, you know, it can work two ways, we either provide it for them and we never hear anything back or they might come back to us and say, hey, tell me more about this or can you look further into that. By "they," I mean, law enforcement.

Q.  I understand.  I've done this too.  I've had clients who did an investigation and passed it to somebody hoping they would pick up the baton.

But I'm trying to understand a little of the -- you having done that before and -- let me ask I guess, in this report, I think I heard you to say basically it was a draft, and it was not really yet of the level where you would want to pass it to law enforcement; is that right, not as it stands?

A.  That's correct.

Q.  And I want to understand the delta between, you know, where the draft is and then what you would have to do to get it before you passed to law enforcement.

Is there something -- could you explain that a little bit?

A.  Sure.  Typical -- I won't say typically, but oftentimes, when the time allotted is -- you

Page  96

EXHIBIT "1", PAGE 96

know, we work in the world of intelligence.  So sometimes people need things three weeks from now or tomorrow.  So based on the time that was provided, in a perfect world, I would have liked to have done additional research to really, yeah, just add amplifying information to this report.  I may have changed -- just like any perfectionist, I may alter some terminology, some words that are used here and there.

And, of course, you know, before any report that we provide goes in front of law enforcement and/or legal, we want to make it the best possible report as humanly possible.  So yes, I would have made some -- I don't really know what the delta would be, the difference, but I would say we would have -- we would have done additional investigative work to add more -- I don't want to say conclusions, per se, but potential leads.  And we would have made some small refinements to the report itself.

Q.    So in short, more of what you were doing and add more leads, and then it might have been ready to pass to law enforcement?

A.    And refining some on the terminology that's currently present in the report.

EXHIBIT "1", PAGE 97

Q.   All right.   More -- all right. Understood.

So I think you mentioned for about the -- there were some things that were, I think, maybe -- I'll go down further here.   This looks like the section where they're talking a little bit more about -- sorry.   Looking around here.

There's several bits of analysis you did on Paula Haygarth.   And before, when you were testifying, I think you said that basically there was some things that you saw in Paula Haygarth's social media posts that correlated with what you were -- the other things that you were seeing in the, you know, quote, unquote, harassment campaign; is that right?

A.   That's correct.

Q.   And is this -- this is the section of the report starting on page 20 that starts to discuss that stuff; is that right?

A.   I believe there may be some references above page 20, but the -- yeah.   Linguistic or pattern analysis begins on -- I think it's page 21.

Q.   That's fair.   So there's a couple things.

So all right.   Well, let's just look at some of these other items then.   And I -- we'll

Page  98

EXHIBIT "1", PAGE 98

start with sort of the Facebook analysis.  And let me ask, do you have some kind of training in terms of this linguistic analysis or is this something you did on the job, you're looking at the language in a post and try to compare it to another set of language in another post to use it for attribution?

Is that something you have other experience with?

A.    If you could rephrase the question or --

Q.    Well, yeah.  I'm asking about is this something -- well, let me ask something simple.

Is this type of linguistic analysis something you usually do to -- do in an attribution investigation?

A.    Yes, it is.

Q.    All right.  And are these particular -- well, and you focus on several particular facets, I guess, that came down to the linguistics comparison because there's some specific items that you call out, right?

A.    Right.

Q.    One, for example, and here they are, the common themes of communication, you're talking about capital lettering, slash, punctuation outside the quotation marks, exclamation points and what you

Page 99

EXHIBIT "1", PAGE 99

call characters to encrypting those words, right?

These were the five aspects you were looking at?

A.    Yes.    From what we reviewed, yes.

Q.    So is it your -- let's try and make it a little bigger.

Is it your testimony -- again, this is Paula Hargarth, but again, this is Paula Haygarth, right?

A.    Correct.    That's a typo.

Q.    At the top, for example, what are you saying about capital lettering?

What is her -- well, let me back up.

What did you review to sort of form your, you know -- a baseline about how Paula Haygarth uses capital lettering?

A.    We reviewed exactly what's in this section here for capital lettering.    So specifically, the Reddit account.    Liana_Shanti_cult369, comparing that to her Facebook account and other social media posts.

Q.    Hang on.

So do you know Liana_Shanti_cult369 is Paula Haygarth's?

A.    No.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com
EXHIBIT "1", PAGE 100

Q.    So I'm asking you a different question, which is, what did you review of Paula Haygarth's to set the baseline for how she uses capital letters, right?

A.    Her social media and online digital footprint.

Q.    Including what?

Because, I mean, you don't have the -- like, a scrape or the working files or whatever you -- or screen shots of everything you looked at, right?

A.    Correct.

Q.    And so I'm asking at least from your memory, 'cause that's, I think, what we have, what did you review of Paula Haygarth's?

Like, all of her social media?

A.    No.  I cannot definitively say all of her social media.  I can say we reviewed that review there that's on the screen, which was from a Canadian review site.  We reviewed her Facebook profile.  We reviewed, if memory serves me, also her Instagram profile, as well as other places where she was referenced online.  That could have been -- I can't remember if she has a website or not or most of her services were advertised on her social media.

Page 101

EXHIBIT "1", PAGE 101

But no, I cannot say definitely that we saw all of her social media.   Actually, I can say definitely that we did not see all of her social media.

Q.     Because some of it is private, right?

A.     Whether it's private or we just didn't discover it in the time allotted.

Q.     Okay.   And so in terms of your methodology or how you did this, you looked at -- so some of Paula Haygarth's social media and you looked at how she used capital lettering?

A.     Correct.   Capital lettering in addition to the other -- I can't remember what term you called it, but the other attributes to the writing.

Q.     I think we're just focusing on the capital lettering right now, the other four that appear, the slash, punctuation and stuff we'll come to in a minute.

But so when you looked through, you know, whatever you looked through for Paula Haygarth's social media, what was your observation about how she uses capital lettering?

Was it any different than anybody else, for example?

A.     Yes.   I wouldn't say it's, you know, only

Page 102

EXHIBIT "1", PAGE 102

Paula Haygarth is the only person on the planet that does this, of course not. But I would say just compared to your common person, and what we've been seeing over the past -- you know, since we've been investigators is that there were very unique uses of all capital letters that the common person does not habitually do.

Q. And, again, that statement is based on essentially your experience and review of a lot of other people doing social media; is that what you're saying?

A. Yes. That's fair.

Q. All right. And so -- like, then, at least in this section on page 21 of the report about capital lettering, you were comparing whatever your observations from your review of her social media and how she uses capital letters against this set of anonymous posts, right?

A. Yes.

Q. And in these anonymous post, for example, there's the word "very" that's capitalized, the one below it at the top of page 22 of the report, looks like there's one word, "shocked," that is capitalized, right?

A. Yes.

Page 103

EXHIBIT "1", PAGE 103

Q.    Are there any others that I'm missing here?  My eyes are older than yours.  But I'm trying to bring this down.

I think it's just those two examples, right?

A.    It looks like three.

Q.    Okay.  So I see very and shocked, and then I'm sorry, what's number three?

A.    There's very -- I think it says all caps, "deep" in the second line there.

Q.    Oh, this one.  Okay.  Okay.  Sorry, this is another one.  All right.  So this is a third example.  Okay.

And so I'm sorry, there's deep and then there's way also, so there's four examples, right?

A.    If you can scroll down, is that the last --

Q.    Yeah.  Below that, it seems to be -- there's just three from Liana_Shanti_cult369.  If you need to look at this file, feel free to open it up.  Because I sent this.  I believe you have all these.  It may be easier to get it larger on your screen.

So it looks like one through -- there's, like, four examples.

Page 104

EXHIBIT "1", PAGE 104

Is it safe to say -- I mean, to me, these look like it's just being used for emphasis.

Do you agree?

A.    So there's one, two, three, four examples of accounts that are not named Paula Haygarth that use the all capital letters for emphasis, and then there are two -- yeah, there are two.  One from Facebook, one from an online review that are from Paula Haygarth that also do -- also have the evidence of the all caps as far as emphasizing certain things.  So to answer your -- sorry, I forgot the question.  If you could repeat it.

Q.    You sort of answered it in your answer, I think, which is, I mean, the use of caps here is for emphasis, right?

A.    I believe so, that's what it appears, yes.

Q.    Do you use caps for emphasis when you text people or post online?

A.    I don't.

Q.    You don't.  All right.

And then at least in the -- it's really hard to see, sorry.

But, I guess in one other entry here that is -- this is an Instagram account that -- this doesn't -- the one that is a screen shot, which you

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300        www.veritext.com

EXHIBIT "1", PAGE 105

can kind of see the reflexion of the person taking the photo off the screen, this is not a Paula Haygarth post, right?

Or you don't know for sure, right?

A.    Correct.   I do not know.

Q.    And there's the word "many" that is capitalized, right?

A.    Correct.

Q.    And then you're comparing that against the Paula Haygarth Facebook, which has the word "truth," and it has the word all capitalized, correct?

A.    Yes.   Yes, on both.

Q.    But, I mean, you acknowledge that capitalizing things is something that people often do online for emphasis, right?

A.    Of course, yes.

Q.    Would the common person use caps in your definition for emphasis online in posts?

A.    I think my -- in my experience, no, it's not common.   I would say, if anything, it's more uncommon than common.   But I think that's pure, you know, speculation, as far as the overall social media population of, you know, 6 billion people.

Q.    You answered maybe my next question.

But is it -- if I sent you an email in all

Page 106

EXHIBIT "1", PAGE 106

caps, would you think that was -- I mean, you've heard it said sometimes that's shouting in email, right?

A.    Correct.

Q.    So, I mean, this is -- all right.  Okay.

Let's just look quickly at -- again, for this "Use of Slash," this is something that appears in -- and, again, I'm at the top of page 23 of the report right now.

And in a section entitled "Use of Slash," there's slashes used in the Liana_Shanti_cult369 posts, right?

A.    Yes.

Q.    And basically what you're saying here is that because Paula, again, Haygarth, not Hargarth, in a Facebook post that you have excerpted, used some slashes that suggests she is the same person as the one who posted Liana_Shanti_cult369; is that right?

A.    There were two Facebook posts, and that's not saying that those were the only posts on her social media, I'll say social media environment where she used that.  So these are just two examples.  No.  I guess we're not saying that they're the same person.  We're saying that the

Page 107

EXHIBIT "1", PAGE 107

pattern is the same from what we can see from Paula's -- Haygarth's social media and some of those Reddit posts.

Q.    The pattern is the same, meaning the usage of the slash is sort of to express different concepts that are related that's linking them together; is that correct?  Families, loved ones, energy, aura, et cetera; is that how this -- let me back up.

Is that how this slash is being used, to link series of related concepts?

A.    It's being used to draw similarities between the anonymous posters, Liana_Shanti_cult and so on, to the tame type of writing style that she has using those same slashes to break up concepts.

Q.    Right.

But what I'm talking about is, within the posts, whoever is using it is using it to link related concepts, right?

A.    It appears that way, yes.

Q.    And this is something that -- you would have to speculate to say how many people make this type of usage or use this, right?

A.    That's correct.

Q.    Okay.  In fact, I may have sent some

Page 108

EXHIBIT "1", PAGE 108

Alexander Feil, 30(B)(6)
January 10, 2023

emails to your counsel that used slashes, right?
Maybe you saw them or didn't.

But all that means is that I'm following a general rule that's out there, right, for how slashes are used?

A.    Yes.   It's available to all, I mean, yeah, it's a -- it's a style that when looked at in itself -- or I should say -- yes.   It's a style that -- or not a style.   Rather a -- I'm trying to think of a good word.   It is a method of putting things on paper that I have seen in the past, yes.

Q.    And have you used it in the past?

A.    I have personally, yes.

Q.    Yeah, I mean, I know I have.

But -- I mean, I think you understand maybe where I'm going with this.   I don't want to take too much time going through punctuation here.

But a lot of these rules that you're pointing to, including the punctuation outside of the quotation, and the -- what you're calling -- you're characterizing as excessive use of exclamation points, these are all standard usage, right?

A.    Yes.

Q.    I mean, a lot of people use this type of

Page 109

EXHIBIT "1", PAGE 109

punctuation, right?

A.    Yes.

Q.    And did you look at any actual -- let me ask, did you look at any posts from Liana Shanti at any point?

A.    Not that I recall, no.

Q.    So you didn't look to see whether she also used caps or put commas inside or outside of the quote mark or whether she -- like, whether there's another exception to your rule, right?

A.    That's correct.

Q.    Okay.   And I guess what I'm trying to ask is, in this case, these types of, you know, punctuation usages, do these -- I mean, they don't necessarily tie Paula Haygarth to the accounts that are involved in the, you know, so-called harassment campaign, right?

A.    In looking at each -- we'll call them subcategory independently, I think that -- that provides one vantage point.   When combined all together, I think it's a slightly different vantage point 'cause all of these together, they're all -- we'll say somewhat unique in themselves.   But when you put them all together, I think it makes it even more unique.   That said, you know, our intent of

Page 110

EXHIBIT "1", PAGE 110

this report was to provide enough information for people to -- for people with resources that we do not have, i.e. law enforcement or, you know, legal resources, to, we'll say, pierce the veil and, you know, subpoenas, whatever, to find the truth as far as who is behind this.

So to answer your question, yeah, I think individually, there's nothing particularly unique about it, but when combined, it does raise some suspicion, hence, why we considered it a lead and decided that it's worthy to report this to the client and -- yeah, to the client.

Q.    One quick question on -- there's this use of characters to encrypt words.  By "encrypt," you mean just kind of -- I mean, you're just replacing characters and words.

Like, if you tried to use a word lookup, it wouldn't find it, right?

A.    That's correct.

Q.    And the two examples you have here from Paula Haygarth, this is on page 27, one of them looks to be F@CK, and the other one, where did it go, is a dollar sign, an SH&TTY, right?

A.    Yes.

Q.    So these are both basically swear words,

Page 111

EXHIBIT "1", PAGE 111

Alexander Feil, 30(B)(6)
January 10, 2023

right?

A.    It appears that way, yes.

Q.    And this is -- you're comparing this with Liana_Shanti_cult369 post where it says shadow banned using at symbols for the As and some other replacements, right?

A.    Let me make sure.  That is correct, yes.

Q.    Do you think that the usage of "in shadow ban" is the same thing as basically making sure -- well, I mean, if you're posting on Facebook, I don't know these days, not all fact checking has stopped per Mark Zuckerberg or whatever is going on.

Does it make sense sometimes to maybe not have your posts called out because you're using swear words?

Is there, like, an online, you know, sort of civility guide or something that you should follow that might cause somebody to alter F-U-C-K and S-H-I-T into something else?

A.    Not that I'm aware of specifically for curse words.  I have seen the use of characters replacing letters in things, like, you know, narcotics deals, scam, human trafficking, things that are much more, we'll say, like, overtly illegal.

Page 112

Alexander Feil, 30(B)(6)
January 10, 2023

Q.    And so people just use emojis too, right?
So okay.

All I'm pointing at is, is there something
that necessarily -- what is the connection between
the use of characters in the Liana_Shanti_cult369
and the way they're used in the two posts from
Paula Haygarth?

Is there any, really?

A.    Again, use of characters to, we'll say,
again, encrypt words or obfuscate words.  In itself,
there is -- I don't believe there's anything
particularly unique about it.  It is something that,
like you mentioned, emojis or using different
characters for letters, that is something you see
quite often online, but, again, when combined with
the other factors, that's what kind of led to it
being in the report.

Q.    And I'm asking -- I'll try it one more
time.

The specific usage of sort of changing a
curse word versus writing shadow banned in the
anonymous Liana_Shanti_cult369 post, the usages
here, are these the same?

MR. PORTNOY:  Objection.  Asked and
answered.

Page 113

EXHIBIT "1", PAGE 113

BY MR. MELCHINGER:

Q.    You can answer.

A.    Are they the same?  Well, no, they are not the same.  I mean, they are different words and different symbols, so I think the straightforward answer is they are not the same.

Q.    Let's -- I'm sorry, we've been going about another 80 minutes here, so let's take a break for the court reporter if we can.  Go off the record.

(Whereupon, a recess was taken from 11:28 a.m. to 11:41 a.m.)

MR. MELCHINGER:  Back on the record.

BY MR. MELCHINGER:

Q.    A couple other cleanup questions, if we can.

Just to confirm, I'm sorry, Mr. Feil, you're ready to proceed, right?

A.    I am, yes.  Thank you.

Q.    All right.  You were so silent, I had to make sure.  Okay.

So one question is, the documents that were produced, I just also wanted to make sure, were there any other documents that you once had, but were, you know, either deleted or you returned them to the client or anything else that -- that we

Page 114

EXHIBIT "1", PAGE 114

should be aware of?

A.    Yes.    Actually, if you scroll down to page -- you had referred to it earlier, page 14 and page -- of this exhibit, and page 5, so those charts there were built off of a system that is called Maltego, M-A-L-T-E-G-O.    It's a link analysis platform.    That is the capacity.    It does many other things, but that is the capacity in which we used it.    Maltego is, we'll say, a relatively -- let's say, when they -- when they do updates and send things to us and there's updates to the systems, a lot of the times, we've lost files in the past.

This is one of those cases where we looked back to see if we had this particular chart, and we did not have the original copy.

Q.    They're not much into backwards compatibility then?

A.    Correct.

Q.    All right.    And other than -- okay.    Let me just look at page 5.    You said 14 and 5.    Okay.

So these diagrams, that one on page 5 and this one here, these were created with Maltego, and you may not have, like, some past versions of them then; is that correct?

A.    Of this specific document or the platform

Page 115

EXHIBIT "1", PAGE 115

itself?

Q.    I'm sorry, you may not have some -- that's what I'm asking you.

What are you -- you don't have versions of this built-out association chart or --

A.    Correct.

Q.    -- what was it --

A.    We know longer have versions of that, yeah.

Q.    So it's just whatever is in the report is what's left, right?

A.    Correct.  Of Maltego, yes.

Q.    Of Maltego.

Is there anything else in that category of stuff that might have gotten deleted or returned to the client that you no longer have possession of --

A.    Not that I'm aware of.

Q.    -- that were produced?

A.    No.

Q.    Okay.  Let's see.  When you -- let's look at -- sorry.  I have to find the documents here.

Let's look at -- I'm sorry, I have the wrong one there.  This is the agreement, Exhibit 7.

When you were entering this agreement and you had some initial phone calls and such, did the

Page 116

EXHIBIT "1", PAGE 116

Bradys give you any parameters on your time or your spend or anything?

    A.    The perimeters that we agreed upon were the 12 hours.

    Q.    I know, I know.

          I'm saying did that come from them or did that come from you?

    A.    I don't recall.

    Q.    All right.  Did they give you anything else in terms of here's your goal and -- or a limit or anything else related to the scope of the engagement that's not expressed in this Exhibit Number 7?

    A.    That was all done telephonically, so I don't recall.  But typically, after the phone calls, this proposal is what follows.  So, you know, we try to capture what was -- what was passed during the phone call as best we can in the scope section of the proposal.

    Q.    And before, when we were talking about you're comparing Paula Haygarth's social media, and then we were looking at specific sections of the -- sort of the linguistics analysis, right?  And I asked about what you had looked at in terms of Ms. Haygarth's Facebook posts, but I need to go back

Page 117

EXHIBIT "1", PAGE 117

and clarify, you know, was there anything else that you were looking at.  I think you said, though, that you looked at her Instagram profile, the Facebook profile, not all of the Facebook posts.

But is there any other data of Paula Haygarth's that you looked at that we should clarify?

A.   Based off my recollection, yeah, I can't recall that we looked at any other things, not necessarily saying that we did not look at any other things, but from what I can remember, we looked at what is in the report, meaning what we found, we put in the report, and what we reviewed was put in the report as well.

Q.   All right.  Other than -- there's several different -- let me back up here to the list.

The sort of common themes of -- themes, sorry, of communications on page 21, and there are these five items.

Other than these sorts of themes -- excuse me -- were there any other correlations between the Paula Haygarth social media universe, shall we call it, that you looked at versus the posts that you were trying to attribute?

Like, is there any other vector here that

Page 118

EXHIBIT "1", PAGE 118

Alexander Feil, 30(B)(6)
January 10, 2023

you were considering other than the capital

lettering, the slash, et cetera, that is not in the

report?

A.    That is not in the report, no.    Based on

the time allotted, there is nothing that is

additional that is not in the report that we

considered in making this conclusion.

Q.    And let's back up further.    You looked at

this, I guess, breach data, and you went to, I

assume, some kind of a site for this.    There are a

number of them.

Do you remember which one?

A.    Which one.    I don't remember which one.    I

could name you a few that we have utilized in the

past.    There's new services that have come out since

then and old services that are no longer with us, so

I don't recall which tool exactly was used to grab

this information.

Q.    If you had to guess, like, is it an

example of the tool, what it might be or what are

the ones you used commonly?

A.    Yeah.    Based off of the time that this

report was drafted, meaning 2022, I would suspect

that it's possibly a platform called DeHashed.

That's D-E, and then hashed, H-A-S-H-E-D.    And that

Page 119

EXHIBIT "1", PAGE 119

platform allows you to see, to a limited extent, the -- you can put it in an email address, a phone number or any other, we'll call it, selector or piece of information, a digital piece of information.  It will query historic data breaches that are public and provide you with the, we'll say, additional information associated with whatever you provided the system and whatever data breaches have historically existed in the past that are queryable.

Q.    That's just, like, you know, Have I Been Pwned or some kind system that has pulled a bunch of data and allows -- is that for investigative purposes or is that, like, for people -- I'm sorry, the court reporter is shaking her head, the website is Have I Been Pwned, P-W-N-E-D, I think.

But it's just -- is that a tool for investigation purposes or is it one so people can sort of assess, you know, whether they've been the subject of a data breach or both or --

A.    Both.  Yeah.  Both.

Q.    Okay.  Okay.  So you went on one of those, at least, on page 21 at the top, it looks like you found some IP addresses that were associated with -- or it associates Paula Haygarth with the following IP addresses, right?

Page 120

EXHIBIT "1", PAGE 120

That's what it says in the report, right?

A.    Correct.

Q.    And I'm sorry, so what does that mean? How is she associated?

Is that a specific device of hers that it's picking up or is that the IP address for the site that was breached or is that what?

A.    Yeah.  So that means -- do you mind if I do a quick example just to simplify?

Q.    You want to share screen or something?

A.    Oh, no.  No.  Just describe something.

Q.    Oh, yeah.  No.  No.  However you can answer it best to help us understand is great.

A.    Perfect.  So let's just -- as an example, let's say today I sign up for a website, anything, let's say, you know, Uber.  When I sign up for Uber, during that process, their systems are capturing which IP address I am originating from, and they're also capturing, to some extent, the information that I enter into the system.  So that happens.

Fast forward three years, five years, ten years, let's just say Uber was breached at a point.  So the information that I initially put in, and in this case, the IP addresses, that's essentially indicating that when the individual

Page 121

EXHIBIT "1", PAGE 121

using the email address PaulaHaygarth@hotmail.com signed up for said named service, she signed up from those IP addresses.

Q.    Okay.    Got it.

And did you check out these IP addresses and figure out what location they connect to or -- that's not in the report in this section, at least, but ...

A.    So yeah, I can assume that we did.    I don't see any reason why we would not.    We don't discover a lead and just leave it there.    So I believe we did.    I don't remember what the outcome was, and we did not amplify any of the information in the report because it was irrelevant and of no use to anyone.

Q.    Okay.    All right.    Before, I think you mentioned that you had looked at Ms. Haygarth's Instagram profile.    We were just talking about what you looked at associated with her.    The other thing that you apparently looked at, right, is Reddit. I'm not sure if you mentioned that.

But what specifically did you look at related to Paula Haygarth and Reddit?

A.    I believe in the report it references a Reddit account that goes by the name Paula Haygarth.

Page 122

Q.    And that's the one that was created on May 9th, 2022 you found, correct?

A.    It -- according to the report on page 3, on May 9th, 2022, the Reddit user Paula Haygarth published her first post.

Q.    Okay.  That's the first post, but you don't know the so-called cake date or something, do you?

A.    If it's not in the report, then I don't. Let me -- do you mind if I do a quick search on my end instead of scrolling through?

Q.    No.  If you need to search something or look at the report, that's -- that's fine obviously.

You mean you're going to Reddit online?

A.    No.  No.  No.  Referring to this exhibit specifically.

Q.    Okay.

A.    Here we go.  So Reddit user Paula Haygarth, cake day or creation date was 5-6, or May 6th of 2022, and, again, the first post was three days later on May 9th, 2022.

Q.    Okay.  I'm searching for cake, and I'm not seeing that.  But okay.

A.    It's on page 6.

Q.    Page 6.  Okay.  All right.  Okay.  In the

Page 123

EXHIBIT "1", PAGE 123

platform Reddit summary.  Okay.  All right.

Understood.

Let's see.  All right.  Let's -- let me find out your -- let's look at the complaint in this matter.  So I'm showing you what's the complaint.  In the PDFs you were sent the other day, it's Exhibit Number 3.  And it may make sense for you just to -- well, I'll ask some questions and then review it as you need to.  If you need to open up the document, et cetera, or I can flip to whatever page you want me to look at.

But basically there are a series of specific allegations in the complaint.  And they concern -- sorry.  I'm trying to find something here.  They concern or allege that the defendants, our clients, Ms. Haygarth and Mr. Horvath, posted certain things online, okay.  And these are in particular related to, I think, in paragraph 11 in Instagram, Reddit and the Cult Education Institute, which I think you called a forum before, CEI for short.

And we're going to walk through those.  This is just -- I want to understand at trial what -- what facts you know about any of these posts, okay.  And it may be simply that if the

Page 124

EXHIBIT "1", PAGE 124

answer is if it's not in your report, you don't know anything.  I don't know.  But that -- that's what I want to try and determine here.

MR. PORTNOY:  Let me just put on the record that these questions relate to a complaint and go beyond the subjects that are listed in the 30(b)(6) notice and, therefore, are inappropriate for this deposition and this witness.  There's nothing in the 30(b)(6) questions that indicate this witness would be questioned as to his testimony regarding allegations in the complaint.

BY MR. MELCHINGER:

Q.   Okay.  And the response to that is that section -- or Topic 2 is basically -- and the report is basically what we're asking about here.  I want to just find out what you know, your personal knowledge from your investigation and creation of the report, may relate to these allegations, because it's an unusual circumstance where plaintiffs have not retained you and yet they seem to be offering you as a fact witness.  So we're entitled to find out what you know, okay.

And your objection is noted, obviously.

But on paragraph 16 on page 3, can you just review that statement, and basically, what I

Page 125

EXHIBIT "1", PAGE 125

want to confirm is whether or not -- whether or not you recall if you investigated that Instagram statement from lianashanti_cult_recovery. The user name for that is lianashanti, all one word, _cult, C-U-L-T, _recovery. There's an all caps statement there in paragraph 16 that I'm showing on screen right now.

And my question is, is that covered in the report at all or something you recall reviewing?

A.    I don't think it's covered in the report unless there's a screen shot that has that. I mean, I don't necessarily look at the context of the posts 'cause that was not my -- that was not my directive. So looking at that quote on paper now on page 3, I have no recollection of ever seeing that. It may or may not be in the report, but I doubt it.

Q.    Same question on paragraph number 18, basically. If you were -- again, is that something that you recall reviewing, these specific allegations? And, again, this is under the anonymous user name lianashanti_cult_recovery, about Ms. Shanti making money, and then this capital word in caps "extortion."

Does this ring any bells or if you were asked about it, would you be able to testify about

Page 126

EXHIBIT "1", PAGE 126

it, from your investigation?

A.   Right.   I do know the user name lianashanti_cult_recovery.   However, the quote that follows, I have no recollection of ever reviewing that.

Q.   You're aware of that Instagram because, I mean, the Bradys asked you to investigate that, posts in that in particular, right?

A.   Correct, yes.   I don't recall if they provided that to us.   They may have.   I think it's highly likely that they did or we stumbled across it ourselves.   But I would -- but I believe it was provided by them, yes.

Q.   And I think in the document production that you made, there is -- I'm kind of scrolling through, you know, the production.   There's a lot of screen shots.   Let's see if I can find -- so here's an example of -- on page 199 of your production, I don't -- this seems to have some kind of markups and things in it.   I'm not -- I'm not sure how this was made or what this is, per se.

But do you recall that this is part of some of the things that the Bradys provided to you?

A.   Yes.   I do recall.

Q.   And this is the -- that account, the

Page 127

EXHIBIT "1", PAGE 127

lianashanti_cult_recovery, right, at the top?

A.    Correct.

Q.    In fact, there's a whole -- there's a whole string of them if we scroll up.  So that's -- it does look like -- at least in the document production -- let me ask this, I guess.

If we can find the -- back to the complaint -- these words, for example, these all caps statements either in paragraph 16 or 18 in the pages of the document production, that means -- it looks like that means that the Bradys provided those screen shots to you; is that right?

A.    The Bradys did provide those screen shots that are in the -- in the exhibits to me, yes.

Q.    Okay.  Or in the document production, right?

A.    Correct.  Correct.  Yes.

Q.    Okay.  So -- but if -- if you had -- if these allegations -- or, I'm sorry, if these -- what do I call it -- these sort of posts that are identified in the complaint, for example, in paragraph 16 or 18, are -- even if they're contained in the stuff that the Bradys provided to you, the screen shots, et cetera, does that mean you investigated them necessarily?

Page 128

EXHIBIT "1", PAGE 128

Or spent a lot of time on them?

A.    No, not at all.  Typically, when clients provide us a large group of -- it comes in the form of screen shots or whatever it is, in this case, screen shots, no, we did not analyze any of these.  Typically, when we quickly gloss over holdings that a client shares, especially in an attribution case, we're more focused on the user names as opposed to the content or the context, in which we -- in this case, we don't care about.  Considering the context of what was being asked of us.

Q.    Is it fair to say that if the specific posts that are identified in the complaint are not discussed in your report, that you probably don't have something to say about them?

Is that likely?

A.    Correct.  Yes.  I think that's correct, yeah.

Q.    We'll walk through just to make sure, but I'm just trying to figure out, you know, the context here.  So -- all right.  Let's go down to -- there's another one in paragraph 20.

As you can see, basically, the allegation of the complaint for all of these is the statement is false and plaintiff -- I'm sorry, painted

Page 129

EXHIBIT "1", PAGE 129

plaintiffs in a false light.  Okay.  Or is false and defamatory, et cetera, okay.

So let's look on Number 20 and see, you know, as you sit here today -- it's the same question, do you have anything that you would testify to, you know, at trial if you were asked about this post?

A.    I would have nothing to say.

Q.    All right.  And you don't -- you didn't investigate, say, the truth or falsity of these per se is what you testified to before, right?

A.    That is accurate, that is correct.

Q.    As to the one in the further posted paragraph 22, again, sort of same set of questions.

Do you have anything that you would testify to about this post at trial?

A.    I do not.

Q.    All right.  Or anything that you do would be in the report; is that correct?

A.    Correct.

Q.    Okay.  Basically same questions for 24, paragraph 24.

Do you have anything that you recall about this one, Ms. Shanti funnels investors' money, et cetera, et cetera, that allegation?

Page 130

Alexander Feil, 30(B)(6)
January 10, 2023

A.    No, not that particular post, no recollection.

Q.    And, again, if it's not expressly covered in the report, it sounds like you have nothing to say about it, right?

A.    That's accurate, yes.

Q.    Okay.  Moving into Reddit, and some of this gets a little confusing because, I think, some of it -- there's paragraph 24, but then there's another paragraph 24 on page 4.  So I'm talking about the second paragraph 24 in the Reddit false statements allegations.  And paragraph 25, actually.

Is the post that's quoted in -- or the statements quoted in paragraph 25, again, the second paragraph 25 on page 4 of the complaint, which we're calling Exhibit 3, is this something that you have anything you can testify to at trial that you're aware of?

A.    No.

Q.    And, again, if it's somewhere in the report -- or if it's not in the report, you really don't have anything to say about this statement in paragraph 25?

A.    That's accurate.

Q.    Okay.  And, again, same -- I want to go

Page 131

EXHIBIT "1", PAGE 131

through this quickly, but same questions on paragraph 27 on page 25, there's a statement about -- starting with "Over the past six months."

Do you see where I'm looking?

A.    I do.

Q.    Okay.  And same questions, basically, unless it's in the report somewhere, quoted, you wouldn't have anything to testify to about this statement, correct?

A.    Correct.  Not about that statement, correct.

Q.    Okay.  Same questions for Number 29.  If not in the report -- I'm sorry, not Number 29, but paragraph 29, starting with a couple of experts we have consulted.

Do you have anything that you would say about this quoted post from the Shanti summary?  And, again, it may not be a post.  It may be a blog. I'm just talking about the statements.

A.    Yeah.  No recollection.  I have nothing to say about it.

Q.    Okay.  Same question about number -- paragraph 31 on page 5.  Did you -- well, a little different.

Did you investigate anything related to

Page  132

EXHIBIT "1", PAGE 132

Alexander Feil, 30(B)(6)
January 10, 2023

this user name Salt-Health6213?

A.    That user name does not ring any true bells in my memory, so I am not aware of that user name.

Q.    And I would represent to you that when I searched through your report, I couldn't find Salt or Salt-Health or 6213 or anything, so ...

A.    Yeah.   That is new to me.

Q.    As to the statement here about Ms. Shanti, would you have any testimony you would offer based on what I saw in your investigation?

A.    I would have no testimony with regard to that statement.

Q.    All right.   Moving down to paragraph 23 at the bottom of page 5 of the complaint -- I'm sorry, 33.   I think I misspoke.   This is under a -- looks like a -- again, a subReddit user, U/Liana_Shanti, S-H-A-N-T-I,_cult369, there are some statements there about possible crimes, et cetera.

Same questions based on your investigation, is there anything that you would testify to about this -- this post or statement?

A.    No, there is not.

Q.    Again, it's a little tricky.   On page 6, I'm looking at the first paragraph.   That's

Page 133

EXHIBIT "1", PAGE 133

Number 35.  There's another one down below.  But this is a May 20, 2022.  This is an allegation that the defendants made a post.  There's a user name here, Alarmed_Aspect1678.

Is this something that you recall investigating?

A.    No, I'm not familiar with that user name.

Q.    Do you know if it appears in the report at all?

A.    It does not appear in the report.

Q.    All right.  And I would say, when I searched, I also could not find it.  I'll represent that.  But there's a statement attributed to that user name, which says basically Ms. Shanti was working on scamming, et cetera, et cetera.

You see that statement, correct?

A.    I do.

Q.    All right.  And is this something about which, based on your investigation or the Bradys, you would have anything to testify about?

A.    I would have nothing to testify about.

Q.    All right.  And then there's a Facebook statement that's next.  This is the second paragraph 34 on page 6 of the complaint.

And it says -- starts with "On May 9th,

Page 134

EXHIBIT "1", PAGE 134

2022," did you -- do you recall whether you investigated this Facebook page?

A.    I do.   If that is the same reference that is in the report.  I believe that is in the report on page -- let's see here.   That is on page 19.

Q.    So we're talking about the two snips at the top, and there's one more underneath, right?

A.    Yes.

Q.    Okay.   And this is Bates number page 774 in the document production.

So I guess the question then is, in relation to this Facebook post, what do you recall from your investigation in terms of -- let's see.

I mean, what did you do to find this post?

A.    I don't recall exactly what we did.   But as it's relatively considering her account was not private at the time, I can -- I can assume or assess that we went to her Facebook profile, we simply scrolled down looking through her posts and commentary and found what you're seeing there on the screen, which looks like a comment, or rather a post, which took place on May 9th.   And then the comments, which fall under that, which it appears like there are two comments from Ms. Haygarth and one comment from an unknown person named -- looks

Page 135

EXHIBIT "1", PAGE 135

like Jennifer.

Q.    I'm trying to -- okay.   All right.   Okay.

Is there anything else you note about this?

Is there something that, from this, that causes you to associate Paula Haygarth with the other anonymous post -- well, the anonymous posts that you've been asked to look at for the purposes of this report?

A.    Yes.   The date May 9th is significant. It is the date where many of these anonymous accounts were created.   So yeah, time is one thing, the actual date of May 9th.   And then secondly to that, just the fact that the Reddit posts that we're referring to are specifically, you know, referencing Ms. Shanti.   So those are the two primary themes that made this specific post and the comments underneath it relevant to the investigation.

Q.    Okay.   Other than the timing and the other events on May 9th, anything else?

A.    Not that I can think of at the moment, no.

Q.    All right.   I think the next section is the CEI, which, again, is the Cult Education Institute.   Allegations start on the second paragraph 35 on page 6.   And -- let's see.

Page 136

EXHIBIT "1", PAGE 136

This one talks about plagiarized a number of health protocols.

In particular, do you see where I'm looking?

A.    I do.

Q.    The same -- same questions, based on your investigation, is there something that you could testify to about Ms. Haygarth, the defendants, et cetera, related to this case?

A.    By this -- meaning that particular statement?

Q.    The case in which you're being deposed today, this lawsuit.

A.    Got it.    Understood.

Q.    When I say "this lawsuit," this case is too big, so --

A.    Understood.

Do you mind if I refer to the report and make sure that quote --

Q.    Not at all.    Please do if you need to. Yeah.

A.    Let's see here.    Zoom in.    I'm on page 17 of the Sourced report.    So the content that was collected from the CEI is what you see there on the screen, footnoted as item number 12.    I don't know

Page 137

EXHIBIT "1", PAGE 137

if that specific quote is the one we were just looking at or any quote in those several paragraphs are in what we were just referring to, but that is what my recollection of what we reviewed from CEI.

Q.    And as stated above on page 17 above those snips from the Cult Education Institute, it looks like there's a forum user, lianarecovery, that apparently you found created an account on the CEI forum; is that right?

A.    Correct.

Q.    Okay.  Sorry if I'm looking up.  I'm looking at my bigger screen.  And other than -- let's see.

And, again, this is created on May 9th, right?

A.    Correct.

Q.    All right.  Are there any other observations or testimony you would have to offer other than what's expressed in the report here at the bottom of page 17?

A.    No.  There's not.

Q.    Let's just look back at -- all right.  So paragraph 37 -- okay.  This looks like the only paragraph 37 on this page.  Page 6, paragraph 37, there's a statement about heavily rooted in

Page 138

EXHIBIT "1", PAGE 138

traditional psychology.

You see where I'm pointing at, right?

A.    I do.

Q.    And I assume the answer on the CEI is -- posts here also in paragraph 37 and 39 -- and I don't want to go through and compare all the individual language because it's -- at this point because it's very small.

But essentially, any testimony that you have to offer regarding the CEI -- this sort of allegations of CEI statements, would all of that be in your report under the Cult Education Institute section?

Is there anything else that you have to offer?  And take the time you need to review the remaining, you know, allegations in the complaint. They run through paragraph 47 and -8 on page 7.

A.    They would be -- besides as you mentioned what's in the report, there would be nothing I could offer further than that.

Q.    Let's see here.  There is -- there is also on page 47 an indication of a WhiteKnight user name.

Is that something that you investigated or --

A.    Yes, it is.

Page 139

EXHIBIT "1", PAGE 139

Q.    Okay.    Is that somewhere in your report?

A.    It is.    There are several variants of, we'll call it, the WhiteKnight.    I believe it's WhiteKnight followed by 4 numeric digits.    I think there's two variants of that.    And then there's another account, WhiteKnight9898, and then there's another account that's slightly misspelled.    It's WhiteKingh, with an H on the end.    I would have to look back at the report.    Let me scroll through it.

So there's a reference to Reddit user WhiteKinght on page 3 referencing that the account on Reddit was created on May 9th of 2022.    There is a second reference to WhiteKnight -- sorry -- WhiteKinght9898 on page 7.

Q.    Can you spell what you're saying is King, 'cause I'm seeing K-I-N-G-H-T-9898.

You're pronouncing that King?

A.    Yeah.    Just the way I separated in my head 'cause -- yeah, there's the WhiteKnight, and there's WhiteKinght, which seems like a shuffling of letters.

Q.    Okay.

A.    There's another reference to WhiteKnight on page 7 as well.

Q.    And let me see if I can find where you're

Page 140

EXHIBIT "1", PAGE 140

Alexander Feil, 30(B)(6)
January 10, 2023

looking at here.

This is -- there?

A.    It is.

Q.    Okay.  So I'm seeing -- you're saying -- all right.  It doesn't say WhiteKing in one word, white, K-I-N-G, right?  That's not what we're talking about.  You're saying that's Kinght.  I see.  I see.  Okay.

A.    Right.

Q.    In my mind, it's breaking it up in different ways.  I see what you're saying.  Okay.

So you found that there were these accounts, and is there anything that necessarily you found that necessarily connects the WhiteKnight or WhiteKinght accounts to Paula Haygarth in particular?

A.    No, there is not.  I don't think we -- I know we don't go into that in the report, so my answer is no.

Q.    All right.  I guess -- well, I guess -- although you haven't said this expressly, what I'm -- what I'm gathering is that this sort of confluence of events on May 9, 2022 is sort of one of the key reasons or factors that you rely on to associate Paula Haygarth with the anonymous

Page 141

EXHIBIT "1", PAGE 141

accounts; is that right?

A. That is correct. It is one of the contributing factors.

Q. Is that perhaps the main factor in your analysis?

A. No, I couldn't say it's the main factor. I'm looking at all the facts combined.

Q. Well, and then obviously this is an open source investigation.

If you had your druthers, ideally, you would subpoena some of these accounts or subpoena Reddit and so on and try and get information on who was behind them if it existed, right?

A. Correct.

Q. Do you know if Reddit requires actually any sort of verified -- all it requires is an email address to set up a Reddit account; is that right?

A. Correct. That's correct. Just an email address.

Q. So anybody could just create sort of, you know, an email and then create a Reddit account?

A. Could anyone create an email? Yes, that is a correct statement.

Q. Let me see here. Let me ask also about -- I'm getting an echo. Sorry.

Page 142

Alexander Feil, 30(B)(6)
January 10, 2023

There are these threatening calls that were made as well that -- I'm sorry, I'm trying to find the page.  Telephonic communications, okay.

So on page 18, you mention telephonic communications, and so there's these allegedly threatening calls, right?

How did you investigate these?

A.    So at the time, I believe we -- what we would have done at the time, depending on what tools we had access to, we would run that phone number through a series of open source caller identification and public records websites.  So that's what we did with that phone number.

Q.    And what did you find?

A.    So we found the host or the provider of that specific phone number at the time, or it lists Saskatchewan Telephone Communications Holding Corporation as referenced in the report as well. Also, there is a reference there to a tool that, in certain cases, can provide you the caller identification name of the individual.  In this case, it only produced a single letter, which is there referencing in the screen shot as the letter B.

Q.    And so did you hear the voice mails that

Page 143

EXHIBIT "1", PAGE 143

were referenced?

A.    I did not.

Q.    I'm sorry.   You did not.   Okay.

Is there any other information you obtained from the client or anywhere else about these -- the telephonic communications referenced on page 18 of the report?

A.    No, there's not.   In a perfect world, we would have had more time, but unfortunately, that is it on page 18.

Q.    And you haven't -- state the obvious, but you haven't talked to Paula Haygarth ever, right?

A.    I have not.

Q.    You wouldn't recognize her voice or the defendants' voices, right?

A.    I would not.

Q.    Did you ever speak to Liana Shanti during this investigation?

A.    She was -- yes, I heard her voice on one occasion.   I don't recall the date.   It is referenced in the emails.   I believe someone asks permission, can Liana join the call today.   During that phone call, I do not know what was discussed from a general standpoint, and I don't know what she said particularly.   I know she spoke very little.   I

Page 144

EXHIBIT "1", PAGE 144

don't know what she said or what was discussed, but yes, I have spoken -- I don't know if her and I communicated directly on that phone call, but she was in the -- we'll say, on the call.

Q. When you say you don't know, as you sit here today, at least you don't recall, but at some point, you knew what the call was about, right?

You were on this call, or no?

A. Sorry, which call?

Q. The call with Liana Shanti.

A. Yes, I was on a call with, I believe, Amanda, Drew and Liana. There might have been someone else there as well. I don't know.

Q. And I'm just trying to figure out, yeah.

My understanding of your answer, you said you don't know, but I'm just -- you don't recall what happened during that call; is that correct?

A. That is accurate. I don't recall what was discussed or what happened during that call.

Q. Do you remember whether it was at the beginning or the middle or the end, toward the end of the investigation?

A. I would have to refer back to my notes. We engaged them in late April, the telephonic alleged threatening phone calls came in on the

Page 145

EXHIBIT "1", PAGE 145

19th.  I don't know if it was before or after the 19th.  I would have to refresh my memory.

Q.   You just said you'd have to refer to your notes.

What are the notes that you have?

A.   The actual -- not the notes.  Rather, the emails that you're referring to where we talk about Liana joining the call.

Q.   Okay.  You didn't, like, handwritten make some notes during the call?

A.   No.  No.  I misspoke on that.  Referring specifically to the emails that are part of one of the exhibits.

Q.   All right.  But during the call, you don't recall anybody -- well, let me ask, did anybody play any of the voice mails for you?

A.   I don't recall.

Q.   Okay.  All right.  I'm going to ask about -- let me ask about -- hang on.  I'm in the wrong document.

Let me look at -- okay.  So we'll look at an email that -- is it page 25 of your production?  This is dated April 27, 2022.  And I'm going to -- I'll make this an exhibit.  Let's call it Exhibit 13.

Page 146

EXHIBIT "1", PAGE 146

Alexander Feil, 30(B)(6)
January 10, 2023

(Whereupon, Deposition Exhibit 13 was marked for identification.)

BY MR. MELCHINGER:

Q.   And there is -- this is your client's, Drew -- maybe you weren't actually retained yet, I'm not sure.

Eventually your client, Drew Brady, is sending you an email on this date, right?

A.   Correct.

Q.   There's an email referenced here, which seems to have been attached as an MSG file to this parent email, right?

A.   Yes.

Q.   And that printout -- I don't know what this is, maybe this is one of the PNG or images or something here.

But this looks like the attachment, correct, Devon Porter at the top?

A.   Yes, it looks like it would be the attachment, but I don't have a good memory of -- of this email or the one above it.  But yes, it is, it appears to be the attachment that's referenced in Drew's email.

Q.   Okay.  And so you don't have any understanding of what this is, per se; is that what

Page 147

EXHIBIT "1", PAGE 147

Alexander Feil, 30(B)(6)
January 10, 2023

you're saying?

Recollection about it, to be -- to be fair?

A.    Correct.   I remember what -- I don't remember the context of it.   I remember what was asked of us.   And I believe it's referenced in the email where Mr. Brady -- yeah.   He was -- Mr. Brady had some visits to his Squarespace page. Squarespace is a website hosting platform.   So I don't know exactly what he was hosting there, but somebody had -- what's the word, somebody had visited his Squarespace page, and that's what he asked me to look into in the context of this Devon Porter individual, who I don't know who that is, or I don't recall who that is.

Q.    So let's just look at -- so this Devon Porter has the email address, and this is as shown on -- sorry, Sourced Intelligence page 28 of the document production.

And the email address is Stoplianacult, all one word, at Outlook.com, right?

A.    Yes.

Q.    And this is to -- sent to your client, Drew Brady, right?

A.    Yes.

Page  148

EXHIBIT "1", PAGE 148

Q.    April 14, 2022, and the subject line is "Can we talk," exclamation point, question mark?

A.    Yes.

Q.    It just says (as read):

Hello Drew, if you're interested, let me know.

Yeah?

A.    Yes.

Q.    As you sit here today, then, you don't recall who Stoplianacult@outlook.com is; is that right?

A.    As I sit here, I do not recall who that person is or who that email address belongs to.

Q.    So if -- I'm going down to some of the other information that was provided by -- it seems to have been provided by Drew Brady on May 26th. It starts on page 541 of the document production. And I think this is an attachment, but there is some kind -- some kind of screen shot starting with "Beware of fraud, Liana is a cult, et cetera."

And at the very bottom, do you see where it says, "Please follow our account, this is Lianacultrecovery, and reach out to me with your stories through" -- there's an email address.

Is that the same email address as the one

Page 149

EXHIBIT "1", PAGE 149

we just looked at that sent an email to Drew?

A.    It appears so, yes.

Q.    Okay.  And, again, there's -- I'm sorry.
Whoops.  There's a screen shot of this.   Let's see.
Whoops.  Sorry.  Okay.

So this looks like another screen shot
from maybe a phone of that same communication,
right?

A.    Correct.

Q.    Okay.  Let me ask another question.

Do you know who -- get to the name -- do
you know who this is, Felicia Mahachek?

A.    I was just looking at that.  I do not know
who that is.

Q.    So Google tells me that that is at your
attorney's office some kind of practice assistant.

Would you guess that she rented out this
email from the production or would you have any
understanding of that?

A.    I would have to ask them.  I don't know.

Q.    Okay.  But it does seem that in your files
somewhere, what you produced, there's a native
email, right, there's the MSG file that's referenced
up here, correct, as an attachment?

A.    Correct.

Page 150

EXHIBIT "1", PAGE 150

Q.   Okay.  All right.  And look at the header information and other information in this email from Devon Porter?

A.   No.  Again, that was not our primary focus.  We do this a lot.  Clients will send us stuff and keep sending us stuff.  A lot of it's noise, some of it's good, good information and good leads.  A lot of the times, we'll be directed to look at one thing, and then the client will start sending us things that require us to look somewhere else.  In this particular case, yeah, this -- this -- we did not look into that email address other than what Drew referenced in the email regarding his Squarespace account.

Q.   But -- I -- you were asked to look at the Lianacultrecovery site and the posts there, right?

A.   Well, not necessarily.  No one said look at this, this and this.  You know, they said here's this tranche of information, and we did a cursory review of what was provided.  So @lianashanti_cult_recovery was one of those things that had -- given the time we were allotted, that we did investigate.  We did not look into Stoplianacult@outlook.com, nor review a majority of the screen shots that were provided to us.

Page 151

EXHIBIT "1", PAGE 151

Q.    I'm sorry, my question may not have -- I may have used the word "this" and you misunderstood.

But you were asked to look at the identity and get attribution on lianashanti_cult_recovery and Instagram, right?

A.    Again, I can't recall a specific message that says, but I'm sure it's in the email somewhere where they said here's this, here's that, here are three or four things, and lianashanti_cult_recovery may have been part of that list.  So I guess to answer your question, yes, we were directed to look into -- into that account that your mouse is over.

Q.    But although you had -- well, let me ask another question, I guess.

The investigation you did was time restricted and kind of budget restricted based on the agreement that we see.

Was it still ongoing in -- you know, towards the end of 2022, for example?

A.    I'd have to look back at the emails again to see the additional correspondence that are all in the -- in the exhibits.  There was a -- we'll call it a tail to the case where they did continue to ask things, although the engagement was kind of unofficially over.  I guess I'm just a nice person

Page 152

EXHIBIT "1", PAGE 152

Alexander Feil, 30(B)(6)
January 10, 2023

and, you know, continued to help for probably a short period of time after the money was sent and the proposal was signed and the project -- or the report, rather, was provided to the client.

So to answer your question, did any work continue on beyond?  Yeah.  There was probably one or two small things, asked questions that they had that we answered.

Q.   I guess let me just ask.  So at least as of -- seems around the end of May 2022, you had some information that tied this outlook.com account to the lianashanti_cult_recovery account in Instagram, right?

A.   Yes.  It was in our possession, but we did not look further into that.

Q.   And generally, it is possible, if you -- if you -- like -- I don't know anybody who has Outlook or any other email system, basically, you can look at the headers in the emails and find a sender IP address generally, right?

A.   Depends when and what the sender is.  A lot of these companies, like Google and several others, have gotten smart and put in specific, we'll say, filters that don't allow you to do that anymore.  So I can't confidently say yes or no.  I

Page 153

EXHIBIT "1", PAGE 153

would say I would to have do the research myself to tell you what was in that header.

Q.   All right.   I mean, I'll follow up with your counsel if -- to communicate further on that, but I would like to get the copy of the -- you know, the native copy of the MSG file, the parent and the child attached.   And we should see, you know, what IP address information is in there.   But all right.

Let me -- we've gone about another hour-plus, I think.   I'm at a point where --

MR. MELCHINGER:   Jeff, I'm -- let's take maybe a little longer break.   I'm going to try to triage and see what's left, and then I think we'll just -- hopefully, I'll be able to wrap up in the next bit, okay?

And I assume -- are you going to have lot or --

MR. PORTNOY:   Five minutes.

MR. MELCHINGER:   Five minutes.   Okay.   All right.   Fair enough.

Okay.   So let's just try to come back at about 11 for now.   I'm going to try to pair down whatever I have left.   Okay.

MR. PORTNOY:   Okay.

MR. MELCHINGER:   I'm sorry, off the

Page  154

EXHIBIT "1", PAGE 154

record.   Thank you.

(Whereupon, a recess was taken from 12:45 p.m. to 1:05 p.m.)

MR. MELCHINGER:   Let's go back on the record.

BY MR. MELCHINGER:

Q.   So I just wanted to ask a little bit about -- I'm sorry, I will go back to the sort of the summary of findings and so on.   Just some cleanup questions and things.

You've also never spoken with Byron Horvath, right?

A.   That is correct.

Q.   And never met him or Paula Haygarth, right?

A.   That's correct.

Q.   And I think you had talked about the May 9th date being sort of a specific point that you focused on.

What -- what are the other sort of -- well, let me ask, is location another one, that sort of seems salient to you in making your attribution in the report?

A.   No, not particularly.   I think when it comes to the social media attribution piece, there's

Page 155

EXHIBIT "1", PAGE 155

very little or no locational data or information that's presented in the report. The only locational information that I can recall is what we had discussed earlier with regards to the PastePixel and the locational information of Moose Jaw, Saskatchewan, Canada, that came from that.

With regards to the report itself again and the attribution, I don't recall there being any reference to locational information.

Q. Sorry, I'm just noticing counsel's note in the chat that he's got a hard stop. Let's see. In terms of -- let's see.

In terms of the things that you looked at -- excuse me -- and relied on in making the sort of high degree of confidence attribution that you have, everything that you are relying on is in this report, right?

A. That's correct.

Q. Let's look quickly at the -- there's a use agreement on page 2 of the report. I'm sorry, it's page 1 of the report. And -- I'm sorry, this is also what I'm going to call Exhibit 9. And it's Sourced Intelligence page 756.

Is this -- you see what I'm looking at, the use agreement paragraphs?

Page 156

EXHIBIT "1", PAGE 156

A.    I do.

Q.    Are these a true and accurate statement of the uses for which this report is permissible?

A.    Yes.  It's a templated use agreement, so at that time, yes, that is an accurate depiction of that.

Q.    Okay.  It is using it in litigation for another lawsuit or for attribution purposes, one of the permissible purposes in the use agreement?

A.    I would to have review or have an attorney review the use agreement for this specific terminology used.  I can't definitively say that.

Q.    I'm just asking for your understanding, then.

Is this a permissible purpose to use the report in a lawsuit that is brought by someone who is not your client?

MR. PORTNOY:  Objection.  Calls for a legal conclusion.

MR. MELCHINGER:  I've been asking for his understanding.

MR. PORTNOY:  Same objection.

BY MR. MELCHINGER:

Q.    You can answer.

A.    Oh, I apologize.  I thought -- I thought

Page 157

EXHIBIT "1", PAGE 157

you were taking --

Q.    No.    Yeah.    I'm sorry.    When an objection is stated, you can still answer.    Yeah.

A.    I think to answer that question, I would to have quickly speed read through this and see, or if you could point me to the line that refers to that, or if it doesn't exist.    But I would to have quickly read through it to accurately answer that question.

Q.    When you say "it," what do you mean?    The use agreement?

A.    I'm sorry, I'd have to quickly read through the use agreement to accurately answer that question.

Q.    Okay.    The whole use agreement is on the screen.    So --

A.    Let's see.    I will take a minute to read it, then.

So I don't know the answer to that question.    I don't know if there's any legalese that I'm glossing over too fast.    If you could repeat the question just one last time so I can fully understand.

Q.    Well, let me ask something, you know -- I'm just asking, is the use of this report -- well,

Page 158

let me ask something else.

The permissible purposes -- and I'm looking at the paragraph number 2, and it says the permissible purposes are.

And there is A, B, C and D, right?

A.    Correct.

Q.    So there's business need in connection with a transaction, right?

I'm just paraphrasing what's written there, but is this related to a transaction initiated by a consumer?

A.    It is not.

Q.    Is the lawsuit that we're talking about here for the underwriting of insurance as a result of an application from the consumer, et cetera?

A.    No, it not.

Q.    All right.   Is it for a use by a potential investor or servicer, as stated in letter C?

A.    It is not.

Q.    And is it for employment purposes in letter D?

A.    It is definitely not.

Q.    Okay.   And, in fact, the client being the Bradys certified that -- it says "it," but I assume that's, you know, the client will use the

Page 159

EXHIBIT "1", PAGE 159

information for specific permissible purposes, right?

A.    Correct.

Q.    Okay.  All right.  That's basically all I want to know.

In terms of the May 9 date that we talked about, you noted there were several accounts and posts and things that happened on May 9 from Paula Haygarth.

Did anybody else make posts for the first time on May 9th on any of these basically forums, such as -- sorry.

Let me look at -- the survivors of the Liana Shanti, for example?

A.    So is the question -- when you say, "Did anybody else create an account on May 9th," meaning -- by "anybody else," meaning --

Q.    Anybody else.

A.    In the world?

Q.    In the world.

A.    I'm sure other people created accounts on May 9th, 2022, yes.

Q.    And these posts that you're investigating are anonymous accounts, right?

A.    They are.

Page 160

EXHIBIT "1", PAGE 160

Q.    And you weren't able to, you know, subpoena information to try and figure out who might have created the accounts or at least get better intel from the subpoena, correct?

MR. PORTNOY:    Objection.    It's been asked and answered now four times.

MR. MELCHINGER:    Asked and answered is the objection.    Okay.

BY MR. MELCHINGER:

Q.    But you can still reply.

A.    I'm sorry, was that for me?

Q.    Yeah.    You can go ahead and answer.

A.    If you could repeat the question.    I got distracted there.

Q.    Yeah.    Okay.    Now we're going to get another asked and answered objection.

So essentially, you weren't able to subpoena and find out exactly who the accounts were created by or get better intelligence, right?

A.    That's correct.

MR. MELCHINGER:    And I'll give you the same objection, Jeff.

MR. PORTNOY:    Thank you.

BY MR. MELCHINGER:

Q.    Let's see.    Let me ask, have you ever been

Page 161

EXHIBIT "1", PAGE 161

retained by any other followers of Liana Shanti, to your knowledge?

A.    Followers of Liana Shanti?  To my knowledge, no.

Q.    All right.  Have you been asked by any other client to investigate the -- any sorts of cult allegations or statements that you investigated in this report?

A.    Not that I'm aware of.

Q.    So you haven't prepared another report for anybody else related to this type of -- the types of statements that you were investigating in this investigation for the Bradys?

A.    Not that I'm aware of.

Q.    Let's see.

MR. MELCHINGER:  All right.  Subject to a little more cleanup, I think -- I think I am done here.  Jeff, I'll pass you the witness.

MR. PORTNOY:  Okay.

EXAMINATION BY MR. PORTNOY

BY MR. PORTNOY:

Q.    Hi, Alex.

A.    Hey.

Q.    You testified today that you believe that to an 80 to 95 percent confidence level that

Page 162

Paula Haygarth played a primary role in the harassment campaign targeting the client. Your report and your summary then goes on to say that additional actors, in parentheses, to some degree, are involved in the campaign to include -- I just want to talk about Byron Horvath, who is a defendant in the case. You haven't been asked any questions really about Mr. Horvath.

Can you tell me why you have in your summary that you believe that he was involved to some degree, and then we'll talk about what you meant by "some degree"?

A. Yes. So Byron Horvath, the communications that he allegedly had with the Bradys or other interested parties, it was a small portion of the investigation that we kind of approached in passing. It was definitely not the primary focus point of the investigation. So -- and that's why it uses that word, "to some degree," as far as Elise Winter, Byron Horvath and Shannon Glas.

With further time, we would have been able to deduce those answers better than we did in this particular version of the report. However, there is very little information, as you see in the report, that refers directly to Mr. Horvath.

Page 163

EXHIBIT "1", PAGE 163

Alexander Feil, 30(B)(6)
January 10, 2023

Q.    Okay.    But you had enough information to suspect that he might have been involved in some way?

A.    I would heavily emphasize the word "suspect."

Q.    My final question is, after almost five hours of questioning by counsel for the defense, do you stand by your report?

A.    I do stand by the report.    I do.

MR. PORTNOY:    That's all I've got.    Thank you.

MR. MELCHINGER:    All right.

FURTHER EXAMINATION BY MR. MELCHINGER

BY MR. MELCHINGER:

Q.    I'm not going to rehash the entire deposition, obviously, but, okay.    Just look again here at -- okay.    I'm looking at -- I'm sorry, I stopped my share.    I'll just put it back up.

I'm looking at the same paragraph Mr. Portnoy was asking about, the bolded second bullet point on page 3.

In terms of these additional actors and including the names listed, your report really doesn't have a conclusion in it, right, about who posted anything, correct?

Page 164

EXHIBIT "1", PAGE 164

MR. PORTNOY:  Objection.  The report speaks for itself.

BY MR. MELCHINGER:

Q.    And you can answer.

MR. PORTNOY:  And it's been asked and answered.

MR. MELCHINGER:  Okay.  That's fine.

BY MR. MELCHINGER:

Q.    You can -- you can answer the question.

A.    Can you -- sorry.

Q.    Yeah.

Let me ask, so the report doesn't connect any particular individual mentioned in the report with any particular post necessarily, correct?

A.    Correct.

MR. PORTNOY:  Object.  Go ahead.

THE WITNESS:  Apologies.

No.  Per the report, per the language written in the report, it does not definitely attribute an account to her with 100 percent certainty.

BY MR. MELCHINGER:

Q.    When you say "her," I'm sorry --

A.    Apologies.

Ms. Haygarth.

Page 165

EXHIBIT "1", PAGE 165

Q.    Okay.    I think let's -- let's stop there and conclude.

MR. MELCHINGER:    On the record, I should also say, yes, please, you will have a chance, Mr. Feil, to review your transcript and to make corrections, and this is pursuant to Hawaii Rule of Civil Procedure 30, and you will have a chance to, you know, make any kind of change to your testimony. But obviously, at trial, if you have made some kind of substantive change or other change, we have the chance to ask you about it, okay?

THE WITNESS:    Understood.

MR. MELCHINGER:    Off the record.

(Whereupon, the deposition concluded at 1:22 p.m.)

--oOo--

Page 166

EXHIBIT "1", PAGE 166

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day: 1/21/25

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

___x___ Re                                    iested.

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212

Page 168

EXHIBIT "1", PAGE 167