IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI, Plaintiffs/ Counterclaim Defendants, vs. PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10, Defendants/ Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br>Honolulu, Hawaii<br>August 3, 2026<br>JURY TRIAL - DAY 1 |

PARTIAL TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs/ Counterclaim Defendants:
JEFFREY S. PORTNOY, ESQ.
TROY C. YOUNG, ESQ.
Cades Schutte
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813-4212

For Defendants/ Counterclaimants:
JOSEPH B. ADAMS, ESQ.
LOUISE K.Y. ING, ESQ.
LAURA P. MORITZ, ESQ.
Dentons US LLP
1001 Bishop Street, Suite 1800
Honolulu, Hawaii 96813

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

MONDAY, AUGUST 3, 2026

* * * * *

(Start of partial transcript:)

THE COURT: All right, ladies and gentlemen, welcome back.

You should have on your chairs, and it looks like you now have on your laps, the calendar of the trial. As I mentioned before, you can take that home if you need to or send it to your employer if you need to. It just gives the general schedule. I'm not going to send it to your employers, so do with it what you wish.

You also have a notepad. As you heard, you can take notes but you don't have to.

I want to say two things. The first is to you, which is that we are going to hear opening statement from the plaintiff and then we will take a stretch break and then we will hear opening statement from the defense and then you will leave for the day.

The audience is informed that cell phones should be turned off or turned on silent. Recordings and videotaping and photographing of anything in the courtroom or in this courthouse is strictly prohibited. And we have informed the attorneys that if somebody is doing so, they will be subject to sanctions.

All right. With that, ladies and gentlemen,

Mr. Portnoy, will you be delivering opening statement.

MR. PORTNOY: I will, Your Honor.

THE COURT: All right. If you could please pay your kind attention to Mr. Portnoy who is delivering the opening statement of the plaintiffs' counterclaim defendants here.

MR. PORTNOY: I have two microphones depending on if I want to walk or stand, but I'll start from here.

My name is Jeff Portnoy. As you heard earlier, I am the trial counsel for Liana Shanti and her company. Troy is with me, as one of my paralegals is with me as well.

Can you hear me?

A JUROR: I'm fine.

MR. PORTNOY: Okay. Let me know, please.

This is an opening statement. As you heard about an hour-and-a-half ago, it's not evidence. All right? I want to reinforce that right at the beginning. This is just the way I see this case proceeding.

Look at it like a GPS. We're going to start here, we're going to end there and I'm going to try to show you and tell you what evidence we hope to prove.

Here's an important thing. I want you to hold me to this, and I want you to hold opposing counsel to this. If I tell you something is going to be produced in evidence, unless the judge rules otherwise, if I don't do it, you remember that. Okay? Because it's easy for me to get up here and tell you all

these things are going to happen to hope that you automatically are going to reach a conclusion before you hear any evidence. I'm going to try to give you the roadmap.

I want to thank you before I start for giving up two weeks of your life to sit as citizens, but as you know, this is important.

I want one thing: Fairness. That's at the end. At the end of the case, the eight of you will decide whether my client prevails, or the defense prevails, or neither one prevails.

I'm an advocate. My job is to hopefully convince you that the evidence that we put on, the evidence, not my next 26 minutes, is going to convince you that my client has been weaponized by the defendant. That the defendants, through a conspiracy with named and unnamed people, entered a series of outrageous defamatory statements, which I'm going to tell you we're going to prove were entered.

The defendants, the evidence will show, take the position that they didn't write or produce or reproduce any of these alleged defamatory statements. Because, why? The evidence will show that whoever posted all of these horrible things, which I'm going to read to you as evidence, you're going to hear it, you're going to see in writing, you're going to see the photos of what was on the Internet, was all done anonymously. No one who defamed my client put their name to

it.

But this case we're going to prove to you -- because we don't have direct evidence. We don't have the author of all of these statements, as you're going to hear, from the defendants. We didn't do it. In fact, the evidence is going to show the defendants are going to tell you, We don't know who did it.

But here's what the evidence is going to show: The evidence is going to show, and I'm going to go into it in a little while, that because of what my client and her company do, the defendants and these others, anonymous and otherwise, conspired, one of the claims we have is a conspiracy, because we don't have evidence, direct evidence, that the defendants posted anything. But we're going to present to you what I call and what the law calls and what the judge just indicated to you in the instructions, it's called circumstantial evidence.

Here's an example. You go to sleep at night, the roads are clear. The grass is green. You wake up in the morning and there's snow. You weren't up when it snowed, but you know it snowed during the night. That's what we're going to try to prove to you.

We take piece number one, piece number two, piece number three, and you're going to hear it, I'm going to tell you what we're going to try to prove, and you put it all together and you have the pie.

Not only, the evidence will show, was my client defamed, false, horrible things said about her on the Internet, but these three defendants engaged with these other people to write letters to another federal judge in a matter totally unrelated to anything that was involved in the dispute between my client and the three defendants.

My client, you will hear, sustained a bankruptcy conviction years ago. And you'll hear her evidence. And there was going to be is a status conference on her probation. Nothing to do with anything you're going to hear about why these people engaged in interactive defamation.

The difference is, you're going to hear my client put her name on everything she put on-line. Everything she posted, she put in her name. They were letters to the court, with these other people who they claim, the evidence is going to show, they never knew who they were.

Except they've already admitted in testimony that they talked on a Zoom call with these other people and don't know one other person. Not one other person. There were 30 letters written.

Was there snow on the ground?

They claimed they were contacted by someone they don't know and asked to participate in this letter-writing campaign about my client's bankruptcy probation status.

Ever been on a Zoom call?

Then they received multiple subsequent e-mails about what happened at the status conference, which, by the way, was nothing. And they say they don't know a single person that sent them these status reports of what happened at the status conference, how they were going to deal with it going forward, how they were going to ruin, the evidence will show, my client's life.

The evidence is going to show that nothing is more important to anyone than their reputation.

Who is Liana Shanti?

Well, you're going to hear tomorrow in great detail from her own mouth about her life. But essentially the evidence is going to show, she is a woman who has dedicated the last ten years of her life to promoting the rights of women. Telling women how to live a life that fits what their life should be. Women who are involved in messy, ugly divorces.

These three were all involved in messy, ugly divorces, and then remarrying people from the other divorces.

She counsels women on how to protect not only the woman in an estranged relationship, but the evidence is going to show children who my client learned from one spouse to a former marriage was being abused by one of the defendants. And so she was there to help support this woman in a story that you're going to hear, that I don't have time to tell you right now, but you're going to hear it from my client.

This whole thing arises from my client's -- my client being asked by one of her students to help in a very ugly, messy family situation. And because she did try to empower this woman, the evidence will show, these three and these other conspirators tried to destroy her life.

Now, what does my client do? She has a company. She sells educational materials. She sells health materials. She gives assistance in trying to help women be empowered. And you'll hear it from her. You don't need to hear it from me, and you'll hear it from the witness stand.

What happened, this one woman I mentioned, is incredibly, the evidence will show, after providing my client with texts and posts and phone calls and -- day after day about what was going in her life with Mr. Horvath, in order to be able to spend time with her daughter has turned. She made a deal in a custody hearing just a little while ago. After providing all of this information about what was going on in her marriage, and what had gone on after she left, and what was going on with her daughter, in order to try to keep the ability to visit with her young daughter in Canada, she now says that everything she said, and you'll hear it all, that she told my client about Mr. Horvath was either a lie, was made up by my client, none of it happened. And it happened -- her change happened the day of a custody hearing in order to get the ability to spend a couple of weekends a month with her

daughter.

So you will hear that testimony, and you will hear my testimony of that woman, and you will decide how credible that person is.

And you're going to hear from another former student who provided my client with all kinds of information about all three of the defendants. And then, after the defendants took her deposition, the next day she said, Oh, I made all that up. I didn't tell -- tell my client -- I didn't tell your client lots of the things that I told her.

Conspiracy.

Husbands and wives getting marrying after divorces. You'll hear this tale by facts of this three couples, divorced, remarried with somebody else in the group.

Let me just give you an example of some of the things that were posted anonymously.

Oh, by the way, the evidence is going to be very interesting in this regard: The defense is, we never posted a single thing online about my client. But -- but anyway, the evidence will show, it's not defamatory.

Well, if you never posted it, the evidence will show, why are you going to testify that whoever posted it, it's not defamatory?

We'll see what the evidence as you hear it from the witnesses, the explanations, as to why, if you didn't do it,

why do you care if it's defamatory or not? We'll hear what they say.

But let me just read you some of the things that you're going to hear in evidence. Multiple times many of these things were said.

On Instagram, I know you're all on Instagram. We talked about that in jury selection. Reddit. And a site called Cult Education Institute. All anonymous. Every single post. How Liana is a cult leader, she coaches other women on how to claim sexual physical abuse against their partner, she encourages false police reports. These are all separate postings. She takes investors' money out of Canada into Florida using a state tax loophole to fund a mansion and a cult.

She never lived in Florida, the evidence will show, so I don't know whose mansion the evidence will say, but not hers.

This is the most important one because it is the crux of how it ultimately tried to destroy her life, her business, her family, her reputation. She uses programming and undue influence, societal pressures and private groups to extort women into disconnecting their families, friends, and spouses in order to truly heal.

In other words, I guess they're going to try to show she's a brainwasher. Has some ability to -- to make people do what they don't want to do. She's running a cult, is what

they're trying to say.

Does anybody doubt that what I just read you, when it goes out over the Internet, anonymously so nobody can even follow-up who's saying this and why you're saying this, what facts do you have? You won't see any of that in the evidence.

The evidence is going to be that this was all in retaliation. That's what the defendants are going to say. And our evidence is going to be, no, the retaliation went the wrong way. My client posted things she was told by one or more of the women, and I've mentioned the two of them that have now turned -- and you'll hear it, you'll see what they said at various times, and now what they're saying. And you can -- you'll compare, the evidence will allow you to compare, which story. Was there -- is there some reason, I'm going to question them, some reason why now you're saying none of it came from you or you made it all up? This is stuff that my client ultimately posted.

The evidence is going to show my client never met personally the defendants. The evidence is going to show they weren't her students. The evidence is going to show that my client has over a thousand students, who pay money in many cases for some of her programs that she's built up over the years.

The evidence is going to show that the year before this abuse started, the evidence, these anonymous things --

I've only read you a small number because I only have a half hour -- the income dropped from over $2 million to a little under $1 million. Just that one year. The evidence will be, why? Is it the snow on the ground? That a business that was earning over $2 million doing the things that she does -- and I'm not even mentioning now you will hear in the evidence all of the things she does for free to help people, not just women. You're going to hear from the family about what she does on the island of Kauai. Not for money, for people who need help in one way or another.

So the evidence is going to show what do you get for helping people? The evidence is going to show what you get is a barrage of statements similar to what I read.

The evidence is going to show that students -- we don't know about prospective students, right? Because we don't know about prospective people who would have joined and become students of hers, or bought one of her programs. But we do know a little bit, because we're going to have a witness who's going to tell you about people who called and said, you know, I wanted to join Liana's group, but I read online that it's a cult, or I read online that she steals and she robs and she's building a mansion in Florida and she tells people to leave Canada and go to the United States. We also know some people who left, who were already students.

But the evidence is going to be, this case really, at

the bottom line the evidence will be, it's not about money. Sure, money is always a part. The evidence is going to be reputation. What is it worth? And you're going to hear my client tell you, if you can value, reputation.

Now, the second part of this trial is the counterclaim. The evidence is going to be, they never filed a suit claiming that what she posted was injurious in any way. When we sued, the evidence will show, obviously decided, Well, you know, the best defense -- play football -- is a good offense. Why don't we countersue? So they have.

And you're going to hear some of the comments my client's posted. Much of which, the evidence is going to show, came from other people. Came from Amanda Brady. Came from Haley Winter. We're not calling them. Not after they, you'll hear, switched their testimony. I would have loved to.

Amanda Brady, you'll hear, was our witness until her deposition. Haley Winter was assisting us until she had to make a deal with her former husband to be able to see her child a couple of weekends a month. Tough decision she had to make, isn't it? Should I tell the truth or should I say everything I told you before I recant? So she can see her daughter. You'll hear that evidence. That's --

And, although, the letters to the Court have a certain privilege, which you'll hear about from the judge, the fact that the letters were written with this unknown group on a

totally unrelated matter, the evidence will show, is evidence of these three conspiring with, they're going to say, I don't know who anybody else is.

I want to end -- I don't know how much time I have left, Your Honor.

THE COURT: You have seven minutes and 15 seconds.

MR. PORTNOY: Oh, I have 15 seconds, too.

THE COURT: Yes, seven minutes.

MR. PORTNOY: Thank you. Thank you. Thank you.

I want to tell you about our witnesses, very briefly.

You're going to hear Liana's son, Chance, who is a tremendous amateur golfer. You're going to hear from her daughter Bianca, you're going to hear from her husband. But you know, the evidence obviously is going to be -- you know, they're going to say, put on evidence maybe, they're your kids, they're going to say nice things. You're going to hear what's happened.

Not only the written stuff, not only the Internet postings anonymously, not only the letters to the court in a totally unrelated matter, but phone calls, anonymous, made to businesses on Kauai, made to Chance's golf coach on the mainland, defaming my client. An attack on the whole island on Kauai. Wasn't enough just to ruin her life, apparently, online, let's ruin it every way we can, let's inundate Kauai by telling everybody we can she's a monster, she's a thief, she's

a cult leader. That's who's living within your midst.

My client's not perfect. None of us are, I'm sure. She's made a couple -- one, at least, inconsistent statement, that she'll explain, in the federal court proceeding, about a certain site and whether she originated that site and whether she posted on that site. But you'll hear the evidence from her husband as to how that site was originated, and it's not hers. She never posted a single thing on that site that they're claiming she posted on. And she'll explain why she told the judge one thing and the truth actually is another, and you'll evaluate it.

She has the bankruptcy. We're not hiding. But are the defendants going to hide from the evidence that at least Mr. Horvath used cocaine? Because that's what he did. And so when my client posted it because she was told by the former wife, it's true. He'll try to explain it away.

We are trying to show you that there's going to be some evidence that they're going to try to show that my client can't be believed, and you'll have to evaluate it because you'll hear from her tomorrow.

You'll hear from an independent contractor, as I mentioned earlier, that works for my client, that will tell you about the phone calls she got about people dropping out of the program or not engaging in it. We don't know how many hundreds of others just read it online, anybody that goes on Instagram.

We'd be in a different situation, the evidence would show, if the people who posted that stuff identified themselves. Maybe these three wouldn't be here. Maybe they'd be here, as the evidence will show, for other things. A whole group, a whole group that decided to let it snow overnight. Because anybody, as the evidence will show, deals on a computer, knows how easy it is to say whatever you want anonymously.

By the way, I talked to you about evidence of circumstantial evidence. You will hear that we tried to get information from the various sites, from the Metas of the world, from all of those people. But they don't give up that information. They won't tell you who the posters are.

But what we did get from Meta, and you'll hear it, is the IP addresses.

The evidence is going to show this is a very interesting thing. The defendants live in Saskatchewan, Canada. Guess what Meta gave us in the way of an IP for the first three anonymous postings. Where they came from, we determined, Saskatchewan. Snow? We'll find out.

There was also a company that had been hired by Amanda Brady, because she was the subject, you'll hear it, of threats by Mr. Horvath when she moved to Florida with her new husband Drew Brady. They were harassed. She'll testify to that. They got anonymous phone calls threatening their lives. You'll hear

from both her and Haley Winters, to who made those calls, according to these people, not my client. Their witnesses who identified Mr. Horvath as the person either made the calls from a phone number of a friend, whatever.

The harassment started against Amanda Brady, you're going to understand, because of the custody of a movement away from Canada to Florida of the Bradys. We'll get into that over the next few days. Sounds like a -- anyway.

She's not the only person who was harassed by this group. But eventually they decided, you know what, the evidence will show, because you can put it together, let's try to cut the head off the snake, in their view. And that's what they did. That's what they did. And you will hear lots -- you will see and hear lots of what was said about my client.

So I want to thank you. Again, this is just an opening statement. Listen to the evidence. Don't make your mind up to the end. Remember there's kind of two cases in one, there's our case against them, and then their case against ours.

And again I thank you very much.

THE COURT: All right. Thank you.

Ladies and gentlemen, as promised we will take a stretch break right now. So you'll not leave the courtroom or leave the jury box, and as soon as we're done we'll hear from Mr. Adams.

(Pause in the proceedings.)

THE COURT: All right. Thank you, Mr. Adams.

One second, I'm waiting for that monitor to turn on. It looks like it is on.

And you may proceed.

MR. ADAMS: Thank you, Your Honor.

Good afternoon, everybody.

As I introduced myself to you earlier, I'm Joe Adams. Along with Louise and Laura, we're going to be the counsel for the defendants in the case, but they're also the counter claimants.

My clients, Paula Haygarth, Stefanie Horvath, Byron Horvath. And they appreciate you being here today and taking this time, because it's a very important process for them. They've waited years for this day. So thank you so much. Thank you very much.

Everybody can hear me okay, yeah?

This isn't evidence, this is just argument. This is not argument, this is a roadmap of what the evidence is going to be. My statements are not evidence, as -- as the plaintiffs' counsel already said, Mr. Portnoy. And so what we're trying to do is, here, to try and walk you through what we believe the evidence will show.

First, let's start off with the parties.

You've already been a little introduced to Ms. Wilson.

She's sitting there next to Mr. Portnoy.

She describes herself as an online teacher and an influencer who is based out of Kauai.

My clients, Paula, Stefanie, and Byron, they live in Canada, up in Saskatchewan. Byron's a farmer. Stefanie is his wife. She's also an occupational therapist in a school. That's their little baby, Blakely. Paula is a life coach, former life coach and small business owner.

They all live in Canada, that's where they're all from. So they've traveled here many -- a great distance to be here. They're all from Saskatchewan, as you heard. Saskatchewan is very far away from Hawaii.

But they're here asking you to decide some very important issues. And the first they're going to do is they're going to ask you on plaintiffs' claim.

Now, let's talk about plaintiff. She's the one that started this action. Ms. Wilson. And she goes online by the name Liana Shanti. But I'm going to call her Ms. Wilson because that's her legal name.

She calls herself a teacher and sells self improvement programs online. She has tens of thousands of followers online across multiple social medias, tens of thousands. She boasts to be a world renown scholar in her field of business and nutrition, but she doesn't have a business license and she doesn't have a medical license. She doesn't have any licenses.

The evidence will show that she lives her life online. That's how she makes her business. And her company Life Mastery, she testified and you will hear, the evidence will show, that's her. Her business is her. She is her business. So for her purposes, and what she's testified and the evidence will show, she makes no distinction.

Meanwhile, the defendants, my clients, Paula, Stefanie, and Byron, are private citizens; a farmer, a school teacher, and a small business owner. They do not live their life online. They don't have thousands of followers on social media.

Paula, she's a former life coach. Her and her husband, Wade Martin, you'll hear from Wade, he will be coming in later in the week, he's working in Canada. They live in another part of Canada now, they moved out of Saskatchewan.

Byron and Stefanie, they're married.

And you might be wondering how these people are all together. We'll get to that. They are not related. Byron and Stefanie are married. And Paula is from Saskatchewan as well, but they are not related. Okay. They are brought here by Ms. Wilson.

And what will happen is the evidence will show that for some reason Ms. Wilson decided to get involved in their two family privacy -- in the private custody disputes that they had. That's because the two mothers that were involved, Haley

Winter and Amanda Brady, they were students of Ms. Wilson.

And the evidence will show that those two students will come in here and tell you exactly what happened in their lives.

But you may ask me, you may me why a social influencer from Kauai decided to get into the lives of people living in Canada. Why?

They're worlds away. But not for Ms. Wilson, they're not worlds away. She has tens of thousands of followers across multiple countries. In a single post she claims she can reach 90 countries.

And then when things didn't go her way in the custody, because my clients got custody of the children, things didn't go her way, she created an online campaign against my clients, private citizens living in Canada. Using her giant social media platform, branding them pedophiles, Satan worshippers. And for one, Paula, claiming that she abandoned her child. A crime of moral turpitude. Abandoning a child? It's interesting because that claim, abandoning your child, has been admitted that she said it, posted it repeatedly on Instagram with photos of Paula. The Court 's already determined that that's defamation, per se. And I'll get to that.

But basically what Ms. Wilson has done is she's branded these private citizens, using her massive platform, she's branded them as pedophiles, child abusers, and Satan

worshippers. And just with one little click, she can send it out to tens of thousands.

What we're looking at is online defamation. That's what happens, and you all know, when you have a large social media platform, or any social media platform.

They claim that my clients made anonymous post on Reddit, that's online defamation, the category of it. On Reddit, Instagram, on Facebook, that's what we're talking about here, online defamation.

But against my clients, they're anonymous posts. And this is what he was talking about the snow. It's not going to be as easy as waking up and seeing snow.

They don't have any proof, zero, that Paula, Stefanie, or Byron made any of the posts on Reddit. In fact, what you're going to hear the evidence will show is that there's hundreds of disgruntled students of Ms. Wilson all over the globe that are just waiting to provide some sort of comment on it.

Ms. Wilson broadcast her lies to the world, under her name, yes, to her tens of thousands of followers. But they have to prove and they have to connect the anonymous posts to my client.

On top of that, if you do, for whatever you reason you find the circumstantial evidence points to somebody in Saskatchewan, and you somehow believe that that's my clients, truth is a defense. And you're going to hear about how

Ms. Wilson runs her business. How much she charges for a mentorship. How she gives her mentees and her students a new name. Encourages them to disconnect from their family. Claims that she can speak directly to Jesus, the evidence will show. Claims she can speak to whales because they have the Akashic records of all known. And to just pay her thousands of dollars, you'll get the information, too.

And you're going to hear two witnesses.

So, first of all, let me back up. The statements are true, right, that's a defense. You've heard that, oh, she kind of runs a cult. Sounds a little culty to me, new name, new words, I can speak to Jesus.

MR. PORTNOY: Excuse me, Your Honor, I think this is argument.

THE COURT: Sustained. The jury will disregard the statement starting with, That sounds like a cult to me.

MR. ADAMS: Apologies, Your Honor.

But you'll have to decide if the statements are opinions or true. And if they are, there's no defamation.

And then finally, the sources for the information, you heard, the evidence will show, this is all secondhand. So, we all hear about gossip, but we all don't have tens of thousands of followers that we push it to, right? That's what she did, the evidence will show.

And who did she rely on? She relied on two witnesses

that were her former students. And they'll come here today -- not today, this week and next to the trial. They're traveling all the way from the Mainland to come to testify against Ms. Wilson.

And you heard that one of them turned only at her deposition? She's going to tell you why. The evidence will show that actually Ms. Wilson was texting her during her deposition, telling her what to say.

That's why she had enough. You'll hear that directly from her.

That was Amanda Brady. The reason why Amanda is here and the reason why Paula is here, is because Paula is married to Amanda's ex. Okay. That's the connection to Paula.

And Amanda's -- Amanda ex, Wade, that's Paula's husband, you'll hear from him, Amanda took their two daughters out of Canada and fled to Florida, for years. And Wade had to try and deal with, during COVID, trying to get his daughters back from Florida. And the evidence will show that Ms. Wilson encouraged her to take those kids over the border.

I thought she was a life coach, the evidence will show. Instead, the evidence will show she's getting involved in custody disputes for couples in Canada.

Amanda will tell you that she spent over $80,000 on Ms. Wilson's programs. I don't think I spent that to go to law school, but the evidence will show that that's how much one

person spent on nutrition and self-help stuff from Ms. Wilson.

And Haley. Haley will come in here. The reason why Haley is a witness is because Haley and Byron were married. And Haley and Byron have a little daughter named Ayla. And the evidence will show that Haley was one of Wilson's students, too. And she does this thing, and Haley will tell you about it, she does this recovered memory thing where she got Haley to recover a memory of abuse and then weaponized that. She's not a psychologist, she's not licensed. She's not a cop, she's not, a law enforcement. She's none of that. But she's involved in trying to recover memories from a very vulnerable young mother that's in a custody dispute.

And the evidence will show that -- Haley will come in here and testify that she spent over $25,000 on Ms. Wilson's programs, direct mentorships.

And she, too, during those mentorships was encouraged to cross the Canadian border to try and get her daughter Ayla out. And the evidence will show that Ms. Wilson encouraged her to do that.

And so what happened then is that Wade, who's -- remember Wade's ex is Amanda, and Byron, whose ex is Haley; Wade and Byron got together to try and get their kids back. And they wrote letters to the court, because Ms. Wilson's actually on probation for a felony. And it's not for filing a bankruptcy. It's that she fraudulently concealed assets, the

evidence will show, during that bankruptcy. Deceit. That's what the court founded. And so she's on probation. Sitting here today she's still on probation, the evidence will show.

So, part of what they tried to do is if this woman is on probation for fraud, I need to try to do something to get my kids back, since she, Ms. Wilson is the one, encouraging these women to go over the border.

As I mentioned, what happened then is in April of 2022, Paula's husband and Byron wrote letters to the court to try -- to the court in Canada, to try and get custody back for Byron's daughter. This enraged the plaintiff, Ms. Wilson.

MR. PORTNOY: Your Honor.

MR. ADAMS: Enraged her.

MR. PORTNOY: Objection. Argument.

THE COURT: Overruled.

The jury understands that what is stated is not evidence.

MR. ADAMS: You'll see exactly what the response was. She filed this lawsuit. She began an online campaign against each one of these three defendants, calling them pedophiles and associating with pedophiles, defending pedophiles, which she called pedos, but we all know -- the evidence will show that pedos is pedophiles.

In one of those statements, that Paula abandoned her son. She even said, this woman abandoned her son Austin, and

posted his name to her tens of thousands of followers. That's already been determined by this Court to be defamation per se. It's so clearly defamatory, the damages don't have to be proved under the law. And you'll see the jury instruction on this. All you have to do, your determination isn't to find out if that's defamatory, it's only to tell us how much that defamatory statement --

MR. PORTNOY: This is argument, Your Honor.

THE COURT: Overruled. He's telling them what this case is about with regard to that particular claim.

MR. ADAMS: Thank you, Your Honor.

So on that defamation per se, you don't have to decide if it's defamatory, you just have to find out and make a determination how much that cost Paula.

You're going to hear a bunch of different versions of the same story. You're going to hear Haley and Amanda come in here. And they gave different stories, but they're going to come here and they're going to look you right in the eye and you'll have to believe which one is true. And actually there's one story that's throughout this. It's a story of manipulation, we believe. We believe the evidence will show these two women were manipulated to lie under oath. We believe the evidence will show that.

So it's going to come down to credibility. And you're going to hear that Ms. Wilson's statement about Paula, this is

what she said, She abandoned her own son Austin.

This is what Ms. Wilson said about Byron, He's a child abuser, he's a pedophile. His daughter Ayla repeatedly says he abused her. And she posts Ayla's name online all the time. Ayla is still a minor. She's 11. She claims that Byron locks her in her room, hitting her, causing her panic attacks, called him a drug addict and Satan's soldier.

Wilson's statements about Stefanie Horvath, Byron's wife, that she's part of a vile group of pedos and pedos supporters, that she's part of Satan's soldiers, and that she's so desperate to become Haley, Byron's ex-wife, her student, by morphing herself to look as much as she could, moving into Haley's marital home. Just the shame she's trying to create. The evidence will show that this is a small town that received this, and that people saw this. And the defendants were ashamed in their hometown, the evidence will show, because of the statements broadcast widely to her tens of thousands of followers.

I mentioned Ms. Wilson's credibility. She's on probation for fraudulent concealment of bankruptcy -- of assets during a bankruptcy. She swore under oath in this case that she did not create a website called Exposing Family Abuse. But in that federal case, when she was trying to get off of probation, trying to respond to letters that were written about her activity, in that federal criminal case she told the judge

in that case, in this very courthouse, that she did create that website as a way to advocate for women. And that's the website that she used to defame my clients. That's why she lied about it, the evidence will show.

She has a history of litigation and lawsuits. She filed this lawsuit against citizens of Canada.

There's also the lack of financials produced in this case. You just heard something about the loss of a million dollars. You're not going to see a single physical document that supports that number anywhere. In fact, you're going to see the opposite. She testified that when she started her attacks, Ms. Wilson, that her business actually increased. That the negativity actually promoted her platform. That's what she said under oath. That's why, the evidence will show, she continues to do it.

One final thing, but a big issue, is that this is a defamation case, and you'll see the laws related to defamation, but there's one important issue here for Ms. Wilson versus my clients. Ms. Wilson, by law, the Court has already determined is somebody that's called a public figure. Public figures are like politicians and athletes that are famous, but they're also people that put themselves out in the public. They assert themselves in the public.

And so because they are public figures, like Ms. Wilson, the standard that they have to prove that they've

been defamed isn't just more likely than not. It's clear and convincing. The evidence will show that you have to find a little bit higher standard if my clients actually said the things that are attributed to them. You have to find a higher standard that it was clear and convincing, not just more likely than not, because she's a public figure.

And then here Ms. Wilson has indeed built a worldwide following of tens of thousands because she is a public figure.

How much time do you have, Your Honor?

THE COURT: Seven minutes and 30 seconds.

MR. ADAMS: Thank you.

So now let me tell you about -- so that's her claims, she has to prove the clear and convincing.

My clients also have claims, counterclaims. But since they're private individuals, all you have to find is more likely than not. And one of them you don't have to find at all. That Paula abandoned her son, already determined to be defamatory. But the other questions you have to find out, the other statements, your determination of whether they were defamatory or not; whether calling somebody a pedophile supporter like they did with Paula, whether that affected her business, whether that caused her shame, whether that caused her damages and injury.

And you'll hear from each one of my clients talk about what these statements from Ms. Wilson did to them in their

community and in their lives.

Here's what we ask of you: On plaintiffs' claims, first we find that Paula, Byron, Stefanie, they did not author these anonymous posts. They're going to come up and testify. They're going to get cross-examined about them, and you're going to hear straight from them whether they authored those anonymous posts. The evidence will show that they did not.

We also want you to find -- what we ask of you is to find that Ms. Wilson defamed Paula, Byron, and Stefanie on our counterclaims. Those are -- the pedo one's already been determined for you. The abandoned her son, you just have to find out if there's any damages attached to that.

And then finally we're going to ask at the end of this, we're going to ask that you compensate Paula, Byron, and Stefanie for the defamatory statements made by the plaintiff and the injuries they suffered, both monetarily and emotionally.

This is a case about accountability. Ms. Wilson used her platform and her influence to destroy the reputations of three private people. The evidence will show this. It's a small town where they live. The evidence will show that she did it knowingly, she did it recklessly, she did it without remorse.

And we'll ask you to hold her accountable.

Thank you.

THE COURT: All right. Thank you, ladies and gentlemen.

So we are done for the day and you're free to go.

Just a reminder, and I will say this at nearly every break, to make sure that you do not do any Internet research about this case. Do not talk to anybody about this case. If you have any questions about that rule, I want you to raise them as soon as you have them with my courtroom managers and we will clarify them for you. So don't talk to each other, don't talk to your folks at home or at work or friends. And certainly don't post anything on social media about this case. All right?

So, Ms. Cortez, we would like them here tomorrow at 8:15 in the jury room?

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Okay. 8:15 in the jury room. And we will start immediately at 8:30. So that's the plan.

For those of you who are our neighbor island folks, I know that our jury department is very good at working with you to make sure that we figure out what your preference is with regard to flights. If you want to fly back and forth or stay at a hotel, you can. That's entirely up to you. But work with them on that. And if you run into any problems with that, which nobody ever does, but if you do, please do let us know.

And with that I will ask everyone to please rise for

the jury.

(At 2:30 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: Thank you. You may be seated.

Who will your first witness be, Mr. Portnoy?

MR. PORTNOY: Chance.

THE COURT: Okay.

MR. PORTNOY: Chance Wilson.

THE COURT: All right. And do you have a plan for the dog? When he takes the stand, the dog is going to be staying there? Okay.

MR. PORTNOY: He will be fine for that. He can remain in the courtroom for the rest of the trial, Your Honor.

THE COURT: Okay. Thank you.

So tomorrow we will start with Chance Wilson.

If either side has anything to raise with me now, please do so. No responses.

If something comes up overnight, I please ask you to let Ms. Cortez know as soon as possible, because if that happens you will be expected to show up at 8 o'clock or even earlier depending on what the issue is. So please give her some insight into what that issue may be.

Thank you, everyone. We are in recess until tomorrow.

MR. PORTNOY: Thank you.

(The proceedings concluded at 2:31 p.m.,

August 3, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct partial transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 3, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC