IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/<br>Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/<br>Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 4, 2026<br><br>JURY TRIAL - DAY 2 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/ Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/ Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


EXAMINATIONS PAGE

CHANCE WILSON........................................
DIRECT EXAMINATION BY MR. PORTNOY................. 10
CROSS-EXAMINATION BY MR. ADAMS.................... 19
REDIRECT EXAMINATION BY MR. PORTNOY............... 35

BIANCA WILSON........................................
DIRECT EXAMINATION BY MR. PORTNOY................. 40
CROSS-EXAMINATION BY MR. ADAMS.................... 52

LIANE WILSON.........................................
DIRECT EXAMINATION BY MR. PORTNOY................. 56
VOIR DIRE EXAMINATION BY MR. ADAMS................ 228


## E X H I B I T S


PAGE

Plaintiffs' Exhibit 1 was received in evidence...... 122
Plaintiffs' Exhibit 2 was received in evidence...... 131
Plaintiffs' Exhibit 4 was received in evidence...... 171
Plaintiffs' Exhibit 1156 was received in evidence... 201

Defendants' Exhibit 1085 was received in evidence... 206

TUESDAY, AUGUST 4, 2026 8:26 A.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery Network LLC, et al., versus Paula Haygarth, et al. This case has been called for jury trial day two.

Counsel, please make your appearances for the record starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor. Jeff Portnoy and Troy Young, along with Jenny Tokuoka for the plaintiff.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor. Joseph Adams, Laura Moritz, Louise Ing for defendants.

THE COURT: Good morning to everyone.

I understand that there's an issue that needs my attention before the jury comes in.

MR. ADAMS: Appreciate it, Your Honor. Thank you.

I raise this issue, and I've spoken about it with counsel. And I would have raised this yesterday had I recognized it sooner, and I apologize. I read the transcript and there's two things.

One is, I understand that there is a Motion in Limine granted with respect to death threats. Death threats were mentioned apparently received by Amanda in counsel's opening. And I just want to make sure that -- I asked him for an offer

of proof as to why he would be mentioning death threats to somebody else that he's not going to be calling as a witness in his case in chief. And I certainly don't want his client being -- referencing death threats to somebody else.

The second issue is that in his opening I noticed that he mentioned that there are text messages to the first witness, the son, text messages to his coach. I asked him, those aren't actionable, why are they coming in? He said that the son is going to testify that the coach told him about receiving messages. So we've got one, two, three layers of hearsay. And I asked him for an offer of proof as to the relevance of this. And he said it would be damaging to the community. Well, I said, Well, why isn't the coach coming in? And he said, I don't need the coach.

And I think he does. And so we would object. And we think it's highly prejudicial, even if borderline relevant and slightly admissible that he is able to talk about what his coach may have said to him or how he felt about it, is that it's highly prejudicial. Its prejudice outweighs its probative value because it's not actionable. It's not an actionable defamatory statement of what was said. What they are going to try and do is connect it to one of my clients, which they can't do.

THE COURT: All right. Let me hear from you, Mr. Portnoy.

MR. PORTNOY: Well, it would have been good if opposing counsel had been here through the Motions in Limine, Your Honor. What you ruled, and we have it right in font of me, the only thing that included is my client's testimony as to who she believed made the phone call. It's clear. That motion had nothing to do with the death threats to Amanda Brady. The motion itself, that was never a Motion in Limine.

And I urge Your Honor the Court to look at the motion. The motion was that my client had allegedly destroyed evidence, or not kept evidence, let's put it the right way, regarding that phone call to her and who she believes made the phone call. It had nothing to do with the death threats to Amanda Brady, which my client will testify she was told about. And Amanda Brady has already written about and told about and is going to testify in their case about what she did to investigate the death threats and who she believed made those calls to her.

There's nothing that prevents my client from saying that they received a telephone call threatening them. They just can't say who it is. And you've ruled on that, and we're not -- you know, that's the ruling of the Court.

That's the argument on that.

And if counsel would look at the motion, he would see that there's absolutely nothing regarding Amanda Brady at all.

THE COURT: All right. So I have my notes from the

Motion in Limine Number 1, which was to exclude evidence of alleged deaths threats due to spoliation of evidence. And it was my understanding that that was related to that one phone call that was made to the plaintiff in this case, and there was a recording of it. And there was a lot of questions I had as to how that had been preserved. I did not understand that that motion related to death threats to anybody else.

I don't think it's a violation of the Motion in Limine for her to mention that she's received death threats, but you're obviously going to have to tie them to the defendants at some point.

What's your second argument?

MR. PORTNOY: Okay. The second argument is that, as you know, we have presented to the jury and are going to present evidence of other methods of defaming my client and injuring her and her family. And one of the more obvious ones was a phone call -- or a posting, sorry, on Instagram, sent to my client's son's golf coach, who he visits repeatedly. We'll get into who he is and everything else later on. And when he met with his golf coach, his golf coach told him, Did you know that I got a message from somebody about your mom and how horrible she is, blah, blah, blah, go on, later on.

How is that not relevant to what we believe? Yes, we have to tie if up eventually. We have the problem with unanimity throughout this case.

THE COURT: How is that not hearsay?

MR. PORTNOY: Because I think it goes to the state of mind of -- of Chance.

THE COURT: No, I'm not going to let that in.

So the objection is sustained in that regard.

All right. Mr. Adams, I'll ask you -- I thought I had made it clear earlier, but I really don't want these last minute things dealt with at 8:20. Right? We want the jurors here at 8:30. So bring them up beforehand.

MR. ADAMS: I assure you -- and I have read every piece of this case, Your Honor. I wouldn't step in front of you if I hadn't. So I believe that to be a real issue, and I just want to raise it because it's going to happen multiple times. And I appreciate the guidance that needs to be -- *[baby crying]* so I appreciate that.

THE COURT: All right. Okay, thank you. With that, we'll bring the jurors in. I'll step off the bench while they are being brought up. Thank you.

(A recess was taken from 8:33 a.m. to 8:36 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297 JAO-RT, Life Mastery Network et al. versus Paula Haygarth et al. This case has been called for jury trial day two.

Counsel, please make your appearances for the record.

THE COURT: Mr. Portnoy?

MR. PORTNOY: I'm sorry, Your Honor?

THE COURT: We're doing appearances for the jury.

MR. PORTNOY: I'm sorry. Jeff Portnoy, and my associate is here. Thank you.

MR. ADAMS: Morning everybody, Joseph Adams, Laura Moritz and Louise Ing, and our clients, Paula, Stefanie, and Byron.

THE COURT: All right. Thank you.

Good morning, everyone. Welcome back. I hope you had a restful evening.

I want to check with you, Mr. Owen, are you able to hear me right now?

THE JUROR: Yes, I am. As long as I can look at people I do pretty good.

THE COURT: Okay. Great. If at any time today any of you can't hear anybody, just raise your hand and let me know.

Thank you for your patience this morning. We started about five minutes later than I had hoped. But we're going to try to avoid that in the future.

So thank you for being on time.

And with that, the plaintiffs may start their case by calling their first witness.

MR. PORTNOY: Thank you, Your Honor.

We call Chance Wilson first.

CHANCE WILSON, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: My name is Chance Trevor Wilson, last name is W-I-L-S-O-N.

THE COURT: I'm sorry. One moment.

Ms. Horvath, if you could please step out, that would be helpful. Thank you.

All right. You may proceed.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: If you could come to the podium, please.

MR. PORTNOY: Okay.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Chance, how are you related to the plaintiff in this case?

A That's my mother.

Q And tell us a little bit about yourself. When were you born?

A I was born July 26, 2006.

Q And where do you go to school?

A I currently go to school at Chaminade University of Honolulu.

Q What are you majoring in?

A I'm currently majoring in psychology.

Q What year are you in in Chaminade?
A About to enter my second year.
Q Okay. Are you on scholarship?
A I am, yes. I am on an athletic scholarship as well as academic.
Q And the athletic scholarship is for what?
A I play golf at Chaminade.
Q Okay. Have you participated in any golf tournaments in Hawaii?
A I have, yes. I recently finished he Manoa Cup, which is one of the longest tournaments in Hawaii. I played the Hawaii State Amateur this year. And I represent Chaminade University in all of our travel tournaments.
THE COURT: All right. I'm sorry, Mr. Wilson, I'll ask you to slow down just slightly so that our court reporter can catch everything. Thank you.
MR. PORTNOY: Thank you, Your Honor.
BY MR. PORTNOY:
Q In high school, did you have any other hobbies or activities other than golf?
A I did, yeah. I like to surf. I grew up in Hawaii, so surfing is big for me. I also enjoy cooking and hiking, especially with my dog.
Q Have you won any awards at Chaminade?
A I have, yeah. I was graciously awarded the Silver Sword

of the Award for honesty and integrity.
Q Can you tell the jury a little bit more about how one gets to be eligible to win that award?
A Right. So, the Silver Sword Award is not an athletics related award, it's for your conduct off the court or field, or what not. And it's based on how you treat the other athletes as well as students, and your participation in volunteer type work, and, yeah, just that sort of assistance with the school not related to your sport.
Q Who votes for that award?
A It's voted by the -- every head and assistant coach of Chaminade. And you have to win a majority vote to win the award.
Q Do you know what it means to tell the truth?
A I do.
Q What does it mean?
A It means to be honest no matter what, even if it doesn't benefit you, always being truthful.
Q Okay. Who else is in your family?
A I have my sister Bianca, my dad Robert, and my dog Lexo.
Q The dog that's been here?
A That is the dog.
Q Okay. Do you know what this case is about?
A To most extent, yes.
Q What do you think the case is about?

A In my view, the case is about harmful statements and untrue things that have been said about my mom, primarily on the internet, and the emotional damage that that has caused her.
Q How do you know what was said or posted on the internet?
A A multitude of ways. Firsthand observations I've seen of posts, videos, comments, et cetera. As well as things that she's shared with me or I've seen from her, as well as firsthand accounts of things that people have showed me or have come to bring to my attention.
Q Let's start with the posts that you've seen. Have you been able to identify who any of the authors of those posts are?
A I have.
Q How have you?
A I'm sorry, I wasn't finished with the question. I'd say I have suspicions of who, but a lot of the posts have a high degree of anonymity.
Q And you mentioned videos, what videos have you seen?
A I've seen a video reposted accusing my mom being a child trafficker.
Q And do you know whose video -- who the person was on the video?
A I believe it was posted -- reposted, but I believe the original poster was anonymous.

Q And who reposted it?
A It is my belief that Paula reposted it, Ms. Haygarth.
Q One of the defendants?
A Yes, sir.
Q And why do you believe that?
A Why do I --
Q Do you believe -- did you actually see her repost?
A I saw it on my -- on my -- from my mom, yes.
Q And do you recall in summary what that repost said?
MR. ADAMS: Objection, Your Honor. Hearsay.
THE COURT: Overruled. It's not offered for the truth of the matter asserted.
THE WITNESS: Sorry, could you repeat the question?
BY MR. PORTNOY:
Q Yeah. Do you have the memory or summary of what the repost said about your mom?
A I believe the content of the post was accusing my mom of a terrible thing, accusing her of trafficking children, which was extremely distressing to hear as a kid.
Q Did you see any other videos?
A I've seen a multitude of videos about my mom and pictures, but to recall them off the top of my head, no, I don't have other examples at the moment.
Q Did your mom traffic children?
A No.

Q Tell us a little bit about your mom.
A Yeah. To me she's the most important person in the world. Growing up with who I truly believe is the most amazing human being I've ever been in contact with. She has supported me in any endeavor that I wanted to do. I picked up golf at an early age and she supported me through that. I also played other sports as a kid, and when I felt like I didn't want to play them anymore, she never pressured me to keep going, and always wanted me to just do what I loved.
And, you know, has supported me all the way where I am at now where I'm extremely lucky to play in college sports. And I can't think of a more supportive person in my life. A lot of people have helped me get me to where I'm at now, but no one person more important to me than her.
Q Can you tell the jury your impressions of what your mom does in the community of Kauai?
A Yeah. So, my mom is heavily involved in our local community in a lot of different ways. But one of the main is through volunteering of her time and resources. I have a bunch of examples of things that we have done together. And she's really helped me get involved in that growing up.
But she has volunteered her time with the food bank, she has volunteered resources to facilitate different charitable organizations on Kauai, animal sanctuaries. She has facilitated resources to help -- I'll just give you an example,

where we helped rescue a dog that nobody else wanted to get involved in. And to me on Kauai she's always been willing to get involved in other things that other people do not want to get it involved in.

THE COURT: Okay. If you could slow down a little bit please. That's okay. It's natural to speed up. So if you could just pay attention to that, please. Thank you.

BY MR. PORTNOY:

Q Are you a little nervous, Chance?

A Yes, sir.

Q It's understandable.

What did your mom do other than being a mom?

A That's a pretty broad question.

Q Does she have an occupation?

A Yeah, absolutely. She runs multiple businesses, and she always has since I was a little kid, she's been an entrepreneur.

Q Can you be a little more specific about what your understanding is of what your mom does?

A Absolutely. She offers -- she has -- I believe, she offers two main kind of components to her business. One is a pretty longstanding health and nutrition school.

Q Can you repeat that? It got a little garbled.

A I'm sorry.

Q Maybe you should move back a little bit from the mic.

Yeah, great. Let's see what happens. Go ahead.
A Could you repeat the question, please?
Q I wanted to ask you what your mom does, what your understanding is. And you were mentioning a couple of programs.
A Yeah. As far as, you know, I've known she has sort of two main kind of components services. One being her longstanding health and nutrition school, which has affected me positively in many ways with my nutrition. And her sort of spiritual and Jesus focused religion type work.
Q Can you tell the jury what you observed, as her son, when she became aware of these videos and posts that you've just briefly described?
A Yeah. She -- I observed her become a shell of herself. There were days that I would come home from practice or being out, and I would see her just kind of, like, blank staring trying to work on her computer or writing notes or what not, and she was just not able to do her work. And I would ask her, you know, Are you okay? You know, What's going on. And for the longest time she wouldn't tell me, she didn't want to put that on me or my sister. And it was difficult to kind of get from her what was -- what was going on. She was very reserved about it.
Q Did you eventually learn what was going on?
A I did, yes. She eventually, after much persistence from

me to try to help her, she had told me what was going on.
Q You've already mentioned one statement that you recall being, what was it, child what?
A I believe the statement was human and child trafficker.
Q Yeah. Do you remember any other statements that you either read or saw in the video?
A Yeah, I mean, read online. I read an article that accused her of being a cult leader. I read many posts on Reddit and Instagram, much to her telling me, Don't pay attention to that stuff, you now, you don't want to see what's out there. But I read many very harmful things about my mom that, you know, I would not expect to read as a kid, as well as you know, people talking to me about it.
Q Let's talk about people talking to you about it. You don't have to mention any names or anything at the moment, but what did people tell you?
MR. ADAMS: Objection, Your Honor. Hearsay.
THE COURT: Sustained.
BY MR. PORTNOY:
Q Was there conversation in the community about your mom, about these posts?
A Yeah, I heard from --
Q Well, you can't say -- you can just answer yes or no to that.
A Yes, sir.

Q Okay. Did that affect the family in any way?
A I believe it had a great impact on our family, yes.
Q What impact?
A I think it was -- it created a very difficult time for our family, hearing things being said about our mom from different people, and having that reciprocated through our pretty tight-knit community. It was very damaging.

MR. PORTNOY: Those are all the questions I have.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Cross-examination.

MR. ADAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ADAMS:
Q Good morning, Chance.
A Good morning.
Q You love your mom, right?
A Yes, sir.
Q You care about her protection, right?
A Yes, sir, I do.
Q You wouldn't want to see her found liable or injured in any way in this trial, would you?
A Could you restate the question?
Q Yeah. You wouldn't want to find -- you wouldn't want to see her found liable in this trial, would you?

A I'd like to see the truth come out in this trial.
Q And you'd do whatever you could in your power to help her, right?
A Everything -- can you reframe the question? Everything in my power seems a little broad.
Q You said your mom is your number one person, most important person in your life. You'd do anything for her, right?
A Anything within -- yeah, anything that's reasonable for a child to do without breaking the law or lie, no, sir.
Q Let's talk about the statements about child trafficker. Do you understand that statements were submitted in this courthouse about your mom encouraging women to take their kids to Florida?
A I don't totally understand the question.
Q Well, what is child trafficking to you, what does that mean?
A It has a pretty broad definition, but I think I would classify it as people abducting children or attempting to funnel children somewhere or really taking children anywhere that they don't want to be, against their will, I would say.
Q Okay. And so do you understand that some of your mother's students have been alleged to be encouraged by her to take their children away from the fathers across international borders?

MR. PORTNOY: Objection, Your Honor. No such testimony.

THE COURT: Overruled.

THE WITNESS: I'm sorry, sir, could you restate the question?

BY MR. ADAMS:

Q Yes. We're talking about child trafficking. You gave your understanding of it. Correct?

A Yes, sir.

Q And you said that when you read these posts about her being a child trafficker, that upset you, right?

A Yes, sir.

Q Because a child trafficker is bad, right?

A Yes, sir, a child trafficker is bad.

Q Do you have any reason why somebody would have called your mom a child trafficker?

A In my understanding, no, sir, I do not understand why people would call her a child trafficker.

Q You don't have any basis as to why somebody would make that statement?

A I do not. There is -- there's -- my mom does not traffic children, sir.

Q And that's why I asked you then if you were aware that your mom's students, at least two of them, submitted paperwork in this courthouse claiming your mom encouraged them to take

their children away from their fathers to Florida. Do you know that?

A I have not been privy to many of the documents involved in this litigation.

Q Okay. But if, in fact, your mom -- I want you to assume this, you're a smart kid. Assume your mom did, in fact, encourage somebody to take her child from Canada to Florida. That's child trafficking, right?

A What -- child trafficking -- could you restate the question? I don't totally understand what you're --

Q That's all right. Let's move on to cult leader.

What were the statements that your mom was a cult leader, you said there was a multitude of them. How many?

THE COURT: Mr. Adams, if you could move closer to the microphone, please. Thank you.

If you could re-ask that question. That's fine.

BY MR. ADAMS:

Q You said that you saw multiple -- multitude of statements online that your mom is a cult leader?

A Yes, sir.

Q Yeah. Where?

A I saw -- I'm not sure if I'm allowed to name the article, but I've seen an article that is accusing her of being a cult leader. I have seen Reddit posts accusing her of being a cult leader. I have had comments on my Instagram accusing her of

being -- I mean, there's many sources that -- do you want me to name them or --
Q What's a cult leader to you?
A That's a pretty broad question, sir.
Q Well, then why did it upset you?
A Because somebody accusing your mom of being a cult leader is not a nice thing to say about someone's mother.
Q Why not?
A Why is -- I'm sorry, sir? Could you restate. I don't understand.
Q Well, what is a cult leader to you? Is it somebody who has a bunch of followers that just follow them blindly, right?
A No, sir, that is not my definition of a cult leader.
Q Then what is it? Tell the jury why your mom being called a cult leader would upset you.
A My mom being called a cult leader upset me deeply, because when you -- when somebody thinks of a cult, they think of, I don't know, Teal Swan, or somebody who is doing very negative and damaging things to people. And for statements to come out accusing your mother of leading a cult, and having that told to you, and having people come to you and say, you know, your mom is running a cult, Chance. Like, that's terrible. So for that reason is why I said it's very distressing for people to tell me that and for me to read that.
Q You were here yesterday, right?

A Yes, sir, I was.
Q In the courtroom?
A I had to leave during opening statements.
Q For the most part. Who are all the people that came in the audience?
A I do not personally know many of the people in the audience, but I believe a good number of them are students, as well as some of my friends are here as well.
Q They're students of your mom that have come in droves to follow her in this trial, right?
A I think "in droves" is possibly --
Q Okay. All right. Do you know -- other than the ones that are your friends, have you ever seen any of the people that have just shown up at this trial for your mom that's not a cult leader?
A Do I -- have I seen some of the people in the crowd? Yes, sir, I do -- I do know -- I do recognize and know many of the people there. And I would extend to say a fair number of them are people I would consider friends.
Q And your mom doesn't use her God-given name online, she uses a fake name, right?
A I mean "fake" has many definition -- God-given name. Could you restate that, please?
Q You don't know that term?
Okay. So on her birth certificate it says Liane Nancy

Robert, right?
A That's incorrect, sir.
Q Okay. Her legal name right now is Liane Nancy Wilson?
A Yes, sir, that is correct.
Q What's her maiden name? What was she born as?
A I believe she was born as her legal name, sir.
Q Is what?
A Liane Nancy Wilson.
Q Okay. And she goes by what name online and in all of her classes?
A I believe she uses her business name and her spiritual yoga instructor given name, last name Shanti. I believe most of her work she goes any Liana Shanti.
Q So her first name -- real legal name is Liane, and she goes buy Liana. And her last legal name is Wilson but she goes by Shanti, right?
A In that characterization of it, yes, sir, that is correct.
Q So Liana -- neither Liana nor Shanti is her legal name, correct?
A Legal name, no. She picked up the adoration of Liana as a very small kid. I think she told me growing up her grandparents used to called her Liana.
Q And you said there was some spiritual yoga name given. What's that mean?
A I believe the word -- I used the word yoga instructor.

Yeah, my mom studied yoga in India and was adorned the last name Shanti, and as sort of a spiritual name. It's not on her driver's license. She intends to have the same last name as her children, which is why she has not changed it. And she goes by -- you know, in her business she goes by Liana Shanti. It's been that way as long as I can remember. It's not new.

Q So it's -- I called it a fake name. What would you call your mom's name that she uses for her business Liana Shanti?

MR. PORTNOY: I'm sorry, I object. Whatever counsel calls it is not evidence.

THE COURT: Sustained.

MR. PORTNOY: He calls it a fake name, Your Honor.

THE COURT: Sustained.

You can sit down.

Just ask the question without any commentary about your language.

BY MR. ADAMS:

Q What would you call then your mom's name Liana Shanti?

A I mean, I would classify it as a -- I'm trying to think of the right word.

I would classify it as a spiritual name or a persona, if you will. It's something that she goes by. Whenever she's asked anything official, she does not tell people at the airport, Hi, I'm Liana Shanti, I'm trying to get through security. She tells people her real name. And I would

classify it as, you know, something that she aligns with spiritually. And something that she uses in her business. Many of my friends as well use not their legal name on things.

Q And do you have an understanding that your mom gives her students new names?

A I can't testify to that as I don't fully understand that.

Q You don't have any understanding that your mom gives her students new names?

A I understand that my mom has a pretty good understanding from her time in India with, you know, spiritual names, and I do believe some people have kind of asked for her guidance on that as they want to sort of -- they also want to have, you know, sort of a spiritual last name for whatever reason.

Q So your mom -- so now that you're thinking about it, your mom does give her students new names?

A I would not -- I would give -- new names, I would not -- I would not say it's accurate. I would say that people have asked her for advice and guidance regarding wanting to have a different spiritual name or what not, or they didn't like their name for whatever reason, or, you know, they've had a traumatic life, they don't want to use that name anymore, and they've asked her for guidance with, you know, coming up with a name that they feel comfortable with.

Q And she comes up with a name for them, right?

A I do not think that's accurate, no.

Q Okay. You know what a screen shot is, right?
A If you're talking about like a mobile device, yes, sir.
Q Yeah. What's a screenshot?
A I think a screenshot is anything you -- anytime you capture the screen of your phone or laptop, iPad.
Q And you're familiar with Instagram, right?
A Yes, sir.
Q Are you on Instagram?
A Yes, sir, I am.
Q What's your handle?
A It is at @ChanceGolfKauai.
Q Is it public or private?
A Currently it's public.
Q And what's your mom's Instagram handle?
A Which one, sir?
Q Oh, she has more than one?
A She has multiple businesses, sir.
Q Okay. So why don't you list them all for me?
A I can think of the ones I can name off the top of my head. Okay. So we have HMI Wellness --
THE COURT: All right. Slow down again, please.
THE WITNESS: Sorry, Your Honor.
THE COURT: All right. Take a breath. Okay. All right. And go ahead.
THE WITNESS: Okay. So the ones I can recall are her

health coach -- health coaching business slash nutrition school, which I believe would be on Instagram @HMIWellness.

I believe she has her more spiritual and advocacy page would be at Liana Shanti.

I believe she has a business account as well, which I believe is possibly Liana Shanti Enterprises. I'm not exactly sure. I don't remember the name. I saw is it yesterday or the day before, but I don't recall right now.

And I believe she has Facebook pages as well that follow those HMI Wellness, Liana Shanti. And I do not believe she has -- is active on that.

BY MR. ADAMS:

Q Do you post under any of your mom's Instagram names?

A Do I post under like her on her written -- I'm sorry, I do not.

Q Is she, as far you know, the only one that posts under @LianaShanti.com? I'm sorry. Let me ask a different -- that was a bad question.

As far as you know, is your mom the only one that posts on Instagram under the handle @lianashanti?

A I do not have any knowledge who posts on her Instagram, no, sir.

Q You have no idea?

A No, sir, I do not.

Q You talked about your mom as nutritionist, but she doesn't

have any medical or healthcare license, correct?
A She's not a medical doctor or anything, no.
Q She's not licensed in any nutrition, correct?
A I do not know the scope of her education fully. I'm not versed enough of it on the top of my head to testify to it in court. But as far as I'm aware, giving nutrition and health advice is not a regulated profession.
Q And so she doesn't need a license. So like me, I have a bar license, I have to answer to people. Your mom doesn't have to answer to anybody on her nutrition license, right?
A No, sir, I would believe that -- or it's my understanding that nutrition and health coaching is not a regulated profession such as the bar, as you mentioned.
Q And your mom sells business programs, right, to her students?
A That is one of the facets of her business, yes, sir.
Q How much does she charge for those?
A I do not know off of the top of my head the exact price breakdown of my mom's business, but there are -- I believe it is a pretty wide range.
Q How much does she charge for any program?
A I mean, I can only -- the one that comes to the top of my head, she has a course on how to generate leads and messaging. I believe it's for Instagram, it might be for e-mail. I believe it's Instagram. And I want to say that one is like

$99. She had a special for a while. But I do not recall her pricing breakdown top of my head, sir.
Q Do you know what the concept of followers on social media means?
A Yes, sir, I do.
Q And your mom has tens of thousands of followers on social media, right?
A Yeah, I mean, she has 30,000 something plus on Instagram and well over -- I believe over a hundred thousand on Facebook.
Q So over 130,000 combined across Facebook and Instagram your mom has followers?
A Yes, sir, but they are amongst two very separate businesses.
Q Sure. But they're both your mom, right?
A My mom and her company, sir, yes.
Q So when she posts on Facebook, it goes to a hundred thousand people, right?
A She's posting something on her HMI Wellness page, on strictly her health coaching Facebook page, yes, sir.
Q And if she posts on Instagram it goes out to over 30,000 followers, right?
A As many of them see it, yes, sir.
Q And these are followers that pay for her courses, correct?
A No, sir. Not everyone following her Instagram pays for her courses.

Q That's fair.

I want to get back to the licensing, because your mom sells the business plans, but she's not a licensed financial planner, right?

A My mom does not have a finance degree or is not a financial adviser, no, sir.

Q Does she have a psychology degree?

A Yes. She recently completed a master's degree in psychology from California Southern University, I believe.

Q But she's not licensed to give psychotherapy, is she?

A My mom is not a board certified psychologist at this time. I do not believe it's something she's interested in.

Q So she does not have to answer to any licensing board for the types of work she does, right?

A She does not run a psychology -- I don't know what they call it -- I'm sorry, office or firm. She's not -- she's not a psychologist, sir. I believe that's the only people -- as far as my understanding those are the only people that answer to a psychology board.

Q And just getting back to Instagram, you understand how Instagram stories work?

A Yes, sir, I do.

Q And Instagram stories, unless you pin it and save it, the Instagram stories go away after a while, right?

A Yes, sir.

Q And so if I didn't see an Instagram story first, I can't go back into your mom's or anybody's Instagram if they haven't pinned that story if it's gone away. Do you agree with that?
A I'm sorry, sir, I almost spilled that.
Q Ice. The ice will get you. It almost got me.
No, so getting back to the Instagram stories. They disappear after a while unless the owner of that account pins them, right?
A Unless they're under I believe what they call highlight, yes, sir.
Q But you could also screenshot an Instagram story right?
A You certainly could, yes, sir.
Q When you screenshot an Instagram story, there's little tiny white bars across the top, right?
A I believe there's multiple stories, yeah, it goes on to a lot of bars.
Q And so we're going to see a bunch of screenshots of your mom's Instagram stories. Have you seen those?
A I do not know what screenshots you're referencing there.
Q You know what a screenshot is of an Instagram story?
A Yes, sir.
Q You haven't seen any of the exhibits here?
A I do not believe I have seen anything that's in trial exhibits, unless I saw them, like, before this proceeding. I haven't looked at any trial proceedings.

Q You haven't seen any of the statements that your mom is accused of saying against my clients?

A I'm sure I've seen those statements, but they would have been from social media or things I've been told, but I've not looked at trial documents of any kind.

Q And do you have an understanding that the Court has already ruled that your mom has made defamatory statements against my client, Paula?

A I'm not aware of any ruling of the Court. I've primarily been here to watch the dog. So I haven't been paying very close attention to the motions and proceedings and what not.

Q Do you think it's despicable to untruthfully call somebody a child abandoner?

THE COURT: Mr. Adams, no.

Mr. Portnoy's expected objection is sustained.

MR. ADAMS: Withdrawn.

BY MR. ADAMS:

Q Your mom's on probation right now, right?

A Yes, sir, that is correct.

Q You know the crime that she admitted to, the felony that she admitted to?

A I do, yes, sir.

Q That's a felony of deceit, right?

A I believe the charge is bankruptcy fraud, sir.

Q Fraud is a charge of deceit, right? Deception.

A I'm not sure -- I'm not sure the specific -- could you restate the question?

Q Sure. You agree that your mom was convicted -- or admitted to committing a felony of fraud in her bankruptcy, right?

A Yes, my mom and dad were involved in a case that resulted in a conviction of bankruptcy fraud.

Q And that involves deception; deceiving people, right?

A I do not know the specifics of why the U.S. Attorney pursued that, or why they were -- exactly what charges were brought. I don't fully understand that case.

Q But your mom admitted to them, right?

A Yes, sir, she's on probation now for it.

MR. ADAMS: Thank you.

No further questions.

THE COURT: Mr. Portnoy.

MR. PORTNOY: Thank you.

REDIRECT EXAMINATION

BY MR. PORTNOY:

Q Well, counsel opened the door why people are here. Do you know why a lot of your mother's students are in this courtroom?

A Yes, sir. I believe --

Q Tell the jury what you understand.

A Yes, sir. I believe a lot of the people are here to support my mom during what has been a very trying time for her

and our family, as well as in the back there are some of my friends that came to support me testifying today.
Q Are you aware of -- other than your mother's students that are here, how many other students are supporting your mother through this ordeal?
A I'm sorry, could you just say that one more time?
Q Well, do you know how many -- not precise numbers, but are there other students, other than the ones who have come all the way here from various places in the United States to support your mother, do you know there are other students doing that?
A Yes, there are probably thousands.
Q Do you have any understanding as to why they're here to support your mother?
A Yes. Many of the people seated in the courtroom today have been helped by my mother in many ways with many different areas of their life. Some of them with their business, some of them with their family. And I can definitely say anybody that's sitting here is -- came here because they feel an immense amount of gratitude for my mother and felt it reasonable to come more than likely across the ocean to support her.
Q Do you think any of the students who are here have been brainwashed to come here?
A No, sir, it is not my belief that anyone here is brainwashed to be here.

Q Do you have any reason to believe that any of your mother's students have been brainwashed to say or do things they don't want to say or do?
A I think my mom teaches quite the opposite of that. I believe that she teaches sovereignty and people making their own decisions. I remember from being a small kid, my sister especially would ask her what to do oftentimes, sometimes when she was in college, and my mom would tell her, you know, Honey, I'll support you making the decision, but I'm not going to make the decision for you. And I think that's a pinnacle of my mom is she's not making people make their decisions for them.
Q Do you think any of the students in the courtroom have been paid by your mom to be here?
A No, sir, I do not.
Q Finally, we began by talking about your understanding of the word truth. You heard opposing counsel try to suggest that you're not telling the truth, that you're here to say whatever you need to say to support your mom. Is there any validity to that allegation?
A No, sir. Truth and honesty, especially sitting here inside of a federal court, is one of my values as a person. And I have told the truth many times that has not helped me, and I intend to live a truthful life and not lie.
Q Do you know what it means to take an oath like you did earlier?

A Yes, sir, I do. It means that, you know, inside of this courtroom, inside of this witness box, I am not to lie and I am not to say anything that interferes with this proceeding.
Q Are you a religious person?
A I am.
Q What does your religion you tell about telling the truth regardless of the circumstances?
MR. ADAMS: Objection, Your Honor. Relevance, 403.
THE COURT: Overruled.
THE WITNESS: Could you say the question again?
BY MR. PORTNOY:
Q Yeah. What does your religion tell you about telling the truth regardless of the circumstances?
A Yeah, I am a follower of Jesus. I attend a Catholic college, although it's not my denomination. But, you know, my religion, the Bible tells us to tell the truth at all times, and that's a big part of who I am as a person.
Q Has anybody suggested to you that you not tell the truth to any question that you were asked by either myself or opposing counsel?
A No, sir.
MR. PORTNOY: No further questions. Thank you.
THE COURT: All right. Thank you.
May this witness be excused?
MR. ADAMS: Yes.

THE COURT: All right. Thank you. You may step down.
Mr. Portnoy, who is your next witness?
(Witness excused)
MR. PORTNOY: I'm going to call Bianca Wilson next, Your Honor.
THE COURT: Okay. Why don't we take a stretch break, ladies and gentlemen. Actually, let me ask, do any of you need a restroom break?
No. Okay. Why don't -- everybody take a stretch break while Bianca Wilson comes into the courtroom. Thank you.
(Pause in the proceedings.)
THE COURT: All right. Ms. Wilson, if you could come forward.
If I could see counsel at sidebar very quickly. Just Mr. Portnoy and Mr Adams. If you could come forward.
(Sidebar on the record:)
THE COURT: From my perspective of this, so the right side of the courtroom is filled with people who won our civics contest.
MR. ADAMS: Yeah, I know.
THE COURT: So, are you guys okay with me, like, just at some point --
MR. PORTNOY: Yeah, I didn't bring it up, he did. But sure.
THE COURT: Are you okay?

MR. PORTNOY: Sure.

MR. ADAMS: It doesn't --

THE COURT: I'll do it before the next break.

MR. PORTNOY: Yeah, sure. No problem.

(End of sidebar.)

BIANCA WILSON, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name, spell your last name.

THE WITNESS: Spell my last name?

THE COURTROOM MANAGER: Say your full name and spell your last name.

THE WITNESS: Okay. Hi. My name is Bianca Wilson.

THE COURT: You may proceed.

BY MR. PORTNOY:

BIANCA WILSON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Bianca, remember to try to talk slowly so everybody can understand what you're saying. Chance tried.

How are you related to Liana?

A She's my mom.

Q Okay. And we also know that in the family is Chance?

A Mm-hmm. My little brother.

Q And your dad?

A Yeah.

Q And your dad's name is?
A Robert.
Q And the dog?
A Lexo.
Q Okay. Tell me a little bit about yourself. How old are you?
A I'm 24 years old.
Q Okay. And where were you born?
A I was born in Washington, D.C., but I moved to Hawaii when I was one-and-a-half. So I grew up here.
Q And who are your parents?
A My mom Liane and my dad Robert.
Q You live on Kauai?
A Yes.
Q You went to high school where?
A I went to a private school part of the time, and then I was home schooled.
Q And you have a degree, a high school degree?
A Yes, online.
Q Any post high school education?
A I went to UH Manoa for about a year-and-a-half, but I ended up dropping out, leaving the school to become a tattoo artist.
Q To become a what?
A Tattoo artist.

Q Sorry?
A Sorry. I'm a professional tattoo artist.
Q Oh, I assume you have some yourself?
A I do, yeah, I have quite a few. I mainly have like little patchwork stuff.
Q Do the tattoos that you have have any meanings to you?
A Like, some of them, like, the first one I got was for my little brother when I was 16. I've got a couple other stuff that are pretty meaningful to me.
Q What are your hobbies?
A I mean, art is like a very big part of, like, what I do. So definitely art. I kind of grew up doing a lot of different sports and stuff. I did, like, junior lifeguards and paddled for Hanalei Canoe Club for seven years, like, competitively, like Outrigger canoe paddling. And I've always loved the ocean. And I group up surfing, so I surf, like, every day.
Q What kind of activities are you involved in in Kauai, charitable, other types of hobbies that you're involved in?
A Yeah. So growing up I went to youth groups, like middle and high school, and then when I got old enough to, like, drive I would help set up the games, cook some of the food, drop off the kids at their house, like, if they didn't have rides home.
Q Do you volunteer with any organizations?
A That was all volunteer.
Q Sorry?

A High school up until right before I left for college.
Q Are you involved in the food bank?
A Yes. When I was younger I would volunteer at one of the churches on the North Shore. We would, you know, just go and help organize the food, like, people would bring to donate to people.
Q Who's Bethany Hamilton?
A She is a pro surfer from the island of Kauai, and one of the youth group that I helped out at. Sarah Hill was, like, very involved in her. She has like an organization called the Beautifully Flawed Foundation, I believe. So they did, like, a lot of work.
Q Tell me a little bit about your mom.
A Like --
Q Take your time. Take your time.
A Okay. Can you repeat? Sorry. I'm a little nervous.
I mean, my mom is, like, the most kind and compassionate person that I know. Both in, like, the way that she had raised me and the way that, like, she presents herself to others.
Q I know this isn't easy.
A Yeah.
Q You want to continue, though, if you can?
A Yeah.
Q Okay.

THE COURT: Why don't you ask her a more specific question. Ask her a more specific question, Mr. Portnoy. That's a pretty broad question.

MR. PORTNOY: Okay. Okay, Your Honor.

BY MR. PORTNOY:

Q I'll just get very specific and then we can work backwards.

One of the things the defendants have continued to state even in the opening is that your mother is a, quote, evil, controlling person.

Is that your mom?

A Not in the slightest.

Q Explain why that statement is not --

A My mom has always supported -- like, even if she doesn't agree with like some of the stuff that I'm doing, she's always supported what I want to do, like, with my life. You know, whether it be, like -- I tend to dress, like, in jeans and, like, band t-shirts and stuff. You know, I mean, even if she doesn't like some of my outfits, she's, like, you do what you want, that's what you like.

Q We've heard allegations that your mom is a cult leader. Do you have a feeling as to whether she's a cult leader or not?

A Absolutely not.

Q Why do you think that?

A I mean, typically cult leaders will have people, like,

they are physically, like, I don't know, very controlling. My mom has never been controlling in, like, anything this she's ever done.

Q Have you ever seen any of the posts that we believe the defendants and the rest of their conspiracy put out about your mom?

A Yes.

Q What posts have you seen?

A I've seen, like, some articles, and I've seen, like, comments and stuff, like, on Instagram and that type of thing that are very harmful.

Q What kind of things did you read or see that were being said about your mom, if you recall?

A I mean, I did see comments and posts and stuff concerning that she was, like, a child trafficker and, like, cult leader and all that stuff.

Q Is your mom a child trafficker?

A No. My mom advocates for people.

Q What do you mean by your mom advocates for people?

A Pretty much, like, in my experience, like, growing up with her, anytime that there's been someone who can't stand up for themselves, like, is too afraid, too young to be able to do that type of thing for themself, she has, when she can, stepped in to stand up for them.

Q Can you give the jury some examples that you've

observed --

A Mm-hmm.

Q -- of how your mom has done that in the community?

A Yeah.

Q Go ahead.

A I think probably one of the, like, biggest examples, at least for me, like, personally, when I was about -- I think I was around, like, 16 years old, I had a friend, CC, she had been adopted into a family with, I think around eight other siblings. And her dad and one of her older brothers were abusive, and she had run away, like, several times. You know, slept on the beach, was sleeping in the woods, had kind of, like, gone to different people's houses looking for help.

And she had -- I don't remember, she had texted or called me, something like that, asking for help. So I brought it to my mom. And she was, like, of course. Like, we can help her.

So she -- you know, it was pretty late at night when it happened. So she was, like, yeah, tell her to come over immediately. And she came over and we gave her, like, money, food. I went up to Foodland, because at the time she had been dealing with a pretty bad uku problem. So I think lice is the term, and we helped her get rid of that, you know, give her clothes and stuff and somewhere to stay.

And my mom had offered to -- like, she had tried

getting help from, like, other people. Like, there was someone -- she was at the time dating one of my friends who was the son of a pastor, and she had called him. I mean, like, hey, like, your son's dating her, like, you need to step up and help and he wouldn't because he didn't really want people in the community to know that they were together.

And so, you know, my mom was, like, the only one that helped. And -- yeah.

Q Okay. Tell me how these posts -- have you seen the videos as well, by the way, that your brother talked about?

A I don't -- I'm not entirely sure.

Q Okay. Can you tell me how you believe these posts, statements about your mom have affected her?

A Mm-hmm.

Q Take your time and tell the jury.

A Can I -- can I also say how it affected, like, me or not?

Q You can, but let's start with your mom.

A Yeah. It's, like, it's pretty hard to talk about. But, you know, I have, like, read stuff of, like, her being threatened to be -- I have read stuff about people threatening to -- to rape and kill her. And, like, as someone who lives with her, it's really hard to watch. Like, she would, you know, try to keep -- sorry. She would try to protect, like, me and my brother. She would try to protect me and my brother from that stuff. So she would always try to keep it to

herself. But, you know, I would see her, like, going into her bedroom for long periods of time. And like, you know, crying or just -- there was one time where we had been on, like, a golf trip for my brother, and she locked herself, like, in the room for hours, like, just crying because of all the stuff that was going on.

Q Did there come a time when you folks had to leave Kauai?

A Yeah. I -- you know, my brother, my mom and I were, like, all threatened, like, our lives. You know, there had been threats made. Sorry. I -- like, a lot of the time when I was driving home from work or from surfing, if there was a car that had been following me for too long, I would take a different turn because I thought they would follow me to my house. And, you know, there were many times where I -- I had told my mom, I'm, like, Hey, there's cars driving really slow, like, by our house. And you know, we contacted, like, police and stuff about it. And there was one point where we did bring it up to an FBI agent that, you know, like, we're really concerned. And, like, from what I know and of the conversation and stuff, he had told us that it's probably not the best idea to stay home. So we actually left Kauai, came here for a week or so.

MR. ADAMS: Objection, Your Honor. Hearsay. Move to strike.

THE COURT: It's not offered for the truth of the matter asserted, so it's overruled.

MR. ADAMS: We'd also like a sidebar, if I may be given Your Honor's ruling from this morning.

THE COURT: You may.

Ladies and gentlemen, let's take a stretch break while I meet with the attorneys at sidebar. Thank you.

(Sidebar on the record:)

MR. ADAMS: I wasn't even going to cross-examine this witness until she starts saying they're getting death threats. That's directly in violation of 403. This poor woman is not part of it, but I can't now --

THE COURT: You didn't stand up and object.

MR. ADAMS: I --

THE COURT: You did not.

MR. ADAMS: I know, but I am now. He's got to move on from the death threats. I am not blaming her, but counsel knows that he's not supposed to touch that.

THE COURT: If you had objected earlier I would have sustained it.

MR. ADAMS: I -- I understand.

THE COURT: But now you can't.

MR. ADAMS: I understand, and that's on me. I respect that, Your Honor.

MR. PORTNOY: There's nothing prohibiting that. She's talking about a phone call. There's nothing in the order that talks about any of the other things that happened to her.

THE COURT: She already talked about the death threats. Let's move on.

MR. PORTNOY: I will.

THE COURT: All right.

(End of sidebar.)

BY MR. PORTNOY:

Q Bianca, are you ready?

A Yes.

Q Okay. We're going to move on.

A Sorry?

Q Huh? Okay?

A I didn't hear you, sorry.

Q Oh, we're going to move on.

A Okay.

Q Do you know what your mom's professional life is, for lack of a better word, what she does when she's not a mom?

A Yeah, she's a life coach. She helps other people.

Q What do you mean by the word "life coach"?

A She has programs that she sells, whether it be, like, business, spiritual, or, like, physical health that she sells that people can buy on the internet and do them.

Q And you say she helps other people. In what way?

A Meaning, like --

Q Well, you said your mom helps people.

A Yeah.

Q Yeah.

A A lot of people that come to her for, like, specific programs and stuff. Maybe they had, like, physical health issues, or, like, mental health issues or just kind of like problems in their life that they, you know, kind of want to turn their life around type of a thing. And, you know, especially with, like, the physical health thing, a lot of people have been able to, like, either change their diet or, like, their lifestyle and fix some of those problems.

Q Do you know what this case is about?

A Yeah.

Q What is it about?

A Defamation and conspiracy.

Q Okay. You heard the questions that were asked of your brother about whether he would lie to protect your mom to help her win this case. Do you have a response to whether you would lie or not tell the truth?

THE COURT: She wasn't in the courtroom.

MR. PORTNOY: Oh, I'm sorry. I apologize, Your Honor. Let me -- let me take the question back.

THE COURT: Hold on. You're talking over each other.

The objection is that it misstates the testimony.

I'll strike that question in any event, so start over, please.

BY MR. PORTNOY:

Q Do you know what it means to tell the truth?
A Yes.
Q Do you know what it means to take an oath in this courtroom to tell the truth?
A I do. I take it very seriously.
Q Would you not tell the truth in this courtroom about any question that you were asked either by me or opposing counsel in order to help your mother prevail?
A Never. I think the truth is -- like, the truth is something that is very, very important to me, and I try to -- my best to answer what I can.

MR. PORTNOY: Okay. I have no further questions, Your Honor. Thank you.

THE COURT: Thank you.

Mr. Adams.

MR. ADAMS: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. ADAMS:
Q Good morning, Bianca.
A Hi.
Q Your mom lives her life online, doesn't she?
A She has an online presence.
Q Well, she has hundreds of thousands of followers, right, over a hundred thousand followers?
A I'm not entirely sure. She has multiple accounts that

have more or less than that. I'm not sure. I don't check numbers.

Q Does your dad earn income for the family?

A He has, yes.

Q Right now, though, your mom is the only income earner for the family, right?

A Mm-hmm.

Q So your entire livelihood depends on her online presence; is that fair?

A Yeah, I mean, she supports all of us.

Q She's a public figure, right? Do you know what that means?

A Yes, 6I do know what it means. I don't necessarily think that she's -- like a -- it's not like she's, like, a celebrity or anything.

Q Well, it's already been ruled on by the Court that she's a public figure. Do you understand that?

A I did not know that, but I do now.

MR. ADAMS: Nothing further, Your Honor.

THE COURT: Thank you.

May this witness be excused?

MR. PORTNOY: Nothing, Your Honor. Thank you.

THE COURT: Thank you. Ms. Wilson, you may step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Mr. Portnoy, who's your next witness?

MR. PORTNOY: My client.

THE COURT: Okay. Why don't we do this: Why don't we take a morning recess of about 20 minutes, give everybody a chance to go downstairs, use the restroom, take a break, and then we will be back with the jury in about 20 minutes.

I also want to welcome -- we have several students here who are contest -- civics contest winners from our court civics contest. And during the 20-minute break I will ask them to come back into chambers to chat with me. All right?

So what we will do is we'll stand for the jury.

And jurors, let's see you at close to 10 o'clock. All right? Thank you.

(At 9:37 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: Thank you, you may all be seated.

And Mr. Portnoy, if your client is testifying next, if we could have her on the stand when the jury comes back in --

MR. PORTNOY: Okay. Your Honor --

THE COURT: -- with the dog.

MR. PORTNOY: Yeah, the only other thing, I've got a lot of papers, can I question her from here?

THE COURT: That's fine. That's fine with me.

MR. PORTNOY: Thank you. Thank you.

THE WITNESS: Can I briefly look at the space up

there?

THE COURT: You may.

We're going to be in a 20-minute recess.

I will ask Mr. Uejio to please bring the civics contest winners and their friends and families back. Thank you.

(A recess was taken from 9:39 a.m. to 10:00 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Welcome back, ladies and gentlemen.

I want you to know the schedule for the rest of the morning. We're going to go until about 11:30. But we will take a stretch break in the middle of that so that you don't get too tired from sitting. Then we'll take, at 11:30, probably about a half hour, 45 minutes for the quasi lunch break. All right? And then when you come back from that we'll talk about scheduling again.

Ms. Cortez, has the witness been sworn?

THE COURTROOM MANAGER: Not yet, Your Honor.

THE COURT: Okay. You may go ahead and swear her in, thank you.

LIANE WILSON, PLAINTIFF'S WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name and spell your last name for the record.

THE WITNESS: It's Liane, L-I-A-N-E, Wilson, W-I-L-S-O-N.

THE COURT: Thank you.

You may proceed, Mr. Portnoy.

And ladies and gentlemen, I'm allowing Mr. Portnoy to conduct his examination from the desk.

MR. PORTNOY: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Liana, what is your full legal name?

A It's Liane Wilson.

Q Do you go by any other name?

A Exclusively pretty much Liana Shanti.

Q Can you explain why?

A I've been Liana since I was two. My grandparents immigrated from Italy. And the Liane is kind of like a French spelling. My mom came up with L-I-A-N-E. So my grandparents called me Liana, so I've always colloquially been called that.

And Shanti is a name that a yoga teacher gave me, it means peace in Sanskrit. And I just felt like it was something that resonated with me, so business wise my name became Liana Shanti Enterprises, so my business accounts, that's how everybody knows me.

Q So can you explain to the jury when you use your real name and when you use the Liana Shanti name?

A Yes. I use Liana Shanti anytime I'm doing business online. I use Liana everywhere, like, I check into a hotel in, like, Liana. And every time they look at my license and they say, Liana? I say, yeah, but it's Liane on the license. I call myself Liana. The Shanti part, Liana Shanti, is the name that I use online, and that's the name of my business, Liana Shanti Enterprises.
Q Do you make any attempt to confuse people by having your business name and your real name?
A No. I mean, most business -- most entrepreneurs that I know have a business name that's not necessarily their name. I have other businesses, I have Health Mastery Institute. It's pretty standard for a business to have a name that is an incorporated name.
THE COURT: All right. If you could slow down just slightly. Thank you.
THE WITNESS: Liana Shanti is a federally owned trademark that I own, so it's a business asset as well. It's fairly common in the world of entrepreneurship.
BY MR. PORTNOY:
Q Where do you live?
A I live on Kauai.
Q How long have you lived on Kauai?
A 23 -- about 23 years.
Q These are the easy ones.

A Do you want me looking at you or the jury to be answering?
Q I ask the questions and you can respond any way you feel comfortable. Okay?
A Okay.
Q Thank you.
Are you married?
A Yes.
Q Have you been married more than once?
A Yes.
Q Married how many times?
A Twice.
Q Okay. Your first husband's name was?
A Dean.
Q Dean?
A Dean.
Q We heard a little bit, and we're going to get into a little later on, about a bankruptcy issue. Who were you married to at the time?
A Two different scenarios. My first husband Dean, there was a bunch of business debt of his that accrued in 2003 to 2005. By the time I filed bankruptcy 2011, he and I were long divorced. He had filed bankruptcy personally because we were divorced, and he got cleared of all the debt and then the debt was all on me. And so I filed the bankruptcy for myself with

all of that remaining business debt of his. But because I was working, I was more working towards doing a repayment plan. That didn't work, it didn't get approved. So I ended up having to pay all of that back, every debt that I did in the bankruptcy. And that was my -- it became my personal bankruptcy.

Q Okay. We'll get back to that later on.

Who are you married to now?

A Robert Beard.

Q And how long have you been married to Robert?

A 20 -- almost 21 years.

Q How many children?

A Two.

Q Who are they?

A Bianca Wilson is my oldest, that's my daughter who testified a little while ago, and my son is Chance Wilson, my son who also testified earlier.

Q Let's talk a little bit about your education. Let's start with, where were you born?

A I was born in New York in Westchester County.

Q And high school in New York?

A I went to a Catholic high school in New York, in Westchester.

Q After that, college?

A Yes, I went to college and I went to law school.

Q Let's back up. Where did you go to college?
A I went to Fordham University.
Q That's in the Bronx, I think?
A It is.
Q And did you get a degree?
A I did.
Q In what?
A Theology, philosophy, classical civilization. I had a Bachelor of Arts, Bachelor of Science dual degree in multiple subjects.
Q Are you a little nervous?
A I'm overwhelmed. It's been a long time coming.
Q If you slow down a little bit I think it will be easier for everyone to understand. Okay?
A Okay.
Q Thanks.
After college you said you went to law school?
A Yes.
Q And where did you go to law school?
A I went to New York's Pace University.
Q Pace?
A Yes.
Q And did you get a JD degree?
A I did.
Q Do you have any other degrees?

A Yes.

Q What are they?

A Last year I just got a Master of Science degree in Psychology specializing in neuroplasticity and the elite mind of an athlete.

Q I don't think I understand. What is it in? I'm sorry.

A Master of science, an MS in psychology, specializing in neuroplasticity.

Q Neuro?

A Neuroplasticity, the brain's ability to adapt and change.

Q And that was an online course?

A It was a fully accredited university. I did the courses remotely.

Q How long did it take to get that degree?

A I did it pretty quickly. Two -- about two-and-a-half -- two years.

Q Okay. Do you have any other degrees?

A Degrees? No, those are the official degrees.

Q Okay. Do you have any certificates?

A Yeah. Quite a few.

Q Well, let's go through them; we got plenty of time. Go ahead.

A I have a certificate from National Healing Institute, which was a homeopathy and nutrition holistic course and program. I have a certificate from the International Sports

and Sciences Association, which was a program I wanted to learn more about athletic nutrition, kind of leaning towards -- my son's an athlete, so just sort of -- I already had extensive knowledge of nutrition from my own 30 years of research, but I wanted to kind of learn specialties, sports being one of them. So I had that certificate.

I have an herbalist certificate. I have a -- another certificate in skin care. These are all, like, online programs. They don't -- they're not anything licensed or -- they're just -- I'm a constant self educator. So I'm always taking new programs, learning new things.

Q Okay. What did you do after law school?

A I took the Bar exam.

Q And?

A Passed.

Q And?

A And then got offered a job at a Wall Street law firm called Skadden Arps, which at the time was the number one ranked law firm.

Q And that's in New York?

A New York City. Well, they're all over the world. The New York office is the biggest office.

Q How long were you at Skadden Arps?

A Probably around five-ish years.

Q What did you specialize in during the five years?

A I did mergers and acquisitions, primarily transactional, large corporate deals. And I did an extensive amount of pro bono work, like extensive.
Q And you were a member of the New York Bar?
A Yes, sir.
Q Are you still a member of the New York Bar?
A No, not anymore.
Q And what happened to your licenses?
A Nothing happened to my license. I left the law and moved to Hawaii, and for a few years I was continuing to renew it and take the continuing legal education. And then I realized -- I had a completely different career by that point, I was in sales. And I didn't want to just keep renewing it and taking all those classes. I have zero intention of ever practicing law again. And my license has always been in perfectly good standing, and I just decided to switch it into the retirement. You can have a fully retired status. And that's the status that it was. In 2010 they put it into what's called into suspension. It's also referred to as being put on ice. Because I never fully got the affidavit to get it turned into a retirement license.
So sometimes people look it up online and it says "suspended." My license was never suspended. You can see there's a Rule 468A, which just says failure to pay the fee to switch it over to retirement.

So I do have a license, there's not been any complaints against it of any kind ever, and it's in suspension currently.

Q For not paying the annual --

A For not paying the -- yeah, exactly, not taking the steps to get it into retirement status.

Q Last time you practiced law was when?

A 2002.

Q Okay. And why did you leave Skadden Arps?

A I was eight months pregnant with my daughter on 9/11, and my original plan was to stay at Skadden. I loved my career. I loved being a lawyer. And then I got pregnant and I thought at that point I would have the baby, stay home for a little bit, and then get child care, which is what the majority of the women at my firm did. They had their babies and then would stay home for a little bit and then they would come back to the office, and that's what I thought I was going to do.

And then eight months into the pregnancy was 9/11. And I watched people jumping to their death at the World Trade Center, and I just had one of these moments where I knew that was it, that was the end of my career. I said, This was my last day; it was people's last day, being in the midst of that kind of terror. I said, This was my last day. This is not where I want to be. I do not want to be in this high-rise building in this crowded city, my daughter being in child care,

and I'm working 70, 80, literally sometimes 90 hours a week flying all over the place. And I pretty much quit at that time. They thought I was crazy for quitting. I was on the partnership track. And they wondered if I had postpartum depression because it was insane to walk away from a career like that, and all I had worked for with my law degree.

And -- but there was -- the minute my daughter was born, too, I looked into her face and I was, like, this is it. This is what. I want to do is be a mom.

Q Okay. And how long after that did you move to Kauai?

A We moved to Hawaii, not Kauai first, we moved to the Big Island first because I was going to acupuncture school. It's just one of the other things I did. And there was an acupuncture school on the Big Island. So I moved there. And that was end of 2002, I want to say. And then on that island I -- couple years later I met my husband Robert. And we had our son, Chance.

Q Okay.

A And then together all four of us moved to Kauai in, like, summer of 2006. So we've been on Kauai for that long.

Q Now, after, your next job was what, you mentioned sales?

A Mm-hmm.

Q Can you tell the jury what that was about?

A Yeah. I sold fractional real estate, like, long term, sort of, like, people would come and buy three, four months of

time at a resort. I did that for several years, six or seven years.

Q What happened to that job?

A I quit in 2011.

Q Why?

A There were a multitude of reasons. It just became something I didn't love anymore, and I felt like I wanted to start doing my own thing, have my own business, have more ability to teach and do things that I was actually really interested in.

Q And so what year did that career end?

A Sales? 2011.

Q Okay. What did you do next?

A I took some time off, and 2012 is -- on 4th of July 2012, I posted a picture of a red, white, and blue smoothie, and started my health coaching business. From there it's been doing that ever since.

Q Okay. Let's spend a little time telling the jury what you do.

A Okay.

Q What you've done for the last 14 or 15 years.

So, we've heard a lot of things about various businesses. Can you go through each of the businesses you have? Let's start with that, and what their names are, and then we'll talk about what they do.

A I have essentially three separate parts of my business. One, which is the biggest one, is the health and wellness. And I started with that. It's a health coaching school. And it's called Health Mastery Institute.
Q And the others?
A And the others are both under Liana Shanti Enterprises, and one focuses exclusively on business, coaching, helping people create businesses for themselves, whether it be coaching businesses or online businesses. I have extensive experience at that.
And then there is the spiritual and life growth aspect of the business. So it's basically business, health, and then emotional and spiritual health.
Q Okay. So let's break them down again. First one is called what?
A Health Mastery Institute.
Q Health Mastery Institute. And what does that business consist of?
A That is two-fold. Everything in my -- let me start off by saying, about 98 percent of my entire business for the last 15 years is digital services. I sell digital programs. People buy the programs. You go online, you find you want a health coaching program or you want a program in business, you buy it, you access it, you take the program. The vast majority of my over hundred thousand people that have been through my doors in

the last 15 years, I have no idea who they are. They are people all over the world who buy the programs.

And so this -- when people refer to community, right, the majority of my business has nothing to do with community. The majority of my business is selling programs to people that find me on the internet.

And then there's a small percentage of people, under 200, so, like, less than half of 1 percent of people who are in my app. I have an app called the Liana Life App. And you can access all of the programs in there if you have purchased the programs. And I have three community groups. So those are the groups where students of mine interact with each other in the community.

One is the health-based group, where people talk about health coaching and building health coaching businesses.

One is a business focused entrepreneur group where I go in and teach periodically, a couple times a month, on how to grow a business, how to grow your Instagram account, how to write your messaging, you know, find out what you're good and be able to share that with people.

And the third is a spiritual.

So the three groups that I have, which is a total of less than 200 people is -- consists of the three same categories that I have in my businesses.

Q Okay. So let's break this down. The so-called hundreds

of thousands of people who follow you around the world, is that accurate?

A I mean, nobody -- I'm an extremely private person. I know I've been designated as a public figure for this trial, but there's not a single picture or video of me. I don't go on videos and -- so, I don't have -- like, people wouldn't recognize me anywhere around the world because I'm not an influencer, I'm a teacher. There's a huge difference.

I don't sell products, I don't take affiliate deals. All the things that come with being an influencer -- sorry -- I'm none of those things. And I -- I don't promote myself, my personal self, it's my programs. So everything -- every content on all of my Instagram accounts and my Facebook accounts has always been for 15 years the teachings themselves.

So, there are people in excess of 100,000 that follow those accounts. But nobody is following me around the world, and I've never had a retreat. I've never done an in-person event of any kind. I don't go and meet up with people. Most of the people who came here today, who informed me that they were coming to support me, I did not ask anybody to come, I literally met them for the first time yesterday morning coming into court.

So, they came to support me. Many of these people had a lot of changes in their lives, health, marriage, et cetera.

Q I want to get back to these various businesses.

The primary business you have is selling programs?
A 98 percent of my business, yes.
Q And again, what are these programs? Are they prerecorded tapes --
A A lot -- most of them at this point are prerecorded. My process, especially since I've had the app -- I started the app in 2024. Prior to that I would record more of an old school way, in a system called Instant Teleseminar. And I would record something that I was teaching. Let's say I was teaching a program on, you know, candida. A lot of people have candida. That's a good example of one of my best selling health programs. So I would sit down and record it on Instant Teleseminar, and then that becomes what I sell, a digital product. The category of my business as far as all the financial, Stripe, all that, is Digital Services Company, that's what I am.
Q That's a major part of --
A The major part.
And now when -- I started the app in 2024, because it had a better format, more modern for me to be able to teach my community. And so when I'm creating a new program, I go into the app and I record it in the app, and people can attend it live if they want to. But then once it's done live and once it's recorded, then from that point forward it becomes digital recorded access only.

Q I want to focus on that part of our business.
A Okay.
Q People pay for the program or programs?
A Of course. It's a business.
Q And what is the price range?
A Free to the health coaching program. To become a health coach is -- I think we're around four -- $4500 for the full eight-month health coaching program.
Q Do you personally interact with the people who buy your program other than providing the program?
A Not unless -- no, not unless they're in one of those three groups in the app, in which case I interact only with respect to if I go live in a group and teach -- I'm teaching something. I'm not going into, like, chat or things like that that I interact in the groups.
Q Okay. So now let's talk about the apps. Can you explain those apps again?
A Mm-hmm. It's only one app. It's the Liana Life App. It's on the Android or Apple. And anyone who buys one of my programs, even if they're not in a group, they would, at this point since 2024, they would access what they purchased through the app.
Q Do they communicate with you through that app personally?
A No.
Q Did you ever post anything about any individuals on the

app?
A Can you -- I don't know what you mean.
Q Well, did you ever post personal messages about people on the app other than the teachings?
A The app isn't like a posting place.
Q Okay.
A Yeah. So, no.
Q Can you explain that?
A The app is, you go into it, and if you've purchased programs, it knows that you are a student and it gives you -- it may see 55 programs that I sell, but you only bought three, so you have assess to three. And then there are active community groups, the three that I mentioned, if you're in those groups, then you can go in there and chat with each other.
Q Okay. That's what I want to get to.
A Okay.
Q Let's define the three community groups. What are they and who consists of the community in those three?
A Okay. So these would be the three community groups that I shared a few minutes ago. The Health Coaching Group, the Business Focused Group, and the Spiritual Focused Group, three different groups. And people join those. And they're total, between all three groups, is about 180 people.
Q Has that number been pretty constant for the last five,

ten years?

A It's not relevant for the last five or ten years because I've only had the app for two years.

Q Okay. Do you have three apps -- I mean three groups, three community groups?

A Yes.

Q Can you explain what the Health Community Group -- why people are in that group?

A The people in that group are building health coaching practices. So they're people that already have a health coaching certificate, whether it's from my school or a lot of other schools as well, and they want to learn how to be a health coach in the world and make a living at it. And that group primarily is run by someone who works for me, Cahira Noelani. She's a very successful health coach, and so she leads people on how to make a living being a health coach.

Q Then there's the Business Community Group?

A Yes.

Q I assume those are people who want whatever it is you're providing regarding their business?

A They are in that group to learn how to build their own independent business. And, you know, I teach about twice a month in there.

Q And what's the spiritual group about?

A The spiritual group is about sovereignty and being a

person in this world who finds love within yourself. I'm definitely Jesus focused. My entire life is based on Jesus in terms of what I believe is the way to live a life. And I have a lot of people over the years who have come to me who were in churches before and left churches because they were very discriminatory, and people had a lot of fear of being in authoritarian structures.

And I had a lot of people on the other end of the spectrum who were caught up in the new age and doing a lot of practices that they felt weren't healing in their lives. And so from those two ends of the spectrum, they found my work, mainly through what I share on my main Instagram account, Liana Shanti, and found that they can have self love and sovereignty in a relationship with Jesus that doesn't need another person, doesn't need an authority figure. Jesus said, The kingdom of God is within you. And that is the truth as I believe it.

And I teach people how to find that within themselves, and regardless of what they've gone through in their life, that whatever they've done -- I have students who have done a lot of things they feel shame for and, like, they're unforgiven and, like, they can never have a good life and they're not good people.

And the vast majority of what I do in that group is -- is encourage people to heal from whatever it is they think makes them unworthy and unloved, and share a lot of things from

the Bible, things from my own personal experience on how no human being is beyond redemption. I believe that in my soul. And a lot of people in that group have shared with me over the years that, knowing that, knowing they're worthy, knowing that they can be loved, has completely changed their life. So that group to me is the most special because --

Q Okay. Just because we're in Hawaii, you know the word sovereignty has multiple meanings here. Can you just explain what you meant by sovereignty?

A Yeah. Meaning I'm a person who believes that every person has free will, and you have a right to live your life how you feel is best for your life and your relationship with God, if you have one. And I really have never been a person who likes other people telling me what to do. And so I don't do that either.

And so sovereignty to me, as I teach it, is make your own decisions. You heard both of my kids say that, a lot of the time if it was something they did that wasn't something I agreed with or something I didn't personally, like, or, you know, my daughter dying her hair purple one time and she had this beautiful blonde hair, and I'm, like, okay, that's what you want to do, because I want them to make choices that are their -- their life. As long as they're good people, and they're honest people, and they're loving people and kind people.

Q Okay.
A That's a tenet of I want to teach. That's what I mean by sovereignty, is be your own person.
Q Do you know how many people are in the spiritual community, roughly?
A I would have to ask Cahira. I genuinely don't know.
Q But all together in the three communities, about 180?
A Yeah.
Q In the spiritual -- well, let's help those of us who are my age. What is a community, an internet community?
A What is it? Could you rephrase that?
Q I don't know what -- what is an internet community? It's a group of people who get together and can communicate online directly?
A Yeah. Inside the app there's -- it's a group, which means you sign into the app and you see the different choices on the left-hand side of the app. And if you're in, let's say, the Health Coaching Group, you enter the group, and there's a -- like, an ongoing chat feature kind of running.
Q Okay. Let me stop you.
A Okay.
Q A chat feature?
A Yup.
Q Does that mean that people in the group can communicate with each other through the internet?

A Yes, that's the main purpose of the group.
Q Okay. Those aren't people that buy the program, they just buy a program and then follow it or don't or whatever?
A There's the digital programs, and then there are people who are in three specific groups.
Q Got it.
A They -- the majority of people in those groups have bought programs from me otherwise it kind of wouldn't make sense. There's a few health coaching that got health coaching from other schools and want to learn the business side of it from me. But for the most part they're people that bought my program.
Q Do people voluntarily join a community?
A Yes.
Q Do they pay to join a community?
A Yes. It's a membership. Those are membership communities.
Q And is there a price for the spiritual one?
A Yes.
Q What is that?
A It's $199 a month.
Q A month?
A A month.
Q Okay. How do people know that that's available? Do you advertise or --

A It's on my website, and it's in the app. I don't promote it. I don't do ads of any -- I don't do ads at all, actually, of any kind that -- they find out about it and they join.
Q We heard the names Amanda Brady, Haley Winter. Do you know who they are?
A I do.
Q Were they part of one or more of your communities?
A Yes.
Q Which communities?
A Excuse me. Amanda Brady joined my community in 2017, in the hospital pregnant with her first son. I released a program. She joined it, and she was in my community ever since. And to my knowledge she joined most of the programs that I created in those nine years that she was in the community.
Q Did she join any of the three communities?
A All three.
Q And we already talked about the fact that people in the community can communicate with each other over the internet. Can you communicate -- are you a member of the chat, if you want to be, can you communicate?
A I'm the administrator of the chat, me and Cahira.
Q But, I mean, can you actually talk to a member of the community or all the members of the community --
A Yes.

Q -- through the group chat?
A Yes.
Q So someone like Amanda Brady or Wade Martin -- I'm sorry -- or Haley Winter. Sorry. We'll get to the cast of characters in a minute. They can actually talk to you, not on the phone, not in person, but over the internet.
A Right. Haley Winter was not allowed in my app because my app was created in -- you used her as an example. She was -- I created the app in 2024.
Q She was what?
A She was not allowed in my app so, she was not in the app. We found out that -- through her, that her husband had been using her account to access my information in private groups, and so when I created the app I told her she was banned from the app. So I wasn't communicating with her inside the app, just to be clear on what that was.
The only way I communicated with Haley was through direct messaging on Instagram. Just want to make sure we're clear, because you keep saying app, so.
Q You have the right to allow someone into one of your communities and not, is that what you're saying?
A Yes.
Q And in her case you did not let her in?
A Correct.
Q Because you thought someone else was portraying them --

using her name and getting in through your community?

A We knew she was, because private things inside of a private community were being shared on the Liana Shanti cult Instagram, things were direct screenshots from inside of the group. And Haley shared with us that her ex-husband had been -- somehow gotten access to her accounts and was using her account to essentially spy on us.

Q Okay. Who was her ex-husband?

A The defendant.

Q Which one? There are three.

A Byron Horvath.

Q Okay. We'll come back to that -- that later on.

Now, you mentioned another way that people can communicate with you. Is that Instagram?

A Yes.

Q Tell me how that operates, with you.

A How it used to operate was people would message me and I would respond and be nice, cordial, you know, chat. I don't do that anymore. I get inundated with direct messages and I have automated messages at this point.

Q So they weren't necessarily members of one of the communities?

A Everybody under the sun messages me. People that are not in any of my programs, people that are having all kinds of things in their life, and they message me for guidance, for

advice, for -- it's been like that for a long time.
Q Do they pay for that?
A No.
Q It's just people that contact you and may ask you a question or want to just discuss anything, and they -- you respond if you want to?
A Yes.
Q I'm trying to let the jury and myself, frankly, understand how all these things work.
A Yeah. You -- on Instagram there's no -- it's a public account. So anybody who can see my account can essentially message -- send a direct message, which is referred to as a DM. And then you get a notification, Mary Smith contacted you, and you can read it and either respond or not, or block them, delete them.
Q That has nothing to do with your business?
A Zero.
Q Okay. You mentioned public and private. Can you explain to the jury the difference?
A Yeah. Some people on Instagram have a private account where they don't show any of their content to the general public. It's generally for family or whatever reason people don't want their information public.
And then I would say a larger percentage of accounts on Instagram are public. Those are ones we see when -- I don't

think you have Instagram, Jeffrey, but when people log on and they see news or restaurants to go to, or workouts, that's all public. It has to be public in order for it to show up in the algorithm for people to be able to see it.

Q And who has access to the communications on a public Instagram account, the world, or just the people that are communicating, or who?

A Well, in -- privately in the direct messages, only anyone who has account access. But in comments, if you make a post and someone comments, it can be anyone in the world, even if they don't follow you, unless you have comments turned off, which I do not. I've always had my comments open. And people comment on what I share, and then sometimes I respond back and have a conversation.

Q Your communications with Haley Winter, let's start with her, what -- on what -- how are those communications facilitated, on what sites, on what internet, whatever?

A So, I have to take you back a little bit.

Q Sure.

A Prior to my app, as I said, back in 2012, my first account was a Facebook account for my health coaching. And from that Facebook, on Facebook it's called a profile. And then there are pages. You can have 50 different business pages, you can have one, you can have none.

From that original Facebook account I had my health

coaching, Health Mastery Institute Facebook page. And I did programs, I did cleanses, juice cleanses, candida program. I did a multitude of health-related programs. So I initially had a group called Eat, Juice, Thrive. And that was a group on Facebook.

Facebook has a function called groups. And there's no pay feature there because it's hosted on Facebook. But it's a way -- it was the pre-app way for people to talk to each other about a cleanse they're going through or a group program they're going through.

So I had two different groups on Facebook before I had my app. And Haley Winter was in one of those groups on Facebook. So I communicated with her there, sparingly. And then she started messaging me quite heavily in my DMs.

Q And messaged you on Instagram?

A Correct.

Q Okay. Was she at that point a member of some -- did you have your community groups at that point, or that came later?

A I had -- you can call them community groups on Facebook versus the ones I have now on the app.

Q We're going to come back in a little while to all of this.

A Okay.

Q I'm just trying to understand.

And Amanda Brady, how did you and she communicate, through what source?

A The same way. She was in the community groups on Facebook, and then she would message me very frequently on Instagram. But also realize, a lot of people, I have years of -- years and years of people messaging me, and sometimes there will be weeks or months that go by that I don't respond. But that's the way that people try to reach out to me, if they're trying to get in touch with me. But it, of course, doesn't mean that I'm always responding back.
Q So I know it's a little complicated. Have you adequately explained what you do now, what the businesses are, and how you communicate through the various internet opportunities?
A I believe so. I --
Q Okay.
A -- don't --
Q That's fine.
A Unless you think I need a clarification.
Q What's an app? Shows you how old I am. What's an app?
A It's an application. It's short for application. And you get the little square emoji thing on your phone, whatever it's called, and you click on it. There's apps for everything now; scheduling flights, calling an Uber, DoorDash. Sephora even has an app. I mean, there's an app for everything.
Q So you can actually -- I can put your app on my phone?
A Yes. That's what it is.
Q Okay.

A I'll show you how to do that after this.
Q So anybody can do that?
A Yes.
Q And it's free?
A It's free.
Q Okay. And if I do go on your app, do I, like, ask you a question or say hello or --
A There's nowhere to ask --
Q It's stuff you have available for me to push, like ESPN or something?
A You would go into the app, if you were a person who didn't buy anything yet, you don't have any of my programs, I don't think you do. You would be in the app and you would see all of the free things. I have always given a ton of free things. I have free prayers. I have free resources. I have free how to get a business started. Each of the areas that I teach I have a lot of free things to kind of introduce people to my work and say, If you think this is good and you want more of this type of thing then you can buy a program. So you would have access to anything that's free.
Q Let's spend some time talking about the cast of characters. Okay?
MR. ADAMS: Your Honor, can we have him describe them as something less derogatory?
THE COURT: I'm not sure how derogatory it is, but use

a different term.

MR. PORTNOY: I'm sorry.

BY MR. PORTNOY:

Q Let's just talk about various names people are going to hear about and various people.

Do you know who Byron Horvath is?

A Yes.

Q I want you to in detail tell the jury who you understand he is.

A Okay.

Q Then we'll talk about -- well, start with that.

A Okay. Everything I know about Byron Horvath has come from his ex-wife Haley.

The timeline is that Haley left Byron on August 2nd of 2016, so almost exactly a decade ago from this week. Haley didn't come into my community until 2021. So when I met Haley she had long left Byron. And they had a child together, Byron and Haley, who had some severe medical issues.

And Haley began telling me about what her life was like with Byron. And she was seeking guidance, seeking support, not only from me, but everybody that was in those Facebook groups back in the day.

She shared with me that Byron's family is the richest family in Saskatchewan. They own 23,000 acres of land. 35 square miles of land. And that no matter how many times

she's reported Byron for raging from cocaine to physically abusing their daughter -- and she did share multiple photos of her daughter with bruises. And I know those photos, you've seen them. She also shared photos of what she believed to be evidence of sexual abuse at the hands of Byron Horvath, which were private parts of her child with extreme redness and things that to her did not appear normal as a mother. She had said this was happening every single time she picked up her daughter. That she had a very red, raw vagina, were her exact words.

And she had videos, we have videos of the daughter herself talking about the bruises in the video Haley and her sister Elise, Elise Winters, one of the people who reported Byron to CPS, again, way before I knew Haley.

Q All of this information --

MR. ADAMS: Your Honor, I move to strike as -- may we approach on the statements? Multiple, she's described --

THE COURT: You may. You may.

Ladies and gentlemen, this is a good time for a stretch break anyway, you've been sitting for 45 minutes. So let's take a stretch break while I meet with counsel at sidebar.

(Sidebar.)

MR. ADAMS: I was going to object to the question, but she just kept going on. She can not describe photos that are

not in evidence. She cannot make statements of these people. Even if it's not brought in for the truth, she's clearly saying it for the truth. This is highly prejudicial for her to describe documents that are not -- they can't get into evidence.

THE COURT: What --

MR. ADAMS: The red vagina. She said, She told me. She described her red vagina. She started off the question with, everything I learned came from Haley. She's coming in as a witness. He has an obligation to bring her in here and he didn't, and now he's trying to get in these photos that cannot come in that are highly prejudicial, no foundation. You're not going to see a red vagina anywhere. This is incredibly prejudicial.

THE COURT: Okay. I don't understand why you're not objecting, Mr. Adams. It's becoming completely confusing to me why you're not objecting in the moment.

But here's what I'm going to do you, and you guys tell me if you disagree with it. I am going to instruct jury the information being provided is not offered for the truth. In other words, what you are hearing from her is her understanding. And at this point you are not to assume that what is being told to her is accurate.

MR. ADAMS: From the point of practice, may I interrupt the witness then if she starts? Before I'm able to

formulate my objection, half of what -- in other words, she starts off okay, and then she as far as saying something --

THE COURT: Yeah.

MR. ADAMS: -- I can't object to his objection, I'm objecting to her response.

THE COURT: Objection. Nonresponsive.

MR. ADAMS: I can interrupt her and do that?

THE COURT: That's fine.

MR. ADAMS: Thank you, Your Honor.

(End of sidebar.)

THE COURT: We are back on the record, but two of the jurors left to use the restroom. So once they get back we will resume.

(Pause in the proceedings.)

THE COURT: All right, ladies and gentlemen. I want to give you what is known as a limiting instruction. And this means that you need to follow this instruction.

The information that this witness has testified to about what other people showed her or told her about or videos that were presented to her are just her understanding of what happened. That does not mean that what she said is true. All right?

Okay.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q So, let me just get back to what you know about Byron Horvath.
Is there anything you know about him prior to the filing of the lawsuit that did not come from his ex-wife?
A Yes.
Q Who else?
A Amanda Brady.
Q Okay. We're just going through the people, and we'll come back to this later on.
A Okay.
Did you want me to continue with what else I know about him?
Q Not at the moment.
A Okay.
Q We'll get there.
Have you ever met him, other than --
A No. No.
Q Okay. Have you ever communicated with him?
A No.
Q Has he ever, to the best of your knowledge, non-anonymously communicated with you?
A No.
Q He was married to Haley?
A Yes.
Q They were divorced?

A Yes.
Q They have a child?
A Yes.
Q Was there a custody dispute going on?
A Yes.
Q Okay. Where does Haley live?
A I don't know. She was living in Saskatchewan when she was a student of mine. I have no idea where she lives now.
Q She was a student of yours?
A Yes.
Q What do you know about Haley?
A Quite a bit.
Q Okay. And how did you learn what you know about Haley?
A Directly from Haley.
Q Okay. Have you ever met Haley?
A No.
Q Is she remarried?
A Not that I -- I mean, not that I know of. But I have no idea, I haven't spoken to her in a couple years.
Q Was there an ongoing custody battle until just recently between Haley and Byron?
MR. ADAMS: Lacks foundation. Calls for speculation.
THE COURT: Sustained.
BY MR. PORTNOY:
Q Were you told there was an ongoing custody battle?

MR. ADAMS: Hearsay.

THE WITNESS: Yes.

THE COURT: Sustained. That's hearsay.

The jury should disregard that answer.

MR. ADAMS: And may we have the witness pause so I can get my objection in?

THE COURT: Yes.

If you could take a moment, Ms. Wilson, to pause between the question and providing your answer, that would be helpful to me.

Thank you.

BY MR. PORTNOY:

Q Did you ever receive any e-mails from Haley Winter describing a custody problem?

A Yes.

Q Who is Stefanie Horvath?

A She is the second wife that came after Haley of Byron Horvath.

Q Have you ever met her?

A No.

Q She ever communicated that you know directly, not anonymously?

A She non-anonymously has followed my Instagram account for several years under her Instagram account called Stefanation.

Q How do you know that?

A Because that's her Instagram account, and she -- and we have screenshots of her following me from back in 2022 when Haley said to me, It makes me nervous that Stefanie is following you. Do you think you should block her?
Q What do you mean by following? Sorry, that must be an internet term.
A When you have an account on Instagram, you know how people keep referring to, oh, I have all these followers and what not. She has been one of them since around 2022. And it concerned Haley, because there was really no -- she's not a student of mine or interested in my work.
Q Is there a way of knowing if someone is following?
A Yes.
Q How do you determine that?
A You click on the icon that says followers, and it will show you your follower account, and then it shows you a list of every Instagram account following you, and you can either look someone up or you can just scroll down the list and see who's following you.
Q Did you ever do that?
A I didn't do that, no, it's too many people. But Haley actually screenshot it and shared it with me.
Q Okay. Do you know when Stefanie Horvath and Byron Horvath got married?
A It was, I think, sometime in 2021-ish.

Q Okay.
A From what I remember.
Q And who is Paula Haygarth?
A She is the new wife of Wade Martin, which is Amanda Brady's ex-husband.
Q Hold on a minute.
A Okay.
Q Amanda Brady was married to someone named Wade Martin?
A Yes.
Q And he is now, Wade Martin, now married to Paula Haygarth?
A Correct.
Q Is Amanda Brady remarried?
A Remarried, and then her husband recently divorced her. So I think now she's single, as far as what she shared with me.
Q Her husband's name was?
A Her second husband's name was Drew Brady.
Q Okay. So what else do you know about Paula Haygarth?
A Amanda shared with me that Paula was a source of major turmoil for Amanda's kids.

MR. ADAMS: Your Honor, it's hearsay. Nonresponsive.

THE COURT: Well, I'm going to give the same limiting instruction.

So ladies and gentlemen, the information that is being asked about is not offered for the truth of what she was told, it's only being offered for the information that was given to

her.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Go ahead.

A And for the majority of the nine years that Amanda was in my community, she shared extensive issues that she had with Paula. They have a decade long hatred of each other. And Amanda would constantly tell me that Paula was making a lot of trouble between Wade and the girls. And Amanda would tell me that --

THE COURT: One second.

MR. ADAMS: Your Honor, now she's directly quoting her and that's hearsay.

THE COURT: All right. That is hearsay.

So -- well, let me reiterate, ladies and gentlemen, the information that is being said here is offered not to show the truth of any of it. So, for example, the statement that they had a decades-long hatred of each other is not something that is offered for the truth of that alleged hatred. It's being offered to provide information about what this witness was told by Amanda Brady. It's not about whether or not it's true, it's just about information that was told about her.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: Let's ask a question.

MR. PORTNOY: Sure.

BY MR. PORTNOY:

Q We're going to get into more, I'm just trying to give everyone an understanding of who everybody is.

When you say you were told, I just want to use the word told, were you told, like, on the telephone or is told by e-mailing or told by posting? What's the word "told" mean in the internet world?

A Between me and Amanda it meant primarily through Instagram messaging, but also in e-mails and also periodically in phone calls.

Q So you actually talked to --

A Yes.

Q -- Amanda Brady on the phone?

A Yes.

Q Have you ever talked to Haley Winter on the phone?

A Yes, during her mentorship.

Q Okay. What do you mean by "her mentorship"?

A Haley Winter hired me for a business mentorship. And that consists of me creating a business plan for a mentee. And I created a skin care business plan for her, designed her whole website, products, and also gave her all of my skin care recipes to use for her to sell.

And that consists of two phone calls. One at the beginning of the mentorship, where I spend some time getting to know the person and what they want, what they're looking for,

what kind of business they want to have. And then I get to work and create the business plan for them. And then we have a phone call at the end of the mentorship where I see if they have any questions and how to launch your business and what direction you want to take it in and setting up your Instagram account.

So Haley Winter was in my business mentorship and I had those two phone calls with her.

Q Is Haley Winter still one of your students?

A No.

Q Why not?

A On the eve of her custody trial with Byron, she took a dramatic turn, in my opinion. She had been fighting him for years and had lawyers and had been trying to get custody of her daughter. And on the eve of trial what she shared with me was that she was able to partially see her daughter again if she would not communicate with me anymore. And that's pretty much what happened. And she apologized to me.

In that final message from her, she said, I'm very sorry to have brought all of this into your life. You didn't deserve any of this. But this is the decision I have to make for my child.

Q So are you now aware that she recants all -- most of what she told you throughout the various years?

A Of course.

Q Is there anything you ever posted about the defendants --
A There's a lot.
Q Wait, I didn't finish my question.
A Oh, sorry, I thought you were done.
Q -- that didn't come from either Haley or Amanda?
A Not that I can think of, no.
Q You have read the depositions of the defendants?
A Yes.
Q Okay. Do you know from the depositions of the defendants under oath how they got together?
A Yes.

THE COURT: One second.

MR. ADAMS: It lacks foundation. It's hearsay.

THE COURT: Sustained.

It's offered for the truth of the matter asserted, so it's hearsay.

MR. PORTNOY: May I approach the bench, Your Honor?

THE COURT: You may. We can take a stretch break.

MR. PORTNOY: Thank you.

(Sidebar on the record:)

MR. PORTNOY: I'm sorry, I don't understand how a deposition of a party before they testify. She's read the deposition, sworn testimony.

MR. ADAMS: Read it.

MR. PORTNOY: They haven't been called yet.

THE COURT: It's hearsay.

Also, Mr. Portnoy, rolling your eyes at me is not helpful to your client.

MR. PORTNOY: Oh, I'm not.

THE COURT: Okay. So, it's hearsay. It's still hearsay. It's an out-of-court statement offered for the truth of the matter asserted. It doesn't matter that it was sworn under oath, it doesn't matter that she read it, it's still hearsay.

(End of sidebar.)

BY MR. PORTNOY:

Q Do you believe you're a cult leader?

A No.

Q Why not?

A Because, number one, to be a cult leader you have to exercise coercive control with a known outcome. Meaning you exert your authority over other people with a specific outcome.

And I literally teach the exact opposite, that there is no -- I tell people, literally, there is no authority over you in the universe, literally. There may be authorities, you know, in the world we live in, clearly, but you are your own sovereign being. And that is the antithesis of being a cult leader.

Cult leaders also often have -- I've never heard of any cult leader that doesn't even meet any of the people in

their supposed cult. They're usually gathering together. They have places where they gather together. I don't have personal interactions with any of my students. As I said, I don't do retreats or anything like that.

And overall, what I teach is that people are sovereign beings. And I even teach my own kids that even their parents are not their authority, ultimately, you're your own authority. So, you know.

Q In your spiritual community, you provide advice?

A Sure.

Q What kind of advice?

A Advice on so many topics. Just a few examples would be, if you are struggling with self-worth. That's one of the more common things, and people say, I did drugs in my past, or other things I'm not proud of, and I have a lot of shame from that. So I give people advice on how to heal from shame, and just face the fact that every human being makes a lot of mistakes.

That's kind of what it means to be human. And you can overcome that and live a better life and choose who you want to be today, without holding on to who you were in the past, because if you keep holding on to who you were in the past, you're depriving yourself of the ability to be someone else in the present. And every day you wake up God gives you life and breath, you can be a completely different person. Even if you robbed a bank or you did something horrible, you can make that

choice.

So a lot of the advice I give is actually what I would characterize as empowerment advice to forgive yourself, love yourself. Even if people close to you don't support you, even if your family rejects you because you choose a certain lifestyle, or you want to move somewhere and start a different type of career, and then they get rejected from their family. And I tell people, you know, you deserve to have a life where it's one that you want to live.

And so I give people -- I would say, overwhelmingly mostly what I teach and give advice and guidance in is, you only have one life, and if you don't love yourself, and you don't have self-worth, your life is going to be nowhere near what it could be if you find that place within yourself that you are worthy and you are loved, and you can make all the choices you want in this one blessed life that we all get.

So a lot of the questions I get from people are in that area of kind of, I was hating myself until I found you. A number of people who were suicidal and then they found me.

That was actually an interesting thing to me, one of my students created a site called Liana Shanti saved my life, and that kind of was very weird to me. Like, I would never say that, like, I saved someone's life. But there are all these accounts, stories on that Instagram account and website of people who genuinely feel that they were either literally

suicidal or maybe depressed and then they found hope. Right?

Like ultimately my purpose in life, I believe, is to give people hope, that no matter what is going on in your life or in the world, to, like, lean into what's good, lean into love, lean into, like, your own self-worth, lean into the fact that there is a lot of goodness in the world. There's a lot of horrible, crappy things, too, but if you get overwhelmed with that -- you know, I've been through some really hard things in my life personally, and it's never, ever dimmed my hope in what can happen in this world.

Q You have both men and women in your spiritual community?

A Yes.

Q What's the ratio?

A Probably 80 -- 85 percent women, 15 percent men.

Q You and your community groups, particularly the spiritual, get involved in concerns some of your students have about their personal life?

A No.

Q What about family issues like a divorce or custody or --

A In the chat groups, peers, like peer-to-peer communication, people talk about -- it's very personal sometimes, people share a lot of stuff they're going through. Men and women, the men and women in the group share just things they're going through.

Q I don't want any specifics.

A Okay.
Q What is your role when somebody in your community group tells you they're having a problem with a spouse or with a child issue, custody, what do you see your role to be?
A I don't have a role with respect to that. The chat feature itself is primarily peer to peer. It's a support group. The community, I go in and teach in there. So I'll do what's called a live, which means I go into the app, I go live and then I teach something. I give a class or, you know, we do a prayer or something like that.
But my function is not to be engaging in the chat function. That's -- the two main functions of a group is teaching, which is my job. I'm a teacher. And then there's the chat function, where people share peer to peer, and that's where mostly you'll see people chatting about everything in their life, whatever they feel comfortable to share with that group of men and women.
Q Is there a way for them just to communicate with you?
A No. Not in the app.
Q So if you say, for example, Haley Winter was communicating with you about any issue, is that just available to you or anyone?
A Those communications with Haley were on Instagram, and that was only available to me through my direct messages.
Q Okay. So are there people like Haley who talk to you

through the computer about problems they're having in their personal life?

A There are -- as I said earlier, there are a number of people who contact me in the DMs. Because once I started advocating -- what happened was once Haley started sharing all of her stories with me and what she was going through and what she was dealing with. I found it very weird that, you know, Byron had been reported to CPS multiple --

Q Let's just talk about what you do in response.

A Right. So because I started advocating, I started researching the family court crisis and what was happening, and it's kind of a pay to play system, the person who has the more money to buy the better lawyer, et cetera, I unearthed things I had no idea could happen in a court. I was only used to this kind of court, not a Family Court where there's no jury. So I found a lot of research and started really advocating for that. And started sending submissions to the United Nations. They have a crisis task force for the family court crisis. It's literally a worldwide crisis.

And since I started doing that, now I'm getting tons and tons of men and women who are in the Family Court system, not just here in the United States, but Europe, Canada, UK, Australia, where they are losing custody of their children for making disclosures of child abuse.

So, there are a lot of people now that are asking me

for guidance on that specific issue. And so I have kind of partnered with a lot of organizations that are helping women and men, advocacy groups. I get a lot of that now. I don't give personal advice. I'm not saying, Hey, Mary Smith, do this thing.

I say, Here's the women's coalition, here's how you can contact legal funds -- resources that give you legal funds to help fight in Family Court. Here's a way that you can get in contact with the United Nations Commission on the Family Court crisis. Here is how you can get involved in legislative initiatives.

All across America right now, there are legislative initiatives to change the laws on how family courts are run and who's paying who. Like, sometimes it's one parent, male or female, who's paying the psychological evaluator, paying the lawyers, paying the GAL, the guardian ad litem. And the person who's paying for that is almost always exclusively getting custody of the child, despite numerous reports of abuse. And those reports often come back unfounded. So then I started researching how many reports are unfounded --

Q So when -- when somebody like Haley or these other people relate to you they're having some kind of a personal issue, you keep using the word "advice" or whatever. What is it that you provide back?

A I provide back a lot of resources. I collected a ton now

over the last -- since Haley started with it. Four years of resources, information on getting help, information on legal networks that can help them, information even on things like people that are financial advisers that specifically help men and women going through the family courts. And health resources.

Q So you know, right, that you've been accused of facilitating children leaving one parent to go somewhere with another, you know that?

A Right.

Q How did you learn that?

A Because it was the slander that's all over the internet.

Q Sorry?

A It is the topic of this lawsuit, it's the slander and defamation that is all over the internet.

Q What is all over the internet?

A That I --

Q Wait, wait, wait, please.

With you being allegedly counseling people to leave a spouse or take a child away from another spouse, what's all over the internet?

A That I encourage people to leave their spouse, that's actually what the defendants have said. But the defendant's ex-wife left him five years before I came on to the scene. So it's what's being said, but it's --

MR. ADAMS: Your Honor --
THE WITNESS: -- ridiculous.
MR. ADAMS: It's lacks foundation. She's --
THE COURT: Sustained.
MR. ADAMS: I'd appreciate an order instruction.
THE COURT: So jury will disregard the answer to that last question.
BY MR. PORTNOY:
Q So the question is: What is being said about you on the internet about you allegedly encouraging one spouse to leave the other spouse, or already have left and take a child away from the other spouse? What is being said about you? What have you read?
A I have read that I encourage women, specifically, to leave their spouses and take their children away from those spouses.
Q Is there any truth to that?
A No.
Q Have you ever done that?
A Never.
Q And providing advice, as you pointed out, to individuals who are having a family related problem, have you ever told them to break the law?
A I tell them the opposite. There's multiple screenshots of me telling all of these people, never break the law. It's only going to bite you in the ass. Like, you do something illegal

and you're definitely going to lose your kid. It's the last piece of advice I would give someone.

MR. ADAMS: Move to strike as nonresponsive. It's hearsay referencing screenshots that are not in evidence.

THE COURT: Overruled.

BY MR. PORTNOY:

Q Did you have conversations with Haley about leaving Canada with her child?

A She mentioned to me that it was something she wanted -- she told me she wanted to take her daughter to a cardiologist in Florida.

MR. ADAMS: Your Honor, it's hearsay.

THE COURT: Sustained.

BY MR. PORTNOY:

Q The question was, have you ever had conversation with her?

A Yes.

Q Okay. We'll have to wait later on.

A Okay. Okay.

Q You're being accused of being a child trafficker?

A Yes.

Q Where have you seen that?

A Reddit, the Daily Beast, pod casts, YouTube. A website run by a guy named Rick Ross, a convicted kidnapper, called Cult Education Institute. It's on there. The Liana Shanti Cult Instagram account that was created specifically to destroy

my reputation. It's a lot of places.

Q Is there an actual Instagram account called Liana Shanti Cult?

A Yes, Cult Recovery.

Q Have you ever read what's on it?

A I have.

Q What have you read?

MR. ADAMS: Your Honor, it's hearsay if she's going to be repeating what she read.

THE COURT: Overruled. I don't think it's offered for the truth of the matter asserted.

MR. ADAMS: Fair enough. Thank you, Your Honor.

THE WITNESS: I read that I'm not a real lawyer, I'm a fake lawyer, I'm a scam lawyer, I never actually was a lawyer.

BY MR. PORTNOY:

Q Go slowly now, please.

A Okay. So that's one of the things they accuse me of lying about being a lawyer. They basically accuse me of lying about everything, just trying to discredit everything I've done in my life.

I have seen pictures of my children on that account. They went to my children's Instagram accounts and took pictures off of their account and shared it on that account. They shared photos of my son, who was a minor at the time, with his best friend, Gavin, skateboarding in our neighborhood with a

sign of the condominium complex that his friend lived in.

MR. ADAMS: Your Honor, this is nonresponsive and there's no relevance to this. She's already testified this is not defendant's website. She's reading -- may we approach?

THE COURT: The original question was that -- one second --

Is there an actual Instagram account called Liana Shanti Cult?

Yes, Cult Recovery.

Have you read what's on it?

I have.

What have you read?

MR. ADAMS: Prior to that she said that it was made by somebody Rick Ross who is not here, not part of this.

THE COURT: That was not my understanding of what she testified to.

If you could clarify, Ms. Wilson, were you saying that Rick Ross, I think it was, created the Liana Shanti Cult Instagram.

THE WITNESS: No. Rick Ross is the creator of CultEducationInstitute.com.

THE COURT: All right. Thank you.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q Can you continue with the things you've read on that site?

A Yes. They put information on there of my whereabouts. They started stalking me, literally in person. I had, you know, shared, oh, my family's going to a concert, my son had a golf tournament.
MR. ADAMS: Your Honor, this is nonresponsive.
THE COURT: Sustained.
MR. ADAMS: May we approach?
THE COURT: No.
The answer will be stricken.
You can sit down.
Let's keep going. We've got ten minutes left.
MR. PORTNOY: Thank you, Your Honor.
THE COURT: Counsel, both of you have been shaking your heads at me or rolling your eyes at me. It is not helpful to either of your clients, so don't do it.
You may continue.
MR. PORTNOY: Appreciate it. Thank you, Your Honor.
BY MR. PORTNOY:
Q The question -- Liana, please try to listen to the question so we don't run into any of these issues.
What have you read that was being said about you on this site, this Instagram?
A That I am a --
MR. ADAMS: This is hearsay.
THE COURT: It's not being offered for the truth of

the matter asserted. It is not hearsay. Overruled.

You may answer the question.

THE WITNESS: That I'm a child trafficker. That I'm a human trafficker. That I coerce women to leave their husbands. That I tell people to do illegal things, like leaving without the permission of a coparent. That I am a scam artist. That I am a fraud. That I'm a liar. That I was never a lawyer.

And then a lot of information about my kids, personal information about my kids and their whereabouts.

BY MR. PORTNOY:

Q Have you read similar comments about you other than on that Instagram account?

A Yes.

Q Where else?

A Reddit.

Q What have you read on Reddit?

A That I am a human trafficker and a child trafficker. And then there's a lot of commentary on finding -- I read things that said, We know where she lives. She lives on Kauai. It's a small island. I will come there and find her. I will rape her. I will kill her. We know how to get her, she's a human trafficker. That's is a lot of what's on Reddit.

MR. ADAMS: Move to strike as violation of the Court's order from this morning.

THE COURT: Overruled.

MR. ADAMS: It's nonresponsive as well to the --
THE COURT: Overruled.
MR. PORTNOY: Thank you, Your Honor.
BY MR. PORTNOY:
Q Can you -- we haven't really talked much about Reddit. Can you explain to the jury what Reddit is?
A It's a cesspool.
Q I understand, but can you tell them what Reddit is?
A I've never been on Reddit personally with my own account, but in my estimation of it it's a place where people go to spread hate. A lot of slander. Like anybody that's hated is talked about --
MR. ADAMS: Nonresponsive. Lacks foundation.
MR. PORTNOY: Your Honor.
MR. ADAMS: She's never been on the website.
THE COURT: One second.
Ladies and gentlemen, let's do this, let's take a longer break now. I think it's a good time to calm down a little bit. So what we're going to do is take our 30 minute break. It'll give me a chance to talk to the lawyers.
And during the break, please do not talk about the case with each other, don't text about the case, don't do any investigations, don't look on Instagram or any of these accounts that have been talked about. And we will see you in half an hour. So that will be at about 11 -- sorry, close

to -- it'll be closer to about 11:50, or sometime between 11:50 and noon.

Enjoy your break, don't think about us. All right? Thank you.

(Jury excused.)

THE COURT: Thank you. You may be seated.

Ms. Shanti Wilson, you may step down.

THE WITNESS: Okay.

THE COURT: Thank you.

All right, counsel, go ahead, and once the door is closed, make whatever objections you want to make.

MR. ADAMS: Thank you, Your Honor.

We raised the issue this morning at -- knowing that we were late to do so because we knew this was going to come up. That's why I raised it. And this witness cannot talk about death threats. Your Honor has made that ruling, that's my understanding.

And I --

THE COURT: Were you not here, for the Motions in Limine, Mr. Adams? My ruling was specifically with regard to one particular recording that was of an alleged voicemail of an alleged death threat. That's what my ruling was about. I have not precluded her from testifying as to receiving death threats.

Now, it's entirely up to you to cross-examine her on

how she -- why she believes it's them or not them, but the ruling was specific to the actual recording that was made.

MR. ADAMS: That -- that's fine. And what's happening now is there's an evidence free for all where she's able to just testify about anything without connecting it to defendants. They have not made their case where they have actual screenshots of this. We're not going to see Mr. Portnoy trying to introduce an exhibit that she's talking about. So she just gets to get up there without a single shred of documentary proof that any of this stuff was published. And this is a liable case, so she has to prove it was published.

And she's out there mixing that anonymous somebody on a website that have not connected a -- I'm sorry, an Instagram account that they have not connected to defendants, saying that they're going to rape and kill her. And that is highly prejudicial under 403 when they cannot get that actual written document in. Show it to her and see if it refreshes her recollection, anything, but it's not here.

THE COURT: All right. Mr. Portnoy, what's your response to that?

MR. PORTNOY: My response is I'm an hour-and-a-half into questioning my client, and I never had opposing counsel tell me how I put in my evidence. We are going to get to the tie in when I believe it's appropriate to get in to tie in.

They know what exhibits are out there, and I will put

in the ones that I think are appropriate to prove my case. Counsel is telling me how I have to prove my case. I've never heard that in my life. We're going through this --

THE COURT: Let me ask you: Are you -- are you going to tie what she's described so far to these defendants?

MR. PORTNOY: Yes. We're going -- we know this is a circumstantial case. We know they're hiding behind unanimity. So she's going to testify all of the reasons, when I get to it in my case, as to why she thinks these defendants are involved, either directly or through the conspiracy. We haven't gotten there yet.

THE COURT: Okay.

MR. PORTNOY: I'm sorry, Your Honor. That's where we are.

THE COURT: Mr. Adams.

MR. ADAMS: I'm not commenting on counsel's case, I'm commenting on the evidence. The last thing I want to do is object 25 times to hearsay, but this witness does not know and they don't have the actual written screenshot, post, or anything. And so it's going to create a huge confusion here if they're unable to tie that together.

He says he's going to, and maybe that's my job on cross-examination, but I -- now I'm going to have this huge hill to climb to prove something that they don't have the documents on. I don't have them on either. I don't know what

she's talking about, nobody does. And we won't ever see it. That's the problem.

THE COURT: Okay. I'm going to take this objection under advisement, and we will resume at 12:50, and I'll rule on it.

MR. PORTNOY: 11:50, Your Honor?

THE COURT: I'm sorry. Thank you. Thank you, Mr. Portnoy, 11:50. And then we will bring the jury back in.

MR. ADAMS: Thank you, Your Honor.

MR. PORTNOY: Thank you.

THE COURT: Thank you. We are in recess.

(A recess was taken from 11:26 a.m. to 11:56 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: All right. Thank you. I intend to instruct the jury as follows: The testimony that you heard from Ms. Wilson needs to be tied to the defendants. You are not to assume any of the statements or threats allegedly made to Ms. Wilson were made by the defendants until the plaintiffs have proved those connections.

And I may start limiting the testimony if it's not more clearly tied to the defendants.

So that's what I'm going to do.

The other thing I want to say is that, if the parties -- excuse me, if the lawyers can't tell yet, I'm

frustrated by the lack of civility that is happening in the courtroom, both toward me and toward each other, and to some degree toward the -- just the whole institution.

So, please try to be more civil to each other. It's, frankly, I think way more effective as a lawyer if you're civil. The jurors see how you behave toward each other. They're watching how you treat me. It's not helpful to our institution if you're going to behave the way that you've been behaving.

So, please, if you're frustrated with me, I get it. Try not to show it. If you're frustrated with each other, I understand that as well, but please deal with one another in a way that is civil and appropriate for what I consider to be a very honorable profession.

All right. With that we will bring the jurors in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: While you're getting settled, ladies and gentlemen, let me just share with you the schedule for the rest of the day, so you know it.

We are finishing today at 3 o'clock because I have another hearing this afternoon. So you will be done no later than 3 o'clock today. At the end of the day I will tell you when and where you are supposed to show up tomorrow.

We will probably, because that will be three hours

from now, we will certainly take probably another 15-minute recess at some point to give you another chance to use the restroom, have a snack or what not.

All right. I'm also going to read you an instruction that you must follow.

The testimony you heard from Ms. Wilson needs to be tied to the defendants. You are not to assume any of the statements or threats allegedly made to Ms. Wilson were made by the defendants until the plaintiffs have proved those connections.

All right. With that, you may continue, Mr. Portnoy.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Okay. Liana, when we left off you were talking about various things that you've read. And I want to go through many of these, and we're going to use a bunch of exhibits to do that.

Do you have an exhibit book there?

A Me?

THE COURT: She does on the left.

THE WITNESS: Oh.

BY MR. PORTNOY:

Q Why don't you grab the exhibit book.

THE COURT: I will ask you Ms. Cortez to help you. There are several binders, so why don't you tell us which

exhibit numbers, please.

MR. PORTNOY: The first ones will be -- see what we'll start with.

THE COURT: Let me ask, are you using -- how are you going to show this to the jury? Are you using trial software?

Yes. Okay. Great.

If you have it, we can show it to her on the screen, if we move her screen in such a way that the jurors wouldn't see it, maybe it already is, but it will be published only to her and to the lawyers but not the jury at this point, if that would be easier, Mr. Portnoy.

MR. PORTNOY: Sure. Thank you, Your Honor.

THE COURT: What is the Exhibit Number?

MR. PORTNOY: Starting with 1.

THE COURT: All right. So if you could pull that up, please. Thank you.

Can you see that, Ms. Wilson?

THE WITNESS: Yes.

THE COURT: All right. And Mr. Adams, can you see that?

MR. ADAMS: I can, Your Honor. Thank you.

THE COURT: Okay.

BY MR. PORTNOY:

Q Liana, can you see that?

A Yes.

Q Okay. You mention earlier several social media platforms, and we also talked about Instagram.
Do you have to identify yourself on Instagram?
A Could you put that in context again?
Q Do you have identify who you are when you post something on Instagram?
A No.
Q Do you have to identify who you are when you post on Reddit?
A No.
Q So you can post anonymously?
A Yes.
Q One of the sites you looked at is Liana underline Cult underline Recovery?
A Liana Shanti underline Cult Recovery, yeah.
Q Okay. And do you recall the first time you saw a post about you on that site?
A It was sometime in April of 2022. I don't -- definitely don't have an exact date.
Q Did you make screenshots of what you saw?
A I did.
Q Did you do that personally?
A I did.
Q And how did you do that?
A There's two buttons on my phone, like, you go on to the

Instagram account and then you push the two buttons and it takes a photo of what's on your screen. So it's effectively called a screenshot. And then that gets saved into your photo album.

Q And did you keep those?

A I did.

Q Would you look at Exhibit 1? Just look at it.

Have you seen that before?

A Yes.

Q Do you recognize the document?

A Yes.

Q Is this a screenshot that you took?

A Yes.

Q Is it a true and accurate copy of the screenshot of the post that you reviewed?

A Yes.

MR. PORTNOY: Your Honor, I'd like to move Exhibit 1 into evidence.

MR. ADAMS: No objection.

THE COURT: Exhibit 1 is admitted and may be shown to the jury.

(Plaintiffs' Exhibit 1 was received in evidence.)

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q When did you first see this?

A I'm sorry, did you say "when"?
Q Oh, I'm sorry, when did you first see it?
A This would have been sometime in spring of 2022. I definitely don't remember specific dates of -- there were just so many posts.
Q And is this post on something designated lianashanti.cult.recovery?
A Underscore?
Q Yes.
A Yes.
Q Also something on the top called Brady Wealth Strategies. Who's that?
A That is Amanda Brady's second, but now ex-husband, his wealth company. He's a financial adviser in Canada, and his company is called Brady Wealth Strategies, or at least it was at the time. I can't speak to what it is today.
Q Do you know who posted this?
A I believe I do.
Q Who?
A Paula Haygarth.
Q Why do you believe that?
A I believe that for a lot of different reasons. You want me to go into all the reasons or --
Q Yes.
A Okay. When this account started was around the same time

that the Reddit anonymous account started, with one date in particular being May 9th. And on May 9th, an anonymous account was created on Reddit with a post saying that Liana Shanti was a human and child trafficker.

On that exact same day, May 9th, a Paula Haygarth account was created also on Reddit in her own name.

Also on May 9th was a reposting of the Liana Shanti Cult human trafficker on Paula's personal Facebook page.

So those three things happened on May 9th. And she shared that Reddit article on her personal Facebook page. And she didn't just share it, she commented and said she was posting it for the reason that she was concerned about the children.

Subsequent to that time, we were able to obtain records from Meta that contained IP addresses, which essentially give you the location of --

MR. ADAMS: Move to strike as nonresponsive, Your Honor. Lacks foundation. Calls for speculation. Subject to an order --

THE COURT: It's also hearsay.

So the jury will disregard the last statement regarding IP addresses.

You may ask another question, Mr. Portnoy.

MR. PORTNOY: Yeah. Can we approach the bench, Your Honor, please?

THE COURT: You may.

Whenever we have these sidebars, ladies and gentlemen, obviously you can stretch if you want to, but you don't have to. So I will be speaking with the attorneys at sidebar.

(Sidebar on the record:)

MR. PORTNOY: Your Honor, I'm trying to do these things sequentially. We subpoenaed the records from Meta and they're exhibits.

THE COURT: Well, who is going to testify?

MR. PORTNOY: She is.

THE COURT: How can she testify about that?

MR. PORTNOY: Because she's going to explain how she took the information from Meta and went and did what she's going to explain and be able to tell how the IP addresses --

THE COURT: How can she authenticate the Meta records? She's not a custodian of record. I think this is not -- this should not be shocking to you. But if I get records from a company that the opposing side has not been willing to -- to stipulate as to admissibility or authenticity, I call the custodian of record in to testify as to what the records state.

MR. PORTNOY: We have no way, as you know, of forcing someone who's more than 100 miles away of appearing.

So I understand you ruled, but --

THE COURT: So in my mind it's hearsay. What has been the IP records at this point is hearsay, because you don't

have -- you haven't laid the foundation as to how the contents of them are admissible.

MR. ADAMS: I'd also comment and warn that he's getting into having her interpret the report. And we know from Your Honor's ruling that Mr. Feil is coming in on that, there's been some page lines on that. She's not an expert and not been designated an expert, and I'm worried that they're going to be asking him what's in the report, findings of the report. And of course, I don't want to have --

THE COURT: I'll keep an eye on that.

MR. ADAMS: Thank you.

THE COURT: Thank you.

(End of sidebar.)

THE COURT: You may continue.

BY MR. PORTNOY:

Q You talked to Amanda Brady about this, Exhibit 1?

A I'm sorry, I didn't hear the second part of your question.

Q Did you ever talk to Amanda Brady about Exhibit 1?

A Yes.

MR. PORTNOY: Okay. Let's go to Exhibit 2, please.

BY MR. PORTNOY:

Q Have you seen this before?

A Yes.

Q Is this a picture you took of a post?

A Yes.

Q Is it one post or is it multiple posts?
A This appears to be one.
Q Did you authorize Lianashanti_Cult_Recovery to make this post about you?
A No.

MR. PORTNOY: Your Honor, I'd move Exhibit 2 in.

THE COURT: Any objection?

MR. ADAMS: Yes. This is a 22-page exhibit, she's only spoken about one.

THE COURT: All right. Let's have you address --

MR. ADAMS: Authentication. Foundation.

THE COURT: All right. Thank you.

Mr. Portnoy, if you could address with her whether or not she's gone through each of these pages.

MR. PORTNOY: Yes. Thank you.

BY MR. PORTNOY:

Q Have you gone through each of the pages?
A No. Somebody is scrolling up on them now. If you want to scroll and I can look at each one.
Q Sure. You should have it in --

THE COURT: Ms. Cortez, if you could hand her, please, Volume I of the plaintiffs' exhibits so that she can do it in hard copy? I think that would be helpful. Thank you.

So we're talking about Exhibit 2, Ms. Wilson. So if you could look at the hard copy content of Exhibit 2.

THE WITNESS: Okay.

(Pause in the proceedings.)

THE WITNESS: Okay.

THE COURT: All right. You may continue. Mr. Portnoy, she's --

MR. PORTNOY: Yes, Your Honor. I'm sorry.

BY MR. PORTNOY:

Q Have you read it all?

A Yes.

Q Was this a single post?

A No.

Q Multiple?

A Yes.

Q You put them together?

A Yes.

Q And you took pictures of all of these?

A Yes.

Q Do they occur on different days?

A I don't remember.

Q Okay. Do you know what catfish -- well, strike that.

MR. PORTNOY: Your Honor, I move to admit Exhibit 2.

MR. ADAMS: Lacks foundation. Lacks authenticity. Doesn't know the date. And he was about to ask about catfish, which is where this was posted. And he hasn't established that she knows anything about catfish.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Did you read this on-site?

A Yes.

Q And you photographed it?

A Yeah. Screenshot.

Q Each one of these?

A Correct.

Q Did you alter it in any way?

A No.

Q Did you read it at the time?

A Yes.

Q Where did it appear?

A This particular series of screenshots appeared on the Lianashanti_cult_recovery Instagram in their stories, which is the feature on Instagram that deletes after 24 hours, and then sometimes the owner of the account puts the stories into what's called a highlight. And this came from a highlight, which is a permanent piece of real estate on an Instagram account. And this particular highlight on the Instagram account was called catfish.

MR. PORTNOY: I move again to enter into evidence, Your Honor.

MR. ADAMS: It still lacks foundation. She said this is multiple posts and there's no date on it. They span

anywhere from four weeks to two weeks.
THE COURT: All right. Sustained. You need to address the time frame.
MR. PORTNOY: I'm sorry?
THE COURT: You will need to address the time frame.
MR. PORTNOY: Okay.
BY MR. PORTNOY:
Q Do you have any recollection of the timeframe? We may have to go through multiple pages. Can you give the timeframe for Exhibit 2?
A The timeframe for when I would have seen it?
Q Yes.
A Would have been sometime in May 2022.
Now, on the -- each of these screenshots, you'll see indications like four weeks, two weeks, one week. That shows you when that story originally aired, if you will, on the Instagram stories. When I saw them, I saw them all at once in the highlight. I was not following that account and watching their stories. I looked in their highlights at things they had saved in the permanent real estate. So I saw it all at once.
Q How did you become aware of it, to look for it?
A Amanda Brady told me about this account, that's how I first found out about it.
Q And so you went to it and you saw what is in Exhibit 2?
A Yes.

Q And there were multiple posts because it had been over a period of time?
A Correct.
Q And you believe -- you looked at all of these sometime around May of 2022?
A Yes.
Q And I guess you can work backwards and figure out when each page might have been originally posted, right?
A Within reason, yeah.
Q Okay.
MR. PORTNOY: Your Honor, I move Exhibit 2.
MR. ADAMS: No objection.
THE COURT: Exhibit 2 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 2 was received in evidence.)
MR. PORTNOY: Thank you.
THE COURT: So if we can publish it to the jury. Thank you.
BY MR. PORTNOY:
Q Okay. Liana, I'm going to go through this, okay?
There are two photographs here. Either one of them of you?
A No. They're attempted to be me. They did a lot of AI photography of me and saying it was me, and every time they did a picture it looked like a completely different person.

Q But that's not you?
A It's meant to be me, but is it me? No.
Q Okay.
THE COURT: And for the record, we're on Page 1 of Exhibit --
MR. PORTNOY: Yes. Sorry, Your Honor.
BY MR. PORTNOY:
Q It says catfish in the upper left-hand corner. Do you -- I'm not asking you who that is, but do you know what that means?
A That's the head of the highlight where they saved all of this particular grouping of stories.
Q Okay. I'm not sure I understand. Is catfish a group or could be a person? I'm not sure --
A Well, they have it -- I assume what they mean what they wrote on here, catfish noun, deceive, swindle, et cetera, by assuming a false identity or personality online. And then supposed pictures of me saying basically that I am deceiving, swindling, assuming a false identity.
Q Did you ever assume a false identity or personality online?
A No.
Q Did you ever deceive or swindle any of your students?
A No.
Q Or anybody else?

A No.
Q How did you feel when you read that?
A Hurt.
Q Why?
A Because it's literally the opposite of what I actually believe and stand for, and how I live my life.
Q Let's go to Page 2.
THE COURT: Let me ask the jurors if they are able to see.
Are you able to see?
Okay. Thank you.
BY MR. PORTNOY:
Q Is this another post on the same site?
A Yes.
Q Okay. Do you know who Create Mode is?
A Create Mode is a term. It's an Instagram specific technical term that when you go to post a story, you click a button that says "create," and then you can type or add photos. You're basically creating a story -- what they call a story slide. So anything that's generated from that mode on Instagram, that's how they would create something like this. So that shows you that the person who posted this did it right there on Instagram in Create Mode.
Q Did you ever try, you personally, to figure out who catfish is or was?

THE COURT: I think she's testified that catfish is not a person.
MR. PORTNOY: I'm sorry.
BY MR. PORTNOY:
Q Did you ever try to determine who was writing these?
A Yes.
Q You personally?
A Yes.
Q What did you do at the time?
A I was researching how people, you know, when they post anonymous, what can you do to find out who it is. And at the same time, as I shared earlier, there were posts coming up on Reddit and started tying it together. And then Amanda Brady was also --
Q Okay. So when you were reading these and we're going to go through them --
A Okay.
Q -- did you reach a conclusion in your own mind as to who was posting Exhibit 2?
A Not right away.
Q Okay.
A No.
Q Okay. Did you make an effort at that time to try figure out who it was?
A Yes.

Q And what efforts did you make at the time?
A I -- like I said, I did research. I went to different accounts of people who I believed it might be. And I looked and saw that some of those people were posting about me.
Q Okay. Were you ever able at the time to conclusively determine who was posting?
A When this first started, no.
Q Okay. What did you learn about how hard it is or not to find out about people who post anonymously?
A I found out that it's actually really hard.
Q How hard?
A For most people, it's actually impossible. If you don't have attorneys and you can't afford to pay a lot of money for private investigators to do research, it's how most people get away with it because most people can't uncover it.
The social media companies are very protective of their client. They want people to have the ability to be anonymous so that they stay on the platform, and they don't just provide information. Even if you're getting threats, even if you're being slandered, it all has to go through a very extensive and exhaustive and expensive legal process that requires subpoenas and multistate attorneys in the case of, like, with Meta, because they're located in California.
Q Have you read in your life since this all started the position that the companies like Facebook, Meta, X, what their

position is on divulging the identities of anonymous posters?
A Yes.
MR. ADAMS: Lacks foundation. It's hearsay.
THE COURT: Sustained.
BY MR. PORTNOY:
Q What is your understanding of a companies' positions?
MR. ADAMS: Same objection, Your Honor.
THE COURT: Sustained.
BY MR. PORTNOY:
Q Have you read about that?
A About what?
Q What these companies' positions are?
A Yes.
Q As a lawyer, have you read any cases in which someone has attempted to find out the name of an anonymous poster from one of these internet companies?
MR. ADAMS: Your Honor, she's not been designated as an expert as an attorney.
THE COURT: I'll sustain the objection.
BY MR. PORTNOY:
Q Let's go through Exhibit 2.
What did you understand it to mean when whoever it was who posted it said, Narc first tells them; are they talking about you?
MR. ADAMS: Lacks foundation.

THE COURT: Overruled.

THE WITNESS: Yes.

MR. ADAMS: Misstates the document, Your Honor.

THE COURT: The first line does say, Narc first tells them.

MR. ADAMS: That's her post.

THE COURT: I'm sorry, what?

MR. ADAMS: That's her post.

THE COURT: I'm sorry, one second.

MR. PORTNOY: We'll get to --

BY MR. PORTNOY:

Q You used the word "narc," right?

A Can I answer that?

THE COURT: I'm sorry. Mr. --

MR. PORTNOY: Let me start again, Your Honor. Okay?

THE COURT: Okay. Thank you.

BY MR. PORTNOY:

Q Page 2?

A Yes.

Q Did you post that?

A I don't know that I posted that. It looks like -- it's made to look like I posted it, but this is four years ago.

Q You're not sure if that was you who wrote that or not?

A I see two different parts here. I see parts that are talking about, like, narcissistic control. And then there's a

larger print that says, Did you know Jesus bestowed spiritual names? I don't know if that was supposed to be two different people. There's like two different narratives going on here. I honestly can't say.
Q Okay. Let me ask you this: Did you respond in any way at the time you read these posts back on Instagram?
A No.
Q Okay. Do you have a Facebook page or a whatever you want to call it, that's just called Liana Shanti?
A I have an Instagram page called that, the handle is @LianaShanti.
Q Okay.
A And I have a Facebook page that's associated with that as well called Liana Shanti.
Q Let's go to Page 3. Is that true?
A No.
Q How is it false?
A I don't mean to laugh, but I don't teach people how to make money from the 12th dimension. I teach them how to make real money in this dimension we live in, because money in the 12th dimension would be useless, as far as I know.
Q Did you release a new business school with enrollment listed as $4,000 U.S.?
A I did release a new business school, and I don't remember the tuition. It was probably in the $3,000 range, but I don't

remember, I would have to ask Cahira.
Q Did you open up a new business school to make money from the 12th dimension?
A No.
Q Do you know what the 12th dimension is?
A I mean, yeah. I mean, quantum physics, they are a multidimensional universe, so for sure I know what it is.
Q Okay. Next page. The first part of that, did you write that? The first part up until the --
A No -- sorry.
Q No, go ahead.
A The part that's highlighted in pink, is that what you're asking me?
Q Well, it's not in pink -- oh, yes, yes, it is on the exhibit. Yes.
A No. It's clearly written by someone else who said they enrolled in the school created by me.
Q Okay.
A When you have personal life proof that everything created by this woman adds value to your life, you don't even need to read the what. My financial abundance has increased dramatically right along with the health side of things. That's a person giving a testimonial about their success with my program.
Q The next portion, Liana loves having her minions promote

for her.

Do you have minions?

A No.

Q What are minions in your mind?

A It's a cartoon.

Q Do you have your students promote for you?

A No.

Q Classic cult behavior. Do you know what classic cult behavior is?

A No, I don't, but I -- no.

Q From what we hear, whoever we are, this particular long-term student is paid Liana over a hundred thousand over the years.

Do you have any idea what student or person they're talking about?

A No.

Q Is that true to any student?

A It could be true for students that have been in my community for a long time.

Q And then, is still trying to figure out what she is doing with her life.

Had you probably well figured out by May of '22 what you were doing with your life?

A I mean, I figured that out quite a while ago. I don't know talking about me or this other student.

Q Let's go to the next page.
She really does encourage false police reports.
You have any idea what that's about?
A It's part of their defamation narrative that I incurred. I don't know what police reports, who, where, when. Never heard of it. Never knew of students doing that, but it became part of their narrative.
Q Do you know -- did you write any of that next whole paragraph? Something, blanked out a name, drug her daughter and her ex through absolute hell making her daughter make a false police report.
Did you do any of those things?
A You asked kind of two different questions.
Q First, did you write that?
A No.
Q Okay. Did you ever work with someone to make a false police report?
A Never.
Q Do you know what this person was talking about, or individuals or group, when they say, These women have the nerve to say they are victims of mother wound?
A This is just all part of their narrative. They just would write to themselves to create it to make it look like it's real people, but there's never a name, it's always anonymous. It's meant to look like ongoing dialogue with people complaining.

But I never had actual students complaining. All of this came out of the ex husbands of nine of my students, out of the hundred thousand plus.

So, this is just made-up stuff. They made up a lot of different theories, ideas. They were kind of throwing darts to see what would stick, just one of many.

Q Page 5. Says Liana Robert. Who is that?

A I had a Facebook -- have a Facebook account that has that name. It's actually in my husband's name.

Q Okay. Liana Shanti Mentoring Group. What is that, do you know?

A This looks like they were trying to post something or share something that might have come out of my Facebook community group that I shared earlier. But a lot of what they did, again, same thing they did with the pictures, they created a lot of their own documents and then shared it on the cult account, made it look like it was coming from me. So they would use my name, my picture, and then create a post and say, Liana posted this, Liana said this, Liana had this in her group. And it was things that were created by them. But it's an attempt to look like something I posted in a group.

Q Let me see if I understand what you just said. Whoever these people are --

A Mm-hmm.

Q -- they would make it look like they were reposting

something that you had originally written, which you never wrote?
A Correct.
Q Is that what you're saying?
A Yes.
Q So look at 5. Is that something you wrote and they reposted is it, or is it something that they implied that you wrote that they made up?
A Let me read it.
THE COURT: 5 is the document that is on the screen.
THE WITNESS: Oh, okay.
BY MR. PORTNOY:
Q Page 5. Sorry. Same exhibit.
THE COURT: He means Page 5.
MR. PORTNOY: Sorry.
THE WITNESS: Some of -- no, I did not write this.
BY MR. PORTNOY:
Q How do you know that?
A Because this isn't -- this is not how I talk. This is not something I would say. I will add -- there's a part where it says, When you remain strong in your boundaries and continue emitting high frequency light by not allowing yourself to engage with these dark people.
THE COURT: One second, ma'am. When you are reading, if you could read more slowly, please.

Thank you.

THE WITNESS: Sorry.

THE COURT: Go ahead. Start over, please.

THE WITNESS: The part that says: When you remain strong in your boundaries and continue emitting high frequency light by not allowing yourself to engage with these dark people, any energy they focus on will expand you.

So that, although I did not write this post at all, that's -- that paragraph specifically is definitely in alignment with what I teach. I teach people to not engage with negative, nasty, horrible people. And just focus your energy on yourself and your own path.

And so one of the strategies they employed was to take snippets of things that I do actually teach, and then add things that I don't teach at all, mix it in, for the appearance of making it look like whole cloth this came out of something that I shared.

BY MR. PORTNOY:

Q And then the bottom paragraph, did you understand that to be they commenting on what they put ahead of that, that they say you said, which you never said when they say the absolute hypocrisy, et cetera?

A Let me read it, it's on the bottom. There's some stuff covering over it.

Q Well, it says, The absolute hypocrisy with the @LianaShanti and her teachings is on such a massive scale that it's confusing, which is just what she wants.
A Right. That was clearly written by the owner of this account to disparage me.
Q And they were commenting on something they had made up that they tried to tell people you had originally said?
A Correct.
Q Let's go to 6, Page 6.
Did you post that first block, So not only is a family cult recovery program in the works, but now a parenting program?
A No.
Q Do you know what that's about?
A I don't have a parenting program. So, no, it's just more stuff that they made up.
Q Okay. Then there's a response. Well, thank you so, so much for posting this.
Did you post that?
A No. This all is coming off of the Liana Shanti underscore Cult underscore Recovery Instagram account.
Q Let's look at the next paragraph. Talking about defamation. We're calling this series Shanti step-by-step method to destroy your kids, your family, and yourself all at once.

Did you find that statement to be hurtful?
A Extremely.
Q Did you find it to be totally untrue?
A Yes.
Q Did you find it to be damaging to you?
A Very.
Q Do you know how many people read that?
A Thousands.
Q Did they call you a home wrecker?
A Yes.
Q Did they also call you -- well, the word is greed? Yes?
A Yes.
Q Did that hurt you?
A Yes.
Q Is that true?
A No.
Q Next page. You know what that's about, Liana Shanti's Cult 101? Is there such a thing?
A No.
Q Has there ever been such a thing?
A No.
Q Is this one of your courses, Cult 101?
A No.
Q Do you drink the Kool-Aid? That's the bottom part of this with the little figure. I don't drink the Kool-Aid.

A I don't drink high fructose corn syrup, so no, if that's what you're asking. I don't know.

Q Then it says something reply to Liana Shanti underline Cult underline Recovery. Did you ever see replies?

A No.

Q Next page. Things that make us go HMMM. Liana Shanti tells all of her minions to divorce their husbands, get soul -- person didn't know how to spell -- get soul custody, and go no contact pound narc.

Do you know what that all means? What did it mean to you?

A It's the continuation of their narrative that they continued to say that I am telling all of my students to divorce their husbands and get custody and go no contact.

Q Have you ever done that?

A Never.

Q Do you know why somebody, whoever it is, these anonymous posters, would say somehow you were getting involved in divorces and custody? Was there something going on where you were communicating with somebody about these things?

A Yes.

Q Tell the jury about that.

A During that time I was communicating with Haley Winter about her custody battle with the defendant Byron Horvath. And Haley, as I said, had divorced Byron five years before she

became a student mine. So there was no encouraging her to leave him, she had left him after he had a cocaine rage and smashed her essential oil diffuser while she was holding their child. And so five years later she became a student and I started talking with her about what she was going through in her life. And she was desperate to try to protect her daughter from what she believed and what she told me was abuse of her child. And I didn't just take her word for it, I -- she showed me photos and videos of her daughter.

MR. PORTNOY: Okay. Let me --

MR. ADAMS: Objection. Nonresponsive.

MR. PORTNOY: Let me --

THE COURT: Overruled.

THE WITNESS: Can I continue?

MR. PORTNOY: Thank you, Your Honor.

THE COURT: I'm sorry, ma'am. The women sitting in that row can use their cell phone because they are on my staff, so they are the only people in the courtroom allowed to use the cellphone. I just noticed that, so.

BY MR. PORTNOY:

Q Liana, hold off on this stuff. I want to understand why somebody would even say something about you trying to get involved in divorces and child custody.

So you were having communications with Haley Winter about her situation?

A Yes.

Q About the same time that this was coming -- being written about you?

A Yes. What I was getting to was, Haley started posting on her own social media. She was feeling brave enough, I guess, to post about what she was going through and dealing with. So the slander -- just for the quick timeline, the slander started in April on this account, and on Reddit it started in May. And I remained silent for seven months as I was being attacked, slandered, ruthlessly ripped apart, articles written in Daily Beast. I hadn't said a word.

But during that time Haley was disclosing what she was experiencing at the hands of Byron Horvath. And that turned into a very, very aggressive battle between the two of them.

Q Okay. So what I'm asking is, how did you -- how did someone think that somehow you were involved in whatever was going on between Mr. Horvath and his former wife?

MR. ADAMS: Lacks foundation. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: Because Haley was a hair dresser in her local town up in Saskatchewan, and she -- according to Haley and according to Amanda Brady -- I don't know if this is true, but according to the two of them, Haley was telling people about the abuse of Byron and people were saying, you know, why are you spilling the family dirt basically now? And she said,

because I feel like I'm finally an adult woman at 33 years old and I don't have to be under the control of my ex-husband anymore, and I feel brave enough to speak out about it.

They -- the group of people that slandered me assumed that I was dictating Haley. So, when someone's in that situation of being, you know, coercively controlled and someone is controlling her, then when she stopped letting them control her -- like if she stopped drinking alcohol, as an example, got better, lost 30 pounds, was feeling healthier, her family, people in Saskatchewan were telling her, you need to go back to drinking alcohol, stop listening to Liana. So they would they would, like, project it on to me that the changes she was making in her own life were because I told her to, not because she's a grown woman and decided she wanted to be healthier and live a better life.

BY MR. PORTNOY:

Q So, so let me stop you there. Okay?

Do you know who might have known about your communications with Haley regarding her family situation, who else might have known about the fact that she was talking you know, writing to you or whatever you want to call it, texting with you, whatever?

A Probably everybody in Saskatchewan --

MR. ADAMS: Objection. Speculation as to who might have known.

THE COURT: Sustained.
BY MR. PORTNOY:
Q Do you know who else knew?
MR. ADAMS: Lacks foundation.
THE COURT: Sustained.
BY MR. PORTNOY:
Q It's obvious, though, someone else knew because they wrote what's on this page, right?
A Correct.
MR. ADAMS: Lacks foundation, Your Honor.
THE COURT: Overruled.
BY MR. PORTNOY:
Q And the rest of it goes, And yet she, her baby daddy ex-husband and her twin flame are one big happy rich Wilson family, including both kids.
Who wrote that, do you know?
A Whoever this account belongs to. I believe it's Paula Haygarth, but I don't -- it's on here.
MR. ADAMS: Move to strike. Speculation. Nonresponsive.
THE COURT: Sustained.
The jury will disregard the last statement as to who she believes it is.
BY MR. PORTNOY:
Q Next page. There's -- there looks like this might be a

conversation of some sort. Is that how you read it? Different type, some is in black, some is in white, some is in pink?

A Yeah. That, yeah, I can tell you there's a person's name in the upper left-hand corner. And that was a student of mine.

Let me go on the paper one. And --

Q Go ahead.

A So this appears to be something that that woman named Kaia posted how unhealthy was the family I grew up in. There was addiction, perfectionism, any type of abuse or neglect, fear of unpredictability, conditioned love, lack of boundaries.

THE COURT: Slow down.

THE WITNESS: Sorry.

THE COURT: Yeah, go ahead.

THE WITNESS: Conditioned love, lack of boundaries, poor communication, lack of healthy intimacy.

BY MR. PORTNOY:

Q Okay.

A I can't read what's underneath that. But that appears to be what Kaia had written, and then they're sharing it on there.

Q That was my next question. One of your students posted this somewhere, someone got it, reposted it, and then made comment about it. Is that happened?

A Yes.

Q Okay. Next page. Perfectionism is a mask for repressed shame and guilt.

Do you know who wrote that?
A I think I did. That looks like something I've said.
Q So they reposted something you've said?
A Looks like it.
Q And then below it are they commenting on that?
A Yes.
Q Give us your money and heal more imaginary wounds.
What did that mean to you that they were saying about you?
A That the hundred thousand people who have purchased my programs and continued to follow me and purchase my programs and stay in my communities don't have any actual, real results or life proof, that it's all imaginary, I guess.
Q Next page has a name on it. I have no idea, Charles Baudelaire, French name.
Do you know if that's a fictional character or one of your students?
A Baudelaire, that's a classical author, poet.
Q Do you know -- and the devil's most devious trick is that they can hide behind your friendly neighborhood online messiah.
Did you believe that whoever wrote this was talking about you?
A Of course. They tagged me and it says Liana Shanti and the devil's most devious trick.
Q So they were calling you the messiah, the online messiah?

A The friendly neighborhood online messiah.
Q The next page, Liana Shanti is a fraud and racist, in my opinion.
How did you feel when you read that?
A Very hurt.
Q Let's talk about you being a racist. You have any idea how anybody could ever make that defamatory statement about you?
A Not a single person who's ever even known me.
Q Have you ever been accused of racism?
A Never.
Q Have you gone out of your way to help people no matter what their ethnic background is?
A 100 percent.
Q Do you have students of every possible race and ethnicity?
A I do.
Q Are you a fraud?
A No.
Q What do you think that means, to you?
A I can't get into the mind of what they thought. I just -- like I said, they were throwing darts and slapping every horrific label, seeing what would stick, what would hurt me the most, what would destroy my business the most. And the target kept moving in what they were calling me.
Q Why are there no men following her?

That's not true, is it?
A "Her" being me.
Q No, why are there no men -- this is what the next sentence says, why are there no men following her?
A There are lots of men following me.
Q You said about 20 percent?
A In my communities, but even more that follow me online.
Q She's helped poison my niece's mind with her BS to the point where my niece no longer associates with any family member.
Does that give you a hint as to who might have posted this particular post?
A No.
Q Did you ever see this posted by somebody else other than what we've been looking at in this exhibit?
A No, because these comments, where they have the red scratched off, they're making it look like someone messaged them, this cult recovery account on a DM, and then they're sharing it with, you know, no name. But they kept making up all these different stories, this person said this about Liana, this person said this, not a single one of them had a name, they were creating their own narrative, they were building up their own fake evidence. And they just kept posting and posting and posting, never with a single attribution to a single actual student. And they never claimed that it came

from an actual student, they just tried to made it look like that with this continuous creation of fake posting.

Q And again, all anonymous?

A Hundred percent anonymous.

Q And in this case they even deleted who might have said it, made this post originally, because you believe they made it up?

A Correct.

Q Then there's a comment, This comes from a supporter who started to infiltrate this cult a year ago.

You know who that is?

A No.

Q Did you ever see any postings by anonymous people in which they have attempted to repost something that they attribute to an unknown student?

A Yes.

Q Did you ever see them attribute a single quote to a known student?

A Never.

Q Well, we can spend a lot more time on these. I'm just going to go through it relatively quickly, I know time is precious.

Again, the next page calls it a family cult. Correct?

A Mm-hmm.

THE COURT: I'm sorry, you have to say yes or no.

THE WITNESS: Oh.

MR. PORTNOY: I'm sorry, Your Honor.

THE WITNESS: Yes.

MR. ADAMS: Misstates the document. Second time he's misrepresented what the document says.

THE COURT: What are you -- where are you looking at, Mr. Portnoy?

MR. PORTNOY: I forgot the page number, but in the middle it says, When you're leaving the family cult. That's all I'm asking about.

THE COURT: You said something different earlier.

MR. PORTNOY: Okay.

MR. ADAMS: He also said --

MR. PORTNOY: I'm having -- the next page.

THE COURT: So the next page is Page 15; is that right?

MR. PORTNOY: Thank you. Yes. I'm sorry, Your Honor. I don't have the number, and I apologize.

BY MR. PORTNOY:

Q Did you write some of this, though, on 15? For example, Amanda has admitted online to using these vulnerable woman's money.

Is that you?

A No.

Q No? Do you know who wrote that?

A Whoever -- again, like I said, I believe -- it's whoever

has this account.

Q Okay. You didn't write that?

A No.

Q Did you write anything on Page 15?

A No.

THE COURT: Why don't we take a stretch break at this point.

MR. ADAMS: Sure.

THE COURT: So, ladies and gentlemen, we've got about 45 minutes until our next break, actually a little less. It's a good time to take a stretch break. All right, thank you.

MR. PORTNOY: Thank you.

THE COURT: We've got about half an hour left.

(Pause in the proceedings.)

THE COURT: All right. Mr. Portnoy, you may continue.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q Next Page 16. The first sentence, first paragraph or whatever, By allowing others to make their own free choices you get to see what is real rather than what you want to see.

Did you post that, anywhere, anytime?

A Like I was saying earlier, some of these -- this is something I would say, but I can't say that that is what I posted on that day. It's something they took perhaps from my account. It's definitely something I teach.

Q So it might have been something you posted somewhere along the way?
A Absolutely.
Q Okay. Then somebody is commenting, As you are shamed and called demonic if you question any of Liana's teaching.
Did you ever call anybody demonic?
A I have called people demonic.
Q I'm sorry?
A I have called people demonic.
Q Who?
A Byron Horvath, Paula Haygarth, and Stefanie.
Q Why?
A Because I believe that when people are deceitful and they go out of their way to try and destroy your life, and to go after children like they did to me, that is very dark, and in my spiritual belief system, that is not of God, that is not loving, and that -- if something is not loving and of God, then it comes from darkness.
Q But why did you think it was them at the time you wrote that?
A For the reasons I was sharing --
Q Not wrote that, but the time you admit you called the three defendants demonic, why did you think it was them?
A Well, here I'm not calling the three defendants demonic. You asked me if I ever do, I said yes, and then I responded

with the defendants' names.

This is a out of context sharing on the Liana Shanti Cult page.

Q But you did just testify, I think, that you have called or would call the three defendants demonic.

A I have, yes.

Q And I'm asking -- and why?

A Because of the things they did to my family and I.

Q What did they do?

A They --

MR. ADAMS: Lacks foundation, calls for speculation. No foundation.

THE COURT: Sustained.

BY MR. PORTNOY:

Q What do you believe they did?

MR. ADAMS: Same objections, Your Honor.

THE COURT: Overruled.

THE WITNESS: I believe that they created the Instagram account, the Reddit account, the Cult Education Institute accounts. I believe that the rape and death threats I received were from them. I believe that they were the ones that contacted all of the businesses on Kauai telling people that I was a cult leader. And for the better part of the first year of the slander, which would go from the period of April 2026 -- sorry, April 2022 through approximately a year

later, almost exactly April 2023, everything was anonymous, but we had a lot of information, circumstantial information pointing to the fact that it was them.

However, in April 2023 they outed themselves. They put their names on paper, and the nine ex-husbands of the women in my community --

BY MR. PORTNOY:

Q They what'd themselves? I'm sorry.

A They outed themselves, like they were anonymous, anonymous, anonymous for a year, and then April 2023 comes and they submit letters to try and create a serious problem for me in my bankruptcy probation. And in that moment we knew exactly who they were because they put their names to it. And it was nine ex-husbands of my students. Not a single student wrote a letter. It was the group of nine, three of which are sitting at the defendants' table. And that's when I --

Q We're going to get to that, Liana. We're going to get to that later on.

A Okay.

Q Sorry. I just want to do this sequentially.

A Okay. Sorry.

Q So it makes sense for everybody. Okay.

It says: Just ask Rebecca on 16. Just ask at Haley Voncello happened to her.

Do you know who Haley Voncello is?

A I never heard of that person.
Q That's never been a student yours?
A Never.
MR. ADAMS: Looks like Vongeld.
MR. PORTNOY: I'm sorry, yeah, it's hard for me to read it.
BY MR. PORTNOY:
Q But whoever it is, you can look at it, do you know who that person is?
A No.
Q Has that person ever bought a program from you?
MR. ADAMS: Lacks foundation calls for speculation.
THE COURT: Overruled.
THE WITNESS: I -- I don't know 98 percent of the people who buy programs from me.
BY MR. PORTNOY:
Q Look at previous messages, others have stated the same.
What others, do you know?
A No.
Q Have you ever seen any message from anybody, other than -- or a former student that says, You will be called demonic if you question her teaching?
A No.
Q Did you ever any other see messages even on this site from so-called other students?

A Not a single one from an actual student. Again, it was all anonymous.
Q Next page refers to Jim Jones and Jonestown. Did you have any feeling they were trying to make it seem like you were runnings the same thing that he was doing before they all drank their Kool-Aid?
A Very clearly is the association they were making.
Q How did that make you feel?
A Devastated. People died in that situation, like families. They committed, like, mass suicide, children.
Q Did you believe that this particular page was equating you to Jim Jones and Jonestown?
A Yes.
Q Next page. I teach my students all the time, dot, dot, dot, there's no one emphasize you need to trust but yourself. Really. You need to.
It looks like a conversation. Did you engage in this conversation?
A I don't believe -- I don't believe it's a conversation. Do you want me to share what I think it is?
Q Sure.
A Where it says, I teach my students all the time there's no one you need to trust but yourself. You need to, number one, apply the teachings. Number two, uncover your stories. Number three, acknowledge the wounds. And number four, begin to love

yourself.

That is definitely something that I teach, and that could potentially have come from my stories. And then what appears to be highlighted in black, appears to be commentary added by the people who own this Liana Shanti underscore Cult.

Q Okay. I know this is taking a while, but it's necessary that we get it all in.

Let's go to the next page.

But I'm very intrigued by all that you were posting because I have been listening to her recordings for about a year, and although it's helped me a lot, et cetera, et cetera.

Is there attribution to anybody?

A No.

Q Is there any way of knowing that this is -- any of your students ever really wrote this?

A Definitely not. Somebody talked to her in her sleep and said in his sleep that I was running a pyramid scheme? I've never heard that, from any actual human.

Q Did you ever run a pyramid scheme?

A No.

Q Do you know what a pyramid scheme is?

A I do.

Q What is it?

A It's where you are a person who's offering something and it's not real. There's no substance there, but you get people

to pay for it, and then the people below them pay for it, and the people below them pay for it. And there's nothing ever really being transacted.

Q That's criminal isn't it, a pyramid scheme?

A It is. And it's one of the things they accused me of in the letters they wrote in 2023.

Q Whoever wrote this accused you of a crime?

A Correct.

Q Do you know -- listening to the opening statement, do you know if -- you've been a lawyer, do you know if a -- being accused of a crime is defamation per se?

A It is.

MR. ADAMS: Move --

THE COURT: Sustained.

You'll -- jurors are directed to disregard the answer to that last question. It relates to a legal conclusion.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q The next page talks about happy Mother's Day.

Did your daughter send that to you? Thank you for your unconditional love, et cetera, et cetera.

A These appear to be messages that students have sent me. Wishing -- it looks like happy Mother's Day, send you love, thank you for your unconditional love and your endless service. Thank you for your programs to help us heal so we can model

love for our children.

That appears to be the type of messages I frequently get from my students.

Q And then the comment on that page, Liana Shanti -- I don't even know how to pronounce that -- unironically boasting a Mother's Day wishes from her students. Students who, in capital letters, relish taking their children away from their fathers just like any, quote, good mother does.

What did in a mean to you when you read it?

A Again, it's their narrative that they kept saying that children are being taken away from their fathers. And the post earlier, the one that had the picture of my husband and my ex-husband, the similar theme, except on that page they were saying that, you know, I have my kids' fathers in their life, my ex-husband, I supported him financially for 11 years to be in my daughter's life. So there was like this constant contradiction of saying, I don't think, you know, mothers -- or children should have mothers and fathers when I had my father my whole life, and both of my kids have had their fathers in their whole life. So that's this narrative.

Q Let's talk about students who relish taking their children away from their fathers.

A Mm-hmm.

Q Are you aware of any students who relish taking their children away from their fathers?

A Not at all.
Q Other than the Haley Winter thing we talked about, did you have any other students that were involved in a situation in which they were thinking about or attempting to remove their child?
A I have nine students total, out of my hundred thousand plus, that were going through very difficult custody disputes, and in all of those cases it was very heated and very nasty.
Q Skip a couple of pages, please, to where it says, Her minions. I think that would be 18, maybe? It starts with "another student" at the top.
THE COURT: I think it was on a prior page.
THE WITNESS: It's on that page -- yeah, right in --
BY MR. PORTNOY:
Q Starts with, Just enrolled.
MR. PORTNOY: Sorry, Your Honor.
THE COURT: This is Page 22.
BY MR. PORTNOY:
Q Just enrolled. So freaking excited. I need an indefinite line of Liana credit because I will eventually take every program you ever make.
Did any student ever send you that?
A Sounds like something somebody would send me --
Q What?
A Yes, it sounds like something somebody would send me.

Q Did you extend credit to some of your students that didn't have money?
A I've given away free programs to people.
Q How about credit? That's what it says.
A People that want to buy a program that can't afford it, I've made exceptions for them, or I've reduced the price, or I've made a year long -- if they can only afford to pay $20 a month, I have allowed them to do that, or just given it away free. So, I mean, that could make sense.
Q And yet will take out a line of credit to pay a woman who will not confirm she is real.
Any idea what that is about?
A Yes.
Q Can you tell the jury?
A Another part of their narrative for a while was that I was an AI bot, not a real human. And they kept posting proof of life, proof of life, Liana needs to prove she's a real person. We don't think she's a real person.
Q Next page accuses you of putting your son or a student's son in a hypnotic trance while he sleeps.
Have you ever advised one of your students to do that?
A No.
Q Do you have any idea where that comes from?
A They are vitriol, their hatred.
Q No, but I mean, have you ever done anything similar to

that?
A No.
Q Okay. And the last page is, Liana Shanti clown show continues. Trying to get all the money as more and more people catch on to her scam.
Do you know who they're talking about, the more and more people catching on to your scam?
A I have no idea what they're talking about.
Q Has any state agency or police department ever investigated your business for being a scam?
A No. However, in 2023, when they wrote the letters in my bankruptcy probation, they tried to create a lie that I was a scam and a fraud, and because I was on probation, five months of my life I was required to -- on the basis of the nine letters of these ex-husbands in custody disputes, I was required by the judge, Judge Mollway, to turn over every single financial document in my business from the day I started the business, every single tax return, every single student list, every single Stripe report, every single thing that was ever purchased from me, five months of my husband and I gathering everything to prove that everything they were saying about the -- they were tying it to fraud and everything was unfounded. So, yeah, that -- that was --
Q We'll come to that --
A Okay.

Q -- probably after a little while.
Can we go to Exhibit 4, please. We're going to skip Exhibit 3.
Let me know when you have it there.
Do you have it?
A I have it, yes. Sorry. I'm getting some water.
Q Sure.
A Okay.
Q Where did you find this?
A On the Liana Shanti underscore Cult underscore Recovery Instagram page stories.
Q Same as the other one?
A Yes.
Q And do you remember about when?
A This would have probably been around May, June. I was collecting screenshots for months on end.
Q Okay. And did you take an accurate picture of what you saw?
A Yes, I did.
Q And these were two separate pictures?
A Yes.
MR. PORTNOY: I move it into evidence, Your Honor.
MR. ADAMS: Well, I make the objections that it lacks foundation, lacks authentication, and hard to see they're the same as the other ones.

THE COURT: All right. Let me ask a clarification question.

May or June of which year, ma'am?

THE WITNESS: 2022.

THE COURT: Okay. I am going to overrule the objection. Exhibit 4 is admitted.

(Plaintiffs' Exhibit 4 was received in evidence.)

MR. PORTNOY: I'm sorry, Your Honor I didn't hear.

THE COURT: Exhibit 4 is admitted.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Let's take a quick look at this. It says, We know many of you who are watching anonymously --

THE COURT: One second. Let's wait.

MR. PORTNOY: Oh, sorry.

THE COURT: On the screen.

MR. PORTNOY: I'm sorry, it's not on yet?

THE COURT: It is now.

MR. PORTNOY: Thank you.

THE COURT: And slowly, please, Mr. Portnoy.

BY MR. PORTNOY:

Q We want to know -- many of you who are watching anonymously want to know who we are and why we want to expose @ Liana Shanti for who she really is.

Did you ever see a response to that on Instagram that

people said, yeah, we want to know?
A Never. I think this had like four likes on it.
Q Say it again?
A I never seen a response, it had likes, but nobody ever responding.
Q Just likes?
A Mm-hmm.
Q Remember how many likes?
A Well, I don't remember, no, but it says four.
Q Okay. 8but you never saw anybody actually say, yeah, we want to know?
A No.
Q Okay. Let's look at the next one. She is a fake capital letter con artist, capital letters, master manipulator, filtered avatar, puppet master, cult leader.
Does that describe you?
A No.
Q Does any of it describe you?
A Zero.
Q What does it mean to be called a fake, a con artist, a master manipulator, a filtered avatar, a puppet master, and a cult leader?
A What does it feel like?
Q Yeah. How did you feel when you read it?
A Feels devastating after 15 years of my life working, doing

the programs I do, and seeing that a small group of anonymous people can create a massive amount of damage to everything you've worked for, for a decade-and-a-half.

Q Okay. You mentioned some Reddit posts. Yes?

A Yes.

Q Do you remember when you first saw a Reddit post that you believed defamed you?

A Yes. It was in May of 2022.

Q Did something happen in May of 2022 that caused you to start looking for these things or finding these things?

A Yes. Amanda Brady shared with me that the threats were escalating.

Q That what? Sorry.

A Amanda Brady shared with me that the threats online were escalating, and that I should be taking a look and seeing what's being said.

Q And do you remember the names of the Reddit accounts that you looked at?

A It was Liana Shanti Cult 369, something like that. There was White Night. There were a bunch of anonymous accounts. And then there was the Paula Haygarth personal account created on the same day as those anonymous accounts.

Q How long did you follow the Reddit postings about you?

A By "follow," do you mean take a screenshot?

Q Yeah, look at them and take a screenshot or whatever.

A For quite some time. Several months.
Q Okay. Can you --
MR. PORTNOY: Your Honor, Exhibit 78.
THE COURT: Let's look at Exhibit 78 only for the witnesses and the lawyers, please.
THE WITNESS: Oh, it's a different book? Do I need a different book or do you want me --
THE COURT: This is Volume II. Thank you.
Ladies and gentlemen, we have about ten more minutes before our break, so you'll be getting a restroom break shortly.
BY MR. PORTNOY:
Q You have it in front of you, 78?
A 78. Oh, God, that's small print. Okay.
Q Got it?
A I'm going to read it on the screen. It's very tiny print on the paper.
Q Don't worry about it.
A Okay.
Q Have you seen it before?
A Yes.
Q What is it?
A This is the hit piece that started a lot of the defamation. This was the one that Paula Haygarth posted on her Facebook page and said she was posting it for the purpose of

her concern of the children.
Q Okay. We'll get to that in a minute.
A Okay.
Q We're still talking about the exhibit. Okay?
Did you take a screenshot of 78?
A Yes.
Q Did you alter it in any way?
A No.
Q Do you have approximate date when you took the picture?
A May 9th, 10th, 11th, somewhere in there, of 2022.

MR. PORTNOY: Your Honor, I move 78 into evidence.

MR. ADAMS: Lacks foundation and authenticity. It has no Bates stamp. It hasn't been produced into discovery.

THE COURT: All right. We'll address this at the break.

So, Mr. Portnoy, if you don't mind moving on to another subject.

MR. PORTNOY: No problem, Your Honor.

THE COURT: And then we can address this at the break. Thank you.

I'm sorry?

MR. ADAMS: May I approach? About this exhibit if he's going to keep asking about it.

THE COURT: I just said -- I just asked him to move on and we'd address --

MR. ADAMS: I didn't hear you, Your Honor. I apologize.

THE COURT: Okay.

MR. PORTNOY: Can you get Exhibit 15?

I only have two more, Your Honor, before you may want to take a break.

THE COURT: Okay.

MR. PORTNOY: Exhibit 15.

THE COURT: All right. You may ask questions, Mr. Portnoy.

MR. PORTNOY: Yes.

BY MR. PORTNOY:

Q Do you have it in front of you?

A I do.

Q Have you seen Exhibit 15 before?

A Yes.

Q What is it?

A It's another anonymous Reddit post.

Q And you read it around when?

A This would have been also in that period of time, May to June 2022.

Q How did you become aware of it?

A By seeing -- sorry. By seeing it on Reddit.

Q Did you take a picture of it?

A I took a screenshot.

Q Did you change it in any way?
A No, I did not.

MR. PORTNOY: Your Honor, I move 15 into evidence.

MR. ADAMS: It lacks foundation for the second page, which is something totally different and I don't know how related. So she hasn't laid the foundation for the whole document.

THE COURT: Sustained.

If you want to remove the second page.

MR. PORTNOY: Yes, I was about to. I didn't realize there was a second page. It's obviously a stapling error.

THE COURT: Okay.

MR. PORTNOY: Remove the second page for sure.

MR. ADAMS: I -- I'm not a hundred percent sure that's correct, Your Honor. And I think he hasn't laid the foundation for this entire document that's been submitted. You can't just take half of it and do half of it.

THE COURT: Well, he can if it's his exhibit.

But let's see if -- do you have an objection to the first page?

MR. ADAMS: It's also labeled that it was posted four years ago. And she said she got it 2022. So there's no relevance to this.

THE COURT: All right. Let's deal with this at the break.

Why don't we do this, ladies and gentlemen, let's go ahead and take our break now. We're going to do it for maybe about 30 minutes, which is a little bit longer than I'd like, but that's just going to give us some time to resolve these issues so not we're wasting your time at sidebar.

Okay. So we're going to give you guys a half hour break, we're probably going to get more like 15 minutes. So why don't we have you back in the courtroom at about 1:50. And then, again, we will be ending today at 3 o'clock. All right?

Thank you. As usual, do not talk about the case, don't do any research on it. And we'll see you at sometime between 1:50 and 2:00. Thank you.

(At 1:23 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. You may be seated.

Just because it's the most recent document that we've talked about, let's talk about Exhibit 15 first.

I'm going to wait for the door to the courtroom to close before we do so, just in an abundance of caution.

Okay. So four years ago would have been 2022.

MR. ADAMS: Four -- she said she printed this up and screen captured it to lay the foundation in April or May of 2022. If that's the case, then that four years ago would have been four years before she captured it.

THE COURT: Okay.

MR. ADAMS: And so that leads us to 2018. There's no relevance of a statement in 2018 about someone's brother.

And then the second page clearly shows -- there's some sort of metadata on there that is an alert, where she's getting alerts on Reddit so that she can -- so that she can find out what people post to her. That's a little bit different than the testimony, but that's why it's attached there, because --

THE COURT: Microphone, please.

MR. ADAMS: That's why it's attached there. And I don't want him to remove it simply because it's inconvenient. If he can't lay a foundation for it, then he doesn't get the whole document in. He doesn't get to take out a second page because he has a problem with it.

MR. PORTNOY: Your Honor --

THE COURT: Well --

MR. PORTNOY: -- I'll make it easy for the Court.

THE COURT: Okay. Thank you.

MR. PORTNOY: I'll withdraw 15.

THE COURT: Thank you, Mr. Portnoy, for your grace.

Let's turn then to --

MR. PORTNOY: 78.

MR. ADAMS: I'd like an instruction on the withdrawal of 15 since there's been testimony on it, some talk about.

THE COURT: I honestly don't think the jurors, because they haven't seen it, they're not going to know -- I think it's

actually going to draw attention to it now.

MR. ADAMS: No problem, Your Honor.

THE COURT: So I'm not going to talk about it.

Okay. Exhibit Number 78. Was this produced in discovery, Mr. Portnoy?

MR. PORTNOY: Yeah. This is a critical document. This is the document that Paula Haygarth has admitted she reposted.

THE COURT: What --

MR. PORTNOY: Of course, it's -- I'm sorry.

THE COURT: Can tell me why there's no Bates numbers on it then, or how can you establish that it was produced in discovery or it was an exhibit to any deposition?

MR. PORTNOY: Well, I don't have -- go ahead. Sorry, Your Honor.

THE COURT: Take your time.

MR. PORTNOY: I have to talk to my brain. Yes.

THE COURT: Take your time.

(Counsel conferring.)

MR. PORTNOY: Can I have a minute, Your Honor, just a minute?

THE COURT: Why don't you folks figure this out, and then when we come back -- why don't we all come back at about maybe about 20 minutes, about 1:45.

MR. PORTNOY: Okay.

THE COURT: And at that point you can fill us in.

MR. PORTNOY: I have one other matter, though, as long as we're talking about exhibits, if you have a minute.

THE COURT: Sure.

MR. PORTNOY: We got a supplemental exhibit today list.

THE COURT: I saw that.

MR. PORTNOY: Of documents that we object to. The period for submitting exhibits is long past. Almost every one of those was available to them long before the exhibit designation date.

THE COURT: Okay. Do you think we're going to get to cross-examination today?

MR. PORTNOY: I doubt it.

THE COURT: Okay. So we can deal with that.

MR. PORTNOY: Sure. I just wanted the Court to know.

MR. ADAMS: Just for clarification these are for impeachment and to refresh recollection.

THE COURT: If that's true then, it's fine.

MR. ADAMS: It was given to him, that's the whole -- thank you, Your Honor.

THE COURT: It's fine. Okay. So we're going to take a recess. We'll be back on the record at, I think I said 1:45, at which point Mr. Portnoy will let us know whether or not this was produced in discovery.

MR. PORTNOY: Sure.

THE COURT: Thank you.

MR. ADAMS: Thank you, Your Honor.

(A recess was taken from 1:27 p.m. to 1:47 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: Mr. Portnoy?

MR. PORTNOY: We're going to make it easy again for the Court at the moment. We're going to use number Exhibit 78 in our cross-examination of one of the defendants.

THE COURT: Okay. Thank you.

MR. ADAMS: We may have a bigger issue here, Your Honor.

THE COURT: What's that?

MR. ADAMS: Well, it wasn't produced in discovery. Has it no Bates stamp on it. The testimony was the screenshot was grabbed, and she said under oath, in 2022. If that's true, then this post says it was three years prior. That would be 2019.

THE WITNESS: No, those are comments.

THE COURT: One second.

THE WITNESS: Sorry.

MR. ADAMS: The other -- the other thing that may be going on is that, in fact, this was grabbed not in 2022, but was posted in 2022, was grabbed in 2025 or later, and that's

why it says three years.

THE WITNESS: No.

MR. ADAMS: So there is --

THE COURT: Ms. Wilson, it's not your place to say anything at this point.

MR. ADAMS: So I think there's a bigger issue here given that this wasn't produced in discovery. And so taking what he said, that he's not going to do it, we don't need to address it now. But if he's going to come on on cross-examination, we'd like an offer of proof and some briefing that this was, in fact, disclosed.

THE COURT: All right. You'll get that.

MR. ADAMS: Thank you, Your Honor.

THE COURT: What I will do is, and -- I assume then this wouldn't be used until the defense case-in-chief; is that right, on cross-examination? Is that what you're saying?

MR. PORTNOY: I may be calling one or more of the defendants in my case.

THE COURT: Okay. All right.

MR. PORTNOY: In light of these objections are, we're probably going to call them all.

THE COURT: All right.

MR. PORTNOY: But we will let you know.

THE COURT: Okay. I would like briefing on this Exhibit Number 78, concurrent briefing not to exceed seven

pages, regarding, A, whether or not it was produced in discovery. And B, what any of the objections are.

If you could make a proffer again as to your objection so that Mr. Portnoy knows how to respond to it in his briefing.

MR. ADAMS: Well, that's what I'm not sure of because I'm basing it on this witness's testimony. And it seems that there is a lack of ability to authenticate this document on its face. There's a lack of foundation. And there's a question as to actually when it was screen grabbed.

THE COURT: Okay. Those are the bases for your objection.

MR. PORTNOY: You don't want me to say anything now, right?

THE COURT: No.

MR. PORTNOY: I have a lot to say.

THE COURT: I'm sure you do.

MR. PORTNOY: We'll wait.

THE COURT: Seven pages due no later than let's say 7 p.m. tonight. Okay?

MR. PORTNOY: Okay. Okay.

THE COURT: Secondly, one of the things that has been happening that I want to address at some point, it doesn't need to be now because we will be bringing the jury back, is that, you know, there was an -- after the final pretrial conference, I was left with the impression that we were going to be doing

the plaintiff's case-in-chief and they would be resting and the defense case-in chief and they would be resting.

Quite a bit of the testimony that has come forward today really addresses some the defenses, I think, to the counterclaims.

So, I want to know from you, Mr. Portnoy, is it your intent that you are going to be utilizing Ms. Wilson's testimony to rebut the accusations of the counterclaims? Like the testimony that's been produced so far.

MR. PORTNOY: Yeah. No, we're not. I know a little bit has spilled over because of some of the Court's objections and the way I've had to move around, but we're not trying to defend the statements that she made.

THE COURT: Okay.

MR. PORTNOY: We're trying to show -- and that's why we had to go through that whole boring segment of the statements that they made.

THE COURT: Okay. So your expectation is that you're going to produce -- you're going to call all your witnesses, you're going to rest, and obviously there's going to be cross-examination, and then the defense will put on their case. That's your expectation still?

MR. PORTNOY: Right.

THE COURT: Okay. With that then, let's get the jury here. I will step out of the courtroom and come in with them.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: Thank you.

And I will have you put on the record that you're withdrawing this exhibit.

MR. PORTNOY: Yes. Sure.

(A recess was taken from 1:51 p.m. to 1:53 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Welcome back, ladies and gentlemen.

While you are getting settled, let me share with you that we will take a stretch break in about a half an hour, and then we will, again, as I've mentioned more than once, end no later than 3 o'clock today.

With that, I understand that Mr. Portnoy wants to address an exhibit.

You are going to withdraw one of the exhibits?

MR. PORTNOY: Yes.

THE COURT: If you could just state for the record that you're withdrawing Exhibit 78.

MR. PORTNOY: Today, yes.

THE COURT: Okay. Thank you.

You may continue.

MR. PORTNOY: Okay. Thank you.

BY MR. PORTNOY:

Q Let's move on to your comment earlier about how the

defendants outed themselves. Okay? And I want to go through this sequentially.

THE COURT: If you could pull the microphone closer.

MR. PORTNOY: Oh, I'm sorry. My bad.

THE COURT: Thank you.

BY MR. PORTNOY:

Q Let's start with the bankruptcy, which you alluded to a little bit earlier on, and I stopped you because it was not sequential.

Were you at some point, you and/or your husband, indicted for some kind of bankruptcy issue?

A Yes.

Q Okay. When?

A 2019. Eight years after the actual bankruptcy.

Q Okay. Let's go through it in great detail.

A Okay.

Q When did you first learn of the indictment?

A 2019.

Q Okay. And what did you understand the indictment to be?

A Do you mean what --

Q What are the circumstances?

A Well, I filed bankruptcy in 2011.

Q You?

A Yes.

Q Okay.

A And I was filing bankruptcy for debt that was from 2003 to 2005 in a previous marriage. It was my ex-husband's business debt, business loans, things like that. We got divorced. He filed separate bankruptcy as a divorced single person. He wasn't working at the time. So got Chapter Seven, cleared all the debt out of his name.

That didn't clear me because we were married when the debt, accrued even though it was his business debt. The debt was on my responsibility. And I was in the -- I was paying it off, I was paying the debt little by little by little. And it was had gotten to the point with interest and penalties things like that that I was unable to pay it. And so I filed bankruptcy in 2011.

Q Okay. And then what happened?

A Then they were looking at all the paperwork from the submissions, and there was an asset that my current husband had gotten from an aunt, you know, like an asset. It's concealment of assets, right? So there was an asset, it was a piece of jewelry that he had gotten. And he had sold it and was using it to pay our bills, literally, during this time because I wasn't working.

So, whatever happened, that turned into what they believed was a concealment of an asset, which was this jewelry. And we didn't know about that, we just knew the bankruptcy didn't get approved. The trustee said, we're not approving

this bankruptcy, you're not off the hook.

So in the years that followed, I paid the debt. I'm like, okay, well, I can't do bankruptcy, I just have to work harder, make more money, pay off this debt. I did that, paid it all off. So the bankruptcy didn't get me any money, an relief.

Going on living my life, building my business, 2019 comes, and 8 o'clock in the morning eight FBI officers show up with guns pointed at my husband's head in front of my children.

Q Okay. Let's just talk about what happened.

A That's what happened.

Q Did you plead guilty?

A Eventually, yeah. Over the next two years we were going back and forth. My husband wanted to go to trial. I did not.

Q Okay.

A So I --

Q So you pled?

A I did, I took a plea.

Q Okay. And what was the sentence?

A It was five years of probation. So I've got five months left to go. It's over in December of 2026.

Q Five years probation?

A Correct.

Q Was there any other penalty or fine or jail or anything?

A There was a restitution. They wanted $21,000. I don't

remember exactly what that was for. Oh, I do. Sorry. It was for the value of the piece of jewelry that was sold.
Q Okay.
A So I paid it, as we were checking out of the process.
Q So what year was that that you got the five-year probation, 2021?
A That was December of '21, was the acceptance of and the hearing. The probation started in January of 2022.
Q Okay. The first three years of your probation was there any issue about you violating your probation or any issue?
A Zero issues.
Q You reported to your probation officer regularly, I assume?
A They -- they didn't -- we have to and still have to every single month report all of our financials, every money spent, et cetera. So every month, 12 months a year for the past four-and-a-half years, we did that. And then periodically they would say, Hey, we're on the island of Kauai, visiting with other people on probation and they would stop by.
Q No issues dealing with the probation, that you were violating it or you were doing something that you weren't supposed to do, or --
A Never.
Q -- there was some other thing that influenced your probation, nothing?

A No.

Q Did there come a time when you were notified that the court wanted to have a status conference?

A Yes.

Q Without going into attorney-client, it wasn't me, but what did you learn was going to happen?

A I actually learned --

Q And why?

A I just want to make sure --

Q Sorry?

A What happened and -- a compound question you want me --

Q What did you learn why there was going to be some kind of a court proceeding dealing with your, I don't know what, probation?

A Okay. Sarah, my probation officer, messaged me, and she said, We are getting bombarded with these letters from people saying that you're running a cult, and that you're trafficking children, and that your business is fraudulent. Do you have any idea what this is?

I said, I know exactly what it is, because these are the people that have been trying to destroy my life for the last year.

And she said, It's crazy because they're posting my name, her name, Sara Nieling, with my phone number on Facebook saying, This is Liana's probation officer. She's on probation,

everybody get together and call and write letters and tell them she's committing fraud. It worked. They did.
Q Let's not get ahead of ourselves.
A Okay.
Q So after the probation officer told you that, as you just testified, they were getting bombarded with letters, what happened next?
A Sara told me that we would be having what's called a status conference. So I said, Should I have an attorney for that? She said, You don't have to, but you never know, you might want to. So I rehired my attorney.
Q Okay.
A Okay.
Q So was there a proceeding of some sort?
A Yeah, I was getting to that.
Do you want to, like, ask me little specific questions or do you want me to just tell you what happened --
Q Was there a proceeding at some point? Was there a status conference --
A There was.
Q -- at some point. Okay. All right.
And prior to the status conference, were you made aware of these letters that your probation officer told you was bombarding the court? In other words, did you get copies?
A Once I hired my attorney, he gave me copies. He said,

This is what is being said and these are the people. And it was in that moment I realized, Aha, we got 'em. These are the people.
Q The letters that you saw in your status conference for your, whatever, were any of them written by the defendants?
A Yes.
Q Which defendants?
A All three; Byron Horvath, Stefanie Vogt-Horvath, and Paula Haygarth.
Q And that was the "aha" moment?
A Correct.
Q Why?
A They outed themselves. They were trying to be anonymous for a year, but now in a submission to a court they're required to put a name on it. So in them putting the name on it, that showed me -- and not just them, their family members. Like, their mother, like Byron's mother, you know, people connected to them. So it was that group of people and their -- a couple of their family members.
Q We'll get to the letters in a little while.
A Okay.
Q Did you, in response, have your students send letters in your support?
A I did not. Cahira who works with me, I shared with her what was going on, and she asked if anyone wanted to write a

letter of support.
Q Did you understand how many letters concerning you in the negative way were sent to the court?
A It was a total of 21. The nine ex-husbands of students and then their related family members.
Q Do you know who else sent letters?
A I do. I don't have the list off the top of my head, but it was Paul Thompson, Dennis Tivless, Cahira's ex-husband, Jeff Lambrecht.
Q Did you know of these people before you saw that they wrote letters?
A I did.
Q How did you know of them?
A There's a multitude of ways. Do you want me to --
Q Well, you need to tell the jury a little bit about how you knew about these other people when you saw letters written about you --
A Right.
Q -- by people who identified themselves.
A Example, Jeff Lambrecht, who is the ex-husband of my student Cahira, who also works for me, and he had been the subject of a four-year restraining order. And they had years -- 2011, I think, before Cahira was in my community, they had a very nasty divorce and custody situation. And Jeffrey was subjected to a four-year restraining order. And she had

shared all of that with me.
Q You knew who he was when he wrote the letter?
A Yeah. Yeah, I looked at -- I knew the nine ex-husbands because I knew their wives.
Q That's my point.
A I didn't know the names of -- like, one was Raylene Dolan. I'm, like, who is this? And Amanda said, oh, that's Wade Martin's mother. I'm like, you Wade Martin's mother?
So I did not know those people.
Q So Wade Martin's mother was one of the people who wrote a letter?
A Correct.
Q And the three defendants wrote letters?
A Correct.
Q Were there three letters written or two letters from the defendants?
A I believe it was two. It was Byron and Stefanie as one letter. Paula and Wade -- excuse me -- as one letter.
Q Along with 17 or 18 other people?
A Correct.
Q Some relatives?
A Yes.
Q Some people you knew because they had been involved in some kind of family issue?
A Yes.

Q For one of your students, yes?
A Yes.
Q Okay. What happened at the status conference?
A I walked into it, with my attorney's advice, being, this is no big deal, it's not a hearing. Judge just wants to know what this is, because they're never seen anything like it. The probation office is being, not only bombard with letters, but with constant phone calls. So she just wants to talk to you.
And I said to Howard, my attorney, should I bring some kind of documentation that these are all false? Should I prepare something? And he said no need. This is a conference.
Showed up at the conference, and it felt to me more like an evidentiary hearing in which I had no participation, because I didn't come with anything. And it was almost like an assumptive belief on the part of the judge that these were real things. And I was speaking to her, saying I haven't been able to submit anything but all of this is lies, and there's real child abuse here and sexual abuse and there's videos and there's photos and there's --
Q Okay.
A They're trying to silence me because they've silenced their wives.
And in any event, I had nothing. And so she said, well, now, you need to answer for this. And on top of that, you need to answer in the form of all of your financials for

your entire company from the day that it started, because they're accusing you of financial fraud. That was the five months I mentioned earlier we spent collecting everything, gathering everything, sending it all. It resulted in nothing.
Q Okay. Did the people who wrote those letters have any involvement in your bankruptcy?
A Zero.
Q Did they have any involvement with you in any financial way?
A Zero.
Q Did you owe them money?
A No.
Q Did you ever come to understand why these 21 people would initiate a status conference looking at your bankruptcy probation?
A They said what it was, on Instagram and Facebook, they said, Let's get her in jail. This is going to get her in jail. This is going to show that she violated her probation. And the more of us that call, that write letters, she'll be locked up. So it was an intimidation campaign.
Q How do you know somebody did that?
A It was written on Facebook, with Sara Nieling's phone number, that this is our intent.
Q Do you have any idea how these three defendants were brought into this group to write these letters?

A I believe it started with Stefanie and Paula.
Q Why do you think that?
A Because the tip of the iceberg, the first domino that went down, was a cold call between Stefanie Horvath -- Vogt-Horvath and Paula. Stefanie making a cold call to a complete stranger at the time. In 2022 they were complete strangers. Stefanie called Paula, a complete stranger, and said, Let's get together for dinner.

MR. ADAMS: Your Honor, move to strike as hearsay. Lacks foundation. Calls for speculation.

THE COURT: Sustained.

The jury will disregard the statements about what the -- Ms. Horvath and Ms. Haygarth were doing with regard to one another.

MR. PORTNOY: Okay.

BY MR. PORTNOY:
Q In any event, they wrote these letters?
A Yes.
Q In some kind of concerted effort with other people?
A Yes.
Q So that -- forget about what the Court has just ruled about, we'll deal with it later. But that led you to believe that they had been involved from the beginning in some of these other posts?
A Yes.

Q With these other people?
A Exactly.
Q Including the people that wrote these letters, other than them?
A Correct.
Q These nine husbands who had been involved in issues with your students?
A Yes.
Q Just like Haley Winter was?
A Correct.
Q Haley Winter, who had been married to Brian Horvath?
A Byron, yes.
Q Byron, yes, I'm sorry. My bad.
Okay. Let's look at 1156.
A What's that?
THE COURT: All right. Ms. Cortez, if you could help her, please. This is in the red binder, Volume II.
BY MR. PORTNOY:
Q 1156. Got it?
A Yes.
Q Do you know how he was asked to get involved in writing a letter? Do you know personally?
A He said his wife in his deposition.
Q Okay. We'll deal with that --
MR. ADAMS: Move to strike as lacks foundation.

THE COURT: Sustained.

The jury will disregard that last answer.

BY MR. PORTNOY:

Q Okay. Let's look at 1156. Is that the statement written by Byron Horvath to the court?

A Yes.

Q Did you have any interaction with Byron Horvath before you saw this letter?

A Never.

Q Had you ever communicated with him?

A No.

Q Had he ever communicated with you directly, that you know about?

A Not anonymously? No. No.

Q Okay. Thanks. Let's go through it.

THE COURT: Before you do that, are you offering it.

MR. PORTNOY: Oh, I'm sorry. You're ahead of me. Thank you, Your Honor.

THE COURT: Any objection?

MR. PORTNOY: Can I offer Exhibit 1156 into evidence, please?

THE COURT: Any objection?

MR. ADAMS: No objection, Your Honor.

THE COURT: I'm sorry?

MR. ADAMS: It's part of the --

THE COURT: Did you say "no objection"?

MR. ADAMS: No objection. It is -- it's been part of the criminal record which has been judicially noticed by Your Honor.

THE COURT: All right. So 1156 is admitted and may be shown to the jury.

(Plaintiffs' Exhibit 1156 was received in evidence.)

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q This is called Victim Impact of Byron Horvath and family?

MR. ADAMS: Perhaps if it could be blown up for the jury? It looks like they're straining a bit.

MR. PORTNOY: Sure.

MR. ADAMS: Thank you.

MR. PORTNOY: Sure.

THE WITNESS: Perhaps if we could go by paragraphs.

MR. PORTNOY: Okay. Let's go by paragraphs, that's fine, if that works with the Court.

THE COURT: That's fine.

BY MR. PORTNOY:

Q Was he a victim of yours?

A No.

Q Did he have anything to do with your bankruptcy?

A Zero.

Q Did he have anything to do with your probation?

A Zero.

Q Let's start from the top.

Over the past several months Liana Shanti has been using her online platform to publicly attack myself and my family. She has used her Instagram page and her online website titled, quote, Exposing Expose Family Cults, close quote, to post false and defamatory statements.

Is anything in that first two sentences true?

MR. ADAMS: Your Honor, may we approach on this? This has been already ruled to be immune from any defamatory statements.

THE COURT: All right. I will give instruction.

Ladies and gentlemen of the jury, just to clarify, the letter here at 1156, you're not to consider as defamatory under the law. You are allowed, however, to consider it, to whatever degree you think is appropriate, as potential circumstantial evidence.

And you'll receive further instruction on this after the close of the evidence in this case. Thank you.

You may proceed.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: You ended with --

MR. PORTNOY: No, I understand, Your Honor.

THE COURT: Okay.

MR. PORTNOY: Thank you. Yeah.

THE WITNESS: Do you want me to answer?

MR. PORTNOY: I'm trying to weave my way through the Court's admonition there. Thank you.

BY MR. PORTNOY:

Q Let's look at the second paragraph. I'm not asking if it's defamatory to you or not, I'm asking whether the statement in the second paragraph about his divorce and custody is accurate.

A You want me to read it?

Q Well, yeah, sure. You don't have to read for line. I'm just asking if it's accurate, and you can say what is and what isn't.

THE COURT: One second. Are you asking her to read it out loud or are you asking her to read it to herself?

MR. PORTNOY: That's fine. Read it to yourself.

THE WITNESS: Okay.

THE COURT: I mean, it is in evidence. So I'm fine either way, it just wasn't clear.

MR. PORTNOY: Right.

THE COURT: Thank you.

THE WITNESS: Okay. I read it.

BY MR. PORTNOY:

Q Is that accurate?

A No.

Q What's not accurate?

MR. ADAMS: Lacks foundation. Calls for speculation.

THE COURT: Sustained.

MR. PORTNOY: Sorry, Your Honor?

THE COURT: It -- it's sustained. The objection was lacks foundation as to its accuracy.

BY MR. PORTNOY:

Q Do you have personal knowledge of some of the things that are written in the second paragraph?

A Yes.

Q How do you have personal knowledge?

A Because Haley told me that her mother, the grandmother of the child, is the one who reported Byron for sexual abuse, as well as her sister Elise. And I have never spoken to either of these people. So this claims that I somehow had something to do with that. I don't know the grandmother or the aunt, and they both reported Byron. So that to my knowledge what I know of is false.

MR. ADAMS: Move to strike as nonresponsive, hearsay.

THE COURT: Sustained.

So the jury will disregard the last statement after, how do you have personal knowledge. It is hearsay.

BY MR. PORTNOY:

Q Did anyone ever explain to you why Mr. Horvath, who has no relationship to you as far as you know in any of the issues dealing with your bankruptcy and probation, would write the

letter that he wrote to impact whatever was supposed to happen at a status conference?

A Haley shared with me, yes.

Q I guess we'll have to wait for Haley then to answer that question.

A Okay.

Q Let's look at 1085.

THE COURT: 1085 will be in Volume I. So, Ms. Cortez, if you could give her --

THE WITNESS: 1085.

THE COURT: Thank you.

BY MR. PORTNOY:

Q Do you have it in front of you?

A Yes.

MR. PORTNOY: Your Honor, I move 1085 into evidence.

MR. ADAMS: Yeah, it's a -- it's the complaint, so it's hearsay, unless this has been -- has this been part of the stipulation?

THE COURT: 1085 is not the complaint.

MR. ADAMS: Oh. I'm on 1185. I apologize, Your Honor. I don't even have the right exhibit, so I'm so sorry. That's my mistake.

1085. No objection, Your Honor.

THE COURT: 1085 is admitted.

And we'll walk through -- if you could give the jury a

chance to understand what this is, with the witness, and then I'll give the same instruction I gave earlier.

(Defendants' Exhibit 1085 was received in evidence.)

MR. PORTNOY: Sure.

BY MR. PORTNOY:

Q Can you explain to the jury what that exhibit is?

A This is the letter written -- just make sure -- it is signed Paula Haygarth. On the cover it says statement of Wade Martin and Paula Haygarth, but it's only signed by Paula Haygarth, so I'm going to say that was a letter submitted by Paula.

MR. ADAMS: Misstates the document.

THE COURT: I'm sorry?

MR. ADAMS: It misstates the document. Nonresponsive.

THE COURT: One second.

Overruled.

BY MR. PORTNOY:

Q Is this one of 21 letters that were submitted?

A It is.

THE COURT: All right. I'm sorry, sustained, there is a signature of Wade Martin on Bates 329.

THE WITNESS: Oh, this copy doesn't have that.

THE COURT: It's not a handwritten signature. On Bates number 329, midway through the page, it says, Thank you comma, Wade Martin. If you could pull that up please so the

witness can see it.

Thank you.

MR. ADAMS: It's not signed by anybody.

MR. PORTNOY: Well, it's on the fourth page.

MR. ADAMS: Hand signed.

THE COURT: All right. You may continue.

BY MR. PORTNOY:

Q Again, this is one of the 21 letters?

A Yes.

Q Again, can you think of any reason why Wade Martin and Paula Haygarth would be writing one of these 21 letters in a totally unrelated matter?

MR. ADAMS: Best evidence rule. Document speaks for itself.

THE COURT: All right. Pull the microphone closer to you, please.

BY MR. PORTNOY:

Q I'm sorry. Can you think of any reason why the two of these individuals would write this letter in a totally unrelated matter?

A Yes. They were trying to silence me.

MR. ADAMS: Your Honor, Best Evidence Rule, the document speaks for itself as to why it's written.

THE COURT: Overruled.

But I will inform the jury, I'm giving you the same

instruction with regard to this letter as I did the prior letter, which is to say that you cannot consider this letter as evidence of defamation. This -- you are instructed that this letter itself is not defamatory, for reasons that you don't need to speculate about. However, the evidence -- the letter may be used as circumstantial evidence, if you see fit, of the identities of the anonymous posters. But, again, that's entirely up to you. That's your decision.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q I assume there were -- tell me if I'm wrong -- 19 or so similar letters written by other people?

A Yes. They pretty much all said the same thing.

Q And were they all written by people who had been involved in some way with a family issue, a custody issue, a child abuse issue, that you had somehow been in some kind of relation -- relationship with one of your students regarding these problems?

A Not all. Nine were that category, men who were ex-husbands of nine of my students. The remainder of them, with the exception of one, were family members of those men.

And there was one letter by a man named Joe Szimhart, who this group of people recruited. He's been arrested for kidnapping, and is a person that was involved back in the '90s in like cult deprogramming, where they would kidnap adults, you

know, torture them, put them in a room and get them to change their religion or what not. And they recruited him, completely random kidnapper off of the internet. But he markets himself as a deprogrammer. And he wrote a letter. I had never spoken to him. He never spoke to a single one of my students. He never bought a program of mine. He just decided to write a letter.

Q Other than he, all of the other letter writers, including the three defendants, had been in somewhat of a similar situation regarding a family issue, child custody, child abuse, in which you had been communicating with the mother?

A Nine of them, and then the rest were their own --

Q Family members?

A Yeah.

Q Related?

A Yes, yes.

Q So there was a common interest --

A Yes.

Q -- among 20 of the 21 people who wrote the letter?

A Yes.

Q And that common interest was what?

A To destroy my reputation.

Q But why?

A They wanted the -- their own family members to speak --

MR. ADAMS: Calls for speculation.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Do you have a belief as to why?

A I do.

Q What is that belief?

A They wanted to get the high value target, which was me, because they had already been effective at silencing their ex-wives by threatening to use their children in the custody cases. Like, if you don't shut up we're taking your child, which is exactly what happened to every single one of those nine women. Every single one of them lost custody of their kids. Every single one of them had been the primary caregiver up to that point. And so they were silenced and they were given gag orders in Family Court. And I continued to expose them and share what had been going on. And they knew they couldn't reach me through the Family Court, so this was an attempt to try to stop me at any cost.

Q You were advocating for these women?

A Yes.

Q And how were you advocating for these women?

A A couple different ways. One is, I was connecting them up with resources, like Women's Coalition, and the Family Court crisis organizations that help women and men, it's not just women, as I said, it's mainly a financial thing, it's pay to play, whoever has more money. So it always disproportionately

disadvantages the parent with the least financial resources. So I was connecting them with resources and trying to give them guidance as far as that.

And then I was also very publicly in my own name, not anonymously, exposing what was going on. Not only in the family courts, but in each of these people's lives. And all of these women who had been going through this asked me to do so.

Q Including what was going on in the defendants' personal lives?

A That is correct.

Q Do you know -- other than the family members, do you have any information from any internet that you had looked at, that the three defendants somehow had been in communication with some of the other letter writers?

A Yes.

Q How do you know that?

A Multiple ways. One of my students, Kara Kosher, she provided me with screenshots of conversations in a group called Hockey Dads where a number of the letter writers were seen having conversations about it.

Another student of mine, Jess Thompson, shared extensive information with me, including private investigative report that she had on her ex-husband Paul Thompson. And she said that he was part of the group.

MR. ADAMS: Your Honor, hearsay.

THE COURT: At this point that's -- that is hearsay. The last statement that he was part of the group is stricken as hearsay.

MR. PORTNOY: Okay.

THE WITNESS: And Haley Winter shared with me that -- in a screenshot that we have, that Paula and -- sorry, Byron and Paul Thompson speak often, was her exact words.

MR. PORTNOY: Okay.

THE WITNESS: So there was -- there was some direct connections.

BY MR. PORTNOY:

Q So let's -- and what happened as a result of this letter writing campaign and this status conference? Were you taken off probation? Were you fined? Were you -- what --

A No, nothing. Because I proved that every single one of the allegations was false.

THE COURT: This is a good time to take our stretch break.

So, ladies and gentlemen, let's take a very short stretch break and then we'll continue.

MR. ADAMS: May I run to the restroom, Your Honor?

THE COURT: You may.

Does anybody in the jury box need a restroom break? Yes. Several.

Okay. So why don't we do this -- oh, he's already

left the courtroom.

Why don't we go ahead and send the jurors to the restroom.

For the gentleman who needs to use the restroom, if you could wait for Mr. Adams to come out.

MR. ADAMS: I'm sorry. I left too soon.

THE COURT: If you could go to the third floor, Mr. Adams, so that the jurors can use the fourth floor.

Why don't we take a very quick five-minute break. I'll get off the stand -- I will get off the bench you can use the restroom. The rest of you jurors, if you need a restroom break. Great. If you don't --

Ms. Cortez, where do you want them to be?

Okay. You can stay here, but obviously, again, as always, what happens during recesses is not anything you should be taking into consideration.

So, I want to make that clear.

All right. Let's take a five-minute recess for folks to use the restroom. I will step off the stand and I will be waiting right outside the door.

(A recess was taken from 2:30 p.m. to 2:35 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. You may continue.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:
Q Just to finish up where we were --
A Okay.
Q -- Liana.
Did anything come from this status conference? Were there any results?
A No.
Q You still on probation?
THE COURT: If you could pull your microphone.
MR. PORTNOY: Oh, I'm sorry, Your Honor.
THE COURT: Thank you.
BY MR. PORTNOY:
Q Are you still on probation?
A Yes. I have five months left.
Q Okay. Any issues come up since this status conference?
A No.
Q What did -- what happened leading up to the status conference to you?
A Sorry.
It -- it put me into a pretty extreme, many months long episode of PTSD. I already had a PTSD diagnosis, nothing to do with this, previously, coming from 9/11 and being so close to Ground Zero. I had done a work healing that to get to a place where I managed it, no medication or anything. I was doing quite good by that time.

And it was a -- I have to use the word -- debilitating episode which I refer to it, like, my frozen year. Like, it was a year where it was, like, thank God for my family. It was very dark for me. Not only because I had been sustaining the online defamation and threats to my life and rape threats and death threats and my children being, you know, harassed, and my own kids being afraid to go places in our own island.

And that then leading up to the probation where -- it was very scary for me. I mean, I was 48 years old, had never committed any crime, had never done -- you know, I had no interaction with law enforcement or anything like that. Hadn't been around criminals or, you know -- so that whole experience for me in and of itself was -- the way that it happened was very traumatic.

Q Did you think leading up to the conference, and when you learned from your probation officer what was going on, that somehow these 21 people might impact your freedom?

A Definitely.

Q In what way?

A Because I know -- you know, probation is a very serious thing, and you are held to an incredibly high scrutiny of your life, which understandable, that's what probation is. And so we had complied perfectly. And then to have this onslaught of really horrific lies and made-up things about fraud, and trying to tie it somehow to a bankruptcy that was before I even

started my business. But they were in these, you know, things they submitted to the court saying that it was connected to my business.

And I know that the whole time you're on probation you could be in trouble. I mean, if you do something that's dishonest or you do something that's out of alignment with what your probation -- your behavior and how you conduct yourself as a citizen. And the very serious things. It wasn't just like he said, oh, she's a witch or she's a cult leader. I mean, very, very serious fought through accusations of fraud and trafficking. And I was very -- I was terrified.

Q Other than talking online with these nine people, including the people we've already talked about related to the defendants, about the personal problems that you were made aware of regarding divorce and custody, et cetera, was there any other interaction you had with the three defendants and the others who wrote these letters?

A I had zero interactions with any of the defendants or their family members, their mother, you know, the people who wrote the letters.

Q Right. But you have said you were talking to people like Haley Winter who we know was a former spouse of Mr. Horvath.

A Yes.

Q So I'm saying, other than the communications with these women, including Ms. Winter, that were involved in family

issues, was there any other thing you got involved with these people who wrote these letters that might have caused them to write the letters?
A No.
Q And the common theme was divorce, custody, et cetera?
A Yup.
Q How long did it take you to kind of -- I won't use the word "recover," but I will use it, from the stress that you've indicated and the emotional distress that you had as a result of this whole proceeding at the status conference and what predated it regarding the letters?
A I feel like it took about two years. I feel like at the end of 2025 I was starting to feel like myself again, and not being in the state of freeze and fear and paranoia of, like, cars driving by, always checking --
Q Let's just talk about the status conference, though, at the moment.
A Uh-huh. You said how long did it take me to recover.
Q Yeah.
A About two years.
Q Do you still think about it, other than today, obviously?
A I do.
Q Okay. I want to talk about damages with you. Okay?
A Okay.
Q Okay. Let's continue on this emotional distress theme.

We already talked about how the status conference issues and the letters that were written, including by the defendants, have affected you.

How did the posts affect you, the various posts?

A They affected me in ways that caused me to be -- the most profound thing for me was for my children, because now -- before the -- you know, even how it affected my business, the effect on my family, my biggest concern is my kids. And knowing that because of my advocacy for these women that now my children were being targeted.

And Kauai is a very small place, there's like 75,000 people on the whole island. And it's like coconut wireless, everybody kind of knows everybody. And for my kids to be -- my daughter worked at a coffee shop, her boss came up to her and said what's going on with your mom, is she a cult leader? Multiple coach -- you know, people at my son's golf course that he golfs at --

MR. ADAMS: Move to strike as nonresponsive. Hearsay.

THE COURT: Overruled. It's not hearsay because it's not offered for the truth of the matter asserted.

BY MR. PORTNOY:

Q Go ahead.

A My kids were -- you know, my son at his golf course, he's very well respected for golf in the state of Hawaii, and to have people coming and saying, is your mom trafficking kids?

It became something that my children were faced with frequently.

I was not -- at that point in time I was in, like, mom mode. I was devastated that my children even had to hear that. My son made his Instagram account private, my daughter made her account private. They were afraid to post things. My son was worried about how that was going to affect applying to colleges and getting scholarships and things like that.

It was devastating for our whole family. And -- and we were hearing it frequently from people in the community.

Q Okay. How about you, what did it do to you, the posts?

A It --

Q Did you ignore it and say, this is garbage, nobody believes it, or it affected you, or whatever?

A No, because a lot of people did believe it, unfortunately. Not people that knew me, knew me. My students that knew me, they didn't believe it. And people that knew me personally on Kauai, I've been very involved in the community and, you know, done a lot of work with multiple people on Kauai. So, of course, they didn't believe it. But a lot of people did believe it and a lot of people online believed it.

And you know, it dramatically impacted -- to this day it's still there. So if somebody want to buy my program --

Q We'll get to the business in a minute.

A Okay.

Q I just want to talk about emotionally how you felt. What effect it had on you from reading the posts. You already talked about impact on your children and how you felt, but how about you personally?
A It would put me into -- into a state of freeze with my PTSD, where I wasn't able to go anywhere, do anything. I spent a lot of time alone locked in my bedroom, because I'm not -- I didn't want to, to the extent possible, burden my kids with my own emotions and my own devastation. And you know, every time I was confronted with it, a lot of things that were sent to me, and people would say, now they're saying this, now they're saying that.
Q Did it impact your marriage in any way?
A Not negatively. No.
Q Did you receive any medical care as a result of the things you just talked about?
A No. I chose to work through it in the way that I had been doing in the years before. I'm definitely lean toward holistic, and I did a lot of prayer and meditation, and worked through it on my own.
Q Do you still think you have PTSD as a result --
A I definitely have PTSD.
Q Let me finish?
A I'm sorry.
Q Do you think you still have PTSD as a result of the post

and the court proceeding --
A Yes.
Q -- status conference?
A Yes.
Q How does it manifest itself?
A Hypervigilance. I -- anytime I get certain e-mails or direct messages that appear to come from somebody connected to these people, which does happen, they -- random, you know, attempts to scare me, I sometimes have a panic attack or I go into a freeze state. And it definitely has dramatically impacted my being out in the world. I'm always sort of, like, looking over my shoulder. I have my service animal for that reason. He's a medical alert dog, so -- for anytime I have extreme panic attacks. It's unfortunately still there.
Q Do you still talk to students about family issues?
A No.
Q Why not?
A I chose to go a more separate route of advocating in the bigger picture. Unfortunately I think in some ways because I was able to help a lot of people by helping individually, but what it put me through, I just don't have the constitution to continue doing that.
So I redirected it to what I'm creating now is an advocacy platform on the Family Court crisis and working on some groups that are trying to pass legislation in different

states in the United States on the problems in Family Court. And I'm working more on the bigger level and involving myself with a couple of non profits that have formed to help with this.

Because in the last four years, now it's -- when I first started advocating and guiding these women, it was very quiet and hush, hush. Not that many people were talking about it. And now there's some really hugely high profile cases. So a lot of attention is being put on these issues. So I'm working at that level now.

Q So is it as a result of these repeated posts about you and what happened at the probation with the letters that you no longer are assisting women who are individually involved, and you're doing this sort of on a group basis?

A Correct. Individual. I'm handing out resources or giving links to -- and eventually I will be giving links to my own website that will have all of this on the website.

Q You mentioned the United Nations. What are you doing?

A The United Nations has designated a Family Court crisis and they have a commission on investigating family courts. And so I've been providing them with submissions of each individual case that I personally have knowledge of, like all of the details and facts and information that I have firsthand knowledge of. And take all the exhibits in this case and then double it, I've given all of that to the United Nations,

because they're -- they have a certain threshold of documentation that they need to collect from people who have experience with this. And so I've been communicating with them on that.

And they're soliciting from anybody, I mean, not just me, but there's a number of us who are submitting documentation to them.

Q Let's talk about business.

A Mm-hmm.

Q As a result of the posts and as a result of any other matter that we've discussed over the last seven or eight hours, have you seen any impact on your business?

A Traumatic. Huge.

Q Can you explain to the jury what you mean?

A Yeah. Every year in my business since I started it, it was growing at a pretty persistent rate of growth. And immediately following all of this in the following year, it took about a 50-percent dive. So not only did it just not stay the same, it -- my income went down by about a half. And the new enrollments for all my programs went down. Cahira has more of the actual specifics on this, but upward of 80 percent.

And even today if somebody looks me up and say, oh, I really want to go to this school and learn nutrition, they look it up and the Reddit threads and the Daily Beast articles comes up and says, she's a humans trafficker. And you know, my

admissions director said, Cahira, she's had many conversations with people who are basically scared to even do the programs because of the accusations.

Q So do you have --

MR. ADAMS: Move to strike as nonresponsive hearsay.

THE COURT: The last statements about conversations with people saying that they are scared to do this is stricken as hearsay.

BY MR. PORTNOY:

Q Have you spoken to anybody personally or online who says that they're no longer going to use your services because of these posts?

A Yes.

Q Who?

A I have a number of people. I could give you a list, but not off of the top of my head.

Q Give me a number?

A That I've personally -- most of them have spoken to Cahira, because she's --

Q No, but to you.

A 40, 50.

Q Do you have a figure in your mind -- and we're going to the exhibits in a minute -- how much income you lost between '21 and '22 when this campaign started?

MR. ADAMS: Calls for speculation. Lacks foundation.

THE COURT: Overruled.

THE WITNESS: Are you asking for just a one year?

BY MR. PORTNOY:

Q We'll start with that.

A Definitely over a million dollars.

Q Between '21 and '22?

A No, no.

Q Go ahead.

A Sorry. '21, there was no defamation. It started in 2022. I misunderstood you. I'm sorry.

So, '21 to '22 there was a huge increase in my income.

Q '22 to '23?

A There was over a million dollars -- zero growth, a million dollars of loss, plus.

Q And were tax returns filed for those years?

A Yes.

Q Both for your company and for you?

A Yes.

Q Okay. Did you have an accountant at the time?

A Yes.

MR. PORTNOY: Okay.

THE COURT: You have about five minutes left, Mr. Portnoy, before we recess for the day, just to let you know.

MR. PORTNOY: I'm not sure I'm going to get through

these all. What's the Court's pleasure, just keep going?

Okay. Fine.

THE COURT: Let's use our last four minutes.

MR. PORTNOY: Fine, fine, fine.

Can you put up Exhibit 184, please?

BY MR. PORTNOY:

Q Do you have that in front of you?

A I do.

Q Okay. Have you seen it before?

A Yup.

Q Go ahead.

Oh, is that a tax return that was filed for a company called Health and Nutrition, but business name Health Mastery Institute?

A Yes.

Q Is that your company?

A Yes.

Q Are you the sole owner?

A Yes.

Q Did you review this before it was submitted to the IRS?

A Yes.

Q It's a schedule C, do you know what that is?

A It's a profit and loss.

MR. PORTNOY: Your Honor, I move 184 into evidence.

MR. ADAMS: Lacks foundation. Lacks authentication.

This is not a plaintiff -- it's not even her return.

THE COURT: All right. What we'll do is I'll take this objection outside the presence of the jury.

So what we'll do, ladies and gentlemen, is we will recess the day for you two minutes early. You're welcome.

And want you to go home and get some rest and don't think about this case. Just go about your day -- your evening like you normally would if you weren't sitting as a juror. Other than making sure that, you know, if for some reason you come across some news article about this, turn away.

So please do not talk about this case with anybody. Please do not do any investigation into this case. And we will see you tomorrow at 8:30 in the jury lounge, right?

Okay. So we'll see you tomorrow at 8:30 in the jury lounge. Same thing tomorrow as today when you show up I will give you some of the guidelines as to what we expect the recesses to be, so you can understand that.

All right. Thank you so much.

If everyone could please rise for the jury.

(Jury excused.)

THE COURT: Thank you. You may be seated.

All right. Do you want to voir dire the witness on this exhibit, Mr. Adams, or do you just want to make a verbal objection? And if you want to voir dire the witness, do you want to do it in the presence of the jury or outside the

presence of the jury?

MR. ADAMS: Well, I guess I would defer, wait until the ruling, but on its face I don't think they've met their authentication. It's not related to a -- a party to this case. Now, if Mr. Beard is going to come up, he can testify. I don't know what relevance this is. This isn't a party to the action. This is health --

THE COURT: The problem is that she testified that it is. So, I mean, that's --

MR. ADAMS: If it was her return.

THE COURT: I understand. Which I can see on the face of it there is an issue with that, which is what I'm trying to kind of ferret out right now is, do you want to voir dire her on that?

MR. ADAMS: I -- I do, yes.

THE COURT: Okay. Do you want to do that now or do you want to do that in front of the jury?

MR. ADAMS: Do it now.

THE COURT: All right. You may proceed.

MR. ADAMS: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. ADAMS:

Q Turning to Exhibit 184, where did this come from?

A My accountant.

Q So you didn't even produce it yourself?

A I did produce it, but my accountant prepared it.
Q For -- and what's the name of the proprietor?
A Health Master Institute is my LLC.
Q No, the first line is the name of the proprietor.
A That's my husband.
Q Robert Beard?
A Correct.
Q And what does proprietor mean?
A In this context, person who prepared the document.
Q You're an attorney. It means the owner, right?
A No, he's never been the owner. He's not the owner.
Q I understand that's your position, but on this document it's asking who the proprietor is. And my question for you is, what does that mean "proprietor"?
A I can't answer that.
Q You don't know?
A No, I don't, because it's my company. I'm the sole owner of Health Master Institute. So perhaps this was filled out by him and his name is on there. But this is my company. Health Master Institute has always been my company. I've been teaching Health Master Institute since 2012. All of the income is mine. My husband doesn't sell health programs, health coaching. They're my groups. So I don't - he would have to answer that specific question as to why his name appears on that first line.

Q You don't know?
A I do not.
Q And you didn't ask your accountant?
A Why would I ask my accountant? It was filed --
Q Yes or no, ma'am, you didn't ask your accountant why his name is on there?
A No, definitely not.
Q And your accountant is not here to testify as to this document?
A She is not.

MR. ADAMS: Nothing further, Your Honor.

THE COURT: All right. Thank you. I will take the objection under advisement, and I will rule on it first thing tomorrow morning.

MR. PORTNOY: Okay. For the Court's edification, there are four of them, so you might want to look at all of them. This is the first one. It's 185 through 189.

THE COURT: 184 through 189?

MR. PORTNOY: Yeah. And they're different issues, but you might as well look at them all.

MR. ADAMS: And this is great, I'm glad that he raised it, because 185, that's actually her return. That's the only return we have. What they're trying to do is use his and the only one of hers to compare.

THE COURT: All right. Let me ask you then,

Mr. Adams, do you have an objection to 185?

I mean, I guess what I should do is I should go back to look at your objections that you filed. But do you think the objections that you filed are accurate?

MR. ADAMS: Yeah, if she can lay the foundation for 185 I wouldn't, because this is actually her. Her name is on it, yeah.

THE COURT: Okay. Do you believe that the objections that you have filed with regard to these exhibits remain consistent with your position today on them? In other words --

MR. ADAMS: I'm unable to represent that to you because I would have to look. But I would defer to my co-counsel on it. And I don't think that we waived any objection to this as far as the authenticity and the admissibility.

THE COURT: I was trying to figure out if we could --

MR. ADAMS: Cut to the chase.

THE COURT: -- cut to the chase.

MR. ADAMS: I will look at that answer and respond to Carla, if you wish, Your Honor, and copy to counsel.

THE COURT: What I would prefer, I guess, since you're not totally sure, is that we go through each one now, just -- and you don't need to tell me what the objection is, I would like to know if you are objecting to --

MR. ADAMS: Yes.

THE COURT: So it sounds like -- again, assuming the foundation is laid, you have no objection to 185, assuming the foundation is laid.

MR. ADAMS: That's correct.

That would be the same for 186.

These are redacted, so it's hard to tell who signed it.

But 187 has the same problem as 184. So we'd assert our objections there, the lack of foundation.

189, appears to be her business, so the foundation she can lay.

THE COURT: That's 188.

MR. ADAMS: I'm sorry, yeah.

And counsel is showing me that we have lodged our objections in docket 142 as to all of these lacking authentication and lacking authenticity, relevance.

THE COURT: Right. But you're -- you're going to withdraw those objections for 185, 186, and 188, assuming the foundation is laid?

MR. ADAMS: Once the foundation is made I won't need to makes those objections.

THE COURT: Right. Okay.

MR. ADAMS: But until it is I will preserve them.

THE COURT: Got it. Okay.

And 189, is that one that you mentioned?

MR. PORTNOY: No, we're not going to use 189. You only need to worry about the tax returns, Your Honor.

THE COURT: Okay. All right. I will take a look at that this evening and I'll issue a ruling. If it seems like it makes sense I might do it in an EO, if not we'll just show up a little bit early tomorrow and Ms. Cortez will let you know.

Is there anything else that needs my attention at this point?

MR. PORTNOY: Not from me, Your Honor.

MR. ADAMS: Only the issue that he raised about my documents we disclosed today, the impeachment and refreshing recollection. I don't know that Your Honor needs to address it, but he did raise it, so I just want to make sure that we come in tomorrow morning --

THE COURT: All right. In my view, if exhibits are added to the exhibit list for the purpose of impeachment or refreshing recollection, that's not a violation of any of our local rules or the scheduling order.

MR. ADAMS: Thank you, Your Honor. We have exchanged this, and the Court has a copy, too.

THE COURT: Okay. Yes.

MR. ADAMS: And we don't have an understanding of who the witnesses are tomorrow.

THE COURT: Okay.

MR. ADAMS: 24-hour.

THE COURT: What is the witness order for tomorrow?

And if I haven't said this explicitly, we should share with each other the -- at the end of the day who the witnesses are for the following day. So this applies to both sides.

So, I don't know that I need to know that, but when I get off the bench, I'll ask you to share that with defense.

MR. PORTNOY: We'll let them know.

MR. ADAMS: Particularly he mentioned that he's going to now, even though not on -- not disclosed yesterday, that he's going to call my clients. Not a problem, he's entitled to do that, I just want to know.

THE COURT: Right. Okay.

MR. PORTNOY: That's fine.

And Your Honor, I do want to make on the record that I do object to any subsequent documents, particularly those that were known and available. Because my feeling is that -- and I believe I'm correct, but maybe not -- that it's a way to sandbag by just keeping out a bunch of documents.

So if the Court's ruling is you're allowed to put in additional documents once the trial starts that you're aware of before, then we have a number of documents we're going to resubmit. And that's fine, I just want to make sure we can do that.

THE COURT: It's only if it's used for impeachment or refreshing recollection.

MR. PORTNOY: Sure.

THE COURT: That's it.

MR. PORTNOY: Got it.

THE COURT: Thank you.

MR. PORTNOY: Thank you.

THE COURT: Thank you.

I do feel like the temperature got turned down a little bit after my admonition earlier. So I appreciate that. I hope it continues tomorrow.

And everyone, we will see you tomorrow. I am not going to immediately step off the bench, just because it's going take me a while to gather my things, but we are in recess.

MR. ADAMS: Until 8:30?

THE COURT: Until 8:30, unless Ms. Cortez tells you otherwise. We'll make a decision on that before 5 o'clock this evening.

MR. ADAMS: Thank you.

(The proceedings concluded at 3:09 p.m., August 4, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 4, 2026.

*<u>/s/ Cynthia Fazio</u>*
CYNTHIA FAZIO, RMR, CRR, CRC