IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI, | CIVIL NO. 25-00297JAO-RT |
| | Honolulu, Hawaii<br>August 5, 2026 |
| Plaintiffs/<br>Counterclaim Defendants, | JURY TRIAL - DAY 3 |
| vs. | |
| PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10, | |
| Defendants/<br>Counterclaimants. | |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/<br>Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/<br>Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


| EXAMINATIONS | PAGE |
|---|---|
| LIANE WILSON | |
| EXAMINATION BY MR. PORTNOY | 8 |
| EXAMINATION BY MR. ADAMS | 11 |
| RESUMED DIRECT EXAMINATION BY MR. PORTNOY | 19 |
| CROSS-EXAMINATION BY MR. ADAMS | 38 |
| REDIRECT EXAMINATION BY MR. PORTNOY | 176 |
| CAHIRA NOELANI | |
| DIRECT EXAMINATION BY MR. PORTNOY | 191 |


## E X H I B I T S


| | PAGE |
|---|---|
| Plaintiffs' Exhibit 253 was received in evidence | 20 |
| Plaintiffs' Exhibit 255 was received in evidence | 21 |
| Plaintiffs' Exhibit 186 was received in evidence | 47 |
| Plaintiffs' Exhibit 52 was received in evidence | 156 |
| Plaintiffs' Exhibit 50 was received in evidence | 160 |
| Defendants' Exhibit 1200 was received in evidence | 110 |
| Defendants' Exhibit 1104 was received in evidence | 165 |
| Defendants' Exhibit 1107 was received in evidence | 168 |

WEDNESDAY, AUGUST 5, 2026 8:21 P.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297-JAO-RT, Life Mastery Network LLC et al., versus Mr. Haygarth et al. This case has been called for jury trial day three.

Counsel, please make your appearances for the record starting with the plaintiff.

MR. PORTNOY: Morning, Your Honor. Jeff Portnoy and Troy -- oh -- Jeff Portnoy, Troy Young, and Jenny Tokuoka, and my client.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor. Joseph Adams, Laura Moritz, and Louise Ing, and with our clients.

THE COURT: Good morning, everyone.

First of all, you may be seated.

I understand, Mr. Portnoy, you have something that you want to bring to my attention before we address the two exhibits that were brought to my attention last night.

MR. PORTNOY: Yeah. Your Honor, I would prefer that this be done initially at the sidebar. It's a very sensitive issue.

THE COURT: Are you asking me to seal a hearing, or what are you asking me to do? Because if you're asking me to seal the hearing --

MR. PORTNOY: Oh, I don't mind about the hearing part, the motions that you're going to deal with. It's something unrelated.

THE COURT: Well, we're in open court, there's not a jury here, so I don't understand why we need a sidebar.

If it would -- because in my mind a sidebar functionally seals a hearing, and sidebars are really primarily utilized when there's a jury present. There are no jurors in the courtroom.

MR. PORTNOY: There is an issue, Your Honor, of great privacy and significance dealing with someone who was in the back of the courtroom yesterday, and my client's belief that that person is an individual who has previously threatened her life. And she has emotional and psychological reactions to testifying today if he is in the courtroom.

It's all I can tell you is what my client has told me. We can go into greater detail --

THE COURT: All right. If he's not in the courtroom is that an issue?

MR. PORTNOY: If he's not in the courtroom, no, I don't think that's an issue.

THE COURT: And is he in the courtroom now?

MR. PORTNOY: I really don't even know who he is, but I don't think so. He's not here now.

MR. ADAMS: I don't know who he is either, so I can't

speak to that.

THE COURT: Okay. Well, first of all, if you want to make a better record of this, Mr. Portnoy, you are going to have to do it in open court, in my mind, because I don't think you've met the grounds for sealing this hearing or requesting that it not be made more public than it is currently under *Oregonian Publishing*, which is 920 F.2nd 1 -- 1462, a Ninth Circuit 1990.

So, do you want to make more of a record at this point, either to request sealing, or do you want to say anything more publicly at this point? Particularly given that this person isn't in the courtroom now.

MR. PORTNOY: Well, I guess in order to do that I have to put my client on the stand to explain the situation, or file a pleading with affidavits.

THE COURT: Okay.

MR. PORTNOY: No other way to do it.

THE COURT: I mean, for what it's worth, I'm not stopping this trial if somebody walks into the courtroom. This is a public courthouse. And you're free to file a declaration or do whatever you want. If you want to call her right now for some evidentiary purpose, you may. But I am not going to stop this trial just based on the proffer that has been made so far, or allow her to not testify if somebody walks into the courtroom.

She can choose to dismiss her claims. She can choose to not prosecute her case. All right?

MR. PORTNOY: I understand.

THE COURT: I understand.

MR. PORTNOY: I'm in a situation which is quite unique.

THE COURT: I know. I know. So it's not that I don't have sympathy for you, Mr. Portnoy, but there are rules and those are the rules. Okay?

So you can decide -- if you want to take a moment, think about it, consult with your client, you can.

MR. PORTNOY: Yeah, I would appreciate that.

THE COURT: Okay. Why don't we go ahead then and give you about five to ten minutes. I'll step off the bench and we'll come back to deal with the.

MR. PORTNOY: Okay. Thank you.

THE COURT: -- whatever your decision is.

And if we could make sure that the folks in jury know that we are running a bit behind. Thank you.

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Okay. Thank you.

(A recess was taken from 8:25 a.m. to 8:35 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

MR. PORTNOY: Your Honor, my client is coming back in.

THE COURT'S STAFF/MR. PORTNOY continued:

The individual that she's concerned about is in the courtroom, so she would like an evidentiary hearing.

THE COURT: All right.

MR. PORTNOY: Which you suggested we might be able to do.

THE COURT: Okay. All right. You may go ahead and call Ms. Wilson to the stand.

LIANE WILSON, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name.

THE WITNESS: Liane Wilson.

EXAMINATION

BY MR. PORTNOY:

Q Morning.

A Good morning.

Q Liana, did you learn something late yesterday after court about an individual that you are in fear of being in the courtroom?

A I did.

Q What did you learn?

A That one of Byron Horvath's good friends, Paul Thompson, who is a man who threatened to kill me. He threatened to kill his wife. He kicked his wife when she was three months pregnant. Violent man. Threatened to rape me. And I had no idea he lives in Toronto. And he's here in the courtroom now. His name is Paul Thompson. He's wearing the red shirt, and he

was sent here to intimidate me, in my opinion, because he has -- they have an alliance, and I've been told that many times by Byron's ex-wife, and also by Paul's ex-wife, Jess Thompson, and also by Paul's sister-in-law and brother-in-law Matt Killen and Joanna Foster, who said that he was violent. He threatened them. He threatened their children, and was violent with a three-year old.

So that's what I've learned.

Q Before the trial started, did you have some apprehension that caused you to hire security?

A I did. I have a security team specifically for Paul Thompson, because I didn't believe that -- although violent -- Byron is a very violent man from everything I've learned about him. I see that in a trial he's a party, I didn't really feel like he would be threatening --

Q Let's talk about your --

A Yeah. So it was specifically for the abuser that's in the courtroom in the red shirt, Paul Thompson.

Q Okay. And when you learned that, there was some kind of physical or emotional reaction last night?

A Yeah. I have PTSD, as you heard yesterday. And several people who were in the room who know the situation and who know of all the threats he's made against many women in my community, they let me know late last night that he was in here. They were afraid to tell me. They didn't know how that

was going to affect me. And so I had a fairly severe panic attack last night. And then this morning, again, not as bad as last night. This morning I was able to do some, like, meditation and calm down. And I had -- I was in shock that he showed up today because this is, again, I believe an attempt at witness intimidation through Byron.

So I'm not shocked at all, given the behavior of the defendants for the last four years and how they've abused the litigation process in and of itself.

Q Just focus on the issue, please.

A Okay.

Q And so if he remains in the courtroom, what is that going to do to your ability to continue to testify?

A I'll do the best I can. I'm -- you know, it's exactly done for me to not be able to testify. They've been trying to silence me for four years. And he has tried to continue attacking me through many different means, reporting organizations that I belong to and all kinds of crazy things.

So the whole goal was to suppress this from being public, and so I'm going to do the best I can to testify.

Q Finally, what is it you want the Court to do?

A I want the Court to remove him. But it's been clear that the judge is not going to do that, so I'm going to just do what I have to do and testify to the best of my ability.

MR. PORTNOY: Okay. No further questions, Your Honor.

THE COURT: All right. Thank you.

EXAMINATION

BY MR. ADAMS:

Q Ms. Shanti, do you have a police report of any of the claims you made?

A I have a police report from his ex-wife, yes, Jess Thompson. There are several.

Q Where is that police report in the documents and files here today? Has it been submitted to the Court?

A Paul is not a party, so of course not. There are no documents that are a part of the litigation because he's not a party to the litigation.

Q And Paul's ex-wife was a former student of yours, right?

A Yup.

Q An ex-student. She left, correct?

A I removed her, because he was one of the other people who was using her account to access private information and then use it against her to threaten her. And there is a private investigation --

THE COURT: Stop.

THE WITNESS: Okay.

BY MR. ADAMS:

Q Just like you removed Byron's wife from the group, right?

A Correct.

Q Just like you removed Wade Martin's ex-wife, Amanda, from

the group?
A Amanda left. Amanda left on her own after she lied under oath. I didn't remove her.
Q And this gentleman, Mr. Thompson, submitted a letter in your probation, correct?
A Correct.
Q And you haven't sued him here today, have you?
A Not today, not yet.
Q And you understand -- you have information that you believe Mr. Thompson is actually the creator of the Liana Shanti Cult Recovery Network Instagram and e-mail group, right?
A No, I never said that. That's your client, Paula Haygarth, who created that.

MR. ADAMS: Nothing further, Your Honor.

THE COURT: All right. Thank you. You may step down.

(Witness excused)

THE COURT: I'm not going to grant the request to remove somebody from a courtroom based on what was presented to me. It sounds like there were no police reports filed against this individual. This is a public courtroom. Under the laws of our country people have a public right -- have -- the public has a right to access our courtrooms. And I have no doubt that this courtroom is safe. We have two court security officers in here. Everybody who enters this courthouse goes through security. The plaintiff also has two bodyguards who have been

present throughout this case. And this, of course, was never raised with the Court as a concern beforehand, despite the fact that Ms. Wilson says that she was not surprised that this individual showed up.

So we are proceeding.

Let's turn now to the --

MR. ADAMS: I do have one related issue.

We have been informed by Mr. Thompson just this morning, who I met this morning, that witness Cahira Noelani was in the courtroom all day yesterday.

THE COURT: I don't think she's being called.

THE WITNESS: She wasn't in here.

MR. PORTNOY: Please.

MR. ADAMS: She's on their list of the witnesses we got last night -- two nights ago.

THE COURT: Are you calling her as a witness, Mr. Portnoy.

MR. PORTNOY: Of course. And she was not in the courtroom. This is just what's going on in this trial. She was not --

THE COURT: Okay. Let's --

MR. PORTNOY: She was not here, Your Honor. Thank you.

THE COURT: This is turning into a ridiculous circus. And I'm doing my very best to make it not so.

And I know that Mr. Portnoy and I know that Mr. Adams, I'm not blaming you folks for it, but we've got to get some control here. Okay?

So, is Ms. Noelani in the courtroom now?

MR. PORTNOY: No.

THE COURT: Okay. When she shows up, I will ask my staff and I will myself see if we recognize her as somebody who's been in the courtroom, and we'll go from there. All right?

MR. PORTNOY: Fine.

THE COURT: No -- the gentleman in the red shirt is raising his hand. He cannot -- you do not have a right to speak. You have a right to attend, but you don't have a right to speak.

All right. Now, let's turn to the exhibits that are at issue.

Let me ask you, Mr. Portnoy, with regard to these two exhibits, what exhibit numbers -- if you could remind me, I looked at them this morning, but I didn't write down the numbers. Was it 13 and 14?

MR. ADAMS: I believe it's 18 and 19, Your Honor.

THE COURT: 18 and 19. Okay.

So, Mr. Portnoy, tell me why these are not hearsay.

MR. PORTNOY: Your Honor, our position is as follows: Based upon some of the Court's preliminary thoughts yesterday

during the testimony, we will not seek to introduce into evidence those two exhibits.

THE COURT: This is --

MR. PORTNOY: But --

THE COURT: You're talking about -- this is the Meta?

MR. PORTNOY: Yes, this is the Meta stuff.

THE COURT: Okay, 18 and 19?

MR. PORTNOY: Right.

THE COURT: Okay.

MR. PORTNOY: But, might as well get a ruling in advance. I intend to ask my client about what she did when she got that information. What she did.

THE COURT: Got what information?

MR. PORTNOY: From the documents.

THE COURT: Well, she can't talk about what was in the documents.

MR. PORTNOY: She can talk about when she got them, what she did in --

THE COURT: She can talk about the date that she received them and what she did based on them.

MR. PORTNOY: Right.

THE COURT: But she can't say what's in them.

MR. PORTNOY: I agree.

THE COURT: And I will be watching that pretty closely.

MR. ADAMS: I am concerned because we know this witness will go outside the bounds from yesterday. And we already had a sidebar yesterday about this exact issue --

THE COURT: Right.

MR. ADAMS: -- that he's trying to get around the -- this hearsay rule by having her say that, oh, this nails our client. And I'm very concerned that the witness will do that despite Mr. Portnoy's very carefully crafted question.

THE COURT: Okay. So I am going to allow you to lead her, Mr. Portnoy, in terms of, you know, what did you do, did -- did you receive this -- well, actually why don't you give me a proffer of what she would say in answer to that question.

MR. PORTNOY: She's going to say that she got this information, and then she'll explain it, went online and was able to determine the location of the IP address.

THE COURT: No.

MR. ADAMS: No.

THE COURT: No.

MR. ADAMS: Sorry.

MR. PORTNOY: Why not? I'm sorry, I don't --

THE COURT: Because she's going to testify that the IP address returns to Saskatchewan, right?

MR. PORTNOY: Yes.

THE COURT: What -- under what theory would she be

allowed to do that? That's going to be hearsay. She could not herself have the expertise to decide that this IP address returns to Saskatchewan. That's going to be hearsay. It's going to have to be like she Googled the IP address, or something of that sort.

So, no, she's not going to be able to say that.

MR. PORTNOY: I'll make a record, Your Honor.

It doesn't take an expert to do what she did. You and I could do it. I'm making my record. I understand.

THE COURT: Putting aside the expertise of it, it's still hearsay. Right?

So if I want to figure out where such and such restaurant is, and I Google it, and that's what I read, and I say such and such restaurant is at such and such location, without myself going there and seeing it, that's hearsay. This is the same thing.

So, if you -- I'm not going to let you ask her questions about where the IP addresses return to.

All right. With that, I'll step off the bench and we'll bring the jury in.

And Ms. Cortez, I'll just be waiting right outside the courtroom.

MR. ADAMS: I'm sorry, Your Honor, there was one issue when we left last night, there was the tax return issue.

THE COURT: Right.

MR. ADAMS: And I believe that's where they're going to take up.

THE COURT: Right.

MR. ADAMS: Okay, thank you.

(A recess was taken from 8:49 a.m. to 8:52 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297-JAO-RT, Life Mastery Network LLC et al., versus Paula Haygarth et al. This case has been called for jury trial day three.

Counsel, please make your appearances for the record starting with the plaintiff.

MR. PORTNOY: Good morning. Jeff Portnoy, Troy Young, and Jenny Tokuoka for the plaintiff.

THE COURT: Good morning.

MR. ADAMS: Good morning. Joseph Adams, Laura Moritz, Louise Ing on behalf of defendants and counter claimants.

THE COURT: Good morning.

Good morning, ladies and gentlemen.

I am sorry to make you wait. We were doing some work. I appreciate your patience.

As for today's schedule, we are going to end today at three. It is now almost 9:00, so probably take a break in an hour, close to 10:00. And then we'll chat about what the other breaks will be. All right?

With that, Mr. Portnoy, you may continue your direct examination.

And Ms. Wilson, I remind you that you are under oath.

MR. PORTNOY: Thank you, Your Honor.

LIANE WILSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

RESUMED DIRECT EXAMINATION

BY MR. PORTNOY:

Q Liana, when we ended yesterday we were talking about the economic losses --

A Yes.

Q -- of your business. And there was an issue dealing with some exhibits.

MR. PORTNOY: So can we have Exhibit 253, please?

BY MR. PORTNOY:

Q Do you have it?

A Yes.

Q What is it?

A Looks like a tax return for 2022.

Q And for who?

A For me.

Q Okay. And you are the sole proprietor of Life Mastery, right?

A Yes.

Q And did you prepare this tax return?

A My accountant did, but yes.

Q Okay. And you verified all the information as being accurate?
A Yes.
MR. PORTNOY: Your Honor, I would like to introduce 253 into the record, please.
THE COURT: Any objection?
MR. ADAMS: No objection, Your Honor.
THE COURT: 253 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 253 was received in evidence.)
BY MR. PORTNOY:
Q So we're not going to go through every page, but I just want to talk to you about the first page.
What did you inform the IRS was your total income in 2022?
A For that company, let me just look, which line it is.
Q Line 8.
A 1.8 million.
Q And the taxable income on Line 15?
A 1.7 million.
MR. PORTNOY: Okay. Can you please put up Exhibit 255, please?
THE COURT: You may.
BY MR. PORTNOY:
Q Do you have it?

A Yes, I do.
Q Okay. And what is that?
A On Line 8 is 645,000.
Q No, no. What is --
A Oh.
Q What is Exhibit 255?
A This is a 2023 individual income tax return, 1040.
Q And did you assist the accountant in preparing it?
A Yes, I gave her all the information.
Q And you provided all the information?
A Yes.
Q And did you review the return before it was filed?
A Yes.
Q And is it accurate?
A Yes.
MR. PORTNOY: Your Honor, I move 255 into evidence.
MR. ADAMS: No objection.
THE COURT: 255 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 255 was received in evidence.)
BY MR. PORTNOY:
Q What did you, on line 15, declare to be your taxable income one year later?
A 523,000.
Q As compared to 1.7 million?

A Yes.
Q Do you have any testimony to the jury as to why your income went down in one year by over a million dollars?
A Yes.
Q Why?
A 2023 was the year that the defendants had their most active part of their conspiracy against me in weaponizing my probation, as I talked about yesterday. And that was the first year since 2012 when I created my business that I wasn't able to create any new programs, and basically do the bare minimum just to keep things going as they were, so.
Q Why were you unable to prepare programs during that period?
A For five months of the year, which is usually towards summer/spring -- sorry, summer, early fall, when I usually do new programs, there's a five-month period where the entirety of my time was spent gathering the requested, required information that the judge and in the probation case required me to produce.
And it was the entirety of my business since it started in 2012, all the documents, anything we had ever done, made, earned, every tax return, every -- so it was a full-scale project between my husband and I and our accountant to get that together in the required time.
And then it was my complete shut -- I call it my

freeze year. Like that was the year where just everything in my life kind of came to a stop.

Q Okay. Thank you.

MR. PORTNOY: Can you put up Exhibit 9, please? 9. Yeah.

Let me know when the Court has it.

THE COURT: You may proceed.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q What is Exhibit 9, Liana?

A This is an article written about me called Liana Shanti Human and Child Trafficker.

Q Where did you see it?

A On the Cult Education Institute.

Q Again, tell the jury what that Cult Education Institute is.

A That is a website created by a man named Rick Ross, who is a convicted -- three-time convicted felon for armed robbery, jewel thievery, and kidnapping. And he was heavily involved in the cult deprogramming days in the '90s, and would kidnap people and then torture them, drugs, the whole thing, and have them be deprogrammed and renounce their spiritual beliefs, basically.

And then that wasn't working anymore because these guys were all getting kidnapped -- or getting kidnapping

charges. So he started this website --

MR. ADAMS: Your Honor, object as nonresponsive.

THE COURT: Sustained.

You may -- please pause. Wait for another question.

The jury is directed to disregard the last statement about the kidnappings.

BY MR. PORTNOY:

Q Yeah, just tell the jury what the Cult Education Institute is, the site.

A Yeah, so that -- that person created this website, along with another man called Anton Hein, who is a convicted pedophile, they created this to basically --

MR. ADAMS: Move to strike as lacks foundation. Calls for speculation. And it's nonresponsive.

THE COURT: Why don't you ask her a narrower question, please, Mr. Portnoy. That might be helpful.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q When all this was going on, did you review that cult education website?

A I did.

Q Okay. Is it a website? I may have --

A It's a website. It's a dot com.

Q Okay. And you have Exhibit 9 in front of you. Is that something you saw on that website?

A Yes. Yes.
Q And Exhibit 9, is that a photo you took of Exhibit 9 or a screenshot?
A No, it's a -- I think that's a printout from a screenshot, but yeah.
Q Okay. But did you do that?
A Yes.
Q At the time?
A Yes.
Q About when was that?
A Sometime in 2020 --
Q Okay. Have you altered it in any way?
A No.
MR. PORTNOY: Your Honor, I move Exhibit 9.
MR. ADAMS: Lacks authentication. It's -- there's no relevance that's been shown, why it -- based on the testimony.
THE COURT: Sustained. There's also significant amount of hearsay in this document, particularly beginning on the second page and so on.
MR. PORTNOY: Your Honor, the first page contains a number of what we claim are defamatory statements.
THE COURT: I understand. But the -- there are several -- I don't know if you would call these e-mails or posts, that make statements that are clearly being offered for the truth of the matter asserted.

MR. PORTNOY: No, I -- I'm happy to remove those. We didn't want anyone to suggest that we had in some way not provided the entire screenshot.

THE COURT: All right.

MR. PORTNOY: I have no problem with all the pages beyond the first page, Your Honor.

THE COURT: All right. Let's lay a greater foundation then as to why this is tied to this specific case.

MR. PORTNOY: Well -- I can do that, sure. I'm happy to do that.

THE COURT: Okay. Thank you.

BY MR. PORTNOY:

Q Does this article, whatever you want to call it, contain a number of false and defamatory statements on Page 1?

MR. ADAMS: Calls for a legal conclusion.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Does this first page contain a number of statements about you that you do not believe are true?

A Yes.

Q Does this first page contain a number of statements about you that you believe are false?

A Yes.

Q Does this first page contain a number of statements about you that caused you distress?

A Yes.

MR. PORTNOY: I move Exhibit 9, first page, into evidence, Your Honor.

MR. ADAMS: There's still no foundation for relevance to these defendants, the claims in this case. It's -- she testified it was written by somebody else.

THE WITNESS: No, I did not.

THE COURT: I'm not sure that she's testified who it's written by. She did talk about the website. So, it is sustained. And -- at least with regard to the relevance to this particular case.

MR. PORTNOY: I'm sorry, Your Honor, I didn't --

THE COURT: There needs to be greater foundation at this point. Who wrote this, when it was written, things of that sort. So you may proceed with that line of questioning.

MR. PORTNOY: It's anonymous, Your Honor. I don't know how we can put in --

THE COURT: All right. Now you're testifying. So you can just ask her --

BY MR. PORTNOY:

Q Do you know who actually wrote this?

A I do not. It was an anonymous posting.

MR. ADAMS: Move to strike everything after "I do not" as nonresponsive.

THE COURT: Overruled.

BY MR. PORTNOY:
Q Yesterday we put in a number of exhibits that the Court allowed, remember that, of various screen shots that you took?
A Yes.
Q That contained a number of statements?
A Yes.
Q It's true, isn't it, that the defendants deny that they posted those?
A Yes, they did.
MR. ADAMS: Excuse me, Your Honor that -- it's hearsay. It's calls for a legal conclusion, and it lacks foundation.
THE COURT: Sustained.
BY MR. PORTNOY:
Q You read the pleadings in this case?
A Yes.
Q Have you read the answer filed by the defendants?
A Yes.
Q What position do the defendants take in their pleadings in this court as to whether they deny or admit that they authored the exhibits that were introduced yesterday?
THE COURT: Let's have a sidebar.
Ladies and gentlemen, if you want to stretch, you can.
(Sidebar on the record:)
THE COURT: Tell me what foundation you think you've

laid so far. Tell me what foundation you think you've laid.

MR. PORTNOY: The same foundation, Your Honor, that I laid yesterday, that these were screenshots that she reviewed, that she photographed. That they were not in any way altered and you admitted them. And there was no objection as to who the author was or anything. This is just another one.

I don't -- I'm sorry, I don't understand.

MR. ADAMS: I didn't end up objecting at the end to the Exhibit 2. I'm objecting to this one.

THE COURT: Right.

So tell me what -- as far as I can tell at this point we -- and I can go back and check the transcript. But you haven't asked her who posted it, who Liana Recovery is, the date that it was posted, and --

MR. PORTNOY: That's true.

MR. ADAMS: He's trying to get around the subpoena issue and trying to back end in that.

MR. PORTNOY: What subpoena issue?

MR. ADAMS: 18 and 19 were related to this, Liana Shanti Cult Recovery and the Reddit posts. So now what he's trying to do is use that same e-mail address and trying to connect it to defendants, and he just can't.

THE COURT: How do you respond to that?

MR. PORTNOY: That's the problem in the case, we have to use circumstantial evidence. You don't have to lay out --

MR. ADAMS: Your Honor, I -- I did not -- I apologize, but it's not allowed.

MR. PORTNOY: Yeah. That's the problem I have in the case, we all know that. I have to hope that I can build a circumstantial case.

The defendants -- I don't understand what this is --

THE COURT: What -- what --

MR. PORTNOY: I'm sorry.

THE COURT: What proffer can you make that this is from them?

MR. PORTNOY: I can't. I can't.

THE COURT: Okay.

MR. ADAMS: It's highly prejudicial under 403.

THE COURT: Let him finish.

MR. PORTNOY: This goes to the conspiracy theory.

THE COURT: I understand, but what proffer can you make that this particular document came from these defendants?

MR. PORTNOY: I can't.

THE COURT: Okay. I'm going to sustain the objection.

MR. ADAMS: Thank you, Your Honor.

(End of sidebar.)

THE COURT: All right. The objections that have been made by the defense are sustained.

And Mr. Portnoy, I'll ask you to move on.

MR. PORTNOY: Okay. Thank you, Your Honor.

BY MR. PORTNOY:
Q Move to a different subject.
A Okay.
Q When you testified yesterday about your occupations, one of the occupations you testified about was you were a realtor for a while?
A Yes.
Q When was that?
A 2004 through 2011, is when I left that profession.
Q And did you have a license?
A Yes, I did.
Q As a realtor or a broker?
A Just a regular basic realtor.
Q Was it with a particular company?
A No, it was an independent real estate license.
Q And you were selling what?
A Fractional real estate.
Q You mentioned that yesterday, timeshares?
A Sort of, yes.
Q What company was that?
A A couple companies, the main one was called Pahio Resorts on Kauai.
Q And you stopped doing that in 2011?
A Mm-hmm.
Q Yes?

A Yes. Sorry.
Q Okay. Did something happen after that regarding issues with your license?
A When I was -- my husband had been apparently renewing it. I didn't ever intend on practicing real estate ever again, so I kind of just forgot about it and did nothing with it. That's sort of what I do when something is not important to me, I have a lot on my mind.
Anyway, so when this whole -- the attacks started on me, a bunch of different agencies started calling me and saying they had received reports that I was engaging in fraud and doing all these things, and this was one of them, the real estate board. And --
Q What year?
A That was -- I can't be -- I think it was 2025, but it may have been late 2024.
Q Go ahead.
A And they had sent me a letter that said somebody had made a complaint about me. But I wasn't practicing real estate, obviously it had been 13 years since I had done that. But the complaint was along the lines of all the other people that have said I was complained about.
And so in the renewal of the license, which is like an online thing, they ask a bunch of questions like do you have any outstanding debt, you know, all these other things. And so

those question marks hadn't been checked off by my husband, he was just renewing and paying the fee. You can ask him why he did that. I honestly have no idea. But -- and so rather than go through a whole hearing with my husband and he can explain why he did that, I just voluntarily surrendered the license because I didn't care. I had no intention, just didn't like practicing real estate.

Q And this was, like, 11 or 12 years after the last -- time?

A 13.

Q 13?

A Mm-hmm.

Q After you tried -- after you stopped selling these timeshares?

A Yeah.

Q Did you ever find out who initiated the complaint 13 years later?

A Not -- I can't name a specific person, no, I just was told by them and by the RICO also that -- because they also said I was practicing psychology without a license, and I didn't. So there was nothing there. But I had to keep answering these claims, but I don't know who.

Q Okay. Who is Cahira Noelani?

A She is a student, and she also is an independent contractor that works for me.

Q And she's going to be a witness, right?

A Yes.
Q How did you and she first hook up?
A She found my original health page on Facebook back in -- very early, like late 2012. I started July 4th, 2012, and she had shared with me that she found my information, my Facebook page like that early, pretty shortly after I had started.
Q And she became a student of yours?
A She did.
Q And which of the various groups that you talked about yesterday was she participating in?
A Well, back then it was only health, the Health Mastery. She went through my health coaching program. And back then I also used to do personal consults, like coaching consults over the phone. And so she had consults with me as well.
Q And she works for you now in some capacity?
A She does.
Q What is that?
A She has a multitude of roles. She runs -- yesterday I spoke about three different groups inside of my app. She pretty much runs one of them, which is the health coaching. She's a very successful health coach herself. That's her main profession, is health coaching.
And she was able to build a six-figure income within, you know, a couple years of graduating. So she teaches future students how to do the same. So she runs that group and she

does that with doing lives on the app. So she coaches those people on how to build their business to learn from what she did.

And she also does some administrative stuff for me. I kind of call her the gatekeeper. She helps people that are having trouble with the app, or accessing their programs, or if they have a question about the programs, she's kind of the go to person that doesn't really have a description. She does a lot.

Q So is one of her tasks to accept new students? In other words, they go through her to become part of one of your groups?

A No. She doesn't have to accept anybody. Because people can just buy my programs, put their credit card in and buy the programs. But a lot of people who want to enroll in the health coaching school, because it's a school, it's a program, they have questions. And it's a more expensive program just like, you know, if you're going to spend money to go to a college, you want to interview and find out. So it's kind of the same process. And she works on a exist basis for that, so if somebody wants a conversation about, can you explain more about the school and what's the philosophy and what is the success rate. And she will get on a call. And so there is a fair number of people who join who talked to her, because they have questions. And she's so well versed in it. And so she earns

commission for that.
Q And if someone wants to leave and not renew or whatever, do they talk to her?
A No.
Q Someone wants to not be associated with you anymore?
A They just leave.
Q What?
A They just leave. They don't have to go through anybody to leave.
Q Okay. But if they are disgruntled with something, would they talk to you or to her?
A They would -- if they -- if there was ever anybody that was disgruntled with HMI, they would talk to her. It's never happened, but that would be the person they would talk to.
Q She's still an independent contractor with you?
A Yes.
Q Okay. Where does she live?
A She just moved to this island when her daughter turned 18, which was, I think, November of 2025.
Q She works remotely?
A Yes.
Q Okay. Finally, after several hours, tell the jury why you're here.
A Why I'm here?
Q Why you're in court.

A I almost wasn't. I almost let this all go and dropped it, just the four years and the time and the money and the stress. And I continued to stick with it and go through my experiences, because I believe, especially since this case got moved from the state court to federal court, I truly believe in the American justice system.

And there's so much really dangerous and vial stuff from anonymity on the internet. And I believe in my heart and soul that this case will be precedent setting in the U.S., because federal district courts have a lot of sway in all 50 states that can hopefully show people that anonymity is not going to be as easy to get away with terrorizing people anymore. I believe that with my hand on a Bible, Jesus as my witness. And that's the only reason I continued.

And to show women that 99 percent of women could not have gone through what I've done. They wouldn't have the money to hire the lawyers. And sure, I could have kept that money for a lot of other things, but at the end of the day that is the most important thing.

MR. PORTNOY: Okay. No further questions.

THE COURT: All right. Thank you.

Mr. Adams, cross-examination.

MR. ADAMS: Thank you, Your Honor.

Just give me one moment while I set up.

THE COURT: Take your time.

(Pause in the proceedings.)

CROSS-EXAMINATION

BY MR. ADAMS:

Q Good morning, Ms. Wilson.

Can hear me okay?

A Yes, sir.

Q I want to start with something you just recently talked about, which was your real estate license.

You gave it up at the end of 2025 because you were facing a suspension hearing, correct?

A No, that's not my understanding.

Q You testified that you didn't even know it was in effect; is that correct?

A Yes.

Q Because your husband for some reason, mysteriously for ten years was online doing it for you?

MR. PORTNOY: Objection, Your Honor. Argumentative.

THE COURT: Overruled.

You may ask the question again, please.

MR. ADAMS: Sure.

BY MR. ADAMS:

Q You didn't know because your testimony, just moments ago, was that your husband, unbeknownst to you, was renewing it annually for you; is that correct?

A Yup. He does that with everything.

Q And so it's your husband's fault that you had an active real estate license while on probation; is that right?
A My probation has nothing to do with my real estate license.
Q Well, you testified that you're supposed to click some boxes when you renew it annually, right?
A Apparently.
Q And your husband did that for you and forgot to click the box that you were a convicted felon, right?
A You would have to ask him that.
Q Well, you've seen the DCCA complaint in this case, right?
A I've seen the complaint. But, again, you have to ask him because I wasn't part of that.
Q It's your license, right?
A It was.
Q You've had two licenses in your life, a law license, which is currently suspended, correct?
A It's in suspension, yes. I explained that yesterday.
Q And a real estate license that you withdrew or relinquished because you were facing suspension, right?
A That's not my understanding.
Q What is your understanding of why the DCCA -- and we can look at the document if you want. I can show it to the jury -- why they filed a complaint against you for not clicking the box that you were a convicted felon?

A There were a multitude of boxes. They were not disclosing liens and judgments and things that dealt with my bankruptcy. There's a multitude of things. So I wouldn't be able to pin it down to one thing.
Like I said, I'm not aware of what it is, but I got the letter and said, no interest in practicing, so I'm just going to relinquish it and not deal with whatever it this is, which is my MO, I focus on the things that are most important to me. That's just it.
Q Around that same time people were complaining that you were practicing psychology without a license, too, correct?
A Your clients did, yes.
Q Can you please answer my question?
A Yes.
Q There were complaints about you, and you have no idea who made those, right?
A I do.
Q You don't have any proof in this courtroom here today, other than your belief, as to who made those complaints?
A My belief.
Q And so there was a multitude of reasons why your license was suspended, including multiple liens on you, correct, your real estate license?
A It wasn't suspended, I relinquished it.
Q Facing a suspension hearing, right?

A Not to my understanding, no.
Q Let's also talk about your tax returns.
You had shown us -- before the break your attorney had showed us two tax returns from 2022 and 2023. Do you recall that?
A Yes.
Q And isn't it true that between that period of time, 2022 and 2023, you actually changed the way you filed your taxes, right?
A I -- I can't answer that. I honestly don't know.
Q Sure. The -- in 2022 -- we can try to pull that up.
MR. ADAMS: Can you pull up that 2022 --
Which was already admitted into evidence, Your Honor. Just one moment.
Exhibit 253.
THE COURT: One second. Let me double-check to make sure that that's the right exhibit.
Exhibit 253 has been admitted and may be shown to the jury. Let's pull it up, please.
THE COURTROOM MANAGER: Yes, Your Honor.
BY MR. ADAMS:
Q This here is your -- this is the one --
THE COURT: One second, it's not.
MR. ADAMS: Oh, pardon me.
THE COURT: Ladies and gentlemen, is it on this screen

in front of you? This one is working but that one isn't?

Okay. Are you able to all see the screen?

Okay. I'll ask Ms. Cortez to work on the other screen, but in the meantime let's use the screen in front of the jurors.

Exhibit 253 has been admitted and is being shown to the jury.

BY MR. ADAMS:

Q And you can see here, this is -- Exhibit 253 is your 2022 tax return, and it's an individual income tax return, right?

A U.S. individual income tax -- yes.

MR. ADAMS: And if you scroll down for me, Linda.

BY MR. ADAMS:

Q It says here that you had 1.8 million from your Schedule I. And that if you go up just a little bit, you didn't have actually any W-2.

Do you know the difference between your business income and a W-2?

A Not exactly, no.

Q You went to law school, you don't have any idea?

A Law school has nothing to do with taxes and finance. So no, I don't.

Q You sell business programs to women online, right?

A How to build a business online, because I'm very good with that, but it has nothing to do with taxes.

Q Did you prepare this in any way?
A My accountant did this.
Q Do you have any basis to verify a single number on there?
A I have all the receipts, everything I gave her of my income, from where I receive income from online.
Q If you look at Exhibit 255.
THE COURT: 255 has not yet been admitted, I think.
MR. ADAMS: It's the 2023 1040?
THE COURT: Let me double-check with Ms. Cortez.
THE COURTROOM MANAGER: I have it. It has.
THE COURT: It has. I'm sorry. My apologies.
255 may be shown to the jury.
MR. ADAMS: Thank you, Your Honor.
BY MR. ADAMS:
Q If you look here on the W-2, which is employment income -- scroll down just a little bit for me -- you have 84,000. Do you see that?
A Yes.
Q So you were earning a salary in this return, right?
A I don't know. Is that what that is? A salary?
Q And then down below -- well, you were answering -- in response to your counsel's questions you were able to tell how much income you made from this. Are you unable to read this one?
A It doesn't say salary anywhere, so I'm not sure -- unless

I'm not seeing the right line. I'm sorry.

MR. ADAMS: Sure. Why dont you scroll up for me, Laura. Says 1a, total amount from forms W-2.

BY MR. ADAMS:

Q You don't know what a W-2 is?

A Usually it's something you give an employer, as far as I know -- employee, excuse me.

Q And then so, if you'll notice then, you testified that your income is less, but as I mentioned before, the -- in 2022 your businesses were your sole proprietorship, where you owned it, but in 2023, they were S corps, correct?

A You're going to have to ask my husband this. Because we did change, I believe, the type of business -- or the format of the business between those years.

Q Why don't I refresh your recollection.

MR. ADAMS: And counsel, this is Exhibit 185. It's your exhibit that you produced in this case.

BY MR. ADAMS:

Q Ma'am, why don't you take a look at Exhibit 185 and see if that refreshes your recollection that in 2022 you were claiming Life Mastery Network as the sole proprietorship.

A I'm sorry, I don't see anything on the screen, except that --

Q No, no, in the books there --

MR. ADAMS: Is it showing to the witness?

THE WITNESS: Okay. Now -- are you looking at the profit or loss from business?
BY MR. ADAMS:
Q Yup.
A Okay.
Q And is it says what -- underneath the very top, profit or loss from business, what does it say describe that business as?
A It says, in parenthetical, sole proprietorship.
Q And the name of the proprietor is you, correct?
A Name of proprietor, yes.
Q And the name of business is Life Mastery Network LLC?
A Yes.
Q Okay. And then in 2023 you filed a tax return, correct, for this entity?
A Yes. I don't see it.
Q We'll get there.
A Okay.
MR. ADAMS: Turn to Exhibit 1 -- or can we show the witnesses Exhibit 186, but not publish it to the jury, please?
THE COURT: You may.
BY MR. ADAMS:
Q Do you see this is a U.S. -- oh, sorry. U.S. income tax return for an S corporation, the next year? Do you see that?
A I do.
Q And so you see the name of the company as Life Mastery

Network LLC?
A Yes.
Q So does this refresh your recollection that between 2022 tax year and 2023, you incorporated Life Mastery Network?
A I believe that was the year. And I believe that that was something that was actually part of our probation, now that -- I think that was a requirement. But I think you should ask my husband that because I'm not a hundred percent sure, but I think I remember we did make that change because it was a probation requirement that they wanted it to be an official corporation, something to that extent, but --
Q Well, I'd rather ask your ask your accountant. Are they coming in to testify?
A No, but my husband does all of the correspondence with her personally.
Q Okay. And at this time you've also testified that -- not only in this courtroom but also in your deposition -- that not only did you own Life Mastery Network, this corporation, but you also owned Health Mastery Institute, right?
A Yes.
Q And so there's no income here for the year 2023 for Health Mastery Institute, right?
A This is a form just for Life Mastery.
Q Right. And so we don't know how much Health Mastery Institute earned in 2023, do we? Because you split them --

between 2022, you split them into three, didn't you?
A They were always split but they weren't corporations. And they're not three corporations, there's two. There's Life Mastery and then there's Health Mastery Institute.
MR. ADAMS: And why don't you scroll down for me, Laura, on Exhibit 186.
BY MR. ADAMS:
Q Does this refresh your recollection --
MR. ADAMS: May I publish 186 to the jury, Your Honor?
THE COURT: Any objection?
MR. ADAMS: It's a tax return they produced.
MR. PORTNOY: Looking at the Court's order, and -- regarding 186, and there was a precondition which we did not meet or attempt to meet. So I object.
THE COURT: Well, that was when you were trying to offer it. And he's laid the foundation for it.
So 186 is admitted.
MR. PORTNOY: Okay.
THE COURT: It may be shown to the jury.
(Plaintiffs' Exhibit 186 was received in evidence.)
BY MR. ADAMS:
Q So you split your company between 2022 and 2023. You split it into three, and then smartly so, because if you scroll down for me, Laura, please, you can see that you didn't pay any federal income tax for this company in 2023, right?

A First of all, you misstated when you said there's three and there's only two.
Q Okay. So you --
A Second of all, I pay taxes for every corporation, so I don't know what I'm looking at. But for sure I pay taxes, I can tell you that.
Q Amount owed -- Line 26, amount owed, zero dollars.
A This is clearly not a completed document. So, again, I -- I can't speak to it.
Q Are you contending that this is not a real, authentic tax return that you produced in this litigation?
A No, I'm not saying it -- I'm saying -- I'm not saying that at all. I'm saying this clearly can't have been the final thing that we turned in, because I can assure you, I wrote the check. I remember paying the taxes for the last several years. There were taxes paid. There's no way that it was zero.
So what I am saying is that this doesn't have all the information, so this is something that looks incomplete.
Q So we can not rely on it then to show that you lost money between 2022 and 2023, can we?
A This particular form, I don't know if that can be done.
Q And so like your real estate license that wasn't your fault, it was your husband's fault. This is not your fault either, it's your accountant's fault?
A There's no fault. No, I'm not putting fault on anybody.

This is just an incomplete form. There's no fault. We filed taxes. I paid taxes. And this form got submitted without all the information on it. There's nobody at fault. There's nothing wrong here. There's no problem here.

Q This brings me to another issue because this is all we have as far as your tax returns, but you've been operating in 2024 and 2025, right?

A Yes.

Q You filed taxes for 2024?

A Yes.

Q Have you filed for 2025 yet?

A Yes.

Q Where are those returns?

A At the IRS.

Q Now you testified yesterday that as part of your probation -- well, starting in 2019 -- or was it 2021? Pardon me. 2021, starting your probation, you had to keep your bank account separate from everybody's, right?

A From everybody's?

Q Separate from your husband? A term of your probation?

A Yes.

Q And then when you had a probation hearing in 2023, and there were 21 letters submitted to try and revoke your probation, you made an agreement after that that you would submit monthly financial statements to the probation officer,

right?

A First of all, it wasn't a hearing. So the characterization of that, you keep repeating, it's not, it was a status conference. And in that conference, when the defamatory letters claimed that I had some kind of fraud, that is part of what I had to do is prove that it wasn't. It was everything I testified to yesterday.

Q That was a long way of saying, yes, you do have to monthly provide financial statements of all of your businesses to your probation officer, right?

A Yup.

Q Where are those monthly statements from the middle of 2023 to today? Why haven't they been produced here?

A Monthly statements? That goes to the probation, not to you. I'm confused.

Q Well, wouldn't that be the best way to find out just how much Liana Shanti Enterprises, Health Mastery Institute Inc., Life Mastery Inc. all make?

A No.

Q It was good enough for the probation officer, but it's not good enough for this jury; is that right?

MR. PORTNOY: Excuse me, Your Honor, argumentative.

THE COURT: Sustained.

MR. ADAMS: Withdrawn, Your Honor. I apologize.

BY MR. ADAMS:

Q Let's talk about your name. Liana Shanti is not your legal name, right?
A Correct.
Q What do you consider it, a business name, a non de plume, pseudonym?
A My grandparents started calling me Liana when I was a child, and so --
Q I'm going to cut you off there because you already testified about that.
What do you consider your name, Liana Shanti? Is it a business name?
THE COURT: One second.
MR. PORTNOY: Your Honor, I object. The witness is trying to answer the question.
THE COURT: She was. She was.
MR. PORTNOY: Thank you.
THE COURT: You asked her a question, she started to answer is it, and you interrupted her.
So, the question was: What do you consider it, a business name, non de plume, pseudonym?
THE WITNESS: I consider is it a family name and a spiritual name, because the Shanti was give to me by a yoga teacher. And also, I trademarked it so it's a federally trademarked name that I used in association with my business.
BY MR. ADAMS:

Q How many accounts do you post online under Liane Wilson?
A I don't post under Liane Wilson.
Q So it's true that you don't post anything online under your real name?
A Everybody knows I'm Liane Wilson, because my pages share that information. But I don't post as that, it's as Liana Shanti.
Q So the answer to my question is "yes"?
A Could you repeat your --
Q You do not post anything online under your real name?
A Under my legal name, correct.
Q Have you ever told a student that you met Jesus in real life?
A Met Jesus? No.
Q You've never told a student or any students that you've personally met Jesus when you were two years old?
A I -- I had a visitation from Jesus. I wouldn't call that met him.
Q So you tell students in your group that you had a visitation from Jesus when you were two years old?
A I tell everybody that, because it's a defining moment in my life. And there are many other people that have that.
Q And you also -- is it true that you use this meeting of Jesus -- I'm sorry, a visitation by Jesus to tell your students that you are somehow closer connected to him?

A Absolutely not.
Q You're sure about that?
A Yes.
Q So if your students were to come in here and testify that that's how you used your visitation by Jesus when you were two years old in your classes, they would be lying?
A They would definitely be lying, because I tell everybody they're as close to Jesus as anyone because he lives within your heart, the Kingdom of God is within you. So yes, they would be lying.
Q You are the only one that had a visitation from him when you were young, right?
A No. Definitely not. I have a number of students who have had that, and you can read online thousands, maybe millions have had that.
Q What does that mean, a visitation? Does he come into the room? Is this a hypnosis?
A I don't believe Jesus is a hypnotist, no.
Q And do you use that -- the visitation of Jesus in your business teachings?
A Business teachings, definitely not. I talk about it all the time because it's a defining moment in my life.
Q You talk about it all the time, including in your business courses, right?
A It's not related to business. I talk about it in a

spiritual sense.
Q And you offer a course called the 12th Dimension Business School, or the 12-DB school, right?
A Based on quantum physics, yes.
Q Well, it's not a physics course at all, is it, ma'am?
A 12th dimensions is a quantum physics principle, so that's where I came up with the name, I thought it was a really cool name, 12-DB school, because it's B school but from a quantum prospective. So it's not a physics class, but I teach people how to really access their energy field, and things -- people like Wayne Dyre and Joe Dispenza. You know, it's quantum, and so I thought it was a school name, 12-DB school, and so I made a logo and got some t-shirts made.
Q You teach a business school online where you encourage people to increase their energy fields?
A I teach people how to put themselves in a great energetic space to create their best work. So it's part of what I teach.
Q Some of the other classes you have are Full Moon Motivation, right?
A Yes.
Q An old course?
A Yes.
Q Freedom from the Mother Wound?
A Yes.
Q That's $222 course, right?

A I believe that's the current price. I can't be sure. I have a lot of programs.
Q Freedom from the Father Wound, that's a course of yours online, right?
A Correct.
Q Freedom from the Narcissistic Relationships, that's another course?
A Yes.
Q And then you offer all three of those, the Mother Wound, Father Wound, and Narcissistic Relationships, you can get a bundle, a Core Healing Bundle of $555 on your site, right?
A I don't know if I still offer that discount. I may have increased the price because it's a hugely popular program. But I would have to ask Cahira. Sometimes we do bundles, we do specials, we do holiday promos. I can't really say if I still have that one.
Q And then you also offer course Awakening Ancient Gifts that's $222, right?
A Yes.
Q And the Ancient Gifts refers to this Lemurian School, right?
A Not at all.
Q Well, what is the Lemurian School that you taught for years?
A I didn't teach it for years. It was a -- it's another

digital program that I offered, a program named Lemurian Mystery School. You may have noticed I try to come up with some cool names to get attention. That's how people find your stuff. And a lot of people connect to Lemurian and Atlantis and ancient, you know, civilizations. And so it's a program that I have called Lemurian Mystery School.

Q And in that you tell your students that there are things called the Akashic records, right?

A I share that information with them, yes.

Q Tell your jury what your understanding of what the Akashic records are.

A It's pronounced Akashic.

Q Oh, Akashic. Forgive me.

A You're forgiven.

The Akashic Records are a lot of spiritual traditions from east to west, all over the world, even predating Jesus, even back before the Egyptians, is this belief and understanding that there are records of everything in the universe. If you've ever seen the movie Everything Everywhere All At Once, it's that quantum concept where everything exists, and time isn't real, and quantum physics has taught that time isn't real. We experience it as time, but time and space actually aren't real because everything is in this exact moment. And you know, it's an amazing quantum concept.

And the Akashic records are the holders of all of

that, according to all these ancient traditions, and a multitude of traditions that believe this and teach this. I happen to believe it and believe it's true also. And especially with quantum physics confirming that time is a human construct.

So, the Akashic Records are the records that have the existence of all of our soul from beginning to end and unfathomable topics that our mind could never comprehend what is held in the Akashic records.

Q So my soul is in the Akashic records, right?

A Everything in existence. If you have a soul, it would be in there.

Q Everybody in this room's soul is in the Akashic Records, right?

A Everyone in here who has a soul would presumably be in the records, yup.

Q And in your school you taught students that you could read them, correct?

A Anybody can read them. I actually teach people how to read them. I teach people how to access information that's --

Q Ma'am --

A Have you seen the Matrix? It's like that.

Q -- please answer my question.

A Yes.

Q Yes. You've told people you can read the Akashic Records?

A I teach them how to do it through -- yes, through how I do it.
Q Ma'am, ma'am.
MR. PORTNOY: Wait, wait, wait.
THE COURT: One second. Okay. Let's calm down. All right?
So the question was: You told people you can read the Akashic Records.
And the answer was: I teach them to do it, yes.
So can you answer the question of, have you told people that you can read the Akashic Records?
THE WITNESS: Yes.
THE COURT: Okay. Continue.
BY MR. ADAMS:
Q How do you do that?
A Through meditation. And it's a multistep process what I teach. But it's through accessing your own personal connection to it. And some people do it very easily, and some people have a hard time doing it. It's an esoteric process.
Q So are you claiming to be psychic or clairvoyant?
A I don't use the word "psychic." I wouldn't call it psychic at all, because psychic implies that there's a future. Psychic implies that you believe in the time construct, versus if you're able to tap into the now, kind of like in the Matrix, if you're able to just access what's there, it's already there.

You don't have to be psychic. Psychic people who do psychic type stuff, in my opinion, I believe that that's a completely different categorization, and it's people who try to predict the future, they believe in a future, and it's a completely different construct than my personal beliefs. But, you know, everybody has their own beliefs.

Q But the Akashic Records aren't actually physical books, right?

A By "physical," do you mean only 3D physical?

Q Okay. I'll take that. Sure.

A Okay. Because --

Q When you read the Akashic Records, let me be clear, you're not going and pulling it off a shelf, opening it up, and going, huh, Joe Adams attorney, there he is, are you?

A Not in the 3D, no.

Q You do it in your mind, right?

A Absolutely not. It's not in the mind. The -- in quantum physics, particle physics, everything exists in all the different 12 dimensions. The 3D is, like, the dense. And, like, we think this table is here, but it's actually vibrating and moving. It's not solid. So as you get into the higher dimensions, it gets less and less visible to the human eye. It's not in your mind at all, your mind is completely separate construct. It's the universe that we live in, it's quantum particle physics.

And so, if you're accessing other dimensions, other -- like when people have near death experiences, all kinds of things that human beings have experienced throughout history, they have experiences that one would call supernatural or spiritual, or people have visitations from angels, and different religions and spirituality and indigenous cultures communicate with ancestors, the Hawaiians communicate with ancestors, that's all happening not in your mind.

When people say they are communicating with an ancestor, it's not in their mind, they're accessing that being, that -- that ancestor watching over them or their aumakua. And that is in what I would call the Akashic Records in the consciousness of existence.

Not in your mind, your mind is ego, your mind is completely separate thing. And it's not the place you want to be. You want to expand out from that to, you know, connect with the universe, connect with God, and get out of your head. So it's definitely not in your head.

That's sort of a brief quantum physics, and really indigenous cultures throughout history kind of merging together and teaching the same concept but with a different perspective.

Q And just to be clear, none of this study that you teach is under any licensure? You're not licensed by any board?

A I'm not a licensed consciousness. I don't think that's a license. I'm definitely not that, no.

Q And you're not a licensed therapist, right?
A No.
Q And you're not a licensed marriage and family counselor, correct?
A No. I don't do any counseling. I'm not a licensed any -- anything you're going to put after the word license, the answer is no.
Q And licensing, like with your attorney license and your suspended real estate license, they -- the licensing board makes sure you're doing things right. Do you agree with that?
A I'm not licensed, so that doesn't pertain to me.
Q Right. And the reason you're not licensed in New York is because you didn't do things right with the New York Bar, right?
A No.
Q Well, you're suspended right now, right?
A If I pay the fine I could go back and practice, but I'm not. So I'm not sure what you're asking.
Q So is that somebody else's fault as well? Is that the New York Bar's fault on your suspended license?
A There's nobody at fault. It's just that I'm not practicing, I don't care. I'm not blaming anybody for anything here.
Q Getting back to the records that you explained. You tell your students that you're able to read the records and tell

them what they mean about them, don't you?
A No.
Q You've never done that?
A You'd have to ask me a much more specific question.
Q Sure. So Amanda Brady and Haley Winter, you didn't tell either of them that you could read the Akashic Records about them and tell them their future?
A Absolutely not.
Q Did you tell them that you could read the Akashic Records through whales?
A No. That -- that is not how Akashic Records work.
Q Maybe I asked the wrong question, so let me ask a broader question.
How do whales play into the Akashic Records to you?
A According to most of the world's indigenous populations, whales are what they call record holders or record keepers, which for a lot of people -- the average person that sounds like a crazy, out there thing. But the ancient cultures knew that animals on this planet have consciousness, and the whales in the ocean have an incredibly deep connection to the overall consciousness. And the teachings of most indigenous cultures is that it is a frequency holder.
And I happen to believe that. I agree with that. Again, a lot of people think that's weird or crazy, but to each his own.

Q Well, it's not just that a lot of people think it's weird and crazy, but you teach it as part of your schools, right? And you charge people for that, correct?
A No, I don't charge people for information about whales, I actually just talk about that for free periodically.
Q In your online classes on your app?
A No. Usually on -- just on my Instagram page I talk about things like that. I talk about it in a multitude of places.
Q And you have a course called -- it's about -- you have a bunch of scores about narcissists, right?
A I have one class about narcissists.
Q And the short term for a narcissist in your world is narc, right, N-A-R-C?
A In the entire world when people refer to narc, not my world, the world, narcissist is referred to as a narc.
Q I knew a narc being the high school kid that was actually a cop.
A It's also that too, because that is short for narcotics, but, yeah.
Q Okay. So when we see documents and posts and things like that, and screenshots that say narc, N-A-R-C, that means narcissist, right?
A It could mean a cop, as you just said.
Q I'm asking you how you use it. How did you use it in your texts? Did you use it as cop in high school or did you use it

as narcissist?
A I would have more been more likely to use it as a narcissist.
Q So I will be clearer then, when we see screenshots of your posts online and you're using the term "narc," that means narcissist?
A Yes.
Q Thank you.
And how many levels of narcissists are there?
A I'd have to get my psychology books out and tell you. There are multiple levels of the degree of narcissism. There's, you know, highly pathological narcissism. There's covert narcissism. There's lots of gradations, and I'm not -- I don't have them off the top of my head.
Q Can you give me an estimate, is it like one to seven?
A No, I cannot.
Q Can't give me any estimate?
A I cannot.
Q But you know that there are levels of narcissism that you teach in your class, right?
A I talk about the psychological delineations of levels.
Q And women come to you online asking you what level narcissist their husband is, correct?
A People don't come to me online for that. They take my narcissist program.

Q People take your narcissist program, and when they do that they are able to chat with you, right?
A No.
Q Well, you testified yesterday that you have a chat within your app.
A I have three groups. If they're in one -- if they're in the business group or in the spiritual group or they're in the health group they chat with each other. I explained that they are peer-to-peer chats. And I go in there and I teach live.
So people don't have opportunities to chat with me unless they reach out to me in my DMs and I choose to respond, which sometimes I do, currently most of the time I don't.
Q Let's -- I'll short circuit this a little bit. There are times when you are online and women will ask you what level their husband is as a narcissist, and you will give them a number, right?
A That doesn't happen. In the past, some of the people that have been in my narcissist program have reached out to me and said, oh, my God, my wife or my husband is such a NARC. I think they're like a -- sometimes people make up levels that don't even exist and say level ten. And so I've definitely had those conversations with a handful of people years ago.
Q Right. And if your former students come in here and testify that groups of students would just give a name, and you would throw out a narcissist number for them without any

thought, is that false?
A They'd be lying.
Q You've never done that? You've never held an online chat where people are allowed to submit their significant other or husband's name and you give a narcissist number?
A No. No.
Q Why is that funny?
A The things that Amanda and Haley have said after years of saying the opposite, I find it funny.
Q Well, let's talk about Amanda, Haley, Jessica McGratty, Paul Thompson's wife. I could probably go on. There's -- let's talk about those. You said that -- because we're talking about your courses. In addition to the online course you also offer what's called a mentorship, right?
A I do a business mentorship, like I talked to you about -- the Court yesterday about Haley was in a business mentorship of mine.
Q The business mentorship's at least $10,000, correct?
A That is -- I don't offer it anymore, but that was the price. It wasn't negotiable. That was the price.
Q And is this the kind of advice you get that the energy and the quantum physics and whales and Akashic Records, is that part of the mentorship?
A No. For Haley I built out an entire business for her, a skin care business that she then went on to make six figures

with. I created the name, the products, the logo, the design, what to name her products, and even the recipes I gave her. And she thanked me for giving the ability to be able to support herself and her child. That was the entirety of the mentorship.

Q At your deposition you didn't even remember Haley and you denied you had any one on ones with her, right?

A I forgot that I had had a mentorship with her, but I have significant proof that I had a mentorship with her. I completely forgot about that.

Q So today, let me be clear, the business plan, the six figures, the skin care line, all that happened before your deposition, right?

A Yes.

Q And at your deposition when you were asked about Haley, you're like, I never had a one on one with her, right?

A Let me explain. When --

Q Is my question correct?

A No -- your characterization of my answer is not correct.

Q We can look at it if you'd like.

A And I can explain it to you, yes.

Q You want to look at Volume I?

THE COURT: What --

MR. ADAMS: Volume I of her deposition, Page 56, Your Honor, for her to read the deposition. I'm just giving notice.

THE WITNESS: Where do I find that?

MR. ADAMS: Volume I, Page 56, Lines 20 to 22.

THE COURT: One second. Let's make sure that she has a copy.

MR. ADAMS: Yup.

THE COURT: All right. This might be a good time, since we're just five minutes away to 10:00 to take the morning recess.

So we'll take a 20-minute break right now. And ladies and gentlemen, we will resume at, hopefully, close to 10:15.

And please -- I know it's tempting to talk to each other about what's been happening in the courtroom. Please don't do that. I know it's tempting to look at things online. Please don't do that.

Just go downstairs, have a snack, hopefully you brought some. Relax. And we'll see you at about 10:15 thank you.

(At 9:55 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. You may be seated.

So, my hope is that when we come back at 10:15 we'll just have the deposition materials, right? We just need to take them out of the envelopes and what not.

MR. ADAMS: Oh, thank you, Your Honor. Yeah, this is the first time. And I will be going through some, so we might

as well do that, yeah.

THE COURT: Right.

So if you want to just maybe flag for Ms. Cortez which ones we need to open now, so that we don't have to open them in front of the jury, that would be helpful.

MR. ADAMS: All three.

THE COURT: Okay. Did you hear that, Ms. Cortez?

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Okay. Great. So we will be in recess until 10:15.

MR. ADAMS: Thank you, Your Honor.

(A recess was taken from 9:56 a.m. to 10:18 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Thank you, ladies and gentlemen.

Let me tell you what the plan is. So I anticipate that we will go for about 45 minutes, take a stretch break, go for about another half hour to 45, and then take our lunch break. Okay?

Of course, you know, things might impact that, but right now that's the plan.

You may continue.

MR. ADAMS: That you, Your Honor.

Just briefly back up before we get to the transcript.

BY MR. ADAMS:
Q Before we broke, you recall your testimony that at your deposition you didn't remember Haley Winter when you were first asked about her, right? You denied having one-on-one conversations, correct?
MR. PORTNOY: Which question -- objection, Your Honor. Compound. Two questions.
BY MR. ADAMS:
Q Did you recall that testimony, before the break?
A I recall what I said before the break, yeah.
Q Okay.
MR. ADAMS: May I read from the transcript, Your Honor?
THE COURT: Well, do you want to lay the foundation for what you are reading from?
MR. ADAMS: Sure.
BY MR. ADAMS:
Q You gave a deposition January 15th, 2025, didn't you?
A Yes.
Q And you remember that? You've read that deposition since?
A Not really. I don't read the deposition. But I was certainly at it and I was deposed, yes.
Q And you recall at that deposition that you testified to before the break when you were asked about whether you mentored Haley Winter one on one, you said no?

A I remember having a conversation about that. I would have to actually look at it to see. I mean, it was almost two years ago now. But I -- I definitely remember something along the lines of that where I had forgotten she did a mentorship with me.

MR. ADAMS: May I, Your Honor?

THE COURT: You may.

MR. ADAMS: The clerk has handed me the certified original transcript, Volume I.

Reading from Page 56, Line 20 to 22.

THE COURT: Do you have a copy in front of you, ma'am?

THE WITNESS: No, I don't.

THE COURT: Ms. Cortez, let's make sure she has a copy.

Do we have a second -- thank you.

Go ahead.

BY MR. ADAMS:

Q 56, Line 20: Okay. Did you have any one-on-one mentoring with Haley?

Answer: No.

MR. ADAMS: And then I'd also like to read, Your Honor, Page 58, Lines 4 to 6. Starting with "but."

THE COURT: Why don't we start with asking her about that first passage and whether or not you read it correctly.

BY MR. ADAMS:

Q Did I read that correctly?
A I'm sorry?
Q The deposition.
A What page are you on?
Q Sure. Page 56.
A Okay. I was on 58 for some reason.
Q Well, there's four on a page.
A Okay.
Q Is that the -- well, yeah, Page 56. You see how they're lined down the left-hand side?
A Yes.
Q And on Line 20, it says: Did you have any one-on-one mentoring with Haley.
Do you see that?
A Yes.
Q And your answer was: No.
Did I read that correctly?
A Yes, on 22.
Q And then --
A On 24 it says: Yes.
Q Right. It says: Any one-on-one engagement at all?
Yes.
A Yes.
Q Question: And what was the context of that?
Answer: She would message me quite frequently.

So that's not -- that's just messaging, right, that's not paid?
A Correct.
Q And it even says, and was that -- question -- Page 57 Line 2 -- and was that a paid relationship or was that just like a friendship thing?
Answer: Neither.
And then on 58 -- you want to say -- do you recall giving that testimony?
A I do.
Q Now, as you sit here today, you know you did have one on ones with Haley, correct?
A I had a mentorship with her.
Q Yeah.
A So just to be clear, when people are referring to one on ones, there was a time in the earlier part of my career where I actually had one-on-one coaching sessions with people over the phone and I would coach them, literally one on one. I stopped doing that a while ago.
Haley was never a one on -- so when I refer to one on one, that's what I mean. So I wasn't a one-on-one coach with her. She signed up for a mentorship, which was a business mentorship. That consisted of two phone calls, one in the beginning to tell me what kind of business she wanted to run, and then I work on the plan on my own, develop the plan for

her, deliver it to her. After she has a time to integrate it, then I have a second close follow call with her on what the business looks like and how to help her go forward.

So some people might call that one on one, but in my vernacular of how I run my business, the one on one was back in the day when I had actual one-on-one sessions with people.

Q So she paid for a mentorship with you $10,000, correct?

A Correct.

Q And a mentorship is, you're the mentor and she's the mentee?

A Correct.

Q And as a mentorship for $10,000, that mentorship that she paid you $10,000, and you met with her and you designed a logo, correct?

A I did her entire business, yes.

Q Created a whole business plan for her, right?

A Yes.

Q And yet, at your deposition you said you had never met with her one on one and she wasn't a business student, right?

A No, because I also said yes. It said any one-on-one engagement at all, and I said yes on line 24.

So the confusion -- that's why I just tried to explain it to the jury, the confusion was using the terminology "one on one" versus the mentorships, which is a very specific closed loop of mentee/mentorship relationship. So that's why there's

a multitude of different categories here.
Q When you would mentor her in the mentorship, it was you on one side, right?
A As the mentor, yes.
Q And she on the other side?
A What do you mean by "side"?
Q As the mentee.
Yeah, mentorship requires two right.
A Yes.
Q A mentor and a mentee?
A Yes.
Q One on one?
A Mm-hmm.
Q Then how much do you think she spent on all of your courses, or do you know?
A I -- I don't know. I know she made six figures from that mentorship, but I don't know what she spent personally. I would have no way of knowing that.
Q So if she contends she spent over $25,000 on your courses, do you have any information to dispute that?
A No.
Q Okay. And you also counseled Haley -- in addition to the business, she also came to you directly for problems she was having with a custody dispute, right?
A I never counseled her, but she definitely did come to me

and I had conversations with her about it.
Q Let's take the word "counsel" out. But you talked with her about it, right?
A Yes.
Q You gave her your thoughts on the situation, correct?
A Yes.
Q And you're not licensed as a family counselor, correct?
A Correct.
Q You are not a family attorney?
A Correct.
Q You don't have any training in domestic disputes, correct, as an attorney?
A I'm not acting as an attorney, right, because I'm not one anymore, so no.
Q So I just want to be clear though, when you are not counseling her, but you're talking and you're giving your thoughts on her custody battle, her divorce, you are not licensed to do that, correct?
A Incorrect, because I'm advising her as a mentor. You don't need to be a licensed mentor. There is no such thing. And I would tell her things like, always follow the law, because if you try to break the law in custody you will lose your child. And there are a multitude of places that I shared that with her, which you will see when she testifies.
But that's advice, that's mentee/mentor. And I did

give her advice when I felt I had something that could help her. And that is not something you need to be licensed for to give somebody advice.

Q Had you ever --

A I didn't give her legal advice, financial advice, or any other type of advice that would require a licensing.

Q Now, you've testified you kicked Haley out of the group, right?

A I removed her from the group after she made a deal to give up her child to the man she said for years abused her, after I had helped her for all those years, hoping for her to get the child to safety. And she succumbed at the end and made a deal with him, and I said to her, don't -- don't contact me. I can't have this in my life anymore.

Q And you understand that Haley tried to take her daughter over the Canadian border into United States, right?

A I found out about that through Amanda, yes.

Q Haley, just so we're clear -- did you ever meet Haley in person at any time?

A No.

Q Okay. So all of the mentoring where you worked with her on the $10,000 mentorship, that was online?

A That was two phone calls that bookended the -- primarily me doing the work, the bulk of the work, creating the business for her. And after I had assessed what she wants, what type of

business she wants to have, I create the business, create a whole business package, deliverables are, here's the outline of your business, your business plan, all the information, here's my recipes to make the skin care, here's the names. And then we have a follow-up call on the phone. So there wasn't online back and forth, for the most part. She may have asked me question here or there. But for the most part it's me doing the work and delivering the work product and then having a call for follow ups.

So I would categorize the mentorship as a telephone and then me doing the bulk of the work in between. So it's different than speaking with her on Instagram, direct messaging, when she would ask me for advice about what she was going through with her custody situation.

Q So let me get this straight. In the mentorship, she tells you the business she's thinking of in a phone call, correct?

A Yes.

Q You don't speak to her again. Instead what you do is you work on a business plan for her; is that right?

A In a very condensed nutshell, yes.

Q And you created a logo for her, correct?

A I created a few logos for her. That's something I do for fun. I'm also an artist. And so I don't know if she ended up using my logo, but I created several, I remember at least like three or four logos that I created for her, and the business

name and the names of the skin care products like a scrub and an acne cleanser, and dry skin cleanser. And I gave her some really cool names to name the products.

And then she actually launched the business and started making a really good income right away.

Q How is that mentoring, in your mind?

A It's mentoring a budding entrepreneur. One of the greatest joys in my life is to see people who have been financially destitute, especially in brutal custody cases, be able to go out and make a living and earn money for themselves and for their children.

And I have a lot of experience in building online businesses, I'm really good with that. And I share that with my students. And many, many of my students now have successful entrepreneurship ventures that have doubled or tripled any money they were able to earn in the past. So that's -- to me that is like the essence of mentorship is using experience you have to help another person do something that they want to do in the world and, you know, you can teach that to them. So that's what a mentorship is to me.

Q Yeah, but your testimony was, you had one phone call, you went back to your work space, create all the stuff for her, as you called deliverables, and then sent it back to her. How is that a mentorship and not simply financial business advice?

A There's zero financial advice. There is how to become an

online entrepreneur, how to create a business. Her --
Q Excuse me. The business plan does not have any financial advice in it?
A Absolutely not, there's no financial advice.
Q Your business plan doesn't have any financial advice?
A It's how to build and create a business. Hers happened to be products based. I do products-based businesses or online. But the mentorship part of it is in the two calls, they're quite lengthy, in how we assess -- I get a lot of information. What do you like to do? What do you want to do? What are you good at? What are you passionate about? How can we turn your passion and your love into a business where you can make money doing something you love.

So I take all the information and then I talk -- I even on that call -- that's why I always call those a mentorship call. I ask, Would you want to do a products business, or on online business, or coaching, what style of business? Are you a person who wants to be online all the time or more out in your community and going to farmers markets. And that was Haley's thing, she's, like, I want to do something local and build a local business.

So all of that gets discussed during the mentorship part of the call, getting to know her in terms of her business goals and what she wants to do and what she loves. And she had a lot of excitement about doing something locally in her

community.

And then I take all of that and I put together with my experience and what I know and what I knew I could help her with, and I create that. And when I'm done with that, I deliver it to her in the form of, here's your plan, here's my ideas for the name and the name of the products, and here's how to market it. And here's -- you can -- you know, I give them lists of, like, here's how to go to farmers markets, and try to get your products in yoga studios, or aestheticians, or spas. And all these ideas for the promotion of the business. So I have marketing sections on how to market your business.

And then I had a whole section with all of the recipes, because I have my own program that I sell called Skin Care Secrets, and it's one of my best selling programs. And I gave her all of those included for free, I said, you can use my recipes, you don't have to pay me a copyright fee or anything like that.

And then once I deliver all of that, the person who's the mentee has time to digest it all, start implementing it, and then I offer a follow-up call at whatever time they want to schedule. Sometimes they want to do it right away, sometimes they're, like, let me get the business going and then I'm going to want to get some more advice from you. And we have the second call and we talk about that, and how's the business going? What challenges are you facing? What can I help you

with? And I help the people kind of move their business along. And with Haley, it worked out great because she ended up doing incredible in a pretty short period of time.

Q And in addition to that, you also were -- let's get back to the counseling or the discussing with her her custody dispute in which you provided your thoughts on.

You hadn't met her in person at all when you were doing that, right?

A I was never counseling her. I was advocating. I advocate for victims of domestic violence and --

THE COURT: The question was -- he didn't use the word "counseling," he corrected himself.

THE WITNESS: Okay.

THE COURT: The question was: You hadn't met her in person at all when you were doing that, right?

THE WITNESS: When I was doing what? Can you repeat that?

BY MR. ADAMS:

Q Mentoring. The mentoring you just got done two minutes telling us what you did, you didn't meet her at all during that whole process?

A I've never met Haley Winter in person.

Q Okay. And just for clarification, Haley Winter is Byron Horvath's ex, right?

A Correct.

Q And Haley and Byron have a little girl together named Ayla, right?
A They do.
Q And Haley told you the custody dispute she was having with Byron, right?
A She told her whole community, yes.
Q Okay. Can we focus on my question? So I understand you want to get out your side, but if you focus on mine, this will go a lot quicker.
She told you about the issues she was having with Byron, right?
A Yes.
Q And at one point she texted you and told you she was going to take Ayla to the cardiologist in United States, right? You testified about that yesterday.
A That wasn't a text to me, that was a message to the whole group, but yes, she did say that and I was aware that she was going to take her child to a -- supposedly, to a -- one of the top cardiologists in the country. Because I think she said her daughter had had three or four open heart surgeries, and this physician in Florida, I think it was, had some kind of unique expertise. I don't know what that was, but she definitely did say that to the group.
Q And this was during the time that you were counseling -- you were -- this was during the time when you -- she was

telling you about her dispute and you were giving her your thoughts?

A Yeah.

Q When she told you that she was thinking about taking Ayla to the United States to see a cardiologist?

A When she shared that with the group, this was probably in, like, the heat of her problems with Byron, yes.

Q It's your group, right?

A It's a -- yeah, it's one of my communities, right.

Q You keep trying to distance yourself from it. She's texting people about her situation in your group, right?

A I'm -- I'll explain it again. I'm not --

Q I'm just -- please try to focus on my question.

MR. PORTNOY: Your Honor, the witness is trying to answer. If there's something improper, I think you would rule on that.

THE COURT: All right. So let's just start over.

The question is: It's your group, right?

The answer was: It's -- yeah, it's one of my communities.

MR. ADAMS: Okay. I'll move on. If there's another question pending, I'll withdraw it.

THE COURT: Okay.

BY MR. ADAMS:

Q Let's turn to another one of your students then. And

that's a witness we anticipate coming in named Amanda Brady. You know Amanda?
A I do.
Q And you've known Amanda for a long time, right?
A She's been in my community a long time. I had a lot more contact with her since this defamation started. So, yeah, I've -- she's been in my community a long time, but I would say I know her more in the last couple years since 2022. Sorry, so four years.
Q And she's a person -- since 2022 or since 2018?
A No, I think she was in the community since 2017, if I remember correctly. But I could be wrong with that exact -- she's been in the community a while. But I didn't really personally know her in any way until the defamation started, because she was the original target of the defamation. That account was originally the Brady Bunch downfall before it became Liana Shanti Cult Recovery.
So when that started we both had been attacked. So from 2022, when the attack started and ongoing, we had a lot more contact with each other, because we were both involved in legal issues with respect to the defamation and just the personal part of it.
Q And so Amanda, who -- what name did you give her?
A She wanted a new spiritual name because she was not close with her family at all, and hadn't been for over a decade. So

her name that she chose was Malie.
Q Well, you came up with that and told it to her and adopted it, right?
A She asked me if I would kinda', yeah, pray for a name and get her one. I did.
Q You came up with the name, right?
A Yes.
Q Okay. So she wasn't to go by Amanda anymore, in your group, she was Malie?
A I think she still did go by Amanda. I don't think she ever changed her name, but she did go by Malie online. I know that.
Q You gave her -- you came up with a new spiritual name and she accepted it?
A Correct.
Q And Amanda, just so we're all clear, to bring it all into the courtroom, Amanda is the ex-wife of Paula Haygarth's husband, correct?
A Yes.
Q Yeah. His name is Wade Martin, right?
A Yes.
Q But Wade's not a defendant in this case, right?
A Correct.
Q Wade submitted a letter in -- as a victim witness statement in your probation, right?

THE COURT: Get closer to the microphone, please. Thank you.

BY MR. ADAMS:

Q Wade submitted a letter in your probation, right?

A Paula and Wade. It was actually one letter, and Paula wrote it. But his name was on there, I believe, as we figured out yesterday. I originally only saw Paula's name, but I think it was concluded that, in fact, Wade also was on that letter. So it was a joint letter.

Q Yeah. When you looked at it closely, it's a joint letter, it just happens to be signed -- digitally signed by Wade first in the middle of it, and digitally signed -- or printed out by Paula at the end, right?

A Yeah. In my copy I didn't see that. But either way, it was a joint letter, so...

Q And Stefanie and Byron also submitted a joint letter, right?

A They did.

Q Why isn't Wade a defendant?

A Because I genuinely don't believe that he had anything to do with any of this. I think it was all Paula, and I think he kind of got dragged in. And I think he's just one of those very disempowered males who -- I really don't have any blame on him for anything. I think he's probably deep down just unaware of a lot of what his wife has done. So I didn't want to

include somebody that I felt was innocent just because he was married to her, and I just didn't feel like that would be right.

Q And Amanda and Wade have two daughters, London and Ellis, right?

A Yes.

Q And Amanda took London and Ellis from Canada to Florida, didn't she?

A Yeah, she had full custody.

Q She did that while she was a student of yours, correct?

A Yeah.

Q And Haley told you she was going to go to Florida for the cardiologist, right?

A She did.

Q And so when Wade and Byron got together to try and find out where their daughters are, if they're going to Florida or not, you have a problem with that, right?

A No, that's not -- no.

Q Well, you testified that you had a problem with -- well, I don't want to characterize it.

But you understand that the Horvaths reached out to Wade to try and get help with their situation with Haley, right?

A No. That's not it at all.

Stefanie Horvath cold called Paula Haygarth, a

complete stranger, and asked her to submit an affidavit that would help facilitate the taking of Ayla and giving her to Byron, because Haley had primary custody. So she called a complete stranger, and a complete stranger wrote an affidavit in a Family Court case she knew nothing about to help a man that had been accused of abuse get his child. So that's actually what happened.

What -- Amanda taking her two daughters to Florida, she had full custody of her daughters, and there are multitude of lawyer letters where her lawyers says Amanda had every right to have her kids there. And there's been no dispute with that. And they have equal -- or some kind of visitation schedule with Wade Martin, completely unrelated, very different situation than the situation Haley was in with Byron.

Q And there -- Amanda, she'll be coming in. She's expected to come in to testify. She spent over $80,000 on your programs. Does that sound right?

A It's definitely possible. For sure.

Q Who spent the most on your programs? Do you have, like, a diamond tier, gold tier student list?

A No. This isn't multi-level marketing. It's a business where people can buy what they want on the internet. So I don't really know how much they buy. Sometimes people say, Hey, I bought everything you ever sold, and I really don't know who they are until they tell me that. But if she says it's

80,000, there's a likelihood that that's true.
Q You mentioned multi-level marketing.
A Um-hmm.
Q What's your understanding of what multi-level marketing?
A A company like Young Living Essential Oils or the old back in the day Amway, Avon, things like that where you sell a product that's belonging to a huge corporation and you become sort of an agent and you sell their products and then you have a down line, and they sell products underneath you and then the commission goes upward. And you have, you know, a flow of money coming from people in what they call your down line. It's a pretty common form of business ownership.
Q Now, yesterday -- well, is -- multi-level marketing, just like you said, would you agree with me then that one person could be a salesperson and have multiple salespeople under them, or the way the multi-level marketing works. That's the levels, right?
A I'm not an expert in MLMs. I just -- that's my understanding. Because I buy products from a product called Melaleuca, just because I like them and they're non toxic. I've been buying those products since I was pregnant with my daughter, because I decided for a whole --
THE COURT: Let's stick to the original question.
THE WITNESS: Okay.
THE COURT: Which was --

THE WITNESS: So I don't have an understanding of MLMs, other than what I just shared. I'm not an expert in that.

BY MR. ADAMS:

Q Well, you described your understanding MLMs, and you used it in your response. Isn't what Noelani does for you a multi-level marketing plan?

A Not even close.

Q Well, let's -- she -- you have a certificate program, certificate school in nutrition that she runs, right?

A She's a commissioned salesperson. That's not MLM. There's no down line, there's no up line.

Q She's selling your products, right?

A She's a commissioned sales agent.

Q And she doesn't have any salary, it's just commission, right?

A Correct.

Q And you take a portion of the commission -- of the sales, right?

A They're my programs. She's -- I'm the one paying her a percentage of the total cost of my program so she can get paid when she helps facilitate -- kind of like a salesperson for anything, a car, a home, she gets commission.

Q And part of what she does is train other people to sell your programs, right?

A No. She doesn't do that. Nobody else sells the programs but her. She's the person who they talk to. She coaches a group, we have a group called Booked and Paid in the app, that's the Health Coaching Group I talked about yesterday where people who are health coaches come in, they want to learn how to be successful like she is. And she gives classes on how she built her business, and she started going to churches and giving free lectures. So she's coaching --

THE COURT: Ma'am, if you would slow down just a little bit. You're starting to get a little fast. So let's slow it down. Thank you.

THE WITNESS: She coaches up and coming coaches how to get their business rolling and make money in the way that she did. She used to be an engineer, she became a health coach through HMI, and significantly increased her income. So she passes that knowledge on to people, so she teaches in that group. That's a function that she does. She's not teaching anybody how to sell my programs. I don't let anybody sell my programs --

THE COURT: Slow down. Slow down. The court reporter is having a hard time. She's the best court reporter I've ever known, so if she's having a hard time, you're going too fast.

THE WITNESS: It's the New York. Okay. Slow down.

BY MR. ADAMS:

Q Okay. Let's move on to the nine people that you testified

yesterday -- or the nine total people that you have discussed their divorce and/or custody with. Okay?
A Okay.
Q And you know who those nine are because you testified about it yesterday. And all nine of them submitted letters in connection with your probation, right?
A Yes.
Q So 100 percent of all of the people that you worked with with respect to this custody dispute, sexual abuse, hundred percent of their spouses wrote letters against you, right?
A I wouldn't say it's a hundred percent, because there are some other people that have had disputes, but it didn't get to the level of really horrific, like these particular nine people. So I wouldn't say a hundred percent.
Q Well, I'm talking about the testimony you gave yesterday. You said that you taught nine -- and you don't do it anymore, right? You're not doing it anymore. In fact, you said you wised up and you wouldn't do it anymore. You learned your lesson I believe was the testimony, right?
A No, that's not exactly what I said. I don't offer any guidance and advice anymore, because unfortunately it brought this into my life. So I moved it to a higher level to do advocacy more broad, which has been great, but...
Q You no longer get involved in families, right?
A I'm no longer willing to put myself in between people and

their abusers, is what it is.
Q And that's because of the nine that you did, you affected their families so much that a hundred percent of their spouses took the time to write a letter and submit it to a U.S. District Federal Court to try and stop what you were doing, right?
A Incorrect.
Q And doesn't that show that -- how hard it is to actually be someone that gives their thoughts on complex issues like childhood sexual abuse and custody disputes?
A I have no idea what you just said or what you're talking about.
Q Well, yeah, because nine of the people that you -- not counseling, but that you gave your thoughts on, that you were talking about, and now you don't get involved in families anymore, the reason is because a hundred percent of those families turned against you, right?
A No. The reason is because every single one of those nine men either had extensive existing domestic violence orders, all of their spouses were exposing them online and talking about the abuse and sharing things like photos and videos. And their spouses attempted to silence their wives. It happened to be all women in this case. And it worked. In the Family Court they were all gagged. And they then went after me as their high value target to try to silence me, which I refused to be

silent about. It's a huge part of -- that is what I do now is advocate on a much bigger level.

So nobody turned against me, it was the ex-husbands, the abusers, who were furious and have tried to and continue to this day to intimidate -- literally today, to intimidate me to be silenced.

Q It wasn't just the abusers. There was 21 letters. There was 11 -- not -- nine people that you said were abusers, and then 11 others that were family members, including mothers and sisters, right?

A There were ten family members and then there was the kidnapper, Joe Szimhart, who they recruited to write a letter. So there were nine men accused of abuse. There were ten of their mommies and sisters, and then there were the -- the singular letter from Joe Zimheart, the kidnapper.

Q And didn't that tell you that you didn't know what you were doing with respect to getting involved in family custody disputes?

A I didn't get involved in family custody disputes. I advocated for women to have safety and to give them resources guidance and advice on how to best protect themselves as they were going through a course of control and abuse. I did not get involved in their personal situations. And it taught me only that my willingness to go out of my way to help people sometimes causes me great and extreme harm, mental, physical,

emotional, spiritual, and financial.

And so I chose for my own well being to redirect my advocacy on to a bigger platform versus being willing to speak to individual people and getting myself in the place where I become a target of very violent and abusive men, including the one sitting in this courtroom right now.

THE COURT: That last sentence will be stricken. The jury is instructed to disregard that last sentence.

MR. ADAMS: Can I have my question read back, please?

THE COURT: Yes. Your question was: And didn't that tell you that you didn't know what you were doing with respect to getting involved in family custody disputes?

BY MR. ADAMS:

Q Isn't that why -- because custody disputes are so difficult, isn't that why attorneys have to be specially trained when they deal with that?

A For people that actually deal with those disputes in the courts, I believe there are attorneys that specialize in custody, for sure.

Q Do you deny on the stand under oath that you encouraged anyone to go to Florida and take their children away from their abusive spouses?

A I have never told anyone to take their child away from their spouse, ever. I always tell people they must always follow the law, and the record shows that.

Q Well, 21 people submitted letters that said that you interfered, right? That's what they were saying, that you interfered, and that interference violated your probation, right?
A It didn't violate my probation, and that's the --
Q My question is that they made that claim.
MR. PORTNOY: Your Honor, please?
THE COURT: All right. She was about to answer that question.
MR. ADAMS: All right.
THE COURT: The question was: Well, 21 people submitted letters that said you interfered, right? That's what they were saying that you interfered and that interference violated your probation, right?
And the answer was: It didn't violate my probation.
Next question.
BY MR. ADAMS:
Q The letters, though, the 21 letters that were accepted by the court all claimed that you interfered with child custody issues, right?
A That's why I have a conspiracy claim, yes, because they made that up.
Q And you already testified that those people, nine of them, were a hundred percent of the women that you actually worked with in the child custody dispute issues. And that's a hundred

percent of the people that came out against you, right?
A Like I said a few minutes ago, I'm not putting percentages on it. Those were the people that had the most heated disputes, and all of those husbands did form a conspiracy to terrorize me and to destroy my life and my business.
The fringe people -- there are other people that went through divorces that didn't have the contentious type of situations that those nine had. So to say a hundred percent is not really relevant. But the nine that were having very scary situations, all of those nine and their family members wrote letters.
Q And that didn't give you any indication that you were doing something wrong?
A It showed me I was doing something right because they were scared and they wanted silence.
Q You're not wrong -- you were never wrong in that one, right?
A You'd have to be more specific. I'm wrong plenty of times.
Q Withdrawn. Withdrawn.
You also had a -- one of your students, Jessica McGratty, you know her?
A I know of her, yup.
Q She filed a restraining order against you in South Carolina for her and her kids, right?

A She took a settlement because I delivered a 40-page document, so that didn't go --

MR. PORTNOY: Objection, Your Honor. Total objection to any testimony about this person. She's not been on the defense witness list and it's all hearsay.

THE COURT: All right. I'll sustain the objection.

Although, Mr. Portnoy, this should have been a Motion in Limine.

MR. ADAMS: Well, I can refresh this witness's recollection if she wants to look at Exhibit 1159, Your Honor.

THE COURT: All right. Let's do this. Let's have you folks take a stretch break. It's a little bit early for that, but let me talk with the attorneys at sidebar. So this will be the one stretch break that I promised earlier.

(Sidebar on the record:)

THE COURT: All right. So where are we going with this? I mean, what is this? How is this relevant?

MR. ADAMS: So, she was called a child trafficker, right. The defense -- the claims we're defending is that she's a fake lawyer, a child trafficker, encouraged her kids to go -- take parents away to Florida. That's where this is going. This is another student of hers that had to get a get a restraining order in North Carolina against her.

THE COURT: Okay. And how is this not hearsay?

MR. ADAMS: I just want to know if she -- the

restraining order -- she received it. It's an actual document with her proof of service -- there's a proof of service in this these documents. You can see --

THE COURT: But where does it say what happened that formed the basis for this?

How much longer do you have on cross? Are we going to make it to the break on cross.

MR. ADAMS: I've got some time.

THE COURT: We're going to deal with this.

MR. ADAMS: No problem. You want me to move on?

THE COURT: Yeah.

MR. ADAMS: Are we taking the break now.

THE COURT: No, no, no. So we're going to take the break at -- I think it was 11:50. And then we'll deal with this.

MR. ADAMS: 11:50, because that's like an hour.

THE COURT: Well, why don't we do this: You finish, we'll take a break and we'll deal with this.

Well, actually, Mr. Adams, how much longer do you think you have?

MR. ADAMS: About an hour.

THE COURT: Okay.

(End of sidebar.)

THE COURT: You may move on, Mr. Adams.

MR. ADAMS: Thank you.

BY MR. ADAMS:

Q Jessica McGratty was a student of yours, right?

A Correct.

Q Did she submit a letter in connection with your probation?

A She supported me. She wrote a very glowing letter supporting me on how instrumental I'd been in her life and saving her life, because she had been a former cocaine addict and alcoholic. And she went through my programs, and she said that through my programs and my guidance she became a much better mother. So she sent that letter in in 2023.

Q Who were the other nine -- we have Haley and Amanda. Who were the other seven women that you counseled whose husbands submitted letters in your probation?

A I might not remember all of them off the top of my head, it was years ago. But Jess Thompson, because Paul Thompson wrote a letter.

Jack Fiorvante. And he was a father of one of my students, not a husband. So that wasn't a custody case, but he's one of the nine. And he was one of the people that had put my probation officer's number on his Facebook account and he --

THE COURT: Let's just have you give us names, Ms. Wilson.

THE WITNESS: Okay.

THE COURT: The additional information is something

that if Mr. Portnoy thinks is important, he's going to have the opportunity to ask you. So let's just stick with the names right now. Thank you.

THE WITNESS: Jack Fiorvante.

Paul Thompson.

Obviously, Byron Horvath.

Timothy Jensen.

Dennis Tiblis.

BY MR. ADAMS:

Q How come none of them are named in this lawsuit, other than the ones you have named?

A Because I believe your clients are the conspiracy. They started the conspiracy and they dragged the other people in.

Q You don't have any particular knowledge or skill in identifying anonymous users online, right?

A No, I don't.

Q And so you don't have any -- yourself, any particular basis other than your belief that Byron Horvath submitted anything anonymously online about you, right?

A We have a lot of circumstantial evidence, which we're presenting in this case, that's what I have.

Q Other than your belief, you personally don't have any information that Byron Horvath posted anything anonymously about you online, correct?

A I have everything I'm presenting in this case. That's

what I have.
Q I'm asking about you personally.
A Mm-hmm.
Q Other than your belief, you don't have any information that Byron Horvath posted anything anonymously online about you?
A All of the information I personally have has been submitted in this case as circumstantial evidence.
Q And is that the same for Stefanie Horvath, that you don't have any personal knowledge that she posted anything about you anonymously online?
A All of my personal knowledge is included as evidence in this case.
Q You're an attorney, you understand -- you went to law school, you're not an attorney, but you understand what personal knowledge is, right?
A Everything I -- yes, for everything that I've been given personally and we've collected and we're submitting is circumstantial to show that hiding behind anonymity, you know, you have to prove it. So that's what our job is here is to prove it.
Q That is your job, right?
A It is.
Q And you understand -- well, let me finish out.
So Paula, Paula Haygarth, you don't have any

information, personal knowledge, that she posted anything about you anonymously online, do you?

A I do, and I submitted it in this case as circumstantial evidence.

Q And isn't it true that -- well, you said you don't have any special training for identifying them, but you are what's considered a public figure, right?

A According to this Court I have been designated that, yes.

Q Well, you live your life online, right?

A No, I live my life extremely privately, that's why there's no videos or pictures of me. But I sell programs online, so my entire business is an online business, but I'm not at all living my life online. I don't share my life online personally at all.

Q Well, you have at least five different Instagram accounts, right?

A I have my artist account, because my -- yeah, artist, business, spiritual, health.

Q And then Liana Shanti?

A That's the spiritual -- I call that the spiritual one.

Q Oh, the one that's @LianaShanti is your spiritual account?

A Correct.

Q So in your spiritual account you call people child abandoners and pedos?

A That's my personalized, like, advocacy platform in the

stories. If you look at -- I'm sure you've looked at my Instagram, the actual content on my Instagram is all spiritual and empowerment and encouragement. In the stories is where I primarily advocate and give people resources and share links and share posts from other organizations, it's always on that account.
Q And you have tens of thousands of followers, right?
A Correct.
Q And as a public figure, you understand that it's your duty to show that my clients posted things that are untrue with malice, right?
A I do understand the burden of proof, yes.
Q And do you know what malice means?
A Not the exact definition, but intention to harm is what I would say it means.
Q And do you have any personal information, you, that any of my clients had malice when they posted any of the things that you allege they posted?
A Yes, because they outed themselves when they wrote letters to my probation officer. And that was the moment I knew. That was like my "gotcha" moment, they finally revealed themselves. So I do have personal knowledge. That was very malicious what they did in trying to tie a bankruptcy from 2011 --
Q Wait, wait, wait, you filed this in 2022.
MR. PORTNOY: Excuse me.

MR. ADAMS: She's nonresponsive.

THE COURT: One second. Okay. Let's not talk over each other.

The question has been answered. Let's ask another question.

BY MR. ADAMS:

Q You filed this lawsuit against my three clients naming them in 2022, correct?

A Correct.

Q And then the outing, after they had already been sued by you, was in 2023?

A Correct.

Q So they didn't out themselves. You already sued them.

A Because I already -- I already knew that it was them. I'm just saying that gave me have the proof. I didn't have as much proof then as I have now. I knew it was them, that's why I filed against them. But the proof came when they outed themselves in the letters.

Q They submitted those letters under their own name.

A That's what outed them. That was the -- that was the blessing from God.

Q You already sued them. How is that outing six months later?

A I already sued them because we had reports, investigative reports, things that to me led me to believe it was them. I

believe to this day that from day one I knew it was the three of them. And then -- so that's why I sued them in 2022, because I said, These are the people. I know these are the people, based on information I received, collected, the source intelligence report, all of that.

And then in the following year in outed themselves because they were so vicious that they were trying to -- literally try to get me put in jail by making up lies. And that was the grace of God that they, in trying to really harm me to that level, they outed themselves, otherwise it would have been much harder to prove that it was them. So the timing of it is exactly what I just described.

Q The -- you mentioned yesterday -- I'm just going to switch gears a little bit here. I want to talk about the probation, the felony.

You testified yesterday that it was one little mistake about your mother-in-law's ring that your husband forgot about. Do you recall that?

A I do.

Q And isn't it true that the indictment for concealing assets in bankruptcy included more than just a diamond ring of your mother-in-law's?

A In criminal indictments they don't have any burden of proof, so they slap on 20 different things. We took a plea for one count, and it was concealment of a single ring. So what

they indict you for is they throw everything against the wall. And we ended up taking a plea deal on the one issue that I discussed yesterday, which was the ring.

Q And they indicted you on not only hiding the ring, they indicted you on hiding business assets of the Raw Vegan, right?

A And that was proven false because the business started a year after the bankruptcy. So that's why it wasn't in the plea deal, it was just the ring.

Q As part of the bankruptcy, you're supposed to report your assets, right? It's a whole process. You hadn't been cleared of bankruptcy when you started Raw Vegan. Is that true?

A I was still in the proceeding.

Q Yeah. And so as part of the indictment -- we can look at it if you want. Exhibit 1200. If you need it to refresh your recollection.

A Like I said, it never went anywhere, we took a plea deal for one thing, which was the -- they can indict you for 30 things. It becomes nonrelevant when you have a plea deal and it's for one count. And that was the one that we took a plea deal for. So whether it's ten charges, 20, 50, they all become irrelevant the minute you have a plea deal and you get put on probation. And that's what we did, and it was for concealment of a singular asset.

Q Well, they may be irrelevant to you, but I'm not sure they're irrelevant in this case, because the one thing that you

mentioned yesterday when asked about it in front of your attorney, you blamed on your husband, right? A ring.

A I'm not blaming anything on anyone. I took full accountability, that's why I'm on probation.

Q Well, but you didn't mention that the indictment was also for failing to disclose the Raw Vegan business assets, right?

A Indictments are not proven. And my business started a year after the bankruptcy, so there's no reason to bring that up. It's completely a non-issue.

Q An indictment are criminal federal charges against you. The FBI came and put a gun to your head, right? That was your testimony.

A To my husband's head, correct.

Q And they had multiple reasons, and you only testified about one, didn't you?

A They didn't have multiple reasons. Those reasons weren't -- couldn't be proven, which is why I did a plea deal for one count of the indictment. It's very common in that type of law.

MR. ADAMS: I'd move to have Exhibit 1200 admitted into evidence. It has been judicially noticed as part of the criminal proceeding. It is the indictment.

THE COURT: Mr. Portnoy, what is your position on Exhibit 1200?

MR. PORTNOY: I'm getting it, Your Honor. Please.

Thank you.

Well, just looking at it, it's sealed by order of the court.

THE COURT: Well, I can tell you it's now unsealed. It's not sealed any longer. That's what's stamped whenever an indictment is filed, and then it becomes unsealed later, so...

MR. PORTNOY: I have no objection.

THE COURT: All right.

MR. ADAMS: May I publish, Your Honor?

THE COURT: You may. Exhibit 1200 is admitted and may be published to the jury.

(Defendants' Exhibit 1200 was received in evidence.)

MR. ADAMS: Oh, can we publish it from counsel's -- yeah. Thank you.

Can you reduce it a little bit?

Do you see it up on the screen? Can everybody see the -- is it up -- okay. Great. It's even working over there.

BY MR. ADAMS:

Q Can you see this indictment? This is you, correct?

A Yeah, I can see, like, the cover page.

Q And if you scroll down to the second page, it lists the things that you are alleged to have fraudulently concealed from the bankruptcy trustee. One of them is the diamond ring -- well, it's actually a cashier's check for it.

Another one is a long-term disability insurance policy

and a claim made on the long-term disability policy. And that was paying you how much per year?

A These are allegations against my husband and I. And again, they were not part of the plea deal. So they're just allegations. I don't have much to say else, other than that. You can read -- everybody can read what it says.

THE COURT: I'm going to ask counsel to blow up the entire exhibit. I don't need to see what's in the background of your computer screen. Thank you.

BY MR. ADAMS:

Q So the cashier's check is one. The long-term disability -- I asked you, how much was that per year?

A These -- these are issues that are --

Q What was the allegation that the government was making against you?

A I -- I don't even remember that. There was allegations -- the ring I remember, obviously, because we did a plea deal. I have no recollection of what the other -- I remember they claimed the assets of my business, but that was unfounded. So, yeah, I just know the ring.

Q You don't know anything about this long-term disability insurance policy and a claim made on the long-term disability policy --

A I don't remember what they were alleging.

Q -- that you were indicted for and pulled out of your house

by FBI agents at gunpoint? You don't know?

A I don't -- I don't remember what they were alleging. I -- seriously do not, because it wasn't relevant.

MR. ADAMS: You can take it down.

BY MR. ADAMS:

Q I want to talk -- so let's -- let's -- yesterday, briefly, you talked about PTSD and that your damages here in this case you suffered from post-traumatic stress; is that correct?

A Yes.

Q Isn't it true that you have been diagnosed with PTSD for over 13 years?

A Yes. It's actually longer than that. Yeah.

Q So, well, you testified yesterday that you got diagnosed with PTSD after 9/11 because you were living in New York?

A Mm-hmm.

Q Understandable.

The -- but then in 2013 you were going through some litigation here in Hawaii, right?

A 20 -- what are you --

Q Sure. If you want go ahead and take a look at Exhibit 1008. I'm sorry, 1002. It's a letter from your doctor dated January 30th, 2013.

MR. ADAMS: This is not in evidence, Your Honor. I'll see if we can --

THE COURT: If we can give her Exhibit 1002, which

should be in Volume I of the defense.

THE WITNESS: I'm sorry, Your Honor, which number?

THE COURT: 1002.

THE WITNESS: Okay.

BY MR. ADAMS:

Q Have you had enough time to see it, Ms. Wilson?

A Yes. Can I ask my counsel? This was privileged information given --

THE COURT: Well, no, you can't ask your counsel a question. He's asking one question. Does this refresh your recollection, with regard to his original question was that, in 2013 you were going through some litigation here in Hawaii.

THE WITNESS: This is a statement from my doctor.

MR. ADAMS: Yeah.

THE COURT: Does it refresh your recollection as to the question of whether or not you were undergoing litigation in Hawaii in 2013?

THE WITNESS: No, it does not. It establishes PTSD, is what it does.

BY MR. ADAMS:

Q This is a medical record of yours, right?

A Correct.

Q You produced it in this litigation?

A I did.

Q And you produced it in response to proving your claim of

damages of post-traumatic stress disorder PTSD, right?

A No. This document was submitted when the defendants' attorneys -- you weren't part of it back then. But when they were requesting information about my service animal and objecting to him being on a Zoom call. And we had two months of litigation about my German Shepherd. And I was trying to resolve that without the court, and I said I really do need this dog. And I was trying to help in giving a medical record, which I wasn't required to do. And it's actually an illegal question --

THE COURT: It is not an illegal question. I get to decide what's legal and not legal --

THE WITNESS: Okay.

THE COURT: -- in the courtroom. All right?

Next question.

BY MR. ADAMS:

Q You stood here yesterday and testified and asked this jury asked my client for money because my clients caused you PTSD, right?

A That's not accurate. They didn't cause my PTSD. I have PTSD for a very long time. And I have had therapy for it and other treatment modalities and got myself to a place where it was very stable in my life and very much in the background. They claim PTSD never goes away, but in my experience I've had years of really complete peace.

And when this whole attack started, especially in 2023 with the probation situation, I went into that freeze year, and it reactivated my PTSD, which is unfortunately for me, and anyone whose suffered from this, very common that certain life events can trigger something that -- of course, it was a preexisting condition but it was manageable for many years, until it wasn't, and until what happened to me.

And I never blamed them for causing it. That started at 9/11. But it was something that got reactivated. And that's how I was referring to it. I wasn't trying to claim that they're responsible for the origin of it.

Q Are you not making a claim for PTSD against my clients in this case?

A I am.

MR. ADAMS: Your Honor, I'd move to admit Exhibit 1200 into evidence.

THE COURT: What's your position, Mr. Portnoy?

I'm sorry, you said 1200. You mean 1002, right?

MR. ADAMS: No, it's 1200.

THE COURT: 1200.

MR. ADAMS: It's a impeachment document.

THE COURT: One second.

MR. ADAMS: I'm sorry. I'm sorry. You were right, Your Honor. I was using the wrong term. It's 1002. Sorry.

THE COURT: Okay.

MR. ADAMS: Sorry. My apologies.

THE COURT: Okay. Now that we're back with the correct exhibit number.

Ms. Cortez -- Ms. Cortez.

MR. ADAMS: Sorry, I took you on a wild goose chase. Apologies, Karla.

THE COURT: What's the plaintiffs' position?

MR. ADAMS: 1002. It's the one she was looking at.

THE WITNESS: Okay. I just switched binders.

THE COURT: What's your position?

MR. PORTNOY: I object on a number of grounds, Your Honor.

The first is that it's not impeachment because she's testified. She's not being impeached on anything that's in this document.

And secondly, there are circumstances to how this document was produced. And I want to mention -- I won't go into them, Your Honor, but I hope that I will have an opportunity to go into how this document got produced and what happened.

THE COURT: All right. We will --

MR. PORTNOY: Those are my objections.

THE COURT: Okay. Thank you.

We will take this up at the break, as we will the other exhibits.

MR. PORTNOY: Okay.

THE COURT: Let's move on.

MR. ADAMS: I will move on. Thank you, Your Honor.

BY MR. ADAMS:

Q Sticking with damages, also yesterday -- do you remember at your deposition you did not know your accountant's name?

A I don't remember not remembering, but I would believe that that's possible.

Q Who is your accountant?

A Her name is Loretta.

Q Loretta what?

A I believe it's Mac --

Q What's her business name?

A MacIn -- I believe her last name is MacIntosh.

Q What's her business name?

A I just know her as Loretta. My husband deals with her.

Q You don't deal with any of the finances in your business?

A I don't deal with any of the filing of papers, of LLC paperwork. Literally since the day I met my husband he kind of took over all the paperwork. It's not my strong point. You can probably tell that by now.

So I do know her name is Loretta, and I think her last name is MacIntosh. I don't know if she has, like, an official business name. It's not important to me.

Q You mentor women on business ideas for $10,000 each, and

you don't know how to handle your own financial paperwork for your business?

A I don't do -- I teach people how to build really great businesses and support themselves and their kids, and I'm really good at that. And I have 15 years of experience that I can pass on to other women so that they can make money and have some more financial freedom. I don't teach anything to do with paperwork, or filing, or finances, or accounting. Those are definitely not my area of gifts or expertise.

Q How confident are you that Loretta's last name is MacIntosh?

A I don't have an answer for that. I have no idea. I'm pretty sure that's her name.

Q How sure?

A I don't have -- I don't have a number.

Q 50 percent?

A I don't have a number.

Q Okay. Let's talk a little bit then about the Exhibit 2 that we saw yesterday.

THE COURT: Exhibit 2 was previously admitted and may be shown to the jury on the screen.

BY MR. ADAMS:

Q Do you have it, Ms. Wilson?

A I do.

Q You recognize this, right?

A I do.
Q You talked about this for hours with your attorney yesterday, right?
MR. PORTNOY: Well, I think that misstates the testimony, Your Honor.
BY MR. ADAMS:
Q You talked about this yesterday with your attorney, correct?
A Correct.
Q And Exhibit 2 is a 24-page compilation of screenshots, right?
A Yes.
Q And they're not all from the same Instagram story, right?
A They came from this -- again, they came from a highlight. So I don't know --
Q So they are all one highlight reel, is that it?
A The person who owns this account created a highlight reel. You can put anything in a highlight reel. It could be stuff that's separated by weeks, months, years. You self select, like, oh, I want to add this story, this story. So they created a story highlight and put whatever they wanted to put in that particular highlight. So I don't know. So it's a wide variety of things.
Q And on the cover you said -- the first page of Exhibit 2 you said these are AI photos of you?

A I said they have done a lot of AI photos of me.
Q Is the -- so let's talk about the two on the top there. The one on the left.
A Mm-hmm.
Q What year is that from?
A I have no idea.
Q You don't recognize that photo of you at a golf tournament with your kids and your husband?
A Definitely does not look like a golf tournament, no.
Q Well, it's blown up, it's close, right?
Do you think that was AI done to make you look heavier?
A Possibly. They -- they've done that a number of times.
Q Do you know what year this was taken?
A I do not, because I don't believe it's an accurate photo. But if it is, I don't know what date it would be.
Q What's your basis for saying it's not accurate?
A Because I've seen a continuous onslaught of manipulated photography of me, some of them included pornographic, which thank God I was able to get down off this site, off of the Cult Recovery Instagram.
So, anything they create is something that is for their purposes to destroy me and to create narratives about me.
Q And the one on the right, is that you?
A I think it's what they are claiming is me. Again, they

have over a hundred different photos of me.
Q Well, you have over a hundred photos of yourself online right?
A I don't have photos of myself online. I'm not a person -- than profile photos, I don't post myself. Again, I'm not the subject of -- I'm not an influencer, so I don't post photos of myself in my Instagram. I focus on my work and my work only.
Q Okay. So the photos that you have as your profile picture -- the one on the right you used as a profile picture on line, correct?
A That's not correct.
Q The one on the right -- you're familiar with filters, right?
A Of course.
Q Camera filters, photo filters?
A Mm-hmm.
Q What's a filter do?
A It's something that changes your skin tone, your eye color. It can change a number of things.
Q You're experienced to know enough to know if a filter was used on a photo, right?
A No, I'm not an expert on that.
Q Does if looks like a filter was used on the one on the right?
A I have no idea. It could be AI, it could be -- I don't

know what it is, to be honest.
Q Have you ever used AI to create one of your account profile pictures on any social media?
A Starting this year I started using Higgsfield to do really cool AI photos of me, like, me with a tiger or a horse or a polar bear. So in 2026 I started using a service called Higgsfield.
Q On Facebook you have been using AI photos on your profile for a while, right?
A No, I just got into the AI -- I learned it actually from a woman I hired to help me learn some AI stuff. I started using that this year.
Q It's your testimony you have never posted an AI photo of yourself on Facebook prior to this year?
A I doubt it. AI? No, because I wasn't familiar with AI.
Q What's a catfish, in internet slang? You know that.
A Deceive, swindle, by assuming a false identity or personality online.
Q Isn't it true from 2012 to 2018 you did not have any photos of yourself online?
A I had profile -- I had -- same as now, I had profile photos.
Q What was the profile photo from 2012 to 2018 of your juice business?
A There is no way I can remember -- I changed it frequently.

So might have been a picture with my dog -- not this dog, a previous dog. It might have been a flower. It might have been a lotus.
Q It wasn't a picture of your face, right?
A It was, at certain times. It absolutely was. But only in the profile picture. Like I said, I don't use my accounts to promote myself.
Q So a catfish in the online world is where somebody assumes a different identity to try and present themselves as something else online. Do you agree with that?
A For the most part, yeah.
Q And when you post online, you post under Liana Shanti. Neither one of them is your name, right, your legal name?
A Liana is my name, but that's what I post under. We established that already.
Q Yup. And so when the claim is that you post avatars and are not -- that use AI, isn't it true that you have done that in the past on your posts?
A Starting this year I've been using AI, but there's no deceiving, swindling. It's sort of like a creative outlet for me. So I'm not sure where you're going with this, but...
Q Well, you're claiming that the statement of a false identity or personality online has damaged you, right? Aren't you claiming that Page 1 of Exhibit 2 damaged you?
A Saying that I'm deceiving, swindling, assuming a false

identity, absolutely.

Q And isn't it true that you post online under two different names that are not your legal name?

A I post under my federally trademarked business name, Liana Shanti. And Liana is my family name since I was a little girl.

Q And Liana Shanti is an online personality, right?

A Liana Shanti is me, and it is also a federally registered trademark business name.

Q Let's turn to Page 2 of Exhibit 2.

I want to just be kind of clear as to how your understanding how these posts are created, because I think you and I may understand Instagram a little bit better than your counsel, no offense.

Look at Page 2 of Exhibit 2.

A Everybody's catching strays over there.

Q Yeah. Yeah. This is a screenshot of what somebody took of your post that then they can use the app, or another app, and they added on the big sentences at the end, the big letters, Did you know Jesus bestowed spiritual names, right?

A Wrong.

Q Then what is this?

A We have to establish that the vast majority of what I've seen from this cult account have been wholly made up, created documentation made to look like things that I posted.

So, this -- I have no idea what this is, where they

got it from or how they created it. It says from Create Mode, which makes it look like it's something that came from Amazon -- Amazon, oh, my God -- from Instagram Create Mode, which we talked about yesterday being the way that you make slides on Instagram.

And then there appears to be one font that shows narcissist information. Again, some of this stuff are things that I teach. Narcissists tell people what they can and cannot eat, what they should think about. Those are definitely things that are true about narcissists.

So they take, like, snippets of things I have said, things that are true, and then they morph them for their own purposes to create fake posts, and they tell -- just like they do with the fake anonymous. This person wrote in about Liana, this person wrote in, zero who have ever been identified, they write to themselves, post it, claim it's real people. So then they add a second font here to make it look like this came from Liana, this came from us.

But that is not a truth that we can in any way agree on because they have created so many documents here that are not real.

Q And I understand you and I are not going to agree on whether you posted any of the 25 pages, because you can't confirm that, right?

Let me withdraw it and ask a different question.

This exhibit is 24 pages long. We went through every one of them yesterday. And is it your testimony that the screenshots that appear to be from your Liana Shanti Instagram are phony, fake?

A The ones that I've seen in this particular exhibit, yes.

Q All 24 of them?

A Let me look through them again, because they're not all screenshots from my account.

So this second page of this exhibit I would say, yes, this is created. Although, it does say things that I would say. So it can appear to be legitimate, but it does also appear to be created, the whole form of it.

Q But you're unable to confirm, is that true, Page 2? You're unable to confirm Page 2 whether you actually wrote that, or are you hundred percent that is a fake?

A No, I would never say a hundred percent sure. It's what looks fake to me because it's not the way I would have written this or said this. But I'm not going to say from how many years ago that this is a hundred percent. I would never say that.

Q Well, we know you do the same concept on your posts on @LianaShanti, right? You've done that and are here in this case facing cross counterclaims because of the screenshots and added texts that you did, correct?

A That would -- that was very compound. Can you ask me

something much more specific?

Q Sure. Trying to cut to the chase, but...

You take screenshots from things you see online, like Liana Shanti Cult Recovery, right?

A This isn't?

Q Is that a yes --

A No, this is not a screenshot --

THE COURT: Let's put the exhibit to the side right now. So we're not talking about the exhibit in this very moment.

So the question wasn't about the exhibit. It was: You take screenshots from things you see online like Liana Shanti Cult Recovery, correct?

THE WITNESS: I do take screenshots, yeah.

BY MR. ADAMS:

Q And you've taken screenshots from my clients' personal Instagram and other photos of them posted online, right?

A No. I've taken screenshots of conversations with Haley, conversations with Amanda, photographs that Haley has given me. I've never gotten anything from your clients.

Q You've posted photos of Paula Haygarth online, right?

A I received photos of Paula from Amanda Brady, and I have posted those, yes.

Q And then you take that photo and you add text on top of it before you post it, correct?

A Correct, I have done that.
Q Yeah. So this is what I'm getting at.
A Okay.
Q You understand the concept of everything that's here in Exhibit 2, the 24 pages, you understand how this works because you do the same, right?
A Well, I don't create fake things and pretend that -- I claim everything with my name. So I don't do this, no. But I -- I screenshot, I text, I type. So the format of what they're showing here is similar to I think what a lot of people do on stories on Instagram.
Q Are you able to tell me, of the 24 pages of Exhibit 2, which ones you believe are not fake screenshots of your posts?
A Let me take a look.
Several of these are just their own texting, they're not -- they're not purporting to be screenshots. Then there's the -- what they look like have taken screenshots of conversations from the DMs, the direct messages.
Then there's a DM here that says, Wow, thank you so much for posting this. I cannot wait for your parenting program. That could be real. A lot of people get excited when I'm announcing new programs.
Then there's a picture of the Kool-Aid guy. Then there's a picture of my ex-husband and my husband.
So, then there's some text messages on the next

couple, and then there's a quote from me, perfectionism is a mask to repress shame and guilt.
Q Is that real?
A That's a quote that I --
Q What page are you on? There's a little Bates number on the bottom, says Shanti 00 --
A 000047.
Q I'm going to put that up. So that's -- this one on the screen right now, that's an actual screenshot?
A Other than the part that's in the writing that says, "Absolutely buuuutttt" --
Q Yeah, yeah, I think we've established that that's --
A Yeah, the perfectionism is a mask for repressed shame and guilt, that is mine.
Q Okay. And so what they've done -- so we agree that is something that you've posted?
A Correct.
Q How do you know, sitting here today, how are you able to say with certainty that that's something you posted but that the other pages are fake?
A This is a quote that I say often, and it has my purple background with my logo for 12-DB school. So, of course, they could have recreated the exact same thing. But that is something that -- I post quotes periodically. That's a quote that I say. That is my actual logo. And purple has always

been the color for 12-DB school. So, you know, maybe it's not accurate to say I know for a fact that they didn't create this, they could have copied it exactly, but it also looks exactly like something I posted.

Q What have you done to demonstrate that these are fake screen grabs of your posts and not real?

A The question would be, what have they done to prove that they are real? I'm not sitting here needing to prove that these are fake. I'm telling you, I don't recognize these. And that burden would be on you, I assume, because I have no idea what they did or how they did it. I'm just telling you the ones that I know are real, and the one the quote that's on the screen is definitely real, it's something I post, and that's my logo.

Q Yes. And it's convenient for you to be able to rely on some but not others, and that's why I asked, what have you done to confirm as the basis of your defamation claim that they are, in fact, not reproducing exactly what you've posted but are faking it?

MR. PORTNOY: I object, Your Honor, to the first preparatory statement, not the question.

THE COURT: Sustained.

The jury will disregard counsel's remark that it has been particularly convenient for her.

And I'll ask you, Mr. Adams, to refrain, please, from

such commentary.

MR. ADAMS: Apologies, Your Honor.

Can I have the question read, after that part? May I?

THE COURT: What have you done to confirm as a basis of your defamation claim that they are, in fact, not reproducing exactly what you've posted but are faking it?

THE WITNESS: Should I answer that from you or --

THE COURT: Yes.

THE WITNESS: Okay.

I'm putting these exhibits in because they are posted on the Cult Recovery account. And every single one of these has elements of slander and defamation, period. So they posted these things. Whether or not some of the information came from my account originally isn't actually at issue, because I'm clearly not slandering myself. So the slides where they say, She's a cult leader and she's a child trafficker and she's committing fraud, those are slander -- my opinion, they're slander and defamation. That will be for the jury to decide and the judge.

So that's why they're exhibits. They're not exhibits meant to be for me proving if they're real or fake. I'm telling you because you asked me. And I said a lot of these are fake, some of these are real. We can spend all day trying to analyze which are which. I think it's a fruitless endeavor, because that's not the point of these. The point of these is,

they posted them on that account. It's an account that exists only for the reason of defaming me, and that's why these are in the exhibit because they all came from that account.

BY MR. ADAMS:

Q Thank you. I appreciate your understanding. I have different goals in mind.

Do you know what parody is, the term parody, P-A-R-O-D-Y, like Saturday Night Live is a parody skit show. You ever heard that term?

A Yeah, for sure.

Q And do you know what parody is in the online world?

A If it's any different than what I know from, like, SNL, no. I mean, unless it's different.

Q And so like what you're doing when you take a screenshot and then you add stuff on, you're engaging with others online to hopefully try and get them to respond, right?

A No, I'm not posting to get -- sometimes people do respond, but I post things that I want to share, which is I assume what most people do.

Q But as a public figure, you understand that parody is a thing that you have to live with, right? People making fun of you?

A Do I have -- I mean, yeah, I guess I have to live with it. Yeah.

Q Well, you put yourself out there. You have over a hundred

thousand followers on Facebook, right?
A When you're online there's a high chance that people are going to make fun of you.
Q They can make fun of you, just like they're doing here, right?
A No. This is slander and defamation in an attempt to try to destroy my reputation. Making fun of somebody is, you know, turning them into a cartoon character or making an AI picture of them in some, like, silly, funny way. But this is vicious slander.
Q How many people saw anything in Exhibit 2?
A There's countless. I mean, there's no way for me to know. I mean, it's a public account.
Q It's impossible for you to know?
A Correct.
Q You don't know, right?
A I don't have an exact number, but it's huge.
Q How do you know? How do you know it's huge?
A Based on the number of people that have shared with me -- just in the people that have shared with me they've seen this account.
Q Do you have any personal knowledge of how many people saw any of these pages on this catfish highlight reel?
A I have knowledge of at least a couple hundred people who I know saw it, who messaged me. But I would guess that it's

probably a lot more than that. Those are just people who told me.
Q And you testified yesterday that none of these people believed any word of this, right?
A No, that's not what I testified.
Q The record will speak for itself.
But you're familiar with the way Exhibit 2 works, you take a screenshot and then you get to type words over it, or you can take any photo and type words over it, and then you post it on Instagram, right?
A Yes.
Q And you've done that with -- in connection with the defendants in this case?
A Yes.
Q And when you do that, it goes out to tens of thousands, right?
A It goes out to my whole account. Stories tend to have a lot less viewership than -- like, you could have a hundred thousand followers and there might be only a thousand people who see your stories. You can go in and look and see, oh, you know, 800 people viewed this. I don't personally do that. But usually with bigger accounts not every person is watching your stories. But more people are more likely to see your actual posts because they stay permanently and stories go away in 24 hours.

Q And you posted personal stuff about Byron's daughter Ayla on your Instagram, right?
A I posted information about her from Haley, yes.
Q And you used her name?
A Yes.
Q And she was a minor at that time?
A Yes.
Q And you broadcast it out to 30,000 people?
A Haley had already been doing that, so -- and she asked me to share it, so I screenshot exactly what she gave me.
Q Do you have any written authorization from Haley?
A Yes.
Q She sent you a cease and desist letter, didn't she?
A That was after Byron threatened her, because he had already taken the child, and then she was under coercive control. But for the years that I was posting it, I have a multitude of messages from her thanking me. She asked me to make it public.
We did a very public prayer vigil where we prayed around the clock for, I think it close to 72 hours when she was leading up to her trial, and she wanted to make it as public as possible so that it could get out there, because she had been silenced. So there was a lot of public exposure of Byron, and that was at the request of Haley.
Q So is that -- the answer to my question is that Haley sent

you a cease and desist letter telling you to stop posting about her minor daughter?

A After she had already asked me to do it for years, yes.

Q And you don't have anything in writing that's part of the hundreds of exhibits that would support your claim she gave you -- it to you in writing?

A I do.

Q Where is it?

A I have messages from her.

Q Go ahead and pull it up. We'll wait.

THE COURT: That's not fair, counsel. There are hundreds of exhibits here. It's not fair to any witness to ask them to pull out an exhibit out of thin air. If you have an exhibit in mind, bring it up. I'm sure Mr. Portnoy will have an opportunity to bring it up.

BY MR. ADAMS:

Q I don't mean to be unfair. I thought you understood -- forgive me. I'm not trying to be unfair. I thought I understood you to say you know exactly what you are talking about, that there's a document here where she absolutely gave you permission for years.

A There are a multitude of screenshots where she asked me to share and she thanks me for sharing and thanks me for being willing to advocate for her when she was silenced. And those are things that we have submitted in discovery over the last

four years.
Q You promote -- in your health and wellness, you promote against taking vaccines, right?
A No. I promote sovereignty for people to make -- I believe people should be able to make a choice on what they put into their bodies.
Q And you -- you are against IVF in your teachings, correct?
A I'm not against anything. I teach what the processes are and whether or not I believe that they're safe. And I have opinions about those issues, especially when it comes to issues of sovereignty.
Q And you teach about the benefits of coffee enemas in your health classes, correct?
A Yeah. They're proven to diminish signs of cancer. The Gerson Institute in Mexico uses them, they do six to eight coffee enemas a day. So I teach people that is a liver detox, they're used in those cancer programs.
Q Have you ever heard that coffee enemas are addicting?
A No.
Q Have you ever studied them?
A Extensively.
Q But you don't -- you're not a licensed medical care provider?
A No. Coffee enemas are considered a holistic practice.
Q Okay. Holistic means what?

A Means using natural substances to help heal yourself. And so example, Gerson Institute, they rely heavily on juicing and coffee enemas. And they have one of the highest rates of, you know, cancer recovery, even people with stage IV pancreatic cancer, they do the coffee enemas, and juice cleansing, and periodic flushes. And they have a very high level of recovery. There's a lot of clinics that offer that service.

THE COURT: Counsel, we have a couple minutes before the break. I will let you decide if you want to ask a couple more questions or end now, it's up to you.

MR. ADAMS: I will ask a couple more, and then I may confer with my counsel and finish right after the break, if I may, because I just want to go back and make sure I'm not missing anything. Is that okay, Your Honor?

THE COURT: Fine.

MR. ADAMS: Thank you.

BY MR. ADAMS:

Q If people believed you were involved in encouraging Amanda to take her children to Florida, let's assume that to be true, do you believe that's human trafficking?

A Amanda had full custody of her kids and went to Florida, so that's a terrible analogy.

Q No, I'm just asking -- I'm asking if that's -- it's not an analogy. You -- let me back up.

A Okay.

Q One of the claims here is that in Exhibit 2 you were called a child trafficker, correct?
A Correct.
Q And you're making that claim today?
A Correct.
Q What's a child trafficker?
A Somebody who takes children and usually, unfortunately, uses them for sexual abuse or slavery and traffics the child from one place to another taking them from the parents, typically, and putting them into trafficking rings. And it's a very widespread problem worldwide.
It's a -- it's one of the most heinous crimes a person could ever be committed of doing. And there are children all over the world that are being trafficked, enslaved, sexually abused, murdered. And that child trafficking -- to me, I can't think of anything worse to be called, other than maybe a rapist. But it's a pretty severe crime, child trafficking.
Q How about pedophile, is that worse?
A Pedophile would be for sure up there. People who sexually abuse their children.
Q So if my clients believed you were involved in having their kids be taken over the border from Canada into United States, isn't that child trafficking?
A No. In fact, Paula in her deposition said, no, I never thought had Liana was a child trafficker.

THE COURT: We're not going to talk about what other people said in their depositions.

THE WITNESS: Okay.

THE COURT: The answer stands as no.

BY MR. ADAMS:

Q You were texting Amanda during her deposition, right?

A I messaged her when she lied under oath and said, You just lied under oath. And I have all the proof. I was hoping to have her not perjure herself, but she had already done that.

Q That deposition was done by Zoom, right?

A Correct.

Q And so you could text the witness under oath during her deposition, and you did that, right?

A Correct.

Q Why?

A She messaged me first. And she was messaging me about Laura and what she felt were inadequate questions being given to her by Laura. I didn't respond to that, I just sat there and listened and watched. And then when I saw her lie when Laura said, Did you tell Liana that the labor board -- or Paula called the labor board to try and get her 16-year old daughter in trouble for working, when she's a home schooled student. And then I say in that exchange, wow, that's really cruel and horrible. Something to that effect. Not those exact words.

Laura asked her in that deposition, Did you tell Liana

this? And she said, No, I didn't. And then I said -- texted her and said: You just lied under oath, and I have the screenshots. Like I was, like, I didn't even know why she was doing it, to lie about something that she had said, clearly, and it wasn't had nothing to do with her really, just the fact that Paula a had called the labor board. And she told me that. I had the receipts. I had the proof. And she lied under oath.

I was scared for her because it looked like she was going in a direction where she was just going to start making up lies. I had no idea why. And I said -- that's what I said to her. That was the exchange. And we didn't talk after that. That was the end of all of the communications between Amanda and myself.

Q That was a noticed court proceeding where the witness was under oath, correct?

A Yes.

Q And while the witness is under oath, a former student of yours, you texted her directly about her testimony, correct?

A Yup, that she had just lied.

MR. ADAMS: Maybe it's a good time for a break, and I can --

THE COURT: All right. Ladies and gentlemen, we are going to take a break. I said it was going to be a half hour. I think what I rather do is give us all about 45 minutes, because there are a few things I need to address with the

lawyers, and then that way the lawyers, my staff, and myself can get a little bit of break.

So we're going to do a 45-minute break, which will mean that you should be back at -- if I'm doing my math correctly -- 12 -- I'm not doing my math.

THE COURTROOM MANAGER: 40.

THE COURT: 12:40.

So as usual, please don't talk with each other, and don't do any research about this case. I mean, you can talk to each other, don't talk about this case. If you need to communicate with folks outside the building, obviously don't talk about the case.

And we will see you at 12:40. Thank you.

(At 11:55 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. Please be seated.

Let's deal with the two exhibits that I mentioned.

The first is Defense Exhibit 1159, which -- help me understand the relevance of this particular exhibit, please. This goes --

MR. ADAMS: Refresh my own recollection, Your Honor.

THE COURT: This is the North Carolina document.

MR. ADAMS: Well, it's one of her students. It says -- she already testified about it yesterday. She talked about a restraining order that she had to file against Ms.

McGratty. It turns out that it's actually a restraining order that Ms. McGratty filed against her on behalf of her kids. The statement in there is that she's interfering with her custody.

And so it's just further evidence that, when the claim is she's a fake lawyer and that she's meddling and that she's -- trying to -- she's involved in human trafficking, we're trying to show that, in fact, those are true or believed to be true. And this evidence supports that.

THE COURT: Actually, Ms. Wilson, you can step down. I'm sorry. I did not mean for you to stay on the stand.

Okay. So I'm going to go back over the lunch break and look at the transcript and see what was said, because I don't have a clear recollection of that. I then will issue a ruling when we come back. So I will come back on to the bench a little bit early.

MR. PORTNOY: Do I get to respond at all, Your Honor?

THE COURT: Yes, please.

MR. PORTNOY: Okay. I have no recollection of that testimony, but you'll check it out.

But it's clearly hearsay. She's not a witness. They never tried to subpoena her. It's totally irrelevant. If they thought this was critical evidence, they should have brought her in like they're bringing in Amanda Brady and other people who we have no right and chance to subpoena. They're trying to get in testimony of people that they have never tried to

subpoena and have not put on their witness list.

THE COURT: All right. Thank you.

MR. PORTNOY: So that's my major objection.

THE COURT: All right. Thank you.

MR. PORTNOY: Thank you.

MR. ADAMS: It's a governmental record, official --

THE COURT: I understand, but there are certainly 403 considerations here, as well as the fact that Mr. Portnoy is right, that he's not going to have an opportunity to cross-examine this person about the statements in this exhibit.

So I will go back and look at what was said yesterday, but at this point I'm going to sustain the objection. I will, however, come back on the bench and let you know if I've changed my mind after looking at the transcript from yesterday?

MR. ADAMS: May I use it to refresh her recollection, regardless of its admissibility.

THE COURT: Refresh her recollection about what?

MR. ADAMS: Being -- there's a proof of service in there where she signed it in Kauai receiving the restraining order and notice.

THE COURT: Whether or not that is relevant is going to depend on what the transcript said yesterday, so I'm going it take a look at that.

All right. As to the medical record, Exhibit 1002, Mr. Portnoy, what is your position on this?

MR. PORTNOY: Okay. We were attempting to take the deposition of Byron Horvath by Zoom. Sorry, but you have to hear this story because it's relevant.

THE COURT: Well, let's assume for the sake of argument this was produced with regard to allowing her to have access to a dog. Let's assume for the sake of argument that this was produced with regard to the logistics of the Zoom deposition, right? That's what you're going to tell me, I assume.

MR. PORTNOY: Yes.

THE COURT: Okay. So why does that mean it can't be used at trial?

MR. PORTNOY: That's fine, but then we're going to go into why and what happened. We're entitled to. They're trying to show some -- I don't know what.

THE COURT: They're trying to show that the damages that your client is claiming can potentially be mitigated, at the very least, and if not, canceled, I assume, by the fact that she as a prior PTSD condition.

MR. ADAMS: That says why.

MR. PORTNOY: She's admitted --

THE COURT: You can sit down, Mr. Adams.

MR. PORTNOY: Oh, I'm sorry.

She's admitted that she had prior PTSD.

THE COURT: She has.

MR. PORTNOY: So it doesn't add anything to the case. And the circumstances, it was voluntarily -- it was not part of a discovery. That's what the Court needs to know. And, in fact, it ended up in a sanction against the defense counsel of $12,000 because of their refusal to allow the deposition to go forward.

So if they want to put it in, Your Honor, I should be able to show why and what the result was. Because it's not to impeach her. She's made an admission that she had 30 years of PTSD, repeatedly she was asked, over and over. And then she explained that it comes back when these things happen. So she's never claimed that she didn't have prior PTSD.

Anyway, I think if they try to get it in, we should be entitled to show why, because it wasn't part of discovery. We voluntarily produced it in the hope of avoiding a sanction motion, which we won.

THE COURT: All right. What I'm going to do is I'm going to take this one under advisement, and I'll come back on the bench. We said that we'd have the jurors back here at 12:40, so I will come black at 12:30.

MR. PORTNOY: I have one other discovery matter -- I mean, evidence matter I should bring up with you now.

THE COURT: Okay.

MR. PORTNOY: And that is for you to change your Motion in Limine on source intelligence. They have opened the

door repeatedly asking my client, why did you sue these defendants? What did you rely on?

You can instruct jury that the truth of the matter is not to be considered. But we now have the absolute right to go into the entire history of the source intelligence report and the exact conclusions as to why she brought this case against the defendants. It's one of the five or six elements that we need to prove, and they have opened the door.

THE COURT: All right.

MR. ADAMS: I was very careful to ask her personal knowledge. I even went through what personal knowledge was. That's the point.

Not only that, the -- the MIL had nothing to do with whether we were going to raise what she knew about identifying these witnesses at the time she filed the lawsuit in 2022. The report's after the lawsuit?

So, it doesn't -- it doesn't -- to the extent you think I may have opened the door, which I don't think it did because I wanted personal knowledge, it doesn't revive what is inferior evidence.

THE COURT: Let me ask you, Mr. Portnoy, is he right that the Sourced Intelligence report was issued after this lawsuit was filed?

MR. PORTNOY: I'll confirm one way or the other. But I have a response to that. But let me answer the Court's

question.

MR. ADAMS: Apparently it was May 2022. I was mistaken.

MR. PORTNOY: That's what I thought, but I wasn't going to make a statement.

MR. ADAMS: I apologize.

THE COURT: Okay. All right. What did you want to say?

MR. PORTNOY: No, no, if it had been after I had some argument to make. I thought it was before.

THE COURT: Okay. All right. Well, I will take that under advisement as well. And we'll be back on the record at 12:30.

MR. PORTNOY: Thank you.

MR. ADAMS: Thank you, Your Honor.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: All right let's start with the two exhibits that were mentioned.

Exhibit 1159, as far as I can tell, is not a court order enjoining Ms. Wilson from doing anything. It's a petition for a TRO that contains quite a bit of hearsay that, even if I were to allow it under some hearsay exception, I think would be overly prejudicial.

So the objection to 1159 is sustained.

Mr. Portnoy, let me ask you a follow-up question with regard to Exhibit 1002.

Are you -- what is your evidentiary argument with regard to 1002? In other words, what Federal Rule of Evidence are you relying on to object to its admission?

MR. PORTNOY: Yeah, Your Honor, maybe I didn't make myself clear. I don't object to it. My point is that I believe I would be able to go through why that was produced, because it was not a discovery document. So on its face, I have no objection to it, but I think it's important that since they've opened the door to this document, and it's already been some testimony about it, that I be able to show the sequence.

THE COURT: All right. That request is denied. I don't think that that would do anything other than confuse the jury about a matter that is not relevant to this trial.

So to the extent that there is no objection to 1002, there's really nothing for me to rule on, other than to preclude you from asking you questions about how this document came into the defense possession.

Now, with regard to the question of opening the door. I think I would like some briefing on this. And it will also give me a better sense of what exactly it is that the plaintiff thinks that the defense said or asked about today that caused the door to be opened to anything about the Feil report. And also it would help me, I think, Mr. Portnoy, if I had a better

sense of kind of the breadth of the questioning you'd want to ask her about the Feil report.

So, I'm going to ask both sides to file concurrent briefs of no more than eight pages no later than 7 p.m. tonight addressing, one, whether or not the door was opened, and two, if it was open, the extent of information that should be allowed with regard to the Feil report.

MR. PORTNOY: And just so the Court knows, we're also going to argue that we can read the entire deposition.

THE COURT: Okay.

MR. PORTNOY: That would be part of our briefing.

THE COURT: That's helpful to know. Thank you for sharing that.

All right. Before we bring the jury in, my understanding -- I just had Ms. Cortez ask how we're doing on timing. And my understanding, Mr. Portnoy, is you anticipate resting no later than tomorrow close of business, right?

MR. PORTNOY: That's correct, Your Honor.

THE COURT: Okay. Will the defense be ready to proceed with its first witness if Mr. Portnoy finishes earlier than tomorrow at 3:00?

MR. ADAMS: Well, the good news is we have three here, so we'd be happy to roll right on through, Your Honor, yeah.

THE COURT: Okay. Great.

MR. ADAMS: There may be some request later on,

depending on who's coming, but right now we're ready to go.

THE COURT: Okay. Great. That sounds good.

And right now, one of the things I'm trying to figure out is kind of how to make our jury instruction conference tomorrow most productive. And so that's something I'm working on behind the scenes, and I'll have an update for you at our next break.

All right. We can bring in the jury.

MR. PORTNOY: Your Honor, just to make this clear, just because you're asking for briefing, when my redirect is finished today I'll have the opportunity today to call my client first thing tomorrow, whenever.

THE COURT: Absolutely.

MR. PORTNOY: Okay. Thank you.

THE COURT: Absolutely.

So if you have another witness ready after her today, we'll put them on the stand, and we'll see if she gets back on the stand in your case-in-chief.

MR. PORTNOY: Okay. Thank you.

THE COURT: Thank you.

(A recess was taken from 12:41 p.m. to 12:44 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Ladies and gentlemen, there will be one more short break today. We are ending at 3:00. So what will

happen is at sometime between 1:45 and 2:00, we'll take about a ten to 15-minute break and then you'll come back. All right?

You may continue, Mr. Adams.

MR. ADAMS: Can I take off my coat, Your Honor?

THE COURT: No, but we can make the air conditioning cooler for you.

MR. ADAMS: No problem. I'm a little hot, so that's okay.

THE COURT: I see some of the jurors appreciating that.

So let's go ahead.

MR. ADAMS: I run hot.

THE COURT: Okay. Ms. Cortez, can we make sure that the air conditioning is cooler, please? Thank you.

All right. Thank you.

You may proceed.

MR. ADAMS: Thank you, Your Honor.

BY MR. ADAMS:

Q Ms. Wilson, you talked over the last couple of days, mostly yesterday about the Liana Shanti Cult Recovery website and Instagram post -- or Instagram account. Is it just an Instagram account?

A There's a Liana Shanti Cult Recovery Instagram account, and then all the other places we talked about.

Q And it's your allegation in this case that my clients are

behind the Liana Shanti Cult Recovery Instagram account, correct?
A Yes.
Q Have you seen documents in this case produced from the Liana Shanti Cult Recovery e-mail?
A From the e-mail?
Q Yeah, from the LSCR@gmail.com.
A I don't have any of the e-mails memorized. I know there are e-mails as exhibits, but I have no idea what the e-mail addresses are.
Q Okay. Why don't you go ahead and take a look at Exhibit 53 for me. This is Plaintiffs' Exhibit 53.
THE COURT: My exhibit list lists this as reserved.
MR. ADAMS: That's right.
THE COURT: Just so you know.
MR. ADAMS: It's authentic, but not admissible, Your Honor, right?
THE COURT: Okay. Thank you.
THE WITNESS: Okay.
BY MR. ADAMS:
Q And this is the -- I called it the LSCR. It's actually LianaShantiCultRecovery@gmail.com, correct?
A That's what it says.
Q And have you seen this e-mail before?
A I have seen it, but I don't remember it, to be honest.

Q This is the group, though, that you claim there was a Zoom call where everybody got on the call and got together to write the letters for your probation. Do you recall that testimony?

A This e-mail is --

THE COURT: One second. One second.

My trial binder doesn't have this exhibit. So she's obviously looking at something that I don't have and Mr. Portnoy doesn't have. Although this is a Plaintiffs' Exhibit.

MR. ADAMS: Their exhibit.

THE COURT: Right. So...

MR. ADAMS: I can give him one.

THE COURT: If we could just pull it up on the screen for both her and me, and not publish it to the jury, that might help.

MR. PORTNOY: You're talking about 53?

MR. ADAMS: 53.

MR. PORTNOY: 53 is just reserved, there's nothing there.

THE COURT: I understand.

MR. PORTNOY: Oh, okay.

THE COURT: But it sounds like she has a document in front of her that was included in your trial binder.

THE WITNESS: Excuse me, Your Honor, that's my mistake. There was a blank page, and then I flipped to the

next page and there's an e-mail. But I think that's actually Exhibit 54. I apologize.

THE COURT: Okay. Thank you for that clarification.

Which exhibit number are you talking about?

MR. ADAMS: I have Exhibit 53 and it has a Bates on it SH000088.

THE COURT: I do not have that, as Exhibit 53.

MR. ADAMS: What do you have?

THE COURT: It has a page that just says reserved.

I'm sure Mr. Portnoy can show you what he has.

MR. ADAMS: Why do I have exhibits produced to me exhibit -- these aren't mine.

THE COURT: I don't know.

MR. ADAMS: Do you have an Exhibit 50?

THE COURT: Yes.

MR. PORTNOY: We have an Exhibit 50, Your Honor.

MR. ADAMS: Okay. So 52. I see. 53 is a duplicate. I'm sorry.

THE COURT: Okay.

MR. ADAMS: That's why. At 52, Your Honor. Apologies. Same document but --

THE COURT: Okay. 52.

MR. ADAMS: Are we good?

BY MR. ADAMS:

Q Ms. Wilson, do you see Exhibit 52?

A I do.
Q And this is the -- yesterday you testified about that there was a Zoom call of the Liana Shanti Cult Recovery group where they were going to get together to conspire to write the letters to your probation, right?
A Yeah, that came from the depositions of the defendants.
Q Yeah. And this e-mail, Exhibit 52, that was produced, that's part of your client's -- sorry, your exhibits in this case, is an -- is a e-mail to the Liana Shanti Cult Recovery Group, right?
A From, to the recovery group. That's what it says.
Q Thanking them for joining the call?
A Yes.
MR. ADAMS: Permission to publish, Your Honor?
THE COURT: Any objection, counsel?
MR. PORTNOY: None.
THE COURT: Exhibit 52 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 52 was received in evidence.)
MR. ADAMS: Do you have it, Laura? Great. And is it up?
BY MR. ADAMS:
Q And so this is dated April 10th, 2023. That's about the time you understand there was the meeting, right?
A That's what it says, yes.

Q And this e-mail says: Hi, everyone. Thanks so much for joining us on the call. We appreciate each and every one of you for trusting us to come forward and share your stories with us.
Did I read that okay?
A You did.
Q We could not do this without any of you.
Did I read that directly?
A Good job. You did.
Q And there are three names, right?
A Yeah.
Q And it's Jenny Rose and she gives her e-mail, right?
A Yup.
Q Do you know Jenny Rose?
A Yes. These are three people that are all media people. Jennings Brown is a tabloid reporter. Shannon and Jenny have cult-themed podcasts, so this looks like they're including those people in the group at this point.
Q Well, okay. The next person is Shannon Joy. Do you see that?
A Mm-hmm.
Q Yes?
A Yes.
Q And then the other third person thanking them for joining is Jennings Brown, right?

A He's -- it doesn't appear that he's thanking them for joining. He's the tabloid reporter that wrote the articles about me. This -- it's signed by somebody LSCR, which I understand is -- stands for Liana Shanti Cult Recovery. So whoever is writing this e-mail and sending this out I assume is not one of these three people, because they are being notified within the e-mail. So it looks to me like they're giving contact information how to give contact to the tabloids and to these podcast posts.
Q And Jenny Rose wrote articles about you, right?
A I don't -- I don't think she wrote articles about me. I think she's the podcaster who had -- had Jennings Brown on her podcast. I don't have the exact details. But I know between the three of them they have podcasts where they call people cults. And then they have Jennings Brown, who is a tabloid reporter, who used to work for the Daily Beast, but I think he's unemployed at this point.
Q And Jenny Rose runs a podcast called A Little Bit Culty?
A I think that's her.
Q Jennings Brown was on A Little Bit Culty podcast talking about you, correct?
A I believe he was.
Q You know that, right?
A I do.
Q And he posted an article -- "he" being Jennings Brown,

posted an article about you on the Daily Beast, right?
A Correct.
Q You didn't sue any one of those three people, did you?
A I did not.
Q Let's turn to Exhibit 50.

This is another one of your exhibits, another e-mail from the Liana Shanti Cult Recovery Group.

Before we publish it -- it's not admitted, but it is part of the -- I believe it's part of the authentic subject to admissibility, but I would request that it be admitted into evidence, Your Honor.

THE COURT: Well, let's see first if she can identify it and then --

MR. ADAMS: Thank you.

THE COURT: -- go through the proper foundation.

MR. ADAMS: Jumping to .3 before I hit .2. Apologies.

BY MR. ADAMS:
Q Do you recognize Exhibit 50?
A Yes. Yes.
Q It's another e-mail.

You recognize -- you know who Shannon Glass is, right?
A Yes. It is Stefanie Vogt's best friend, one of the people who stalked me on my Instagram, so I recognize her name.

MR. ADAMS: Permission to publish, Your Honor.

THE COURT: Any objection?

MR. PORTNOY: None.

THE COURT: Exhibit 50 is admitted and may be shown to the jury.

(Plaintiffs' Exhibit 50 was received in evidence.)

BY MR. ADAMS:

Q Once again, this is an e-mail -- it's a series of e-mails. If you'll scroll down to the bottom, the first one is Shannon Glass, and she's sending her victim impact statement. She's sending that -- when we get to that. There we go. Down at the bottom of page 1 of Exhibit 50, it's Bates stamp SH000085. April 20, 2023, at 8:43 and 56 seconds a.m. Central Standard Time. Do you see that?

A I do.

Q And then it looks like she forwards it on to the Liana Shanti Cult Recovery Group at the top there?

A Yes.

Q And then there is a response from Liana Shanti Cult Recovery Group dated April 20th, 2023, at 9:07 and 47 seconds, right?

A Right.

Q To Shannon?

A Yes.

Q And your response: Got it. Thank you, Shannon. This will be submitted this morning. I'm very glad you came forward. Together we are stronger and will make a difference.

Best, Thomas.
Thomas isn't one of the three defendants, is it?
A They told us they didn't know the names of anyone because everyone used fake names, so this isn't even a real name.
Q How do you know?
A Because your clients said so at their deposition.
Q How do you know?
A Well, I'm trusting that everything they did was anonymous throughout this entire hate campaign, so for them to suddenly start using a legitimate name, I'm drawing an intelligent conclusion from that. I can't say for sure that I know for a fact because I don't, but I don't think it takes a brain surgeon to figure out this would be fake considering they were anonymous the entire time. And your clients testified that they never ever heard a name of a real person, with the exception of Paul Thomas and Beverly Veras. Those are the only two real names that defendants identified.
Q My clients aren't on this, are they? Except at the top for who produced it. Exchange between -- sorry. Strike that.
Is that true?
A I'm sorry, can you read that again?
Q Yes. Until the very top where Shannon sends it to Stef Vogt?
A Mm-hmm.
Q You understand that to be my client Stefanie Vogt-Horvath?

A I do.
Q Other than that, this is an exchange between the Liana Shanti Cult Recovery Group and Shannon, right?
A Yes, the -- it looks like the first e-mail that's in the lower part was written by Shannon Glas, Stefanie's best friend. And then that was forwarded, it looks like, to Stefanie from Shannon, like, Shannon sharing with Stefanie, Hey, I wrote this letter kind of a thing.
Q Yeah, that's fair.
And so we have two e-mails that are part of the exhibits admitted into evidence in this case that have four names on them from the -- associated with the Liana Shanti Cult Recovery Group, and it is Thomas, and then in Exhibit 52, it was Sherry and Joy and Jennings Brown, right?
A No, I don't think those three people were associated with the group. I never blamed the podcast hosts or the tabloid writer for being part of the slander campaign. They were not part of it, as far as my understanding, especially since your clients testified they didn't know any names. These names are clearly on this e-mail. So they would have said, yeah, we know these names for sure.
I don't believe these people were part of the conspiracy to harm me. I think they were doing what they do, they have a podcast on cults, and Jennings Brown writes tabloids, and they look for sensationalized copy. And that's

what they do. I didn't sue them. I don't believe they were people who went after me to attack me, so I definitely do not think they are part of the Liana Shanti Cult Recovery Group. And Thomas, I think, is a made-up name, based on what your clients testified to.
Q And in Exhibit 52, the three names there, you don't think that when they say "thanks for joining us" and they put the three names, you don't understand that to mean that those three are the Liana Shanti Cult Recovery Group?
A No, I believe they joined on the call. I think that was probably one of the calls where they gave the information on what to write in this article. They never interviewed any actual students or me.
So I think they went on the Zoom call, from this. I would deduce that they went on the Zoom call for the purpose of gathering information about me and writing the article or doing the podcast.
Again, I really don't think these three podcast hosts and article writers were ganging up to try to harm me. I think it's what they do for a living, is this sensationalized click bait garbage that we all see on the internet. And they went on the Zoom call. I'm not in any way blaming them for being part of this -- these attacks on me.
Q Turn to -- okay. Thank you. And you can put that aside.
A Okay.

Q You take that off. We'll move on.

I want to get to damages and sort of wrap this up a little bit.

Isn't it true that you've posted online in 2022 and 2023, under the @LianaShanti handle, that you've had great success over the last two years?

A Probably.

Q Why don't you turn to Exhibit 1058. This is Defense Exhibit 1058. It's not in evidence.

I'm going to skip that one. I take it back. It's 1104. 1058 is for another day.

A Okay.

Q Apologies.

A No worries. I just got to get a different book.

Q Yeah, sorry. It's probably a different heavy book. I'm sorry.

A Okay. Can you tell me that number one more time?

Q 1104?

THE COURT: Why don't we bring it up on the screen for her.

MR. ADAMS: Yeah, that'll be great. I have it on mine.

THE COURT: May proceed, counsel.

BY MR. ADAMS:

Q Do you recognize this?

A It looks like something I wrote.
Q And it's one of your Instagram stories, correct?
A It looks like it, sure.
Q And that's your profile picture up in the upper left?
A It's hard to see.
Q It is hard to see. Maybe we can blow it up a little bit.
A Looks like my account.
Q Do you remember posting this in the middle of 2023?
A No, I don't remember what I posted three years ago. I don't even know what date this is, to be honest.
Q But you don't have any doubt in your mind this is an authentic post, right, it hasn't been manipulated?
A Again, because of what I've seen in this case, I wouldn't say that. But I definitely write things like this. So it's completely possible that it's something I did post several years ago.

MR. ADAMS: I'd move to enter 1104 into evidence.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 1104 is admitted and may be shown to the jury.

(Defendants' Exhibit 1104 was received in evidence.)

BY MR. ADAMS:

Q So in 2023 you posted: I am so excited for the massive growth I've had this year across every part of this legacy -- a

little typo there -- of love I have built over the last 12 years.

The expansion has blown my mind. This community has radically expanded, and what's so magnificent for me is to see how much my students have healed. How they love themselves. And how they're thriving.

Is that true, that over the last year you had massive growth?

A I'm sorry. Can you direct me to where the date is on this, because I don't see the date?

Q It's in 2023. It's not on the document.

A Okay. Then I have no idea what date. This could be yesterday. I seriously have no idea what this is. I need to see the date. I mean, to ask me to remember -- you probably know you have boxes and boxes and boxes of my screenshots from my stories, I am very prolific in the stories. There's thousands. Every week there's hundreds. So for me to go back to what you're saying is 2023 and then verify this as legitimate, that would be dishonest.

Q Okay. Let's go to Exhibit 1104.

MR. ADAMS: This has not been admitted.

THE COURT: Let's unpublish it.

This should not be published.

MR. ADAMS: Sorry.

THE COURT: Go ahead.

MS. MORITZ: Pull it up?

THE COURT: She can see it.

THE WITNESS: It's the same one we were just looking at, right?

THE COURT: 1104 is what we just looked at, counsel.

MR. ADAMS: 1107. Yeah, it's 1107.

MS. MORITZ: Got it.

BY MR. ADAMS:

Q And remember we talked about in 2022 and 2023 how your businesses went through a big change, right, as far as corporate structure?

A Yeah. They didn't go through a big change, we just changed the setup of them.

Q Right.

And then you recognize Exhibit 1107 as being a screenshot from the end of 2023? You can see down at the bottom for the dates there.

A I'm sorry, I actually am looking at the paper and online. I don't -- I see in the text itself it says 2022 and 2023.

Q Yeah.

A Mm-hmm.

Q So is this a post you made?

A Let me just read it.

Yes.

MR. ADAMS: Permission to -- or admit -- move to admit

it into evidence, Your Honor.

THE COURT: Any objection?

MR. PORTNOY: None.

THE COURT: 1107 is admitted. It may be shown to the jury.

(Defendants' Exhibit 1107 was received in evidence.)

BY MR. ADAMS:

Q This is a post of yours where you say: Thank you. Yes. Major website upgrades. New programs. A lot of my art on so many new items coming. The "I am" prints on everything. New logos. Mentorships. Podcast episodes coming. And a super exciting LMS announcement on the way.

I'm going to stop there. LMS, is that Lemurian Mystery School?

A Yeah, that's one of my programs we talked about.

Q So in 2022, 2023, you're still promoting the Lemurian Mystery School?

A No, this would have been -- this looks like it would been in 2024, because I'm saying 2022 and '23, amazing. So this would have been after that. I'm trying to get people excited and reinvigorate the business and saying, Major new things coming, I painted a lot of art, that's coming. I'm going to be making announcements.

I made all these plans after what I'd been through in '22 and '23, and looked at it as an amazing time for me to be

fortified in the fire, if you will, and was getting my community excited about what was coming. And in fact, in 2024, it says, A whole new platform with an amazing app, which is actually what happened in 2024, I did create the app.
Q Yeah, and so in 2022 and 2023, this is correct, you had -- the previous one said you had massive growth and now it's a radical change -- radically amazing with new apps, correct?
A Coming in 2024, yeah.
Q And that HMI app is used today, right? You testified over last couple of days.
A Yeah. And actually it became not an HMI app. That's what I originally thought it was going to be, but it became the Liana Life app, to have all my programs. It was originally just going to be the health coaching program.
Q That's the app you talked about yesterday you launched and it's in apple and Android, right?
A Right. I'm just saying, it was going to be the HMI app, and it's not. It's more than that. It's all of my programs now.
Q That was clear. I appreciate the clarification. Thank you.
How much money do you make from the app?
A I don't make any money from the app. It's a free app.
Q But it's helped expand your business, right?
A No. I wouldn't say it's helped expand. It's helped

streamline it, because now everybody is in one place, so anything you ever buy or have ever bought, you log in and it's all there. So it's a very expensive app for me to maintain, but it's made it very easy for anybody who buys my programs to have one place to locate everything. And my students love it.

I love it, too. Because it's very condensed. Before I used to have my programs on different websites and Instant Teleseminar, and people were downloading and some was MP3, MP4, and this made everything under one roof. So it has been really great for that purpose.

Q Okay. And at your deposition you testified that the posting about defendants, my clients, the Horvaths, and Paula Haygarth actually increased your business, right?

A No. What I said was not that it increased my business, it increased my community.

And one of the really unique things that happened in this situation, I always look for what Jesus is guiding me through in really, really bad, difficult situations. And one of the things that happened, I was sharing about yesterday, is that a lot of people who are victims of domestic violence came and found my site. They had no intention of buying my programs. They don't buy my programs. They're not customers of mine.

But the tone of my account shifted dramatically, on the Liana Shanti account, to where a lot of if not most of the

new followers have been people looking for help, support and advocacy. So on some level it became kind of an advocacy platform. And I've been very happy about that. I'm happy that my voice is getting out there, and people are joining for those reasons, but that's not a financial increase in any way.

Q So you remember giving a deposition on behalf of your businesses in this case?

A Yes, I believe I did two depositions, like a personal and then a business one.

Q Yeah. And one is called -- because corporations can't be deposed themselves, they have to put up a human, right?

A Right.

Q And for your corporation, the plaintiff in this case, Life Mastery, you were the witness, right?

A Correct.

Q And do you remember the date of that deposition?

A I'm sorry, I don't.

Q It was January 16th of 2025. You remember that?

A If you're saying it, I believe you.

Q I'd like to read from Page 68, Line 22, through 69, Line 21.

A Is this an exhibit? Do I have this?

Q The deposition transcript. The 30(b)(6) depo.

A Okay. And I'm sorry, which line or page?

Q Sorry. It's Page 68.

A Okay. Wrong one.
Q Line 22.
A Okay.
Q The question: Do you think that the posts that you make about my clients and Mr. Horvath's wife have any negative effect on your business Life Mastery Network?
Answer: They've had a very positive effect.
Question: Okay. And how do you quantify that?
Based on the well over thousands letters, messages, comments that people have said thanking me, a lot of people have joined my account. Even now when I post about this situation, my account lately in the past couple of months has been growing exponentially. And a lot of people, you know -- I can't account for every single person that's joining, but whenever I post advocating for Ayla and talking about the situation, I did, I turned it into a mini master class on domestic abuse, coercive control. That was free in my stories. And I got such a great response from that. People said thank you very much, and then they were interested in doing my programs as a result of my teaching -- teaching through this horrific story, turning it into something very positive. So it's been very good for my company.
Question: Any negative responses?
Answer: To me sharing about this? No.
Not at all?

Excuse me. None at all, not a single one?

Answer: I can't think of anybody who has definitively -- who has definitively, they haven't said anything to me, you know.

Did I read that correctly?

A I'm really sorry, I didn't want to interrupt you, but I think I have the wrong volume, because I was on Page 68 and that's not at all -- but I didn't want to interrupt while you were talking, but you read that whole thing and I wasn't able to follow along.

I think I have -- you might be on Volume II?

Q You're right. I told her to hand you the wrong one.

A I didn't want to be rude.

Q No, that's okay.

THE COURT: Why don't we do this: Why don't you direct her to the page number and line, and she can look at it and see if she thinks that what you just stated is accurately stated, so that we don't have to go through it again.

MR. PORTNOY: I'm sorry, Your Honor. Is it Volume I or II?

MR. ADAMS: It's the 30(b)(6). There's only one volume, but it looks like it's --

(Counsel conferring.)

THE COURT: So if you could direct her, please, to the page and line number.

MR. ADAMS: Apologies, Your Honor.

BY MR. ADAMS:

Q It's Page 68 at the bottom. And you see how there's lines?

A Yes, I see that.

Q It starts at 22, there's a Q, question?

A Yes.

THE COURT: All right. So you're welcome to go through it yourself, if you want, or if you want him to read it again and -- while you look at it, we can do that.

THE WITNESS: I'll just go through it myself, because I remember this.

THE COURT: So the question that was left to you is: Was what he stated on the record accurate, an accurate recitation of what's in the transcript of your deposition on behalf of your company?

THE WITNESS: He read that correctly.

THE COURT: Okay. Now he can ask another question.

BY MR. ADAMS:

Q So you testified under oath that, in fact, your businesses haven't been injured by posting about my clients engaging in online activity but, in fact, they've grown exponentially, correct?

A No. My posting -- the question was asked was, do you think that the posts that you make, meaning me, when I share

about what my clients are going through, Laura was insinuating that my posting about my clients was damaging my business, and I said no. The posting about it has brought a lot of people, it's expanded exponentially. I've gotten tons of comments from people joining my account, being very happy that I'm posting and sharing, being very vocal about this issue as more and more people are finding out about it.

So me posting about it, she was insinuating that that was what was causing the loss of business when it was actually the defamation. So that is not at all what I'm saying here. I'm saying that posting about it, sharing about it, did bring a lot of people to my account, which I was sharing a few minutes ago. And people did not have negative responses to me sharing it. People kept thanking me for having a voice, for speaking out, for being courageous enough to talk about it. I took a lot of the things I have learned -- I have learned a tremendous amount over the last four years about the Family Court crisis. I turned it into a mini master class on domestic abuse and I offer that for free; a class on course of control, I offer that for free. And I got really, really great responses for that. And nobody came to me and said, you know, this is terrible. They were thanking me.

And it -- as I was sharing, actually just a few minutes before you read this, that it changed the tonality of my Liana Shanti Instagram, and it's become, to a large extent,

an advocacy platform. And that's -- to this day I still get messages about this.

Q And it was very good for your company, right?

A It was very good for my advocacy, yeah.

Q That's what you say here, Page 69, Line 19: So it's been very good for my company. Right?

A Yeah.

Q Okay.

MR. ADAMS: Nothing further, Your Honor.

THE COURT: Thank you.

Redirect.

REDIRECT EXAMINATION

BY MR. PORTNOY:

Q Hello.

A Hi.

Q Well, counsel asked you a number of questions that I'm going to follow up on, because we now have the opportunity to do that.

On the next question, I do not want you at this point -- because the Court is going to make a ruling on evidence tomorrow morning. I don't want you to report on -- testify to any report that you alluded to earlier. Okay?

A Okay.

MR. ADAMS: Your Honor --

BY MR. PORTNOY:

Q But I do want to ask you, you were asked, why did you sue these three people? What proof did you have in your own mind when you made the complaint?

So why don't you tell the jury what information you had at the time you decided to file this lawsuit against these three people?

MR. ADAMS: Your Honor, this question violates a ruling that you are about to make and it hasn't been ruled upon.

THE COURT: Let's not address this now, please, Mr. Portnoy. We can address it tomorrow. So let's stay away from this topic for now. You can move on to a different subject matter.

I'll give you the opportunity to ask her that question tomorrow if I think it' appropriate.

BY MR. PORTNOY:

Q Counsel asked you a bunch of questions about your communications with various people, including Amanda and Haley. So we're going to follow up on those.

You were asked and responded to a question about a dinner. What were you responding to, a dinner, with whom, by whom?

A The dinner was the first domino to go down in this whole situation, and that was between Stefanie and Paula. And Stefanie had made a phone call to Paula, who at the time was a

complete stranger, and she recruited her to write a letter in a custody case to support Byron Horvath, whose wife and child in her own words in a video had accused him of abusing her. And Paula decided that she was going to do that and write a letter. They met for dinner. They talked about what that letter should contain. And the letter was about saying that Haley was in a cult and it was -- helped to facilitate custody being taken from Haley, who had been the primary caregiver since the child was born, and put that custody in the hands of Byron. And that was what I call, like, the dinner. That was the beginning of it at all, where a complete stranger got involved in a private custody matter by writing affidavits, and then that snowballed because they got these other nine men and wrote affidavits for each other, every single one of these men.

MR. ADAMS: Object as nonresponsive.

THE COURT: Sustained.

So the -- starting with, that was the beginning of it, all where a complete stranger got involved in a private custody matter, is stricken.

You may continue.

BY MR. PORTNOY:

Q How did you learn about the dinner?

A From the defendants, Stefanie and Paula.

Q How did you learn about it?

A During their deposition.

Q Had Haley told you about it before that?
A She also had told me about it.
MR. ADAMS: Hearsay.
THE COURT: Overruled.
THE WITNESS: Haley had told me about it as well, and -- but then it was -- I should say it was confirmed in the deposition. But Haley had already told me that.
THE COURT: Well, let's do this --
MR. PORTNOY: Yeah, please just respond to what you know.
THE COURT: So this information, ladies and gentlemen, you'll remember yesterday I gave some instructions about information that she's being told. This is an example of something where the information that she is being told, whether or not it's true is for you to not assess at this point, it's really only for her to provide you with what she was told. So -- by somebody else. Not as to whether or not it was actually true.
You may proceed.
MR. PORTNOY: Thank you.
BY MR. PORTNOY:
Q When did you first start having communications with Haley?
A I want to say sometime in 2021.
Q When did you she first start communicating with you about her custody issues?

A Probably sometime in late 2021, maybe early 2022.

Q And what was she telling you?

A She was telling me how she was living in terror. She was telling me that she couldn't even make phone calls from anywhere in her house because she was being stalked, and she would send me photos of cars parked in front of her home, and she felt and believed she was being surveilled, so she would be calling friends and family from inside the closet with hoodies over her head.

She had shared with me that Byron had a pattern of stalking her anytime she had a new boyfriend. She shared with me that Byron was very, very upset when she divorced him because he didn't want her to leave, and that he threatened her. And she did provide me with different text messages between Byron and her. So she substantiated most of what she shared with me.

She shared with me that she was dealing with Stefanie, who, in several of her communications with me, she said that Stefanie was the, quote, driver of it all, because it was her belief that Stefanie was trying to take over her life. Stefanie, according to Haley, and according to a wedding video of Stefanie and Byron, whose -- Stefanie's mother said that Stefanie had wanted to be with Byron since 2009, and Byron chose Haley. And he met her, and two weeks after he met her he fell madly in love, proposed to her. And Haley told me that

Stefanie went into a deep depression after that because she wanted Byron.

And by the time Haley finally divorced Byron or left him in 2016, then Stefanie came into the picture, she moved into their house, she kept everything exactly the same the way it was. She dyed her hair from black to blonde, to look more like Haley, according to Haley. I don't know if that's actually why she dyed her hair, I'm not going to guess. But Haley shared with me this pattern of Stefanie trying to take over her life and being extremely jealous of Haley.

And she shared with me that that is why she believed that Stefanie was taking over her life. And Stefanie would do things like post a picture, which we have, which again, Haley showed me, where Stefanie posted a photo on Facebook of the little girl, the dad and Stefanie on Mother's Day, and saying Byron should be celebrated on Mother's Day. And that was very hurtful to Haley. She had been the primary caregiver since the child was born.

And that Stefanie continued --

MR. ADAMS: It's going on nonresponsive now.

MR. PORTNOY: I'll ask another question, Your Honor.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Did you solicit these comments from Haley?

A No.

Q Did she continue to provide you over a period of how long information about what was going on in her life?
A For a couple years on a regular basis.
Q Starting when?
A I believe it started in late 2021, but don't pin me to that because I don't know exactly.
Q You posted a number of things, which the jury has heard about, and will hear more about in the next part of the case, about what was going on in Haley's life, including what you've just talked about with the child and the custody issues.
Where did you get all of that information from?
A From Haley.
Q All of it?
A All of it was from Haley. Amanda Brady added her own flavor to it. But Haley was the primary source of everything.
Q There was some questioning of you of whether you got involved and provided advice about how Haley could leave Canada and -- in violation of some custody order and go to the United States.
What involvement did you have in that situation?
A Zero.
Q Did you have communications with her about it?
A I found out about it after the fact, that she had tried to take the child across the border.
Q You heard an allegation in the questioning that somehow

you were instructing her to take the child across the border.
Did you ever make such an instruction?
A Never. And in fact, the record reflects the opposite, because there was multiple conversations with Haley where I told her, do not ever do anything illegal.
So, yeah, I did hear the allegation, though.
Q Now, you know, because you've heard, that Haley is going to come in not as a witness for you, but as a witness for the defense. Do you know why?
A I know exactly why.
Q Why?
A Because she --
MR. ADAMS: Lacks foundation. Calls for speculation.
THE COURT: Sustained.
BY MR. PORTNOY:
Q How do you know why?
A Well, for three years everything Haley did was --
MR. ADAMS: Nonresponsive.
THE COURT: Overruled.
THE WITNESS: Everything Haley did was shared with me, what she was going through, and I was helping her. And I have constant messages of thanking me and supporting me. She wrote a letter to Judge Mollway. She told --
BY MR. PORTNOY:
Q She wrote a letter in support of you to Judge Mollway?

A Oh, yeah, it was very -- and she talked about how Byron never has accountability because --
Q Let me stop you for a minute.
A Okay. Sorry.
Q We're talking now about the status conference or a different letter?
A No, I'm talking about -- yes, she wrote a letter to support me when the defendants and their co-conspirators wrote letters to Mollway.
Q So -- so Haley, who is going to come in as a witness against you for the defense, through the status conference was writing a letter to the court saying positive things about you?
A Extremely positive things. She supported me up until the night before their trial when she made a deal with Byron to cut off contact with me in exchange for getting her daughter two weekends a month.
Q How did you learn about that?
A From Haley.
Q And you've already testified yesterday that you cut her off because, why?
A I chose not to have contact with her. Our entire community defended her, supported her, prayed for her. People loaned her money. Like everybody in the community came together to help her, and then at the last minute she basically, it was like, you know, I'm doing this, I'm making a

deal with him.
Q You're aware that Haley now claims in written material that you, in effect, brainwashed her. You told her what to say, et cetera. And the jury will hear it at the appropriate time. But what's your response to that -- those statements?
A I -- I actually feel really sorry for her, actually. My heart breaks for her in the sense that I know -- I know what she's living in. I know the terror. I know under the control of -- of this extremely wealthy family and with your child being used as a pawn.
In the beginning I was upset. I was very sad. Maybe even a little bit angry that she had used the community in the way that she had. I'm a human. It definitely hurt my feelings. But then I reflected a lot and prayed a lot, and I felt like what it would be like to be her. And if her choice is to continue to have her support network, which was us -- and she even says in a text, like, Byron's motive is to cut me off from this whole community because you are the people supporting --
MR. ADAMS: Nonresponsive. Nonresponsive.
THE COURT: Sustained. And this point hearsay.
Ask another question.
BY MR. PORTNOY:
Q Let's talk about Amanda. You also know that Amanda Brady is going to come in as a witness for the defense.

A Mm-hmm.

Q When did you first start any kind of a relationship online or otherwise with Amanda Brady?

A She joined my programs, I believe, it was in 2017, when she was giving birth to her son. And she bought several of my programs. And then in 2022, when the defamation started, the original cult account was called the Brady Bunch Downfall, and they were attacking Amanda and Drew Brady.

Q I want to stop you right there because I need to get into this in a little more detail.

A Okay.

Q We already talked about the Haley situation. Let's talk about Amanda.

We heard from defense counsel questioning you that Amanda left her husband, remarried, and et cetera, et cetera, and then moved to Florida with the two kids, right?

A Her and her new husband --

Q Right.

A -- Drew Brady, they lived in Canada for quite sometime, but then eventually they did move to Florida. And Amanda and Drew have their own two kids. They have two little boys.

Q What happened to them when they were in Florida regarding Byron Horvath?

MR. ADAMS: Lacks foundation.

THE COURT: Sustained.

MR. PORTNOY: May we approach the bench, Your Honor?

THE COURT: All right. Ladies and gentlemen, let's take a stretch break while I meet counsel at sidebar. Thank you.

(Sidebar on the record:)

MR. PORTNOY: They opened the door to all this by talking about the meeting in Florida and the two kids. This is the beginning in the history of why these three defendants are being sued.

THE COURT: What --

MR. PORTNOY: It started with the Bradys.

THE COURT: What is she about to say?

MR. PORTNOY: She's going to testify about what Amanda told her was going on between this defendant and them creating the same kinds of issue that eventually they created with Stefanie. I mean, I didn't open this door, you wouldn't let me because it would have been hearsay. He brought all of this up.

MR. ADAMS: I don't know what door he's talking about. He's trying to get into a TRO that was filed in Florida, and I don't want that to come in unless he's going to be able to get that admitted. That's what he's trying to do. He gets this wide open, and then she goes in, you know, just goes on and on.

THE COURT: There's no door that's been opened.

MR. ADAMS: Thank you.

THE COURT: So, I mean, what -- what -- if she's going

to say something about what somebody -- these two women told her that caused her to make these posts, I think that's relevant. Again, I can do the same instruction, this is just for the information she received. If she's going to get into however some evidence of a conspiracy that has been told to her, that's hearsay because that's substantive.

MR. ADAMS: I think he's going to get into a TRO.

THE COURT: Are you going to get into a TRO?

MR. PORTNOY: No, but I'll move on.

MR. ADAMS: Thank you, Your Honor.

(End of sidebar.)

BY MR. PORTNOY:

Q You kept up your relationship with Amanda until when?

A Until the day after her deposition.

Q You've already testified that that relationship ended as a result of the deposition, correct?

A Yes.

Q Yes.

A Yes.

Q Why?

A I caught her lying under oath. I brought that to her attention. And within 24 hours of that, she went on a rampage and started messaging at least 20 plus of my existing students, telling them that I told her to lie. When literally it shows it was the exact opposite. I'm telling her, You just lied.

And Cahira Noelani will testify to that because she was the main one talking to the people who Amanda contacted. But she contacted a lot of people. And I have no idea what -- I think she was trying to do damage control.

Q Okay.

A But she -- that was the --

Q You've already answered why.

A Okay.

Q Okay. Some of the posts that you made that are in issue in this case later on, did any of that come from Amanda?

A Yes.

Q What? What subjects came from Amanda? Concerning the defendant --

MR. ADAMS: On the posts she made about my clients?

THE COURT: Right. That's related to the counterclaim case.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q Was Amanda telling you things about any of the defendants --

A Constantly.

Q Hold on.

-- that led to your belief that they were involved in what we're here for?

A Yes.

Q What did she tell you?

MR. ADAMS: Hearsay.

THE COURT: Sustained.

MR. PORTNOY: I guess we'll have to wait for her.

BY MR. PORTNOY:

Q Why do you believe Amanda and Haley are coming here to testify against you? Let's start with Haley.

A I'm sorry, there was some noise.

Q Sorry.

MR. ADAMS: Speculation.

THE COURT: Sustained.

MR. PORTNOY: No further questions, Your Honor.

THE COURT: Thank you.

MR. ADAMS: Nothing from me, Your Honor.

THE COURT: All right. Thank you.

Ma'am, you may step down.

Ladies and gentlemen, actually let's take our break right now that I mentioned a moment ago. So we'll let the jurors leave and we'll come back at -- in 15 minutes. So, shortly before 2 o'clock. All right? Thank you.

(At 1:37 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. You may step down.

All right. We will be in a recess for 15 minutes.

(Witness excused)

(A recess was taken from 1:37 p.m. to 1:54 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Welcome back, ladies and gentlemen.

Mr. Portnoy, you may call your next witness.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: Oh, let's wait for him to state her name.

THE COURTROOM MANAGER: I'm so sorry.

THE COURT: That's okay. No problem, Ms. Cortez.

Go ahead. Please tell us who you're calling.

MR. PORTNOY: It's Cahira Noelani.

THE COURT: All right. Thank you.

Go ahead, Ms. Cortez.

CAHIRA NOELANI, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name, and spell your last name.

THE WITNESS: Cahira Noelani, N-O-E-L-A-N-I.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Hello.
A Hello.
Q Cahira, let me just start by something. There was an allegation that you were in the courtroom yesterday during testimony. Is there any truth to that?
A No. I've been stuck in the witness room.

Q Have you ever been in this courtroom since this trial started?
A Only on the first day when they said we could come in for -- after the jury selection.
Q But you've not been here for any testimony, correct?
A No, I have not been in this room for any testimony.
Q All right. We're going to spend a little time talking about your very interesting life.
When were you born?
A August 2nd, 1979.
Q Where?
A In Appleton, Wisconsin.
Q And brothers and sisters?
A I'm the oldest of 11 children.
Q 11?
A 11. Six brothers, four sisters.
Q And where did you live in your youth?
A I grew up in Milwaukee, Wisconsin.
Q Did you live in a traditional neighborhood?
A I lived in -- I did live -- I lived in inner city Milwaukee. So inner city, a very poor neighborhood.
Q How long did you live there?
A For 14 years.
Q Were your parents involved with another -- a group of other people?

A Yes. Yes. I was born and raised in a cult.
Q You were born and raised in a cult?
A In a religious cult, yes.
Q What is your understanding of a religious cult?
A The -- from my experience, the religious cult I was born into was one that was very dominated by -- by a male, and his name was Dr. Hobart Freeman. He ruled everything with, you know, this is what he said had to go. His word was -- was final. And he was very authoritarian. Nobody could think for themselves. Nobody could question anything. Women and children were second-class citizens, and we were not allowed to have opinions of our own, have higher education, or -- really, yeah, that was, like, the biggest thing. Was very, very controlling. Very seclusive. We were very secluded from anyone outside of our group. Weren't allowed to seek medical attention. And women were not allowed to do anything other than get married and have babies.
Q That's why your family had 11?
A That's why my mother had 11, mm-hmm.
Q That was at the instructions of the cult leader?
A Yes. It was preached from the pulpit that you were not to use birth control, including natural family planning. There was no birth control allowed.
Q How many families were in the cult up until you were 14? And then we'll go beyond that.

A So there were 2,000 people in the cult. It started in Indiana. I was in the Milwaukee branch. In my branch there was about 150 people.

Q Was there a leader in the Milwaukee branch?

A Yeah, his name was Gary Eide.

Q Gary?

A Gary Eide, E-I-D-E.

Q And then there was a larger group somewhere else?

A So the main group was in Indiana. It started with, yeah, Dr. Hobart Freeman was the leader in Indiana. He died in 1984 from, when I was young, from a medical condition because he would not seek medical treatment.

Q Was he -- best of your knowledge, was he undergoing investigation by authorities?

A Yes. He was being -- he had a lot of -- he was being prosecuted because so many people died in the community. And even in the Milwaukee branch babies were dying, mothers were dying in childbirth, because you were told you would go to hell if you sought medical treatment. So we were not allowed to go to any doctors, dentists, eye doctors.

My mom needed glasses, and it was told -- it was considered witchcraft if you sought any medical treatment. So she would not wear glasses to even drive. So she did not drive my entire childhood, because she wouldn't wear glasses because that would go against the church, the cult.

Q It was a church?
A Well, they called it a church, but it was a cult. It's listed in a book that's called Churches That Abuse it's written in a book that's called Churches that Abuse.
Q Did it have a name?
A It was called Faith Assembly.
Q Called what?
A Faith Assembly was the official name.
Q Okay. Now, you used the word "cult"?
A Mm-hmm.
Q What is your definition of "cult," having lived through it for part of your life?
A So, my definition is, is very -- a religious organization that's very authoritarian, where you're not allowed to think for yourself, you're not allowed to trust your gut feelings, you're not allowed to question anything, because if you question the man, you question God.

And so even when I had concerns about, I wanted to wear pants because I lived in Wisconsin in the winter, and I was only allowed to wear dresses. I had to wear jean skirts in the middle of snowy blizzards in winter, because women -- this guy, Dr. Hobart Freeman, said women only wear dresses. So I would argue with my parents, like, I'm freezing. I have bare legs. Like, why can't I, you know, put on a pair of pink sweatpants? They're like, no, that's men's clothing, you're

not allowed to wear that, you have to wear the jeans skirt. And they would start --

THE COURT: Ma'am --

BY MR. PORTNOY:

Q Slow down, slow down.

A Okay. Sorry.

Q I know you're getting excited, but slow down. We got plenty of time.

A Okay.

Q Go ahead.

A So if I questioned that, I was questioning God. And they wouldn't let me question things. I would be shut down. I would be told, you know, you -- there's no -- there's no arguing with God.

So even when I had simple questions as a teenager, or as a kid, you couldn't question things. You couldn't trust your gut. So it was very authoritarian. It's my way or the highway. There's no questioning your parents, there's no questioning God. Because if you questioned the leader, you're questioning God. And the -- very much like taking away any independent thought, any independent feeling. Trusting your body, trusting your own gut, there was none of that. These are the rules, you don't question them, you do them or you're going to hell.

Q Okay. So I'm going to skip ahead for a second and then

move back.

The claim in this case is that the defendants and/or others say what Liana Shanti does is a cult.

A It's --

Q You know what a cult is. How would you respond to an allegation like that?

MR. ADAMS: Calls for an expert opinion.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Does Liana Shanti do any of the things you just mentioned that your cult master imposed upon you and your family?

A Absolutely not. It's a hundred percent different.

Q What would you say to anybody who calls what Liana Shanti does a cult, or that she is a cult leader? How would you respond?

A It's laughable, because of, like, I lived it. I know what it is. The authoritarian, Liana is the opposite of that. She teaches sovereignty, even as a parent she teaches sovereignty. Teaches you to think for yourself, to ask questions. She encourages you to ask questions, to go within. How do you feel? Always check with your body. Answers come from within.

Q Slow down, slow down.

THE COURT: Ma'am, one thing that you're doing is, if I'm listening to you, it's hard for me to tell when a sentence is ending and when it's beginning.

THE WITNESS: Okay.

THE COURT: So, our court reporter is doing an outstanding job of that, but I'll ask you to just slow down, and if you can just take a moment between your sentences, in particular, I think that's going to help you slow down. Okay?

THE WITNESS: Okay. Thank you.

BY MR. PORTNOY:

Q We're not going to get out of here any quicker. So just go ahead. Sorry.

A I apologize.

Q Go ahead.

A Okay. So, the difference that I've experienced is Liana teaches sovereignty, and that your answers come from within. They don't come from one person. They don't come from one text. They don't come from a parent. They don't come from one person in the family.

She teaches you to be sovereign, to think for yourself, to go to find your answers within, you know, get calm, get quiet, go within, learn to listen to your body because we have the answers within us. And that you should think for yourself.

Parenting, instead of my way or the highway, you do what I say or you get beat, was what I grew up with, Liana teaches children are supposed to ask questions. Empower them, encourage them to think for themselves, to question authority.

Because every single person, whether they're man, woman, or child, is sovereign and they deserve to be heard, they deserve to be loved, they deserve to be respected.

It is night and day different from what I experienced. And anyone who says that Liana Shanti is a cult, is a cult leader, it's laughable to me, because I'm like, you have no clue what it's like to actually be in a cult.

Q Okay. So we got to 14.

A Yes.

Q How long did you stay in that environment?

A So I was still in the cult, we just moved to a different city. But we still drove an hour to participate in those cult services two to three times a week, because that was the only group we were allowed to associate with. So I was officially in it until I was 31.

Q The rules change at all?

A They did. Some of them did get more lax as people got older and people started to just do different things, yes.

Q And something happened when you turned 31?

A Yes.

Q Slowly tell the jury what happened.

A Okay. So my marriage was becoming more abusive. And in the religious cult, I -- you are not allowed to get divorced, you are not allowed to leave no matter what they did or said to you. They could cheat on you, they could be abusive, they

could be a pedophile, and you would still have to stay with them. There was no leaving. There was no leaving.

And so I stayed as long as I could, until I literally thought I was going to die. And I decided to risk everything and escape with my four kids.

Q Explain the escape.

A So, I told my ex that I was going to leave him. And I secretly had been finding a place to live. I had secretly hired an attorney to help just to guide me. And I told him I was going to move on a Saturday, and he informed me that I was not allowed to leave him, and that he and my dad and my six brothers were going to come and they were going to physically prevent me from leaving and from taking my kids. And even though I am a woman in a middle class environment in a small town of Wisconsin, they were not going to let me leave my husband.

Q And so what did you do?

A I called my attorney. He said leave on Friday instead.

So when my ex -- or my husband was at work, I waited until he went to work. I waited for about 30 minutes until I didn't think he was coming back, and I took my kids, I had four little kids, they were ages three to nine. And I took them to a friend's house, one of the only people I still trusted. And she had --

THE COURT: Slow down, slow down.

So we lost you after you said "and she had."

THE WITNESS: Okay. She had escaped a domestic violence situation, so she was very sympathetic to my situation. So I took my kids to her house and dropped them off. I got a U-Haul. And my grandparents and one friend were waiting around the corner for me until I gave them the word. They were the only people that I still trusted that weren't part of the cult.

And I said, My attorney said get as much on the truck as you can before the police come. If he calls the police, they'll just stop everything, and then you'll have to wait until a court order to be able to divide things.

And so I had a box of garbage bags -- I couldn't pack anything because he would know then that I was going to leave. So I just had a box of garbage bags. And we ran, and my grandma and I just grabbed my kids' clothes, we threw them in garbage bags and threw them on the truck as fast as we could. I remember thinking, I can't believe this is my life. I can't believe I'm literally trying to escape, like how is this happening to me. Grabbed my kids' clothes, got the kids' clothes on to the U-Haul truck. Then they said -- my grandpa is, like, what do you need next? I said, My kids' beds. So they're taking apart bunk beds, running them down the stairs. And then I'm like, I need to work -- I'll have to go back and explain that part.

BY MR. PORTNOY:
Q Okay.
A Grabbed the computer --
Q Yeah, I got it. So --
A Okay. We escaped in three hours.
Q And where did you move to?
A I moved ten miles away. And my ex did not know where I was going. And I called the police to tell them where I was going, because I said he'll probably say I kidnapped my kids, but I didn't. I want you to know where I am. I'm working with an attorney. This is where my new address is, but I'm very, very scared for my safety and the safety of my children.
Q Are you divorced now?
A I am divorced.
Q And what year did you get divorced?
A That was 2012 -- 2013, I believe it was finalized.
Q Who got custody of the kids?
A It was 50/50 originally, but I still had them primarily.
Q I'm sorry?
A It was 50/50 primary -- but they were with me most of the time, even though it was called 50/50.
Q Okay. Do you still keep in touch with your husband?
A No.
Q Okay. Kids are all over 18 now?
A They are. Yes. But we did have --

Q So, moved out, escaped, started another life?
A Mm-hmm.
Q Let's talk about the life after 31. I assume you didn't have a job before then. If I'm wrong, tell me.
A Yes, I missed that part.
Q Go ahead.
A So I kind of got ahead of myself.
So I -- even though we were not allowed to have careers, or I was never asked what I want -- what I wanted to be when I grew up, if I wanted, you know, anything like that. There was no question about that, because your only job was to get married, have babies.
THE COURT: Slow down, slow down. Thank you.
THE WITNESS: I'm sorry, Your Honor.
THE COURT: It's all right. I understand. It's natural.
I'm not getting upset with you, I just want you to be aware of it, that it's hard. Okay. Thank you.
THE WITNESS: Okay. So I graduated -- I ended up graduating high school at 16, and even for the cult that was too young to get married. You can't get married legally in Wisconsin at 16. So they decided I could go to a community college that was five minutes from my house, because despite getting a 30 on my ACT, which is a 96th percentile, it was a waste of time and money for a woman to go to a four-year

university. So I couldn't go to a four-year university. I could go to a community college for two years, which I would graduate at 18.

My dad chose my career, to be tool and dye designer. I didn't know what that was for six months. But I did it, I was great at it. And it's a form of mechanical engineering. And so they did let me work until I got married. So I could work. I became a journeyman tool and dye designer, until at 22 years old, which I got married at 21, I had my oldest child at 22, and then I was forced to quit that job.

BY MR. PORTNOY:

Q So from 22 to 31 you raised your kids?

A Yes. I was raising my kids, but I did find a way to keep working in the restrictions of the cult.

Q And what was that?

A My uncle owned a tool and dye shop, and he offered me a job, which I was not able to take because I couldn't work outside the home. But I convinced him to give me a chance to work from home, and to use the software with dialup internet and design automotive equipment so that I could still be at home and follow the cult rules, raise my babies, do everything a housewife is supposed to do, all the cleaning, all the cooking, all the laundry, four babies. But I still was able to bring in some of my own income.

Q Your uncle was ahead of his time working at home.

A I was one of the originals.
Q So now you're out. Got your own life. Trying to start a new life.
Did your parents ever try to get you back, by the way, into the cult?
A They disowned me for leaving. They wrote me a letter and signed all of my 11 -- or my ten siblings' names on it, all my sisters-in-laws, brothers-in-laws, all of my nieces and nephews, and they disowned me and said that I was never allowed to contact them. I was not allowed to have anything to do with them because I was no longer following the rules.
Q So basically at age 31 you and your four kids were on your own?
A Completely. We started our whole lives completely over. It was just me and my kids.
Q So let's move forward. You stayed in this town in Wisconsin with your four kids?
A Mm-hmm.
Q Yes?
A Yes.
Q And did there come a time when you got another job in Wisconsin?
A So, ten months later, after leaving my husband, I found Rawganic Vegan on Facebook.
Q What?

A Rawganic Vegan on Facebook.
Q Rawganic Vegan?
A That was Liana's nutrition Facebook page.
Q Oh, so that's how you first had any kind of interaction with Liana?
A That's correct.
Q You were 32?
A That was 2012. Yes, I think I was 32.
Q Go into detail about that site or your association with it.
A So it was a nutrition page, and I'd had a lot of health issues. I had struggled with a lot of weight issues. I was over 200 pounds. I had chronic fatigue. I was constipated. If I sat down to read my kids a book I would fall asleep. I was drinking a pot-and-a-half of coffee every day just to function and still not doing very well. And I didn't feel well.
So I was looking for answers, and I found Rawganic Vegan, and Liana posting on there. And it was very science based, very fascinating, and unlike anything I had ever heard before. So I followed it.
Q Stop for a second. When you say you followed it, did you have to pay something at that point?
A No, it was completely free. It was a Facebook page where she posted educational content, with, like, research that

backed it up, tips you could do, things you could use practically. There was a free detox on there that you could do for three days to just kind of get a taste of like what it would be like and how you could feel well.

Q Did it help?

A Absolutely.

Q How?

A I was able to -- for the first time it relieved a lot of bloating. I had a lot more energy. And I lost like 5 pounds in three days, something that had taken me a month to do previously.

Q Did you have a job at that point?

A I was still doing some of the contract engineering work, that I was doing still from home. But it was very difficult because I was in so much stress. And to function -- to do mechanical engineering, you're working with tens of thousands of an inch, which is like a human hair divided by -- in six parts. And you have to be very on to be able to work at that level. So I was taking some jobs, but I was unable to do a full workload just because of stress.

Q So we're in 2012 now, right?

A This is 2012.

Q And you were getting advice, for lack of a better word, on some health issues just like everybody else --

A Yes.

Q -- who signed into that site.
Was that a -- was that a app or was that -- what was it?
A It was a public Facebook page. So it was just public information, there was no direct contact with Liana.
Q Okay. And take us a little bit forward. Did you then become involved in other programs of Liana's? I don't want to get up to the point where you started to work with her. I want to talk about before that. So go ahead.
A So then I did a 20-hour juice fast guide that she released, and it changed my life. It was amazing. And I was shocked at how well it worked. And it was only $20. Still no personal interaction.
And then in 2013 she released something called 66-day Health Mastery Program. It was less than $100 and it was literally module -- nine modules of recipes and a specific plan, nutrition plan, holistic health, things that you could do. And that also had a Facebook group that went along with it that you could join along with the program for the time that you were in the program.
Q So in that time, 2012, 2013, did you have any interaction at all directly with Liana?
A In 2013 with 66-day Health Mastery Program, in that Facebook group is the first direct interaction I had with Liana.

Q And how does that interaction occur? Is it only online Facebook or some other way?
A It was only online in the Facebook group. She was very generously answering questions. She was guiding people, which was amazing because it was less than $100. And this program was, like, 244 pages with work things you could do, nutrition information, recipes, like an exact plan that, when you followed it to the end, like, I mean, so many things. Like my whole life, health was different.
Q How many people were in that Facebook group in 2013, '14? Roughly, if you know.
A I'd say one to 200.
Q And did you have any direct communication with her?
A Only in that group.
Q Okay. I mean, did you ask questions in the Facebook group of the group?
A Oh, yes. I was very active. Was thrilled with it. Would ask questions about why the garlic was so strong in the juices, and things like that.
Q Did she ever tell you to do something that you didn't want to do?
A Never.
Q What was her mantra about your choices regarding these health options?
A She always said, It's your choice. She -- that was a big

thing with her, which actually made it a lot easier, because she said, Of course you're free to do anything you want. You're on a juice fast, if you want to go eat six cupcakes, go eat six cupcakes. You're an adult. You make choices. I'm here to give you the information. Here's what -- the information. Here's how it helps. Here's how it hurts you and what the science says. Go try it for yourself and see. She's a huge try it and see, don't take my word for it. She always says that, everything she teaches.
Q Did she ever tell the group that she was a doctor?
A No. She made it very clear she was not a doctor.
Q How did she make it clear?
A It was in a huge paragraph, like, a whole page paragraph right in the program when it started. And including saying, If you have any medical issues, if you have any -- you know, on any medications, make sure to seek -- talk to your doctor first. Everybody should talk to your doctor and make sure this program is a good fit for you before beginning.
Q Did she ever tell you she was a licensed nutritionist?
A No.
Q Did she ever make any representation that she had any professional license dealing with the subjects that you folks were all communicating with?
A No.
Q So, 2014, we've talked about this health Facebook group.

Did you get into any other kind of groups?

A Yes. In 2014, we -- Liana launched Health Mastery Institute, because those of us in the 66-day program were so amazed at the results we were getting, we're like, Where can we learn how to do this? In fact, I was looking at, should I become a naturopathic doctor? How do I do learn how to do what Liana is teaching? Because this worked so well. I've been searching fors answer; nothing works in nutrition. How can we learn what you're teaching us? And she had nowhere to send us, so she created a health coaching school called Health Mastery Institute in 2014.

And I enrolled in that, somehow. I was very, very broke. My divorce was just finalized. And my kids were still very young. And people told me I was crazy for even thinking that I could possibly change careers as a single mom with four kids with zero family support. In fact, my family was actively harassing me. My dad was threatening people. And I was very much on my own.

And so I reached out to Liana and asked if she would be willing to do a payment plan for me, and make an exception. And she didn't know me, other than from a few interactions in the Facebook group, but she did know I was a single mom. And so she said, Yes, I will make an exception and I will give you a payment plan. So I could pay every two weeks for HMI wellness.

Q What was HMI when it was formed?
A Yeah. So HMI is Health Mastery Institute. So it's a holistic health coaching certification program. It's 26 modules, and each one is very in-depth with nutrition, and it goes into everything from like how to properly and safely detox, liver function, how to best support your liver, your digestive system, how to heal your body from the inside out. All the vitamins and minerals, what your body really needs. Adrenal, hormones. Literally everything a human needs from birth to old age, and how you can help your body, give your body the nutrients and the tools it needs to fully heal yourself.
Q If I understood, correct me if I'm wrong, you and others who were already getting some advice about health, decided, along with Liana, to set up this institute; is that correct?
A Oh, no. Liana set it up. We asked her for it.
Q You asked her for it?
A We wanted it, yes. We were very excited. We were, like, teach us this -- or tell us where to learn it. And she had nowhere to send us because she had spent so much research and created it on her own.
Q Initially in 2014, how many participants, students -- what would you call them, yourself?
A Yeah. I feel like there was probably nearly a hundred people in that first -- that first group. There was a lot of

us.

Q Okay. And so that was from 2014 to when?

A To the beginning of 2015. It was -- we went through it as she released it. And it was about eight months. So it ended in the beginning of 2015.

Q And it ended why, do you know?

A Well, the end. That was the end of the first cohort. She finished creating it 2015. I went through it as she created it. And every single module I was mind blown.

Q Did it get expanded after 2015 or renewed?

A Oh, yes, yes. That was just the first group, and then it was more open enrollment. After that people could continue to enroll, because then it was created and it was -- it was, you know, there for people to do. That was when she first created it.

Q Did you around that time also get involved in any other projects of Liana's?

A No, not at that time. I was fully focused on -- I was very excited about -- yeah.

Q So take us to the next time that you, other than HMI, had any interaction with Liana.

A Oh, at that time I was also doing personal consults with her, around that time, or in 2014, 2015. Because that was something she had opened up to -- that was available where you could do one-on-one consults with her.

Q Just you and her?
A Yeah, it would be --
Q Not the rest of the group?
A Correct. It was something that could be -- that was available that she was doing.
Q Was there an extra charge for that, by the way?
A Yes, of course.
Q And was it like once a month, twice?
A You could do it as often as you wanted. So she didn't make you commit to anything. And she was very, very reasonable. The first time she told me her pricing, even though it was -- it felt like a lot to me, I was like, oh, I can't believe this is all she's charging.
Q So the personal consult, did it deal with anything other than the health?
A Yes. This one she would -- she would go into whatever you wanted to discuss. So it was very much -- I was focused on motherhood and how to -- how I could be a better mother, how I could learn how to raise my kids in a sovereign way so that -- because everything I knew came from the cult. So I knew I didn't want to give that to my kids, but I didn't know how to raise them any other way because I had been so indoctrinated in that. And so I was wanting to know, How do I raise my kids to think for themselves? How do I raise them to be empowered and initiated? What does that look like? What does a healthy

mother look like? And then also for guidance in a very tumultuous custody battle, because even --

Q Okay.

A Okay.

Q So these personal consults, would you initiate them and bring up some issue you wanted to talk to Liana about? How did that work?

A Yeah. I initiated all of them. She never reached out. I was the one that said, Liana, do you have any time in your schedule to do a consult? I have a lot going on.

Q What types of things did you ask of her?

A Very -- so like I said, the mother -- just practical motherhood. Like, what does it look like to, you know, to have your child -- your children question you. To show unconditional love. Give me examples.

And then in the custody things, because my ex was becoming more aggressive again, and we were starting to have more issues and my kids were starting to really struggle at his home, and then it turned into more domestic violence. So I was asking, like, how to practically -- I wanted to coparent very desperately. How do I coparent. And she gave very practical advice on trying to negotiate, trying to talk to him.

Q Did she instruct you or tell you how you should handle any of these things?

A No, never. She never told me what to do. I would ask for

guidance, and she would share from her experience or give me techniques to try. And as things got more violent, she connected me with resources, like domestic violence hotlines, therapists, would encourage me to reach out to different people, and even, you know, find me resources or find me people to connect with.
Q How long did the personal consults go on?
A For a couple years. But there would sometimes be large gaps between them. There wasn't -- there was no regularity to it.
Q You can characterize it any way you want, but would it be fair that she was there when you needed her to talk about issues that you wanted some people to assist you with?
A Absolutely.
Q She didn't force any of that on you?
A Never. Never. It was always me asking if she would be available for another consult.
Q So that went on to '15, 2016?
A Yeah. On and off until --
Q Okay.
A Yeah. 2017.
Q Meanwhile, you're still in the HMI?
A Yes. Created my health coaching business and thriving in that.
Q That's what I want to get into.

At some point you kind of started your own business?

A Yeah. So one of the great things in HMI is that Liana also included business training in it. So not only was it the nutrition, but she literally taught you how to have a business in health coaching, which was incredible because I had no idea how to do it. She's very, very practical in how she teaches.

So I went and finished HMI and followed everything she said in the business modules to a T. And in 60 days I was full-time health coaching. And I never took another engineering contract job again, and was able to replace my engineering income and support myself and my four kids on HMI health coaching alone.

And I was independent. I had all my own clients. I found all my own clients. There was nothing connected to HMI, other than I had all the training, and I went and created my own business.

Q So very briefly, just describe the business.

A My health coaching business?

Q Yeah.

A So, it's -- so I work with people with all different types of health issues. Most of the time people come to HMI health coaches when they're out of options.

Q You got to go a little slower.

A Yup.

Q Okay. Thank you.

A So my clients come to me when they're out of options from anything else. The stuff that we learned in HMI is unlike anything else, and people get results that they cannot get when they're with their naturopath, their chiropractor, their other health coaches. And my clients have been able to reverse things like type 2 diabetes.

I had a client who was able to get off of a liver transplant list in six months. She was scheduled for a liver transplant. Her family called me. We worked with them. I worked very closely with her doctors and in six months she no longer qualified for a liver transplant.

Q So without getting into the specifics --

A Yeah.

Q -- any particular thing. What does the business consist of? Do they buy a program? Do they have personal consults? Do they buy product from you? What -- what is it?

A Sure. So I -- it's a coaching package. So people call me if they want to work with me.

Q How did they find out about you, do you know?

A It's all word of mouth. I get people who, like, I worked with one of your clients seven years ago, and they called me.

Q Are they referrals from Liana?

A No, none of them are referrals from Liana.

Q Does she have any involvement in your business at all?

A None.

Q None?
A None.
Q We heard defense counsel suggest to Liana that what you are doing is part of a Ponzi scheme. How do you react to that?
A Well, that's crazy. She doesn't have anything to do with my business. Nothing. It's completely independent. Completely independent.
Q Does she make money of any kind off of your business?
A None. Nothing.
Q She doesn't get a fee for every new client?
A No. She has no idea what I do in my business.
Q It's completely separate from anything else you may do with Liana?
A Yes. Absolutely.
Q And you still have that business?
A I do.
Q How much of your day is spent in this non-Ponzi business?
A Non-Ponzi business. 50 -- 50 percent of my time, my work time is spent on that.
Q You live here now?
A I do.
Q When did you move to Oahu?
A I moved to Oahu last November, November of 2025, two weeks after my youngest daughter turned 18.
Q And your kids are in the courtroom?

A They are. My four children are here.
Q Okay. So now you're a resident of Hawaii?
A I am.
Q You're still running your online business?
A I am.
Q How many -- I know it probably varies month-to-month, but about how many clients do you have?
A I usually have anywhere from, you know, 15 to 20 at a time.
Q And it's word of mouth?
A Yes, it's all word of mouth.
Q Does it compete with HMI, by the way?
A No. In fact, a lot of my clients end up becoming HMI health coaches later because they're so impressed with how well it works.
Q You tell them where you got your training from?
A Yes, of course.
Q So we heard that you're now working with Liana?
A Yes.
Q In what capacity? I mean, are you an employee, an independent contractor? What do you do?
A So I'm also an independent contractor for Liana. And this started in around 2018, because I was telling so many of my clients that they should become health coaches because my health coaching schedule filled up so much that I didn't have

room for new clients. So I was telling some of my clients who I felt would be great at health coaching, some of which are here today, that, hey, you should enroll in HMI. Think about doing this. You'd be really great at it. And I'd have somewhere else to send more of my clients to --

Q Slow down, slow down, slow down. Go ahead.

So we're trying to understand how you now became associated directly with Liana.

A Yes. So I was sending so many people to HMI, that Liana said, Would you like to help with HMI enrollment? And you know, do it as an official part of HMI as an independent contractor. And I said yes.

Q And that was 2018?

A I think it was 2018, 2019.

Q Okay. And what is -- what do you do?

A So, now I -- I -- I was -- you know, I post on my own Instagram about HMI. I also -- I answer e-mails, I talk to people who are interested. If they contact HMI and are interested in the program but have questions, I will talk to them, answer their questions. Share what it's like being a health coach. Tell them, you know, how it works. And then share the details of the program. And talk through any of their concerns, so that we can see if it's genuinely going to be a good fit for them or not.

Q So how do they initially get in touch with you about -- in

your capacity as an independent contractor?

A So --

Q As an enrollment -- what did you call yourself?

A I'm like an enrollment coordinator, admissions.

Q Enrollment coordinator. Okay. Thank you.

How do they know?

A So, we have an HMI Wellness website. And so people can watch a webinar, and if they have more questions they can book a call with us or they can e-mail. So there's -- the e-mail, they can e-mail and it'll get to me. If they e-mail support, they'll get to me, they have questions, or they can set up a call.

Q So the webinar at the end or somewhere in it says, If you have any further questions, are you more interested, please contact you?

A Yes, it goes to me, to me or actually we have another person now, too, Malana.

Q Is it only for HMI? Because Liana testified she's got other groups, et cetera.

A So, it can be -- initially it was just HMI, and now it's expanded to her other programs as well, too. So I will help and guide people on any of the programs they have questions on.

Q So if someone wants to participate in one of the communities, for example, do they eventually get in touch with you to see if they're accepted, or whatever the right word is?

A No. Our communities are all online. Like the community programs, they're all in the app. All of those have direct links on the website. So if people are interested in those, they just purchase them and they get directly in there.

A few of them have, like, questions. If they're -- if they're going to be community groups where there's interaction with other members, we will have, like, a couple questions on there, like, you know, how do they know Liana, their Instagram handles. Just to make sure that, you know, see who's joining the group. And then we kind of preview -- I preview them and then we'll accept them in. But people can join from the website.

THE COURT: This might be a good time for a very quick stretch break. The jurors have been sitting for quite a while now. So let's just take a very quick stretch break, ladies and gentlemen. And we'll be done in about 20 minutes for the day.

MR. ADAMS: Your Honor, may I quickly run to the restroom? I'll be super fast.

THE COURT: Does anybody in the jury box need a restroom break?

No.

Okay. Yes. If you're quick, Mr. Adams, please. Thank you.

(Pause in the proceedings.)

MR. ADAMS: Ready to proceed, Your Honor. Thank you.

THE COURT: Thank you.

All right. Mr. Portnoy, you may continue.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q As enrollment coordinator, do you have access to all of Liana's internet --

A No, I --

Q -- and app, et cetera?

A I am an admin on the app. I do not have access to -- I have access to the HMI Instagram page in Facebook. I do not have access to the other ones.

Q Okay. And we heard about three communities. One is spiritual. Do you have any involvement with the spiritual community?

A In the app, yes.

Q In the app. Okay.

In your position as an enrollment coordinator, did you ever, either personally or on the -- one of the -- either the app or any of the other Facebook or whatever, have any direct communication with Amanda?

A Yes.

Q And how is it that you would be communicating or reading whatever Amanda had been posting, in what capacity had you been doing that?

A So originally before we had the Liana Life App, we had

Facebook communities that we would do Facebook groups that we would do along with different programs. So one was a spiritual group, and the program was separate and there was a Facebook group that went with it. And people could be part of that, and Amanda was in that, as I was as well.

Q And through what period of time?

A That was, I think -- I believe that started around 2020.

Q Until when?

A 2020 to 2024. And then we started the app, and when Liana created the app, I helped with that, and then we moved the chats and the groups into the app.

Q Is she still involved?

A Amanda?

Q Yeah.

A No.

Q Do you know why?

A She left in April of 2025, I believe.

Q Did you ever find out why?

A I am not sure exactly what happened. But she was very, very active in the community before that and in those groups. And the Facebook groups are just like any other community, like, Mom's on Oahu or, you know, any of those. It was very similar to that. Just a community where people could connect and talk, where women could connect and talk.

Q Did she communicate about any issues involving her

personal life that you viewed?
A She was always talking about her personal life, and chaos and drama was pretty much -- followed her.
Q Do you know if she ever solicited advice from Liana as to how to deal with what was going on in her life?
A I mean, she -- solicit advice? She was always wanted advice. She was always trying to be buddy, buddy and wanted to be Liana's favorite, and tried to act like she was very close friends with Liana, and made it seem like she was very close friends with Liana, when she was really just another program -- another student.
Q Same series of questions about Haley Winter. Did she communicate with you and with others through one of Liana's apps or Facebook or Instagram?
A Mm-hmm. Yeah, she was very active in the Facebook group as well. And then I did forget there was a Signal chat in between the Facebook group and the app. So I just wanted to make sure. I forgot about that. But there was a Signal group, same thing, it was a place to chat until we had the app. And Haley was very active in there as well with the other women in that group.
Q Did Haley also comment about issues going on in her personal life?
A Yeah, she was very -- very open about issues she was having with her divorce, with her ex-husband, and with custody

concerns and safety concerns for her daughter.
Q Did you ever participate in any -- I'm going to call it a group chat, with the two of you and Liana, either with Amanda and Haley, just the three of you?
A Not just the three of us, no. But I definitely participated with Amanda and Haley, yes.
Q And when Amanda and Haley would post, would there be others, other than you and Liana, who would have access to it?
A Yes, there was. At that time there was about 145 people in that Facebook community.
Q So anytime they would put something on Facebook, up to 145 people would see it?
A Correct.
Q Including you?
A Including me.
Q Including Liana, if she was looking?
A If she was looking.
Q Did there ever come times where Liana responded back in the same forum?
A She would occasionally respond back, but not that often. Most of the time it was, you know, all -- like, all of us just chatting amongst ourselves and encouraging each other. And it was pretty serious. That group was pretty serious. A lot of women going through some pretty rough personal life situations, a lot of custody issues, a lot of things going on with their

kids, you know, safety concerns with kids. So there was some pretty heavy conversations in there.

Q These were, at least in part, a group of women all communicating with each other about problems they were having in their personal lives with their spouses and/or their kids?

A Correct.

Q And Amanda and Haley were just two of them?

A Correct.

Q There were others?

A Yes. Many others.

Q How many others?

A Well, there were 145 people in the group, but, you know, not everybody is super active. But there were probably 20, you know, 20 women that had active things going on that were pretty -- pretty hard core, some domestic violence stuff.

Q What is your understanding of what Liana's role was, if any, regarding these women who were communicating with each other about these domestic issues?

A She was -- always been a huge advocate for women. And especially in domestic violence situations and for protecting kids. I mean, that was a huge part of what she did for me and helping me. I ended up having to get --

THE COURT: Slow down.

MR. PORTNOY: Slow down.

THE WITNESS: So --

THE COURT: You ended with "I ended up having to get," and we lost you after that.

THE WITNESS: Okay. So she's always been a big supporter of women in domestic violence of kids who are, you know, need a voice, of people who don't have a voice. She's always been a voice for the needy, and the people who are being abused. And so she created space for us to communicate with each other. And she wasn't giving, like, direct advice to anybody, but it was very much empowering and encouraging women to stand up for themselves, to seek legal guidance, to find ways that they could legally protect -- you know, protect themselves, protect their kids, you know, to be strong, you know, because it's weary going through that. So it's a lot of encouragement with that.

BY MR. PORTNOY:

Q Okay.

A But more in general, not a lot of, like -- there's nothing, like, specific.

Q That's what I was getting at.

A Yeah.

Q The ones you saw when you participated or read what was going on in this group, did you ever see Liana give specific instructions on do this or do that?

A No.

Q Did you ever see her give specific instructions on don't

do this or don't do that?

A She did say, Don't break your custody agreement and don't break the law. She said that repeatedly. And even at one point it was, like, in all caps, a pinned post in the Facebook group. Like, do not go outside your custody agreement. Do not break the law, because it will never end well for you, and that will not be good for your kids. And she'd also told me that personally as well for my situation.

Q Do you know if, during any of this period of time, that -- let's just take Amanda and Haley, were having private conversations with Liana that weren't in the group?

A They were -- I know they were DMing her. They would try to DM her often.

Q For those of us who are over 30, "DM" means what?

A It means direct messaging on --

Q Okay.

A -- usually Instagram.

And I know Haley was DMing her in Instagram because she DMed me on Instagram in this one situation, and she had --

Q Who DMed you?

A Haley. Haley DMed me.

Q About what?

A About her daughter. She was -- she had some very serious concerns, and she didn't feel safe sending her daughter to Byron, which was her ex-husband. And even though it was his

time, and she said, I messaged Liana and asked her what I should do and she's not answering me. And she's, like, I don't know what to do. I'm scared to send her. She's crying. She doesn't want to go.

And so I suggested, Have you reached out to your lawyer? You know, find out what you can do. But she specifically said, you know, I messaged Liana, she's not answering me, because Liana won't answer in those situations.

Q Do you know why she was getting in touch with you?

A Probably because she was trying to find someone to tell her what to do or hoping I would message Liana.

Q What did you do?

A I suggested she talk to her attorney, and then feel into your mom gut, because you have to go with your mom gut and what you need to do to be safe with your kids. But then talk to her attorney, as quickly as possible, to make sure she stays within what she can do legally.

Q Did you pass that conversation on to Liana, that Haley is trying to get in touch with you and she says you're not responding?

A No.

Q Why not?

A Because it's not Liana's business. She doesn't get involved in all those things. And people message her constantly, and she doesn't even read most of them. And she

doesn't get involved in all those.

MR. ADAMS: Strike as nonresponsive, the last part.

THE WITNESS: What?

THE COURT: Sustained.

So the last sentence about people messaged her constantly, and she doesn't even read most of them. And she doesn't get involved in those is stricken.

So you can ask another question.

BY MR. PORTNOY:

Q Just so I understand what DM means, people are communicating in these forums with 140 people?

A Mm-hmm.

Q And sometimes they have the ability to just communicate with a specific person?

A That was not in that group, that was just on regular Instagram, in private. Like that was personally contacting me, not in a -- not in a business capacity. She was messaging me on my personal Instagram and sending me messages that way.

Q Is that a public Instagram versus private? We heard something about that.

A Yeah, it's just my -- it's my personal -- yeah, personal Instagram. It's -- yeah, it's public. Anybody can find it and send DMs. You get to decide who you reply to or who you read.

Q Did you ever have DMs with Amanda?

A I did some, but most of hers were in the group.

Q Okay.
A She was very open about everything she said.
Q Do you know if Liana had DMs with Amanda?
A Yes. Amanda messaged her constantly.
Q Do you know if Liana responded?
A She would respond to some.
Q Did you see those DMs?
A Occasionally. When she would -- I don't see them unless she shows them to me. It's not something I can see on my own, no.
Q Okay. So let's switch to another topic in the few minutes we have left.
We've heard about a site called Exposing Family Cults. Do you know what that is?
A Yes.
Q What is it?
A It's a website that has information about some of the nine different -- the nine abusers who conspired to harm Liana.
Q Who were the nine?
A The nine -- well, my ex-husband is one of them. The defendants are three of them, along with a few other dads who are men who were domestic violence abusers or were trying to harm their own family members and then turned to try to harm Liana who was advocating for them. Liana had absolutely nothing to do with them.

Q Nothing to do with the site or with them?

A No, Liana had absolutely nothing to do with these families. Just the families decided to attack Liana because she was the one who was empowering them, and empowering these women to stand up for themselves in their family situations.

Q So this was kind of a place to react to what was being said and posted about Liana?

A So, yeah, when all the things were being posted online, we were doing -- people were doing different things to respond. We were creating -- people were creating different websites to support Liana. A lot of us were doing things to protect ourselves because we were in a lot of fear for our safety, because, like, my ex-husband was contacted by the defendants to also conspire to harm Liana as well, even though Liana had nothing to do with our situation. And I had a lot of fear again for the safety of myself and my children, because they were -- they were connecting with very serious, like, people who kidnap adults and try to deprogram them, and they were requesting children's information on their website. So -- or on their Instagram forum.

So, we were doing different things to try to protect ourselves. So me and some of these -- some other women that were -- were -- our exes were -- were causing problems and attacking Liana.

Q Who --

MR. ADAMS: I would move to strike as nonresponsive, the entire answer, Your Honor.

THE COURT: Sustained.

So the jury will disregard the last answer.

The question that originally was asked was -- one second, please.

This was the kind of place to react to what was being said and posted about Liana?

So you can answer that question.

THE WITNESS: Okay. So that -- the people who attacked Liana, conspired to attack Liana, we -- like, I was responding. My ex wrote defamatory letters and I was responding to that letter, and I -- that I posted that on that website.

BY MR. PORTNOY:

Q So the question was, that website, to your knowledge, was set up to respond to what was happening about Liana from these nine or whoever?

A To respond to that, but also to protect ourselves --

Q Okay.

A -- from, like, the abuse that we were experiencing.

Q Okay. Who set it up, do you know?

A I don't know.

Q How did you know it existed?

A There was a lot of different things going on, a lot of

different websites. And I -- I heard that it was being set up, like, in our group. And then I got an invite to -- to join it, and I put my own information on it.

Q But you don't know who set it up?

A No, we kept it very, very quiet. We were very -- we had to be very, very careful with what we were doing, because there was a lot of active safety concerns and death threats going on.

Q Okay. And who posted on it?

A I posted the -- my letter that I wrote for my -- about my ex and, like, the truth about what my ex did and said and how he had absolutely nothing to do --

Q Who posted on it?

A I posted it.

Q Who else?

A I don't -- well, I know some of the people, but I'm not going to share that.

Q Students?

A Students. It was students.

Q And when they posted it, did they post in their names or did some do it anonymously, or are they always --

A Everything that was shared was stuff that was shared by people who -- what they had experienced. So it was -- everything that was put on there was only things that were told by firsthand experience.

Q Did you know if Liana had anything to do with the setting

up of the Exposing Family Cult?
A No, she did not.
Q How do you know that?
A Because I heard a student did it.
Q You what?
A I heard that a student set it up, and it was all student --
MR. ADAMS: Move to strike as hearsay. Nonresponsive. Lacks foundation.
THE COURT: Sustained. It is hearsay. So it is sustained.
MR. PORTNOY: That's fine.
THE WITNESS: Okay.
BY MR. PORTNOY:
Q To the best of your understanding, you don't believe Liana had anything to do with setting it up, right?
A No, she did not.
Q Okay. Did she ever post on it?
A Not that I'm aware of. I don't think she -- she didn't have anything to do with it. It was all students.
Q She had nothing to do with it?
A No, it was all students. The people that I knew were all students.
Q You read them -- you read that -- what do you want to call it? What was it?

A I read what?

Q What was Exposing Family Cults, Instagram or Facebook or --

A There was an Instagram, and then it was -- Exposing Family Cults was a website.

Q Okay. Did you ever see anything that you believed was posted by Liana?

A No.

THE COURT: Is this a good place to stop?

MR. PORTNOY: Yeah, I was just going to get into one separate subject I haven't done yet.

THE COURT: Okay.

MR. PORTNOY: Thank you, Your Honor. Thank you.

THE COURT: Yes. Ladies and gentlemen of the jury, so tomorrow I'm going to have you show up just slightly later. We'll be doing some work in the morning. So I will have you show up at 8:45 tomorrow instead of 8:30.

And right now the schedule is going to be, again, 8:30 to 3:00, with the breaks that we've been taking. So we will be done tomorrow at 3:00. I have another hearing at 3:00 tomorrow afterward. So that's the plan for tomorrow.

As always, don't talk about this case. You guys have probably memorized what I'm about to say, but I need to say it, not because I don't think you'll do it, but just as a reminder. Do not talk about the case, don't do research, don't speculate

about things, don't -- that are happening inside the courtroom that you are not seeing yourself. Just focus on what's presented to you. All right?

And with that, have a restful evening, and we will see you at 8:45 tomorrow. So slightly later than usual.

Thank you for your attention. You folks have been paying close attention, which I very much appreciate.

(At 2:59 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: Thank you, ma'am. You may step down. Thank you.

Before we talk about scheduling I want to make absolutely clear, if I haven't already, that cellphones are not to be used in this courtroom by anybody other than people who have already obtained permission from me to do so. There have been more than one instance during the course of this trial where people in the audience have been caught using cellphones. If anybody is caught using a cellphone after this, you will be sanctioned and you will be removed from the courtroom.

I am going to post a notice outside this door making that very clear. And I'm also directing the court security officers to make sure that all of them who come into this courtroom continue to do a very good job of what they have been doing, which is monitoring the use of cellphones in this courtroom.

You cannot record anything in this courtroom. You can't take pictures of anything in this courtroom. You can't record anything in this courthouse. You can't take pictures of anything in this courthouse. All right?

Now, with that, let's talk about schedule.

What I would like to do, counsel, and you tell me if you have a problem with the schedule. I had, frankly, not realized that I would -- we would probably need more than potentially an hour to talk about the jury instructions, and that's my fault. So I have a hearing tomorrow at 3:30. I have a hearing Friday at 3:00 or 3:30.

I'm going to move my Friday hearing so that we can actually start dealing with jury instructions Friday at 2:30. So we would finish on Friday at 2:30, slightly earlier. Hopefully, go for no more than two hours. That's a lot more time than I think we need, but I also don't want to put our staff and our court security officers in a bind.

I think the expectation is that the courtroom can only remain open until about 4:30, is my understanding.

So I want to see if that's a problem for you, Mr. Portnoy --

MR. PORTNOY: No.

THE COURT: -- if we move our jury conference to Friday at 2:30.

MR. PORTNOY: That's fine.

THE COURT: Any problem for you?

MR. ADAMS: No, Your Honor. Thank you.

THE COURT: Friday 2:30. This will give me, honestly, more time to get the instructions together in a way that's going to be useful to all of us.

Anything that needs my attention before tomorrow? If not, I will see everybody here about 8:25, 8:30.

MR. PORTNOY: Thank you.

MR. ADAMS: Thank you, Your Honor.

THE COURT: All right. Thank you everyone.

We are adjourned for the day.

(The proceedings concluded at 3:05 p.m., August 5, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 5, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC