IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/<br>Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/<br>Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 6, 2026<br><br>JURY TRIAL - DAY 4 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/<br>Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/<br>Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


| EXAMINATIONS | PAGE |
|---|---|
| CAHIRA NOELANI | |
| RESUMED DIRECT EXAMINATION BY MR. PORTNOY | 13 |
| CROSS-EXAMINATION BY MR. ADAMS | 27 |
| REDIRECT EXAMINATION BY MR. PORTNOY | 53 |
| RECROSS-EXAMINATION BY MR. ADAMS | 61 |
| ROBERT BEARD | |
| DIRECT EXAMINATION BY MR. PORTNOY | 66 |
| CROSS-EXAMINATION BY MR. ADAMS | 66 |
| PAULA HAYGARTH | |
| DIRECT EXAMINATION BY MS. MORITZ | 149 |
| RESUMED DIRECT EXAMINATION BY MS. MORITZ | 204 |


# E X H I B I T S


| | PAGE |
|---|---|
| Plaintiffs' Exhibit 1-2 was received in evidence | 41 |
| Plaintiffs' Exhibit 185 was received in evidence | 115 |
| Defendants' Exhibit 1045 was received in evidence | 184 |
| Defendants' Exhibit 1046 was received in evidence | 186 |
| Defendants' Exhibit 1055 was received in evidence | 188 |
| Defendants' Exhibit 1066 was received in evidence | 190 |
| Defendants' Exhibit 1121 was received in evidence | 195 |
| Defendants' Exhibit 1076 was received in evidence | 205 |
| Defendants' Exhibit 1106 was received in evidence | 209 |

THURSDAY, AUGUST 6, 2026 8:27 A.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery Network LLC et al., versus Paula Haygarth et al. This case has been called for jury trial, day four.

Counsel, please make your appearances for the record starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor. Jeff Portnoy, Troy Young, and Jenny Tokuoka for the plaintiffs.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor. Joseph Adams and Laura Moritz for the defendants and counter-claimants.

Ms. Ing is out this morning but will be joining us later. My two clients are here. Ms. Horvath has a crying baby. If you would like her to come in, she is here, I will be happy to bring her in.

THE COURT: That's fine. I've been very impressed so far by both the baby and the dog, they've both been very calm.

You may be seated.

Let me start with you, Mr. Portnoy, and ask, now that the transcript has been finalized, are there any passages that you want to point me to in particular that you think opened the door to Mr. Feil's report?

MR. PORTNOY: Yeah. Okay. Yeah, good question.

I think you know, if you look at page with 106 and 107, you can the see inferences that counsel is attempting to draw.

THE COURT: If you could read into the record the ones that you --

MR. PORTNOY: Oh, sorry.

THE COURT: Not a problem. I thought I had my computer up here with me. I did a thorough search.

MR. PORTNOY: I'm happy to read it.

THE COURT: Thank you.

MR. PORTNOY: It starts on -- there's a whole section on Line 7.

You filed this lawsuit against my three clients naming them in 2022, correct.

Answer: Correct.

And then the outing after they had already been sued by you was in 2023?

Correct.

So they didn't out themselves. You already sued them because I already -- I already knew that it was them. I'm just saying that gave me the proof. I didn't have as much proof then as I have now. I knew it was them, that's why I filed against them, but the proof came when they outed themselves in the letters. They submitted those letters under their own name, that's what outed them. That was the -- that was the

blessing from God.

You already sued them, how was that outing six months later?

I already sued them because we had reports, investigative reports, things that led me to believe it was them.

It goes on to the next page: I believe to this day that from day one I knew it was the three of them, and then so that's why I sued them in 2022, because I said these are the people. I know these are the people based on information I received, collected, the source intelligence report, all of that.

And then it goes on to the outing.

So -- and there's a general tenor, if you read the transcript of this particular issue, that my client just out of the blue picked these three people as being the sources of the anonymous posts. And as you know, we've admitted from the beginning that there's no direct way to prove it, but we have to prove it by circumstantial evidence.

And the issue that they're trying to show is my client had nothing to base it on. And we know that she had belief in things that she was shown. And as we conceded in what we filed with you yesterday, I'm not arguing that the Source Intelligence deposition should get in for the truth, but it gets into what led her to bring the claims, along other things,

but a very important thing against at least one of the defendants and maybe more.

So I think what he has put in the mind of the jurors is she just made it up, she didn't have anything. And I just showed you that particular section which I think synthesizes why we believe that the jury must hear, as part of the circumstantial case, what my client believed or saw that led her to believe it was the three defendants.

So that's where I am, Your Honor.

THE COURT: All right. Thank you.

MR. PORTNOY: Thank you.

THE COURT: Mr. Adams.

MR. ADAMS: Sure, Your Honor.

First off, my intention in the passage he read was to explore this idea that she had somehow outed -- my clients had outed themselves in 2023 when they had already been sued in 2022. Had knowing to do with the Sourced Intelligence report.

But also to back up as a preliminary matter, counsel yesterday said he wants to revisit the Motion in Limine on the subject. It was, in fact, a Daubert motion. And no statements by this witness can revive the infirmities of that report that were the basis of that Daubert motion. And certainly I didn't revive that expert report with my questioning. And I think to the extent that this witness is able to testify about what she knew, she did, yesterday, it's very clear. She said, No, I had

circumstantial evidence. It's all in here. And the Feil testimony has been page lined. It's coming in to the extent of Your Honor's order on a Daubert motion, not a Motion in Limine where we're trying to stay away from evidence and then we open the door. That's the open the door.

He can't revive a Daubert ruling by his own client's testimony.

THE COURT: All right. I agree with the defense on this. I went through the transcript and did not see an instance where I viewed the defense as somehow inviting the reversal of a Daubert ruling, especially one that -- where I held that the report was also not sufficient -- sufficiently discovered under Federal Rule of Civil Procedure 26.

What I did find, however, was an instance -- and Mr. Portnoy just read it -- when Mr. Adams asked Ms. Wilson about how it was that the defendants outed themselves six months after the lawsuit was filed, to which she responded, and I quote: I already sued them because we had reports, investigative reports, things that led me to believe it was them. I believe to this day that from day one I knew it was the three of them, and then so that's why I sued them in 2022 because, as I said, these are the people, I know these are the people based on information I received, collected, the Source Intelligence report, all of that.

So, she has been able to talk about more than just

pulling information out of thin air.

The objection is sustained for the reasons that I excluded the report under Daubert and Rule 26.

Additionally, at this point I further exclude it under 403 as it is more prejudicial than it is probative. And it is, frankly, in my mind confusing.

In particular, the following summary could tend to mislead the jury, especially when I have found the report unreliable.

So summary says: Quote Sourced Intelligence assesses with a high degree of confidence that Paula Haygarth plays a primary role in the harassment campaign targeting the client. Furthermore, analysis indicates additional actors to some degree are involved in the campaign, to include Elise Winter, Byron Horvath, Shannon Glas, and others.

What "to some degree" means is unclear. What "a primary role" means is unclear. And moreover, the report is filled with hearsay information that I would not allow because it would be too difficult, frankly, to limit this report with an instruction and anything about it to the effect it had on Ms. Wilson.

So she's already been able to talk about it to some degree, and that's as far as I'll let it go.

All right. The motion -- the objection is sustained.

MR. PORTNOY: I need to make a record, Your Honor, if

I may.

THE COURT: You may. Absolutely you may.

MR. PORTNOY: Because I think we're going down two paths here. And we have been given handcuff after handcuff about putting in evidence that my client believed led her -- what her state of mind was. I never tried to say that it should -- this particular report, for example, should get in for the truth.

What I've tried to do from day one, and we've been handcuffed repeatedly, and I accept the Court's rulings, but I need to make a record.

I'm not suggesting that what's in that report and then his deposition, which he went into at length, which they took, should go in for the truth. But the whole case is about anonymous people and why she thought it was them. And just to hear that there's a report leaves no information to the jury about why what's in the report led her and her state of mind to believe that it's these three defendants.

So, that's my record. I believe never tried to get it in on the basis that he's an expert. I've never tried to get it in that it's true. I've agreed to a limine instruction. But how can we possibly prove what information my client had for the jury to evaluate? They have a sentence that says, I read a report. I don't know how a jury can determine whether my client's belief in that is credible or not.

So that's my record. Thank you.

THE COURT: All right. Thank you.

The jurors are actually already here.

So is Ms. Noelani here?

MR. PORTNOY: I don't know, Your Honor. I can go check.

THE COURT: Okay. Let's make sure she's here and we can bring the jurors back in.

MR. PORTNOY: Okay.

THE COURT: If somebody from the plaintiffs could try to find her, please.

MR. ADAMS: Just to address some housekeeping.

We do have a impeachment, refresh recollection exhibit that we have presented. We've exchanged it with counsel. We've presented it and filed it with the court, updated our witness list. It's 1205.

THE COURT: Okay. Thank you. Is it in my binder?

MR. ADAMS: I hope so.

THE COURT: Okay.

MR. ADAMS: I believe so.

THE COURT: Let me check.

It is.

MR. ADAMS: Wonderful.

THE COURT: Actually I lied. It isn't.

MR. ADAMS: There's no copy in there?

THE COURT: I have a tab, but I don't have a copy of it.

MR. ADAMS: May I approach, Your Honor?

THE COURT: You may.

All right. Good morning, ma'am. You may take a seat on the stand.

And Ms. Cortez, if we could have the folks down in jury send them up, please.

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Thank you.

(Pause in the proceedings.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297 JAO-RT, Life Mastery Network LLC et al., versus Paula Haygarth et al. This case has been called for jury trial day four.

Counsel, please make your appearances for the record starting with the plaintiff.

THE COURT: Mr. Portnoy, appearances, please?

MR. PORTNOY: Yes. Jeff Portnoy and Troy Young, along with our paralegal.

THE COURT: Thank you.

MR. ADAMS: Good morning, Your Honor, Joseph Adams, Laura Moritz, Louise Ing, on behalf of defendants and counter-claimants, Byron Horvath, Stefanie Horvath, and Paula

Haygarth.

THE COURT: Thank you. Good morning.

Good morning, ladies and gentlemen.

One schedule update I know already about tomorrow is that we are going to have you leave a little bit earlier than usual tomorrow. So about 2:15 tomorrow. As I mentioned before, today we're leaving at 3:00. It's now quarter to 9:00. We're probably going to go until about 10 o'clock, with a stretch break. And then I will update you after that.

When there was discussion yesterday about the temperature in the courtroom, I could tell some of you had some thoughts about that. So if you could please make sure to let Ms. Cortez know or let Ms. Parker know if you would like the temperature lowered or elevated that would be helpful. Thank you.

MR. PORTNOY: I didn't mean to exclude Jenny by name, Jenny Tokuoka. Sorry.

THE COURT: No problem.

You may proceed.

MR. PORTNOY: Thank you. Good morning.

CAHIRA NOELANI, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

RESUMED DIRECT EXAMINATION

BY MR. PORTNOY:

Q Okay. Cahira, did you have a good evening?

A Yes, I did. Thank you.

Q We have some things to go back over and some new things.
A Okay.
Q We spent a little bit of time yesterday talking about these chat groups --
A Mm-hmm.
Q -- and what was going on regarding family issues, divorces, custody.
A Mm-hmm.
Q Can you go into a little bit more detail as to the topics that were being discussed, and what the tone of the -- and the subjects that were being discussed?
A Mm-hmm. So in the chat groups it was multiple things. You know, but mostly focused on, you know, life, life things. And a lot of the custody stuff, it was, you know, those were a lot of the topics. Just women going through very intense, heavy, heavy things with their families, with -- with their ex-spouses, with their kids and trying to navigate, you know, being great mothers, and also navigating the legal system and, you know, family systems and stuff.
Q And was there any discussion regarding any of the three defendants?
A Yes.
Q What was that? What did you see?
A So with --
MR. ADAMS: Hearsay, Your Honor.

THE COURT: Overruled.

BY MR. PORTNOY:

Q Go ahead.

A So Amanda discussed everybody. And Haley, Haley talked -- she spoke a lot about Byron because that was the father, her ex -- that was her ex-husband and the father of her daughter Ayla. And so there was extensive discussion about things she had experienced when she was married to him. She mentioned a lot of drug use, cocaine use. And then her immediate concerns were with her daughter coming home with signs of sexual and physical abuse, as well as some very concerning statements her daughter was making about, like, being locked in bedrooms and having to pee on the floor when she was at her dad's house, just things that tear your heart out as a mother.

MR. ADAMS: Move to strike as nonresponsive. It's also double hearsay.

THE COURT: All right. The statements about what the daughter said are stricken.

I will advise the jury again that the information here isn't to prove that these things happened, but rather, offered to show what information was being received. All right.

BY MR. PORTNOY:

Q Yeah.

A These were things that Haley shared in our group, in like the Facebook group and then the Signal group.

Q Okay.
A Yeah. She also -- she also said that Byron made -- was the one who made the death threats to Liana and Amanda as well, too. So that's another thing she had said.
MR. ADAMS: Move to strike as nonresponsive. Lacking foundation. Calling for speculation. And hearsay, double hearsay.
THE COURT: Sustained.
MR. ADAMS: Subject to a Motion in Limine.
THE COURT: All right. The statement about death threats are to be disregarded.
MR. ADAMS: And I would request, Your Honor, that this witness be told about that Motion in Limine so that we understand.
THE COURT: All right. Do you want a recess to do that?
MR. ADAMS: Yes, I would, Your Honor.
THE COURT: Okay. So, ladies and gentlemen, we're going to take a very short recess. We're going to send you back down to the first floor. Sorry about this. It's only going to be five minutes, so it will be a good time for you to just stretch. And we'll be back in about five minutes, please. Thank you.
(At 8:47 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. You may be seated.

I will step off the bench and give Mr. Portnoy an opportunity to consult with the witness.

(A recess was taken from 8:48 a.m. to 8:54 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: You may continue.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Was there any discussion in the chat room about who was posting about Liana?

A Yes, there was a lot of discussion about that. It was shocking, for one. But then people started posting -- would share when they recognized their family members on the Reddit pages. And because -- and so they would say, oh, the -- the people were posting anonymously, or supposedly anonymously. But people in the -- in the groups could recognize their family members. So they would say, oh, you know -- this one is, oh, like, this one is my dad.

MR. ADAMS: Objection, Your Honor. Nonresponsive. And it's hearsay.

THE COURT: Overruled.

BY MR. PORTNOY:

Q Was there anybody in the chat room that you saw or read -- let's talk about Amanda in particular. Did she post something

about who she said was responsible for any of the posts that we've talked about here today -- over the last few days?
A Yes. She recognized Paula as one of the people who was posting and doing the main account that was the -- was Liana Shanti Cult 369, I believe. It was a Reddit page. And she -- she said that that was Paula.
Q And Amanda said that?
A Amanda said that.
Q Okay. Did anybody else believe that in these posts -- in these conversations, that any of the other defendants had posted? You mentioned other family members.
A Yeah, other family members. Not with -- not with the Reddit post, no.
Q Okay. Did Haley -- was she a participant in these discussions?
A She was part of the group, so she was in all of it.
Q Did she ever say anything -- write anything to suggest that she had an idea who was posting?
A I don't recall her saying anything about who was posting, no.
Q And did that information get to Liana, what -- what Amanda said about Paula?
A I believe so. It was all in the group that she had access to.
Q Let me ask you --

MR. ADAMS: Calls for speculation. Move to strike.
THE COURT: Overruled.
BY MR. PORTNOY:
Q Let me ask you a little bit about the website. You talked a little bit yesterday. Can you explain more what it was about?
A Yeah, so --
Q First of all, who set it up?
A I'm not --
THE COURT: Sorry, which website are we talking about?
MR. PORTNOY: Any of the -- any of the websites.
THE WITNESS: Any of the websites?
Well, there is one that was --
MR. ADAMS: Any of what websites?
THE COURT: Yeah, let's go -- let's be more specific, please, as to which website we're talking about. There have been several websites mentioned.
MR. ADAMS: The latest was Reddit.
THE WITNESS: Reddit is not a website.
BY MR. PORTNOY:
Q Did Liana have any websites?
A She has three websites; HMI Wellness, The Relaxed Millionaire, and LianaShanti.com.
Q The LianaShanti.com website was devoted to what subjects?
A That's her spiritual work.

Q And that's where this group would meet that we've talked about?
A No, it's completely separate.
Q Instagram?
A It was Facebook, Signal, and now Liana Life app. Nothing to do with the website.
Q Okay. There was also, we heard, an Exposing Family Cults slash Abuse website?
A Mm-hmm.
Q Yes?
A Yes.
Q How did you learn about that?
A I learned about that in our discussions in -- in the group.
Q Do you have any reason to believe Liana ever posted on that site?
A No, she did not.
Q She didn't.
And we talked yesterday, you don't really know, but you think -- I think you said some were students?
A Yeah. It was -- it was students who were posting on there.
Q I want to move on now to the business part.
Oh, let me ask you about a part of your life which we didn't get to yesterday.

When you escaped with your four kids, your husband was attempting to interfere even after that, you were trying to get a life together. Did you have any financial difficulties over the next couple of years?

A Yeah. I mean, I was -- it was -- I had a lot of initial financial difficulties just in leaving him. And then things were starting to get a lot better when I went through HMI and started health coaching. And things -- I started making a lot more money, because I had actually even been on government assistance when I first left him. And then when I went through HMI, within two years I had tripled my income and was able to get off of government assistance.

And then we went through more custody issues, because my ex-husband actually came to my house and smashed out my car windows, I had to get a domestic abuse restraining order on him, which Liana was super supportive in helping me find, like, resources and stuff.

And then after that I had a series of events that brought up a lot of financial -- financial issues, including -- well, one, I gave up almost all my child support in order to have primary custody of my kids. So I gave up almost a thousand dollars a month in order to negotiate with my ex. So basically bought my kids so that he -- he was willing to let me have primary custody if he didn't have to pay child support. So my income went down significantly from that.

And then I had a house fire in 2020 that we lost everything, like, almost everything. A few kitchen things survived and everything else we had to start completely over. And that was in the middle of the pandemic. And we had to move to a whole new city and start our lives completely from scratch. Like, we moved in, we had nothing.

And so that, combined with a lot of attorney fees from going back and forth with my ex. Starting over with the house fire. I did file for bankruptcy in 20 -- I think it was 2021, and then 2022, just to give myself, like, a new fresh start so that we could, like, regroup again new city, new house, once again starting from scratch.

Q You've had quite a life.

A Yup. We've been through a lot. But we're here. We're happy. And thanks to Liana's work I've been able to do a lot for myself and my kids.

Q So let me ask you about the business part.

A Mm-hmm.

Q We talked yesterday about how new and potential clients, customers -- what would you call them?

A Yeah, new students, new customers, mm-hmm.

Q How they go about signing up. How would you -- what would you call that?

A Yeah, enrolling. So some people just sign up for programs. Liana does a lot of programs that people just

purchase. And then the HMI enrollments, or enrolling in the certification.

THE COURT: Let's slow down just a little bit.

THE WITNESS: Okay.

THE COURT: Thank you.

THE WITNESS: So some people buy programs. A lot of them are just programs that you can just purchase and get right into them immediately. And then there's certification programs, that HMI health coaching certification, which is the one that I went through and love. That one, most of the time people call or e-mail me to enroll.

BY MR. PORTNOY:

Q So if somebody has a question about what's being offered and how much it costs, and they're deciding whether it's worth it or not, would they most likely talk to you?

A Yes, quite often. They'll DM me, e-mail me, or they'll set up a call, which could be -- right now it could be either me or Malana, but back then it was me who was answering those phone calls or scheduling those sessions.

Q So do you know whether these defamatory statements, as we allege back, in 2022 stretching into 2023, had any impact on existing students, customers, clients?

A Yes, it did.

MR. ADAMS: Calls for an expert opinion, Your Honor. This witness hasn't been disclosed for this.

THE COURT: Overruled.

BY MR. PORTNOY:

Q Go ahead.

A Yes, it did. Absolutely.

Q Can you explain?

A Mm-hmm.

Q Thank you.

A So, I mean, those are pretty -- pretty crazy and serious allegations to, you know, say someone is, you know --

MR. ADAMS: Your Honor, move to strike. Now she is getting into --

MR. PORTNOY: Can I --

MR. ADAMS: -- expert opinion.

MR. PORTNOY: Sorry, Your Honor, but I'm ready.

BY MR. PORTNOY:

Q Just talk about what you know about --

A Okay.

Q -- people's reaction and either staying in the program, staying a student or leaving, people that were already in.

A Okay.

Q Go ahead.

A So in the Facebook group, in the Signal groups, we had about 145 people. And for approximately 47 of them left following -- like, in the near future following these things coming out. And that was just in that community group.

Q Did any of them tell you why?
A Tell me why? Some of them did. Some of them just didn't renew memberships, that had been there for a long time.
Q Is that -- was that an average number that you had experienced before, or was it a dramatically increased number?
A It was dramatically increased, yes. Most people don't -- don't leave.
Q Okay. And did anybody ever contact you to find out whether they might want to become involved and talk to you about what they had read?
A Oh, absolutely. It happens -- it happens frequently.
Q Tell the jury a little about that.
A Okay. So, for instance, there's this one woman who contacted me, we had several discussions and then DMs about, you know, enrolling in HMI. She was really excited about it. I sent her the link to sign up. And then I wake up to a DM from her on Instagram saying, you know what, I found this stuff about the cult and the human trafficking. And you seem really awesome, I thought this was exactly what I wanted to do, but I just -- I'm not sure about going forward now because of what I read online. And that was it. And she's, like, so I'm going to pass. And she never signed up. And I was a hundred -- you know, a hundred percent sure she was sold on the program.
Q Was she alone -- you don't have to go into others, but was she alone or did you hear that from others, similar --

A Oh, yeah, I heard that many times. That was just an example.
Q About how many times?
A How many times?
Q Roughly.
A Oh. I mean, dozens.
Q So did you reach a conclusion that there were a number of people who had expressed initial interest and then told you that they had read something online about Liana and were no longer interested; is that fair?
A Absolutely. Yes.
Q And is it fair that there were a number of people already in a program or in a group that told you they were leaving because of what they were reading?
A Some of them didn't tell me they were leaving, but they just -- just left.
Q Okay.
A But I did have -- I also did have people who had purchased, like, the certification program. And most of the time once people do that they also purchase additional programs, because we have a lot of additional training you can do in health. And I did have people who contacted me and said they would no longer purchase more, because they were -- because of the things they had read. And they would have been ongoing continuous customers, which most of our people are.

MR. PORTNOY: Thanks.

No further questions, Your Honor.

THE COURT: Cross-examination.

MR. ADAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ADAMS:

Q Morning, Ms. Noelani.

What was your name at birth?

A Laura K. Schneider.

Q And then you took your husband's name to Laura Lambrecht?

A Correct.

Q And Ms. Wilson, after you met her, gave you the name Cahira Noelani, correct?

A No.

Q Where did you come up with -- Noelani is a Hawaiian name, yeah?

A Yes, it is.

Q What does it mean?

A It means heavenly or princess from heaven.

Q And is it your testimony that Ms. Wilson didn't have any input into your changing your name?

A Oh, I didn't say that.

Q What input did she have?

A I asked -- I asked her if there was a name that would energetically resonate with me, because I was at the end of so

much work and personal work on my life, and I no longer resonated with the name my parents had given me in the cult. And I didn't want to be associated with the person they created me to be. And I no longer wanted to use my ex-husband's last name because of all the trauma and abuse he had caused me.

So I wanted a fresh start that was symbolic of the ten years of work I had been doing to deprogram from the religious cult and create a new life. And it's hard to pick out your own name, so I asked Liana if there was -- if she saw a name that would resonate with my energy and my life. And I asked her repeatedly if she had anything, and eventually she -- she saw one and I loved it. So I took it.

Q Where did she see it?

A It's an Akashic name. So she can see --

Q A what?

A An Akashic name. It's a spiritual name.

Q What's an Akashic name?

A It's something in the Akashic Records that you can see things that resonate with each person. So it's quantum physics, you know, past, present, future. And there can be, you know, energy -- everything is energy. So everyone's name is energy. Like, words have frequency, that's just -- you know, everybody can hear something and feel that. And so I wanted a name that felt like it was more along the new energy that I wanted to present in life.

Q And Ms. Wilson told you that she saw in the Akashic Records that your new last name would be Noelani?
A She saw it or she felt it.
Q And then she told you that and then you went and legally changed your last name to Noelani?
A I changed my entire name.
Q Yesterday you didn't mention the bankruptcy after you were talking about making six figures working for plaintiff. I filed -- I found your bankruptcy last night and I filed it this morning. When you walked outside with counsel, did he tell you that I found your bankruptcy file?
A No, he didn't talk about my bankruptcy.
Q How come you didn't mention it yesterday but you only mentioned it this morning after I filed it?
A Because he asked me about financial difficulties, he didn't ask me that yesterday.
Q Well, he did ask you about financial difficulties out in the hallway, when I asked for a break, and I asked him to read you an order to limit your testimony, he asked you about your financial difficulties in the hallway?
A No, he asked me about financial difficulties on the stand.
Q You didn't mention it yesterday when you were talking about making six figures for Ms. Wilson. How come you didn't mention that eight years into her program you filed bankruptcy?
A I didn't make six figures with Ms. Wilson. I made six

figures in my health coaching business.
Q You testified yesterday within 60 days of finishing Liana's health coaching program in, like, 2014 or 2015 that you started making six figures. Is that wrong?
A I didn't -- I don't believe I said that.
Q And do you remember what you submitted to the bankruptcy court in Wisconsin about your earnings in 2021?
A I don't remember my details.
Q Do you remember that you -- well, did you go to any formalized education after high school?
A Did I --
Q College. I think you went to junior college, you said?
A Correct. Yes.
Q Did you take out student loans for that?
A I did not.
Q In your bankruptcy you discharged student loans. Who were those for?
A My children. And actually, no, I didn't because student loans can't be discharged.
Q And in your bankruptcy petition -- do you want to take a look at it? I have it in there. It's Exhibit 1205 in front of you, if you like to take a look to refresh your recollection.
A I have nothing in front of me.
THE COURT: Ms. Cortez, if we could get her Exhibit 1205, please. Thank you.

This will be in Volume III of the defense.

THE WITNESS: Okay. Thank you.

There is nothing in 1205.

THE COURT: Why don't I give you my 1205.

(Handing document.)

MR. ADAMS: You have it now?

THE COURT: I had one, but she didn't have one, so I gave her mine.

MR. ADAMS: We had people here doing that. I thought they had done that. Apologies. That's on me.

THE COURT: No problem.

All right. You may continue.

MR. ADAMS: Your Honor, this a -- an official court record. May I have it -- move to admit it in evidence.

THE COURT: Well, let's have her identify it first.

MR. ADAMS: Oh, thank you.

BY MR. ADAMS:

Q You see what's been marked as Exhibit 1205 is your petition that you filed in the Eastern District Wisconsin Bankruptcy Court?

MR. PORTNOY: Well, Your Honor, I think it's multiple, multiple, multiple pages. And I don't think she should be asked from looking at the first page. She should be given an opportunity to make sure she recognizes the entire 25- or 35-page document.

THE COURT: Okay. Why don't we just start by asking her the foundational questions, and if she doesn't know them, we will give her time to answer them.

So go ahead with the foundational question.

BY MR. ADAMS:

Q This is the petition you filed, correct, you recognize it?

A I'm not sure.

Q You're unable to tell -- what does it say is the name of the -- of the debtor?

A Yes, Cahira Noelani.

Q Cahira Noelani?

A Yeah.

Q And you lived in Wisconsin right?

A Yes.

Q And you testified under oath here that in 2021 you filed bankruptcy?

A Correct.

Q So what basis do you have to say that this is not that actual bankruptcy filing that I pulled off the court website?

A Because I have not looked at the whole thing.

THE COURT: All right. Let's give you an opportunity, ma'am, to take a look at it.

THE WITNESS: Okay.

THE COURT: So take your time.

THE WITNESS: Okay.

THE COURT: And ladies and gentlemen, if you want to stretch now, you can. You don't have to. I might. So it's up to you.

(Pause in the proceedings.)

BY MR. ADAMS:

Q That was your address on Page 2, 6015 North Shoreland Avenue?

MR. PORTNOY: May the witness -- I believe the witness is still reading the document, Your Honor.

THE WITNESS: I'm still reviewing everything.

MR. ADAMS: I was just directing her to some pages.

MR. PORTNOY: And Your Honor, to shorten this, I would be happy not to object to any specific page that counsel may want to ask and try to get admitted, than rather have the witness read the whole thing. But if counsel is going to ask about --

MR. ADAMS: Page 5.

MR. PORTNOY: Just one page?

MR. ADAMS: Page 5 of 48.

MR. PORTNOY: Okay.

BY MR. ADAMS:

Q Do see it down at the bottom, ma'am, there's numbered pages of 48?

A So this is the only page I should be looking at?

Q That's the one I'm going to ask you questions about.

You're welcome to continue to look. I think Ms. Wilson's counsel was hoping to speed it up.

MR. PORTNOY: Page 5 of 8?

THE COURT: There's two -- and apologies, ladies and gentlemen, I know that it's hard --

THE WITNESS: Page 5 --

THE COURT: One second, one second.

I apologize, ladies and gentlemen, but we're just going to try to figure this out without having you leave the courtroom.

So there's two sets of documents. One is 48 pages. And one is eight pages.

So, they're asking you, ma'am, to look at the 48-page document, which is the second document, Page 5.

THE WITNESS: Is it -- is it page --

MR. ADAMS: That's correct.

THE WITNESS: Page 3 of where it says, like.

MR. ADAMS: Yes. Yes. And there's -- it says --

THE COURT: Let's ask her if she recognizes it. We still need to lay the foundation.

MR. PORTNOY: I don't know what --

THE COURT: All right. Let's ask her some foundational questions, please.

MR. ADAMS: Sure.

BY MR. ADAMS:

Q Paragraph 19, you see that where you're listing your business, Nutrition For Amazing Health LLC?
A Yes.
THE COURT: Let's start by asking her if she recognizes what this document is.
MR. ADAMS: Sorry, I just wanted to make sure we're all on the same page, Your Honor.
BY MR. ADAMS:
Q Do you recognize this now?
A I recognize it as part of it. I do not know if it's all mine. I have not looked at this a long time and I'm not, I guess, going to be looking at the whole thing, so.
Q I'm just trying to ask a couple -- few questions on this.
Does that refresh your recollection now you filed your bankruptcy 2021 in the Eastern District of Wisconsin, correct?
A Yes, I said I did that.
Q And at the time if you --
MR. ADAMS: Well, I'll move to admit this into evidence, Your Honor.
MR. PORTNOY: I'm sorry, Your Honor, move to admit what?
MR. ADAMS: The entire exhibit.
MR. PORTNOY: No, I don't agree until she's had a chance to read the entire exhibit. I said I would --
THE COURT: All right.

MR. PORTNOY: I'm sorry, Your Honor.

THE COURT: No, I understand. Mr. Portnoy was trying to move things along, and I don't think he predicted that you were going to offer the entire exhibit.

MR. ADAMS: Can I publish the page that she has confirmed?

THE WITNESS: I don't know -- I mean, Nutrition For Amazing Health was my LLC, correct. I am not confirming anything else because I have not looked at this in years. And I had somebody fill it out for me, it was an attorney.

BY MR. ADAMS:

Q And you signed it and submitted it?

A Yes, but...

Q In federal court?

A Correct, but I'm going to have to look at exactly what it is to answer to what it is.

Q We're on that page that --

A Okay.

Q -- your business is listed. And this is the business that you were able to form through the courses you took from Ms. Wilson?

A Yes, this is the business I chose to form.

Q The business you were talking about yesterday gave you financial freedom after meeting Ms. Wilson, correct?

A Yes.

Q This is the business that you testified yesterday was the one that you were able to make six figures with after taking Ms. Wilson's courses, correct?
A I didn't say six figures.
Q Well, the record reflect what it does.
A I don't believe --
Q This business then, in 2021 you said you own a hundred percent of, has no assets, holds no inventory, and has zero value, correct?
A Mm-hmm.
Q Thank you.
THE COURT: I'm sorry, you have to say yes or no.
THE WITNESS: Oh. So --
BY MR. ADAMS:
Q Is that a yes?
THE COURT: You have to say either yes or no.
THE WITNESS: So can you please repeat the question?
THE COURT: The question was: This business in 2021 you said you own a hundred percent of has no assets, holds no inventory and has zero value, correct?
You responded mm-hmm, but mm-hmm can't be an answer in the record. So the answer is either yes or no.
THE WITNESS: Okay. So --
THE COURT: The answer is yes or no. Is that accurate?

THE WITNESS: Yes.
THE COURT: Okay.
MR. ADAMS: Thank you.
BY MR. ADAMS:
Q You can put that aside.
How much money have you spent since meeting Ms. Wilson in 2012 on her programs?
A I don't recall exactly.
Q How did you pay for it? Using a credit card?
A No.
Q Well, online you need to punch in something, right? To buy something online you can't pay with cash, you agree?
A I use debit cards.
Q Sure. Debit card.
A Mm-hmm.
Q Which bank?
A I've had several banks.
Q Well, if you want to look at your bankruptcy petition, that might help you. But you had about eight different consumer credit cards that you discharged in bankruptcy. Does that sound right?
A Possibly.
Q And on those eight different consumer credit cards, how much of it was incurred for Ms. Wilson's business?
A Zero.

Q The programs?
A Zero.
Q How do you know that?
A Because I didn't use my credit cards to pay for her programs.
Q You said you used your debit cards.
A I used debit cards. Most of what I paid for the Health Coaching Program, that I was paying for -- she gave me a payment plan, and I paid that every two weeks out of my child support check.
Q So how much was it? How much total have you paid Ms. Wilson for her programs?
A The Health Coaching Program at the time was only $2200, so it was an incredible, incredible value that I could change my whole career for only $2200.
Q Are you financially connected to her business now?
A I am an independent contractor.
Q Right. You sell -- you get a commission for everybody that you enroll in the health certification course, right?
A Correct.
Q And so the more people that come in to her health certification class, through you, you get money?
A Yes, that's commission.
Q And so if her health certification class were to take -- would be out of business because of this lawsuit, then you

would also be out of business, right?
A No.
Q You have a financial interest to defend her in this case, right?
A I would say it's not that much of my income, no.
Q You defended her in her probation action, right, in 2023?
A Correct. I -- I'm not sure.
Q Sure. You haven't been in the courtroom.
There's been some talk about some letters submitted in Ms. Wilson's probation when she admitted she pled guilty to bankruptcy fraud. You know what I'm talking about?
A Yes, I do.
Q And you submitted one of the letters in her favor, right?
A Correct.
Q You remember how long that letter was?
A I believe it was, like, 40 to 50 pages.
Q 55 pages.
A Okay.
Q You want to look at it? It's Exhibit 102 if you want to look at it.
A Mm-hm. Okay.
Q While you're pulling it up, what made you write a 55-page letter to a federal court on behalf of Ms. Wilson?
A It was in -- okay, which -- which -- where am I looking?
Q Exhibit 102.

THE COURT: It's in the binder. One second. We'll get it for you.

THE WITNESS: Thank you.

MR. ADAMS: Which is plaintiffs' exhibits.

THE COURT: This will be in the plaintiffs' exhibits.

THE WITNESS: Thank you. Plaintiffs' exhibits.

Okay. Can you repeat the question?

BY MR. ADAMS:

Q Yeah. This -- just, that's the letter if you wanted to look at it. If you want to take a look, you can see that it's -- at least the PDF that I have is 55 pages.

MR. ADAMS: And this for the record is Exhibit 102, it's been Bates stamped Shanti 000476 through 530. It is part of the record that's been judicially noticed by the Court, and I would ask that it be admitted into evidence.

THE COURT: Let's make sure she identifies is it as the letter.

THE WITNESS: Yes. At first brief glance it does look like the letter that I wrote.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: Exhibit 102 is admitted.

(Plaintiffs' Exhibit 1-2 was received in evidence.)

THE COURT: It may be published to the jury.

Do you want it pulled up on the screen? Do you want

it pulled up on the screen?

MR. ADAMS: Sure. Yes.

THE COURT: Let's go ahead and do that.

Let's -- now you -- now it can be published. Thank you.

Are the jurors able to see it? Okay.

You may continue.

BY MR. ADAMS:

Q Do you see Exhibit 102 that was produced by Ms. Wilson?

A Excuse me?

Q Do you see this letter?

A Yes, I see this letter.

Q Have you had a chance to take a look at it?

A I've briefly looked at it, yes.

Q Does it look like the letter you wrote?

A It does.

Q And if you scroll down to the very end or turn all the way to the end --

A Mm-hmm.

Q -- it's 55 pages, and it's got your E signature, right?

A I believe so, yes.

Q And --

MR. ADAMS: All the way at the end 530.

There we go.

BY MR. ADAMS:

Q That's your signature, and you signed that April 28th, 2023, in Wisconsin, right?
A Yes, I did.
Q And then if you go to -- we don't need to go through the whole thing, it's in evidence. But this is basically you talking about, like you did yesterday, all of the things that Ms. Wilson's done for you, in part, right?
A The majority of it, no, is not about that.
Q Instead the majority is about what?
A The majority of it is about the domestic violence and the abuse and the -- the custody issues that I've gone through with my ex-husband and protecting my children.
Q And Ms. Wilson gave you guidance in that, right?
A When I requested guidance she would give me guidance on certain things, yes.
Q And one of the things that you did to escape your abusive husband is you left when he didn't expect you to, correct?
A At the advice of my attorney at the time, I did.
Q I make no judgment. I'm just saying, that as a strategy in order to get away from the monster that was your ex-husband, you left when he wasn't expecting it, right?
A Yes, I did.
Q And that's a good strategy for you, right?
A It was.

That was also before I met Ms. Wilson.

Q And it worked, right?
A And it worked?
Q Yeah. You got away from the monster and got to raise your children in the area where they grew up, correct?
A It got me out of the immediate situation. It took me years to get away from him.
Q I totally understand and I respect your situation. I'm just trying to say as a strategy, what you employed --
A It was a strategy suggested by my attorney.
Q Right. Exactly.
And then when you got in with Ms. Shanti, Ms. Wilson talked about chat groups. And the chat groups are private, right?
A The chat groups are amongst the people who are in them.
Q They need to be invited, correct?
A Correct.
Q You're the administrator of the group that allows people in and allows people out, right?
A In that one I was not.
Q But that's how that chat group worked?
A The chat group had people let in and let out, correct.
Q And as part of that chat group, Ms. Wilson and you advised the same strategy that you employed, which is leaving when your husband isn't expecting it to take the kids; isn't that true?
A No.

Q So if Ms. Brady, Amanda Brady, comes in here and testifies that you and Liana encouraged women to take their kids away from their exes, would she be lying?
A That would be an absolute lie.
Q And do you know Haley Winter, she was caught at the Canadian border trying to take Ayla over the border. You know that, right?
A I heard that later, yes.
Q Is that a strategy that you gave her because it was successful for you?
A That is not the strategy that I used and I would never recommend that. I did not go against court orders and I didn't do that.
Q I believe you. But what did Ms. Wilson tell Haley Winter about what she should do? Do you know?
A She didn't tell her to do anything.
Q How do you know?
A She never said what to do in any of the groups or the chats.
Q How about her direct messages, straight with Haley. You're not part of those, right?
A Correct.
Q You don't post -- and I want to be very clear on this. You don't post under the Instagram handle Liana Shanti, do you?
A I do not.

Q And you never have, have you?
A I never have.
Q And you know the only one person that ever has, right?
A What?
Q There's only one person that ever has and you know it, right?
A As far as I know. I don't have that account so I don't know who posts on it.
Q Who is the one person you understand to be the one that posts under Liana Shanti?
A The only person that I believe that posts on there is Liana.
Q Which is Liane Wilson?
A Yes.
Q In the chat groups when these women who you said are going through the most difficult point in their life, custody battles, exes, do you think it's okay to take those and publish them on Instagram?
A It depends on the context.
Q How? You think it's okay to use Ayla's name, Byron's daughter, when she's a minor? It's okay for Liane to use that from a private chat group where these women going through custody battles are bearing their soul?
A If it's to protect a child and a mother, absolutely. I did --

Q The ends justify the means, right?

MR. PORTNOY: Wait, wait, wait, Your Honor.

THE COURT: One second.

MR. PORTNOY: I think she was in the middle of an answer.

THE COURT: All right. You may continue.

THE WITNESS: Okay.

Yeah, I posted -- if you look at Page 14 of my letter, that is something I posted. Those are my daughter's code words that we used to stay safe from when we were going through -- trying to stay safe from my ex-husband. So, yeah, I've posted pictures of my kids and things because it's important that abuse is called out.

BY MR. ADAMS:

Q How many times have you posted photos of other kids, minor children online?

A I haven't.

Q Right. But Ms. Wilson has hundreds of times, right?

MR. PORTNOY: Your Honor, I -- I --

THE WITNESS: Not that I'm aware of.

MR. PORTNOY: Your Honor, I object to counsel continuing to point his finger at my client.

THE COURT: It's fine. Let's just not do that. Make my life easier, please.

Okay. Thank you.

You may continue.

BY MR. ADAMS:

Q You've never met Byron Horvath ever before today, have you?

A Thank God, no.

Q You've never met Paula Haygarth before today, right?

A No.

Q You never met Stefanie Horvath, right?

A No.

Q And you testified that Amanda was in the chat, these private chats, bearing her soul, talking about Paula, and that -- remember, she thought -- she speculated that Paula was behind the Liana Shanti 369 Reddit posts, right?

A The Liana Shanti Cult.

Q What was the relationship of Amanda and Paula at that time?

A She said that she was married to her ex-husband.

Q They were coparenting Amanda's kids which she had with Wade, right? And Wade is Paula's husband, right?

A I believe she had full custody. I don't think they were coparenting, from what she said.

Q But Paula was Amanda's ex's new wife, right?

A From my understanding.

Q Yeah. And so Amanda, who's going through a custody battle, as you just testified, she's going through horrible

family issues in these chat rooms as she's bearing her soul --
A No, Amanda was not.
Q She's saying that she thinks --
MR. PORTNOY: Wait.
THE COURT: One second.
So she just denied that Amanda was doing that.
MR. PORTNOY: Right.
BY MR. ADAMS:
Q Well, when Amanda is saying that she thinks that Paula is behind some negative comments of Ms. Wilson -- sorry, I pointed.
When Amanda is in the chat room saying that she thinks -- it's her speculation that my client is behind some of the anonymous posts on Reddit, her ex was married to Paula, right?
A Yes.
Q The motivation is there. She viewed Paula as a threat, right?
A No, she didn't -- she never said she viewed Paula as a threat, as I recall.
MR. PORTNOY: Wait, please.
THE COURT: All right. Okay. Let's not talk over each other, and let's just take it one question at a time, one answer at a time. All right?
So ask your next question.

BY MR. ADAMS:
Q At the time then that Paula -- that Amanda was speculating in the chat about my client, she was also saying that she didn't think she was a good mother, stepmother to her kids, right?
A Please repeat the question?
Q Yeah. You denied that Amanda and -- that Amanda and Paula, my client, were coparenting. But at some point in time Amanda's kids went over to Wade's house and were then in the same house and living with Paula. Do you agree with that?
A I don't know.
Q You have no idea?
A I don't know what their -- I remember Amanda saying that she had full custody. I didn't know really much about Paula until the threads -- she started posting these threads. And the custody situations were more with Haley talked about those. Amanda was more talking about the people who were attacking her business and -- her and her husband's business.
Paula didn't -- I don't -- I don't recall Paula being mentioned until the Reddit threads started, and then she said -- that's when I first recall Paula being mentioned. And I didn't know who Paula was until she said she's married to my ex, something along those lines. I don't recall the exact wording. I don't remember discussion about her before that.
Q So she was speculating that it was her ex's new wife that

was making these nasty postings against Ms. Wilson?
A I have no idea when they were married.
Q But you understand that's their relationship, is that Wade's now with Paula and he's not with Amanda, and so Amanda would have a motivation to say negative things about her ex's new partner?
A Not if she left Wade. Why would she care?
Q Because she's having to deal with the custody issue.
A But she had full custody, so I don't know why -- I never heard that being a problem.
Q How do you know that?
A I just say, I never heard her mention that being a problem.
Q And full custody doesn't mean the kids don't get to go over to the father, does it? You know that.
A Well, it's different in every court situation. I don't know what their exact situation was.
Q You had full custody and the kids still went over and stayed at their dad's, right?
A I had primary custody.
Q Right. And the kids still went over and stayed at their dad's?
A They would go to see him for a couple hours a week.
Q Did he have a new spouse at any of that?
A Yes. He has been remarried.

Q So you had to coparent with a new spouse, didn't you?
A No, I did not.
Q So your husband, when the kids went over stayed with him, you didn't have to deal with his new spouse parenting your kids?
A I'm the mother. He's the father. We did not.
Q Okay.

MR. ADAMS: I don't anything further, Your Honor.

THE COURT: Thank you.

Any redirect?

MR. PORTNOY: Your Honor, can we have a sidebar please?

THE COURT: All right. Yes.

MR. PORTNOY: Very quick.

THE COURT: Ladies and gentlemen, you may stretch while we have a sidebar.

(Sidebar on the record:)

MR. PORTNOY: Trying to be cautious -- oh, I'm sorry.

THE COURT: He put his binder over it. That's okay.

MR. ADAMS: -- death threats in this --

MR. PORTNOY: Yeah, you know exactly --

MR. ADAMS: I asked her --

THE COURT: Okay. Hold on. Let's -- let's -- sorry. Why don't we do this. Why don't we go ahead -- how long do you think your redirect is going to be?

MR. PORTNOY: Well, depends upon what the Court says.
THE COURT: Okay. Maybe about 10, 15 minutes.
So, this is an exhibit. I don't know why he can't go into what's in an exhibit that's been admitted.
MR. ADAMS: I think he's saying I opened the door.
MR. PORTNOY: He put it in.
THE COURT: You put it in, so he can ask whatever is in the exhibit.
MR. PORTNOY: Yeah, I just wanted to make sure. I don't want another --
THE COURT: That's fine.
(End of sidebar.)

REDIRECT EXAMINATION

BY MR. PORTNOY:
Q Me again.
A Hello.
Q Can you take out Exhibit 102?
A Is that -- is this my letter one?
Q Excuse me? Yes. That's the letter.
A Mm-hmm.
Q And can you turn to Page 43?
MR. PORTNOY: Your Honor, can we have that put on the screens, please?
THE COURT: Sure.
MR. PORTNOY: Thank you.

THE COURT: For the record, 102 has obviously been admitted.

MR. PORTNOY: I don't see, is it there yet.

THE COURT: Does your team have it? If your team could pull it up, please.

MR. PORTNOY: Sure. No problem.

THE COURT: Thank you.

What page number again?

MR. PORTNOY: 43. Exhibit 102. Which defense counsel just put in.

THE COURT: All right. It's on the screen.

MR. PORTNOY: Is it on? Thank you.

BY MR. PORTNOY:

Q Do you see Page 43?

A I do.

Q I want to talk to you about the first several lines. Did you write that in the letter to the Court?

A Yes, I did.

Q Other dangerous people associated with the silencing group that Marie and Jeff are engaging with.

Did I read that?

A Yes.

Q This is just a few examples.

Can you read exactly what you wrote?

A Yes. This is just a few examples. Byron Horvath of

Saskatchewan, Canada, his connection is he was the ex-husband of Liana Shanti's customer Haley Winter. He made death threats on May 19th, 2022, to six people, Liana Shanti of Kauai, Hawaii; Robert Beard of Kauai, Hawaii, who is Liana Shanti's husband; dean Wilson of Kauai, Hawaii, Liane's ex-husband; and B and C, Liana's two minor -- or two children; Amanda Brady of Jacksonville, Florida, acquaintance to Haley Winter and Liana Shanti's customer.

See the ongoing FBI investigation led by Jimmy Chen, (808) 479-7372.

Amanda Brady was granted a six-month injunction for protection from Byron.

Q Is what you wrote there, to the best of your knowledge, true?

A Yes, absolutely.

Q How did you learn about the death threats on May 19, 2022, to Liana and her husband?

A I was told it directly from Liana.

Q Okay. What did you mean by "other dangerous people" when you mentioned Byron Horvath?

A That -- that these people were very dangerous. I was very concerned because they were now connected to my ex-husband, who was Jeff and his new wife. And they were conspiring to harm Liana with these letters, and I was very concerned that he was now connected with people like Byron, who Haley had spent years

telling us about how dangerous he was and what he had done to his daughter. And that was very, very concerning for me.

Q How did you know that Byron was connecting with your ex-husband?

A Because my ex-husband had been completely, like, out of the picture, basically. We had gone through our custody situations, and all of a sudden out of nowhere he is writing letters to a judge about Liana who had nothing to do with our relationship because I left him before I even knew Liana. And so I was, like, where is this coming from? Like, why would you write -- or where -- why are you writing letters? And also this whole group of people.

And I was very, very concerned for our safety because these people were making death threats, rape threats to Liana, and you know, were actively doing things to try to -- you know, from what their spouses were saying, their ex spouses were trying to harm them, and now his ex-husband and his wife were connected to them again. Like, I've been through some awful stuff with my ex-husband and I was very, very concerned about this.

Q Okay. Go to Page 44.

Information about the kidnappers and deprogrammers the silencing group has been colluding with.

A Mm-hmm.

Q Before we get to the individuals, who is the silencing

group?
A So the silencing group is what we called the nine people who wrote letters to try to harm Liana, because they were all -- they were all family members, like ex family -- family members of people who were outing their -- like the abuses that they had endured from them.
And so they --
Q I just want to know who they were. Thank you.
A Mm-hmm.
Q Who were the kidnappers and deprogrammers?
A These are very scary people. So Rick Ross, Joe -- I don't know how to say his name, Joe Szimhart, and Steve Hassan, these are people that are, like professional kidnappers, and have actually kidnapped people, adults, trying to psychologically and physically torture them to get them to change beliefs.
Q Are these people that you believed were associating -- when you say other dangerous people associated with the silencing group, and you list Byron Horvath, that's how you were tying them in?
A Yes, because they had -- Joe Szimhart had actively posted on the Instagram page that they were using to -- to attack Liana. He was following it. He was posting on it. And he had also made a video about her. And then one of the other people had -- I was told had come to another one of the women in our group's home and her ex-husband --

Q Right. But my question was, what was the association when you listed Byron Horvath as a dangerous person associating with the silencing group? That's my question.
A Oh, yes, yes. So he -- so he was the -- the ex-husband who made the death threats.
Q Okay.
A And we were then -- and then this group of these -- these kidnappers were connected to the page that I believed they had started. And they -- the -- they had an like a jot form that they had on this Instagram page that they were using to make these claims, that's false claims about Liana with the child trafficking. And they were -- no, this is serious. They were requesting --
THE COURT: Slow down. Slow down, please.
THE WITNESS: Sure.
THE COURT: Thank you.
THE WITNESS: They were requesting people submit their family member's names, along with minor children information. And that was going to this page that had these professional kidnappers following it. They were posting information from these kidnappers and these deprogrammers.
BY MR. PORTNOY:
Q Okay. Thank you.
A You're welcome.
Q Page 51. And I'm not going to ask either you or the jury

right now to read the entire section between 51 and 55. But you had a section at the end called, So who is Liana Shanti to me, right?
A Mm-hmm.
Q You wrote that?
A I did.
Q And you basically over the last couple of hours talked a little bit about what she meant to you, what she means to you?
A Mm-hmm.
Q Correct?
A Yes.
Q Okay. Defense counsel tried to suggest that you have both a personal relationship and a financial relationship to Liana that would cause you to not tell the truth. Remember that?
A Yes, I remember that.
Q Is there any validity to that?
A No, there is absolutely not.
Q Has Liana in any way ever threatened you or -- let's start with that, that if you don't come to court and you don't say what a great person I am, you're no longer going to be an independent contractor?
A No. She has never said anything like that.
Q You're appearing voluntarily, correct?
A Absolutely. I was happy to come here and tell the truth.
Q Okay. One last thing. Do you know how many people signed

up in the first part of 2022 before May?
A Yeah.
Q A rough number.
A Approximately 70.
Q Okay. Do you know how many signed up in the second half of 2022, after all of these posts started to come out?
A 16. Approximately 16.
Q So 70 in the first six months?
A Well, if you want the full six months -- you said through May.
Q Okay.
A So --
MR. ADAMS: Objection. Relevance. Signed up for what?
THE COURT: Let's clarify what they're --
MR. PORTNOY: Yeah, sure. I'm going to.
THE COURT: Thank you.
BY MR. PORTNOY:
Q When I used the word signed up --
A That would be --
Q -- which -- which program or which --
A Enrollment in HMI -- the HMI Health Coaching Certification.
Q So it went from around 70 in the first five months, before there were any posts, defamatory posts, down to 16 in the next

seven months?
A From July through December there were 16.
MR. PORTNOY: No further questions. Thank you.
THE COURT: Thank you.
Recross.

RECROSS-EXAMINATION

BY MR. ADAMS:
Q You can stick with Exhibit 102 there, Page 43, where it -- Exhibit 102, Page 43, where it mentions Byron.
A Mm-hmm.
Q And you testified every single word of that, all of that information came from Ms. Wilson, correct?
A I'm sorry, I didn't hear what you said.
Q Sure. You're at Page 43?
A Yes.
Q Remember this letter that you submitted to federal court?
A Yes.
Q You just testified that every single word in this about Byron Horvath, you learned from Ms. Wilson, correct?
A No. I learned that -- no, I did not say that.
Q How did you learn that Byron Horvath is from Saskatchewan?
A How did I learn that what?
Q How did you learn that Byron Horvath is from Saskatchewan?
A I believe that was what Haley told me.
Q So the death threats part, everything under the death

threats, Liana, Robert, Dean, all of that, that's all -- your testimony just moments ago, you were told all of that from Ms. Wilson?

A I was told by Liana that she received death threats. Haley is the one who said they were from Byron because she recognized his voice.

Q And so then you didn't -- you don't have any personal knowledge from what you saw or read anywhere about this, correct?

A I heard from Liana and Amanda that they received death threats, and I heard from Haley that she said that Byron was the one who made those.

Q Go down to Page 49 of this, where you talk about Amanda.

You guys were close, right, for a little while?

A We were not close.

Q Okay. Well, you knew enough about her that you knew that she had a place in Florida that was being described as a compound, right? And you took it upon yourself to tell the Court that, no, it's not a compound, it's just three adjoining houses with a collective group of women that live there; is that right?

A From my understanding, that's what Amanda had said, it was three adjoining houses.

Q Right. And so then Amanda, who is one of Ms. Wilson's students and part of this group, is living in Florida. She was

from Canada, right?
A Yes.
Q She moved from Canada to Florida, right?
A Yes.
Q And you're telling the federal court judge that she has a house down there, a multi-family house together, that she rents out to people, correct?
A That is what she told me.
Q What you don't say is that she's renting it out to women that are fleeing their exes, correct?
A I don't know they're -- they weren't all fleeing their exes, so why would I say that?
Q But she was renting it out to women who had their children there, correct?
A Some of them had children, I believe, yes.
Q So don't you think it's reasonable then, if you were Wade Martin, and Amanda had your kids down in Florida, and she's got houses there, multiple units where she's renting out to women who are bringing their kids, isn't it reasonable for Wade and Paula to believe that Ms. Wilson's encouraging that?
A Why -- why in the world would they believe that?
Q Well, how do you know about it?
A Because Amanda told me she bought a house that had multiple units and it was super cool.
Q And she told you in connection with all of the chats where

she's talking about abuse, right? You guys weren't friends. You just said you weren't friends.
A She was not talking about abuse in those. Haley was talking about abuse. She was talking about her husband being -- business being attacked and her being attacked.
Q And then finally look at Page 54 of your letter where you underline it.
A Mm-hmm.
Q Right there in the middle.
A Mm-hmm.
Q And you say to the judge: If I can be one one thousandth of the woman Liana is, I will die feeling I served my life's purpose.
Did I read that correctly?
A Absolutely.
Q Do you believe your life's purpose is defined in relation to Ms. Shanti?
A Repeat the question?
Q Do you believe your life's purpose is defined in relation to Ms. Shanti?
A No.
Q Okay.
MR. ADAMS: No further questions, Your Honor.
THE COURT: Thank you. May this witness be excused.
MR. PORTNOY: (Nods head up and down.)

THE COURT: All right. Thank you.

Ms. Noelani, you may step down.

And actually, before we do that, let's take our recess. It's close enough to 10:00.

So we'll take a 20-minute recess right now, which means that we will start shortly after 10:15.

And so as always, don't talk about the case and don't do any research.

So we'll see you closer to sometime between 10:15 and 10:20. Thank you.

THE WITNESS: Thank you.

(At 9:56 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. You may step down, ma'am.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Portnoy, if you could have your next witness on the stand once we come back from the break, please.

MR. PORTNOY: Yes, Your Honor.

THE COURT: We are in recess.

MR. PORTNOY: You said between 10:15 and 10:20?

THE COURT: Correct. So whoever your witness is, if you could have them on the stand around that time.

MR. PORTNOY: Thank you.

THE COURT: Thank you.

(A recess was taken from 9:57 a.m. to 10:21 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right, ladies and gentlemen. While you are getting settled, let me tell you that our next break will be at noon. So we're going to do a stretch break between now and then.

And if I haven't said this before, if you need a break for any reason at a time that I haven't scheduled, just raise your hand. You guys can take a break when you want, just raise your hand and let us know. All right?

Okay. Mr. Portnoy, call your next witness, please.

MR. PORTNOY: Thank you.

Robert Beard.

ROBERT BEARD, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name and spell your last name for the record.

THE WITNESS: My full name is Robert Steven Beard, B-E-A-R-D.

THE COURT: You may be seated, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: You may proceed.

MR. PORTNOY: Thank you.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q And Robert, what is your relationship to Liana?

A We've been -- I call her my wife. We're not legally married, but we've been together for 21 years.
Q Okay. Let's learn a little bit about who you are, the pre-Liana days. Where were you born?
A I was born in Des Moines, Iowa.
Q And graduated high school?
A Yes, I did.
Q And what did you do after high school?
A I joined the U.S. military, the Army.
Q Voluntarily?
A Yes, sir.
Q In what year?
A 1976.
Q And why did you join the military?
A I wanted to learn construction and utilities work, that was originally what I went there for.
Q How long were you in the Army?
A I served ten years total.
Q Can you give us your rank progression?
A Yeah. I started off as a private and ended up as a staff sergeant.
Q And during your ten years in the Army, can you just give a summary to the jury of what your tasks were?
A Yes. Originally, as a construction utilities worker, I was assigned to -- at Fort Rucker, Alabama to a battalion that

did engineering in general. We were able to be deployed worldwide with everything from a shovel to a bulldozer. And we would move the whole unit there. And I had some pretty decent scores in the tests that I was admitted into the Army. And so I never actually got to do the job that I wanted to go into. They put me into S2 intelligence, and I helped, like, do that kind of work. And it was all office kind of work and paperwork and stuff. And so I didn't really enjoy that.

And so during the course of doing the paperwork, I, like, got people security clearances and stuff like that, I learned about a unit that I never, ever saw anybody from, and it was called an EOD unit, explosive ordinance disposal.

And so should I just continue?

Q Go ahead.

A Okay. And so I wanted to change jobs, but it was really hard back then to change jobs. So I made an excuse to take paperwork over to their unit and I met them and talked to them and found out what they were doing and why they needed these clearances. They had, like, top secret clearances with critical nuclear weapon design information and all of this kind -- I was just, like, fascinated. And these guys worked in, like, very small, like, nine, ten, 11-guy units, and they did all different sorts of things. It dealt with --

Q Did you join that unit?

A I ended up doing it. I told them I'd like to be -- I'm

looking for a new job and you guys know how hard it is to get out. And the captain liked me. And so he did all the paperwork and got me to transfer.

Q Did you stay in that?

A Yes. That was my job for the remainder of my service time. It was shortly after a year after I got in.

Q Did you ever serve overseas?

A No. I was on my way overseas when I was injured.

Q How did you get injured?

A I got smashed between two vehicles on -- on my -- the day I was traveling to go to Korea. Anyway, I got -- and then I was, like, smashed between these two vehicles for a couple of hours, and then, like, the garbage men found me. It was like 4 o'clock in the morning or something and they found me pinned in between them and they called police and ambulance and all of that sort of thing. And they came and got me unpinned. And then I was in so much pain that they put me into a medically induced coma for a while.

Q What kind of injuries did you sustain, just succinctly?

A Five fractures of the hip, two crushed vertebra in my back.

Q And how long were you hospitalized?

A It was, like, somewhere between four, five months. It might have been even up to around six.

Q And did that cause you to leave the service?

A No. It did not.
Q You went back?
A They were telling me I was never going to walk again. And I was -- I didn't buy any of that. And so I -- I was in traction, and they couldn't get my hips to work right again. And so I would just lay there and I would move around as much as I could. And I actually, because of the traction and the way -- however that worked, I actually popped my own hip back into place.
Q So are you on any kind of disability?
A Am I on disability now?
Q From the service?
A Yes, I am. I'm 90 percent disabled veteran.
Q So what made you leave the service?
A My disability was -- was -- was not going to continue on like that.
Q So that takes us to, what, 1986?
A Yes.
Q What did you do when you got out of the Army?
A So, I had -- we never took vacations or anything when I was serving because we didn't have time. So I had a bunch of leave built up and I cashed it in, and I got out and I was going to go to college to become an engineer, because I wanted to still build things.
And so I did that for a couple of years and figured

out that my job as an engineer was going to be in an office going over plans and drawing stuff and doing calculations, which I can do, and I enjoyed learning that part of it, but it wasn't what I wanted to do.

But I had met this other guy and -- during -- in my neighborhood and we became friends. He worked in construction. And so during the summer when I was off, he came over and got me one morning and goes, come on, I need you to help me do something.

Q So -- so you got involved in construction?

A I got involved in construction with him, yes.

Q And that's what you've been doing since?

A I've been doing that for 38 years.

Q And what kind of construction?

A I -- I build and remodel homes.

Q What year did you meet Liana?

A Wait a second. Let me do the math.

Q These are the tough ones. Go ahead.

A That's funny.

It's 2020. It would be 2019 -- wait a second. No that's not right. Chance is 20. So --

Q Obviously not a math major.

A 2005.

Q And that was where?

A I didn't know there was going to be math involved.

Q Yeah, I know.
Where -- where did you meet her?
A Oh.
Q So don't go into all the details, just where?
A I met her in -- on the Big Island, in Kailua-Kona. That's where I used to live at.
Q Okay.
A That's where I met Liana.
Q Wait. Stop. We got to do this sequentially.
When did you move to Hawaii?
A I moved to Hawaii 38 years ago.
Q And why?
A Because a friend of mine there -- oh, wait, I misspoke about the construction. That's how I got involved in construction in Hawaii, was through Gordon. But I used to live in California. When I got out of the military, I was stationed in California and I got out in California.
And I met a guy there -- oh, no, that is where I met Gordon. And then I went into the union there in California. And I met another man, Keith Johnson, and he had a hard hat on, and it had like a calendar and he was crossing off days of every day. It was called -- we called it short timer in the military.
And I would ask him what it was at lunch and stuff. And he goes, oh, I'm going back to Hawaii to build houses. He

had come to California because there was a recession. Anyway, I go, do you need any help? And he goes, Actually I do because I don't have a crew there anymore.

So I literally put what I owned in a shipping container, a storage yard shipping container, and went with him and left to Hawaii. He got me an apartment set up before I got there, and I worked with him. And I've never left since.

Q And you lived on the Big Island?

A I lived on the Big Island for 17 years.

Q So now --

A Maui for one. Kauai for 20.

Q Okay. We'll get to Kauai.

A Okay.

Q So you were involved in home construction on the Big Island for a number of years?

A Yes.

Q Okay. And you remained -- do you still build homes?

A No. I -- I mostly remodel homes now. I take on remodel projects. And not just homes, like, I can do a variety of things, but it's all building stuff that I do.

Q Do you have a company name?

A I used to have a full-on company. Bob's Home Improvement, is what it was called. Now -- the way -- and how my business evolved was that I only work for people that I know or friends of, like --

Q Mostly on Kauai?
A Yes.
Q Okay.
A My business started on Big Island, though.
Q Yeah, I understand.
A Yeah, yeah.
Q Okay. So let's move a little bit ahead. You met Liana where?
A Oh, okay. So I would -- construction, like, hurts my body pretty much a lot. So I would get massages, like, weekly. And a friend of mine who was a triathlete and really into all that kind of stuff would, like, give me massages once a week and use these, like, torsion bar things to break up like sore stuff and stuff that was keeping me from moving around right. And all of a sudden I lost my regular Tuesday afternoon slot that I had had right after work.

And so this went on for a while and he kept rescheduling me, here, there and everywhere. So finally I asked him, I go, why, you know, do I not have my slot anymore? And he's going, like, Well, somebody else has it now. And I'm going, like, Who? He's like, It doesn't matter, I'll fit you in other places and stuff.

So then one night -- him and I used to go to the movies once a week, and he goes, somebody else is coming to the movies with us, and it was Liana. This guy is my best friend.

And so we get -- we're -- we're at dinner talking before the movies and stuff, and she's telling me what a great massage therapist Gary is and how he goes to her every Tuesday afternoon at 4 o'clock, which was my slot. And so we're going back and forth. And now 21 years, here we are.
Q Okay. The rest is history.
A I'm telling you, I'm not one of those believers in, like, love at first sight or anything, but we hit it off, like, immediately, much to my best friend's dismay.
Q Okay.
A Because he was very, very interested in her, and it actually ended our friendship.
Q So that was 21 years ago?
A Yes, sir.
Q All right. And you say you're not married?
A No, we're not married.
Q Okay. Do you live together now?
A Yes.
Q When did you first start living together?
A Several months after we met.
Q And how many kids have you had through this relationship?
A We have one biological child together, Chance. And Bianca is my daughter also. She calls me Dad.
Q From another relationship or --
A No, no. Bianca is Liana's daughter.

Q Okay.
A She has a different biological father, but I'm Dad.
Q Okay. So, what did you know then -- and we'll move forward -- about what Liana, other than taking up your massage spot, what was her life? What was she doing? What did you learn?
A I learned -- you mean, from us just, like, talking and dating in the beginning?
Q Yeah, in the beginning.
A Oh, that she was a lawyer at -- at Skadden Arps, the largest law firm in the world, and that she worked in mergers and acquisitions. And, like, her -- I learned everything about her, her family history. But how -- like, what I learned from her, like, right away was how smart she was.
Q Yeah, but what -- what's her work? What did she tell you she was doing? This was on Kauai?
A Yes. She had gotten -- she quit being a lawyer during 9/11 because she was pregnant with Bianca and she actually witnessed people --
Q Yeah, the jury the jury's heard that, yeah.
A Okay. So she was changing careers. And she had tried, like -- I don't want to get it wrong -- some -- was it acupuncture? No, I'm going to get that one wrong. She tried something else and it wasn't fitting her.

So then she met a woman who was making a lot of money

doing timeshare. So she got her real estate license and started doing timeshare. And she was a natural at it. And she was, like, breaking sales records and had, like, this percentage of close rate that was incredible and just, like, yeah.

Q So she was in real estate?

A She was in real estate, yes.

Q Okay. And there came a point where she no longer was involved in real estate, right?

A Yes.

Q And then what did she begin to do?

A So, she went to nutrition school. She loves nutrition and food and how your body works and stuff.

So, one 4th of July, after she got her degree, we were sitting around and she had her notepad and her computer and she's like going like crazy. And I'm going, like, what are you doing? And she goes, I'm going to start a nutrition website and company. And I go -- I go, oh, wow. Okay.

And so that was how Rawganic Vegan was born.

Q And then how has she expanded her business from that point to now?

A Okay. So this Rawganic Vegan was a website, and it dealt with health and nutrition. And it was designed -- anybody could buy the stuff, but the majority of her customers were women, because I guess women make -- this is the number that I

heard -- 70 percent of the buying decisions of a family and they're more involved in that type of thing.

So she had -- like, it started off with a juice cleanse. And it was 20 bucks. And then a candida program, because I guess that's more of a female thing, candida. And then there was a 66-day life mastery program, which was an eating thing of how to eat healthier.

And she put those three programs together and, like, had to, like, prove herself on the internet. These doctors and all these people would come on there and, like, try to debunk her and what she was doing. And she would, like, research for hours and hours and answer these people one at a time to establish herself as a credible figure on the internet.

And by -- by selling -- a juice fast was 20, candida was 39, and 66-day was $66. And she literally, like, kept promoting it, working, like, posting these articles on health and nutrition and stuff. And she became a credible figure on the internet. And from there she has expanded her business into two separate corporations over -- this is over from 2000 to -- 16 years it took her to -- to be like where she's at now.

And it deals with a business school, programs that, like, help you, like, empower yourself to -- in this world. And it's incredible. There's 60 programs total that she has, that she's, like, created over the years. And they're broken down into different categories. And thank God for apps now

because you can find all of them on there and find out which area you would like to explore.

But she's constantly, like, coming up with all these ideas and stuff of -- of, like, these things that can help people, and puts them together and -- and adds them to her list of things that she does.

Q What -- what is your involvement -- or has your involvement been --

THE COURT: Microphone. Microphone, please.

MR. PORTNOY: I'm sorry.

BY MR. PORTNOY:

Q What over the last five years has been your involvement in these -- this business?

A The last five years? Mostly putting together papers for you.

Q How about when you're not doing that?

A Before that I was literally, like, the person that made sure people got their digital copy of their thing, if there is a problem with that. Made sure they were paid up correctly. Or if they had a payment problem, I would handle that. And, like, I literally did it with pencil and paper. I had, like, all these names and lists with months next to them if they were paying, if they weren't, take them out, so --

Q Who -- who -- let me try to make this more concrete.

Do you do the business side?

A Yes. I just handle paperwork. I -- I do not create anything.

Q Right.

A Okay. Yeah, I just help out where I can with stuff like that.

Q I mean, for example, when tax returns need to be prepared, what's your involvement?

A My involvement -- we have two corporations now. So, the paperwork's way more extensive and -- and so what I do is, I gather up all -- I still do it with paper and pencil. I gather up all the records, like, for what areas that are business deductions, like, how much money comes in, all of that, and I consolidate it all. And it's hundreds of pieces of paper. I'm not even kidding, it's probably more than hundreds, it reaches into over a thousand. And I categorize it and put all the numbers down next to what it is, and then I give it to our accountant.

Q Okay. We'll come back to that later on.

A Okay.

Q I want to it move ahead to 2021. Was there anything that you saw or learned on -- that was happening 2021 -- 2020, 2021, that was affecting the progress of --

A No, 2021 --

Q Let me finish. Let me finish.

A -- was a very good --

THE COURT: Let him finish.

THE WITNESS: Oh, I'm sorry.

BY MR. PORTNOY:

Q Was there anything happening in 2020 or 2021, that was affecting Liana's progress in her business, the expansion?

A No.

Q Okay. Everything was moving smoothly?

A The app, the best finally.

Q Did anything happen in the spring of 2022 that began to have a significant negative impact on her personally?

A Yes.

Q What was that?

A The online attacks calling her a cult leader and child trafficker.

Q How did you learn of that?

A I was -- I lived in the same house.

Q Did you actually see these posts?

A I'm not a internet social media person, but I would directly -- and she would show me sometimes a piece -- I never saw it directly on the internet, because I do not do social media.

Q Did she seem affected by it?

A She was devastated, to put it lightly. It was out of the blue. And then the -- the threats.

Q Let's talk about her reaction that she expressed to you

when she began to see these posts. Go into a little bit more detail other than devastated.

A She was in disbelief at first. And she -- she -- she started, like -- she would curl up in a ball and cry. She would -- like in the fetal position and crying, that -- that people were attacking her, like, maliciously, like that viciously.

And we would, like -- the kids and I, would -- she would, like, lock herself in the bedroom sometimes. And we would wait for her to get done. And then we'd go in and surround her and, like, re -- like, just love her as much as we could to get her to be able to, like, get back to, like, walking around and stuff. She couldn't do anything, like, with her work. It was -- any sudden noises, like, would -- she would just be jarred and on edge.

If she was at the kitchen counter or something, and we were coming in from the living room area, we would have to announce, like, Liana, I'm -- you know, so she knew we were coming, because if you walked up behind her or startled her or something, it would send her into, like -- she was just so, like, nervous and on edge, and just like -- and we would announce ourselves walking in and out of the front door. Like, we would walk into the front door and go, it's me, so she knew someone else was in the house if they weren't there before.

And the same, like, walking down the hallway into a

different room, like, Liana, I'm -- like, you know, like that, so that she knew -- heard a familiar voice that was coming that way.
Q How long did that last?
A For almost two years. All of 2022 and all of -- the -- the part of 2022 when it started, and then all through 2023.
Q Did she get any better during that period of time in coping with the --
A No, not at all.
Q You need to wait until I finish.
A Oh, I'm sorry.
Q Did she get any better during all this time in coping with what was being posted and the other things that were happening around you?
A At first she didn't do anything.
Q For how long?
A Like, almost -- till late in the year in 2022, because -- and unfortunately I said this to her also, that it's just, like, a bunch of haters. My -- and that it's going to go away. And I think that she actually -- like, she respects my opinion. And she didn't do anything in the beginning.
Q How did it impact the business during that period of time?
A The business declined dramatically.
Q How do you know that?
A Because I do the taxes.

Q And we'll get into that later on.

THE COURT: Before we do that, somebody's phone is pinging in the courtroom. So if your phone is pinging, please make sure it's turned off. I can hear a pinging noise.

Is it your phone?

THE WITNESS: No, it's not. But I did have my phone on. I'm sorry, Your Honor.

THE COURT: All right. Thank you for turning it off.

THE WITNESS: But it's not my phone.

THE COURT: All right. Okay. Thank you.

MR. PORTNOY: Thank you.

THE COURT: All right. Let's --

BY MR. PORTNOY:

Q In this early period of time, how often would -- let's say May, June, July --

A Oh --

Q Wait, wait. -- 2022, how often would Liana show you these posts? Every day, once --

A Oh, it was happening -- yeah, I -- I can't say exactly every day, but it was a bombardment.

Q Did she ever, in this early period, express to you -- because they were all anonymous, right, you knew that?

A Yeah, it was a complete anonymous attack. Not one person put their name on anything.

Q Did she, in that early period, say the first several

months, when you would sit down with your significant other, did she ever express to you who she thought might be posting those things?
A I'm not sure of the exact date of when we had those discussions.
Q Tell us about the discussions, even if you don't remember the date.
A That she -- that she had come to believe that it was Paula and Stefanie were the, like -- what do you call it? Like, they were the organizers of the campaign.
Q Did she explain why she thought that?
A Yes. That in her business there are these programs that are, like, mostly women, and they have these groups in there where the women get together, and it's called a chat group. And they get together, and these women share their experiences with each other. And so it's on that record. It can be, like, something that Liana can see.
And they -- she was told by others and she saw stuff that led her to believe that there was a dinner between these two that started to help one of them get custody in a custody battle. And then that was used as a model for others.
Q Okay. Did she tell you where that information was coming from, that led her to tell you she believed it was two of the three defendants, where she was getting that belief from?
A I know that Haley and Amanda were giving her information

about Stefanie and Paula, because of whatever their exact relationship was.

Q Okay. So, we heard that other than the online issues, that things happened that caused the family to leave Kauai?

A Yes. When the threats came in, the death threats, I was so concerned that I hid them over here.

Q "Here," meaning Oahu?

A Here on Oahu, yeah. And -- yeah.

Q About when -- about when was that?

A That was early on in the 2022.

Q 2022?

A Or -- November -- like November of 2022.

Q Okay.

A November 2022 area.

Q And you brought them over here --

A I believe.

Q Okay.

A This was four years ago. I'm not exactly certain all of the dates of this.

Q That's fine.

You brought them over here for how long?

A It started off -- we just started with the week. And I know it went past three weeks. And then Liana and I had a discussion because the kids were, like, so -- I couldn't be there to help, you know, what I mean, too. So we made a

tradeoff that they would come back.
Q You stayed?
A I stayed in Kauai, yes.
Q But you sent the family here?
A Yes, I sent them here.
Q And that was for what reason?
A I was supporting the family --
Q No, but I mean the reason you sent the family away.
A Oh, I was afraid for their safety.
And then also I was talking to the local police and stuff and, like, trying to find -- and also the FBI.
Q Okay.
A And trying to, like, get some, like, protection of some kind.
Q Eventually the family moved back --
A Yes.
Q -- to Kauai?
As we move past the fall of 2022 and into 2023, did you come to understand that the posts continued?
A Yes. And then she started defending herself.
Q Okay. Since you brought it up, what do you mean --
A Oh, I'm sorry.
Q That's all right. What do you mean she started defending herself?
A She started posting things about -- I don't know exactly

what the posts are, because, like, I don't read that kind of stuff. But that -- how she wasn't a cult leader and a human trafficker.

Q And how do you know she began posting in response?

A Because she told me that she was going to stand up for herself now. It had been going on for, like, seven months.

Q Did you have a discussion with her on whether her decision to respond online was a good or a bad idea?

A Liana respects my opinion, but Liana is her own person, and when she feels about something, she's going to do that. And that's what is -- is going to happen.

Q Okay. Did she ever show you any of those posts?

A She may have, but I can't remember the exact content of any of it. We mostly just talked about it. I was just -- I was supporting her in what areas that she was going into. I never really got involved of reading everybody's back and forth.

Q So what was the impact on the kids?

A Oh, my God. Bianca, who is very social, she was afraid to leave the house during that whole -- from 2022 through 2023. And so Chance would go with her, like, a lot, unless I went with her. And she would -- like, even at her work, her boss confronted her about her mom being a cult leader and a child trafficker because he saw it on Instagram, I believe. Don't quote me on which the source is, but I believe it was

Instagram.

Q We're of the same age that we have the same knowledge of technology.

But go ahead.

A I -- I'm just not a social media participant. I know how to use a computer, but --

Okay. And then the other places that she frequented, the surf shop, the bakery, gas station, they we all were asking her about her mom, you know, like, we saw these things that she was a cult leader and a child trafficker. And she was devastated.

And then she saw the condition that her mom was in. And she's very, very, like, a sympathetic empathic person with her mom. It was like she was living it. I mean, the same kind of, like, pain that she had.

Q And Chance?

A Chance assumed a different role. He became, like -- he's only 15 at this time. Like, he was the male protector. And everybody became shady. Anywhere that we went or that him and I went, like that person, that person, they were -- everybody was shady.

And there were cars -- like if a car was in our -- around our house, like, maybe somebody pulled over to check an address on a phone or whatever it was and it was a strange car to our neighborhood, he thought that they were there to, like,

do some kind of harm or kill us. And I would put him in the car and we would follow those people till they went to, like, a resort or something, until he was comfortable that they were not there to do any harm. And then I would take him back home.

Q So was there a period of time where -- we're talking 2022, 2023?

A Yes.

Q Did that fears that your daughter and son expressed, did that kind of get better as we moved on to 2024, '25?

A It wasn't better, but it was, like -- the only way I can explain it is it's like living with an injury. Like, you live with it, right? It's still there, but you're, like -- you have to function in your day-to-day life still.

Q So now I want to move to what happened in the middle of 2023. You were aware there was a court proceeding dealing with Liana's probation?

A Yes. There was a status --

Q Hold on. Yes or no?

A Yes.

Q Okay. And you were not in a relationship with her during the events that are part of that original bankruptcy indictment? Does it relate to your relationship or one she had with a previous person?

A During her bankruptcy? I did know her.

Q Right. But the charges, the indictment --

A Yes.
Q -- concerned issues that occurred before you --
A Yes.
Q That's what I'm trying to get at.
MR. ADAMS: Lacks foundation, calls for speculation. Legal opinion.
THE COURT: Overruled.
MR. PORTNOY: Thank you.
BY MR. PORTNOY:
Q How did you first learn that Liana had been indicted?
A She -- I believe she got some kind of notice.
Q Okay. And were you at the house when the police and FBI came?
A No, I don't -- no, I was not.
Q Okay. That led to a proceeding in court, correct? There was a status conference eventually?
A What -- I want to be clear on -- you mean when she was served with some kind of -- I'm not -- Your Honor, can I get --
Q Let me try to clear --
A Okay.
Q We're beyond that.
A Okay.
Q I'm trying to understand whether you knew that there was going to be a court proceeding before a judge dealing with some issues that have come up -- that had come up about her

probation.
A Yes.
Q Okay. How did you learn about that, that it was going to -- there was going to be a proceeding?
A Because one morning I got a knock on the door and I opened it, and an FBI agent stuck a gun in my face.
Is that the particular one you're talking about?
Q Keep going.
A Okay. And -- wait, are we talking -- can I get clarification on this, because there were two separate events -- are we talking about the Mollway thing?
Q Yes, sir.
A Okay. That was --
Q Let's talk about that.
A Okay.
Q What do you know about that proceeding? What it was for, for example?
A I didn't know the -- the Judge Mollway thing was a group of people had gotten together and they wrote a bunch of letters about Liana and how she was, like, involved somehow in their personal lives and violating her probation, her business was a fraud somehow. That was part of it. And that it needed to be shut down and she needed to be shut down.
And it was just -- it was, like, all these letters from -- it was eight different people and people and their

families describing how horrible of a person that she was, and how that they had -- were, like, interfered with these people's lives.

Q How did you learn these letters had been written?

A When -- because Liana had to have a -- how did I learn that there were the letters?

Q Yes.

A Yes, from Liana.

Q Did you ever see the letters?

A I saw the stack of letters. I never read them.

Q Okay. And then there was a proceeding?

A Yes, there was a proceeding.

Q Were you there?

A Yes, I was there.

Q Were any of the letter writers in the court?

A No.

Q Do you know if --

MR. ADAMS: Lacks foundation if he never read them.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Do you know if any of the letter writers were on Zoom?

MR. ADAMS: Lacks foundation.

THE COURT: Sustained.

THE WITNESS: I --

THE COURT: One second.

Sustained.

BY MR. PORTNOY:

Q Were there -- could you tell whether there were people participating either as observers or otherwise on Zoom?

A No. There was a person in the courtroom that was -- I can't -- no, there was no Zoom people in the -- on the call.

Q Okay.

A In the courtroom, there was no Zoom.

Q And did Liana talk to you about how those letters were affecting her?

A Oh, my God. That was another, like, piece of it that -- she -- she couldn't believe that they had gotten all this stuff together --

MR. ADAMS: Your Honor, move to strike as relevance. And I'd like a sidebar, if I may.

THE COURT: I'm going to strike it as hearsay. So any statements that he makes about what she told him is hearsay.

You may ask another question.

THE WITNESS: Did I misunderstand the question?

THE COURT: You did not.

THE WITNESS: Okay.

BY MR. PORTNOY:

Q What was her reaction?

A Her reaction was --

Q What did you observe?

A -- disbelief.

Q Did it affect her emotionally?

A It was more of the same. It kept getting worse and worse, her emotional state. Throughout 2023 I was, like, seriously concerned for her health and mental wellbeing. She wasn't eating. It was, like, she -- there -- there -- anybody that knows Liana knows, like, what, like, just a happy, like, joyful to be alive person that she was and is like.

And there's a certain sadness that was in her in 2022 and 2023 that I -- I couldn't -- it was hard, it was so hard, because she -- it's almost like she lost faith in human nature. And that's like her -- her thing. That's like her thing, is helping people to, like, love themselves and -- and where they're at, to be, like to be in the world and be yourself and do what you want to do. And she lost it. It was gone. It was -- it was so sad.

Q All right. 2024, '25, did she get --

A It's still there a little bit, it's not as bad as it was. But she -- she finally, like -- I mean, she -- we had so many discussions in our family, and especially thank God for Chance, because he's the one that was, like -- we all told her it, but it was, like, just do something else.

Like, she's so smart and she's so, like, dedicated to what she does that she could have started any business. It could have been anything and it would eventually be successful

because she would make it successful. But she is going, like, no. That was, like -- she ultimately made the decision to continue on. And I mean, things -- she continues on.

But the -- that hurt and -- and that -- what she went through, it's going to affect her the rest of her life.

Q Did you ever participate in any of the communities that we've heard about?

A No.

Q Okay. Did you ever --

THE COURT: Mr. Portnoy, it's about time for a break, but -- a stretch break. But if you're finishing up, I'll let you finish up.

MR. PORTNOY: I'm not finishing up.

THE COURT: Let's take our stretch break right now. Does anybody need to use the restroom? No.

Okay. Let's go ahead and take our stretch break.

(Pause in the proceedings.)

THE WITNESS: Do I stretch in place, Your Honor?

THE COURT: You may.

THE WITNESS: Thank you.

(Pause in the proceedings.)

THE COURT: All right. We can continue.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Okay. We're going to move into some other subjects, okay?

Did you ever set up a website?
A No. That's not my thing.
Q Did you ever hear of a website Exposing Family Cult?
A Yes.
Q What do you know about that?
A I purchased that domain name.
Q What does it mean to purchase a domain name?
A You just -- I just went on GoDaddy and -- and saw if that domain name was available, and then you just give them some money and then you own that domain name.
Q And why did you do that?
A One of Liana's students contacted me, because a bunch of -- like a bunch -- everybody wanted to help her. And she told me, Oh, I don't have, like, money to do that, but I want to help Liana. And so --
Q The student said that?
A Yeah, one of her students.
Q Go ahead.
A And so I got her the domain and a web host and she said she was going to build a website to help Liana. I go, great, go do it.
Q So your involvement in that was only to purchase the domain name?
A Correct.
Q And then do you know who posted on it going forward?

A I have no idea.
Q Do you know if Liana ever posted on it?
A If Liana posted on it?
Q Yeah.
A Her name would be all over that.
Q Why do you say that?
A Liana is not afraid to put her name to what she writes. She -- if Liana wrote something, you know she wrote something, because she doesn't do things anonymously. She puts her name right on it. And it can be, like, very controversial topics in this world, and she has an opinion, and she states her opinion, and she signs her name to it, and it's not always popular.
Q Okay. Did you ever read any of the posts that were made by whomever?
A I'm not involved in social media, Jeffrey.
Q Sorry?
A I do not. I mean, you guys are probably going, like, what some kind of husband doesn't --
THE COURT: No, let's -- let's not --
THE WITNESS: Okay. Okay. All right. I'm sorry. Okay. Sorry.
No, I do not participate in social media.
THE COURT: All right. You may ask another question.
MR. PORTNOY: Thank you.
BY MR. PORTNOY:

Q Just so the answer is clear, you never posted anything on --
A No.
Q Okay?
MR. ADAMS: He cut him off. On what?
THE WITNESS: I never posted any --
MR. PORTNOY: Please, just wait.
THE WITNESS: Okay. I'm sorry.
MR. ADAMS: I just ask for the full question, Your Honor.
THE COURT: What are you talking about specifically, you said you've never posted anything --
MR. PORTNOY: On Exposing Family Cult, that site.
THE WITNESS: No.
BY MR. PORTNOY:
Q Okay. There's been testimony in the courtroom about some issues with licenses Liana has had over her life. One of them concerned her law license and what happened to that. Were you involved in that?
A I do all of the paperwork in our family. I mean, hers, like, I help the kids out, I show them how to do it and stuff. Yes, I was involved in that.
Q How were you involved?
A Every two years a notice would come from New York of -- like, it was like a renewal thing. And it was, like, are you

doing -- there was three categories. One was, are you doing continuing education? And you had to provide stuff and money.

And then another one was, are you, like, not going to be a lawyer anymore?

And then another one was, is -- like, they kept it on file, the law -- it was on file and you just had to fill out a form and then submit it, and then it was still on file in case she ever wanted to be a lawyer again in New York in the future. And it was -- and their term for it is "suspended."

And -- but there's also a thing on there, if you look her up to find out if she is, like, an attorney and stuff and it says that, you can punch a button and it explains what it is. So it's not a derogatory term. It's their term for when you're not a practicing lawyer in -- in New York.

Q So that's your understanding what so-called --

A That's --

Q Hold on.

A I'm sorry.

Q That's your understanding what the so-called suspension is?

A Yes.

Q Not paying the required fee?

A That's not exactly accurate. It's not -- it -- you just have to fill out the paperwork. And it was, like, nominal fee to keep it, like, on file.

Q And did you fill it out?
A Yeah, it was just an on-line thing, you just, like, fill it out and send the payment.
Q It wasn't for any misconduct or --
A No.
Q -- there had been complaints --
A No.
Q -- or anything like that?
A No. Nothing like that. Every two years it had to be done.
Q Okay.
A And she wanted -- oh.
Q That's enough.
A Sorry.
Q Thank you.
There's also been testimony about an issue with a real estate license. Are you aware of that?
A Yes, I am.
Q Tell us what you know about that.
A That was another form for something that she didn't do anymore, and it came every two years. And you just, like, checked out a bunch of boxes and sent the money in. And so every two years it would come and I would fill it out, I would just check the boxes, send -- and send the payment in. She hadn't done real estate for, like, 11 years, 12 --

Q What happened? There came a time where she --
A Because I didn't read it. I never read the thing. I just -- and one of them was, were you convicted of a felony, which she had been in between the time of the two of them.
Q And you didn't check that box?
A I didn't check it "yes," that she had been convicted. Whatever they all were, like, everything is okay, I just ran down the line and checked them all. I didn't know that.
Q So you omitted to check that box?
A I was -- my fault, yes.
Q Did Liana in any way get involved with --
A She had -- no, it was just, like -- it was -- I did all the bills, I did all the correspondence, I did all of it, that came into our house. And I -- and I still do to this day.
Q Did you intentionally not check that box?
A No, I did not intentionally lie.
Q And then there was some proceeding that led to a settlement with the Real Estate Commission?
A She volun -- she gave he up her license, and that was the end of it.
Q Do you know why?
A She didn't need her license anymore.
Q Okay. We'll move on now to the business part of your interaction with Liana's businesses.
Do you have a title, other than significant other?

A Yeah, hey, Honey.
Q I mean, do you have an official title?
A No, I do not have an official title.
Q Do you get paid for doing this work?
A No. Do I receive money for it?
Q Yeah.
A No.
Q So, do you accumulate all the information necessary to file tax returns?
A Yes, I do.
Q Okay. So, let's start in telling the jury -- because they've heard about different businesses and different aspects of Liana's businesses. Let's start in 2020.

What businesses were filing tax returns or individuals starting in 2020?
A Okay. I'm -- I'm going to do this to the best of my recollection.
Q Sure.
A Because the business had different names.
Q Right.
A And they changed as the business got more complex and evolved.

I believe that in 2020, it was either Rawganic Vegan or Health Mastery Institute. I can't be sure without actually seeing the piece of paper.

Q 2021?
A 2021 was Life Mastery Institute, I believe.
Q Go ahead.
A Yes. Go ahead. No.
Q 2022?
A 2022, we got -- formed two corporations. One, Life Mastery Network, the other Health Mastery Institute.
Q Say that again, Health Mastery?
A Institute.
Q And the other one?
A Life Mastery Network.
Q Life Mastery?
A Network, yes.
Q And do those still exist today?
A Yes. They're two S corporations.
Q And they file separate tax returns or one?
A The way it works, there's -- there's -- yes. There's two tax returns for the corporation that affect her personal income tax filing, yes. It's a mountain of papers.
Q Is there anybody else?
A No, she's a hundred percent owner of both of those businesses.
Q Both?
A Both of them.
Q Okay. So does she file an individual return --

A Yes. It's based on --
Q Let me finish, please.
A Yes.
Q Did she file an individual return in 2022 and '23?
A Yes.
Q And who prepared the information that went to the accountant?
A I put together all the papers.

MR. PORTNOY: Can we have 253, please? Which I --

THE COURT: 253 has previously been admitted and may be shown to the jury.

BY MR. PORTNOY:

Q Do you have that in front of you, Robert?
A Yeah, hold on a second, please.
Q I'm sorry?
A Yes, I do.
Q Have you seen that before?
A I have to look at it.
Q Sure.

MR. ADAMS: Got a hairball situation.

THE WITNESS: Yes, I've seen that.

MR. PORTNOY: Just wait a minute, please.

(Pause in the proceedings.)

MR. PORTNOY: Thanks, Chance.

BY MR. PORTNOY:

Q And why don't you look through all the pages.
A Oh, I was going to say, are there more pages in this? Okay. Good.
Q You should have an entire document of several pages.
A Okay. I think it skipped one.
Okay.
Q Did you accumulate the information that the accountant --
A Wait.
Q -- put on the return?
A Yes, I did.
Q And what did you have that you had accumulated to support the numbers that are on the return?
A I believe that the -- the accumulator of the income was a company that we used called Stripe.
Q And?
A Stripe.
Q Who gives them the information?
A All of the sales and the distributions that come through the internet are recorded on there, and then they distribute you the money for the total income.
Q And what about deductions and the business expenses?
A Oh, that is a whole other things that I have to do every year, is go through credit card receipts, and take out and categorize, like, what is an internet expense, what is an education expense. There's, like, many, many categories. And

I go through every receipt and document that we have line by line and separate them out and categorize them to give to the accountant. It takes me over two weeks to do a corporation. And --
Q So the taxable income on the bottom of 1.718,024, you provided the information that led to that?
A Yes.
Q And all of the other numbers?
A Yes.
Q On the various pages?
A Every page.
Q Does Liana get involved in any way in the preparation of the tax return?
A No, she does not.
Q Why not?
A That isn't her -- this is something that I do for her. Paperwork is not her forte. And I'm happy to do it for her. And that's -- that's where it's at.
Q Okay. So decisions like if you look at the first page, you redacted Bianca's Social Security number. Who makes that decision?
A I don't know who put redactions on these documents, I didn't.
Q The accountant?
A Pardon?

Q You don't know who did?
A No, I do not.
Q I don't see Chance on here as a dependent, do you know why? Was he not a dependent at that point or --
A I would have to see all of the documents from 2022 --
Q Okay.
A -- to answer that question accurately. I don't know if that was just an oversight on my part or what.
Q Okay. Did you review the return before it was sent to the IRS?
A Loretta sends me a copy --
Q That's the accountant?
A Yes. And -- and but it's filed electronically. And I would not understand -- I wouldn't, I wouldn't -- I don't understand all of the forms. It's a packet, like different schedules and forms and stuff. And she's responsible for that.
Q Have you been informed in any way that since this was filed for 2022 that the IRS has had any issues or questions?
A No, there have not been.
Q Sorry?
A No, there are no --
Q Sorry?
A No, there's no -- there's been -- oh, with 2022?
Q Yes.
A Yes, there was a huge thing with 2022.

Q And what was it?
A It was that it was electronically filed and lost. They -- the IRS actually -- I have a receipt number for this return and they misplaced it. The payment was sent in and they had the money, and a couple of years later I got a notice that, oh, Ms. Wilson, we have, like, this money of yours, and unless something -- like, you claim it back or apply it to something, that they were going to keep it.

And so then I looked into this whole thing and found out that it hadn't been filed, that it wasn't on record. It was filed, but it wasn't in their system. And so I had to go through a whole thing to get those two things matched together.
Q That's been done?
A It's been done.
Q There's been no penalties?
A It's a done deal.
Q Okay. And then I show you 255.

THE COURT: 255 has been admitted. It may be shown to the jury.

BY MR. PORTNOY:
Q You seen that before, Robert? That's the 2023 tax return.
A Yes.
Q Have you seen it before?
A Yes.
Q Okay. And again, both 253 and 255, the taxpayer is Liane

Wilson?
A Yes. She's the owner of the company.
Q And whose decision was it to file the returns from the businesses in the name of Liana?
A No, this is her personal part of the income tax.
Q Okay.
A 2023, there are now two S corporations. They have their filing requirements, and then those determine her individual income tax filing requirement.
Q So this is -- these show how much money she earned in a particular year on -- on Line 15?
A Yes.
Q And for 2023 it's 523,651?
A Correct.
Q Do you know why, between 2022's return and 2023's return, Line 15 went down almost one and a quarter million dollars?
A I know exactly why, because of this whole -- her reputation being literally massacred on the internet.
MR. ADAMS: Move to strike as an expert opinion, has nothing to do with the accounting.
THE WITNESS: Oh, sure it does.
THE COURT: Sir.
MR. PORTNOY: Please.
THE WITNESS: Oh, I'm sorry.
THE COURT: You should not respond to anybody other

than your lawyer and me. All right?
THE WITNESS: Yes, ma'am.
THE COURT: The objection is --
THE WITNESS: Yes, Your Honor.
THE COURT: The objection is sustained.
MR. ADAMS: I move to strike, Your Honor.
THE COURT: It is stricken.
BY MR. PORTNOY:
Q Do you know -- you do all the assembling of all the documents?
A Yes.
Q So you know why the income tax shows a million and a quarter less, right, in looking at all the documents you're given to provide --
A In all the --
Q Wait a minute.
A Oh.
Q -- all the documents you get and obtain to provide to the accountant?
A Yes.
Q So do you have any understanding of why --
A Yes.
Q -- it goes down?
THE WITNESS: The sales --
MR. ADAMS: It's the same, Your Honor. He's trying to

get an opinion in. He can say what he saw, which is sales, but not link it.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Do you believe the income went down because of all of the slanderous statements that were being made?

MR. ADAMS: Same objections.

THE COURT: Sustained.

MR. PORTNOY: Can we have a sidebar, please?

THE COURT: You may.

Ladies and gentlemen, you can take a stretch break. Thank you.

(Sidebar on the record:)

MR. PORTNOY: I don't understand why it's sustained.

MR. ADAMS: They should have brought in an expert to connect the fact that the sales with the defamation. This gentleman is only able to say it's because there's less sales. He cannot say why there is less sales, that is an expert opinion.

THE COURT: In addition, he has himself said that he never looked at any of the postings. He didn't himself see what they said, that everything was told to him was hearsay. So I'm going to exclude it under 403.

MR. ADAMS: Thank you, Your Honor.

(End of sidebar.)

THE COURT: You may move on, Mr. Portnoy.

BY MR. PORTNOY:

Q Liana's business opportunities decreased during 2022 and '23?

A Correct.

Q Did she ever -- well, you keep track of the number of students from the information you see?

A No.

Q Okay. Do you see receipts from people who purchase the products?

A I see the overall income of -- of the -- of the -- the paperwork.

Q And are the numbers on 253 and 255 accurate, to the best of your knowledge?

A Yes, they are.

MR. PORTNOY: No further questions.

THE COURT: Thank you.

Cross-examination.

MR. ADAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ADAMS:

Q Let's stick with these 253, the tax returns.

Good afternoon, by the way, Mr. Beard.

A Good afternoon.

THE COURT: You have to get back to the microphone.

THE WITNESS: I have no signal on my screen either.

MR. ADAMS: Sure. Sure. Why don't we ask to -- I'll ask to republish Exhibit 253.

THE COURT: 253 may be shown to the jury. It was previously admitted.

BY MR. ADAMS:

Q Okay. 253, this is your spouse's individual return?

A Yes.

Q From 2022, correct?

A Correct.

Q And you've already testified that in between 2022 and 2023 her businesses were split into two?

A No, there were still two businesses.

Q Well, let's -- let's see that, sir.

Why don't you pull up Exhibit 185 for me. That's in your books there, sir.

THE COURT: 185 has not yet been admitted.

MR. ADAMS: Right. I'm going to try and get it admitted with this witness, Your Honor.

THE COURT: Okay.

BY MR. ADAMS:

Q As the one responsible for sending all of your spouse's information to the accountant to form her tax returns, do you recognize Exhibit 185?

A Yes.

Q Is this a document that came from your files? You can see down at the bottom Shanti 001029?
A Yes.
MR. ADAMS: Your Honor, I ask that this be admitted into evidence.
MR. PORTNOY: No objection.
THE COURT: 185 is admitted.
(Plaintiffs' Exhibit 185 was received in evidence.)
BY MR. ADAMS:
Q I'm not publishing because I'm going to show -- I'm going to go back to 253 just so we can make sure we're on the same page. Okay, sir?
So what we're looking at now is Exhibit 253 and Exhibit 185?
A Right.
Q 253 is her individual return, correct?
A Yes.
Q And 185 is the return for what?
A It's part of her individual return still.
Q It's --
A Schedule C --
Q Right.
A -- of her individual return.
Q And what does the Schedule C say that she owns?
A No, that --

Q Hang on. Read -- read the document for me.
A It says she owns Life Mastery Network.
Q And what does it say at the top is formation, the business formation of that? Is it a corporation?
A No, she was the sole proprietor.
Q So thank you.
In 2022 Life Mastery Network --
A Yes.
Q -- was a sole proprietor of your wife?
A Correct.
Q Okay. And so the information on 185 --
A Yes.
Q -- is -- forms the basis of what went into 253, the individual return?
A It's part of the same return.
Q Where is the other stuff?
A Where's the what?
Q Where's the rest of it?
Withdrawn?
It's part of the same return, right?
A Correct.
Q 185 is the Schedule C from her individual return?
A Correct.
Q Yes.
Now go to Exhibit 255 for me.

And this has been admitted into evidence.
A Oh, I'm supposed to go --
THE COURT: If we could pull it up for the witness, please. Is it okay if it's published?
MR. ADAMS: Yes -- oh, it's been admitted. Yeah, we can publish it, if you're asking me, Your Honor.
THE COURT: Yes. Go ahead and publish, please, 255 for the jury.
Thank you.
BY MR. ADAMS:
Q Now, this is her individual return from 2023, right?
A Correct.
Q And at this time, in between 2022 and 2023, Life Mastery Network, which was a sole proprietorship in 2022 --
A Yes.
Q -- was converted into an S Corp, correct?
A Correct.
Q And the S Corp filing in 2023 for Life Mastery Network is Exhibit 186, correct?
A I don't know, I don't have 186.
Q Go ahead and take a look. We'll publish 186, which has been admitted?
THE COURT: 186 may be shown to the jury.
BY MR. ADAMS:
Q And that's the S Corp. filing for the converted sole

proprietorship into the S Corp. correct?
A Correct.
Q Now, at the same time there was also Health Mastery Network, correct?
A That is a correct -- that is also an S Corp. in 2023.
Q Where's that return?
A Because this lawsuit couldn't incorporate Life -- or Health Mastery Institute because it said Life Mastery Network on the things.
Q That's not my question about this lawsuit, sir. I'm talking just about tax returns.
A Yeah, that's why I'm saying that's why you don't have it.
Q From 20 -- I know I don't have it, but focus on this:
All of her income from the 2022 return --
A Yes.
Q -- was from her total company, correct? The sole proprietorship, Life Mastery --
A Network, yes. In 2022 that income is from her Life Mastery Network. 2022 sole proprietor, 2023 S Corporation.
Q Yes. And we only have the income for one of the S Corps that were created in 2023.
A Correct.
Q And so this is only a portion of the income that she earned from her businesses in 2023? Exhibit 186, the S Corp. forming of Life Mastery Network, the return.

A Correct.
Q Okay. So, you can't compare only the income in Exhibit 186 with the income from 2022, because it doesn't tell the whole story, does it?
A No, it tells the whole story of Life Mastery Network.
Q But not of the difference between 2022 and 2023. Because 2022 included it all, right? And thin it was split into two. And this is only one of the two, correct?
A No. Because --
Q Where -- where is the return --
MR. PORTNOY: The witness is trying --
BY MR. ADAMS:
Q -- for the other S Corporation?
THE COURT: All right. So the question is: Where is the return for the other S Corporation?
THE WITNESS: I have that.
The reason that it wasn't --
BY MR. ADAMS:
Q Sorry.
A Okay.
Q Thank you.
A Okay.
Q You also pled guilty to the fraudulent concealment in the bankruptcy proceeding, correct?
A Yes, I did.

Q And so you are a convicted felon as well, correct?
A Oh, yes, I am.
Q And as part of that probation that your wife was on in connection with that --
A Uh-huh.
Q -- she testified that she's required to keep monthly financials in support -- and provide them to her probation officer. Do you understand that?
A Those were conditions of the probation that have been totally met along the way.
Q Okay. My question for you is yes or no. Is she required to submit monthly financials of her business to her probation officer?
A In the very beginning, yes.
Q And the beginning was when, 2021 through when?
A Whenever that conviction was.
Q You don't know?
A Let me do --
Q Let me withdraw -- let me withdraw that. I don't want --
A Yes, it was in 2021.

THE COURT: Hold on. Let's not talk over each other. Are you withdrawing that question?

MR. ADAMS: I am.

THE COURT: Okay. Let's ask another question.

BY MR. ADAMS:

Q Who prepares the monthly financials that are submitted to the probation officer?
A In the beginning they were -- I would submit them to Loretta Cook MacIntosh, who prepared the reports to give to the probation office.
Q Monthly, correct?
A I -- I don't remember if they were monthly or not or quarterly or for sure.
Q And following the 2023 letter-writing campaign where they tried to get your wife's probation amended because she was -- they thought she was interfering with custody issues -- you know that part, right, the letter writing campaign?
A Yeah.
Q After that, isn't it true that since 2023 your wife has also been required under her probation to submit monthly financial reports about her business?
A That is incorrect.
Q What's that?
A That's incorrect.
Q Well, she testified to that. You weren't in the courtroom.
So she is wrong?
I just want to know because you handle the books.
MR. PORTNOY: Can the witness please answer a question, please? Object.

THE COURT: All right. Let's slow down.

The question is: After that, isn't it true since 2023 your wife has also been required under her probation to submit monthly financial reports about her business?

THE WITNESS: The probation officers have changed over the years, and what they request changed over the years.

BY MR. ADAMS:

Q You admit though --

A So I'm not clear on what your question is.

Q Yeah. We have partial tax returns here that you're trying to use to justify a loss in business. And we know that there's actually monthly financials for these businesses that are supposed to be produced to a probation officer.

So my question for you is: Where are those monthly financials that will actually tell the story of these businesses?

A They quit asking us. We were not required to provide them to the probation department any longer. They didn't want them. And it wasn't monthly, I believe it was quarterly. It was quarterly.

Q Where is the 2024 return?

A For taxes?

Q Yes.

A Nobody asked me to give that to them.

Q Where is the 2025 return?

A They're all -- I believe you have access to those, don't you?
Q I'm asking you.
A Oh, they're filed. They're filed, paid up-to-date, everything.
Q But where are they in this case so we can follow along and see the complete filings and all of the income and all of the deductions?
A I'm -- I was asked to provide information that showed the difference of income between 2022, 2023, the huge disparity between those two things.
Q So look to -- turn to Page 253, which is your wife's individual 2022 return, Page 2.
THE COURT: This has been admitted and may be shown to the jury.
MR. ADAMS: 253, Page 2.
BY MR. ADAMS:
Q In 2022 she paid, on Page 2, Line 24, she paid $676,821 in taxes, correct?
A Correct, as a sole proprietor.
Q And that's because, if you look at Page 1, the income -- and you've already said the Schedule C, that's all from her online businesses, right?
A Which business are you talking -- you're talking about 2022 now?

Q Yeah, 2022. We've already been through that. That was the sole proprietorship.
A Right. That's why -- yes.
Q And so the taxes --
A The tax rate is much higher as a sole proprietor.
Q Absolutely. And so in 2023 --
A But they didn't --
Q Hang on.
THE COURT: Let slow down.
I'm a little confused as to which exhibit --
THE WITNESS: I'm confused, Your Honor.
THE COURT: No commentary, please.
THE WITNESS: Okay.
THE COURT: Which exhibit is on the screen right now? Because I don't see an exhibit number.
THE WITNESS: I don't either. And I don't see a year.
THE COURT: Okay.
MR. ADAMS: I'm talking about the 2022 individual return Exhibit 1 -- 253. It's been admitted into evidence.
THE COURT: Let slow down. Let's make sure Exhibit 253 is on the screen.
THE WITNESS: I see 253.
THE COURT: Okay. The exhibit that was on the screen didn't have an exhibit number on it. So now let start over with regard to Exhibit 253, please.

BY MR. ADAMS:

Q On Page 2, you see on line 24, that the taxes as an individual owning a sole proprietorship cost $676,821 in taxes?

A Correct.

Q And so because of that, one of the reasons why the companies were switched to an S Corporation for 2023 is to try and reduce the tax burden, correct?

A Correct.

Q And so if you'll look at Exhibit 186.

THE COURT: Let's not publish this while they're pulling it up, please.

Thank you.

186 has been admitted. Once it's on the screen, it can be published.

All right. It's published.

You may --

MR. ADAMS: Thank you.

BY MR. ADAMS:

Q You see 186?

A Yes, I can.

Q Great.

And this is the return -- the Page 1 of the return for the -- one of the two S Corporations that were formed that year, correct?

A Correct.

Q And you can even see on Line G that it was actually -- the box is checked yes for, yes, it was created this year, right?
Corporations beginning with this tax year --
A Hold on a second, please.
Q -- line G.
A Hold on a second, please.
THE COURT: Are you able to enlarge that?
THE WITNESS: Yes, it says, check box -- G is checked that it is an S Corporation beginning with this tax year; that is correct.
BY MR. ADAMS:
Q And then go down to Line 26 and tell the jury how many taxes were owed for this S Corporation in 2023.
A On Line 26 it says zero, the corporation itself.
Q And that's an accurate statement, right?
A For the corporation, yes.
Q Yeah. Yeah.
A Yeah, not the owner of the corporation.
Q I understand.
For the owner then we can look at Exhibit 255, right.
Exhibit 255, if we'll publish to the jury.
THE COURT: You may.
BY MR. ADAMS:
Q Is the 2023 individual return.
A Yes, that is correct.

Q And on Page 2, by forming the S Corporations, she was able to reduce her tax burden to only 153,566, correct?
A Yes, that is correct.
Q Now, when I asked your wife about -- that her S Corp. didn't pay any taxes, she said that that's inaccurate and that we shouldn't rely on Exhibit 186 where it had the zero taxes for her S Corporation 2023.
A Wait. Could you repeat what you just said that she said, please?
Q Yeah. She said that in 2023 --
A Yes.
Q -- she knows her corporations paid taxes and so this Document 186 cannot be relied on.
A She -- she can't really accurately answer that question, because she didn't know how this whole thing worked, and neither did I until that year. Means you asked me.
The thing about the corporation filing and the individual filing are two entirely separate things. It has nothing to do with how -- with the person that's responsible for that business's payment to the IRS. The corporation filing is to satisfy the corporation portion of the IRS. The -- all of the income and all of the taxes and everything are transferred to the individual 's return.
Q We understand that. We understand that. I'm just asking you about her testimony.

A No, you're asking me -- you're saying to me --
Q Hang on, hang on. Sir, I ask the questions. Okay?
A That there was zero tax --
Q Hang on. Hang on. There's no question pending, sir.
THE COURT: Stop.
THE WITNESS: Okay.
THE COURT: Let's ask a question.
BY MR. ADAMS:
Q Now, you said that you -- let's get this straight. You registered the website Exposing Family Cults or Exposing Family Abuse, which one was it?
A No, I didn't register anything. I bought it. You're switching to Family Cults now?
Q I am.
A Okay. What was your question?
Q Yeah. You testified that you -- okay. I'll use your terminology -- registered the domain name for ExposingFamilyCults.com.
A I purchased it.
Q Yeah. And your testimony was you did that why?
A Because one of Liana's students contacted me, she wanted to start her own website.
Q Who?
A I only have a -- like, an e-mail thing, or whatever her name was online.

Q Who was it?
A It was Briana, like, 123 or something like that.
Q Do you know who Briana was?
A I have no idea.
Q Totally anonymous?
A Just like everything else in this case.
Q Hang on. Can you answer my question, sir?
Totally anonymous to you?
A You know, you asked me if I knew who it was. I have no idea.
Q I know.
A Right.
Q And so I'm saying -- trying to explore why you would register a domain name for somebody you don't know. Why did you do that?
A Because she wanted to help Liana.
Q And so -- so -- and you said she didn't have any money, right?
A Yeah. She told me she was actually, like -- I don't know if she used the word broke. But she said she couldn't afford to buy a domain name and a web host.
Q Now, have you come up with this story because you know that we subpoenaed --
MR. PORTNOY: Objection, Your Honor.
BY MR. ADAMS:

Q -- the origins of that website?

MR. PORTNOY: Objection.

THE COURT: Hold on.

THE WITNESS: Wait a second. You're telling me --

THE COURT: One second, please.

Let's rephrase the question.

BY MR. ADAMS:

Q Are you coming up with this Briana 123 who you don't know because you know that we subpoenaed the origins of the website?

A No. I'm not making up any story.

Q But you know that we served a subpoena to find out who registered --

A I found out --

Q Hang on. Hang on.

THE COURT: You need to let him ask the question.

Let's go with the question. What's the question?

BY MR. ADAMS:

Q You know that my clients served a subpoena on GoDaddy to find out who started the website, right?

A Yes.

Q To be clear, the website is Exposing Family Abuse?

A Correct.

Q And you know that that subpoena turned back your name in Princeville, correct?

A Yes, I purchased it.

Q But you purchased it for an anonymous student who's not here today and you don't know their name?
A In 2022, yes.
Q Do you remember the date?
A It was around -- oh, there were two of them, just for your clarification.
Q And --
MR. PORTNOY: Wait, wait, wait.
THE COURT: Let's let him let him finish the answer.
BY MR. ADAMS:
Q Give us the two names. Yeah.
A In -- in around November of 2022, there was -- she wanted Exposing Family Cults. So I got her that one. And then whatever she was doing with it, she told me it wasn't really working that well, like, people wise. And so she wanted another one. And that was around -- the subpoena thing that you have, April, I believe, of 2023? Is that the correct date?
Q And so she asked you --
A So she wanted a different name because the other one wasn't doing whatever she wanted it to do. So I got her a second one.
Q Had you been to the website?
A I don't do anything on social media.
Q Hang on, hang on. Let me finish my question so you know what I'm asking.

Have you been to the website that you set up for her first?
A No.
Q Do you know what she posted on it?
A I have no idea.
Q So why would you set up a second one for her?
A Because she wanted to help Liana.
Q But you don't know if she's helping.
A It's like $15. If she can -- wants to help Liana for 15 bucks, I'll give her 15 bucks.
Q But you said she was too poor to do it so that's why you did it. 15 bucks.
How does that -- how does that justify you stepping in to do it for her?
A To help Liana.
Q So you set it up, Exposing Family Cults and ExposingFamilyAbuse.com, to help Liana, correct?
A No. I purchased a domain name and a web host for whoever this Briana person is so that she could help Liana.
Q Right. And so you wanted to help Liana, too, correct?
A (No response.)
Q You're helping someone to help Liana, right?
A Yes.
Q Okay. And then you've seen the posts that are on Exposing Family --

A Never. I've never seen one of them.

THE COURT: Hold on. Stop.

Wait for the full question.

MR. ADAMS: Yeah.

THE COURT: What's the full question?

MR. ADAMS: I'll withdraw it because I understand he's never been on the website.

MR. PORTNOY: Move to strike.

THE COURT: The comment is stricken.

Why don't we take our break right now.

MR. ADAMS: That's great.

THE COURT: Okay. So, ladies and gentlemen of the jury, this is going to be our longer break of the day. This is going to be probably about half an hour to 40 minutes. This is the time when you get to eat your lunch, hopefully you brought one.

And as always, don't talk about the case, don't talk with each other, and don't do any research. And we will see you probably around 12:30 12:40. All right? Thank you.

(At 11:58 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: Thank you. You may be seated.

You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Anything that needs my attention?

MR. PORTNOY: No. We were just verifying scheduling, Your Honor.

THE COURT: Okay. So that's a good question. Where are we at on scheduling?

MR. PORTNOY: When he is finished with his cross, if I have a little bit of redirect, I don't think I will, but I might. And then we're going to read what you've permitted from the Sourced Intelligence deposition, and then we're done.

THE COURT: Okay. And then you will call a witness?

MR. ADAMS: Yes. We'll make a motion and then we'll call a witness.

THE COURT: I will allow you to preserve that motion until the end of the day, so that it's not in front of the jury and we don't need to --

MR. ADAMS: That's why I'm raising it now. So I appreciate that, Your Honor.

THE COURT: I appreciate that.

What I would like you to do over the break is just confirm with one another that everybody is on the same page about what's going to be read in the deposition. I think my order on that is clear, but I don't want any mishaps.

MR. ADAMS: I think we've gone through it and it appears what's designated is in order.

THE COURT: With both sides?

MR. ADAMS: They prepared it and gave it to us. So

we're fine, yeah.

THE COURT: Fantastic. Okay. Good.

Two things.

One is, Mr. Beard, I'm going to ask you to be patient to listen to the question before answering it. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: Understood.

THE WITNESS: This is very emotional.

THE COURT: I understand.

THE WITNESS: Thank you.

THE COURT: And I have actually myself had to testify before many, many years ago, and I get it. But by the same token it's not helping the court reporter or the jurors if you folks are talking over each other.

THE WITNESS: Okay.

MR. ADAMS: It's part of my fault, too, Your Honor. And I'll work with the witness, too. I apologize.

THE COURT: That's what I was about to turn to you next. You saw it coming.

You've got to calm down, too, okay? So let's do that.

MR. ADAMS: Yeah, I would ask that perhaps this witness could focus on my questions. I get it, Your Honor, yeah.

THE COURT: So both sides need to focus on what the question is and let the answer happen. Okay? And that's it.

Secondly, I'm not sure why the defense doesn't have trial software. It's honestly very difficult for me when you're pulling things up and there's not an exhibit number on it. I don't know if the jury is seeing something they're not supposed to see.

I don't know if you have trial software and just aren't using it. But we've got to make this a smoother process in terms of the exhibits on the electronic side. All right?

MR. ADAMS: We have trial software.

THE COURT: Can you use it?

MR. ADAMS: We are trying.

THE COURT: Okay. All right. We will be in recess until 12:30ish.

So thank you everyone.

(A recess was taken from 12:01 p.m. to 12:33 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Ladies and gentlemen, I am -- we will take a break probably again, as we usually do, a little bit close to 2:00, something of that sort, with a stretch break in between.

And we will continue with the cross-examination. Please.

Thank you.

MR. ADAMS: Thank you, Your Honor.

May I proceed?

THE COURT: You may.

BY MR. ADAMS:

Q Mr. Beard, I want to try and get some clarification on some testimony both you and your wife gave about FBI agents coming to your house.

Was your house raided by eight FBI agents and they pointed a gun at your head in front of your children?

A Yes. They -- I had a gun pointed in my face when I opened the door by an FBI agent.

Q Your testimony, you opened the door and there was an FBI agent. How many?

A With a gun in my face?

Q Yeah.

A One.

How many FBI agents were present? Around seven or eight, plus local law enforcement.

Q And it's your testimony what were they doing?

A They were there to arrest us for the bankruptcy fraud charge.

Q And when you opened the door, you had a gun at your face --

A A gun --

Q -- in front of your children?

A -- pointed through -- I opened the regular door, the agent

is standing with a gun in my face through the screen door. My wife and children are in the background.
Q Did that tell you how serious the situation was?
A That they could have sent a letter to us to come over and do the same thing? That was so over the top, I couldn't even believe it.
Q My question for you is: Did it show you how seriously they took the situation?
A I can't speak to that.
Q You said that -- switching gears -- well, let me back up a little bit.
You understand that both you and your wife were indicted for fraudulently concealing assets, correct?
A What was on the indictment --
Q It's a yes or no. It's a yes or no. You and your wife --
A Rephrase the question, please.
Q You and your wife were indicted for fraudulently concealing assets during bankruptcy, correct?
A That was written on the indictment, yes.
Q And you pled guilty to that, correct?
A Yes.
Q You pled guilty to a charge of fraudulent concealment in federal court, in this courthouse, correct?
A That is correct.
Q Turning to 2012 when your wife started her Rawganic Vegan

juice company.
You said she initially got tons of hate online from doctors calling her -- she didn't know what she was doing and she defended herself for hours. Do you remember that?
A If I used the word "hate," that was an incorrect thing. She was challenged.
Q And I apologize if I added "hate."
A I don't remember --
Q It wasn't positive.
A -- saying the word.
Q It wasn't positive. It was criticism.
A There was a lot of positive, too.
Q Yes. But there was a lot of criticism from doctors online, right?
A No, not a lot of criticism. There were people that challenged her credibility, and they were not all doctors.
Q And that was all dissent online, right?
A Pardon me?
Q That was online dissent, correct? People disagreeing with her and posting comments online about her, correct?
A Disagreeing that she knew what she was talking about was the context of the -- of the conversations. There was no hate going on.
Q No problem. Let's get rid of the word "hate."
Your wife was receiving online criticism from doctors

and others about her program saying that she didn't know what she was talking about, correct?

A No, that is not correct.

Q Are you changing your testimony now from earlier this morning?

A I'm not -- you're mischaracterizing what I said.

Q Well, tell the jury what it was. What did she spend -- you sat here for a little while and you stalked about how she'd stay up for hours responding to these doctors online. Remember that?

A No, not just doctors. You're --

Q I know. But I'm talking about that situation.

THE COURT: All right. Folks.

THE WITNESS: Okay.

THE COURT: Before the break I warned both of you that we need to -- there to be a complete question and a complete answer.

So let's start this over.

THE WITNESS: Okay.

THE COURT: What is the question?

BY MR. ADAMS:

Q You testified that there was a group of not only doctors but others criticizing your wife online for her Rawganic Vegan juice business claiming she didn't know what she was doing, correct?

A Incorrect.
Q And that -- what was the testimony then where she spent hours responding to her critics online? What was that testimony about?
A Okay. Now that you've asked me that question, I can tell you what it's about.
People would write in, whether they were qualified or not, I don't know, but they would be trying to challenge her as of -- to whether a post that she wrote was accurate or not. And then she would respond to them one by one, literally, by looking up all of the science behind what she was saying and their sources, and then publish that on the internet.
Q And so your wife has faced criticism for her businesses since at least 2012; is that correct?
A No.
Q Okay. And then in this situation you recall -- well, your wife doesn't have a licensed -- a license in any medical field, does she?
A No.
Q She's not licensed in any -- and I say "licensed," not certified -- licensed nutritionist, is she?
A No.
Q And so then when she turned into -- turned from the juices into the business program, she also received criticism online, correct?

A I don't know about that.
Q How did you know about the criticism online from the raw -- what was it, the raw organic vegan?
A I know about that because we were literally -- like, we were doing something, like, we would take maybe a staycation to go down to the Aspen and, you know, hang out at the pool or something. And when that happened, we would literally not go there, because we wanted to be there for her. And she would, like, not go to the pool and stayed in there during the Saturday and write stuff to -- to respond to, like, verify her credibility for what she was saying.

The people on the internet -- this is why I don't participate in it. I find it to be very, like, not a friendly place. And when -- when that things was happening, that was -- like any words that I use are my words of what I felt the experience to be.

She was establishing herself as a credible figure on the internet. And to do that, she provided documented scientific proof to people that would write in, like, challenging her knowledge. That's the characterization of it that is the most accurate. Trying to challenge her knowledge that she was being accurate on -- in her information. And she would 100 percent provide information that was not only credible, but it had sources behind it from other sources.
Q So then eventually her businesses started morphing and

evolving to what they are today. And you talked about the chat rooms that she would have with her students. You remember that testimony?

A All different things have chat rooms.

Q Okay. Great. Let's just focus on your testimony about the chat rooms. Try and listen -- wait for my full question, because I'm going to bring it back to what you've testified to. Okay?

So these chat rooms, your wife was counseling -- talking with people about serious domestic abuse issues, right?

A No.

Q You don't know that?

A I don't know that.

Q Well, the testimony has been for days about how in these chat rooms women would share their deepest problems with their exes and their child custody battles. You don't know anything about that?

A I know that -- I've been in room C 443 all week, so I haven't heard one word of testimony.

Q Well, prior to this trial, did you ever hear that your wife, as part of her programs that she sold, would have chat rooms where her students would divulge very personal information about their exes and their custody battles with their kids?

A To each other.

Q Yeah.
A Yes.
Q You know that, right?
A They would talk to each other in there. That's why -- the clients.
Q But your wife doesn't have -- but your wife doesn't have a license in marriage or family counseling, does she?
A I am not aware of any marriage or family counseling that went on.
Q Okay. And your wife isn't an attorney in family law, licensed in any state, correct?
A Correct.
Q And so when the online criticism started with her that she the shouldn't be involved in these custody battles, you told her, just walk away and forget about it, right?
A Incorrect.
Q And then instead what she did -- and it's your own testimony -- rather than walking away, she defended herself, correct?
A (No response.)
Q You said that. It was your words.
A You're asking -- is that -- is that an open-ended question?
Q No.
THE COURT: Sir, let's stop. This is the question:

And instead what she did, it's your own testimony, rather than walking away, she defended herself, correct?

THE WITNESS: In context to the first question that you asked that I said was incorrect, you're trying to say that I'm going to answer it based on that question.

THE COURT: All right. What's the answer to the question?

Mr. Portnoy is going to have a chance to come back --

THE WITNESS: Okay. Could you please repeat the question?

THE COURT: Wait, let me finish my sentence.

Mr. Portnoy is going to have a chance to come back up here and clarify things. So just answer the question that's before you.

THE WITNESS: Okay.

THE COURT: Mr. Portnoy is going to have a chance to clarify things, if it's needed.

So, the question was --

BY MR. ADAMS:

Q When the attacks and the criticisms started that you testified to earlier, when the online criticism happened, you testified that she started to defend herself, correct?

A Seven months after she was called a cult leader and child trafficker, she began to defend herself.

Q So the answer to my question is, yes, she started to

defend herself instead of walk away, correct?
A After seven months, yes.
Q The answer to my question is "yes"?
A Yes.
Q Thank you.
Do you have any idea what she did to defend herself?
A No, I do not.
Q Well, one of the things you did is you registered Exposing Family Abuse and Exposing Family Cults, right?
A For a student to help defend her, yes.
Q Defend her against the attacks online. You created that website, right?
A I did not create that website.
MR. ADAMS: No further questions, Your Honor.
THE COURT: Any redirect?
MR. PORTNOY: No.
THE COURT: All right. Thank you. You may step down, Mr. Beard.
THE WITNESS: Thank you, Your Honor.
THE COURT: Thank you.
Plaintiffs may call their next witness.
MR. PORTNOY: Your Honor, the next witness will be reading from a deposition.
THE COURT: All right.
MR. PORTNOY: You want to the explain to the jury what

a deposition is? Thank you.

THE COURT: Yes, one second.

MR. PORTNOY: Thank you.

THE COURT: Ladies and gentlemen, you are about to hear the reading of a deposition. You are to treat the questions and answers the same way you would treat other testimony in this case.

You may proceed.

And I should add, you will have a more fulsome instruction at the end of the case also.

MR. PORTNOY: And these are not in sequence, they are portions.

Question: All right. For the purpose --

Well, I guess we should say who the witness is, even though it's not designated.

The witness name is Alexander Feil, F-E-L-L, and he was testifying as a --

MR. ADAMS: It's F-E-I-L.

THE COURT: It's F-E-I-L.

MR. PORTNOY: Yes, I'm sorry.

THE COURT: All right. So you may ask the questions.

MR. PORTNOY: I was just saying he was testifying as what we call a 30(b)(6) representative. That's all.

THE COURT: All right. Okay, you may proceed.

MR. PORTNOY: Thank you.

(Deposition of ALEXANDER FEIL read.)

MR. PORTNOY: Can you read the answer later on.

MR. ADAMS: Page 44.

THE READER: Page what, 44?

MR. PORTNOY: Yes.

THE READER: Says: --

(Deposition read.)

MR. PORTNOY: And then later on there's a portion of another answer, please.

(Deposition read.)

MR. PORTNOY: Okay. Then further on a different answer.

(Deposition read.)

MR. PORTNOY: And further down.

(Deposition read.)

MR. PORTNOY: That concludes the deposition, Your Honor).

THE COURT: Thank you.

Ladies and gentlemen, again, a deposition is testimony taken under oath before the trial preserved in writing. You are to consider the testimony the same as if it had been given in court.

All right. Plaintiffs may call their next witness.

MR. PORTNOY: That concludes our case-in-chief, Your Honor.

THE COURT: All right. So the plaintiffs rest?

MR. PORTNOY: We reserve our right to rebuttal. Thank you.

THE COURT: All right. Thank you.

Defense may call its first witness.

MR. ADAMS: Thank you. My co-counsel will do the first witness.

MS. MORITZ: Defense calls Paula Haygarth.

THE COURT: All right. Ms. Haygarth, you may approach.

PAULA HAYGARTH, DEFENDANTS' WITNESS, SWORN

THE COURTROOM MANAGER: Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: My name is Paula Haygarth, H-A-Y-G-A-R-T-H.

<u>DIRECT EXAMINATION</u>

BY MS. MORITZ:

Q Hi, Paula.

A Hi.

Q How are you doing?

A I'm nervous.

Q In what year were you born, Paula?

A 1976.

Q And where were you born?

A In a very small town in Saskatchewan, it's called Oxbow.
Q Is that where you grew up?
A I did.
Q Okay. Tell us about that. What was it like to grow up in -- say it again. How do I pronounce that?
A Oxbow.
Q Oxbow.
What was that like?
A It was amazing. I grew up with three sisters. Like I said, the town was really small. It consisted of oil field activity, farming, small high schools, small elementary school. I had freedom to roam everywhere I wanted to go. I mean, I was a '70s child. I got to go swimming in the river. Swimming at the pool. I came home when the street lights came on. I had a lot of close friends. Played a lot of sports. That kept me out of trouble.
Q Did you go to high school in Oxbow as well?
A I did.
Q What kind of activities were you in?
A Sports, sports, sports.
Q And after high school, did you attend secondary school somewhere?
A Not right away.
Q How much time did you take off?
A Well, first I got married to my high school sweetheart

when I was 21.
Q What was his name?
A Jason.
And then we had a baby.
Q What was his name?
A Austin.
Q Go on. Yeah.
So you started a family and --
A Yes.
Q What -- did you end up going to school after that or --
A Yeah. We had trouble conceiving. I was told I was never going to be able to have a baby, a less than a 1 percent chance. And during that troubled time our marriage became difficult. And so when Austin was seven months old we separated and I immediately started university classes while I was working full-time.
Q I see. Now, did you and -- you said you got married to your former spouse; is that right?
A Correct.
Q Yeah. Did you -- did the two of you raise Austin together?
A We did.
Q Even after you separated?
A Yes.
Q And how was that relationship raising him together?

A It was good.
Q No issues or --
A No. The only issue we had was when we had to transfer him back and forth and each one of us missed him deeply.
Q So it would be fair to say you had a friendly coparenting relationship?
A Yeah. In fact, the whole town, which was very small, it's only a thousand people, was amazed and impressed, considering that we were just doing what was in the best interest of Austin.
Q And this is still in Oxbow?
A Kind of, a small town right beside named Alameda where Austin's dad grew up.
Q Thank you.
And you said you enrolled in university after you two split up. Where was that?
A It was the University of Regina in Saskatchewan.
Q What did you study at the university?
A I initially went in to study being either a teacher or a social worker. And I took a lot of social science classes, psychology, sociology, women studies, religious studies, and then geography. I found geography classes. And coming from the '70s, I had no idea I could major in geography. So I did.
Q Any particular part of geography that you focused on and worked in?

A I learned a lot about human geography, but what I ended up doing most was remote sensing and GIS, which is geographic information systems, making digital maps and analyzing them.

Q Interesting.

And what degree did you get from that university?

A It would be classified as a arts degree majoring in geography.

Q Thank you.

What year did you graduate?

A 2002.

Q 2002.

And did you go and -- out into the workforce at that point or did you do something else?

A I was already in the workforce when I was a student in university. I worked for the Canadian federal government for the agricultural branch. So I was already doing analysis for farmland and farmers, and working on programs to assist farmers with financial help.

Q Okay. Do you hold any professional certifications?

A Not anymore.

Q Did you hold professional certifications at some point in time?

A I did. I had a professional Ag designation.

Q Professional, sorry?

A Ag, which stands for agriculture.

Q Okay. Anything else?
A That's it.
Q Okay. So you talked about the -- I'm not going to repeat -- I'm not going to state it right. You talked about the work you did after you graduated from university. For what time period did you do that?
A I began with the federal government while I was in university, and then after -- while I was in university, our boss asked who wanted to go to this really small town in another province, called Morden Manitoba.
So I then worked for Agriculture Canada and did assessments in the fields and then provided analysis with GIS.
Q And what time period did you do that?
A That would have been from -- I believe, it was 2003 to 2007.
I just realized -- I said I graduated 2003 from the university. I actually graduated in 2007.
Q Okay. Thank you.
A So while I was a student I worked for Ag Canada, and then in 2007 I also continued as a professional working for Ag Canada.
Q Thank you.
A Then I completed that job when they shut down our division in 2008.
Q Thank you for the clarification.

A Yup.
Q So when they shut down that division in 2008, what came next in your life?
A I moved to Weyburn, Saskatchewan while I was doing that job. And in Weyburn, Saskatchewan there was about five of us women that had graduated from university that knew one another. And I ended up getting a job with one of them at a company that did environmental consulting in the oil field.
Q Are you married?
A According to the Canadian government, I am, which is called common law married. But I have not been officially married under a church or justice of the peach -- justice of the peace.
Q And what is the name of your spouse?
A Wade Martin.
Q And how long have you and Wade been together?
A We got together in September of 2014.
Q Did you meet Wade in Weyburn?
A No.
Q Oh, okay. Where did you meet Wade?
A I met Wade in Estevan, Saskatchewan.
Q Did you meet Wade after you moved to Weyburn or had you moved to somewhere else after that?
A I met Wade when I lived in Weyburn.
Q And how did you meet Wade?

A I, at the time, was friends with Amanda Brady, and she suggested that I get to know her ex-husband, and that she felt that I would be an amazing stepmom to --
Q Go ahead and take a moment.
(Pause in the proceedings.)
Q And there's tissues behind you if you need them. Okay.
A That I would be an amazing stepmom for her daughters London and Ellis. And eventually I ended up being in her wedding to Drew.
Q Okay. Let me back up for just a second.
After you and Wade met and started dating, you know, partnering together. I mean, what is your life like there with him? What are your interests and hobbies when you were living in Weyburn?
A We just lived very, honestly, kind of boring, non chaotic life. We hung out with our friends. We kayaked. We often worked on renovation projects together. We hung out with our families all the time.
Q And what were you doing for work during this period of time?
A When I first met Wade?
Q Mm-hmm.
A I was a life coach.
Q Okay. And did you have a certification as a life coach?
A Yes.

Q Okay. Tell me a little more about your work as a life coach. What does that involve?
A It involved helping mostly women and sometimes men achieving goals that they wanted to achieve in their life.
Q Okay. Tell me a little bit more about that. What kind of -- like, do people come to you with specific problems, specific issues, questions in their life? Tell me more about that.
A A lot of women came wanting to achieve more success in their careers and needing help overcoming limiting beliefs.
Q Okay. Did you do any other kind of work during this period?
A I did.
Q Tell me about that.
A I was trained in something called body talk.
Q And tell me about that. What's body talk?
A It's -- without going into great detail, it's somewhat like the same principles as acupuncture, where we have points in our body that we can help release emotion or stress, and it involves stuff like tapping and touching points on your body.
Q I see. And does that require any kind of licensing or certification?
A No.
Q Okay. And for how long did you do the life coach work?
A Life coach and body talk work, I started learning about it

all in 2012, and I really began early 2013, I believe.
Q Early 2013?
A Yeah.
Q Any other -- any other work during that period that I didn't touch on that you haven't shared with us?
A Yeah. I would also have different jobs as well. Sometimes I did safety in the oil fields, or I worked at a kitchen cabinet company helping design cabinets. I worked for Wade sometimes.
Q What does Wade do?
A Wade at that time was in construction. So he did a lot of renovations. So I did a lot of painting or putting baseboards on or trim around windows or hanging doors.
Q And where do you live now?
A British Columbia, Canada.
Q With Wade?
A Yes.
Q And what do you folks do now?
A We own a metal fabricating company.
Q We'll talk more about the reason for the move later.
Let's back up and talk about, you were friends with Amanda Brady and that's how you met Wade?
A Yeah.
Q When did you meet Amanda Brady?
A August 2013.

Q Okay. And how did you -- how did the two of you meet?
A I was having a party at my house at the lake, and her sister-in-law brought her and Drew over with London and Ellis.
Q And you guys just hit it off, you became friends? Tell me how the friendship developed.
A I actually hit it off with the kids first, and Amanda started coming for body talk sessions, and so did Drew, and so did London.
Q So Amanda became a client of yours initially; is that right?
A Correct.
Q And for how long was she a client of yours?
A A year, I believe.
Q Okay.
Did the relationship change at some point between you and Amanda.
A Yes.
Q Yeah. Can you tell us about that, what happened?
A Well, I don't necessarily know what happened, but I just -- it I just started to get a little more distant, I would say, at first.
Q Did you say you were in Amanda's wedding?
A Yes.
Q And when was that?
A September of 2014.

Q So when she came to your house with Drew and the girls, they weren't married yet?
A Correct.
Q You guys got know each other after that. Okay.
And how old were the girls at that time, do you remember?
A You're asking me to do math.
Q Oh, oh. Sorry.
A They were little. Ellis wasn't even in kindergarten yet, and I think London was in kindergarten. So five and three.
Q Okay. For then how many years would you consider were you and Amanda close friends?
A I don't know if I'd ever say we were really close, but we were friends.
Q You were in her wedding?
A I was in her wedding, so close enough, I guess, yeah.
2015 I started noticing things.
Q Okay. And what did you notice?
A Distance. I think the regular things of what a mom or a stepmom relationship might experience.
Q Because you were dating -- you were seeing Wade by this time, right, in a relationship with Wade; is that right?
A Right.
Q Okay. And that -- is it fair to say that new relationship caused some tension perhaps?

A I would say that, yeah.
Q Did you guys ever talk it out or anything like that, or it was just kind of a different dynamic in the friendship?
A Actually we did once talk it out.
Q You did? Oh, tell me about that.
A I think it was 2016 my mother-in-law, Rayden Dolan, called me and said that Amanda called her and was upset with me, and that somebody told her I was trying to poison her.
Q To poison Amanda?
A Correct.
Q And you and Amanda discussed this?
A I called Amanda immediately and said, can I come over? I'd like to talk about what was said.
Q Uh-huh.
A And so I went over. And by the end of it, it was just hugging and crying and committing to being coparents together. But it never worked out.
Q I see. Poisoned how? Do you know?
A I don't know.
Q So you don't know if it was like literal or figuratively what she was referring to?
A I took it as figuratively.
Q But when you discussed it with Amanda, she never provided specifics about that?
A I don't -- I don't remember.

Q Okay. That's fine.
So despite having that discussion and, you know, hugging and crying it out, as you said, the relationship didn't -- wasn't the same as it was previously, is that fair to say?
A Yeah, I think there was some trust lost.
Q Okay. But you weren't aware of any other issues aside from what you've shared so far?
A No. I mean, there might have been little things like, hey, London, can you brush your hair? And London might say, My mom says I don't have to. And Wade and I would say, You need to brush your hair, Honey. Just little things like that.
Or one time I bought deodorant for London, because she developed early, and London shared with me that she -- she was told that Paula needs to fucking give her head a shake for buying her deodorant and a bra.
Q Wow. Explain that statement to me, that's what --
A Came from Amanda and Drew.
Q And that was London saying that to you?
A Yes.
Q And she told you that that's what her parent -- or her mother and stepfather had said?
A Yes.
Q Do you know what year that was, approximately?
A 2018.

Q Where did Amanda live at the time that you two were friends?
A When we first met, I think that she lived in Regina, Saskatchewan, or maybe a community outside of there called White City.
Q And when she married Drew, did she stay in that same area?
A They moved to the lake where I was living, but they did eventually go back to Regina.
Q What was the custody arrangement between Amanda and Wade regarding London and Ellis when they were young?
A When they first separated, Wade had them most of the time. So they lived the majority of time with Wade. Amanda would come and get them on weekends.
Q Do you know what year they separated?
A 2012.
Q And are you aware of that custody arrangement changing at any point in time?
A There was never a legal custody arrangement. It was -- how do I say this? There was never like a court ordered legal custody arrangement. It was just shared between the two of them.
Q They just managed it with a mutual agreement, in other words?
A Mediated upon themselves, yeah.
Q And you're not aware of any formal court order that

directed one parent having custody or another, it was just between the two of them?

A No, neither parent had primary or full or any classification like that.

Q Okay. So initially Wade had the girls more often, you said, and Amanda would have them on the weekend. And at some point that changed?

A Yeah.

Q Okay. Do you know when that changed?

A I think when London went into grade one. So he had them for a year, for sure.

Q But you don't remember the year?

A Yeah, I do. Just let me think.

Q Okay. Take your time.

A I think she went into grade one in September of 2015.

Q Okay. And so at that time, Amanda started having custody of the children during the week and Wade would see them on the weekends; is that fair to say?

A Yeah.

Q Okay. Did you come to understand that Amanda started taking online courses with Liane Wilson at some point in time?

A Yes.

Q When did you learn about that?

A I don't remember if it was 2019 or 2020.

Q Well, let me ask you: When did you first come to learn

about Liane Wilson or Liana Shanti?
A 2020.
Q And how did you come to learn about her?
A I heard the girls saying her name.
Q The girls would say her name?
A Yeah, London and Ellis.
Q What would they tell you?
MR. PORTNOY: Objection. Hearsay.
THE COURT: Overruled. Not offered for -- well, let me hear what the answer is to decide whether or not it's offered for the truth of the matter asserted.
THE WITNESS: That they would overhear their mom on the phone.
THE COURT: All right. Sustained.
You may ask another question.
MS. MORITZ: Sure.
BY MS. MORITZ:
Q Did you hear about Ms. Wilson from any other people in the community during this time period?
A Yes.
Q And who was that?
A Friends of Wade's.
Q And what did they share?
MR. PORTNOY: Objection. It's hearsay.
THE COURT: Sustained.

BY MS. MORITZ:
Q What else did you learn about Ms. Wilson during this time period?
A When I heard her name, I went and checked her website. So I learned the different programs that she offered.
Q Do you remember the context in which you learned about Ms. Wilson? Was it just from the girls or from anywhere else?
A It was from friends.
Q Okay. And what was it that you learned from friends about Ms. Wilson?
MR. PORTNOY: Objection. Hearsay.
THE COURT: Sustained.
BY MS. MORITZ:
Q What were you told?
MR. PORTNOY: Objection. It's hearsay.
THE COURT: Sustained.
BY MS. MORITZ:
Q You mentioned that you went to the website to learn. What did you learn there?
A I just learned that she was a spiritual teacher and she had various programs.
Q Okay. And did anything prompt you to you do that other than the girls mentioning her?
A No.
Q Okay. And in the year -- what would you -- I think you

said it was -- I don't want to misstate it -- 2020?
A I think so, yeah.
Q Okay. Was there a point in time that Amanda and Drew moved to Florida?
A Yes.
Q What do you know about the circumstances of that move?
A Amanda called Wade, and I was on the phone with him, in November of 2021, and shared with him that she was taking the girls to Disney World in Florida for a vacation. And Wade said, But hey, it's my year for them over Christmas. So I don't want you to take them because it's my year that I get to have them at Christmas.
And she said that she had already told them and they want to go, so that was that.
So Wade succumbed to letting his girls go on an amazing vacation to Disney World.
Q He didn't want to disappoint the girls by being the parent that said no?
A Yup.
Q So they went on this vacation and then what happened?
A They didn't come back for four years.
Q What did you and Wade do in response to that?
THE COURT: This might be a good time for a stretch break. So it's right around the time we were going to take a stretch break anyway. So we can take a real quick stretch

break, unless anybody needs to use the restroom. We do have a couple.

Okay. So we're going to take a real quick five-minute recess.

I've been asked to send you, if you do need a restroom break, to go back down to the jury room.

So, just go back down to the jury room and then whenever you're ready to come back, I'm sure that Ms. Parker will let Ms. Cortez know and we'll make sure that everybody is lined up.

All right. Thank you.

(At 1:29 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. We'll be in a short break.

You may step down if you want to you don't have to, but you don't have to. It's up to you.

(A recess was taken from 1:29 p.m. to 1:37 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Thank you.

Ladies and gentlemen, we'll go until about 2:15 and then take a ten-minute recess and then finish up the day. All right.

Okay. Ms. Moritz, you may continue.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q I believe there was a question pending when we took a break. And if I'm right about that, can we read it back, please?

THE COURT: One second.

MS. MORITZ: Thank you.

THE COURT: Yes. She said they didn't come back for four years. And the question was: What did you and Wade do in response to that?

THE WITNESS: Well, the first thing we did was ask her if she would come back. And she said no. And then --

BY MS. MORITZ:

Q Go ahead.

A And then we started calling as many authorities as we could to get advice. So we started with Weyburn City Police, and we went in there and told them what was going on. And well, they didn't really take us all that seriously. It seemed that they thought that it was just, you know, coparents arguing and is it wasn't a big deal and she'd be back.

So that was March, I believe, of 2022.

And then we also called the RCMP. Which is the Royal Canadian Mounted Police to ask if there's something we could do.

Q Yeah.

A And we also called the Jacksonville State Police to share

that there are kids there with their room that didn't have permission to stay there.

We also called immigration in Florida, because at that point we were told that Amanda was getting visas for her and the children to be there.

We also called the FBI. We talked to Weyburn City Police again. We talked to our lawyer. And we also met with our local MLA politician to see if he could help get us special permission at that point to cross the border to go see them, because we didn't have the proper vaccination papers to cross the border by land into the United States.

Q And what did the local politician tell you?

A Well he promised that he would help us and he gave us his word that he would get back to us, and he never did, even after us contacting him again.

Q Let me ask you this, Paula: At what point after they went on the trip to Florida for the vacation, which was supposed to -- I think you said it was supposed to last four weeks; is that right?

A Yeah, Amanda said about four weeks.

Q Okay. At what point did you realize that they weren't coming back?

A In March when we got a letter from her lawyer stating that Ms. Brady planned on relocating to Florida.

Q Wow. How -- how did that -- how did that affect you and

Wade? Tell me about that.
A It was devastating. We were terrified. We didn't know what to do. Not one single authority helped us, because -- and then we were even told that --
Q Take your time. It's okay.
A I'm sorry.
Q It's okay?
A When we said to Weyburn City Police, well, what if we just get vaccinations so we can cross the border, and then we can go see them and we can bring them back if they want to come back. And we got warned, Do not do that. If you do that you will be dealing with the Florida State Police and jail -- Wade will be put in jail for kidnapping. So we were more terrified.
Q Yeah. Was Wade in touch with the kids while all this was happening?
A Yeah. Amanda didn't stop him from accessing the girls by Zoom and phone. And they adore him. They contacted him all the time.
Q Was there -- when you look back on this experience, Paula, was there anything before they -- before they left that you see as kind of a red flag or anything like that?
A Yeah. The things that Ellis and London would tell us.
Q Tell you -- is there something that you heard that you -- from them that you look back on and think is a red flag?
A About them moving, you mean?

Q Yeah. Or rather not coming back.
A Yeah. Two things, I guess. It was in September of 2021, Ellis mentioned that they were thinking they might move to Hawaii.
Q What did you make of that?
A Well, honestly Wade and I were kind of laughing. We're like, well, you can't just move to Hawaii because your dad's not going to agree to that.
Q You said there was a second thing?
A We had heard that Amanda had sold her house in Regina, Saskatchewan. And when asked, she assured Wade it was just, I'm selling my house, we're coming back. Wade said, where are you going to live when you come back? She goes, We'll live back in Regina. He said, Are you coming back? And she said, Yes.
Q And he took her at her word?
A You pretty much have to.
Q So they didn't come back for four years, is that your testimony?
A They didn't come back to live back in Canada for four years.
Q Okay.
A But in September of 2023, after almost two years of being gone, they came back. I believe it was to have a meeting with the government of Canada about their visas that they were

trying to acquire.
Q So I want to make sure I understand you.
They left in December 2021?
A Correct.
Q When was the next time Wade saw his kids?
A Mid-September of 2023.
Q Wow. The kids didn't come back to visit at all? They weren't allowed to come back to -- for a holiday or Christmas or --
A No.
Q Was any reason given for that?
A That they can't come back because they didn't have vaccines, is what Amanda told us.
Q Okay. Because they didn't have vaccines, they couldn't freely cross the border to and from the United States and Canada; is that right?
A That's what we were initially told, yeah.
Q I see. Did you ever hear about -- well, let me back up.
How did that -- how did those years away with not seeing your kids in person, Wade's children and your stepchildren, how did that affect the relationship?
A Mine and Wade's relationship or relationship with the children?
Q Let's start with the children.
A It put a lot of distance and -- like almost a divide

between -- especially me and the girls. It -- it caused a lot of pain between Wade and his daughters, him not being able to be there for their events. And then being mad at him that he wasn't there.

Q Remind me how old the girls were when they went on that -- when they left in December of 2021, I think it was.

A 11 and 13.

Q And how did it affect your relationship with Wade?

A I don't know that it affected it, other than we spent many years being in a lot of fear and sadness. And we didn't go do the fun things that we always did because we were sad.

Q Did Wade ever try to hire an attorney in Canada to help with the problem, help with the situation, I should say?

A Yeah. He did, at first.

Q And what happened with those efforts?

A Well, our first our first effort was to work with the City Police, because after they finally started paying attention to us, they did make us aware that, in fact, Amanda crossing the border with the girls was illegal, according to their parenting arrangement. And so in working with the City Police, they did tell us that they would bring this to a Senior Crown Prosecutor in Saskatchewan and we'd have a conversation about what we could do about this, because it was illegal.

And eventually we got a call from the Senior Crown Prosecutor of Saskatchewan, and she told Wade that, yeah, the

minute Amanda Brady comes back across the border we will arrest her for this, and she can be charged if you want her to be. And Wade said, Well, if it's the only way I can get access to my daughters again, I guess so, but I don't want to do that to their mom either. But yes, go ahead and charge her, if that's what it takes.

And then the Senior Crown Prosecutor proceeded to tell Wade that what the charge would be, would be that she would probably get a fine only for Ellis, because London was of age to make her own decision of what parent she wanted to be with. And after that fine, in her own words, she can take them back and go do whatever she wants. She can go out for supper with them. And if Wade wanted to take it further, he would have to hire an attorney and again, the Senior Crown Prosecutor said, This will bankrupt you and you probably won't win.

Q I see. Thank you.

Did you ever hear about this happening with other families at any point?

A I did.

Q What did you learn about that?

A The first phone call I got in regards to knowing that it was happening to anybody else was from Stefanie Horvath.

Q When did she call you?

A Mid March of 2022.

Q And remind me where you guys were living at the time.

A Weyburn, Saskatchewan.
Q Okay. And so you got a call from Stefanie Horvath. And did you -- you had not met her previously; is that right?
A No. She indicated that, This is Stefanie Horvath. You don't know me. We have someone in common. Her name is Shannon. Her son works for Wade. And I said, Oh, yeah, we know Shannon. Well, I'm calling because we think we're in a similar situation to what you and Wade have experienced. And I was kind of in shock.
Q So what came next? Did you meet with them?
A Yes. Stefanie asked if Wade and I wouldn't mind meeting with her and Byron in Regina, Saskatchewan, which was kind of a meeting halfway point for us. So we went for supper at Famoso Pizza.
Q How big of a town is Weyburn, by the way? I should have asked you that earlier.
A Weyburn is approximately ten to 12,000 people, depending.
Q Okay. And how big is Regina?
A I don't know, it's like the capital of Saskatchewan.
Q Okay. So it's a bigger town?
A Big city.
Q Did you -- when you and Stefanie chatted on the phone, did she tell you where they lived?
A I don't remember if she told me on the phone or if she told me at supper.

Q Okay. But you met Regina and had dinner?
A Correct.
Q Okay. And I believe you testified that she got your name from Shannon?
A Shannon, which is Haley Winter's sister-in-law.
Q Okay.
So, do you -- did you know more about why she wanted to speak with you at that time.
A When she initially called me? Yeah, I knew.
Q And she mentioned a similar situation?
A Yeah.
Q Okay. And so you met for dinner. What did you all talk about?
A We talked about how things played out with Amanda, and they shared their story of how things had made out. And we talked about how there was a common denominator, that they were both students of Liana Shanti. And they asked Wade if he wouldn't mind signing an affidavit just stating his experience of how his ex-wife left Canada.
Q Do you know how Wade felt about that, doing an affidavit?
A Yeah, he really wanted to support Byron, because Wade was in a lot of pain from having his kids taken. He didn't want it to happen to another dad.
Q So is it correct that Wade did submit something for Byron?
A Yes.

Q What was that? Tell me more about that, please.

A He shared the story in the affidavit of the timeline of Amanda taking the girls, and that he believed there was some connection to Liana Shanti.

Q What kind of connection? Did you know at that time?

A Just that she was a student of hers.

Q She --

A Amanda Brady was a student of hers, yeah.

Q And what became of that proceeding that Wade submitted an affidavit, if you know?

A I believe that Byron ended up with -- I don't know if it's called full custody or temporary custody of Ayla.

Q And did you know -- did you have an understanding at that time whether or not Byron had already experienced a similar situation where his ex-spouse had tried to take the child? Or I mean, did you even know the status of what had happened at that time?

A I think that they shared that she was talking about maybe moving to Florida or asking permission to go on a vacation to Florida.

Q Do you remember a point in time when Ms. Wilson started to post about you on Instagram?

A Yeah.

Q Do you know when you first learned about that?

A It was in the spring of 2022. I saw posts where she

talked about a woman in Saskatchewan with a son named Austin. So I assumed that was me, because I was called a failed Reiki healer when I did that work. So Austin, Reiki healer, we're from Saskatchewan, I assumed that was about me. I don't necessarily recall anything about my name on it until after May or June of 2022.

Q So Wade submits this affidavit. And what, I think you said it was April '22 or around there? If you remember.

A March, I think.

Q Okay. And in the month or two after that you learned that Ms. Wilson was posting about you on Instagram?

A Yes. And then in -- well, this one is easy to remember because it's burnt into my brain. Mid-June of 2022 I saw a post on Reddit that took me 45 minutes to read because it was so long, saying disgusting and awful and untrue things about me. It was called The Evil in Saskatchewan, and it had my picture on it.

Q And that was in mid-June 2022?

A Yes.

Q How did you come to learn about that article?

A I got a phone call.

Q From whom?

A Paul Thompson, I believe.

Q Did you know a Paul Thompson?

A No.

Q What was the phone call about?
A It was someone telling me that they saw --
MR. PORTNOY: Objection. Hearsay.
MS. MORITZ: So you got --
THE COURT: Let's ask another question.
MS. MORITZ: Sure.
BY MS. MORITZ:
Q When you received a phone call in mid-June '22 about The Evil in Saskatchewan article, did the person identify themselves on the call?
A Not at that time. I believe it now, that it was maybe Paul Thompson.
Q I see. Okay. So it was a call. And what did the person say on the phone to you? What did you learn?
A He --
MR. PORTNOY: Objection. Hearsay.
THE COURT: Sustained.
BY MS. MORITZ:
Q Prior to seeing The Evil in Saskatchewan article that you referenced, had you already seen posts on Instagram about you posted by Ms. Wilson?
A I can't recall those, no.
Q Okay. Do you have an Instagram account?
A I do.
Q Okay. So you know how Instagram works, the mechanics of

it?

A Yes.

Q Okay. And you know the difference between an Instagram story and an Instagram post? We heard talk about it in here.

A Yes.

Q A story is temporary, I believe, and a post is permanent, correct?

A Permanent, yup, and temporary, yeah, that's right.

Q Do you follow @LianaShanti on Instagram?

A No.

Q You mentioned -- I'm going to back up for a second. You mentioned a spring in 2022 post that mentioned Austin and called you a failed Reiki healer, but did not name you by name.

What's a Reiki healer?

A Someone who's taken Reiki certification that does sessions on people to help them with their energy and their stress.

Q Is that something you did at some point in time?

A Yeah.

Q Is that one of the certifications you obtained?

A It was one of them, yeah.

MS. MORITZ: Let's pull up, please, Exhibit 1045 for the witness.

MR. ADAMS: I have it pulled up, Your Honor. Bates stamp number.

THE COURT: All right.

MR. ADAMS: Marked exhibit.

THE COURT: Thank you.

This has not yet been admitted, right?

MS. MORITZ: Not yet, no.

THE COURT: Okay. It may be shown to the witness but not to the jury.

THE WITNESS: I can't see anything on my screen.

MR. ADAMS: Oh, I'm sorry.

THE WITNESS: Am I looking on the screen or in a book?

THE COURT: One second. It's going to come up in just a second.

MR. ADAMS: How about now, Carla?

MR. PORTNOY: Can we approach the bench, Your Honor?

THE COURT: Okay. Why don't we take a stretch break, ladies and gentlemen.

And we'll have counsel meet me at the bench, Ms. Moritz, please, and Mr. Portnoy.

(Sidebar on the record:)

MR. PORTNOY: I know there's been intermingling of the two claims, but this is directly related to the counterclaim. And so this makes it really difficult. So I just want to raise that, because this post goes directly to the counterclaim, directly.

THE COURT: Okay.

MR. PORTNOY: If there's some other reason why it's

going to get into our claim, which is -- you know what it is, these people posted. But what she posted about them is the subject of the next proceedings. That's all I'm pointing out.

THE COURT: Okay. Okay. I'm going to allow it.

MS. MORITZ: Thank you.

(End of sidebar.)

THE COURT: All right. You may proceed.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q Paula, do you recognize Exhibit 1045?

A Yes.

Q Is this a true and correct copy of a screenshot that you took?

A Yes.

Q With your phone?

A Yes.

Q Do you recall approximately when you took this screenshot?

A Probably in November of 2022.

Q And did you doctor it in any way?

A No.

MS. MORITZ: Request Exhibit 1045 be admitted into evidence and shown to the jury, please.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 1045 is admitted and may be shown to the

jury.

(Defendants' Exhibit 1045 was received in evidence.)

BY MS. MORITZ:

Q So this post here, it reads -- on the Liana Shanti account at the top. Jesus, we ask you to delete and destroy all toxic lies from the Satan servant, Paula Haygarth, whose campaign to invalidate truths of hashtag child abuse to cover up her own misery. She is hateful and envious. And in her hatred and envy she cannot bring herself to acknowledge the pain of all the children who have been harmed by their parents. She abandoned her own son Austin, and her guilt and shame have turned her into a soldier for Satan.

Paula, how did you feel when you saw this post?

A Terrified, gutted, an immense amount of pain, shock, anger, disbelief, disgusted.

Q Was this the only time that Ms. Shanti posted about you on her account, specifically about you abandoning your son?

MR. PORTNOY: Objection, Your Honor. There's been no testimony about who posted this. That was --

THE COURT: Well, I thought she asked something about the wording. But maybe you can clarify that question.

MS. MORITZ: Sure.

BY MS. MORITZ:

Q Is this the -- is this the only time you observed a post about you abandoning your son on the at @LianaShanti Instagram

account?
A No.
Q Do you know how many times you saw similar statements on the @LianaShanti Instagram account?
A I don't. It was just constantly put on there. Sometimes statements about me would range from one a day to ten. But it was over and over again.
MS. MORITZ: Let's take a look at Exhibit 1046, for the witness, please.
THE COURT: All right. This has not yet been admitted, so let's just pull it up for the witness, please.
MS. MORITZ: Yes, please. Thank you.
MR. ADAMS: 1046?
THE COURT: Yes.
MR. ADAMS: Is on the screen?
MS. MORITZ: Not yet.
MR. ADAMS: Did you have it now, Carla?
MS. MORITZ: It's here now.
BY MS. MORITZ:
Q Paula, take a look at 1046. I believe the Bates stamp number is PH000545.
Do you recognize this screenshot?
A Yes.
Q And is this a true and correct copy of the screenshot you took from the @LianaShanti Instagram account?

A Yes.
Q Do you know when approximately you took this screenshot?
A It would be around that same time, in November of 2022.
Q Did you doctor this screenshot in any way?
A No.
MS. MORITZ: Move to admit Exhibit 1046 into evidence.
THE COURT: Any objection?
MR. PORTNOY: No.
THE COURT: 1046 is admitted and may be shown to the jury.
(Defendants' Exhibit 1046 was received in evidence.)
BY MS. MORITZ:
Q It reads: Paula Haygarth abandoned her own child so you have free time to attack other people's children.
Ms. Haygarth, do you know what that's referencing, attacking other people's children?
A I assume she means I'm attacking other people's children. I don't know whose children.
Q Do you attack other people's children, Ms. Haygarth?
A No.
MS. MORITZ: Let's look at Exhibit 1055, please.
THE COURT: Let's pull this up just for the witness.
MR. ADAMS: On the screen, Your Honor.
BY MS. MORITZ:
Q Paula, do you recognize this post?

THE COURT: That's not on. Oh, I'm sorry.
Go ahead.
THE WITNESS: Yup.
BY MS. MORITZ:
Q I see that this post has similar -- well, I'll back up.
Do you remember seeing this post on the @LianaShanti Instagram account?
A Yup.
Q Okay. And do you know approximately when you saw it?
A It would be in between November of 2022 and probably February or March of 2023.
Q Okay. And how do you place it in that date range?
A Because it was happening a lot during that time period, and this image was used multiple times.
Q I see. So you've seen this image -- the photograph or the entire post was used multiple times?
A The photograph.
Q Has this image been doctored in any way from when you first observed it on Instagram?
A No.
Q Okay.
MS. MORITZ: I would move Exhibit 1055 into evidence, please.
THE COURT: Any objection?
MR. PORTNOY: The problem I have with 1055, Your

Honor, it may be me, is that I can't read the whole document. I can read what's in black.

THE COURT: Mr. Young, are you able to see the wording that is in red?

MR. PORTNOY: No objection.

THE COURT: All right.

MR. PORTNOY: Thank you.

THE COURT: 1055 is admitted and may be shown to the jury.

(Defendants' Exhibit 1055 was received in evidence.)

BY MS. MORITZ:

Q This post has a similar photograph of you, Paula. And this one reads: Jesus, we ask you to delete and destroy all evil within and admitted from Black Magic Reiki Witch Paula Haygarth.

Ms. Haygarth, are you a black magic Reiki witch?

A No.

Q And again, it says: Paula Haygarth abandoned your own child so you have free time to attack other people's children.

It's not true that you abandoned your own child, is it?

A No.

Q Do you attack other people's children?

A No.

Q Paula, how did you feel when you saw this?

A Well, I felt multiple things because of the multiple things that are said here. I am a very spiritual person, and to see that someone is using Jesus's name to want to delete and destroy me scared me.

And to call me a black magic Reiki witch, I was terrified, because that was my business. I worked with people in Reiki and body talk and coaching. And to be called that in that business is pretty detrimental. To use a prayer to hurt somebody in the name of Jesus is disgusting.

And to say that I abandoned my son, someone who I was told I would never be able to conceive, as if I would do that. An immense amount of pain and anger.

Q Did anyone ever talk to you about these posts in the community, friends, family?

A Yes. Yup.

Q Yeah? Did it happen often?

A My boss talked to me. My friends talked to me. Acquaintances talked to me. Well, obviously Wade talked to me. My family, my sisters talked to me.

Q What did you tell them?

A That I was scared and terrified and hurting.

MS. MORITZ: Can we pull up for the witness only, please, Exhibit 1066?

THE COURT: You may.

MR. ADAMS: It's on the screen.

THE COURT: All right. 1066 is on the screen for the witness.

MS. MORITZ: Okay.

BY MS. MORITZ:

Q Paula, do you recall seeing this post on the @LianaShanti Instagram account?

A I do.

Q Do you recall when you saw that post on the @LianaShanti Instagram account?

A Probably the same time period.

Q Is it a true and correct copy of what you observed on the @LianaShanti Instagram account?

A Yeah.

Q It's not doctored in any way?

A No.

MS. MORITZ: Can we move -- I would ask to move 1066 into evidence, please.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 1066 is admitted. It may be shown to the jury.

(Defendants' Exhibit 1066 was received in evidence.)

BY MS. MORITZ:

Q So, Paula, we have a similar photo of you here in this post, and it reads: This hashtag black magic Satanist, Paula

Haygarth, who abandoned Austin, her own son, as a baby was the person who posted on Cult Education Forum. We understand why now with her involvement in child trafficking and convicted felon Rick Ross.

You've already testified you did not abandon your son. I'm not going to ask that question again.

Are you the person who posted on Cult Education Forum?

A No.

Q Are you involved in child trafficking?

A No.

Q Do you know Rick Ross?

A I do not.

Q Are you involved with him in any way?

A No.

Q How did this make you feel when you saw this post?

A Well, same thing about abandoning my son, same feelings. Black magic Satanist, same feelings. Confused. Calling me a child trafficker, that's pretty detrimental to my reputation as well. Terrified about what people in my community were going to think of me. I was even scared at this point what my family might think of me.

MS. MORITZ: Can we pull up Exhibit, please, 1121.

THE COURT: All right. We'll take our break at this point.

MS. MORITZ: That's fine, yeah. Thank you.

THE COURT: Ladies and gentlemen, we'll take a real quick ten-minute break, and then when you come back at around 2:25 we'll finish up for the day, and we'll be done at 3 o'clock. All right.

Please don't talk to each other. Don't do any research. And we will see you at around 2:25. Thank you.

(At 2:16 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: Okay. Thank you. We'll see everybody in ten minutes.

(A recess was taken from 2:16 p.m. to 2:27 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Thank you.

You may continue, Ms. Moritz.

MS. MORITZ: Thank you, Your Honor.

THE COURT: And I think when we left off you had asked for Exhibit 1121. Do you still wish that to be on the screen for the witness only?

MS. MORITZ, actually. If we could, let's go back to 1045 briefly, Paula.

THE COURT: 1045?

MS. MORITZ: Which is already admitted.

THE COURT: Admitted.

MS. MORITZ: Yes.

THE COURT: You may do so.

BY MS. MORITZ:

Q Paula --

MR. ADAMS: It's on the screen.

MS. MORITZ: Yes, thank you.

BY MS. MORITZ:

Q Paula, how did your photograph -- do you know how your photograph ended up on this post? You didn't share your photograph with Ms. Wilson, did you?

A No. This is a photograph I would have had on my Instagram page, public Instagram page at the time. It's a -- it's a picture of me in a really happy time in my life my with one of my nieces when she graduated.

Q So Ms. Wilson took this from your Instagram page and put it on hers; is that accurate?

A Well, she or someone else screenshot it and gave it to her.

Q And put it -- I didn't mean to talk over you. I'm sorry.

And put it on the -- and used it on this @LianaShanti --

MR. PORTNOY: Objection, Your Honor. She has no idea who did it and why. There's been no testimony.

THE COURT: She answered the question, so you may ask another question.

MS. MORITZ: I'll move on to the next document.

1055, please, already admitted into evidence.

THE COURT: All right.

BY MS. MORITZ:

Q Paula, this photograph of you, do you know where this photograph would have come from?

A My Instagram page. It's something I posted on my Instagram page. I took the picture myself.

Q Do you have idea how someone would get ahold of your photograph and put it on the @LianaShanti Instagram account?

A They would had to have gone to my page, took a screenshot, put it on the Liana Shanti Instagram account.

MS. MORITZ: Now, let's look, please, at -- for the witness, Exhibit 1121.

THE COURT: You may.

BY MS. MORITZ:

Q Paula, do you recognize this post?

A Yes.

Q And do you know where it came from?

A Yup. I screenshot it from the Liana Shanti Instagram account.

Q What's the reference at the bottom, AnonStories.com?

A It's the site I used to view Liana Shanti's Instagram account so I could remain anonymous when viewing it.

Q I see. And do you know to the approximate date of this post?

A Some time after November 2022.
Q Is it a true and accurate copy of what you viewed on the @LianaShanti Instagram page?
A Yes.
Q And you did not doctor it in any way?
A No.

MS. MORITZ: I'd ask to move Exhibit 1121 into evidence.

THE COURT: Any objection?

MR. PORTNOY: Yes. Several.

THE COURT: All right. Do you want to voir dire the witness?

MR. PORTNOY: I'm sorry?

THE COURT: Do you want to voir dire the witness, or what objections do you want to raise?

MR. PORTNOY: The objections are, one, there's no attribution on here. Two, it looks like it come from somebody called AnonStories.com, who are not witnesses. There's no authenticity. And it's obviously not complete. There's obviously more to this.

Those are my three objections.

THE COURT: Understood.

Overruled. It may be shown to the jury. Exhibit 1121 is admitted.

(Defendants' Exhibit 1121 was received in evidence.)

MS. MORITZ: Thank you, Your Honor.

BY MS. MORITZ:

Q Paula, take a moment to look at the language there. It reads: We know this by the disturbing smear campaign that she would launch on Amanda's two daughters every time they were visiting their dad. More on that later. We know it's not because of Paula's desire to be a parent to Amanda's daughters. No. In fact, about 18 years ago Paula Lee Haygarth was married to Jason Hammermeister, and they had a son, Austin. Austin is now 18. Paula gave up custody of her own son when she divorced Jason. Austin was a very small child. Instead, she chose to live her life of new age life coaching, completely abandoning her own son and never looking back. Paula then remarried a man named Peter, who lives in Mainprize, Saskatchewan. They divorced in 2013.

Paula, how did this make you feel when you saw this?

A Well, yeah, again, terrified, in deep pain, gutted, completed gutted. I was worried because my son's name is on there. They talk about his age. They talk about his dad, who is a very private person. I was worried that he would be upset about this. They talk about me abandoning Austin again. This is full of lies. There's a couple of true things on here. I was married to Jason. I was married to Peter.

Where it says, Instead she chose to live her life of new age life coaching completely abandoning her own son and

never looking back, it's implying that I started life coaching and just left Austin to his dad, by the looks of it. That's not true. None of that is true. I didn't even start life coaching until 2013 or later.

I don't understand why it would say I would launch a smear campaign when the girls visited us.

And the part where it says, we know it's not because of Paula's desire to be a parent to Amanda's daughters, that is just the most complete crap I've ever seen. I loved those two little girls before I was even their stepmom. And I continue to love them to this day. I support them in anything they want to do. And I've helped them through a very difficult time in the last four years. I taught them about tampons. I taught them about deodorant. I put them to bed at night. I read to them. I did crafts with them. I taught them how to ride bikes. We swam together. We camped together. We watched movies together and snuggled. I did their hair. I braided their hair. I bathed them. I took them on little trips.

Q The girls were, remind me, how old when you and Wade started dating, seeing each other?

A Approximately five and three.

Q And how old are the girls now?

A 18 and very soon to be 16.

Q What's your relationship with the girls now, what's it like?

A So much better. Being -- being repaired every day.
Q You see them often now?
A Yeah.
Q Paula, do you know -- do you remember right now, how many times have you seen posts on the @LianaShanti Instagram account which accused you of abandoning your son as a baby? How many times have you seen that?
A I don't think I could say an exact number, but it's got to be over 50. Just reposts. Same post sometimes, just reposted. And then this right here is the synopsis that began on Reddit, called The Evil in Saskatchewan, and I worked hard at getting that taken off of Reddit. And eventually it did, but only to be moved to the website Exposing Family Abuse, which remains on to this day. So this is out in for my son, my son says father to see, for London and Ellis to see, for potential business people to see, for past clients to see, for my old boss to see, for my family to see, for my family to potentially have to explain why this is out there. It's still there.
Q Have you ever had to explain this to anyone that asked?
A Yes.
Q Can you give me an example?
A When this began in 2022 I was having difficulty being able to see clients in my own business because I was very stressed and upset about this. And so I decided to get back into my old work, which was environmental consulting. And so I reached out

to a friend of mine, Damon Lamontagne who owned Keneco Environmental, asking him if he had any sort of part-time work, telling him that's all I could probably handle, a couple days a week. And so I started working part-time for him in, I think it was September of 2022. And in November he came to my office and let me know that someone had phoned him in the community of Weyburn and said, I understand --

MR. PORTNOY: Objection. Hearsay.

THE COURT: Sustained.

BY MS. MORITZ:

Q What did your employer tell you -- I'm sorry.

Is there something else that you learned during that meeting with your employer at the time?

A That he was worried about me.

MR. PORTNOY: Objection. Hearsay.

THE COURT: Sustained.

MS. MORITZ: Let's take a look at, please, for the witness Exhibit 1052.

THE COURT: You may.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q Paula, do you recognize this Instagram post made on the @LianaShanti Instagram account?

A Yeah.

Q You recognize it?

A I do.
Q Do you recall when you first observed it?
A Not really. No, I'm sorry, I don't.
Q Okay. Is it an accurate copy of what you observed on the @LianaShanti Instagram account?
A Yeah.
Q Has it been doctored or altered in any way?
A No.

MS. MORITZ: Move 1052 into evidence, please.

MR. PORTNOY: I want to make sure I heard correctly, did the witness say she didn't take this screenshot? I'm sorry, I didn't hear it.

THE COURT: All right. If you could ask that question again.

BY MS. MORITZ:
Q Paula, did you take the screenshot of this post?
A I'm not sure if that one was taken by me or not.
Q But you are certain that you reviewed it or observed it on the @LianaShanti Instagram account?
A There's a good chance because I was always watching it.

MS. MORITZ: Again, request to move Exhibit 1052 into evidence.

MR. PORTNOY: Object.

THE COURT: What's the foundation? What's your grounds for the objection?

MR. PORTNOY: She didn't take the picture. It's a document. She can testify as to -- that's the objection, she didn't take the screenshot.

THE COURT: All right. Let's lay a further foundation.

BY MS. MORITZ:

Q Paula, is it your testimony that you are not sure that you took this screenshot?

A I probably took a screenshot that said this. Did I take this specific one, I don't know.

Q Okay. We'll move on to another exhibit. That's fine.

MS. MORITZ: Let's look at Exhibit 1054, please.

THE COURT: All right.

MS. MORITZ: For the witness, that is.

BY MS. MORITZ:

Q Paula, do you recognize this document?

A Yes. It's a printout of the Exposing Family Cults website.

Q Is this a printout that you did?

A I would have given you one of these, yeah.

Q Did you -- did you print this out, do you know?

A Yeah, I saved one -- I saved this to a PDF myself.

Q Okay. Do you know approximately when you did this?

A It would have been likely in November of 2022, because that's when that website began.

Q Do you want to take a -- scroll through page -- page by page? I don't recall I'm sorry how many pages this is.

MS. MORITZ: Let's pause here, I'm sorry, of 7 of 21 -- no, next one. 8 of 21.

Let's give the witnesses a chance to see the rest of the document.

If you want, Paula, you can look at it in the binders.

THE WITNESS: No, this is okay.

MS. MORITZ: Okay. Maybe scroll down so that she can see the rest. Or is that the last page?

THE WITNESS: I can see the full page.

MS. MORITZ: Okay.

THE WITNESS: Okay.

MS. MORITZ: And scroll down. There we go.

THE WITNESS: I'm looking at Page 9 now?

MS. MORITZ: Yeah, Page 9. And just let us know when you're ready for the next page.

THE WITNESS: Okay.

MS. MORITZ: Next page.

Okay. Next.

Okay. Next.

Next.

Next.

Next.

Next.

Next.

Next.

Next.

Next.

Next.

MR. ADAMS: That's it.

BY MS. MORITZ:

Q Paula, do you recall making a copy of this website page?

A Yes. I made more than one copy, because I gave it to you and I gave it to Weyburn City Police.

Q I see. And do you remember when that was that you took this -- made this record of this web page?

A November of 2022.

Q Okay. And this is from, I see at the bottom it's from www.ExposingFamilyCults.com. That's where you found this page?

A Yes.

Q Other than the places in the document that were redacted, is this an accurate copy? Is it doctored in any way?

A No.

MS. MORITZ: I would move Exhibit -- I forgot the number -- 1054 into evidence, please.

MR. PORTNOY: Your Honor, may I ask couple of questions on this --

THE COURT: You may.

MR. PORTNOY: -- of the witness?

THE COURT: You may.

MR. PORTNOY: Thank you.

VOIR DIRE EXAMINATION

BY MR. PORTNOY:

Q Is it your testimony that this specific exhibit, this document, was photographed by you, this one, 1054?

A No. This one says BH001272 at the bottom. That's not me.

Q That's my point.

A But I didn't say --

Q Hold on. This document that is trying to be introduced, you did not photograph this specific document?

A This specific one, no.

Q No. Because it was produced by Mr. Horvath?

A Looks that way, yes.

MR. PORTNOY: Objection, Your Honor.

MS. MORITZ: I'll withdraw, Your Honor. I'll review this with a different witness.

THE COURT: Okay.

MS. MORITZ: Let's go to Exhibit 1076, please, for the witness.

THE COURT: You may.

MS. MORITZ: I believe this exhibit is two pages. Let's show the witness both pages.

RESUMED DIRECT EXAMINATION

BY MS. MORITZ:

Q Paula, do you recognize these two pages from the @LianaShanti Instagram account?
A Well, so far I've only been shown one, I believe.
Q I think this is the second page.
A Oh, there you go, sorry. My eyes not working.
Q That's okay.
A Yes, I do.
Q Okay. Do you -- did you take this screenshot of these two pages?
A I -- sorry. I did.
Q Do you recall approximately when you took the screenshots of these two pages?
A I'd say probably the winter of 2023.
Q It is a true and correct copy of those two screenshots; is that accurate?
A Yeah.
Q And you did not doctor it in any way?
A I did not.

MS. MORITZ: Okay.

I move Exhibit 1076 into evidence, please.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 1076 is admitted and may be shown to the jury.

(Defendants' Exhibit 1076 was received in evidence.)

MS. MORITZ: If we could start with Page 1, please, the first page? Thank you.

BY MS. MORITZ:

Q So looking at this exhibit, it reads: What we are doing in this Jesus-led community in calling out these people -- and I see there are several names listed. Including yours, Paula Haygarth, in blue. I also see Stefanie Vogt's name in green. And some other individuals.

Let's look at the second page. And you see -- full screen.

At the top of the second page, it reads: This vile group of pedos, pedo supporters, pedo aligners, victim blamers.

And then again I see your name, Paula Haygarth, Stefanie Vogt. Lower I see at the bottom Byron Horvath.

I want to -- I want to know how you felt when you saw this post, Paula?

A Well, extremely upset. Being called a pedo is terrible and untrue and malicious.

Q Are you a pedo?

A No.

Q Are you a pedo supporter?

A No.

Q What about a pedo aligner?

A To my knowledge, I've never met a pedo in my life.

Q What about a victim blamer?

A I don't think I am, no.
Q Did anyone in your community -- how -- how did this affect you in your community, if you know?
A People -- people would see it, obviously.
Q Do you live in a big town, small town?
A When this was going on, I lived in a town of 10,000 people, and not that I knew everybody, but I'd lived there for a while and I knew a fair few people.
Q Did you ever see similar posts like this on the @LianaShanti Instagram account?
A Yes.
Q That named you as a pedo supporter?
A Yes.
Q That named Stefanie Vogt as a pedo supporter?
A Yes.
Q That named Byron Horvath as a pedo supporter?
A Yes.
Q Do you know approximately how many times you saw a post like this on the @LianaShanti Instagram account saying these things about you?
A I don't know how many times, but I know that we have many printed out posts that fill many binders.
Q Yeah.
MS. MORITZ: Let's take a look at Exhibit 1106, please, for the witness.

THE COURT: You may.
BY MS. MORITZ:
Q Paula, I see this is a document that has a PH at the bottom 000161. Take a look and familiarize yourself with it.
Is this a document that you captured?
A It is.
Q Can you tell us what it is?
A It's a PDF printout from ExposingFamilyAbuse.com/Paula Haygarth.
Q And I see there's a date on the bottom, it reads 20th of September 2023. Is that the date you printed this out?
A Yeah.
Q And except for the redactions that appear and that were added into the document, is the document an accurate copy of what you printed out in September of 2023?
A Do you want me to look at the whole thing?
Q Sure. Absolutely.
A Next.
Next.
Next.
Next.
Next.
Next.
Next.
Next.

Next.

Q That was the end of the document.

And you recognize this printout as a printout that you did, Paula?

A Yeah.

MS. MORITZ: Okay. Your Honor, I move to admit this into evidence.

MR. PORTNOY: No objection.

THE COURT: 1106 is admitted. It may be shown to the jury.

(Defendants' Exhibit 1106 was received in evidence.)

BY MS. MORITZ:

Q Paula, how did you learn about this website?

A I saw it on the Liana Shanti Instagram account that a link was posted to her stories.

Q Do you remember -- excuse me. Do you remember the first time you learned about this website?

A Yeah. I learned it from Liana Shanti's stories.

Q Do you recall approximately when that was, the first time you learned about it?

A It was in the fall of 2023, I think.

Q First --

A No, 2022. It was in the fall of 2022.

Q Okay. I know they can blend together sometimes.

A Yeah.

Q And you read the article when you found the website, Evil in Saskatchewan?

A I did.

Q How did -- how did this make you feel?

A Pretty scared.

THE COURT: This might be a good time to recess for the day.

If you want to return to this exhibit tomorrow, you can, Ms. Moritz.

MS. MORITZ: That sounds like a great idea. Thank you.

THE COURT: All right. Ladies and gentlemen, tomorrow let's have you show up at 8:30 tomorrow.

And as mentioned, we are going to have you finish the day a little early tomorrow so that we can prepare for finishing this case on time. Right now we're looking good at finishing it on time. I'm not worried at all. Not at all. But in order to make sure that happens, we're going to deal with some things tomorrow afternoon.

So you'll be done tomorrow at 2:15. All right?

Thank you everyone.

You know what I'm going to say. Don't talk about the case. Don't do any research about the case. Don't talk with each other about what's happening inside the courtroom or what you see in the courthouse, just talk about things unrelated to

this case.

And we will see you tomorrow, jury lounge, at 8:30. All right. Thank you.

(At 3:00 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Ms. Haygarth, you may step down and you may be seated.

Everyone may be seated.

I do have a hearing at 3:30, but I will take the motion now. I will take it under advisement. I would like to hear the motion and hear the response now and I will take it under advisement.

MR. ADAMS: Ms. Ing will be making the Rule 50 motion. It's under FRCP Rule 50, Your Honor, and Ms. Ing will be providing the detail.

THE COURT: And before I forget, have you provided counsel with your list of witnesses for tomorrow?

MR. ADAMS: Yes. And I will update that. To the extent that we get through my clients -- so my clients, all three. To the extent we don't, we will have -- if we need a fourth, it will be Amanda Brady.

THE COURT: Okay.

Sorry. I just want the to confirm that Ms. Vogt Horvath will not take the baby on to the stand, right.

MR. ADAMS: If you don't want her to, she will not.

Whatever Your Honor orders.

That means that Byron will have to leave the room because she will start crying very loud.

THE COURT: Okay. That's -- that's my preference.

MR. ADAMS: Okay.

THE COURT: All right. You may, Ms. Ing, proceed. Thank you.

MS. ING: Thank you, Your Honor.

Your Honor, we are making this motion under Rule 50 of the Federal Rules of Civil Procedure on the grounds that this is a Motion for Judgment as a Matter of Law on the grounds that there has not been legally sufficient evidentiary basis on which a jury could find any of the claims.

I'll start first with defamation. The other claims are false light, intentional infliction of emotional distress, and conspiracy.

All the claims that -- that plaintiffs have been trying to tie the defendants to are based on anonymous posts. That's because the other types of claims they have made relating to victim impact statements have been found not to be defamatory by the Court. And so -- and basically we're focused on the anonymous posts.

There has not been legally sufficient evidence tying defendants to those posts by a preponderance of the evidence.

Plaintiff has -- Ms. Wilson has testified she has no

personal knowledge or information. And the other information that we have heard from various witnesses has been pure speculation, hearsay. And there's been reference to some investigation, clearly biased, because the subjects of the -- the defendants were the ones that were suggested to the report maker.

Even if defendants were involved with the posts, we submit that they are not defamatory either because they are true, that there was evidence that Ms. Wilson is indeed has a -- is operating her schools and courses as a cult, or that they are privileged. Either statements to the Court in the form of victim witness statement, victim impact statements, the reposting by Ms. Haygarth of an existing online post which was found also not to be defamatory, or commentary on posts that are either -- either should be deemed opinion, parody, or caricature, which are protected under First Amendment principles, or hyperbole.

Plaintiffs have failed to show also that defendants, even if they are associated with any posts, have acted with actual malice. That means the either evil intent or malicious intent or reckless disregard.

The testimony has been so far that plaintiffs have -- or defendants have been exercising their right to defend themselves, both in court proceedings in Canada and the United States, in this court.

By the same token, the false light claim fails because there has been no evidence of tying defendants to the role -- defendants to the anonymous posts.

Likely, with intentional infliction of emotional distress, which is only a claim, by the way, that Ms. Wilson can have, not her business, that too is derivative of the defamatory claim and depends on proof that defendants have -- have been involved, again, in the anonymous posts and had actual intent to inflict emotional distress damages on the plaintiff.

Conspiracy, likewise, there has been a lot of talk and speculation and hearsay about defendants having been engaged in the conspiracy. And again, there has been no evidence that they have conspired with other parties, with anonymous posters, to engage in illegal purpose -- in illegal purpose for an illegal means.

Their communications have been with persons with a common interest, either actionable to defend themselves, or in the course of preparing defense, or with respect to claims in Family Court or in this case.

For those reasons, Your Honor, we believe that there has not been legally sufficient evidentiary basis on which a jury could find defamation, false light, intentional infliction of emotional distress, or conspiracy in this case.

THE COURT: All right. Thank you.

Mr. Portnoy, your response, please.

MR. PORTNOY: It's clearly a jury question for them to resolve.

As you know, these quotes were anonymous, and we have attempted to put together a group of facts and beliefs as to the postings and who might be responsible for them. We have established grounds why these three people were involved in posting.

Do we have any direct evidence? We never have, other than what is in the record. We have the Sourced Intelligence information you allowed in, dealing with Paula.

And what was found, that she had posted and reposted. It's a matter, as I said in my opening, of putting together a bunch of facts and trying to create a situation in which jurors could reasonably reach a conclusion that these three defendants were involved in the posts.

There's no question they're defamatory, Exhibits 2 through 5. I don't have to go through all the statements that are in there. So I don't understand an argument about they're not defamatory.

And as far as malice, I think that's clear from the evidence as to what the relationships were between these three people and my client. Their belief that she was wrongfully involved in child trafficking and taking children or encouraging people to take their children out of the country,

and all of the testimony that you heard regarding that.

We have Amanda and Haley's comments that was solicited by counsel as to who they believe post it and why. They obviously haven't testified yet because we have no way of getting their testimony, Your Honor. They do not live in Hawaii. We are not capable of subpoenaing them and making them appear.

We obviously need to wait for them to testify and to hear what they have to say under cross-examination as to who and why. Who they believe made the post. Who they were telling my client made the post. These were not able to get in initially, as you know, because they have not yet been on the stand. But it's not as if we have control over any of these witnesses.

We have the ability, when they're put on in the case by defendants in defense, to cross-examine these people and to have them confirm much of the information which at this point you have ruled is hearsay. But that is not because of any opportunity on our part to not have them available.

THE COURT: Did you depose either of them?

MR. PORTNOY: I deposed Amanda Brady.

THE COURT: Okay. And you have not offered her deposition as part of your case-in-chief?

MR. PORTNOY: Oh, I'm sorry, they deposed Amanda Brady. I'm sorry, Your Honor.

THE COURT: Okay. All right.

MR. PORTNOY: Yeah.

THE COURT: But you have not asked to use her deposition in your case-in-chief?

MR. PORTNOY: No, not at this point, Your Honor.

I don't know -- you know, the conspiracy, you know, I think it's pretty -- the evidence is clear that they got involved in a totally unrelated matter. I know the Court has ruled that what they said was not defamatory, but that's not the issue. I think that's proof positive of a combination of these three defendants with others, some of whose names have come out, others who haven't, in working together to try to have my client's probation revoked. Is there any further evidentiary need of malice as well?

They conspired together, to work together, to attempt to get my client's probation revoked and for additional penalties to be imposed upon her.

I think a jury could draw a conclusion that they're the same people who made some of these posts or all of these posts.

They were deeply involved. They tried to say they had no involvement other than somebody asked them to write a letter.

So, again, this is a case of circumstantial evidence. And for the Court to grant directed verdict is to say there's

absolutely nothing that this jury can look at and determine that that could in their minds make these defendants authors of the exhibits that we've put in so far.

And we have not yet had an opportunity to cross-examine the defendants. They're still in the defense part of this case.

You know, and so all I can say is I think it's a jury question. We have never said we had absolute proof. That's what anonymity is all about. And we have to put the building blocks in. And we put in as much as this Court would permit at this point.

And, again, I think there's more than enough testimony. And we can look back through three-and-a-half days of testimony. And we're prepared to do that if we need to.

And that's all I have to say at this point, Your Honor.

THE COURT: Do you recall, Mr. Portnoy, and if you don't it's fine because I can look it up in the transcript, but do you recall with regard to Exhibit 2 what the date was with regard to when it was believed that these posts were either made or the screenshots taken?

MR. PORTNOY: I don't recall, but I think my client has testified to. We can probably find it back in the transcript, because we went through this with her.

THE COURT: Okay. I'll go back and look.

MR. PORTNOY: I appreciate that, Your Honor.

THE COURT: Okay.

MR. PORTNOY: I don't have that first three days of testimony.

THE COURT: Okay. All right. I will, obviously, as I said at the outset, take this under advisement and I will issue a ruling first thing tomorrow morning.

Any rebuttal, Ms. Ing, that you wish to offer?

MS. ING: My only points, Your Honor, is that, first of all, plaintiffs have rested. They could have called in their case our clients. They did not. They could have taken the depositions of Haley or called Ms. Brady themselves, and they have not done that.

And this case from the beginning was sort of taken -- it was almost like target practice, let's see who we can victimize and make accusations against. And even now we are several years later in trial, and all we have heard in order to make their case is a lot of they, they, they, without tying our clients to any of the other alleged co-conspirators, or even tying our clients to the anonymous posts.

So I think we -- we would submit the Court has heard enough to -- in order to make a determination that this case should go no further. That we cannot just incur costs and time and energy and make these people undergo any more suffering, just because maybe they're going to come up with something else

that they haven't yet. And they have, indeed, rested their case.

In terms of conspiracy, it's not just the issue of you work together so somehow must be wrong. There must be an underlying tort.

Your Honor has already ruled and has prepared a jury instruction that just the communications with the common interest of preparing one's defense, of finding out a bases for one's defense claims and the like, that is not actionable.

So for those reasons, Your Honor, and because really this case turns on defamation, and the other claims arise out of that, judgment as a matter of law should be granted in favor of the defendants.

Thank you.

THE COURT: All right. Thank you.

As I mentioned, I will take this under advisement and I will work on this in this evening.

All right. Thank you. With that we will -- we are in a short recess for my 3:30 hearing. I think we need to switch court reporters, too, so I will step off the bench.

Thank you.

MR. PORTNOY: Thank you.

(The proceedings concluded at 3:15 p.m., August 6, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 6, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC