IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/ Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/ Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 7, 2026<br><br>JURY TRIAL - DAY 5<br>*AMENDED* |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/ Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/ Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


| EXAMINATIONS | PAGE |
|---|---|
| PAULA HAYGARTH...................................... | |
| RESUMED DIRECT EXAMINATION BY MS. MORITZ.......... | 8 |
| CROSS-EXAMINATION BY MR. PORTNOY.................. | 43 |
| VOIR DIRE EXAMINATION BY MS. MORITZ............... | 79 |
| RESUMED DIRECT EXAMINATION BY MR. PORTNOY......... | 80 |
| REDIRECT EXAMINATION BY MS. MORITZ................ | 166 |
| STEFANIE HORVATH.................................... | |
| DIRECT EXAMINATION BY MS. MORITZ.................. | 174 |


# E X H I B I T S


| | PAGE |
|---|---|
| Plaintiffs' Exhibit 341 was received in evidence.... | 100 |
| Plaintiffs' Exhibit 342 was received in evidence.... | 104 |
| Plaintiffs' Exhibit 78 was received in evidence..... | 130 |
| Plaintiffs' Exhibit 22 was received in evidence..... | 171 |
| Defendants' Exhibit 1179 was received in evidence... | 19 |
| Defendants' Exhibit 1056 was received in evidence... | 31 |
| Defendants' Exhibit 1094 was received in evidence... | 32 |
| Defendants' Exhibit 1108 was received in evidence... | 34 |
| Defendants' Exhibit 1141 was received in evidence... | 38 |
| Defendants' Exhibit 1127 was received in evidence... | 40 |
| Defendants' Exhibit 1142 was received in evidence... | 41 |
| Defendants' Exhibit 1162 was received in evidence... | 42 |

FRIDAY, AUGUST 7, 2026 8:29 A.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: 8:29 Civil Number 25-00297 JAO-RT, Life Mastery Network LLC, et al., versus Paula Haygarth, et al. This case has been called for jury trial, day five.

Counsel, please make your appearances for the record starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor. Jeff Portnoy and Troy Young, along with Jenny Tokuoka on behalf of the plaintiffs.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor, Joseph Adams and Laura Moritz on behalf of defendants and counter-claimants.

THE COURT: Good morning.

You may be seated.

MR. PORTNOY: Thank you.

THE COURT: Mr. Portnoy, I understand you wanted to bring something to my attention.

MR. PORTNOY: Yeah. I got a little confused because I thought we had reached an agreement. And frankly, that's how I prepared in trying to prepare my case, that we would put on our affirmative case, they would defend that case. End of that. Then they would put on separately their counterclaim and we

would defend the counterclaim.

But it was clear yesterday for the last half hour it was simply related to the counterclaim, because they went through multiple alleged posts by my client or others that they claim defamed Ms. Haygarth. And so that's their counterclaim.

And so it's very difficult for me to know what I'm facing. And so I know you allowed one question on that, and then I didn't keep coming up because I knew there was another 35 minutes or something.

But I would just like to get an explanation if we're going to combine these two cases, because we didn't do that, and I think that's what's happening here, is the counterclaim is being put in not as a defense to my client's case.

So I just wanted to bring you in and get a clarification, because we've been through this twice.

THE COURT: Okay. So you're not objecting to anything, right?

MR. PORTNOY: From yesterday, no, no, of course not, no.

THE COURT: Right. And -- and --

MR. PORTNOY: I just want and understanding moving forward.

THE COURT: I think for purposes of clarifying and making the -- answering your question, Mr. Portnoy, I do expect that when they have their witnesses on the stand right now that

they will be able to address both the claims and the counterclaims. So hopefully that clarifies that.

MR. ADAMS: Thank you, Your Honor. That's our understanding, that this is our case to defend and to prosecute, and then when we rest, we're done, and then he defends.

THE COURT: Right.

And he can -- you can put on rebuttal witnesses, obviously, Mr. Portnoy.

All right. I looked at -- before we bring the jury in in a couple minutes, I want to make sure that everybody got the jury instructions last night.

MR. PORTNOY: We did.

THE COURT: And you should have gotten the PDF red line this morning.

MR. PORTNOY: I haven't looked at it, but we did, yes.

THE COURT: And so we should be ready to go at 2:15, right?

MR. PORTNOY: Sure.

THE COURT: Okay. Great.

MR. ADAMS: We're stopping at 2:00 and then we'll pick up at 2:15, or are we just going to go to 2:14 and --

THE COURT: We're going to stop with the jury at 2:15, we'll take a 15-minute break, and then we'll resume at 3:00 to go over the jury instructions.

MR. ADAMS: 2:30.

THE COURT: I'm sorry, 2:30. Yeah, 2:30. With the hope that we'll done by 4:30. That's my goal.

Okay. All right. I'll step off the bench then and we'll have the jurors in.

MR. ADAMS: Should we have Ms. Haygarth on the stand?

THE COURT: Yes, please. If you could, please. Thank you.

(A recess was taken from 8:32 a.m. to 8:36 a.m.)

THE COURTROOM MANAGER: The United States District Court for the District of Hawaii, with the Honorable Jill Otake presiding is now in session. You may be seated.

Civil Number 25-000297JAO-RT, Life Mastery Network LLC, et al., versus Paula Haygarth, et al. This case has been called for jury trial, day five.

Counsel, please make your appearances for the record for the record starting with the plaintiff.

MR. PORTNOY: Jeff Portnoy and Troy Young and Jenny Tokuoka for the plaintiff.

THE COURT: Good morning.

MR. ADAMS: Morning, Your Honor. Joseph Adams and Laura Moritz on behalf of defendants and counter-claimants.

THE COURT: Good morning. You may be seated.

Good morning, ladies and gentlemen. I hope you had a restful evening.

We are going to do the same thing today, except we're ending early. So we're going to take the same breaks, kind of -- we will still take the same number of breaks. The timing of them might be a little different. But for this morning I am expecting we will take a break at around 10 o'clock, and we will have a stretch break before then.

As always, if you need anything, a break, just let us know and raise your hand.

All right. Ms. Moritz, you may continue.

MS. MORITZ: Thank you, Your Honor.

PAULA HAYGARTH, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

RESUMED DIRECT EXAMINATION

BY MS. MORITZ:

Q Good morning, Paula.

A Good morning.

Q When we left off yesterday we had just started to look at Exhibit 1106.

MS. MORITZ: So if we could pull that up, please, for the witness.

THE COURT: You may.

1106 was admitted and may be shown to the jury.

BY MS. MORITZ:

Q So let's look at Page 2 of this article that you found on the internet on the ExposingFamilyCults.com, ExposingFamilyAbuse.com website.

Page 2, just at the top of the page it says: You will find out who is Paula. A bitter aging woman with a bleak future, a broke husband, desperate to get her clause into the Bradys' wealth by gaining custody of her husband's children. Who is Austin? The son she abandoned as a baby. Who is Byron Horvath?

Do you remember reading this about you?

A Yes.

Q Let's move on to Page 6 of 10, Bates stamp 166.

Towards the bottom of the page it reads: Paula created the cult narrative to try and get custody of the kids so her and Wade wouldn't have to pay back support. Wade and Paula are broke. Yes, financially broke, having to support his own children would be devastation for Paula. She loves to use what money they have to take healing trips, like her recent trip to Mexico on a falsified vaccine passport. But we will leave that for the authorities.

Turning to Page 7.

Remember, Wade and Paula are broke. Attorneys are expensive.

The attorney's name is Roxanne Ouellette of McKercher LLP. Guess whose attorney that is? If you guessed Byron Horvath's, you're right. Byron is paying for legal representation for Paula and Wade, people he has no personal connection to or --

MR. PORTNOY: Excuse me, Your Honor. Is there a question?

MS. MORITZ: I'm going to ask a question after we go through this material, Your Honor.

THE COURT: Go ahead.

BY MS. MORITZ:

Q Paula, were any of these statements true?

A No.

Q Did Byron pay for legal representation for you at any time?

A No.

Q Turning to Page 9, Bates ending in 169, third paragraph down: Paula, a woman who gave up custody of her own son, actively engaging in brainwashing these vulnerable young girls to hate their mother.

Is that true?

A No.

Q Paula, when you first read this article -- I think you testified yesterday the first time you saw it was mid-June 2022 -- how did this make you feel?

A I cried for three hours while Wade held me. We were already dealing with his children being gone and not sure how to get them back, and we couldn't believe that now we had to deal with this on top of it. We were confused as to why something like this would be posted about myself, and some of

the things that are said about him and -- about Wade in here as well. I became paranoid because of the some of the things that were said in here. I was in shock, because I was called a drug addict, which isn't even remotely true. I was terrified how this might affect my relationship with London and Ellis and what it would do to my extended family.

Q Do you know if London and Ellis were aware of this article and the other posts that we looked at yesterday?

A I don't think they saw it at that time, no.

Q What about other people in your community, did anyone in your community ask you about the things that were coming up on social media about you?

A Yes.

Q Tell me more about that.

A I was --

MR. PORTNOY: Well, to the extent it calls for other people's statements to her, it's hearsay. Object.

MS. MORITZ: It's calling for the effect on the listener.

THE COURT: Overruled.

THE WITNESS: I was at a golf tournament, an oil women's golf tournament, not long after this was published on Reddit. And some women that I knew that were friends of friends, I knew them I had spoken to them in the past, came up to me and asked me about this, and were also in complete shock

that things like this would be said about me.

MR. PORTNOY: Objection. Hearsay.

THE COURT: That last statement will be stricken.

BY MS. MORITZ:

Q And how did you feel hearing this?

A Embarrassed, because now I had this potential reputation in a small town, in Weyburn where once I had a great reputation.

Q And I believe you testified that these posts, they continued, correct?

A Yes.

Q And what was the effect of that in a town where you were living, a small town? What was it like going to the grocery store, the bank, doing your daily activities?

A Going to the grocery store. Well, there's two grocery stores where I was living then. And when I would go to the grocery store, I constantly felt like people were watching me. And sometimes I noticed people would look over at me and even point their finger.

Q So all of this is happening in late 2022, early 2023. All of this began to happen after Wade submitted his affidavit in Byron's custody proceeding earlier in 2022, correct?

A Yes.

Q And then you were sued by Ms. Wilson, correct?

A Yes.

Q And do you remember what day you were served?
A January 7th, 2023, on the day I was having a celebration for Wade's 40th birthday party.
Q And she sued you for defamation and false light and other claims; is that correct?
A Yes.
Q And did you find it rather ironic that when she was posting about you all over the Instagram and the internet, that you were being sued for defamation?
A Yeah. I read it and I was, like, what?
Q What did you feel after you read the complaint?
A This is ridiculous. This person has been posting about me nonstop, and there's this article out there. She does it under her own name. How could this be happening? I'm just this -- well, even according to this, I'm nobody, a failed Reiki practitioner. Why does she care about me? Why does she want to sue me? How would she even know about me and my family? How does she know about how I practice spirituality? What right does she have to come into my country and sue me based upon her belief without evidence?
Q Paula, have you ever posted anything on social media under an anonymous account?
A I have not.
Q Did you ever post anything under the anonymous username LianaShanti_Cult_Recovery on Instagram?

A No.
Q Do you know who did?
A No.
Q Have you ever posted anything anonymously on Reddit?
A No.
Q Did you ever post anything anonymously on Reddit under the username You/Liana_Shanti_Cult369?
A No.
Q Do you know who did?
A No.
Q Did you ever post anything on Reddit under the anonymous username Salt-Health6219?
A No.
Q Do you know who did?
A No.
Q Did you ever posted anything on Reddit under the username -- anonymous username Alarmed_Aspect1678?
A No.
Q Do you know who did?
A No.
Q Did you ever post anything on the Cult Education Institute website?
A No.
Q Did you post anything on that website under the anonymous username LianaRecovery, one word?

A No.
Q Do you know who did?
A No.
Q Did you post anything on the Cult Education Institute under the anonymous username White Knight?
A No.
Q Do you know who did?
A No.
Q At some point in time did you come to learn about the anonymous group, the -- that identified itself as the Liana Shanti Cult Recovery Group on Instagram?
A Yes.
Q And when did that occur?
A Mid April of 2022.
Q How did you find out about the account?
A They actually came to my Instagram page and pressed "follow." So they started following my Instagram page.
Q I see. And how did you happen to notice that?
A Because on Instagram you get a notification that says someone followed you.
Q Okay. I'm learning a lot in these proceedings.
Did you start to follow them back?
A Not immediately.
Q Okay. And what's is that handle of that account, do you know?

A I believe it's LianaShanti_CultRecovery.
Q And that's the same handle that Ms. Wilson claims posted defamatory statements about her, correct?
A Yeah, I believe so, yeah.
Q Okay. When they initially started to follow you, did you get any other kind of communication from them?
A Not initially, no.
Q Okay. At some point did you?
A Yes.
Q Okay. And about approximately how much longer after that?
A I don't think -- actually I think the first thing that happened was I said I'm not going to follow you.
Q I see. So you affirmatively told them that you're not going to --
A Yeah.
Q And why was that?
A Because I was scared that people would think I had something to do with something like that. I was scared because our kids were gone. I saw what was being posted on there about Amanda Brady, Drew Brady, and our children. I was scared that Amanda would see that I followed them.
Q But at some point you did have some communication with them through direct message; is that accurate?
A Yeah.
Q And what were they?

A One that I can remember off the top of my head was -- there is something said along the lines by them: We're sorry you're taking the heat for this.
Q Do you remember when that was, approximately?
A It would probably have been after the posts started on Reddit called The Evil in Saskatchewan, because that's when I noticed I was getting blamed for things.
Q I see.
MS. MORITZ: Can we pull up -- and I'm sorry, I didn't have this on my list earlier -- 1179, Plaintiffs' Exhibit 1179.
THE COURT: You may, it has not yet been --
THE WITNESS: For the witness, excuse me, yes.
THE COURT: Yes.
MS. MORITZ: Thank you.
BY MS. MORITZ:
Q Paula, do you recognize this document?
A I do.
Q And can you tell us what it is?
A It's a -- it's an Instagram direct message between me and LianaShanti_Cult_Recovery.
Q And is this a screenshot that you took?
A Yes.
Q And I'm sorry, I know you just answered this question, approximately when you took it?
A It was after I saw the Reddit synopsis, Evil in

Saskatchewan written about me. So this would be sometime after the middle of June of 2022.
Q Okay. And this is a true and accurate copy of the screenshot that you took, correct?
A Yes.
Q And you did not doctor it in any way?
A No.
MS. MORITZ: Okay. Move to admit Exhibit 1179.
THE COURT: Any objection?
MR. PORTNOY: Well, somebody underlined it. So somebody doctored it. So I do object at this point.
MS. MORITZ: Underlined it?
MR. LEFT1: 1179?
MR. ADAMS: 1179?
MR. PORTNOY: 1179 is two pages, Your Honor, in my book, and the second page has underlining.
MR. ADAMS: Okay. Let's --
MR. PORTNOY: So it's two pages.
THE COURT: One second.
MR. PORTNOY: Thank you.
BY MS. MORITZ:
Q Paula, the underlining in the -- I believe what counsel is referring to is in the -- I don't know how to refer to that, the bubble?
A Yup.

Q Was that part of the original document?
A Yes.
MS. MORITZ: Move to admit.
THE COURT: Any objection?
MR. PORTNOY: No.
THE COURT: 1179 is admitted and may be shown to the jury.
(Defendants' Exhibit 1179 was received in evidence.)
BY MS. MORITZ:
Q So, Paula, this is an exchange -- a direct message exchange between you and the Liana Shanti Cult Recovery Group. Can you give us some context?
A I sent them a message, which is that bubble, which is a screenshot. I sent them a message, which is that bubble that you noticed.
Q On the second page?
A That's right. The screenshot.
Q Okay. So you sent them that, and it said -- I think it reads, correct me if I'm wrong: Tying her anonymous Reddit account to your personal e-mail -- I can't read it all.
A IP address and Instagram slander, that one?
Q So this was -- this was blaming you for the anonymous posts?
A Yes.
Q I see. Okay. And so this was the first part -- is the

second page the first page, or is the first page -- is it reversed? I just want to be clear?
A I do think it's out of order.
Q Okay. And then they responded by saying, what?
A UGHHH. It sucks you're taking the heat for this.
MS. MORITZ: Let's go back to the first page, please. Thank you.
BY MS. MORITZ:
Q When it says "she changed it," what's that referring to?
A When the Reddit post Evil in Saskatchewan was created, and after it was moved to the website Exposing Family Cults, now Exposing Family Abuse, it changed just a little bit slightly with some of the wording.
Q I see. But again, this is the Liana Shanti Cult Recovery Group, and then they: And again, I'm sorry you're being blamed for it when you have no connection?
A Yeah.
Q That's what they said to you?
A That's what they said to me.
Q At some point were you invited to participate in a Zoom call by the Liana Shanti Cult Recovery Group?
A I was.
Q Was that before or after this exchange, do you remember?
A After.
Q After.

And how did they contact you to --
A By e-mail.
Q Do you know how they got your e-mail?
A No, but I assume it's because I had a public business with my e-mail attached on my website.
Q I see. Okay.
And did you decide to participate in that call?
A Yeah. I thought it was important to figure out everything I could about what was going on in our life and why these things might be being said about me, and how we could understand what was happening with Wade's children.
Q And this is April 2023, so you had already been sued by Ms. Wilson, right?
A Yes.
Q So what did you hope to gain by participating in this call?
A Information, so that maybe, just maybe, we could somehow get Wade's kids back.
Q Do you remember the date of the Zoom call?
A It was mid April.
Q And do you know who else was on the call?
A No, I don't.
Q How is that possible? How did you not know who was on the call?
A Because everybody showed up with their videos off and

there were no identifying names.
Q Okay.
A Like I even put, person, as my name, because at that time my Zoom account had my name on it so I changed it to "person." I was terrified to identify myself, because what if this got used against me somehow when all I was trying to do was gather some information and take part in something that I thought was really important.
Q Mm-hmm. And who -- who was speaking on the call, if you knew -- if you know, excuse me?
A The only thing that I could maybe identify was when people would say, Hi. Hi. I'm here. And it sounded like Stefanie's voice.
Q But you don't know that for?
A I can't say that for certain.
Q But so there was a person that was leading the conversation or leading a presentation on the call?
A It seemed like maybe multiple people were leading it.
Q Okay. Was it a man or a woman, do you remember?
A I think both. One of each, maybe.
Q Okay. And do you remember what they shared with you?
A That there was going to be some sort of hearing. I'm sorry if I get this wrong because I don't know about the legal system. Some sort of hearing for Liana Shanti's probation, and that if she's found to have been doing something that violates

her probation, that maybe this could help us with our custody and getting our children back.

Q Okay. So what did they ask you to do specifically?

A They asked both Wade and I to write victim impact statements on how this has affected our family and our lives, the postings, the kids being gone.

Q And did you guys decide to do that?

A Yes. Absolutely.

MS. MORITZ: Let's pull up, please, exhibit, I think it's one -- or 1085?

THE COURT: 1085 has previously been admitted.

MS. MORITZ: I hope I have the right one.

Yes.

BY MS. MORITZ:

Q Paula, do you recognize this document?

A I do.

Q Okay. Can you explain to me what this is?

A This is a document written to Honorable Susan Oki Mollway. I'm sorry if I get that wrong. Written by -- there's two sections in it. One section is by Wade, my husband. And the next section is by me. And we're just explaining our story and our experiences with our kids. Yeah, that's about it.

Q When you prepared this letter and submitted it, you knew this would be a public record, right?

A Yes.

Q And you didn't hesitate to put your name on it, did you?
A No. Why would I hesitate? I don't have anything to hide. I want them to know who I am.
Q And the statements you made in here were an accurate representation of what you were experiencing at the time; is that right?
A That's right.
Q Well, let's talk about the impact that Ms. Wilson's online statements --
MS. MORITZ: We can take down this exhibit. Thank you.
BY MS. MORITZ:
Q Let's talk about the impact that Ms. Wilson's online statements about you have had on your life.
A I'm sorry, is that a question?
Q No, I'm forming a question. I'm sorry. Taking a minute.
Did this -- did these posts, these statements, this article that was posted on Reddit and later put on the Exposing Family Cults website, did you feel that publicized your life?
A Yeah, my private life, private things about Wade and his custody and relationship with his kids.
Q What else?
A Private things about my work. Private things about who I am as a mom. Private things about my son, his dad.
Q And you never consented to have these things published,

right?
A Absolutely not.
Q And can you describe how this -- when this started to happen, these online posts, what -- I want to understand how this affected you and your life, your day-to-day life. How did it change?
A I totally changed who I was.
Q Can you be more specific? Can you -- take a moment though, of course.
A Yes. Sorry.
Typically I'm really outgoing, outspoken, loves to be in her community, brave, courageous, fearless.
Q You said fearless?
A Fearless.
Q That's how you used to feel?
A Yeah. I used to go everywhere and do everything and take pottery classes and yoga classes and participate in spiritual ceremonies with going to sweat lodge with the First Nations people in Saskatchewan.
It made me scared to trust people. So I no longer did those things. I was scared to walk down the street with my dog because people might be watching me. I stopped practicing my spiritual practices.
Q Why did you stop practicing your spiritual practices?
A Because I was talked about and slandered for my beliefs

and what I did.
Q In some of these posts, you saw that?
A Yeah.
I was also scared that if I went to a ceremony with other women, that they could be students of hers and they were there just to gather something that I would be saying in a sacred moment. So if I shared something with women in a circle, who are they, what if they go tell Liana Shanti or her students, and that ends up posted all over the internet? I was scared to post happy moments on my social media, because maybe that picture will get taken or put up on Instagram and talked about and bashed.
I was scared that if I went to anywhere that someone was following me. I was always looking over my shoulder. I -- I would look out my window and I'd have the curtains closed because I would be scared someone was going to come sit outside my house. And I would make Wade take me to places because I didn't feel safe. And I understand that this is online, but there's this fear, and fear has nothing to do with geographic location when you're being mentally and emotionally and spiritually abused online by posts from someone that doesn't even know you, has never spoken to you, and has no business being involved in your family situation or who you are as a woman or a mother or someone who has faith.
Q Do you -- I know we looked at some of the posts yesterday,

Paula. Do you recall seeing posts that accused you of teaming up with felony kidnappers and psychological torturers?

A Yeah.

Q How did that make you feel?

A I just thought it was absurd.

Q And to be clear, you don't team up with felony kidnappers or phycological torturers?

A No, that's ridiculous.

Q Has -- have these events, have they affected your sleep, your physical well-being in any way?

A Yeah. When they first started in 2022 -- and it still happens on occasion now, depending on what's going on and what I have to deal with. But in 2022 I would wake up in the middle of the night in, like, this state of shock thinking that someone was standing in the bedroom. And that's not normal for me. It's never happened to me in my life before.

So I was at the point where in the middle of the night I would think someone was in my house by my bed.

Q And this is all stemming from the onslaught of social media posts about you?

A Yeah.

Q Did -- with all this happening, did you get off of social media?

A I didn't get off entirely, but I stopped posting, yeah, and I made my accounts private, and I blocked anybody that I

thought had anything to do with Liana Shanti.

Q Did that have any affect on your business?

A Yeah, that time I was trying to grow my own business. So not having a public account stops you from reaching people.

Q So you were unable to promote the work that you did to others in the community?

A Yeah, I was too scared. And even when I would sometimes get a new client, I would wonder, is this a mole? Is this someone that's going to come and have a session with me and then report back and then it be publicized on Instagram?

Q Can you put a dollar amount on that, like, how much business you lost?

A I'm sorry?

Q Can you -- can you -- can you put a dollar amount on that? Is there any way for you to know how much business you lost as a result?

A No. How could I know? I don't know who saw things, and if they were about to hire me. And I mean, there could be many people. I have no idea.

Q Well, new customers couldn't see you because you took yourself off?

A No.

Q Right?

A And if they could find me --

Q What else did you do to try and deal with everything that

was happening with respect to the online posting and the trauma that it was causing you?
A I went to therapy.
Q Okay. We can look at some of that.
A Okay.
Q What else did you do?
A Sorry, can you ask that again?
Q Just to try and work through this, this trauma that you're experiencing as a result of these online posts about you. How did you try to -- did you take steps to try and protect yourself, to heal yourself, anything like that?
A Yeah. Probably the first step I did was hire one of my long-time spiritual mentors to help me understand what -- what this was about specifically, because there were spiritual things being said about me.
MS. MORITZ: Let's take a look at Exhibit 1056, please, for the witness only.
MR. ADAMS: It's up. Oop. Sorry.
MS. MORITZ: Oh, that's not -- one before that.
BY MR. ADAMS:
Q Paula, do you remember -- sorry, excuse me. Do you recognize this document?
A Yes.
Q Okay. It reads: Embodied soul awakening program-discovery calls.

Can you explain what that is?
A This is a screenshot of my iPhone calendar indicating that I was having a meeting with Bernhard Guenther.
Q And what was the purpose of this meeting?
A The purpose of the meeting was to have him tell me about a program that him and his wife were offering that I thought could help me do some healing.
Q Okay. And did you -- did you participate in that program?
A I did. I liked what they were offering. It was -- it included a multitude of things, like meditation, yoga, Quigong. His wife Laura is a psychospiritual coach. They are long trained, have great reputations. And it did help me quite a bit, actually.
Q How much did the program cost?
A I think it was approximately 2500 U.S.
Q Let's look at -- well, is this an accurate copy of the calendar item that you took a screenshot of?
A Yeah, it is.
Q It's not altered in any way?
A No.
MS. MORITZ: Okay. Move to admit 1056 into evidence, please.
THE COURT: Any objection?
MR. PORTNOY: No.
THE COURT: 1056 is admitted and may be shown to the

jury.

(Defendants' Exhibit 1056 was received in evidence.)

MS. MORITZ: We can move on to Exhibit 1094, please?

BY MS. MORITZ:

Q Okay. Paula, take a look at that. It reads: Piercing the veil of reality-courses. Your receipt.

A That's mine.

Q That is yours. And this is a copy that you made?

A Yup.

Q And has it been altered in any way?

A No.

Q Okay.

MS. MORITZ: Move to admit Exhibit 1094 into evidence.

THE COURT: Any objection?

MR. PORTNOY: Yes.

THE COURT: All right. Let's lay further foundation.

MR. PORTNOY: The top part of it is redacted, so it's an incomplete document.

THE COURT: All right.

MR. PORTNOY: We have no idea what precedes the part they want to put in.

THE COURT: All right. Let's go ahead and cover more of a foundation, what is this, so forth, please. Thank you.

BY MS. MORITZ:

Q Paula, do you know why that is redacted there?

A No. I didn't do that.
Q At some point did you forward this e-mail to your attorneys for production?
A I did.
Q Do you see that communication? No, that's been redacted, correct?
A Yeah, it looks like it's an e-mail that I got from the course and class that I was involved in, but it's not showing who I sent it to.
Q Okay. Do you know who you sent it to?
A You guys.
MS. MORITZ: Move to admit Exhibit 1094.
THE COURT: Any objection?
MR. PORTNOY: Yes. Same objection.
THE COURT: Overruled. 1094 is admitted and may be shown to the jury.
(Defendants' Exhibit 1094 was received in evidence.)
BY MS. MORITZ:
Q Paula, I see this is a receipt, piercing the veil of reality-courses, 2,897. I'm presuming that's U.S.?
A That's U.S.
Q Can you explain what this receipt is for?
A It's for the calendar event that we just covered.
Q And you said you attended the course?
A Yeah. It was about ten or 12 weeks. And then there

was -- you could log back in on the website and you could continue with the meditations and the Quigong and the yoga.

There was also something in there called Internal Family Systems which helps you psychologically deal with things that you've been through.

Q Would you have taken this course but for the trauma that you were experiencing from the online posts about you?

A I probably eventually would have because I find this stuff helpful and interesting just in general. But I definitely took this because I was experiencing that at the time.

MS. MORITZ: Okay. Let's turn to Exhibit 1108.

BY MS. MORITZ:

Q Paula, do you recognize this document?

A Yes.

Q Okay. And what does it have on there? Can you describe what it contains?

A It looks like a receipt from something I paid for with that old mentor that I was telling you about earlier. So I paid her to help me through some spiritual things.

Q Were those spiritual things related to the trauma you were experiencing as a result of the online posts Ms. Wilson made about you?

A Yes. Specifically related to that.

Q Okay. And I see that the top part is redacted. Is this an e-mail that you forwarded to counsel?

A Yeah.

MS. MORITZ: Move to admit 1108 into evidence.

THE COURT: Any objection?

MR. PORTNOY: Yes, I have the same objection, Your Honor. It's redacted. There's been no explanation of why it's redacted. Does it contain some personal or private information? It's a partial document.

THE COURT: You want to cover what was redacted, just so that we have it in the record, please.

MS. MORITZ: Sure.

BY MS. MORITZ:

Q Paula, do you know what portion was redacted from this document?

A I assume just who I sent it to, which is you.

MS. MORITZ: Move to admit 1108 into evidence.

THE COURT: Any objection?

MR. PORTNOY: Same objection.

THE COURT: 1108 is admitted. The objection is overruled. It may be shown to the jury.

(Defendants' Exhibit 1108 was received in evidence.)

BY MS. MORITZ:

Q So to A CAD SS Consulting LTG you paid $1155 for -- tell me again, Paula, I'm sorry, the program that this is for.

A This isn't a program. It was for having sessions with a spiritual mentor of mine to help me understand the things that

were being said about me and how they were affecting me spiritually.

Q Okay. Thank you.

How much counseling did you go to as a result of what you were experiencing?

A By "counseling," do you mean spiritual counseling or psychological counseling, all of it?

Q Either one, yeah.

A Well, like I said earlier, I started with the spiritual stuff, and then I started looking for a therapist that could help me as well. And that took some time because, believe it or not, not everything in Canada is free public health care. So that took some time.

And eventually I started seeing a therapist in British Columbia where I'm living now. The first one I think I saw three or four times. I didn't find her that helpful. So I moved on to the next. And I probably have seen her about five times.

Q You mentioned British Columbia. I'm glad you brought that up. When did you move to British Columbia?

A August 30th, 2023.

Q Why did you move to British Columbia from where you were living in Saskatchewan?

A The plan was always, once all of our kids graduated and were living their own adult lives, so approximately ten years

from, you know, when this all started, we were planning on moving somewhere but we didn't know where. And once we realized Wade's kids probably weren't going to be coming back, and that distance between him and the kids, you know, didn't -- didn't stop us from moving, and the fact that I was really struggling in the community and feeling safe, we decided to move to British Columbia, mostly just to get out of that environment and for me to be more in nature, because I love nature, and it's part of -- I'm sorry.
Q Take your time. It's okay.
A It's part of what helped me work on getting through this and the fear. And I don't know if you guys know anything about Saskatchewan, but there's basically not a single tree where I live. It's flat. It's prairies. Nature is a little bit boring there. And British Columbia is just this beautiful -- you know, beautiful lakes, amazing rivers, trees everywhere.
Q Was it hard to leave the town you had lived in, though, for a while?
A It wasn't hard to leave the town because I didn't want to be there anymore. But it was hard to leave family and friends, yeah. But it was what Wade and I chose to do so that we could hopefully somehow move on and heal together.
So we sold our house, which we worked really hard on. It was amazing, we loved it. And we had a good -- good chunk of change in our bank account to move to BC, and we had a plan

to figure out where we wanted to be and where we wanted to settle. And so we sold our house and we bought a fifth wheel camper and we put our dog in the back.

Q Take your time.

Is it empty?

A Yeah.

(Pause in the proceedings.)

MS. MORITZ: Thank you.

THE WITNESS: Sorry. Just give me a minute.

MS. MORITZ: Sure. I want you to finish your thought when you're ready.

THE COURT: Do you want to take a stretch break now?

MS. MORITZ: Sure. That's fine.

THE COURT: Why don't we take our stretch break right now, ladies and gentlemen. Thank you.

(Pause in the proceedings.)

THE COURT: You may continue.

MS. MORITZ: Okay.

BY MS. MORITZ:

Q Paula, had you finished your answer?

A No.

Q Okay. Please continue.

A So we sold our house, got the camper. We lived right beside our neighbors who are our best friends. They threw a huge going away party for us, and all our friends and family

came. And the plan was to take the fifth wheel camper to BC, figure out where we wanted to be, where we felt comfortable. And we bought some land eventually and we parked our camper there with the intentions of building a house.

Q Okay. And is that where you live now?

A Yeah.

Q Have you built the house yet?

A No.

MS. MORITZ: Can we pull up, please, Exhibit 1141, for the witness?

BY MS. MORITZ:

Q Paula, do you recognize this document?

A Yes.

Q Is it an accurate copy of a receipt for counseling?

A Yes.

MS. MORITZ: Move to admit Exhibit 1141.

MR. PORTNOY: I need a second to find it, Your Honor.

MS. MORITZ: Sure.

(Pause in the proceedings.)

MR. PORTNOY: No objection.

THE COURT: 1141 is admitted and may be shown to the jury.

(Defendants' Exhibit 1141 was received in evidence.)

BY MS. MORITZ:

Q Paula, what is this a receipt for?

A This is a receipt for counseling and therapy that I go to where I live.
Q And this is therapy that you've gotten as a result of trauma from the online posts?
A Yes.
MS. MORITZ: Okay. Let's take a look please at 1127, for the witness.
THE COURT: All right. Let's unpublish, please.
MS. MORITZ: I'm sorry, did we publish 1141? I may have forgotten.
THE COURT: We did.
MS. MORITZ: Okay. Thank you. Sorry about that.
MR. ADAMS: Now I'm sorry --
MS. MORITZ: 1127 for the witness.
THE COURT: 1127?
MS. MORITZ: Yes, please.
BY MS. MORITZ:
Q Okay. Paula, do you recognize this document?
A Yeah, I do.
Q Is this a document you forwarded to counsel by e-mail?
A Yes.
Q I see.
MS. MORITZ: Move to admit --
BY MS. MORITZ:
Q Has it been doctored in any way, other than the

redactions?
A No.
MS. MORITZ: Okay. Move to admit 1127 into evidence.
MR. PORTNOY: No objection.
THE COURT: 1127 is admitted. It may be shown to the jury.
(Defendants' Exhibit 1127 was received in evidence.)
BY MS. MORITZ:
Q Paula, can you briefly describe what this document is?
A It's a receipt from the first therapist I started seeing where I live in British Columbia right now.
Q Again, this is as a result of the trauma from the online posts you experienced?
A Yes.
MS. MORITZ: Let's take a look at 11 -- Exhibit 1142 for the witness, please.
MR. ADAMS: Okay.
BY MS. MORITZ:
Q Paula, do you recognize this document?
A Yes.
Q Has it been altered or doctored in any way?
A No.
Q And can you describe what it is?
A It's a receipt from a long-time mentor that I had a session with not all that long ago, again, just to help me

through some of what I was experiencing spiritually.

MS. MORITZ: Move to admit 1142 into evidence --

MR. PORTNOY: No objection.

MS. MORITZ: -- and display for the jury.

THE COURT: It is admitted and may be shown to the jury.

(Defendants' Exhibit 1142 was received in evidence.)

BY MS. MORITZ:

Q And again, Paula, this is a receipt for counseling you got as a result of the trauma you have experienced from the online posts, correct?

A Correct.

Q Okay. I've got one more.

MS. MORITZ: Exhibit 1162 for the witness, please.

MR. ADAMS: Okay.

BY MS. MORITZ:

Q Paula, do you recognize this document?

A Yes.

Q And what is it?

A It's a receipt from Laura Matsue for -- very similar to what I just explained. It's a psychospiritual coaching receipt to help me through with what I went through.

Q I do see a portion that's redacted. Do you know what that is?

A That's my credit card info.

MS. MORITZ: Okay.

Move to admit 1162 into evidence.

THE COURT: Any objection?

MR. PORTNOY: Your Honor, can -- I can't tell if there was anything on here. It says, show story, message, and they're blank except for a box and -- can we just have a representation nothing has been removed other than the credit card number?

MS. MORITZ: I think the witness just testified to that, but I will confirm.

BY MS. MORITZ:

Q Paula, has anything else been redacted from this document?

A No, this is, I believe, from PayPal. And so "show history" probably is just -- if I clicked on that, it would show the history of payments that I sent to this person.

MR. PORTNOY: No objection.

THE COURT: All right. 1162 is admitted and may be shown to the jury.

(Defendants' Exhibit 1162 was received in evidence.)

BY MS. MORITZ:

Q Okay. And Paula, what was the purpose of this transaction?

A This is for help -- spiritual help, psychospiritual help for what I had been through.

Q Okay.

So I see you had some sessions here. Is there reason you didn't get additional counseling beyond what we looked at here?

A I couldn't afford it because of the massive financial burden because of this lawsuit.

MS. MORITZ: No further questions at this time, Your Honor.

THE COURT: All right. Cross-examination.

MR. PORTNOY: Can I get a minute to get organized, Your Honor?

THE COURT: All right.

MR. PORTNOY: Thank you.

(Pause in the proceedings.)

CROSS-EXAMINATION

BY MR. PORTNOY:

Q Morning.

A Good morning.

Q Ms. Haygarth, I can't figure out how all this relationship between the defendants, particularly you and my client, started. So I want to go all the way back to the beginning.

Before you went to the dinner -- which was what day?

A I believe it was around March 20th of 2022.

Q Had you ever heard of my client?

A Liane Wilson?

Q Yeah.

A Yes.
Q Before March 20th?
A Yes.
Q And from who?
A My stepdaughters, London and Ellis.
Q And what had they told you?
A That their mom was a student of hers, and the things that were being said about me.
Q Did you do anything about that?
A Yeah. I had conversations with London and Ellis to educate them on what was true about me and not true about me.
Q And did you do any investigation to see who Liana Wilson Liana Shanti was?
A Yeah, I looked at her website.
Q I'm sorry?
A I looked at her website.
Q In March?
A No, before that.
Q Before March?
A March when?
Q 2022.
A Yeah, I had looked at her website before March of 2022.
Q When was the first time?
A I don't remember if it was 2019 or 2020.
Q Way back in 2019?

A Yes.
Q And did you continue to follow that website from 2019 through 2022?
A Did I -- did I look at it again or follow it?
Q Yeah.
A I probably didn't look at it again. And you don't really follow a website.
Q So you looked at it once in 2019, and the next time was when?
A Her website?
Q Yeah.
A I don't recall if I ever looked at it again.
Q And did you see anything about you in 2019 when you looked at the website?
A 2019 or 2020? Yeah. My memory is not perfect on that. On her website I saw nothing about me.
Q Okay. Did you know -- when did you first get to know Amanda?
A I'm sorry, I'm actually having trouble hearing you.
Q Oh, so was I, so that's equal, I was having trouble hearing you.
When did you first meet Amanda?
A 2013.
Q And when did you first have any discussions with, if you did, with Amanda about them leaving for Florida?

A I didn't participate in a discussion. I listened to Wade have a discussion with her at the end of November of 2022.

Q End of --

A I'm sorry, that was wrong. 2021.

Q Okay. And you listened in?

A It was on speaker.

Q And what -- who initiated that call?

A Amanda.

Q And what was it about?

A Amanda was letting Wade know that she was planning on taking the kids to Disney World Florida for a vacation.

Q Okay. Did Liana's name come up?

A No.

Q Was there any mention in that call that somehow Liana was involved in discussing with Amanda going to Disney World or Disneyland?

A No.

Q Did you have any knowledge at that point from anybody that in any way Liana was influencing Amanda's decision to move to Florida?

A No.

Q Anything happen regarding my client and your relationship with her, one way or another, between November of 2021 and the dinner we've heard about?

A I don't think I understand your question at all.

Q My question is: Did Liana's name come up in any conversation you had with anyone, after the phone call of November 2021 and the dinner that we're going to talk about in a few minutes?

A Yeah. I already testified that my stepdaughters spoke to me, Wade and I would talk about it, because the kids told us things before they left that involved Liana Shanti's name.

Q I'm sorry. I didn't hear the last part of your answer.

A The kids told us things before they left that involved Liana Shanti's name.

Q What did they tell you?

A That -- that Ellis specifically said that she overheard her mom on the phone because she was in the car and it was on speaker, that Liana Shanti told Amanda to get me, Paula Haygarth, out of the family no matter what it took.

Q Is there any reason why -- strike that.

Did you know Stefanie before you got contacted to go to this dinner?

A No.

Q Did you ever ask her how did you get my name?

A She told me how she got my name.

Q And what did she say?

A She said that we had a mutual, not friend -- but a person contacted her, her name was Shannon. Shannon's son worked for Wade's business. So Shannon's son was an employee of Wade's

business. So Shannon knew that Wade's kids had been taken to Florida and hadn't come back. And that Shannon told Stefanie, you might want to talk to Paula Haygarth and Wade Martin, they seem to be in a similar situation as you guys.
Q And what was the similar situation?
A That Amanda had already made it across the border into Florida, and our kids weren't coming back, and that there were signs that Haley was potentially going to do the same thing.
Q And what were you told about what my client's involvement was in Amanda's decision to go to Florida?
A Nobody told me anything about Amanda's decision to go to Florida.
Q Well, then why did you get involved in -- and your husband get involved in writing letters about Liana after that dinner?
A Because a common denominator between these two students was Liana Shanti. They were both leaving to Florida. We were trying to figure out how we could protect our families.
Q I don't understand what the common denominator was. Because you had just said you had no information that Liana was involved in any way with Amanda's decision to take her kids to Florida.
A We had made an assumption that she was involved.
Q I'm sorry, I didn't --
A We had made an assumption that she was involved.
Q You made an assumption based upon what?

A Based upon what my stepdaughters had already told me.
Q Did Stefanie provide you any facts that Liana had been involved in Amanda's decision to go to Florida?
A Stefanie knew nothing about our situation. How could she provide me with any facts?
Q Well, because she was sitting there talking about you how your situations were so similar. That's why Stefanie asked for the dinner, to get your assistance to try to prevent a similar situation. Isn't that what the dinner was about?
A They were sharing their side of their story and what they were being put through. So she had no information to give me facts on Amanda Brady.
Q No, no, about Liana.
What was the facts that you were provided at the dinner that my client had anything to do with Amanda taking the kids to Florida, and how the situation in your family was also going to be similarly influenced by my client. What were the facts at the time of the dinner?
MS. MORITZ: Objection. Compound.
THE COURT: Let's stick with the last question, which I think is easier to understand.
What were the facts at the time of the dinner?
THE WITNESS: The facts were that Amanda Brady had left the country, went to Florida. The children had already told us that the goal was to get me out of their lives at any

cost. The fact was that both Amanda and Haley had the same teacher and they were both behaving in very similar ways. There was a common denominator. We went there to see if there was more going on, and to help, because Wade had been through something horrible and he wanted to support someone so that he didn't have to go through the same horrible situation.

BY MR. PORTNOY:

Q So the only fact was that both Amanda and Haley were students of my client; is that right?

A Yeah.

Q Is -- sorry.

A Yes.

Q And so from that one fact, you then went on a effort to try to involve my client in whether Haley took her kids out of the country or not, the fact that Amanda and Haley were students?

THE COURT: That's a confusing question, Mr. Portnoy. Ask a crisper question, please.

MR. PORTNOY: All right.

BY MR. PORTNOY:

Q At the dinner, what were you asked to do?

A I wasn't asked to do anything. Wade was.

Q What was Wade asked to do?

A He was asked to provide an affidavit of a statement of his experience of Amanda taking the kids to Florida.

Q Did that have anything to do with my client?
A We felt it did, yes.
Q On what basis other than they were both students?
A It was a common denominator.
Q Any other facts that my client was involved?
A Not at that point, no.
Q Okay. And the affidavit was to go where?
A To Byron's lawyer.
Q And what was it supposed to say?
A It wasn't supposed to say anything. It was supposed to talk about Wade's personal experience. That's what they asked for.
Q Was my client mentioned at all in the affidavit?
A I believe so, but I don't have it in front of me. Wade wrote it.
Q What's your recollection of what the affidavit said about my client, other than Haley had been a student of Liana's, or was?
A That affidavit didn't say anything about Haley.
Q What did it say about Liana?
A It said that Amanda Brady was a student of Liana Shanti's. And that Wade had a belief.
Q And what was that belief?
A That Amanda crossed the border under the direction of Liana Shanti.

Q You had no facts, not one fact at the time that was written; isn't that correct?
A A belief.
Q A belief?
A Yeah.
Q No facts?
A No facts.
Q And so that started this interaction that took place over the next few years between you and Wayne and my client, right?
A Who's Wayne? Did you say Wayne?
Q I'm sorry. Between you and my client.
A I don't understand what you mean by interaction.
Q There were postings back and forth.
A There weren't postings back and forth. She posted.
Q You never posted about my client?
A Anonymously? No.
Q I didn't ask about anonymously. Did you ever post about my client?
A I shared one post.
Q We'll get to that.
A Yeah.
Q That started the interaction, that affidavit based upon no facts other than the student relationship and a belief, right?
A An interaction, I don't -- I don't know what you mean by that. I can't answer the question if I don't know what you

mean.
Q Was that the precipitating document that subsequently led to what the jury has heard over the last four days about --
MS. MORITZ: Objection.
THE COURT: The question is confusing, Mr. Portnoy. Ask a better question. Was that the precipitating document that subsequently led to what the jury has heard over the last is four days?
MR. PORTNOY: Yeah, I'm sorry, Your Honor.
THE COURT: Ask a better question.
MR. PORTNOY: Okay.
BY MR. PORTNOY:
Q Had Liana posted anything about you before that affidavit was submitted accusing her of somehow being involved in an effort to have families take their kids out of Canada?
A I'm still confused by your question. Had Liana posted anything accusing -- I don't understand your question.
Q Had Liana posted anything about you before the affidavit was submitted accusing her of somehow being involved in one or two families being encouraged to move out of Canada?
MS. MORITZ: Objection. Compound.
THE COURT: Overruled.
THE WITNESS: Calls for speculation.
THE COURT: Overruled.
THE WITNESS: Had she posted anything on Instagram, is

that what you're asking me?
BY MR. PORTNOY:
Q On any -- on any site.
A No.
Q What happened next? As far as the story about what Haley might have been trying to do or did do or what Amanda did after the affidavit, what was your next involvement?
A Next involve --
MS. MORITZ: Objection. Mischaracterizes prior testimony.
THE COURT: Overruled.
THE WITNESS: Can you ask again, please?
BY MR. PORTNOY:
Q I'm sorry?
A Can you ask the question again, please?
Q Yeah. What's the next thing that happened after the affidavit was submitted where you were involved regarding these child custody issues?
THE COURT: All right. That -- I'll sustain that objection. That does misstate the testimony.
BY MR. PORTNOY:
Q Did you ever do anything, other than participate in the one dinner, regarding these custody issues?
A I -- I honestly don't know what you're asking me. What happened next in regards to what, in context to what?

Q No, that's not the question.
A Okay. I'm confused.
Q The question was you went to a dinner that led to a discussion and that led to an affidavit, right?
A That Wade wrote, yes.
Q Yeah. Were you ever involved again in any issue dealing with these two custody matters? Or was it all Wade?
A Involved legally?
Q In which you discussed it with people, in which you posted it about it, in which you --
A Well, my life was surrounded with issues with London and Ellis being gone. So, of course, there's stuff going on in my life and I'm talking to my friends and family about it.
Is that what you're getting at?
Q That's fine.
A Okay.
Q Did you ever, subsequent to the dinner, receive any facts that Liana was involved in encouraging, soliciting, advising Amanda to move to Florida?
A No.
Q To this day, correct?
A Sorry, what? I'm really having a hard time hearing.
Q Can you read the last question back, please?
THE COURT: Sure. It is: To this day, correct?
THE WITNESS: In with regards to what again?

THE COURT: The question was: Did you ever, subsequent to the dinner, receive any facts that Liana was involved in encouraging, advising Amanda to move to Florida, soliciting?

No.

And then the next question was: To this day, correct?

MS. MORITZ: Your Honor, I'd like to request a sidebar, please.

THE COURT: Why don't we do this: Let's go ahead and have our recess now, just to save the jury time.

So, we're going to do our recess now. It's a little bit early. But this will be a 20-minute recess. We'll be back on the record close to 10:15. All right?

Don't talk about the case. Thank you.

(At 9:52 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. You may be seated.

Ms. Moritz?

MS. MORITZ: Your Honor, the problem here is that Mr. Portnoy is confusing two different events and conflating the issues, and the questions are, therefore, quite confusing for the witness.

THE COURT: I understand.

Mr. Portnoy, I think you're asking questions about the wrong woman. You're asking questions -- I mean, is that what

you're thinking, Ms. Moritz, or are there different events that you were thinking about?

MS. MORITZ: Well, I think he's -- it appears he's talking about different events and maybe doesn't have the people -- the questions are just very confusing as what he is talking about.

THE COURT: Why don't we do this: If you're willing to chat with Mr. Portnoy over the break and just kind of clarify what your concern is. I was honestly getting confused. I don't want to say too much in front of the witness, just because I don't think that's fair.

So why don't you guys talk about it over the break and we'll see everybody at 10:15.

Don't talk to the witness about it, talk to Mr. Portnoy. Thank you.

MS. MORITZ: Thank you.

(A recess was taken from 9:53 a.m. to 10:15 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: You may continue.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q The first public document or posting concerning you and the other defendants and my client was the affidavit, correct?

MS. MORITZ: Objection.

THE COURT: Let's clarify that. What do you mean by the first public document or posting concerning you and the other defendants and my client?

BY MR. PORTNOY:

Q Did you ever see anything posted by my client before that affidavit was written and submitted to a court in Canada?

MS. MORITZ: Objection. Vague as to "affidavit."

THE COURT: Overruled.

THE WITNESS: Which affidavit?

BY MR. PORTNOY:

Q The one we've been talking about for the first half hour.

MS. MORITZ: Objection. Vague as to "affidavit."

THE WITNESS: The one I've been experiencing -- sorry.

THE COURT: Let's just say who wrote the affidavit, Mr. Portnoy, just to make it easier at this point.

BY MR. PORTNOY:

Q Do you know what affidavit I'm talking about?

A I don't. I'm confused, clearly.

Q There was a dinner, right?

THE COURT: Tell her who wrote the affidavit, what affidavit are you talking about.

BY MR. PORTNOY:

Q There was a dinner, right?

A With who? Like Byron and Stefanie, that dinner, is that the one you're talking about?

Q Yeah.
A Okay.
Q And as a result of that dinner, someone wrote an affidavit, correct?
A Wade Martin wrote an affidavit.
Q Yeah, right.
And in that affidavit Wade Martin made some comments about my client, right?
A As far as I can remember. I don't have it to look at.
Q Right. You were married to him at the time?
A Yes. Still am.
Q Okay. You saw the affidavit at the time?
A Yes.
Q Okay. So before that affidavit was written by Wade, arising from the dinner, are you aware of any posts my client had made about you or any of the other two defendants?
A I'm not aware of any posts made about me. I can't say about to the other two defendants.
Q Okay. Now, when was the first time you saw a post about you that you attribute to my client on any site, Facebook, Instagram, you name it?
A Middle of June 2022.
Q Middle of June?
A Yes.
Q But we've heard testimony that you posted a critical

e-mail about my client, with an accompanying comment by you on, May 9th.

MS. MORITZ: Objection. E-mail? Not clear what you're talking about.

THE COURT: She can answer the question. It may or may not be true. She can answer it.

THE WITNESS: I didn't post an e-mail.

BY MR. PORTNOY:

Q Did you take something off of Reddit and repost it on May 9th?

A Yes.

Q But you hadn't seen anything that my client posted about you until a month later?

A I didn't see any posts. I had a lot of information from my stepdaughters.

Q That wasn't my question.

MR. PORTNOY: I move to strike, Your Honor. The question was about a post.

THE COURT: Overruled.

BY MR. PORTNOY:

Q You indicated the one conversation with your stepdaughters. Were there others?

A There were plenty.

Q But you posted or reposted -- and we'll get into it in a little while -- a critical story, article, whatever you want to

call it, about my client, and then commented on that one month before you ever saw any posts from her about you, correct?

MS. MORITZ: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: I reposted something from Reddit to my Facebook page.

BY MR. PORTNOY:

Q A critical story about my -- I'm sorry, Your Honor. A critical story about my client?

A A story about your client, yes.

Q And then you posted something of your own when you reposted that, correct?

A I'm not sure what you mean by that, posted something of my own.

Q Did you publish something of your own after that at the same time you republished the Reddit post?

A Published something on my own after that or with that?

Q With that.

A Yes.

Q And again, that was one month before you ever saw any negative posts, alleged negative posts about you that you attribute to my client, correct?

A Yeah, other than the post that didn't include my name, which seemed to imply me. Because there was posts that said a failed Reiki healer from Saskatchewan with a son named Austin,

so I assumed those posts were about me. And that was in the spring.
Q I asked you when was the first time you saw a post that you believed my client was talking about you and you said June. Now you say there were prior ones in which your name wasn't mentioned but you were described. What posts are those? Where are they?
A I didn't submit them because it didn't have my name on them.
Q I'm sorry, I'm having trouble. It's my bad.
A I'm sorry.
Q No, it's not you.
A I don't think they were submitted because they didn't have my name on them.
Q You don't think they were submitted them because?
A My name wasn't on them.
Q But you're telling this jury they were about you and they were negative, and they were before you posted about my client, but you didn't keep them?
A I have them.
Q You have them?
A Yeah.
Q But they're not in the record in this court?
A I didn't provide them because it didn't have my name on them. All I have -- and the reason that I reposted the post

that I did, is because we have spent years hearing from London and Ellis the things that they have experienced with Liana Shanti and their mom. So I was concerned for my stepdaughters, and Wade was, too. And so we wanted to let people know what was going on in our lives. And I think we have every right to let people know what's going on in our lives.

MR. PORTNOY: Your Honor --

THE WITNESS: I get to finish.

MR. PORTNOY: I didn't ask that question.

THE COURT: Let's calm down. All right?

The question was: But they're not in the record in this court?

THE WITNESS: No, they're not.

THE COURT: All right. Next question.

BY MR. PORTNOY:

Q So the first post or article, I hate -- you know, different names for different things -- that you saw that's in the record that you believe was about you and written by my client is a month after you reposted the critical Reddit article about my client, correct?

A The article --

Q This calls for a yes or a no, please.

A Yes, the article was about me, yes. And that's the first post. Yes.

Q Okay. So, on May 9th, 2022, did you repost an article

called the Shanti Summary?
A Yeah, that's the one we've been talking about. Yes.
Q Okay. And where did you see it?
A I saw it on Reddit.
Q And how did you come to see it?
A I saw the Liana Shanti Cult Recovery Instagram account share it. So I clicked the link.
Q How did you know about that account?
A They followed me.
Q How did they know about you?
A I have no idea.
Q Well, wait. I want to see if I understand.
There's a Liana Shanti Cult Recovery. Do you know what that is about, what their subject is that they're talking about, what the issue is that is discussed on that?
A It initially started with the stuff about Amanda and Drew Brady. And then it went in to talking about issues with Liana Shanti that families were having.
Q But now we're back in May of 2022. You were already aware of that entity?
A Of the Instagram account?
Q Yeah.
A Yes, I was.
Q Okay. And when did you first get contacted by whoever was responsible for that?

A When I hit -- when they hit the like on my Instagram, I contacted them first and said, I'm not going to follow you.
Q But do you have any idea how they knew about you?
A How would I know how they know about me when I don't know who they are?
Q I'm not sure that's responsive, so --
A So no, I --
Q My question was -- and if you don't, that's fine.
Somehow this Liana Shanti Cult Recovery Group became aware of you, correct?
A Correct.
Q And you have no idea how?
A No. I'm sure that there were multiple names they became aware of. I have no idea how.
Q And they contacted you how?
A On the Cult Recovery account.
Q And they directly contacted you on that account, or was a group message that you were included in?
A On that account, it wasn't a group message.
Q Were you directly contacted individually?
A Individually, yes.
Q Okay. And is that the first time you ever saw that?
A Saw what?
Q Anything from Liana Shanti Cult Recovery.
A They didn't know -- the first time I saw that account was,

I think, April 14th.
Q And had it -- that was the first time?
A Yeah.
Q And that is when you told them right away, don't contact me anymore?
A That's not what I said, no.
Q What did you say?
A I said, I'm not going to follow you.
Q And don't contact me, right?
A I didn't say "don't contact me."
Q Well, what did you mean by, I'm not going to follow you?
A Okay. So on Instagram, someone comes to your page, they click "follow." You can decide if you're going to follow them back or not. I decided not to follow them back. I said, I'm not going to follow you.
Q Okay. And did they ever contact you again?
A Again or initially? They didn't contact me. They just hit "like" on my Instagram page.
Q Did you ever see another post from them again?
A Yeah, I've seen plenty of posts from them.
Q Okay. And when the next time after April 14th?
A That I saw them post something?
Q Yeah. About my client.
A Probably pretty quick.
Q Well, how quick?

A Within that week, I'm assuming.
Q But if you said you weren't going to follow them, how is it that you saw what they posted a week later?
A Oh, because they have a public account, so you can see whatever you want. You don't have to follow someone to see their content.
Q But you have to go on it to see it?
A Yeah, I checked it. I was worried about our kids.
Q Okay. I'm trying to understand.
You testified that you made it clear to them that you weren't going to follow them, right?
A That's right.
Q But within a week you follow them?
A I don't think you understand how Instagram works maybe here.
Q Right.
A I didn't follow them, I just -- it's like you go to the website and you have a look at it, but you're not -- you're not on the website. So on Instagram, you can go there and not follow them but still see the content. So I could go to my own Instagram, I could type in the search bar their handle, and then I would go to their page and I would look at stuff.
I didn't follow them, but I would look at the stuff that they were posting.
Q All right. So let me try to understand. What's the

difference between following them and looking at what they're posting?

A In order to be following someone, according to Instagram, you have to hit "follow." There's a -- there's a button at the top, you go follow.

Q But even if you're not a follower, you have access to see it?

MS. MORITZ: Asked and answered.

THE COURT: Let's let her answer it.

Go ahead. You can answer that question.

THE WITNESS: If the account is public, you can see it, yeah.

BY MR. PORTNOY:

Q Yeah. And you continued to do that?

A Yeah, of course.

Q Okay. And when is the first time you saw on that site negative comments about my client?

A On the Instagram?

Q Yeah, Instagram account.

A I'm sorry, Mr. Portnoy, I'm just making sure because there's --

Q No, no, no.

A Okay.

Q I'm cool. On the Instagram account. No problem. Take your time.

A Can you ask that again?

THE COURT: The question was: And what --

MR. PORTNOY: I can rephrase it, Your Honor.

THE COURT: Okay.

BY MR. PORTNOY:

Q When was the first time you saw on that Instagram account a negative posting about my client, or statement?

MS. MORITZ: Objection. Vague as to what account.

THE COURT: I think we're talking about the -- well --

MR. PORTNOY: Liana Shanti Cult Recovery. I don't -- I don't --

THE COURT: Instagram.

BY MR. PORTNOY:

Q That's all we're talking about now.

A Just the Instagram account?

Q Yes.

A Because I think we got confused earlier.

Q That's okay. Go ahead. I'm sorry if I confused you, but go ahead.

A The first time I saw a negative comment about your client on that account?

Q Right.

A Probably within a week.

Q Within a week of April 14th?

A I'm guessing so, yeah.

Q Okay.
A It was about her, so I'm assuming they posted about her.
Q And all you knew about her at that point was what you had learned at the dinner, that both Amanda and Haley were students of hers?
A That's incorrect.
Q Oh, and what your daughters had told you?
A Quite a bit from my daughters, yes.
Q Yeah. Okay.
But online --
THE COURT: Sorry, sir, the gentleman in the back is my career law clerk, so he can use his cellphone. So the people who are on my staff are allowed to use their cellphones.
Thank you.
MR. PORTNOY: Interrupted my --
THE COURT: I'm sorry, I didn't mean --
MR. PORTNOY: That's all right.
THE COURT: I just have been very strict about cellphones in the courtroom, and I have explained that my staff can use their cellphones in my courtroom.
MR. PORTNOY: Yeah.
THE COURT: Go ahead.
BY MR. PORTNOY:
Q I guess what I'm trying to get at is, over the course of several years, there are these conflicting internet comments

about you and the other defendants and about my client. And what I'm trying to do is find out when they started and who started it. Maybe I'm not doing it that artfully, but that's what I'm trying to do.

And is it not true that this interchange of allegedly negative comments about the plaintiffs and the defendants, the first bullet fired in this war was Wade's affidavit?

MS. MORITZ: Objection. Argumentative. Vague and ambiguous.

THE COURT: Sustained as to argumentative.

BY MR. PORTNOY:

Q The first statement, negative about the defendants or my client, was contained in Wade's affidavit --

MS. MORITZ: Objection.

BY MR. PORTNOY:

Q -- right?

MS. MORITZ: Argumentative.

THE COURT: Overruled.

THE WITNESS: I disagree with that. The first statements that came up about your client were inside my home with my stepchildren.

BY MR. PORTNOY:

Q You keep coming -- let's focus on what was published either online or in a court filing. Okay. Let's put aside statements.

The first public statement, negative, about anybody in this case was in Wade's affidavit, correct?

MS. MORITZ: Objection. Misstates.

THE COURT: Overruled. She can answer it.

THE WITNESS: So the first public statement that went to the Canadian court that was in a private custody battle, that should have remained private, yes, was by Wade Martin.

BY MR. PORTNOY:

Q And the first posting of anyone in this courtroom who is a party, that either defendants made, and you in particular, or my client, was your May 9th reposting of a critical article posting about my client, along with your comment about that post, correct?

MS. MORITZ: Objection. Compound, vague, argumentative.

THE COURT: Overruled.

THE WITNESS: Sorry, that was a very long question. I -- I -- I don't even know where we're at here. Can you go ahead? Can you please make it more precise?

BY MR. PORTNOY:

Q I'll try again.

The very first posting made by either the plaintiff or you, or the other defendants, online was your reposting of a critical post about my client, along with your comment about that repost, correct?

MS. MORITZ: Objection. Compound, vague, argumentative.

THE COURT: Overruled.

THE WITNESS: The first public posting that I reposted that somebody else wrote that was posted to my Facebook page was made by me.

BY MR. PORTNOY:

Q And it wasn't until when after that that you believe my client first posted about you by name?

A Like I said earlier, middle of June of 2022.

Q Okay. Did you think that might have been in response to what you had posted a month earlier?

A No. I thought that was in response to the conversations I had with my stepdaughters about Liana Shanti. I felt like I had conversations with my stepdaughters where I stood up to the things that they were being told, and so it wasn't liked, so there was retaliation.

Q When you reposted -- and we're going to get to it in a little while. When you reposted on May 9th this -- I'm going to call it an article, called The Shanti Summary, it contained a lot of negative information about my client, didn't it?

MS. MORITZ: Objection. Argumentative.

THE COURT: Overruled.

THE WITNESS: There was negative information in there I would say, yup.

BY MR. PORTNOY:

Q Why did you repost it?

A Because I was terrified about what was going on in our lives.

Q What was terrifying about what was going on in your life?

A Our kids had been taken across the border and not come back. I had met with another father and stepmother who had been in a similar situation. There started to be a theme about this.

Wade had also received phone calls from other fathers saying that they had experienced the same thing. I didn't want any other father and I was -- to experience it, or stepmother. And I was protecting and trying to protect our kids. We were -- we were scared. And I did -- I didn't want that to happen to anybody else.

Q Did you have any information on May 9th to verify any of the statements in the Shanti summary as being true?

MS. MORITZ: Objection. Vague, best evidence.

Show her the document.

THE COURT: Sustained.

Are we going to show her the document, Mr. Portnoy? At this point I'm not sure it's quite effective to talk about a document that nobody is looking at. So are you going to show her the document?

MR. PORTNOY: Can we post Exhibit 78, please?

THE COURT: Exhibit 78, one second, has not yet been admitted.

BY MR. PORTNOY:

Q Is this what you reposted?

A I can't see the whole thing.

MR. PORTNOY: Scan down, please. Go ahead, scan it all down.

MS. TOKUOKA: You want it smaller?

MR. PORTNOY: Go to the end, please.

Okay. Stop.

MS. MORITZ: Your Honor --

THE COURT: Yes.

MS. MORITZ: -- may I approach -- request a sidebar to discuss this document?

THE COURT: Sure.

Let's take a stretch break, ladies and gentlemen. Thank you.

(Sidebar on the record:)

MS. MORITZ: This is the exhibit that we had the briefing on.

MR. PORTNOY: That I couldn't put in before. I needed a witness. I don't understand. I withdrew it because they were going to claim it was hearsay. Now I have the witness, read it and reposted it. I don't --

MS. MORITZ: This is not my client's document.

THE COURT: Right. So use the -- I think I've seen the Reddit post when I went through the Liminé, and this doesn't look like it.

Am I wrong about that, Ms. Moritz?

I thought I saw the -- and I have a limiting instruction now ready to go.

MS. MORITZ: Right.

THE COURT: But I thought I saw the Reddit posting during the Motions in Liminé practice and I don't remember it looking like this.

MS. MORITZ: That's right, because it's not the same document. I mean, it may or may not be the same article in different context, but we don't -- that's --

THE COURT: Can you tell him which exhibit it is? Do you know which exhibit it is?

MS. MORITZ: Our -- our --

THE COURT: You don't have it?

MS. MORITZ: I have it. I can get it.

THE COURT: Mr. Portnoy, you need to use the exhibit that she actually produced, or somebody produced, that was relevant to the Motions in Liminé practice. Because at this point I'm looking at this thinking this looks like nothing what I've previously seen in this case, other than maybe the content itself.

MR. PORTNOY: It's been pleaded. She deleted it.

She's going to testify, she deleted it. I mean, is there a dispute that that's the Reddit post she reposted? She admitted in her answer.

THE COURT: Is there going to be a dispute about that?

MS. MORITZ: This is not the document. She did not download this document. Whether it's identical to the one she reposted, I don't know.

THE COURT: Okay. Well, let's let her answer that. She can tell us.

MR. PORTNOY: All right. Thank you.

(End of sidebar.)

BY MR. PORTNOY:

Q Have you seen Exhibit 78 before?

A I'm not sure, actually. Exhibit 78 specifically? Have I seen this exhibit? Or the article?

Q The article, of course?

A I have seen the article.

Q Does this accurately reflect what you saw?

A Well --

MS. MORITZ: Let the witness read it?

THE WITNESS: We've gone through it pretty fast and now I can't actually see it, so.

THE COURT: If we can publish it. I'm not sure why she can't see it on her screen.

Is it on your screen, ma'am?

THE WITNESS: It is, but it's on the comment section, it's not on the actual article.

THE COURT: Why don't we give her the actual exhibit, please.

THE WITNESS: I need my glasses. I'm sorry.

THE COURT: Who has it?

THE WITNESS: It's in my bag.

THE COURT: Let's get them for you.

THE WITNESS: I'll start with what's on the screen while I'm waiting.

THE COURT: Thank you, Ms. Cortez.

(Pause in the proceedings.)

THE WITNESS: Okay.

THE COURT: Ask a question, please.

BY MR. PORTNOY:

Q I think my question was, is this the Shanti summary post, for lack of a better word, that you put on your Facebook page on May 9th, 2022?

A I shared a link to this post on my Facebook page.

Q This exact -- yes?

A From -- from my memory, yes, unless it's changed since I posted it.

MR. PORTNOY: Your Honor, I want to move Exhibit 78 into evidence, please.

MS. MORITZ: Objection. There is question about

authenticity as to the date of the document.

THE COURT: I'll allow you to voir dire her. So if you -- so, Ms. Moritz, go ahead and voir dire the witness.

VOIR DIRE EXAMINATION

BY MS. MORITZ:

Q Ms. Haygarth, take a look at the top of the document.

When you reposted -- on what date did you repost an article entitled The Shanti Summary?

A May 9th, 2022.

Q And what is the date at the top of this document?

A It says three years ago.

Q Did you reprint this document, Exhibit 78?

A No.

Q Do you know when this document was taken off the internet?

A No. It's not one of my -- no.

Q So you don't know when this specific copy was published on the internet; is that accurate?

A That would be accurate, yeah.

MS. MORITZ: Your Honor, I think there's a question as to the authenticity of the document.

THE COURT: All right. Let me ask you, ma'am: On Page 2 of Exhibit 78, it looks like there are comments there. Did you repost these comments, too, or just the article?

THE WITNESS: Just the article.

THE COURT: All right. I'm going to sustain the

objection.

MR. PORTNOY: Well, I'll delete the -- as I said the other day when we were talking about this, I'll delete --

THE COURT: Let's move on.

MR. PORTNOY: I'm sorry, Your Honor?

THE COURT: Let's move on. We'll deal with this at a break.

MR. PORTNOY: Your Honor, I'm putting it in to refresh her recollection, but I understand what you're saying.

THE COURT: You don't need to admit an exhibit to refresh somebody's recollection under the rules of evidence. You can refresh her recollection with it if you want, but that doesn't mean it's admissible.

MR. PORTNOY: Okay. As you said, we'll deal with it at a break.

RESUMED DIRECT EXAMINATION

BY MR. PORTNOY:

Q That article was about my client, right?

A Yeah.

Q At the time you put it on your Facebook page, is that available to anybody who follows you on Facebook?

A Yeah, this article is public.

Q So it's available to the world, if they go to your Facebook page?

A Only if you're a friend of mine on Facebook.

Q Okay. But you said you posted it to warn the community and all these other fathers who might be in a similar situation. Unless they were following you, what value was that?
A Our community is small, there was our fathers in the community, potentially. If someone saw it they could share it with another father in Saskatchewan.
Q Do you know who your followers are?
A My friends and family on Facebook?
Q Well, you said you posted it on your Facebook page and it was public and it's available to your followers, right?
A This article is -- is a public thing. You could go to Reddit and see it, yes. So you could click on it and go there, yeah.
Q Yeah, I understand it first appeared on Reddit. We're not talking about that. We're talking about your reposting of it.
A Sorry. What do you mean I first appeared on Reddit?
Q You just said you can go to Reddit and look at it. That's where it first appeared, right?
A I thought you said "I" first appeared or this article -- I -- I'm honestly not understanding your questions.
Q I'm sorry. I mean, The Shanti Summary that you reposted, where did you first see it?
A I first saw it shared to the Liana Shanti Cult Recovery page on Instagram.

Q Then why do you mention Reddit?

A Because they shared the link to Reddit. So you click the link and then you go to Reddit and you read it.

Q And that's where you believe it was first published, on Reddit?

MS. MORITZ: Objection, Your Honor. Relevance. This Facebook post is not defamatory, it's already been determined by the Court. Rule 403.

THE COURT: Let's -- let's move on, Mr. Portnoy, please. Let's move on to a different subject at this point.

MR. PORTNOY: I'm sorry, Your Honor?

THE COURT: Move on to another subject, please.

BY MR. PORTNOY:

Q When you republished The Shanti Summary on May 9th, did you also at the same time publish your own comment?

MS. MORITZ: Objection. Relevance. This has already been determined not to be defamatory. And Rule 403.

THE COURT: Overruled. I will read the limiting instruction at the close of cross-examination.

The question was: When you republished The Shanti Summary on May 9th, did you also at the same time publish your own comment?

THE WITNESS: Yeah, I did.

BY MR. PORTNOY:

Q Okay.

What happened to that comment later on?
A What do you mean "later on"?
Q Did it stay?
A Yeah.
Q I'm sorry.
A My comment, did it stay, or what -- are you -- I don't know what you're asking of me.
Q Your post --
A Okay.
Q -- when you reposted the article that we're going to move on right now, is it still online?
A No.
Q Why not?
A Because I took it down shortly after when I thought about how it might affect my stepchildren, for one.
Q Well, why did you put it on in the first place?
A Because I was scared and worried and wanted people to know what we were going through.
Q But I'm sorry to ask you again, other than the fact that Amanda was a student of Liana, why were you posting a negative article about my client and your own comments about my client?
THE COURT: This has been --
MS. MORITZ: Objection.
THE COURT: This has been asked and answered. Move on to a different subject, please, Mr. Portnoy. Just -- let's

move on from this Shanti Summary discussion. You've been on it for a while now. Choose a different topic, please.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Did you ever talk to a reporter about my client?

A Yeah, I talked to Jennings Brown.

Q Who's Jennings Brown?

A He's --

MS. MORITZ: Your Honor, can we take the exhibit down, please?

THE COURT: Yes.

Go ahead. Who's Jennings Brown, ma'am?

THE WITNESS: He's a reporter, an investigative reporter.

BY MR. PORTNOY:

Q For who?

A He's an independent investigative reporter, as far as I know.

Q And when did you talk with him?

A 2023.

Q And how?

A I think he called me and he sent me a couple of messages.

Q Did he ever tell you how he knew about you?

A He saw my name online, I believe.

Q On what online?

A On Liana Shanti's Instagram stories, as far as I know.
Q Well, did he get any more specific about why he was contacting you?
A Yeah, he wanted to hear about what happened with Amanda crossing the border with the kids.
Q Did he ever explain to you why he thought you might have some information about that?
A Because I'm their stepmother.
Q Wasn't the story about Liana that he was inquiring into?
A The story was about what people went through.
Q Wasn't the focus of what was ultimately published and what he talked to you about, in part, was about my client?
MS. MORITZ: Objection. Foundation. We don't even know what article we're talking about.
THE COURT: Sustained.
MR. PORTNOY: I'm sorry, I didn't understand the objection.
THE COURT: Clarify which article you're talking to her about, please, Mr. Portnoy.
BY MR. PORTNOY:
Q Did he ask you questions about my client?
A No. He asked us questions about our kids and our experience with our kids that had to do with Liana Shanti and Amanda.
Q I'm confused. Did he bring up Liana Shanti's name in

questioning you?
A I don't recall that part. I know that he first brought up the fact that he had an idea about Amanda crossing the border. Is that what you're asking me?
Q I'm asking you if he mentioned my client in his conversation with you, the first one.
A Probably did, considering this is part of what this is about, yeah.
Q I'm sorry, considering what?
A That's what this was about, yeah. Amanda's relationship to her, yeah. To Liana -- Amanda's relationship to Liana.
Q Other than the fact that she was a student?
A I don't -- I don't remember what else would have been discussed.
Q How many times did you talk to him?
A Oh, I'd say two, three maybe.
Q Over a period of how long?
A Less than six months to a year, I think, off the top of my head.
Q What did you tell him?
A I told him about our experience with our daughters. I told him that Amanda had crossed the border. I told him how it affected our lives very negatively. I told him that we had suspicion that she crossed the border in fear of being in Canada. I told him that we were scared.

Q Did you tell him that you believe that somehow my client was involved?
A I told him probably that we thought Amanda was influenced.
Q Was what? I'm sorry. Go ahead.
A That there might have been some influence, but we weren't -- yeah.
Q What proof did you have, even when you talked to him, that my client had influenced Amanda to take the kids to Florida?
A Because London and Ellis told us so.
Q Now, what did they tell you?
A What do you mean "now"?
Q Well, you never said that they had said that they told you that my client was involved and they're moving to Florida.
MS. MORITZ: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: I don't think you had asked me that timeframe of a question yet. When you asked me earlier we were talking about 2022. So from January to April the kids didn't tell us.
BY MR. PORTNOY:
Q What?
A That their mom was influenced to cross the border, and that they were taken without their dad's permission.
Q Influenced by who?
A Liana Shanti.

Q And how did they tell you they know that?
A Because they were told to keep it a secret, that Liana told their mom to leave Chinada.
Q They were told to keep it a secret by who?
A Their mom.
Q The kids told you that their mom told them that the reason they left Canada and went to Florida was because my client told Amanda to do that, but it's a secret; is that what you're saying?
A I don't know about the last part where you're saying "but it's a secret."
Q You said they were told it's a secret, that's where I got that from?
A They were told to not tell their dad that they were going to stay there. Is that --
Q I'm sorry. Yeah. Okay.
So they were told not to tell their dad. But they could tell you. Does that make sense?
A At first they didn't tell any of us.
Q Yeah.
A And after a while in 2023 they told their dad.
Q I thought they were told it was a secret.
A Yeah, they let the secret out of the bag.
Q How old are those kids now?
A 18 and almost 16.

Q Where are they?
A In Canada.
Q Why aren't they here to testify?
A Because we don't want them to subject -- we don't want to subject them to this. They've been through enough. They've been harmed deeply.
Q You're testifying to all these things they allegedly said. How do we know they said it?
A Because I'm being truthful.
Q That's the only reason we know, right?
A Right.
Q But the people who actually made the statements, if they made any statements at all, aren't here, correct?
A Correct.
Q Do you have any motivation to say that the kids told you these things?
A I --
Q Anything to do with the lawsuit, your claims?
A Not at all.
Q One of them is 18, though?
A She is now, yeah.
Q You came to this courtroom from Canada?
A I did.
Q Where does Amanda live now?
A Canada.

Q Where does her daughters live?
A Canada.
Q Anybody ask Amanda whether the kids could come and verify what you're telling this jury they allegedly told you?
A I'm not sure.
Q Did you?
A No.
Q You don't keep in touch with Amanda, right?
A Not really, no.
Q When did that stop?
A 2017, about.
Q 2017?
A Yeah.
Q Now, we're going back. Why did your relationship with Amanda end in 2017?
A I believe that she was upset with me for some reason, but I don't know why.
Q What was the relationship before 2017, friends?
A Friends.
Q And then did one day she said I don't want to be your friend anymore?
A She didn't say that to me, no.
Q So what happened?
A I don't know.
Q But there came a time where you weren't talking to her

anymore or she wasn't talking to you, right?
A Correct.
Q And did you ever try to find out why?
A Not really, no.
Q You don't think there was something going on with the various marriages and divorces and remarriages of all the people that we've heard about that might have had something to do with that?
A I don't understand what you're saying. Like, because I'm married to Wade she doesn't want to talk to me anymore, is that what you're saying?
Q I'm trying to find out, that's all I'm trying to do. You had a relationship with Amanda, you were friends until one day in 2017 it stopped, right?
A I guess. I don't know if I'd say "one day." It was probably more like a slow burn. We just drifted apart.
Q But something led you to know that that relationship was over. Did you try to contact her one day and say, let's go to lunch and, you know, she said I don't want to have lunch with you anymore? I mean --
A No. I think probably hearing kind of from the kids that, you know, that her mom wasn't necessarily happy that I was parenting them was enough for me to realize she didn't really want to be friends again.
Q Okay. So it had something to do with all the

relationships among all of the defendants in the case and some of the witnesses, right?
A Sorry, what? I can't hear you.
Q That's fine. That's fine.
So we get back to Jennings Brown. Didn't you tell him that everything that you were telling him he couldn't publish?
A I did.
Q Why, if you were telling it to him?
A It felt good to have a conversation with someone about what we were going through.
Q But you told him he couldn't publish any of it?
A Yeah, I didn't want him to publish any of it.
Q What value is it for you tell him things and then tell him he couldn't publish anything you told him?
A It felt healing to me to have a conversation with someone.
Q Feeling?
A Yeah.
Q I thought you wanted to warn people about what Amanda -- I'm sorry, what my client had been doing. You wanted all these people to know about evil Liana and her getting involved in custody.
MS. MORITZ: Objection. Argumentative.
THE COURT: Sustained. And it misstates the testimony.
BY MR. PORTNOY:

Q Why did you talk to him in the first place, to heal?

A That's what I told you.

Q Was the reason why you had to talk to a reporter who you knew was going to do a story, to heal?

MS. MORITZ: Objection. Argumentative.

THE COURT: Sustained.

Let's take a stretch break, ladies and gentlemen. We're at about that point, so let's go ahead and take a stretch break.

(Pause in the proceedings.)

MR. ADAMS: Can we get an estimate from counsel so the next witness can prep?

THE COURT: Yes. Mr. Portnoy, how much longer do you have?

MR. PORTNOY: Oh, depends -- you want to break for lunch, Your Honor? I'm going to be at least past 11:30, may be close to 12:00. But I'll stop whenever you want to take the lunch break.

THE COURT: I'm just asking how much time you have left in your cross-examination. That's what I'm asking.

MR. PORTNOY: I would say maybe up to 50 minutes.

THE COURT: How many?

MR. PORTNOY: 50.

THE COURT: 15 or --

MR. PORTNOY: Five-zero.

THE COURT: All right. Thank you.

MR. PORTNOY: Okay.

MR. ADAMS: We just might need a little bit of a break because --

THE COURT: That's fine. We'll deal with it.

Okay. Our stretch break is over.

You can proceed.

Ladies and gentlemen, we'll go until about 11:45.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q You say you talked to Jennings Brown maybe two, three times over six months; did I understand that?

A Best of my memory, I can recollect, yeah.

Q Can you segment for me what the discussions were in each of those two or three meetings over six months? Did you talk about the same things? Did he come back and ask you new questions? Tell me.

A He would share with me things that he had heard from some other people, which was helpful for us to help understand what we might be going through, was helpful for us to see that we weren't alone, that there's other people going through this. He -- he would ask, you know, are the kids back from Florida yet?

So, our conversations were a lot about, off the record, me gathering information because of what, you know, I'm

going through in this -- this stuff, so. Is that --
Q I'm sorry. Did you finish?
A Yeah.
Q Did you say "me gathering information"?
A I was hearing information from him about other people.
Q Oh, he was giving you information?
A That's right, yeah.
Q And in these two or three conversations, was it the first conversation where you gave -- told him your story?
A Yeah, I believe so. Yeah.
Q Did you augment it in any way in the second and third conversations?
A Sorry. What do you mean "augment it in any way"?
Q I'm sorry?
A What do you mean by "augment it"?
Q Did you give him new information in the second and third conversations?
A Well, yeah, I just said I would update him if the kids had been back or the status of the girls being in Florida, yup.
Q So you continued to give him new information as you received it on your own, right?
A If he asked me.
Q Well, did he?
A Yeah, I just said he did.
Q And why was it all done anonymously, like the posts that

someone --

MS. MORITZ: Objection. Argumentative.

THE COURT: Overruled.

BY MR. PORTNOY:

Q Why did you do it anonymously with him?

A I didn't do it anonymously with him. He knew who I was. I knew who he was.

Q But you told him he couldn't use your name in the article.

A Yeah.

Q So what you were telling him that he rewrote was not attributed to you because you told him, don't use my name?

MS. MORITZ: Objection. Lacks foundation, argumentative.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Did you tell him not to use your name?

MS. MORITZ: Asked and answered.

THE COURT: Overruled.

THE WITNESS: I told him not to use anything I told him, not to use anything I said in the article. We did not want to participate in the article.

BY MR. PORTNOY:

Q Then -- I'm sorry, but then why did you talk to him other than -- I forgot the words you used, healing?

THE COURT: This is asked and answered. Ask another

question.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q Did you ever read the articles?

A I did.

Q And how did you come to see the articles?

A They were posted on the Instagram account Liana Shanti Cult Recovery.

Q And did you receive advance notice that they were going to get published?

A Not that I recall.

Q Did Mr. Brown tell you, I'm going to be writing this story, it's going to be coming out in a week or a day?

A I'm sure he did, but I don't have that memory, no.

Q And they appeared in what publication?

A It was called The Daily Beast.

Q Had you ever heard of the Daily Beast before?

A I had.

Q How do you know about The Daily Beast?

A I don't know, probably from social media. Probably from social media.

Q Had you ever read stories in The Daily Beast before?

A Yeah, probably.

Q And you read whatever he wrote about the Amanda situation and related issues, right?

MS. MORITZ: Objection. It's not clear what article we're talking about here.
MR. PORTNOY: I'm sorry?
Did you read the articles he eventually published in The Daily Beast that --
MS. MORITZ: Same --
BY MR. PORTNOY:
Q -- that he'd been --
I'm sorry, Your Honor.
THE COURT: He's clarifying now.
The question is: Did you read any of the articles that he published in The Daily Beast?
THE WITNESS: Yeah, I answered that I had read those.
BY MR. PORTNOY:
Q Okay. What's your understanding of what he wrote about?
A My understanding is that he wrote about some of the families that were in association with Liana Shanti.
Q It was about Liana Shanti, weren't they?
MS. MORITZ: Objection. Best evidence.
What article are we talking about?
THE COURT: Well, sustained.
Do you have the article as an exhibit?
MR. PORTNOY: Well, first --
BY MR. PORTNOY:
Q You read the articles; yes?

A For the third time, yup, I did.
Q Well, do you have any recollection of what was in there?
THE COURT: Why is this not hearsay? I mean, do we have an exhibit that is the article that you're planning on introducing?
MR. PORTNOY: Yes, but --
THE COURT: Okay. Well, let's pull it up. Let's move this along.
MR. PORTNOY: Okay.
THE COURT: What exhibit number is it?
MR. PORTNOY: One second, Your Honor. Sorry.
THE COURT: I'm sorry, what?
MR. PORTNOY: Oh, my bad. I moved away.
We're getting it, Your Honor.
Can you post, please, 341?
BY MR. PORTNOY:
Q Is this one of the three articles written by Jennings Brown regarding the issues we've been talking about?
A I can see Page 1.
THE COURT: Ms. Cortez, if we could give her Exhibit 341, please.
THE COURTROOM MANAGER: Yes, Your Honor.
THE WITNESS: Sorry, is it 317 or 341?
THE COURT: Exhibit Number 341.
So if you look at the divider.

(Pause in the proceedings.)

THE WITNESS: Without reading the whole thing, this looks like something I've read, yeah.

BY MR. PORTNOY:

Q Okay.

And do you know who -- did you read it about the time it was published?

A Probably --

MS. MORITZ: Objection. Lacks foundation.

THE COURT: Overruled.

THE WITNESS: Probably pretty close to the time it was published.

MR. PORTNOY: Your Honor, I move that exhibit into evidence, please.

THE COURT: Any objection?

MS. MORITZ: Yes. This witness cannot authenticate this exhibit.

MR. PORTNOY: Your Honor, this was an exhibit produced in discovery by one of the defendants.

THE COURT: Well, I'll allow it. 341 is admitted. She said that she read this article and it looks like the article that she reviewed.

(Plaintiffs' Exhibit 341 was received in evidence.)

BY MR. PORTNOY:

Q Why don't you take a minute and read it. Sorry, but the

question I'm going to ask you so you know, although not attributed to you because of what you've already testified to, anything in that article come from you?

THE COURT: Well, are we publishing this to the jury?

MR. PORTNOY: Oh, I'm sorry. Yes, Your Honor. I'm sorry.

THE COURT: No problem.

MR. PORTNOY: My bad.

THE COURT: Exhibit 341 can be shown to the jury.

MS. MORITZ: Objection to the question. Lacks foundation.

How would she know?

THE COURT: How would she know she -- after reading it whether or not she provided information for it?

MS. MORITZ: I believe the question was whether anything was attributed to her.

MR. PORTNOY: No, not attributed we -- sorry, Your Honor.

THE COURT: Go ahead and ask another question, Mr. Portnoy.

BY MR. PORTNOY:

Q I want you to look at the article, take your time -- wait. Let me tell you why, so you'll know.

I want to know, even though you told him you want nothing that you say to him in the article attributed to you,

is there anything in that article that you remember talking to him about?

MS. MORITZ: Objection. Lacks foundation.

THE COURT: Overruled.

THE WITNESS: Can you ask that again?

THE COURT: Let me ask the question.

Do you remember if there's anything in this article that you remember talking to him about?

In other words, is there anything in this article that reflects what you told him? Meaning the article's author.

THE WITNESS: I could instantly without reading it saying it doesn't, because I didn't give him anything to put in this article.

BY MR. PORTNOY:

Q I'm sorry. We know that you told him things in one or more conversations about your knowledge of the things he was asking you about --

A Correct.

Q -- right?

A Yeah.

Q We know that you told him, nothing I tell you can be attributed to me.

MS. MORITZ: Objection. Misstates prior testimony.

THE COURT: Sustained.

BY MR. PORTNOY:

Q What did you tell him about using the information you were giving him?
A That it was confidential and that he couldn't use it.
Q Okay.
And so my question to you is: By looking at the article, despite you telling him that he couldn't use anything, is there anything in there that you recall telling him in your conversations with him?
A (Perusing document.)
MS. MORITZ: Your Honor, can the record reflect that the witness is reading the article?
THE COURT: Yes.
MS. MORITZ: Thank you.
THE COURT: While she's doing that, ladies and gentlemen, just know that you will have this with you back during deliberation.
THE WITNESS: (Perusing document.)
Finished.
BY MR. PORTNOY:
Q From reading it, do you have any recollection that anything in there, even though it's not attributed to you, came from you?
A Came from me? No.
Q Okay.
MR. PORTNOY: 342, please.

BY MR. PORTNOY:
Q What is this, do you know?
A I'm sorry, what?
Q What?
A I can't hear you.
Q Do you know what this is, 342?
A Looks like another article written by Jennings Brown.
Q Did you read it at or about the time it was published?
A Probably shortly after, yeah.
Q That was about -- it says on April 22nd, 2023? Yes?
A It looks like that's when it was published, yeah.
MR. PORTNOY: Your Honor, I move 342 into evidence, please.
THE COURT: Any objection?
MS. MORITZ: No objection.
THE COURT: 342 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 342 was received in evidence.)
BY MR. PORTNOY:
Q I hate it do this again, but can you please read it and let me know if there's anything in there as something that you told him?
A (Perusing document.)
MR. PORTNOY: May we publish it to the jury, Your Honor?

THE COURT: It is published. They can see it.
MR. PORTNOY: Thank you. Thank you.
THE WITNESS: (Perusing document.)
THE COURT: Ms. Cortez, if we could clear -- somebody accidently highlighted the page.
MR. PORTNOY: I just did that by mistake.
THE COURT: Yeah, we'll clear that.
MR. PORTNOY: I'm sorry.
THE COURT: No problem.
Ms. Cortez, maybe if you could find if he's got the highlight pen clicked on? Thank you. Okay.
BY MR. PORTNOY:
Q Any of that come from you?
A It didn't come from me, but there's talk in here about a house bought in Jacksonville, Florida, which Amanda Brady would have bought. It also talks about four other women that live with her in there.
Q Yeah, did you provide that information to him?
A No, I didn't.
Q I thought you were talking to him about Amanda Brady's situation?
A I was.
Q And do you deny tell him, last year -- I'm not saying exactly, that you talked to him one of Shanti's Canadian followers took her children and fled to Jacksonville, Florida,

where she bought a $1.4 million McMansion. Four other Canadian Shanti followers and their children also moved into the house, which they named Destiny Manor? You deny talking to him about Amanda's move to Florida?

A No, I don't deny it. But that information was available in a lot of places. So he could have taken it from anywhere.

Q But you also told him that?

A I did.

Q And two paragraphs above that, he says, The Daily Beast story --

THE COURT: Let's highlight for the jury so that they --

MR. PORTNOY: Oh, I'm sorry.

THE COURT: -- can see what you're talking about. That will be helpful to them.

MR. ADAMS: Are we on Page 1 still?

THE COURT: What page are you on?

MR. PORTNOY: Are you talking about the prior question, Your Honor, or the new one?

THE COURT: The new question.

MR. PORTNOY: I'm on Page 2, which is 210 on the actual document, BH000324.

THE COURT: All right. Which paragraph?

MR. PORTNOY: The third full paragraph, starts "The Daily Beast's story."

Thank you.

BY MR. PORTNOY:

Q "The Daily Beast's story on Shanti was based on court documents, leaked conversations from her private Facebook and Signal groups, and interviews with six former Shanti followers, and 19 people who said they lost loved ones to the Lemurian Mystery School."

Are you one of the 19.

A No. He could have interviewed --

Q I'm sorry?

A He could have interviewed 45 people that --

Q Yeah.

A -- could pertain to this article.

MR. PORTNOY: I move to strike that, Your Honor. There was no question.

THE COURT: Overruled.

BY MR. PORTNOY:

Q The only question I have is: Did the information that I read previously, about moving to Florida, buying the McMansion, that's stuff you told him. I'm not saying other people didn't tell him as well, right? You told him that stuff as well, right?

MS. MORITZ: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Yeah, I shared our story. I also shared

it in a public -- in a court document to the federal court in Hawaii where he could have learned of some of these things.

MR. PORTNOY: Well, again, I move to strike as nonresponsive, Your Honor.

THE COURT: Overruled.

BY MR. PORTNOY:

Q And the reason you're not quoted as maybe being the source of that information is because you told him not to quote you, correct?

MS. MORITZ: Objection. Lacks foundation.

THE COURT: Speculation. And assumes facts not in evidence.

So sustained.

BY MR. PORTNOY:

Q You told him not to attribute anything you told him in print to you, correct?

MS. MORITZ: Asked and answered.

THE COURT: Sustained.

MR. PORTNOY: Go to Exhibit 22, please.

THE COURT: I'm sorry, did you say 22?

MR. PORTNOY: 22.

THE WITNESS: Do you want me to read it?

MR. PORTNOY: Yes.

THE WITNESS: (Perusing document.)

THE COURT: This one is pretty lengthy, so why don't

we do this: Let's go ahead and take our longer break right now.

Ladies and gentlemen, we're a little bit early to do so, but that way we won't waste your time in the courtroom. We're going to take a break for -- let's give it about 40 minutes, which means we'll be back in the courtroom at about 12:20. This is the bigger break.

And then when you come back, we're going to have one more short break before you leave for the day at 2:15. All right? Thank you.

(At 11:37 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you. You may be seated.

Mr. Portnoy, would you be willing to at least give counsel the list of exhibits you plan on attempting to introduce through this witness so that she might look through them over the break so we don't have to read them in front of the jury?

MR. PORTNOY: Sure. Absolutely.

THE COURT: Thank you.

MR. PORTNOY: Thank you.

MR. ADAMS: That's a particularly difficult haul, because these are 20-page articles, and he's asking her under oath which information came from -- which information he talked about. So it's not even -- she can't even look for her name or

attribute it. It's very difficult.

THE COURT: Understood.

MR. ADAMS: We appreciate it, Your Honor.

THE COURT: Okay.

Couple things. One is, I don't know if the defense wants me to read the limiting instruction on The Shanti Summary that I had crafted or not. It's up to you. And if so, do you want me to read it now -- or I should say at the end of cross-examination or at another point.

MS. MORITZ: I think that would be appropriate, Your Honor.

THE COURT: Okay. So I'll do that at the end of cross-examination.

If I forget, remind me, please.

MS. MORITZ: Thank you. I will.

THE COURT: Okay.

MR. PORTNOY: I don't think we resolved it yet. You said you would deal with it.

THE COURT: No, I filed it. It's in the record. It's in ECF --

MR. PORTNOY: No, no, not the limiting instruction. Exhibit 78.

THE COURT: Oh, Exhibit 78.

MR. PORTNOY: We don't even have it in yet.

THE COURT: That's right. But they have heard

evidence about it. So -- and the limiting instruction talks about, you have heard evidence that Paula Haygarth reposted on her personal Facebook page a subReddit article entitled The Shanti Summary with commentary about plaintiff Liane Wilson.

All of that is true so far.

So with regard to 78, my recollection -- and I think Ms. Moritz would be the one on the defense team who would recall this the most, and I can go back on the break and look, but I could have sworn I was provided a copy of the Reddit post as part of the Motion in Liminé.

MR. PORTNOY: They would have brought the motion.

THE COURT: Right. That's why I'm looking at them for that.

MR. PORTNOY: Yeah.

THE COURT: I can go back and look. But what I'm a little nervous about is that the document Exhibit 78, I think it is, doesn't look like it's the same thing. And I think she testified that she didn't repost everything in that document.

So --

MS. MORITZ: Yes.

THE COURT: Yeah, so. Right. So we're going to have to use a different document for that.

MS. MORITZ: That's correct, Your Honor. It has -- 78 has a bunch of commentary that follows that doesn't --

THE COURT: And is her Reddit comment in 78?

MR. PORTNOY: No.

THE COURT: No, right.

MR. PORTNOY: Because her Reddit comment no longer exists, but it's in one of your orders.

MS. MORITZ: Her Reddit comment was on --

MR. PORTNOY: Sorry. Can I finish, please?

THE COURT: Let's do this: You guys see if you can figure this out in terms of what document you can all agree on. And if you can't, I'll come in early before 12:20 to work on it. But I would like to see if you folks can meet and confer and agree on something.

MR. PORTNOY: Sure. Let me just say one thing might be helpful.

THE COURT: Yes.

MR. PORTNOY: The repost, the new post, that one with the repost, was taken from the Sourced Intelligence report, and you published it verbatim in your order, in a prior order.

THE COURT: Okay.

MR. PORTNOY: So we can't use the Sourced Intelligence report.

THE COURT: Understood.

MR. PORTNOY: So we are left where we are. I don't know why this is a problem, Judge. This has been admitted to. But I guess we'll have to deal with it under the rules of evidence. But I can read your order and I don't think there

could be an objection to that. You have actually written it -- written --

THE COURT: Why is my recollection that I -- is my recollection completely wrong then that I saw what it looked like?

MR. PORTNOY: Well, what you wrote in your order --

THE COURT: Yeah.

MR. PORTNOY: -- is what she posted.

THE COURT: Right. That's --

MR. PORTNOY: Not the repost.

THE COURT: Right.

MR. PORTNOY: I mean -- okay. And you got it -- because it doesn't exist anymore. You got it from Sourced Intelligence report, and we've been told repeatedly about the restrictions.

THE COURT: All right. Mr. --

MR. PORTNOY: Anyway.

THE COURT: Mr. Adams and Ms. Moritz and Ms. Ing are all shaking their heads at the exact same time.

I'm going to let you guys figure this out --

MR. PORTNOY: Yeah. Okay.

THE COURT: -- so that I don't need to get involved in this.

MR. PORTNOY: That's fine. That's fine.

THE COURT: I will wait for you to tell Ms. Cortez if

I need to come back on the bench early. In the meantime, I will look at Motion in Liminé Number 1, which I have a copy of here with me, and see what the attachment looks like.

MS. MORITZ: I think it was 3 or 4, but yeah.

THE COURT: Okay. Maybe I'm getting the number wrong. Okay we're in recess. Thank you.

(A recess was taken from 11:42 a.m. to 12:21 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: How are we doing?

MR. PORTNOY: Well, we're not going to use 22.

THE COURT: Okay.

MR. PORTNOY: I advised them of that.

We still have the two issues that we've been fumbling about, which is 78, which is the repost. And then her post, which we have confirmed, despite facial expressions, were in the Reddit -- in the Sourced Intelligence report. That's the only place before you published it verbatim in a portion of your order.

THE COURT: Okay.

MR. PORTNOY: I'm just pointing out where our position is. We have no other access to it. So thank you.

THE COURT: Okay. Why don't we do this: Let's see if you can lay the foundation with her now. Let's do this outside the presence of the jury.

MR. PORTNOY: Okay.
THE COURT: That way we're not wasting --
MR. PORTNOY: That's fine.
THE COURT: And we can see where we go.
MR. PORTNOY: That's fine. Can we put 78 on the screen?
THE COURT: Yes. And obviously it can be published because the jurors aren't in here.
MR. PORTNOY: Yeah.
THE COURT: 78, please.
MR. PORTNOY: And again, I've made it clear, Your Honor, we're going to -- before -- if you allow it, we're going to take -- we're going to take out the comments after. We're just interested in The Shanti Summary.
THE COURT: Got it.
MR. PORTNOY: I know that there were comments after. We have no interest in those.
THE COURT: Got it.
MR. ADAMS: Just for my purposes, Your Honor -- and forgive me as second chair requesting this. But for the limiting instruction, Your Honor wants to tie it to an actual exhibit?
THE COURT: No.
MR. ADAMS: Okay.
THE COURT: This is unrelated to the limiting

instruction.

MS. MORITZ: That's what I thought.

THE COURT: I'm giving the limiting instruction.

MR. ADAMS: I was confused myself. Thank you.

THE COURT: Okay. All right. Go ahead.

We're now looking, for the record, at Exhibit 78.

BY MR. PORTNOY:

Q Ms. Haygarth, all I'm trying to do, and take as much time as you want, just take a look at the body of The Shanti Summary, which is Exhibit 78, not any of the comments. And all I'm trying to establish is -- you can take as much time as you need, you know it's come up -- is that what you republished on May 9th?

THE COURT: And by "republished," you mean reposted on --

MR. PORTNOY: Reposted. Sorry, Your Honor, yes.

THE COURT: -- the Facebook page?

MR. PORTNOY: Yes.

THE COURT: Thank you.

THE WITNESS: (Perusing document.)

Other than the date saying it's three years ago, it looks like the article, but I can't tell for sure.

BY MR. PORTNOY:

Q Okay. And then the second question deals with what you posted. And you deleted it at some point, right?

A Deleted this -- this link?
Q What you -- when you reposted what we've just talked about, you wrote a comment, or your own post, right?
A Right.
Q Okay. And you put it on your Facebook account?
A Yes.
Q Okay. And did it also go on Reddit at some point?
A No.
Q Okay. But you deleted it a few months later?
A I deleted it what?
Q You delete -- sorry. You deleted it a few months later?
A Not a few months. Couple weeks.
Q Okay. But you -- you deleted it, that's all I'm trying to establish?
A Yes.
Q Okay. Have you seen it since?
A Seen what?
Q What we're talking about, which is what you posted when you reposted 78?
A I'm not sure what you're asking.
THE COURT: He's asking if you deleted your commentary -- sorry, have you seen your commentary, right, that's what you're --
MR. PORTNOY: Yes, that's fine, Your Honor.
THE COURT: -- the commentary that you posted on

Facebook at the same time that you posted this article on Facebook?

THE WITNESS: So have I seen my commentary since I deleted it? That's the question, right?

THE COURT: That's my understanding of what the question is.

BY MR. PORTNOY:

Q Yes.

A In the Sourced Intelligence report.

Q That's the --

A My commentary?

Q No, no.

You posted some commentary on the same day, right, May 9th?

A Can I explain? Because I think we're confused with each other again.

Q Sure.

THE COURT: Go ahead.

THE WITNESS: The link I posted to my Facebook page from Reddit, I posted a link to this article. Above the article I did have commentary.

BY MR. PORTNOY:

Q Okay.

A And then a couple of weeks later I deleted all of it.

Q Yeah. I got it.

A And the commentary.
Q Yeah. What I'm trying to do establish for later on, have you seen that commentary since the was that you posted it and then subsequently deleted it?
A Yes. In the Sourced Intelligence report.
Q Okay.

MR. PORTNOY: So, Your Honor, that's the dilemma, because the only other place is on Pages 39 and 40 and the top of 41 of your ruling, which, of course, I don't want in.

THE COURT: Right.

So she just testified that, I posted a link to this article, commentary. And she testified that -- testified that this looks like the article that she posted.

So, I'm fine with introducing it with the caveat that everything -- and I don't know how you're going to do this Mr. Portnoy -- but everything on the sides, there are three columns here, on the left I don't care about, but on the right there's a bunch of related posts that are showing up. And then, obviously, there are the posts on the second page of Exhibit 78 and the third page of Exhibit 78.

So you have very good trial software and your paralegal is doing an outstanding job with that, so I'm wondering if she could potentially, when she shows it to her, make it such that we're seeing anything but the article itself.

MR. PORTNOY: That's absolutely fine.

THE COURT: All right.

MR. PORTNOY: But that leads to the second problem, which is what she -- her commentary is. How do I show that to the jury unless I show them either --

THE COURT: Well --

MR. PORTNOY: That -- go ahead, Your Honor, please.

THE COURT: You can ask her what her commentary was. If she can't remember, you can refresh her recollection with the Feil report. And she can talk about it if it refreshes her recollection.

MR. PORTNOY: I'm going to read it then if I need to.

THE COURT: Right.

MR. PORTNOY: That's fine. I just wanted to make sure I don't run afoul.

THE COURT: Right. Without it becoming an actual exhibit.

MR. PORTNOY: Okay.

Well, I don't understand why it can't be an exhibit. I just --

THE COURT: Because I have excluded the report. That's --

MR. PORTNOY: I got it. And that's it why it's not there. But you have quoted it. I'm just saying -- so I don't understand -- you've excluded that portion of the report, but you have already found that -- and published in your public

order exactly what it was. And I'm just struggling as to why the jury can't see it. That's all.

THE COURT: Because the Feil report has been excluded. I mean, the fact that I mentioned it in an order doesn't suddenly make the Feil report admissible.

MR. PORTNOY: No, I'm not trying to get it in through that.

THE COURT: Okay.

MR. PORTNOY: I'm sorry, Your Honor.

THE COURT: So tell me what you want to do. After I admit Exhibit 78, and you're going to cover that.

MR. PORTNOY: Yes.

THE COURT: What is your questioning going to be after that?

MR. PORTNOY: It's going to deal with the commentary.

THE COURT: Okay.

MR. PORTNOY: And why and what -- and she doesn't have it because it's not an exhibit because it only appears in the report.

THE COURT: Ms. Moritz, please sit down.

MS. MORITZ: Sorry.

THE COURT: Thank you.

MR. PORTNOY: And so you have told me, and I appreciate it, that I can ask her what she remembers. And to the extent it's not complete, I have two choices. One, I can

read it, see if it refreshes her recollection.

THE COURT: And actually, to clarify, that's not how a refreshing of recollection would be refreshed under the evidence. So you would show it to her, she would look at it, she would say whether or not it refreshes her recollection. So --

MR. PORTNOY: Yeah. But what am I supposed to show her? I can't show her --

THE COURT: You can show it to her. You can show it to her, you just can't show it to the jury. Her recollection can be refreshed with anything. She can see it. I don't have a problem with her seeing it. I have a problem with the jury seeing it.

MR. PORTNOY: Yes. I don't know what I'm missing here, but I'm sure it's me.

THE COURT: So --

MR. PORTNOY: I can show her --

THE COURT: And actually, I'm so sorry, ma'am, I'm going to have you step out of the courtroom only because I think it's going to be cleaner if you're not present for this discussion.

Thank you.

THE WITNESS: (Complying.)

THE COURT: And so let's wait for Ms. Haygarth to leave the courtroom.

MR. PORTNOY: Sure.

THE COURT: Thank you.

So I don't understand what you're asking to do.

MR. PORTNOY: Okay. Ultimately my goal is to publish to the jury verbatim what her commentary was.

THE COURT: In what form?

MR. PORTNOY: That's the dilemma.

THE COURT: Okay. Tell me what exhibits you're considering using so I can look at them.

MR. PORTNOY: Well, the only two places it exists is the Sourced Intelligence report --

THE COURT: What exhibit number is that?

MR. PORTNOY: I'm not sure it's an exhibit, because you excluded it. But it's Page 19 of the report. And I can show it to you.

THE COURT: Okay. What's the other option?

MR. PORTNOY: Your statement in which you quoted verbatim in your opinion on the summary judgment. I don't want to use that, but there's only two places it exists.

So, yes, I understand that I can show it to her, and yes, I understand that I can read it and ask if that's accurate. But the issue that we're struggling -- I'm struggling with is whether it can actually be published to the jury so they can read it themselves. That's -- that's all that's there.

THE COURT: All right. Ms. Moritz, what's your position on this?

MS. MORITZ: Well, nothing from the Sourced Intelligence report should be published to the jury, because it's been excluded.

THE COURT: Right.

MS. MORITZ: And as to -- and it can't be read to the jury. He can refresh my client's recollection. She may and possibly will remember some of the content, I don't know.

But I also question just the relevance of this discussion because the Court's already ruled on the issue of the Facebook post and the commentary.

THE COURT: Right.

So the ruling was that it can be offered as circumstantial proof of identity of the authors of the anonymous Facebook postings.

Would the defense be willing to stipulate that she did repost this? I mean, she hasn't been denying any of this. She hasn't been denying any of this. So I just want to know --

MS. MORITZ: That's true.

THE COURT: Do you have a problem with him asking her, did you post -- did you say this in a commentary? And if she doesn't remember, she doesn't remember.

MS. MORITZ: That -- you know, counsel could ask that question.

THE COURT: Okay. All right.

MS. MORITZ: You know, with --

THE COURT: Mr. Portnoy I'm not going to let you try to get this in as some sort of exhibit. First of all, it's not listed as an exhibit.

Secondly, the best you can do, I think, is to say, did you repost 78 -- or post 78, a link to it, on your Facebook account. And then at that point ask her, did you post a commentary to it as well.

You posted a commentary to it as well, didn't you?

Yeah.

Do you remember what that commentary said?

No.

Would it help refresh your recollection if I showed you something?

Yes.

Show her whatever it is that you want to refresh her with, perhaps the Feil report, ask her if that refreshes her recollection.

If she says no, then I think -- then I'm okay with her leading her, didn't you say blah, blah, blah? I think that's just the cleanest way to deal with this. And then we can --

MR. PORTNOY: That's fine, but what am I supposed to show her? Because there's been --

THE COURT: You can show her anything you want.

MR. PORTNOY: I can show her the Sourced Intelligence --

THE COURT: Yes.

MR. PORTNOY: That's fine. We're good.

THE COURT: You can show her the Sourced Intelligence report. It just can't be published to the jury.

MR. PORTNOY: Got it.

MS. TOKUOKA: Should I start working on this redaction now?

MR. PORTNOY: Yes.

THE COURT: Okay.

All right. I think that's the only thing that needed my attention.

So let's go ahead and bring Ms. Haygarth back in, put her on the stand, and get the jurors back here, please.

MS. TOKUOKA: Your Honor?

THE COURT: Yes.

MS. TOKUOKA: Everything on the right-side column?

THE COURT: Yeah. See how it has the related posts on the right?

MS. TOKUOKA: Like these?

THE COURT: Right. That's what I'm concerned about. Thank you.

MS. TOKUOKA: What about the comments on the bottom?

THE COURT: Yeah, anything that looks like a

comment --

MS. TOKUOKA: Okay.

THE COURT: -- please. Thank you.

And you don't have to rush and redact it now. We can do it later. Just whatever is shown to the jury, as long as it doesn't include --

MR. ADAMS: Also, I mean, are we calling it the Sourced Intelligence report?

MR. PORTNOY: No, I'm not calling it anything. That's why --

THE COURT: Ms. Haygarth, you may come back.

MR. PORTNOY: Is that okay, Your Honor? I'm just going to put this up.

THE COURT: Totally fine.

MR. PORTNOY: So there's no inadvertent reference.

THE COURT: Okay.

MR. ADAMS: I think we worked it out, Your Honor. We got it.

THE COURT: So, Mr. Portnoy, you're not going to say, obviously, would it refresh your recollection if I showed the Sourced Intelligence report? You're just going to say you have a document --

MR. PORTNOY: I can't do that?

THE COURT: No.

MR. PORTNOY: Don't worry, Your Honor. I think I've

been sufficiently advised.

THE COURT: Okay.

MR. PORTNOY: Thank you.

THE COURT: All right.

MR. PORTNOY: I'd like to, but I don't think I'll get away with it.

THE COURT: All right. Let me confirm that you folks are ready, because I -- I can see that you're trying to do the redactions now. I don't know that we need the redactions at this moment as long as we're just showing the witness the article on the screen, and the redactions can be done later, if that's easier for you.

MR. ADAMS: When we left, Exhibit 22 was up. We're moving on from Exhibit 22?

MR. PORTNOY: (Gesturing).

THE COURT: I just got a chat saying the jury is headed back up. So they should be here in a moment.

So if we could Zoom in such the jurors don't see the right side of this exhibit.

MS. TOKUOKA: Okay.

THE COURT: Perfect. Perfect. Perfect. Thank you.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Thank you. Ladies and gentlemen, I'm sorry that that took longer than expected, but it really was to

try to not waste your time. So as I said before, we are going to take another break, probably in about an hour. Actually maybe less than that, but somewhere between now and 1:45. So a short break, another ten-minute break. All right?

Thank you.

MR. PORTNOY: Thank you, Your Honor.

THE COURT: You may proceed.

BY MR. PORTNOY:

Q Good afternoon.

Before the lunch break we talked about May 9th. And two things happened on that day. One, you reposted something that you had seen, correct?

A That's correct.

Q Okay. And then you added commentary of your own, correct?

A I'd say that happens as a one thing. It happened at the same time. So it's -- it's -- it's not two things, it was one event. I shared it, the commentary goes with it.

Q Okay. No problem.

So, I'd like you to look at Exhibit 78.

A I can't see the number, so --

THE COURT: It is Exhibit 78 that is on your screen.

THE WITNESS: On the screen?

THE COURT: Yes.

THE WITNESS: Okay.

BY MR. PORTNOY:

Q And that's titled The Shanti Summary, correct?
A Yup. Yes.
Q And is that what you reposted on May 9th?
A As far as I know, yeah.
Q Okay.
MR. PORTNOY: I would like to move Exhibit 78 into evidence, Your Honor.
THE COURT: Any objection?
MS. MORITZ: No, Your Honor.
THE COURT: 78 is going to be admitted with redactions, and may be shown to the jury.
(Plaintiffs' Exhibit 78 was received in evidence.)
BY MR. PORTNOY:
Q Take a moment for you to read it and for the jurors to read it, please.
MR. PORTNOY: And you may need to scroll down slowly. Thank you.
(Pause in the proceedings.)
THE COURT: All right, Mr. Portnoy.
BY MR. PORTNOY:
Q Oh, you're done? Sorry.
A Yeah.
Q Oh, sorry.
You don't know who originally posted this, right?
A I do not.

Q Okay. Did you do anything to determine whether anything in it was accurate or not?
A I researched whether or not the stuff about her programs was accurate, yeah.
Q Anything else in this article?
A Well, I read it, and there's a part in there that says, Women cut their families out, which Amanda Brady did. I spoke to her parents and her siblings, and they did tell me that that was true. So yes, that -- that was researched.
Q I'm sorry, I'm not getting of some of what you're saying at the end.
A Oh, sorry about that. So yeah, that was some research I did. I did talk to some of Amanda Brady's family that she did cut out.
Q Sorry for the yellow dot.
What else did you do to check on the accuracy?
A That's what I can recall right now.
Q Did you have any knowledge from before you read it as to anything in here as being something that was true?
A Yeah. Quite a bit of knowledge.
Q What's that?
A Our kids were taken across the border by a student of Liana Shanti's. Amanda did leave her family and cut them off. I did read the stuff on her website that is listed in here.
Q Well, Amanda didn't leave her family, Amanda left with her

husband.
A Amanda left her parents --
Q Please answer my question.
MS. MORITZ: Objection.
THE COURT: Overruled.
Let's start with another question. Go ahead.
BY MR. PORTNOY:
Q Amanda left with her husband, Drew, right?
A Yes.
Q So she didn't abandon her family, did she?
A That's not what I said. I said she cut --
Q Go ahead.
A She cut her family off previous to even leaving for Florida.
Q You were talking about going -- your testimony a minute ago, and we can have it read, is that she abandoned her family and went to Florida.
A I don't recall saying "abandoned." Can we go back to it?
THE COURT: She did not say "abandoned," she said "leave."
MR. PORTNOY: Sorry. Leave.
BY MR. PORTNOY:
Q Did she leave her family?
A Well, yeah, she went to Florida, she left her family.
Q She went with her husband and her two kids.

A Her parents are also her family. Her siblings are also her family.
Q And you're suggesting that she didn't have the right with her husband to decide where to go live? Is that what you're implying?
A I am implying that she didn't have the right to take London and Ellis across the border.
Q She went with her husband, correct?
THE COURT: This has been asked and answered.
MR. PORTNOY: Well --
THE COURT: Ask another question.
BY MR. PORTNOY:
Q If and she and her husband decided to leave and take the kids, despite what her mother or father might have said, do you think that that's not a decision a mother and father can make on behalf of their family?
A Apologies. Mr. Portnoy. But you are confused. Drew Brady is not the father of London and Ellis. Wade Martin is. Drew Brady and Amanda Brady took London and Ellis who are the children of Wade Martin, I am the stepmother, across the border and didn't come back, and they did not have permission to do that from Wade.
Q Was Amanda married to Brady when they went to Florida?
A Yes.
Q I mean to Drew, sorry.

A Yes.
Q You don't consider him, let's say, to just be a stepfather?
A Yeah, Drew was a stepfather.
Q They were a family unit when they went to Florida?
A Yup.
Q So it's not something Amanda did on her own, is it?
A So you're asking if Drew went with her?
Q Yeah, and Drew participated in it.
A He did.
Q And agreed with it?
A I can't -- that would be speculation. I don't know if he agreed.
Q Did you ever hear that somehow Drew didn't want to go?
A Wade heard that. Wade had a conversation with Drew.
Q At the time they left and the time that you had the dinner, did you have any information that Drew did not agree with his wife to go to Florida and take the kids?
A Not that I can recall.
Q Was Drew a student of my client?
A I don't know.
Q Do you think somehow my client influenced Drew at the time they moved to Florida?
A I don't know.
Q These weren't things you wanted to investigate when you

were -- when your husband was submitting an affidavit about Amanda illegally going to Florida, whether Drew was part of that?

A The children are Amanda and Wade's. Drew doesn't get to decide custody.

Q Nor does Wade.

A Yes, he does, he's their father. They shared custody.

Q Voluntarily or from a court order?

A Voluntarily.

Q So Drew had partial custody of the kids when they left?

A I wouldn't say that Drew had that. I would say Amanda did. It's like saying I could take London and Ellis across the Canadian Border into Florida and keep them away from their mom, and just because I'm the mother -- the stepmother of them and a partner of Wade that I have a right to do that.

It's like saying Stefanie Horvath could take Isla across the border, and just because she's stepmother and a support to the father that she's just allowed to take someone else's biological children across the border.

Q You seem to have a knowledge of this. Who ultimately makes the decision that --

A Sorry?

Q I'm sorry?

A I can't hear you.

Q Who ultimately makes the decision in these split marriages

and divided custody as to who gets the kids when and how?

A Ultimately and ideally if you're not involving a court, the parents, the biological parents do it together, which didn't happen.

Q And if they're in dispute, who resolves it?

A If possible, the biological parents. If not possible, the court.

Q I'm sorry, are you saying that if the natural father and the stepfather can't agree on custody, the only person that can make that decision is the natural father unless it goes to court? Is that what you just said? That's what I heard, so I want to make sure.

MS. MORITZ: Objection. Vague.

THE COURT: Sustained.

MS. MORITZ: Argumentative.

THE COURT: What she said was: Ultimately, ideally, if you're not involving the court, the parents, the biological parents, do it together, which didn't happen.

MR. PORTNOY: There was more to the answer, but I'll ask it again.

THE COURT: Not according to the transcript.

BY MR. PORTNOY:

Q If there's no agreement, voluntary agreement between the natural father, Wade in this case, and the stepfather, Drew, other than a court, before it gets to court, who do you believe

has the right to make that decision?
A Drew Brady, who is the stepfather of London and Ellis, has absolutely zero rights to make a decision if -- about custody. He is not -- he's not their father.
I don't understand what you're getting at, Mr. Portnoy. Are you saying that Drew Brady, who's a stepfather, has rights to decide what custody should be?
Q No, that's not my question. We'll move on.
Let's get back to your commentary.
Have you seen it recently, the commentary you posted along with the reposting?
A Not recently.
Q Okay. And where did you put the commentary?
A On -- above the link that I shared on my Facebook page.
Q And why did you add a commentary?
A Because when you share a link, you usually -- I personally explain why I shared it.
Q Because -- I'm sorry?
A I often explain why I'm sharing something.
Q Well, there's something about reposting something and then commenting on it, right?
A Yeah, like if I shared a news article, I would say, oh, I found this news article interesting. There was a fire in Creston and I live there so I'm worried about it. So that would be my commentary.

Q Yeah, but this was more than there was a fire in some town.
A Just a metaphor I'm using, but yes.
Q Your commentary was your personal opinions and views on what was being said and what you were reposting, correct?
A I would say it was -- involved my experience, yeah.
Q Okay. Do you remember what you originally posted in your commentary, that came from you, on May 9th?
A The only time I had commentary, do you mean?
Q I'm sorry?
A What do you mean by "originally"?
Q The commentary that you added at the time you reposted, do you remember what you said?
A Not fully.
Q Okay. Well, I put before you what you did. So can you take a look at it and see if it helps refresh your memory of what you originally posted when you reposted 78?
A Sure. (Perusing document.)
Sorry, it's pretty small. I'm just having trouble reading it.
Q No, no, take your time. I know.
A Okay.
Q What was the purpose?
MS. MORITZ: Objection. Improper refresh recollection.

THE COURT: Overruled. He's switching gears slightly. So --

MR. PORTNOY: Yeah, I'm going to get back to it.

BY MR. PORTNOY:

Q What was the purpose of reposting it -- of posting the commentary? Sorry.

A To let people know why I was sharing that post to begin with. And to let people know in our community what was going on, because there were a lot of questions about what was happening in our life with the girls and why they went to Florida.

Q Does it refresh your memory of what you actually wrote?

A It does.

Q Would you like to -- let's go through it.

It starts: I have been really hesitant to speak about this. This is damn hard to say.

Is that accurate?

A It was very hard to say, yeah.

Q Yes?

A Yes.

Q "Hey, this is what we are going through because it's truly only seen on TV around our small parts of the world."

Did you --

A I said that.

Q Okay. "We are not victims. We don't want to be viewed

that way at all, so please don't put that on us."
A I just personally don't like to be viewed as a victim, so that's accurate, yeah.
Q You wrote that?
A I did.
Q Okay. What did you mean by "don't put that on us"? Who were you talking about?
A Us? Like me and Wade and our kids.
Q Who was -- sorry.
Who was putting something on you?
A So, if you were to come along and you read it and you're like, ah, poor Paula, don't view us as the victim.
Q "We want to educate. It's very unjust what is going on for many families. I have been sitting with it for months. I had to question myself as to why I would speak up and to make sure it wasn't from a place of fueling my own ego."
You wrote that?
A I did.
Q Okay. "There have been many past and more concerning recent events that have led me to share this."
You wrote that?
A I did.
Q Other than what you testified to that you said your children said, what were the and many past and more concerning recent events that led you to share this?

A A lot to do with what our children had been through.
Q Yeah, other than that.
A Well, I mean, that goes back many years, so...
Q Well, you wrote it. I'm asking what were you referring to.
A Yeah, that's what I mean.
Q Just the kids?
A Yeah. And by this point I had talked to Byron and Stefanie, so that was concerning to me. And Wade had been contacted by a few other fathers, so that was concerning.
Q "This has directly affected my life and the lives of people I love for years since about 2016."
Why did you pick that date?
A That's actually not all that accurate. I would say it's more like 2017.
Q Amanda and Wade moved to Florida when?
A 2021.
Q What happened in 2016 and 2017?
A Well, in 2016 I got a call from my mother-in-law saying that Amanda told her that I was trying to poison her. So, in my head I was thinking this was going back all the way to 2016.
Q Do you think Liana Shanti was involved in communicating to your mother?
A That's not what I said.
Q To someone else, that your mother was trying to poison you

in 2016?

THE COURT: That's not what she said.

MR. PORTNOY: I'm trying to understand, Your Honor, I'm sorry.

THE COURT: She did not say that her mother was trying to poison her.

MR. PORTNOY: No. Somebody told her mother. Sorry.

THE WITNESS: In law.

MR. PORTNOY: In law. I didn't hear that. I'm sorry. Let me rephrase the question.

BY MR. PORTNOY:

Q Are you saying that in 2016 you had some belief, which you tied into this commentary, that my client contacted somebody and had a discussion about poisoning you?

A I didn't say "somebody." I said Amanda.

Q That Amanda was going to poison you?

A That somebody told Amanda I was poisoning Amanda.

Q And do you think in 2016 that was my client?

A At the time I did, yeah.

Q You didn't know anything about my client back then, did you, other than what you --

A I didn't -- sorry.

Q Go ahead. I'm sorry.

A When it happened in 2016, no, I wasn't sure that it was your client. But on this day, I had attributed it to her, for

the reason that, in 2021 after Amanda left, I had another friend come to me and share a screenshot with me that she had in a conversation with Amanda Brady where Amanda Brady says, my shaman and teacher has told me and saw it plain as day that you, meaning Paula, is trying to kill you, which was one of my friends. Trying to kill you and your kids.

Q Where are those screenshots?

A I submitted them in discovery.

Q I'm sorry?

A I submitted those into discovery.

Q Well, you weren't shown those during the part of your case from your counsel, were you? They're not exhibits?

A I showed them to them. I submitted them.

MS. MORITZ: Objection. Best evidence.

THE COURT: Overruled.

Let's ask another question.

MR. PORTNOY: Okay. I'm -- I'm moving on.

BY MR. PORTNOY:

Q "I have been targeted by this woman and one of her students as a demonic Luciferian spell-casting evil witch."

Where were you targeted by -- "this woman" is my client, right?

A That's correct.

Q You weren't trying to talk about someone that couldn't be identified, right?

A No.
Q Because it came as commentary to the post?
A Right.
Q Okay. How did she target you --
A Via --
Q -- at the time you made this commentary?
A Via my stepchildren would come and tell me these things.
Q Were you targeted any other way?
A Not that I can recall.
Q And one of her students, Amanda?
A Amanda.
Q How come you haven't brought an action against Amanda for what you claim she did to interfere with Wade's right to keep his kids and making all these threats against you and statements about you?
A We did approach pursuing that in Canada. And under the advisement of the Senior Crown Prosecutor, it never went anywhere.
Q I'm sorry. I'm having trouble. It may be me, but can you repeat that, please?
THE COURT: She said: We did approach pursuing that in Canada, and under the advisement of the Senior Crown Prosecutor, it never went anywhere.
BY MR. PORTNOY:
Q But you had every right to file a lawsuit against Amanda

for what she was doing, right?

MS. MORITZ: Objection. Calls for legal conclusion.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Do you know what a lawsuit is?

A Yes.

THE COURT: Let's move on from this topic, Mr. Portnoy. Part of why is because I don't know what the law in Canada is.

MR. PORTNOY: Yeah, I understand that.

BY MR. PORTNOY:

Q Amanda was in Florida by then, right, when you -- when you posted the commentary?

A Yeah, that's why I posted it.

Q Yeah. Okay. "I have been accused of trying to kill my friends and harm their children."

Where are those accusations in writing?

A That's the one I just told you about that I shared with my counsel.

Q Which we haven't seen in this case so far, right?

MS. MORITZ: Objection. Argumentative.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Who threatened to kill your friends? You mentioned about you being poisoned. Who threatened to kill your friends?

A Nobody threatened to kill my friends. It says that someone said I was going to kill my friends. Amanda Brady was told by her shaman that I was going to -- I was trying to kill my friend and her family.
Q Amanda Brady?
A Was told by her shaman and teacher that I was trying to kill my friend and her family. That's the same that I was just talking about.
Q "I am not here to defend myself. I don't need to."
You wrote that, correct?
A Yeah.
Q "Me being targeted is peanuts compared to how far this has gone."
Let's start with "me being targeted." Targeted in what way and by who?
A By Liana --
Q Kids again?
A Yeah, kids again.
Q In May, how far had it gone?
A How far had what gone?
Q You wrote it. I'm just asking. "It's peanuts compared to how far this has gone."
A Really far. Our kids were gone at this point. Really far. Our kids were gone at this point. I had conversations with friends who told me they were being told I was trying to

kill them. I think that's pretty tar.
Q Did they say that Liana Shanti was the one?
A They showed me -- they gave me screenshots where there's a conversation with them and Amanda where Amanda is saying it's her shaman and her teacher. At the time Amanda was taking classes with Liana Shanti. Sounds like it's Liana Shanti.
Q Did those screenshots, were you told were written by my client?
A I just stated they were written by Amanda Brady.
Q "I am sharing to educate anyone who is involved with" -- and you mention my client, Liana Shanti "or following her or is considering getting involved in any way. Ultimately it is your choice."
What -- what were you educating them about?
A About the potential of what could happen if you got involved.
Q Potential of what?
A Losing your kids, being targeted, and getting -- your friends getting told that people are trying to kill them. I think it's pretty clear what happens --
Q What -- what's pretty clear?
A It's pretty clear what happens when you have something like this occur in your life. It's very difficult for you.
Q You were not the natural mother to the kids, were you?
A No.

Q So why did you get involved?
A Because I love them and I care about them and I helped raise them.
Q And what about Drew, do you think he loved them and cared about them and is helping to raise them?
A Absolutely. He was really good to them.
Q So he had a right to get involved in where his kids were and who they lived with just like you got yourself involved, correct?
THE COURT: This is argumentative. Ask another question, Mr. Portnoy.
BY MR. PORTNOY:
Q The last paragraph: I am not one to speak about another this way, but this person is dangerous.
"This person" is my client?
A Yes.
Q You were telling the world that she's dangerous?
A She was dangerous when it came to what occurred in my family with the kids. She would --
Q Go ahead.
A The stories that London and Ellis would tell us were dangerous. They would tell us that they were supposed to get me out of the family at all costs. That sounds dangerous to me.
They would tell us that they were asked to remove

friends from their life because they were dark. That sounds dangerous to me.
Q You have no proof of that other than what you say your kids told you, correct?
A Yeah.
Q Okay. Let's move on.
You deleted it when, couple of weeks later?
A Approximately a couple weeks later.
Q Why, after you posted it -- or commented it?
A Because I didn't want to harm my kids. I was worried that London and Ellis would see it and that it would upset them.
Q Well, the damage was already done to my client, wasn't it?
A I wasn't worry --
MS. MORITZ: Objection. Argumentative.
THE COURT: Sustained.
BY MR. PORTNOY:
Q Two weeks earlier you had published it to the world, correct?
MS. MORITZ: Asked and answered.
THE COURT: Sustained.
BY MR. PORTNOY:
Q And you removed it. Did you think about you were damaging your kid when you posted it, when you commented?
MS. MORITZ: Objection. Argumentative.
THE COURT: Sustained.

MR. PORTNOY: Can we have a sidebar, Your Honor?

THE COURT: No.

BY MR. PORTNOY:

Q Let's move on.

All the exhibits that you put in yesterday about alleged defamatory statements about you, I believe you testified they started in November 2022, correct?

A Sorry, all the exhibits?

Q Yeah, all the ones that were introduced by your counsel yesterday, you went through them one by one, and I believe you said multiple times that they started in November of 2022, where they were directly about you, correct?

MS. MORITZ: Objection. Compound.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Did you testify yesterday that the exhibits that you and your counsel put into evidence, in which you say these were all false statements about you, began in November of 2022?

MS. MORITZ: Objection. The exhibits speak for themselves.

THE COURT: I'm a little confused. So which exhibits are you talking about?

BY MR. PORTNOY:

Q All of the exhibits, every one that you say was defamatory -- and I can pull them all out. I'm just asking if

they started in November of 2022?
A As far as I can remember.
Q Okay.
A All is a lot, so.
Q Do you believe my client's a child trafficker?
A Honestly, I -- I -- I don't know how to answer that because I'm not sure I know the exact definition of that. But let's say she is involved with influencing these women to take their children across --
Q You remember I took your deposition?
THE COURT: Wait. Let her answer the question.
MR. PORTNOY: Oh, I'm sorry.
THE WITNESS: Let's say she is involved in influencing women to take their children across --
BY MR. PORTNOY:
Q I asked a specific question dealing with the term "child trafficker." Do you believe my --
A I'm trying to answer.
Q Well, please, it's a yes or no. Do you believe my client, using that term, child trafficker.
MS. MORITZ: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. PORTNOY:
Q You remember I took your deposition under oath on November 19, 2024?

A Yes.
Q Do you remember I asked you that exact question?
A I do. I remember what I said.
Q Well, I'm going to read it to you.
MR. ADAMS: Page?
MR. PORTNOY: 126.
It's not -- I'm going to move off of that, Your Honor. I have the wrong page in my notes. But I'll get to it.
BY MR. PORTNOY:
Q Do you remember I asked you a question whether my client was a child trafficker?
A I'm sorry. I didn't hear that one.
Q I'm sorry?
A Can you repeat it? I didn't hear you.
Q Do you remember me asking you at your deposition my client whether my client was a child trafficker?
A Yeah, I just told you I remembered.
Q What was your answer?
A I said I didn't think she was.
Q Let's move ahead to the status conference in which you submitted -- you and your husband submitted letters. You remember that proceeding before Judge Mollway?
A Oh, yeah, I remember the letters, submitting them.
Q I want to go through how you first were involved in that.
You said you got a message?

A In context of what? Sorry.
Q Sorry, go ahead.
A In context to what, I got a message? I don't know what you're asking.
Q How did you first learn someone was asking whether you were willing to write a letter?
A I got an e-mail.
Q And the letter came from who?
A The e-mail came from --
Q I'm sorry, the e-mail.
A -- something called Liana Shanti Cult Recovery.
Q Did you know who that was?
A No.
Q Had you ever heard of them before?
A Well, there's a similar name on Instagram, so I kind of assumed it was the same group.
Q And do you remember the message --
A Something --
Q -- what was in the e-mail?
A Something about joining a Zoom call about -- something about joining a Zoom call, I believe.
Q And when you got it, did you have any idea who the individuals were?
A No.
Q Did you have any idea what the subject was?

A I think they told us they were going to talk about a hearing or something like that, that she would be involved in, yeah.

Q Okay. And did you respond?

A Yeah, I believe we joined the Zoom --

Q I'm not up to that.

Did you actually respond to the e-mail?

A Probably to say, yeah, we would attend the Zoom call.

Q Did you have any idea, again, what the Zoom call was going to be about?

A I just told you that. Same answer.

Q It was about my client?

A Correct.

Q Okay. And then how did the Zoom call come about? How did you know when and what time?

A Through the e-mail that I just told you about.

Q Oh, it was in the very first e-mail?

A Sorry, what?

Q You told me you got an e-mail asking you if you would be involved in a Zoom call. You said you responded yes. I'm asking whether there was a subsequent e-mail that told you the details, when, what time?

A Yeah, I assumed there was probably a link sent to join.

Q Did you ever make any effort to find out who the humans were that were e-mailing you?

A No.
Q Could have been anybody?
A Could have been.
Q Could have been my client?
A Could have been.
Q But you were still willing to participate in the Zoom call?
A I was willing to participate in the Zoom call to get more information about what was going on in our life, absolutely.
Q But not knowing who was putting the call together?
A Well, at this point I understood why people might want to remain unanimous when it comes to the subject of your client. Because when you're not anonymous she goes online and starts slandering and defaming you. So I respected their privacy because I assumed they were fearful of what was going on to me already.
Q But that wouldn't affect you making an inquiry as to who they were?
A As I said, I respected their privacy.
Q So you're saying that you were willing to get on a Zoom call to talk about my client without having any idea who was scheduling the call, whether they had similar interests to you, who they were, none of that, is that it?
A I knew they had a similar interest to me. The subject of Liana Shanti and what we've been experiencing, that is a

similar interest.

Q But you had no idea who was behind it?

A Again, no.

Q Do you know if Byron and Stefanie got a similar e-mail?

A I've seen evidence in discovery so, yeah, they did.

Q Did you know at the time?

A Don't recall knowing that at the time.

Q Well, you had already had this dinner with them and were cooperating with them in their problems that related to Amanda.

You get an e-mail saying would you participate in a Zoom call about Liana Shanti, and you never contacted Stefanie or Byron to see if they got a similar e-mail? Is that what your testimony is?

A Well, first of all, I wasn't cooperating with them over Amanda. Amanda Brady is Wade's ex-wife. Byron's ex-wife is Haley. So, that's not correct.

And I don't recall talking to them about it, but there's potential that I knew they were going to be coming too.

Q You did know?

A I didn't say I did know, but I had a feeling they would be coming.

Q Well, why wouldn't you have contacted them to say, Hey, I got this e-mail about a group that wants us to participate in a Zoom call to talk about Liana Shanti? Why wouldn't you make that call since -- go ahead.

A I possibly did, but I don't have a clear memory of doing that or having a conversation with them.
Q Were they on the call?
A I assume so.
Q Why, if everyone was anonymous?
A Because I heard a voice say, Hello, we're here, and it sounded like Stefanie. So I'm speculating it was her.
Q Okay. You never learned who else was on the call, did you?
A No, we didn't.
Q Never made any inquiry?
A Like I said, I respected their privacy so, no, I didn't.
Q Well, what was their privacy when you and all these people on the call were being asked to submit public letters to the court? What -- what privacy were you respecting?
MS. MORITZ: Objection. Argumentative.
THE COURT: Sustained.
This is a good time for our break that I mentioned earlier, so we're going to take a ten-minute break, ladies and gentlemen. We will have you back in the courtroom at about 1:35, and then we'll go until 2:15. All right? Thank you.
(At 1:24 p.m., the jury was excused, and the following proceedings were held:)
THE COURT: Thank you. You may be seated.
Mr. Portnoy, how much time do you have left?

MR. PORTNOY: Maybe ten minutes or less.

THE COURT: All right. I'm holding you to ten minutes.

MR. ADAMS: We're getting really concerned, Your Honor, because I have witnesses that I'm now going to have to change. I thought we were going to get all three of my clients today, and this is hijacking our time.

THE COURT: Let's not use the word "hijacking."

MR. ADAMS: Fair enough, Your Honor.

THE COURT: Mr. Portnoy, I am going to start curbing your cross-examination. I am going to give you cross-examination limits. You have gone way over what anybody would reasonably expect. You are asking questions repeatedly in different forms. You are drawing multitudes of objections that I am sustaining. I'm going to start limiting your cross-examination, starting with ten minutes with this witness. And then we'll see how long the next witness testifies and I will decide how long cross-examination is going to be based on that.

MR. PORTNOY: And the same with direct as well, or just cross?

THE COURT: Just cross.

MR. PORTNOY: Okay.

THE COURT: We're in a recess for ten minutes.

(A recess was taken from 1:24 p.m. to 1:37 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: You may continue, Mr. Portnoy.

BY MR. PORTNOY:

Q Did you ever learn the identity of any of the other people involved in this letter-writing campaign, other than from actually seeing the letters once they were submitted to the court?

A I never knew the identity of the other people, no.

Q Okay. Were there other phone calls after the Zoom call?

A Like other Zoom calls?

Q You talked about a Zoom call.

A Yeah.

Q Were there other calls after that Zoom call?

A No.

Q Were there future communications from this anonymous group to you?

A I think there was an e-mail that updated us about the probation hearing.

Q Just one?

A That I can recall.

Q There may have been more?

A Not sure. I only recall one.

Q And did you participate in any way in the status conference, by viewing it in some way?

A No.
Q So your only thing -- the only way you learned what happened was from some subsequent e-mail from this group?
A Yeah. I believe so. Yeah.
Q Were there subsequent e-mails -- let me see if I can help you remember -- in which they talked about future strategy and how to deal with their continuing concerns about my client?
A I don't recall that.
Q We'll deal with that with another witness.
Why did you -- in that Zoom call, was there a leader, somebody that was the narrator, originator, chairperson?
A Yeah, I think there was -- I wouldn't say one, maybe there was a couple people that were kind of leading it, I would say, that I can recall.
Q And nobody identified themselves?
A Again, no.
Q Even the person who had led the meeting, didn't say who he or she was, right?
A They did not.
Q So you were participating in a call -- and did you say anything during the call, by the way?
A I just said, Hello, I'm here.
Q Yeah. Did the people not engage in conversation about their experiences and why they would be willing to get involved in this writing letters to the court?

A Yeah, I think there was some people sharing their experiences, as anonymous people.
Q Without identifying themselves in any way?
A That's right.
Q And did you share?
A I think Wade and I shared a little bit about our experience, yes.
Q And how did you do that without identifying yourself?
A We just didn't say our names, we just told our story.
Q Did you say you were in Canada?
A Not that I recall. I don't know.
Q Did you say it concerned somebody who moved from Canada to Florida, taking the kids?
A I don't know if it went like that, but it was a concern that his ex-wife had left with the kids.
Q And other people shared, but nobody said who they were?
A Again, nobody said who they were.
Q And to this day you don't know, other than you think you recognize Stefanie's voice?
A Yeah.
Q Have you had further communication with this group in the last two, two-and-a-half years?
A I just shared with you the communication that I had.
Q One subsequent e-mail that you remember?
A That I remember.

Q Was there a reason given in that call by some anonymous person as to why they were looking for these letters?
A Yeah, I shared that earlier. They -- they thought that if we provided these letters in her probation hearing that it could help some of us get their kids back and --
Q Some --
A And --
Q Go ahead. I'm sorry.
A And let the court know that there was stuff going on that could be a problem with the probation, so that maybe we could somehow -- because like I said before, this was Wade and -- Wade's last straw, how can I -- how can I maybe do something so that my kids could come home to Canada?
Q Was there an exploratory discussion, since you knew nothing about what was going on, why there would be a hearing? Did somebody explain what these letters were going to be used for?
A I believe I answered that already. Do you want me to try to answer it another way?
Q Did they explain to you what the probation hearing, as you used the word, was about? You knew nothing about it until you got on the call.
MS. MORITZ: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: Yeah. They explained that it was for a

felony fraud conviction.

BY MR. PORTNOY:

Q They what?

A They explained it was for a felony fraud conviction.

Q Did they say it was a bankruptcy?

A Yes.

Q Did they explain how a bankruptcy proceeding, regardless of how it came about, had anything to do with the issues that you were concerned about, dealing with taking kids from one country to another? Did they explain their relationship there?

A If you violate terms of probation, for example, I think one was stated where you are a menace to society, which this could have been one of those terms, then maybe we could get our kids back.

Q Who used the term "menace to society"?

A I don't know who used it because I don't know who said it.

Q So just so we understand, because none of us were there, somebody said, there is this proceeding in a bankruptcy and we would like you to submit letters about your custody issues with the subject of that proceeding; is that essentially what the leader said?

A Yeah, they asked us to submit letters. And I wouldn't say it was a custody issue, the issue was that Amanda crossed the border without our permission. So the issue was how terrified we were and that we had no way at that point of getting our

kids back --
Q Yeah.
A -- because we tried all other avenues.
THE COURT: You have three minutes, Mr. Portnoy.
BY MR. PORTNOY:
Q Your counsel pointed to the record a number of alleged visits with psychologists and others. 1141, 1127, 1124, 1152. But we didn't see records of those visits, we just saw a bill. Where are the notes of what occurred during those visits and what the -- was discussed during those visits? Where are those notes, from the provider, from you, from anybody?
A Those are private and confidential notes. I didn't realize I had to bring notes without a receipt. I brought receipts. I went to those sessions.
Q But how do we know what you talked about?
A Because I'm telling you what I talked about.
Q Well, isn't the best record the notes of the therapist?
A So what I should have done was bring the notes of the therapist and have everything redacted because it's private and confidential?
Q Finally, did you ever make any effort to find out who was making anonymous posts about my client?
A Like I said, no, I respected their privacy.
Q And you've come here today to testify under oath that you didn't do it?

A I didn't do it.
Q How would anybody be able to figure out who did it, if it was posted anonymously?
A Well, if you immediately would have subpoenaed these Meta companies, there's a good chance that you could have found it out --
Q Did you --
A -- had you done it four years earlier.
Q How do you know that? Are you an expert on how you find who posted anonymously?
A I'm not an expert, but I do know that you can subpoena them.

MR. PORTNOY: I have no further questions, Your Honor.

THE COURT: Thank you.

Do you want when to read the limiting instruction now?

MS. MORITZ: Yes, please. Thank you.

THE COURT: Ladies and gentlemen, you have heard -- this is a jury instruction obviously.

You have heard evidence that Paula Haygarth reposted on her personal Facebook page a subReddit article entitled The Shanti Summary with commentary about plaintiff Liane Wilson. The Court ruled prior to trial that this Facebook post is not defamatory for reasons that you should not speculate about.

Nevertheless, it is up to you to decide whether the reposting and/or commentary offer circumstantial proof of

whether a conspiracy existed as alleged by the plaintiff/counter-defendants in Count 4.

It is also up to you to decide whether the reposting and/or commentary offer circumstantial proof of the identity of the authors of the anonymous Facebook postings.

Redirect?

REDIRECT EXAMINATION

BY MS. MORITZ:

Q Hi, Paula.

A Hello.

Q Paula, you were discussing with counsel an affidavit in Byron's custody proceeding. Do you remember the date approximately when that happened?

A Yeah. Around March 20th, I think we had the supper, and then shortly after that, within days, we -- Wade would have submitted it.

Q And I just want to be perfectly clear, who submitted the affidavit, you or Wade?

A Wade.

Q Did you submit an affidavit in that proceeding?

A I did not.

Q Was that a private family court proceeding in Canada?

A Yes.

Q Did you at a later time submit a statement in Ms. Wilson's probation proceeding?

A Yeah, I did an victim impact statement, yes.
Q And that was approximately in April 2023; is that correct?
A That's correct.
Q And was that letter based on your personal knowledge?
A My personal knowledge and experience, yes.
Q And at the time you submitted that letter in the probation proceeding, you had learned a lot more about Ms. Wilson, correct?
A Yes.
Q Counsel reviewed -- well, he referred to three articles by Jennings Brown, but I think he only asked you about two. But I want to ask you a few questions about those articles --
A Okay.
Q -- and confirm some information.
A Sure.
MS. MORITZ: Turn -- excuse me. Can we pull up, please, Exhibit 341?
THE COURT: You may.
MS. MORITZ: For the witness and publish to the jury, please.
THE COURT: One second. Let me make sure that that's been admitted.
MS. MORITZ: I'm pretty sure it has been.
THE COURT: It has been. It can be shown to the jury.
MR. ADAMS: 341?

THE COURT: Yes.

MR. ADAMS: Okay. It's up for the witness.

MS. MORITZ: Okay. Great.

Let's please turn to Page 4 of 9.

And I heard there was a highlighter up here, but I don't see it. That's okay.

BY MS. MORITZ:

Q Let's go down a few paragraphs where it says: Mollway responded, quote: As a lawyer you undoubtedly have heard that sometimes a child may be coached and then may say something, so I don't know the background, but you might want to be careful before you go around accusing people of things when I don't know what kind of purported evidence you have. But that is a very serious allegation.

Were you the source for that information for the reporter?

A No. Turning to the next page, 5 of 9. Let's go -- kind of scroll to the top. You can just make it full screen.

Thank you very much.

BY MS. MORITZ:

Q You can see there's a screenshot there and then commentary below, quote: What are you talking about Mollway asked Shanti? You don't like somebody's photo so you decide rage and evil in their eyes. This darkness goes way back in the lineage. You're talking about some kind of genetic passing down of

things. You told me you're a lawyer. Are you really qualified to be making this kind of statement?

Paula were you the source for that information in the article?

A No.

MS. MORITZ: Let's turn to Exhibit 342.

THE COURT: You may. It may be shown to the jury. It was previously admitted.

BY MS. MORITZ:

Q Paula, let's turn to -- oh, I'll wait for it to come up. Sorry.

THE COURT: All right. It's on the screen.

BY MS. MORITZ:

Q Okay. Paula turning to Page 2. There's a paragraph --

MR. ADAMS: Which page?

MS. MORITZ: Page 2, sorry. Bates 324.

BY MS. MORITZ:

Q Coming down to the third paragraph, it reads: The Daily Beast story on Shanti was based on court documents, leaked conversations from her private Facebook and Signal groups, and interviews with the six former Shanti followers and 19 people who said they lost loved ones to the Lemurian Mystery School?

Just to be clear, you made it clear to the reporter, Mr. Jennings, that you were not to be -- you were off the record in your discussions with him?

A Yes.
Q And to the best of your knowledge, he did not attribute you as one of these 19 people in this article, correct?
A Correct.
Q Turning to the next page, Page 3, second paragraph, the article -- the paragraph reads: In 2012 she began posting online as Liana Shanti, a women's empowerment health coach. Shanti's appearance was a mystery until 2018 when she started posting selfies. But the photos appear so heavily filtered that she seems almost ageless, leaving some of her detractors to accuse her of being a catfish.
Paula, were you the source for information for Mr. Jennings?
A No.
MS. MORITZ: Thank you.
I would like to turn to Plaintiffs' Exhibit 22, please.
THE COURT: You may.
22 has not yet been admitted.
MS. MORITZ: If it can be shown just for the witness, please.
BY MS. MORITZ:
Q Paula, have you seen this article before?
A Yeah, I seen it shortly after it was published, and I had to read it again as per Mr. Portnoy's request at the lunch

break.

Q Okay. So you've had a chance to review it carefully?

A Yeah. Okay.

Q And is this a true and accurate copy of the article that you read back in March, thereabouts, of 2023 when it was originally published?

A Yes.

MS. MORITZ: I would move that Exhibit 22 be moved into evidence, please.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 22 is admitted. It may be shown to the jury.

(Plaintiffs' Exhibit 22 was received in evidence.)

MS. MORITZ: Let's turn to -- since there's no page numbers, I need to count -- one, two, three -- five, six, seven -- let's go to the eighth PDF of that, please.

There you go, that's it. Yeah. Thank you.

BY MS. MORITZ:

Q Here's a screenshot of a message between Liana Shanti and it looks like a Jennifer Veras. Were you the source of this information, Paula, for the reporter?

A No.

Q Question: You said I have several narcs around me, at least four. Can you tell me -- and then there's a response.

Your mom and dad, Jason, all three for sure.

A Yeah, it says right below, screenshot of message exchange between Liana and Jennifer Veras.

MS. MORITZ: All right. And let's please forward to the.

Sorry. Yes, that's the page we're looking for. Thank you.

THE COURT: If we can state for the record what page number this is, please?

MS. MORITZ: 16 of 21. Thank you.

BY MS. MORITZ:

Q And here is a screenshot of a text exchange where Liana Shanti: Question: Was I sexually abused and if so at what age and by who?

Answer: You have experienced sexual abuse, yes. You'd uncle and a brother, both.

And this appears to be a screenshot of a Signal conversation between Liana and a follower.

Paula, were you the source of this information for the article?

A No.

Q Do you know who was?

A No, I don't.

MS. MORITZ: No further questions, Your Honor.

THE COURT: All right. You may step down

Ms. Haygarth. Thank you.

(Witness excused)

THE COURT: Defense may call its next witness.

MR. ADAMS: We need a moment to get her. She's putting --

THE COURT: All right.

MR. ADAMS: 30 seconds, Your Honor.

MS. MORITZ: 30 seconds.

MR. ADAMS: No need for a break, we'll grab her. She's ready.

THE COURT: All right. Thank you.

[You can stretch if you want. You don't have to, but if you want, you can.

(Pause in the proceedings.)

THE COURT: Ms. Moritz, are you conducting this examination?

MS. MORITZ: Yes, I am.

THE COURT: You may call your next witness.

MS. MORITZ: The defense calls Stefanie Horvath.

THE COURT: Thank you, Ms. Horvath. You may approach.

STEFANIE HORVATH, DEFENDANTS' WITNESS, SWORN

THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: Stefanie Horvath, H-O-R-V-A-T-H.

DIRECT EXAMINATION

BY MS. MORITZ:

Q Hi, Stefanie.

Are you settled there?

A Yeah.

Q Okay. Let's start by talking about your background. Okay? In what year were you born?

A 1986.

Q I feel dated.

And where were you born?

A Aubergines, Saskatchewan.

Q Did you grow up in Regina?

A No, I grew up of a small town.

Q What's the name of the small town?

A Odessa.

Q Odessa. Is that -- can you briefly describe geographically where that is in Saskatchewan compared to Regina?

A I would say it's 45 minutes east of Regina. Usually just drive time is usually what I estimate it by.

Q Okay. And how far is that from where you live now?

A It's probably about two hours away from where I live now.

Q What was it like growing up in Odessa? Tell us a little bit about your upbringing there.

A I grew up on a farm, so my parents' farm. Did a lot of

family things growing up throughout all of our childhood, we played a lot of sports. So I think I was on hockey skates when I was three years old for the first time. I have two older brothers, and my dad always coached my brothers in hockey.

I figure skated, I danced, I played broomball, badminton, volleyball. Basically any sporting activity that I could participate in, I did. So just lots of team sports. And then family farm stuff, so sitting beside my dad in the combine. Yeah, family events, different things like that.

Q Okay. Great. I just want to make sure you're speaking slowly enough for the court reporter. I think so.

A Sorry. I went through speech therapy when I was little because I was talking too fast.

Q And did you attend secondary school in Odessa High School?

A No. Our town is so small that our high school actually closed when I was going into grade 11. So then I completed my high school in Vibank, which is a town 15 minutes beside where I grew up.

Q Okay. And after you graduated, what did you do then?

A After graduation, I wanted to take a year off. However, I had a scholarship, so my parents really encouraged me to use the scholarship while I had it. So I did a degree program at the University of Regina, and I have a double major in kinesiology and a minor in psychology.

Q You mentioned a scholarship; what was it for?

A Well, I graduated at the top of my class, which is small town. I think there was, like, 15 of us. So there was a Governor General's Award scholarship that I had received, as well as I guess an award. As soon as you enter into the university, if you maintain a certain average you automatically get a certain scholarship value.
Q Oh, okay. And were you able to maintain that scholarship throughout the university?
A Just the first year. But I was able to maintain a high level in the university.
Q Okay. And I think you mentioned your degree, but could you repeat it for me?
A I have a degree in kinesiology, with a double major and then a minor in psychology.
Q Okay, good. Got it.
And then we just need to be careful not to talk over each other for the court reporter.
A Sorry.
Q No worries. Thank you. It's easy to forget. I'll try to do my best as well.
So in what year did you graduate from the University of Regina?
A I graduated high school in 2004, and then I believe it was 2009 when I graduated from the U of R.
Q And did you do any additional schooling or education after

that?
A I worked for a little while with my degree. So, I worked as the youth development coordinator for Special Olympics Saskatchewan. So I traveled around the province developing programs for young children with disabilities.
Q Okay. How long did you do that?
A I believe a year and a half, almost two years.
And then at that point I decided I wanted to do more involvement with young individuals with disabilities. So then I applied for school in Edmonton at the U of A to get my master's in occupational therapy.
Q I'm not a -- U of A is?
A University of Alberta, which is in Edmonton, Alberta, Canada.
Q Okay. And how long did you attend the University of Alberta?
A It's a two-year program for your master's.
Q And so you graduated with your master's in what year?
A I think 2010, I believe.
Q Okay. Do you hold any additional professional --
A Sorry, it might have been 2012.
Q Okay.
A Yeah.
Q I think you've said you took a year off between there?
A Yeah. I think it's 2012.

Q Do you hold any additional professional certifications or degrees?
A In order to practice as an occupational therapist I had to pass my Canadian national exam. So I have that certification that I've passed that.
And then part of the process of being able to work, we need to be governed under the Saskatchewan Occupational Therapy Association, to ensure that, you know, we're having good practice in our work. So it's something that we need to maintain every year.
Q Okay. So you have to get recertified every year staying up to standards?
A I believe I would only need to be recertified if I did not practice for more than I think three years, then I would have to rewrite my national exam, just to ensure that the knowledge is still maintained if you took a hiatus from work.
Q I see. So they want to make sure you're staying up-to-date on the --
A Yes, yeah.
And then with the Saskatchewan Society, they have goals that you have to maintain every year. And then you need to ensure that you have completed those goals; otherwise, the organization could audit you to make sure that you are providing good practice in your work.
Q Okay. When you said "goals," is that like a continuing

education or --
A You have the option. There's a whole, I guess, binder of different goals that you can work towards. I always usually do a continuing education aspect of different, I guess, online programs that you could take that are based on occupational therapy.
Q Okay. And so leading to my next question, it sounds like you are an occupational therapist?
A I am, yes.
Q And how long have you been doing that now?
A It would be since I've graduated. So I was fortunate enough to do -- in our degree program we need to do field work placements. So my last field work placement, the University of Alberta has a partnership with the university in Surakarta, Indonesia, because they were partnering with Surakarta, Indonesia to help train physiotherapists and occupational therapists. And because they had this partnership, we were able to go for my final field work placement to work in Surakarta in Jakarta for a period of time. And then I decided to travel Southeast Asia for a month-and-a-half after that. And while I was away I interviewed and returned back to Saskatchewan and began working.
Q Okay. And are you -- where did you start work?
A My first position as an occupational therapist, I was working in a school division, the Horizon School Division. I

did that for one year where I covered a maternity leave.

From that maternity leave, once I was done for one year, I moved to Wascana Rehab, in the long-term care facilities, where there's individuals with brain injuries, different disabilities. So we worked there. A lot of the focus was on wheelchair use.

And then from there I continued in the health region for a period of time.

I did take a year off and traveled Australia for a year.

Came home once to help my parents' farm, and then returned to Australia.

And then when I returned I came back to work in the health region, but in a rural capacity. So I worked in a small town hospital.

Q Okay. And which small town did you work in?

A I worked in Indian Head, Saskatchewan was where my office was. And that's where I grew up, because -- or near where I grew up, because when I returned from Australia I stayed with my mom and dad and worked there.

Q And so how did you land in Weyburn -- where are you -- okay. Now I'm getting my geography mixed up. I'm sorry.

Where do you reside now?

A In Raymore, Saskatchewan.

Q Raymore.

A Yes.

Q And how did you end up in Raymore?

A Because my husband grew up around the area in Raymore. So when I returned from Australia -- we have always kind of known each other for several years, and then when I returned, he messaged me on Facebook and said, Hey, I hear you're home. And then we kind of reconnected at that point.

I worked for about six months in that position in Indian Head. And then Byron and I moved in together in Raymore.

So at that time I took a position back in Regina, Saskatchewan at Wascana Rehab, where I worked for stroke rehab. And when I was working there, it was about an hour-and-a-half to drive to work each morning, and an hour-and-a-half home, with living in Raymore, which became a lot, especially in Saskatchewan winters, because it was dark when I drove to work, and I would work all day and then maybe have an hour of daylight when I got home after driving home the hour-and-a-half.

Q That's a lot.

A So it was actually -- I lucked out because there is a community beside Raymore, which is another hour in the opposite direction. We had a friend who worked as a nurse there. So I messaged her to see about possible employment in that small town hospital. She gave me a contact number. And when I

contacted this individual, who is the rehab therapy manager, she called me and said that the occupational therapist just resigned three hours prior to my phone call.

Q Wow.

A So then I was able to work closer to home.

Q Got it. Okay. Very lucky.

A Very lucky.

Q So when you said Byron messaged you -- mess -- I'm tired -- messaged you --

A Yes.

Q -- was that through social media or was that through just is a text messages or --

A I believe it was on Facebook Messenger.

Q Okay. It sounds like you knew him already?

A Yes.

Q And where did you know him from previously?

A Through a mutual friend in Regina. We were kind of acquaintances for -- I think we maybe met 2009 or 2010.

Q But you didn't maintain any kind of friendship with him or anything like that?

A If we ran into each other, you would say hi and be cordial kind of thing, yeah.

Q So fast forward to the two of you reconnecting. What year was that?

A When I got home from Australia, so that would have been, I

think, in 2018 or 2019.
Q And Byron was already divorced from his prior spouse at the time; is that right?
A Yes, that's correct.
MS. MORITZ: Okay. I'm just watching the time, Your Honor. I know we're --
THE COURT: You've got two minutes.
MS. MORITZ: Okay. Great.
BY MS. MORITZ:
Q Okay. So the two of you moved in together in what year, then?
A I believe in 2018.
Q Okay. And at that time Byron was sharing custody with his ex-wife with their daughter Isla, correct?
A Yes, that's correct.
Q And how old was Isla at that time?
A When I first met Isla, she was about two-and-a-half. Because I remember that Byron and I were able to have her third birthday party in a park in Regina.
Q Have her -- I'm sorry?
A Her third birthday party.
Q And did you have an understanding as to the custody arrangement between Byron and his ex-wife Haley at that time?
A Byron had Isla every second weekend. So I believe in their agreement originally it's every second weekend and every

Wednesday night, which I believe that's what he followed for a period of time. But because of the distance of being between Raymore and Weyburn being about two hours distance, they changed the agreement so instead of every Wednesday night to extend is from Thursday till Sunday, instead of Friday till Sunday, just so there was less driving for Isla.
Q Got it. Got it. And in what town did Haley live?
A In Weyburn.
Q Weyburn.
THE COURT: Last couple questions, Ms. Moritz.
MS. MORITZ: Sure. Of course.
BY MS. MORITZ:
Q Okay. So that change the because of the drive. And did the -- did they have a formal custody agreement or was this sort of an informal agreement that they had?
A When Byron and I were together they -- well, Isla had her last heart surgery on May 25th, 2019. And shortly after that time, Byron and Haley had to do a court proceeding for their divorce. But they settled between a conversation with themselves about the custody agreement for Isla. So that was never brought to court. They just had an agreed upon custody agreement. But I think it was formally written out and signed by the two of them.
Q Okay. So it sounds like what you're telling me -- and don't let me mischaracterize it, but they had an amicable

agreement as to what the custody would be, but it was memorialized in some sort of court proceeding?
A Yes.
Q Okay. Okay. Thank you.
THE COURT: That's a good place for us to stop, I think.
MS. MORITZ: Okay.
THE COURT: Thank you.
Thank you, ladies and gentlemen.
We will see you on Monday at 8:30. And want you to enjoy the weekend. Don't do any research about this case. Don't get on social media about this case, either to look at things or to post things.
Don't -- you know, some you are going to be seeing some family and friends for the first time since you started sitting as a juror, right? They're going to ask you, what's this case is about? I guarantee you. I would bet money on that. Your answer's going to be, The judge told me I can't tell you. All right? Yes.
So thank you very much. I guarantee you that when you come back you will be refreshed because we will have the weekend. So we will see you Monday 8:30 in the jury lounge.
All right. Safe travels to those of you who are flying to neighbor islands. Thank you.
(At 2:17 p.m., the jury was excused, and the following

proceedings were held:)

THE COURT: Thank you, ma'am, you may step down.

We will take a 15-minute recess to get ready for jury instructions. Obviously, the parties don't need to be here, most of the time it's just the lawyers.

MR. ADAMS: That's what I was going to ask. Thank you.

THE COURT: It's pretty boring stuff, so -- for non-lawyers.

So we will see everyone back on the record. Let's give ourselves until about 12:40, just so that we have enough time.

MR. PORTNOY: 2:40?

THE COURT: 2:40, yes. Thank you.

(A recess was taken from 2:17 p.m. to 2:41 p.m.)

THE COURT: All right. So the way we are going to handle this, folks, is you should have received, both via e-mail and via CM/ECF, the version one of the proposed instructions.

We are going it go through each instruction by number, and I'm going to hear from plaintiffs first, and then from the defense, just so that we're not talking over each other.

So some of this is just going to be, no objection, no objection, no objection, no objection. And then some of it is going to require more discussion.

I think I had suggested this earlier, but I want to be clear that these are, you know, not final. I haven't, for sure, made up my decision on some things. I have some big picture questions that we will get to as well with regard to, for example, damages and the false light and invasion of privacy claims and so on and so forth.

So with that, let's start with proposed instruction number one.

Any objection from plaintiffs?

MR. PORTNOY: None.

THE COURT: I'm sorry?

MR. PORTNOY: None.

THE COURT: Defense?

MR. PORTNOY: Oh, I'm sorry. Let me turn the mic back around. I'm sorry. No objection.

MR. ADAMS: Louise Ing will be handling our --

MS. ING: No objection.

THE COURT: Okay. Let me just make sure we've got that.

So no objection from either side on that one.

Instruction number two?

MR. PORTNOY: None.

MS. ING: None, Your Honor.

THE COURT: Three?

MR. PORTNOY: None.

MS. ING: None, Your Honor.

THE COURT: Four?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: Five?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: Six?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: Seven?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: Eight?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: Nine?

MR. PORTNOY: One second, Your Honor, please.

THE COURT: Take your time. I'm not --

MR. PORTNOY: It's a lot of paperwork, we really haven't had a chance to study them in detail. There's only two of us. I'll get to it in second.

THE COURT: Take your time.

MR. PORTNOY: Thank you.

THE COURT: I'm not in any rush.

MR. PORTNOY: Thank you.

(Pause in the proceedings.)

MR. PORTNOY: None.

MS. ING: None, Your Honor.

THE COURT: Ten?

MR. PORTNOY: None.

MR. ADAMS: Might be a typo. I think it should be "to each."

THE COURT: Yes, you're right.

MR. ADAMS: Party separately.

THE COURT: Thank you for catching that.

MR. PORTNOY: Okay.

MS. ING: I had a version that had my notes.

THE COURT: All right. We will make that edit. So the instruction will now read: You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

MR. PORTNOY: Fine.

THE COURT: Any objection to that Ms. Ing, which is proposed instruction number ten?

MS. ING: I am looking for my notes on -- I have none with that amendment.

THE COURT: Okay. 11.

MR. PORTNOY: None.

MS. ING: None.

THE COURT: 12. I don't know that we're going to need this. This was, I think, jointly proposed. But let me hear if the parties think we will need this one.

MR. PORTNOY: I don't think we do.

THE COURT: Okay.

MR. ADAMS: I don't think so either, because we've been admitting the exhibits based on this, and I think that's probably the better evidence than --

THE COURT: Okay.

MR. ADAMS: We haven't used it -- we haven't asked for judicial notice, I don't think.

MR. PORTNOY: Yeah, that's my point.

MR. ADAMS: We've only been using it as a basis to admit exhibits.

THE COURT: All right. So 12 is, for now going to be deleted.

Same thing as 13. I don't think -- I mean, there were stipulations filed. I don't know if we're going to get to exhibits that were agreed upon. Are we expecting that to happen?

MR. PORTNOY: Not likely. But I'm happy to --

MS. ING: Nothing comes to mind.

MR. PORTNOY: I don't have any knowledge of any to date.

THE COURT: Okay. So I'm going to delete this one,

and we can obviously easily reinsert it, if needed.

Instruction number 14, I wasn't sure about the inclusion of punitive damages. As we all know, punitive damages are not a separate claim under Hawaii law. There wasn't a Motion to Dismiss on this, but I don't think the plaintiffs offered a suggestion that they were treating this as a separate claim anyway.

So, Mr. Portnoy, is it okay if I take out Count 5, punitive damages? I mean, punitive --

MR. PORTNOY: It's going to come out?

THE COURT: There's going to be a punitive damages instruction, and there's going to be a punitive damages question on the verdict form.

MR. PORTNOY: Right.

THE COURT: But --

MR. PORTNOY: I'm fine.

THE COURT: Okay. So I'll take that out.

Any other things -- any objections to this otherwise?

MR. ADAMS: Not with the removal of punitive damages, Your Honor.

THE COURT: Okay. And Mr. Portnoy, you're fine?

MR. PORTNOY: Yes.

THE COURT: Okay.

MS. ING: Both parties have asked for punitives anyway, but you're right, it's not a claim.

THE COURT: Next is 15, which relates to plaintiffs' Count 1.

So, Ms. Ing, I'll ask you to pull the microphone away from you when you're reading things to yourself, because it's going to be confusing for our court reporter. Thank you.

MR. PORTNOY: Just checking. Yeah, there's a separate -- well, you've already ruled on some of this. So I have no objection to the instruction in light of your prior rulings.

THE COURT: All right. Defense?

MS. ING: My only question is whether in -- my only question is whether, in number four, damages, should be meaning either general and special damages or defamation per se.

THE COURT: So, that's -- that was one of my bigger picture questions too, is whether or not there needs to be an instruction regarding defamation per se and general damages and what that all means.

So, excuse me -- so what are you proposing with regard to the number four?

I will say that the reason why I edited it is because I thought it was confusing.

MS. ING: I do think we probably need to be clearer, you know, have an instruction on per se, defamation per se. I think we did address it in the damages section, but I think it's more than that.

THE COURT: Okay. It does show up in the damages section. There is a -- if I'm remembering correctly -- a defamation per se discussion in the damages. One second. Let me find --

MR. PORTNOY: I don't think that any of the language starting with "meaning" up to "per se" is necessary in this instruction. I think damages is understood and generic, and then further on you explain the types of damages that are available. But that's my point.

THE COURT: That's not a bad suggestion.

Ms. Ing, instruction number 32.

MR. ADAMS: Yeah.

THE COURT: Is per se -- defamation per se.

Well, actually, the problem is damages might be too broad, actually. If we just say "damages."

MR. ADAMS: Yeah, no, I think it ties back -- the way you have it here ties back to the other instructions, and this is probably right, 15 right now, as is. Given what we have in 32.

MS. ING: Yeah, actually, those were the standards I had been thinking that we need to have in there somewhere.

THE COURT: Is the definition of what general, special -- general damages are and how --

MR. ADAMS: Yeah. 34 -- so it ties to 32 and 34. I mean, you could cite to those if you want it in 15, but --

MR. PORTNOY: Part of the damages are general damages. That, as written, limits it. The special damages are -- I don't even know why defamation per se is in there. That's a legal claim, not a damage.

THE COURT: Actually, I think defamation per se is a -- is treated as a general damage.

MR. ADAMS: Yes, because damages are presumed, you don't have to prove them.

THE COURT: Right.

MR. PORTNOY: Right.

THE COURT: So I think what -- I think that's what's happening with defamation per se, is that if defamation per se is shown, damages are assumed, and you don't need to bring in the sort of testimony --

MR. PORTNOY: Right.

THE COURT: -- with special damages. That's my read on the law. And that general damages are only available if there's defamation per se.

I mean, one option is we can refer the parties -- excuse me, the parties -- the jurors to these other instructions here, or we can have some explanation of what I just said in this instruction.

MR. ADAMS: Yeah, that's what I was thinking, too, is you could cite -- you could say, see instructions 32 through 34 -- or 35, actually, because it has them all.

MS. ING: My only issue is that -- and maybe we just need to look at this further. I assumed that for -- if it's non per se, then you're going to need to prove both general and special damages. Whereas if it's per se, meeting those certain categories, then general damages are presumed. You'd still have an opportunity to show special.

I can't say I can cite to a case at this point, but that's how I was conceptualizing it in my mind.

THE COURT: Right. My understanding is if defamation per se is not shown, then you would have to show special damages. That's my understanding.

So why don't we do this: Why don't we have the parties meet and confer on a -- an explanation of the function of defamation per se and general damages and special damages.

So, maybe an instruction saying, defamation per se allows for general damages. See instruction number such and such.

But I'll let you folks meet and confer on that and I'll ask you to submit something by Monday morning.

When is -- is there a next jury conference Monday afternoon or is it Tuesday afternoon?

THE COURTROOM MANAGER: Your Honor, I believe it's Thursday afternoon.

THE COURT: Next week Thursday? That can't be right.

THE COURTROOM MANAGER: Tuesday. I'm so sorry.

THE COURT: If the parties could meet and confer and inform me in a joint filing as to how they want to perhaps add to this instruction, or create a new instruction regarding the function of an interplay between defamation per se, special damages, and general damages.

Okay. Let's go now to 16.

MR. PORTNOY: No objection.

MS. ING: And you said no objection, Jeff?

MR. PORTNOY: Yeah.

MS. ING: Okay. My -- and then what I wanted to propose there is, we had submitted last night a instruction on parody, which I would envision coming after this one. But it sort of expands on the idea of figurative or hyperbolic language that negates the impression.

THE COURT: All right. And for the record, this is at ECF 195-1.

So the citation of *Hustler Magazine* is primarily about whether a public figure can recover under IIED for a statement that hasn't been proven false. And the quote from *Hustler Magazine* at 485 U.S. 56 is: We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publication such as the one here at issue without showing in addition that the publication contains a false statement of fact that was made with actual malice, i.e., with knowledge

that the statement was false or with reckless disregard as to whether or not it was true.

So, I'm not sure that this really ties to -- ties to this particular claim.

MS. ING: We may need to find more citations on that. There was some extended discussion, perhaps in dictum in that case, about caricatures and how the public figures have been subjected to caricatures over a long period of time. And even if it's unpleasant, it's a First Amendment issue.

THE COURT: Wouldn't -- I mean, one of the things that I noticed -- I think the actual malice instruction covers some of this. But if you want to supplement with additional briefing on it, you may. But at this point I'm not intending to give this instruction.

So any supplemental briefing should not exceed five pages, and will be due on -- all of these will be due Monday morning, let's say, at 8:30.

MS. ING: All right.

THE COURT: Okay. Do you otherwise object to instruction number 16?

MS. ING: Other than that, we don't object.

THE COURT: Okay. I mean, I will say, I think that these instructions are -- and I'm not blaming you guys, I think some of the instructions in this arena are just naturally confusing.

And so, for example, the second paragraph in 16 kind of gave me pause whether communications defamatory depends, among other facts, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age in one community, and so on and so forth. I think that could be worded better. The first paragraph, a communication is defamatory when it tends to harm the reputation of another as to lower him or her in the estimation of the community.

I mean, I just -- if you folks think you can make it more accessible, let me know. But I --

MR. PORTNOY: Yeah, we grabbed a lot of our instructions from a case here in federal court.

THE COURT: Right. I know.

MR. PORTNOY: So --

THE COURT: And again, I'm not faulting --

MR. PORTNOY: That's where we took it from.

THE COURT: I understand.

MR. PORTNOY: Okay.

THE COURT: I understand. So --

MS. ING: I agree, Your Honor, that if we can give it planer language, that would be better.

THE COURT: Okay.

MS. ING: Some of these are sort of, what, relics from other cases.

THE COURT: Okay. Let's have you work on that as well then. So we'll have you work on instruction number 16 also, to see if you can agree on language for that.

So as with everything related to this hearing, if you have any jointly proposed instructions or separately proposed supplemental instructions, should submitted by 8:30 on Monday.

Okay. Let's turn next to 17.

MR. PORTNOY: No objection.

MS. ING: No objection.

THE COURT: 18.

MR. PORTNOY: No objection.

MS. ING: No objection.

THE COURT: 19.

MR. PORTNOY: This is one we're going to have to look at, Your Honor, candidly.

THE COURT: Okay. Take your time.

MR. PORTNOY: Yeah, no, we object. I think our instruction goes right to the heart of this case, particularly the second paragraph. So we don't agree. And we propose our 28.

THE COURT: Okay.

MS. ING: Your Honor, I'm generally okay with this one, I just have a little wordsmithing issue where, after the blue lining you have, an investigatory failure alone on the part of defendant, et cetera, et cetera, and then it says "for

example, actual malice would exist."

My suggestion would be, that's actually a however clause, because in the first sentence describes how actual malice does not exist, and then the next one explains how it would exist.

THE COURT: Okay. I think that's a good point.

One second, Mr. Portnoy, I'm going to pull up your instruction. If I'm remembering correctly, was yours ECF 138? Am I remembering that correctly?

MR. ADAMS: Yes.

MR. PORTNOY: Yes. And I'm talking specifically about the second paragraph. I think the first paragraph of proposed instruction number 19 and our instruction 28 are not all that different. But the second paragraph is what we believe should be included.

THE COURT: Okay. I'm sorry. Can you say that one more time?

MR. PORTNOY: Yeah. My objection is that we would want our instruction, particularly because of the second paragraph in our proposed malice instruction. What the plaintiff can prove circumstantially regarding knowledge of falsity or reckless disregard of the truth.

Otherwise the defendant in all media cases simply says, I believed it. That's insufficient.

THE COURT: All right. So this instruction you

proposed is from the Massachusetts Superior Court. I think the circumstantial evidence instruction already provides enough background for the jury to understand that you can prove knowledge or falsity or reckless disregard by circumstantial evidence.

So I'm not going to change this instruction on that ground.

MR. PORTNOY: Well, it's in over objection.

THE COURT: Yes. And I will change the word "for example" to "however."

Instruction number 20.

MR. PORTNOY: Well, it also should mention what it can be considered for, which you have already ruled on. Can be shown as evidence of criminal conspiracy, et cetera. They just want to take it out completely. So we totally object to 20. It's half of the story.

THE COURT: Any objection to adding some language about it can be considered? It's kind of similar to what we have for the limiting instruction on The Shanti Summary.

MR. ADAMS: Yeah, I think it would be mixing it up a little bit, because there should be a separate instruction that the civil conspiracy requires an underlying tort. And if we have it just here where they can prove it by -- it can be used for civil conspiracy, it would just sort of be dangling out there.

I think that this is -- that it should be in connection with the civil conspiracy instruction, not -- not the -- this. This appears to be singularly focused on that statement itself cannot be defamatory. And he's not talking about just the letters, he's talking about for the civil conspiracy --

MR. PORTNOY: I'm saying --

MR. ADAMS: -- the Zoom meeting and all of the things that were related to the letters. But the letters themselves, this is very clear, it cannot be actionable.

MR. PORTNOY: The Court has a ruling on how the letters can be used. This is an attempt to isolate it and make it appear that the letters are out. The Court has already ruled what the letters can be considered for, and it's not in this instruction. It's an attempt to eliminate the letters completely. So we object for that reason.

THE COURT: All right. Let me -- I'm going to take a closer look at this.

MR. PORTNOY: Okay. Thank you.

THE COURT: Okay. Next is 21.

MR. PORTNOY: No objection. It's ours. Comes from *Gallagher*.

MS. ING: Just a sec, Your Honor.

THE COURT: Take your time.

(Pause in the proceedings.)

MS. ING: No objection, Your Honor.

THE COURT: All right. So 21 will be given.

Let me ask a big picture question. Both sides have false light claims. Do the parties believe that a false light claim can survive even if a defamation claim cannot?

MR. PORTNOY: Yes.

THE COURT: Okay. Is that -- the defense is nodding their heads as well.

MS. ING: That's my understanding, Your Honor.

THE COURT: Okay. All right. Thank you.

22, IIED. I need to add a space between the number four and the next paragraph.

MR. PORTNOY: Yeah.

THE COURT: I'll do that.

MR. PORTNOY: Well, Your Honor, we haven't had the opportunity to look at the cases that the defendants cite for the proposition. So I would ask that you give us that opportunity, and we'll advise the Court Monday morning.

THE COURT: All right.

MR. PORTNOY: Thank you.

It may well be that we don't object. I just don't know.

THE COURT: Okay.

MS. ING: And I know this was our instruction. But since Jeff is asking for more time, I wanted to look at the

burden of proof and just make sure nothing more needs to be said about -- whether it's different from preponderance of the evidence.

THE COURT: We should include it. Okay. We should -- I think we should say "must prove by a preponderance of the evidence."

MR. ADAMS: Yeah, right before the colon and at the end of the first paragraph?

THE COURT: Yeah, so we're going to add that.

Now, Ms. Ing, if you find that you think that's the wrong standard, just let us -- you know, file something, please, on Monday.

MS. ING: Yes. Thank you.

THE COURT: But I will add that.

Okay. Not sure why the red lining put this on the same page, but legal cause, number 23. Any objection?

MR. PORTNOY: None.

MS. ING: None.

THE COURT: 24.

MR. PORTNOY: Yeah, I think we want our 31.

THE COURT: Okay.

MR. PORTNOY: So I think that's one that probably is going to have to get briefed.

THE COURT: All right. Just a second.

MS. ING: Jeff, I'm sorry, I missed that. Were you

addressing 24?

MR. PORTNOY: We want --

THE COURT: We're on 24, but he wants his.

MS. ING: Oh, I see.

Okay. I know this was our instruction, but I'm -- I'm just wondering whether we need to add some language about the formation of the conspiracy, you know, the purpose of it being to accomplish either a wrongful act or by wrongful means. Because the law is, you know, not just combination of two persons, but for a wrongful purpose or wrongful means.

MR. ADAMS: Or the underlying actionable claim.

THE COURT: All right. So you're saying you want to revise --

MS. ING: Yes.

THE COURT: -- this?

And Mr. Portnoy, remind me your number that --

MR. PORTNOY: 31.

THE COURT: 31?

MR. PORTNOY: Yes.

THE COURT: One second.

MR. PORTNOY: And we'd be happy to brief this one. It's a critical instruction.

THE COURT: Okay. Yeah, why don't you folks, since you're not on the same page of where you were, Ms. Ing, when you submitted these, go ahead and file a revised version with

briefing not to exceed five pages.

And Mr. Portnoy, you can file briefing not to exceed five pages.

MR. PORTNOY: Thank you. Okay.

THE COURT: Okay. 25.

MR. PORTNOY: Well, it's not accurate. We already just discussed that false light survives. I think that's a misleading first paragraph.

THE COURT: Well, would IIED and civil conspiracy survive?

MR. PORTNOY: I think they're separate.

THE COURT: So -- okay. So you do not think that any of your claims are derivative of defamation at all?

MR. PORTNOY: I don't.

THE COURT: Okay. So under what theory are you saying that there was, for example, a civil conspiracy, like what were they conspiring to do?

MR. PORTNOY: To damage my client. To damage her reputation.

I'm not sure I understand. There is a defamation claim, I understand that. And there's also a false light claim.

Is the Court saying that intentional infliction of emotional distress and civil conspiracy both go out the window if defamation can't be proved? Because otherwise I think we

need to brief that, too.

THE COURT: Okay. Let's go ahead and have you brief this.

MR. PORTNOY: Okay.

THE COURT: This one will be a little longer. And I know this is going to seem crazy to have you file separate things, but it's honestly going to be easier for me if you do this in separate filings. So this one I will give you up to seven pages --

MR. PORTNOY: Okay. Thank you.

THE COURT: -- to brief this argument.

Are you going to brief this, Ms. Ing, or no?

MS. ING: We will brief this as well.

THE COURT: Okay.

MR. ADAMS: And what we do, we should keep the numbers that are on here, even though we've gotten rid of a couple?

THE COURT: Yes, let's do that for now.

I hope I remember to do this, is that in the next version of this, I might try to keep the numbers the same just to make our next conference easy, and then the numbers will change for the final.

Okay. I think *Gold* is pretty on point on this.

MR. PORTNOY: Yeah, I don't have a problem with that. But it has the same number four that we talked about earlier.

THE COURT: Oh, sorry. You jumped the gun a little

bit. I just -- I was still on number 25.

MR. PORTNOY: Oh, I'm sorry, because *Gold* is cited for 26. Sorry, Your Honor.

THE COURT: Yes, sorry. I think *Gold* is on point for that, but we'll see what you folks say.

Okay. 26, go ahead.

MR. PORTNOY: No, I have no objection, except number four we've already talked about in an earlier instruction, that needs to be clarified.

THE COURT: All right. I will make a note of that.

MR. ADAMS: So whatever you do with the prior one should just be applied here.

THE COURT: Right.

Any objection, Ms. Ing, otherwise to 26?

MR. PORTNOY: No.

THE COURT: Ms. Ing?

MS. ING: What were you saying, whatever we do with the prior --

MR. ADAMS: 15.

THE COURT: Yeah. So element four, and kind of, you know, however you folks --

MS. ING: Yes. Exactly. Got it. I just wanted to makes sure that we weren't changing, you know, the mens rea.

THE COURT: All right. And 26 you're fine with then otherwise; is that right, Ms. Ing?

MS. ING: Correct.

THE COURT: Okay. 27.

MR. PORTNOY: Fine.

MS. ING: No objection.

THE COURT: 28. My one addition to 28 would be that what the standard of proof is for this. That's something that has not been included.

MR. PORTNOY: I'm fine with that, with that --

THE COURT: I assume it's by a preponderance of the evidence?

MR. PORTNOY: Well, we have clear and convincing burden, so unless it's separated out. I'm happy to have preponderance, but I don't think the defendants want that.

THE COURT: But this is a defense.

MR. ADAMS: This is fine.

THE COURT: Yeah.

MR. PORTNOY: But we'll take it. It's fine.

THE COURT: Okay. But I want to say what the burden of proof is. So are we all in agreement the burden of proof is by a preponderance of the evidence?

MR. PORTNOY: Yes.

MS. ING: Yes.

MR. ADAMS: With respect to truth -- proving truth is a defense, yes.

THE COURT: Okay. So this will read -- let me take a

moment to read it to myself.

What if we say at the end of the first sentence -- well, I'm wondering if it's going to be too confusing if I say: And must be shown by a preponderance of the evidence.

I might actually separate this out into two paragraphs.

So it would say: For both plaintiffs' count one and counter-claimants count one, truth is an absolute defense to defamation and must be proved by a preponderance of the evidence.

MS. ING: That's fine.

MR. PORTNOY: Okay.

THE COURT: Okay.

MR. PORTNOY: No objection.

THE COURT: All right. Okay. We will make that change.

Okay. 29. Let me start our discussion on this by asking about what the defense theory is for invasion of privacy. I'm not totally sure I understand what the theory is or why these two are included in the same count, because I think they're different torts, is the impression I get.

So lets hear from the defense first.

MR. ADAMS: I think that's probably right.

MS. ING: Yeah, I have to go back and look to see what our counterclaim said. I don't know if we provided --

THE COURT: Your counterclaim combined it under one count.

MR. PORTNOY: That's my point.

MS. ING: It does seem to me they are separate claims. I think we combined it just because that's the way we had asserted it in our counterclaim.

MR. PORTNOY: Yeah, I don't -- I'll grab the complaint, but I don't think there's a claim for invasion of privacy in the counterclaim. There's a false light claim.

THE COURT: So they mention invasion of privacy -- one second.

So invasion of privacy is actually listed. It says: False statement -- excuse me, false statement/invasion of privacy. But I don't what your theory is as to invasion of privacy. Like, what is the basis for it? What is the -- it's on Page 14.

MS. ING: Right.

The basis for it would be the various posts that Ms. Shanti made about, you know, the marital life of the Horvaths, their sex life, what happens in, you know, their personal lives. As well as Paula and -- well, we got the child issue taken care of.

(Counsel conferring.)

MS. ING: Yeah, there were a number of statements of -- posts about them that focused on private as well as

their -- you know, their practice or their profession, such as Paula's.

THE COURT: All right. Which specific -- if you could take a moment to look at your counterclaim and let me know which paragraphs in particular you have in mind for this, that would be helpful to me.

MS. ING: Mm-hmm.

THE COURT: I don't recall them being in your verdict form, by the way.

MS. ING: Okay. We'll check. I thought we had it.

THE COURT: Okay.

MS. ING: It was a very long verdict form.

THE COURT: Okay. So if you could file no more than five pages, Ms. Ing, about what your theory is, and point to what -- the counterclaim paragraphs you're relying on for this.

So setting that aside, any objection, Mr. Portnoy, to 29?

MR. PORTNOY: Yeah, my other objection would be if, in fact, there is an invasion of privacy claim, it should be a separate instruction. Just going to confuse the jury to put false light in the same instruction as invasion of privacy.

THE COURT: I agree. Okay. I don't have a problem with doing that.

MR. PORTNOY: Okay. So, again, I need to see if it's been pled.

THE COURT: Right.

Do you want to brief this too or no?

MR. PORTNOY: No. If it's been pled, it's been pled, then it's the burden of proof.

THE COURT: Okay.

MR. PORTNOY: But I do think if it is in the case it needs to be a separate instruction.

THE COURT: All right. We also need to add, "must prove by a preponderance of the evidence."

MR. PORTNOY: Yes.

THE COURT: Okay. So if we could a make a note of that, that definitely needs to change so that the standard is clear.

And Ms. Ing, any objections other than --

MR. PORTNOY: No.

THE COURT: Okay.

MS. ING: No. We will brief that, and also propose a separate one, assuming that the Court allows us to have -- to assert both.

THE COURT: Okay. I'm assuming you're talking about the only having sex when they are drunk, but maybe I'm wrong.

MS. ING: Correct.

THE COURT: That's Paragraph 54 in your counterclaim.

But if it would still be helpful to have you brief this.

Okay. Again, I'm not sure why the red line did this, but special damages defined.

MR. PORTNOY: No objection.

MS. ING: No objection.

THE COURT: 31.

MR. PORTNOY: No objection.

MS. ING: No objection.

THE COURT: 32.

MR. PORTNOY: Let me read it for a minute, Your Honor, please.

THE COURT: Take your time.

(Pause in the proceedings.)

THE COURT: I also don't mind hearing from Mr. Young on this if he has things to say.

MR. PORTNOY: No. Thank you, though. He's being consulted repeatedly though. Thank you.

THE COURT: I can tell.

(Pause in the proceedings.)

MR. PORTNOY: That's fine.

THE COURT: All right. I assume no objection.

MS. ING: No objection.

THE COURT: All right. 33.

MR. PORTNOY: No objection.

MS. ING: No objection.

THE COURT: 34.

MR. PORTNOY: No objection.

MS. ING: Just a second.

THE COURT: I'll be honest, it seemed like there were a lot of damages instructions.

MS. ING: Yes.

THE COURT: And I was trying to figure out -- I mean, a lot of them were jointly proposed. This one wasn't. But I was trying to figure out how they function with one another.

MR. PORTNOY: I don't think there's a huge controversy on the general law on damages, if you want to combine them or something.

MR. ADAMS: Just seems like if you read 33, 34, 35 --

THE COURT: Microphone, please.

MR. ADAMS: Sorry, Your Honor.

It's just, looking at it, when -- if you go to 33, 34, 35, it's like nominal damages, damages, general damages. That all seems like damages -- general damages and nominal damages -- the general and damages just seem to be a little confusing having them separate.

MS. ING: I'm wondering if we -- I think there might be some reordering we would want to do, and -- at least. Maybe do some sorting out.

THE COURT: All right. I'll let you folks work on that. If you could jointly work on that.

MR. ADAMS: It seems like 34 and 35 can be combined,

right?

THE COURT: Yes. So I'm going to ask you to all jointly work on what are currently instruction numbers 33, 34, 35, please.

So 33 through 35, if you could see if there's a way to make that more accessible to the jury, I think that would be helpful.

MR. PORTNOY: I do want to state, Your Honor, that we think 33 needs to stand on its own. It's a separate damage which is unique to these kinds of cases. I have no problem trying to combine general, special.

MR. ADAMS: I think I agree with you, yeah.

MR. PORTNOY: Okay.

THE COURT: Okay. So let me revise that then. 34 and 35.

MR. PORTNOY: Yes, no problem.

THE COURT: Okay.

MR. ADAMS: Yeah.

THE COURT: Thank you.

MS. ING: And I think also 30 could be included, that's a special damages defined section.

THE COURT: Okay. I'll let you folks work on that. So I'll say 30, 34 and 35. You'll see if you guys can work that in a way that makes it easier for the jury to understand.

Okay. 36. This is provided as a definition for one

of the damages instructions.

MR. PORTNOY: Yeah. Here's the confusion we have, Your Honor, and it's been repeated. We believe you have a prior order that took out emotional distress, but it's been in everything since. So...

THE COURT: It took out negligent. I -- a prior order of mine granted MSJ for the defense as to negligent infliction of emotional distress, but not intentional. So intentional remains.

But this emotional distress definition relates more to the general damages definition at 35.

MR. PORTNOY: Yeah.

THE COURT: So...

MR. PORTNOY: Okay. Well, thanks for clarifying that. Thank you.

THE COURT: Okay. So any objection to 36?

MS. ING: No objection.

THE COURT: 37. I think this was jointly proposed.

MR. PORTNOY: That's fine.

MS. ING: No objection, Your Honor.

THE COURT: 38.

MR. PORTNOY: That's another damage. No problem. No objection.

MR. ADAMS: This is about calculating.

MR. PORTNOY: Yeah.

No objection. Standard.

MS. ING: We had -- one of the special damage elements we had proposed as -- a couple nights ago was another instruction on the -- basically the *Uyemura* type of damages where you are -- you incur litigation -- legal expense for, litigation with third parties caused by the wrongdoing of the defen -- of the other side.

MR. PORTNOY: Yeah, we objected to that supplemental that we just got yesterday or the day before. We don't even have a counter instruction. We don't think that's the law in Hawaii and --

THE COURT: Right. I'll make a better record of it in the future, but I don't think that's a -- that fits the scenario. I'm not going to give that instruction, but I'll make a better record as to why.

MR. PORTNOY: Okay.

THE COURT: Any objection to 38?

MR. PORTNOY: No.

THE COURT: And I think we already covered this but, Ms. Ing, I'm not sure I got on the record, do you have any objection to 38?

MS. ING: No objection.

THE COURT: 39?

MR. PORTNOY: None.

THE COURT: Ms. Ing?

MS. ING: None.

THE COURT: 40?

MR. PORTNOY: It's a little hard for me, because 40 is underlined and crossed out. I'm trying --

THE COURT: Yeah. I don't --

MR. PORTNOY: I don't understand this, so I don't know how a jury is. But there's probably is a better way of --

THE COURT: I have a clean copy. So I don't know -- this is the defendants' proposed. Is there a way I can get from the defendants in Word -- and this might be my own user error -- a clean copy of 40, please?

MS. ING: Yeah.

MR. ADAMS: You want us to send you a clean copy?

THE COURT: Of 40, please.

MR. ADAMS: To Otake orders?

THE COURT: Yes, please.

MR. ADAMS: Yeah.

THE COURT: Some of this red lining might have been something I did and couldn't figure out how to make it look, I think, clearer. But some of this I thought came from the defense instruction, I think, was probably just red lining the model instruction. I'm sure that's what it was.

MS. ING: Right.

THE COURT: So if I could get a clean copy of that.

MR. PORTNOY: And we would like our instruction 34,

which comes from *Gallagher*. It's not dramatically different, but it's different.

MR. ADAMS: Comes from what?

MR. PORTNOY: The *Gallagher* case.

MR. ADAMS: *Gallagher*.

MR. PORTNOY: Yeah. We might be able to reach agreement on that, but at the moment we would like our 34. I don't think they're dramatically different, there's some wording differences.

THE COURT: I assume you folks had talked about this as a potential jointly proposed --

MR. PORTNOY: We did at one point.

THE COURT: Okay. Do you think you're closer to that? I mean, do you think you could reach agreement on a mitigating damages instruction?

MR. PORTNOY: Should try.

THE COURT: Okay.

MS. ING: We're talking about it.

THE COURT: All right. Let's have you guys do that, then.

MR. PORTNOY: Okay.

THE COURT: Punitives, 41. This is from the defense instruction 61. It's from model Hawaii civil jury instructions.

MR. PORTNOY: That's what I was going to ask.

That's fine.
THE COURT: Okay.
MR. PORTNOY: Yes.
MS. ING: No objection, of course.
THE COURT: All right. 42.
MR. PORTNOY: No objection.
THE COURT: 43.
MR. PORTNOY: No objection.
THE COURT: Well, I'm sure Ms. Ing doesn't object to --
MS. ING: Fine.
THE COURT: -- 42 or 43.
Is that right, Ms. Ing?
MS. ING: Correct. I don't object to 42 or 43.
THE COURT: 44?
MR. PORTNOY: No objection.
MS. ING: None.
THE COURT: 45 is the verdict form instruction. I don't know if I'm going to explain it or not. But at this point is there any objection to 45?
MR. PORTNOY: No.
MS. ING: No, Your Honor.
THE COURT: Okay. All right. So, sorry to bounce back to the damages, but did -- it just dawned on me, do the damages instructions say what standard of proof is for damages?

MS. ING: We can put that in if it's not there.

THE COURT: Okay. Thank you.

MR. ADAMS: 34, 35, when we work on it, we should put in a burden of proof as well.

THE COURT: Yes. Thank you.

MS. ING: And Your Honor, with respect to the *Uyemura v. Wick*, I don't know if you want us to address it now. But the reason we had added that was because of our contention that with respect to Mr. Horvath's legal fees in the Canadian Family Court, that those was multiplied by the actions of Ms. Wilson.

THE COURT: Okay. I will -- I'll take a closer look at that.

MS. ING: Thank you.

THE COURT: That's helpful to know.

Okay. Are there any instructions that I'm not giving that you want me to give? We've gone through my proposed instructions at this point.

MR. ADAMS: Other than what we haven't already addressed, which is the parody and the *Uyemura*, I don't think so.

MR. PORTNOY: No.

THE COURT: Okay.

MS. ING: Oh, Your Honor, we had a dispute over how to handle the issue of your Court having made a finding about Ms. Haygarth's -- one of her defamation claims. And we had

included in one of our instructions that the decision had been made and your -- so the jury's role is only damages.

THE COURT: I think that's going to go in the verdict forms. That's what I'm anticipating.

MS. ING: Okay.

MR. PORTNOY: Well, since it's come up, Your Honor, I have gone back, and you found that we had conceded that that was defamatory, that she had abandoned her son. That's in your order. I went back and looked at the transcript, and I don't see a single statement by counsel, me, conceding that position at all. And so we were going to raise it at the appropriate time. I don't know whether it's now, during instructions. But I need to go back and look at the memo we filed, but --

THE COURT: What I recall --

MR. PORTNOY: Yeah, I read the transcript, is all I'm saying, Your Honor.

THE COURT: Yeah, yeah. What I recall, and you can correct me if I'm wrong, is that there was no concise statement of fact demonstrating why it was possibly true that Ms. Haygarth abandoned her son. That's my recollection.

MR. PORTNOY: Okay.

THE COURT: So if I used the word "concession" in the order --

MR. PORTNOY: Well, that's not the exact word you used. I think -- I don't have it right in front of me, but I

can get it.

THE COURT: Yeah, I don't recall you raising it in your briefs or putting on any evidence.

MR. PORTNOY: Because I looked at the argument, and there was no -- other than the defendants stating that there was this statement, as you'll recall, you went through statement by statement as best you could --

THE COURT: Yeah, my -- my recollection wasn't based on what was argued at the hearing so much as what was presented in the briefing.

MR. PORTNOY: Okay. Okay.

THE COURT: I don't know that that was responded to and/or -- I certainly don't recall there being anything in the concise statement of facts related to it.

MS. MORITZ: Your Honor, I have the order in front of me if it's helpful to read.

THE COURT: Yes, please.

MS. MORITZ: I think the relevant portion is at Page I.D. 1858, Docket 92: Paula unsurprisingly denies that she abandoned her son. See ECF number 48-3, Paragraph 9. Although the claimant bears the burden of proving falsity and thereby must show, quote, evidence is so powerful that no reasonable jury would be free to disbelieve it, unquote, the Court is satisfied Paula has met this burden, particularly because plaintiffs offer no evidence of its truth.

THE COURT: Okay. Thank you.

MR. PORTNOY: Yeah. Okay.

THE COURT: Let's talk then -- well, actually, let me ask, do we need to go over what you guys owe me?

You guys have it written down? Okay. Great.

I have it written down, too. So I expect to see it Monday morning.

Let's talk about the verdict forms. They're --

MR. ADAMS: Too big.

THE COURT: They're on different ends of the spectrum, shall we say.

MR. ADAMS: Yeah. We -- I looked at it and I want to take another shot at it, if that's what your thought is, Your Honor.

THE COURT: Okay. I was honestly going to come in tomorrow to work on them myself out of whole cloth. What I don't want to have happen is I don't want to have a situation where -- I'll be frank, where I spend a whole bunch of time on it and then you guys come up with something better.

The other thing I don't want to have happen is that I'm stuck flat-footed working until, you know, 2:00 in the morning to get the verdict forms done.

So, what I'd like to have, maybe that might be more useful for all of us, is a discussion of what we generally think we can do to make the verdict forms less cumbersome.

I think plaintiffs' are too simple. I think defendants' are too complicated. I've looked at verdict forms in other cases. I have not looked at verdict forms in State defamation cases. And I'm curious if anybody looked at what verdict forms might look like in defamation cases on the State side.

Any thoughts on how we can make this not 70 pages?

MR. PORTNOY: Well, you'll have to talk to the defendants, because ours are only ten pages.

THE COURT: Right.

MR. PORTNOY: So I think this conversation goes one way at the moment.

THE COURT: Okay. All right.

Let me hear from the defense, please.

MS. MORITZ: I can't remember it off the top of my head, but there is a State case that comes to mind that I looked at, and I can go revisit that to try and resimplify the form.

THE COURT: Did you like those instructions? I mean, sorry, did you like that verdict form, the State verdict form? Do you remember thinking, oh, this is a good model?

MS. MORITZ: I remember thinking it was -- it was certainly more detailed than the one that Mr. Portnoy proposed, but candidly, in preparing it, it may be that I was just trying to be thorough in our own claims and our own allegations, and

maybe overly so.

So I can go back and maybe take another crack at it.

THE COURT: If you could, tonight, Ms. Moritz, have you or somebody in your firm just send to Otake orders and cc plaintiffs, please, that form, because I'd like to take a look at it myself.

MS. MORITZ: You're speaking of the one we submitted or the --

THE COURT: No.

MS. MORITZ: -- the one I'm thinking when I find that case?

THE COURT: Yes.

MS. MORITZ: Okay.

THE COURT: Please. Just so that I can see what that looks like.

The thing I guess I need to know from both sides is -- and let's take the defense as an example, just because it's an easier example off the top of my head, since we're in the defense case in chief.

So we have a screenshot, right, with let's say five different statements in it, pedophile, pedophile -- pedo, pedo support, Satan soldier. Okay. So are those three different statements that we need three different decisions on from the jury?

MR. ADAMS: That's how we've read -- that's how we've

written it as is, and why it became 70 pages.

THE COURT: Right. I understand.

So I'm trying to figure out like how -- what do we -- can we actually streamline this?

MR. PORTNOY: Well, I think the problem is, Your Honor, that each one of those is separate. And you may rule that -- or the jury may find that, taking the example you just gave, that one is opinion, and one is hyperbole, and one is actionable. That's why you can't lump 'em together. I mean that was the *Gallagher* problem. I mean, there are -- as you know from the summary judgment and elsewhere, there's scores of statements that were made both ways. Who made them is another issue.

And I think the jury, unfortunately, is going to have to rule on each one, because you can't lump them together. They may find that -- if four are lumped together, they may find that one is actionable and three aren't. And you're going to make rulings, too, so --

THE COURT: Right. I --

MR. PORTNOY: -- because those are legal rulings.

THE COURT: One thing I had in mind, which now I'm literally just thinking off the top of my head, this is not something I'm whetted to, is, for example: We, the jury, find X party committed -- yes or no -- the X party committed the tort of defamation; yes or no. If the answer is yes, which of

the following statements do the jurors unanimously agree amount to the tort of defamation?

MR. ADAMS: That's a very clever idea. We've done that with multiple defendant -- we have like 50 defendants, and you just list them and they can check the box.

THE COURT: That's my thought.

MR. ADAMS: Yeah. We could try something like that, if you want us just to take a first crack at doing something like that.

THE COURT: Yeah, that would be helpful.

MR. ADAMS: Yeah.

THE COURT: Can I ask for that by Sunday morning?

MR. ADAMS: Yes, we'll work on that this weekend.

THE COURT: If you can e-mail that Otake orders no later than 8 a.m. on Sunday morning, that would be very helpful to me. That way I can just switch which day I come into the office.

MR. PORTNOY: Do we get to respond to it at some point?

THE COURT: Absolutely.

MR. PORTNOY: Not Sunday morning at 8:00, though, I assume.

THE COURT: No.

MR. PORTNOY: Okay. All right.

THE COURT: If you want to propose something else --

it sounds like you don't. It sounds like you're very happy with your verdict form.

MR. PORTNOY: But we'll be happy to look at theirs, and it may be better.

THE COURT: Okay. And what -- what we can do then, Mr. Portnoy, is perhaps you can file by Monday morning --

MR. PORTNOY: Sure.

THE COURT: -- any thoughts you have on the verdict form?

MR. PORTNOY: Got it.

THE COURT: Okay. All right.

Anything else?

This went actually much more smoothly than I expected. Is there anything else?

MR. ADAMS: Just to conceptualize, I think what you were talking about is, what we do is, rather than each statement, we have each statement, like, on the same page with, like, boxes for them to check. Like check the box to each phrase you think is defamatory.

THE COURT: That's what I'm picturing.

MR. ADAMS: Yeah.

THE COURT: Yes. That's what I'm picturing.

MR. ADAMS: We can do that.

MS. MORITZ: I'm not sure if I heard the time on Sunday. I'm sorry.

MR. ADAMS: Morning.

MS. MORITZ: Morning.

THE COURT: Yeah. I said 8:00. Let's say 9:00. Yeah.

And actually, why don't you file it? That makes more sense to have you file it rather than e-mail it. So if you could both file it and e-mail us a Word version, that would be helpful.

And then with regard to Monday morning's filings, if you have a proposed revision to a jury instruction, if you could e-mail the Word version also, please. Thank you.

MR. ADAMS: All, for everything we're doing submit -- yeah.

THE COURT: Yeah.

Okay. Anything else? No?

MR. PORTNOY: No, Your Honor.

THE COURT: All right.

MS. ING: I have to say this is relatively painless compared to some I've been in. Thank you.

THE COURT: Well, it's -- I don't know -- you guys deserve credit for working together on proposing joint jury instructions. There were more than I usually see; so I very much appreciate that. That made it much easier. And I think the hard part is just getting this first version out, knock on wood. So hopefully after this it'll be even more streamlined.

MS. ING: Well, I don't want to sound like Eddie Haskell, but it was helpful also to get the Court's proposed amalgamation of what you thought should be adopted.

THE COURT: Okay. I didn't realize people didn't -- do something different. I just assumed that's how it worked. But that's good to know. That's helpful for me to know. And it that's helpful for me because, you know, jury instructions are what govern the case. So having it figured out earlier is better. So, thank you for -- but thank you for that. And I won't think of you as Eddie Haskell.

MS. ING: Thank you.

THE COURT: Okay, folks, then we are in recess until Monday morning at 8:30.

If anything comes up before then, obviously e-mail Ms. Cortez.

I expect to see things in our orders inbox and online with regard to the verdict form by Sunday at 9:00, and then everything else Monday at 8:30.

MR. PORTNOY: Thank you.

THE COURT: All right. Thanks.

MR. ADAMS: We have informed counsel that we have to switch up the witnesses just because of timing. We thought we were going to get done with all the plaintiffs, or a majority.

So I told him that Amanda Brady will be coming on after Stefanie is done.

THE COURT: Okay.

MR. ADAMS: Just so the Court knows that there will be a difference in witnesses if the Court was expecting somebody.

THE COURT: That's fine. That's fine. Thank you.

All right. Thank you. Have a good weekend.

MS. MORITZ: Thank you.

MR. ADAMS: Have a good weekend.

(The proceedings concluded at 3:48 p.m., August 7, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 7, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC