IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/ Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/ Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 10, 2026<br><br>JURY TRIAL - DAY 6 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/ Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/ Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


EXAMINATIONS PAGE

STEFANIE HORVATH....................................
RESUMED DIRECT EXAMINATION BY MS. MORITZ.......... 18
CROSS-EXAMINATION BY MR. PORTNOY.................. 50

AMANDA BRADY........................................
DIRECT EXAMINATION BY MR. ADAMS................... 85
CROSS-EXAMINATION BY MR. PORTNOY.................. 131
REDIRECT EXAMINATION BY MR. ADAMS................. 158

HALEY WINTER........................................
DIRECT EXAMINATION BY MS. MORITZ.................. 162
CROSS-EXAMINATION BY MR. PORTNOY.................. 191
REDIRECT EXAMINATION BY MS. MORITZ................ 202

BYRON HORVATH.......................................
DIRECT EXAMINATION BY MR. ADAMS................... 207


# E X H I B I T S


PAGE

Plaintiffs' Exhibit 48 was received in evidence..... 60
Plaintiffs' Exhibit 43 was received in evidence..... 62
Plaintiffs' Exhibit 44 was received in evidence..... 64
Plaintiffs' Exhibit 62 was received in evidence..... 69
Plaintiffs' Exhibit 74 was received in evidence..... 70
Plaintiffs' Exhibit 54 was received in evidence..... 71
Plaintiffs' Exhibit 280 was received in evidence.... 111
Plaintiffs' Exhibit 315 was received in evidence.... 123
Plaintiffs' Exhibit 317 was received in evidence.... 126
Plaintiffs' Exhibit 115 was received in evidence.... 141
Plaintiffs' Exhibit 158 was received in evidence.... 199

Defendants' Exhibit 1171 was received in evidence... 24
Defendants' Exhibit 1052 was received in evidence... 34
Defendants' Exhibit 1054 was received in evidence... 37
Defendants' Exhibit 1063 was received in evidence... 49
Defendants' Exhibit 1003 was received in evidence... 105
Defendants' Exhibit 1124 was received in evidence... 179
Defendants' Exhibit 1004 was received in evidence... 218
Defendants' Exhibit 1007 was received in evidence... 220
Defendants' Exhibit 1035 was received in evidence... 222

MONDAY, AUGUST 10, 2026 8:17 A.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery LLC et al. versus Paula Haygarth et al. This case has been called for jury trial day six.

Counsel, please make your appearances for the record, starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor. Jeff Portnoy and Troy Young, along with Jenny Tokuoka.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor. Joseph Adams and Laura Moritz.

THE COURT: Good morning. Let me just take a moment to ask our courtroom manager, can we ask them to stop the vacuuming in the background, please? Thank you.

You may be seated.

All right. We have in front of me this morning a motion from the plaintiffs regarding witness intimidation. And Mr. Portnoy, I want to clarify with you, what specifically are you asking me to do? Your -- your motion suggests a mistrial, but I don't know that it's quite so explicit.

MR. PORTNOY: Yes. Thank you, Your Honor.

I'll just answer your question first. We've obviously struggled with this from Friday at 6 o'clock till we filed the

motion.

I've never experienced it in my 50 plus years. I called a number of colleagues to see what they thought. It's unfortunate, but I think a mistrial on the counterclaim is the only remedy that can fix what's occurred.

08:18AM

I've lost three critical witnesses who are refusing to testify. One has already fled back, gone back to the Mainland. Two are still here, but refused even to meet with me to go over the weekend what their testimony might be.

08:19AM

So we have lost three absolutely critical -- as you know, two impeachment witnesses and one that already testified in our case but was going to come on to impeach particularly Amanda Brady, and Haley.

And so I know it's a -- I was thinking of what other things could be done, but nothing can be done to bring these witnesses back, at least now.

08:19AM

And so, yes, I just think we have to have a mistrial. I'm not asking for a mistrial on our case-in-chief. They were not going to testify anymore in that part of the case, but as for the counterclaim, they're critical, so...

08:19AM

THE COURT: What evidence do you have other than what's in the declarations that these defendants are tied in any way to Mr. Thompson's behavior?

MR. PORTNOY: Well, there's no question that Byron Horvath and Paul Thompson know each other, talk to each other,

08:20AM

been communicating with each other.

We've never suggested -- and I think we've been very careful -- that the defendants in any way promoted what occurred, solicited what occurred. We were just trying to show a connection. So it's not a claim that we believe the defendants actively participated in. Of course, we have no way of knowing that, but we've not stated that.

But this was an individual that we warned -- we told the Court about the very first day. There's no question about his relationship to Mr. Horvath. We didn't bring it in because you would probably have said it's irrelevant as to the issues before the Court. But I actually witnessed part of this, I don't want to become a witness, after we left your courtroom. And so he may or may not have fled already, back to Canada, we don't know. There are police reports. We were told the police will be looking for him today.

But whatever sanctions you bring on him won't bring three people back who are absolutely refusing to testify, because not only of what occurred here, but what's occurring online.

So that's really it, Your Honor.

THE COURT: All right. Thank you.

Mr. Adams.

MR. ADAMS: Thank you, Your Honor.

I actually have seen this before when I tried cases in

08:21AM front of Claudia Wilkins and Vince Chhabria in the Northern District in San Francisco on criminal cases. This is -- this is sort of textbook, as the verdict starts getting closer, things start getting tighter.

08:21AM And this -- these witnesses, I'm not sure why they're hanging around the courtroom, I'm not sure why they're mingling around with others that are in the courtroom. There's groups of people hanging outside. These -- this counter defendant cannot create her own mistrial with her groups of people that 08:22AM she is transporting to this hearing.

We don't have anything to do with this person. He's not a witness. He's never been on our witness list. He's not a party to this case. I don't even know who this guy is. When I raised it, it was a note handed to me by my counsel. And 08:22AM unfortunately, it was incorrect, and that's regretful, but I don't know who this person is. I've never communicated with him about this case. He's not working for us.

THE COURT: Sorry. What note are you talking about?

MR. ADAMS: They put in their papers that I mentioned 08:22AM that Paul Thompson said that --

THE COURT: I see.

MR. ADAMS: -- Ms. Noelani was in the courtroom.

THE COURT: Right. Okay.

MR. ADAMS: That's, I believe, the one thing they have 08:23AM connecting me. I received that from my co-counsel. I don't

08:23AM
08:23AM
08:23AM
08:24AM
08:24AM

know Mr. Thompson. I've never met him before Wednesday when I asked him who he was point-blank in this courtroom.

THE COURT: Okay. All right. Thank you.

First off, let me address Mr. Thompson, who's not in the courtroom, but address what I'm going to do about him. And I'm glad that a CSO is here, and I'll work with the CSOs to make this happen.

But I am excluding him from the courtroom. I am excluding him from the courthouse. I am precluding him from having any contact with any of the witnesses in this case, directly or indirectly. I'm precluding him from taking any photographs of any witness in this case. I will work with the CSOs to get information to them about how they can identify who he is.

Additionally, obviously a criminal investigation has already started. I have referred this matter to the United States Marshal Service as well, to see what our cameras picked up and what we can discern from what we see on those cameras.

As for a mistrial, however, I am going to deny that motion. There's been no indication that these defendants have directed any of the behavior here that is very concerning and bothers me immensely. But I don't see a tie between what he did and what they did. They have very capable counsel who I'm sure has told them that this sort of thing can only be detrimental to them. And so I can't imagine that they would

have been involved in this, at least given what's been provided to me so far. Now if that changes, I will reconsider. But at this point I'm not going to grant a mistrial.

Additionally, I should say that if Mr. Thompson wishes to tell his side of the story, he may wish to do so --

08:24AM

Mr. Thompson, you're being excluded from the courtroom and the courthouse, so if you could just wait for one second I'm going to tell you what I just ruled on and you can listen and then leave.

08:25AM

I have ruled that there has been sufficient -- a sufficient proffer made of your behavior with regard to witnesses in this case. You are being excluded from this courtroom and this courthouse during the duration of this trial. You are to have no contact with the witnesses. You're to take no photos of the witnesses. You're to have no contact with them directly or indirectly. You are not to post anything on social media about them. If you do any of those things, that will get you into trouble, including potential sanctions or worse.

08:25AM

08:25AM

The other thing you should know is that I am giving you an opportunity, if you want to, seek leave to enter the courtroom and the courthouse. You will have to do that by filing a motion under miscellaneous case number in our court. I would suggest that you speak with an attorney before doing so, because the allegations here involve criminal accusations

08:26AM

08:26AM of you being engaged in witness tampering or intimidation, which is a federal crime.

So with that, I'm going to ask you to please leave the courtroom and leave the courthouse, and do not return unless and until you file a motion for me to consider.

If we can make sure that the CSOs take him out of the courthouse. Thank you.

08:26AM All right. Mr. Portnoy, as for your witnesses, I don't know if it would help you to have me talk to them in open court. I'm happy to try to do that to assure them of the things that I just said on the record. If that's going to help with them feeling more comfortable about testifying or what not, I'm happy to do that. But at this point, I've done what I think is just under the law.

08:26AM MR. PORTNOY: I need to make a record, Your Honor.

I cannot proceed in defending the counterclaim without three critical witnesses, regardless of what involvement the defendants had or didn't have.

THE COURT: Tell me what -- go through each one and

08:27AM tell me what their testimony would have been.

MR. PORTNOY: Well, we've already heard from one of them, from Cahira, about conversations that she participated in -- or posts that she reviewed in a chat rooms with Amanda. She's a critical impeachment witness on Amanda.

08:27AM And both Joni -- Joni in particular has had multiple

conversations with Haley about issues that are before the Court and will impeach her.

08:27AM These are two nonparty witnesses that they're bringing to try to reinforce this case, that here are two people who have come here on their own and testify against my client. And we have two impeachment witnesses who are going to rebut all of that. I don't know exactly what they're going to say, but we can guess.

08:28AM And you know, you've made your ruling. We're going to obviously have to appeal it at one point. I can't put on a case to rebut things about witnesses that I don't control that are being brought by the other side. They're not affirmative witnesses. That's why I said, it doesn't impact the case that we put on, in our case, but it directly impacts our ability to

08:28AM defend the counterclaim.

So --

THE COURT: I thought you said that there were three witnesses. Who's the third?

MR. PORTNOY: Well, yeah, Cahira is going to come

08:28AM back, too, to testify based upon what particularly Amanda and Haley say.

THE COURT: Okay. So tell me the three witnesses' names again.

MR. PORTNOY: Yeah. It's Aaralyn Shiri, Cahira

08:29AM Noelani, and Joni Abbott, who has now left the jurisdiction in

08:29AM fear of her life.

THE COURT: Would it matter, Mr. Portnoy, if I allowed any of these people to testify remotely?

MR. PORTNOY: In what? I'm sorry.

08:29AM THE COURT: I would like to allow them to testify remotely. I mean, if they have -- if at least one of them has fled because she's fearful for her safety, she can testify remotely, as can the others.

And I think I've done everything I can at this point 08:29AM to reasonably protect them from further intimidation or concerns. I have excluded him from the courthouse. I've ordered him to have no contact with them. I have ordered him to post nothing about them and to take pictures of them. I think remote testimony is a very good alternative that you have 08:29AM perhaps not discussed with them, and I will direct you to consider discussing that with them.

MR. PORTNOY: I have discussed it with them, Your Honor, and at this point they are not willing to do so.

One thing you did say -- and I don't control these 08:30AM people. They're not my clients. But if you want, I can ask them if they would appear before you and discuss their fears and concerns, and you can talk with them and see if there's an alternative.

But I know what they've told me starting late Friday 08:30AM through the weekend. And again, they're not my clients. I

can't make them do anything. And I think you may want to hear from them. We didn't put everything in the affidavit in the short time that we had.

08:30AM So, that's all I can say. I certainly know that a mistrial is not a preferred thing, that's why we didn't state it as the only option. We put it as an alternative. But if we don't have them -- and there's no question, there's no question that Mr. Horvath and Mr. Thompson know each other and have talked. People have seen --

08:31AM THE COURT: I understand --

MR. PORTNOY: But I'm not -- I'm not -- I want to make it clear, I don't -- I'm not suggesting there was a direct connection that you go out and you harass these people and you write on -- you post about them and you stand out there with

08:31AM the telephoto lens and you confront them, there was a screaming match, you know, but it happened. And I need them.

So if you can convince them somehow that they can testify, either remotely or otherwise, I'm happy to have you have that opportunity. I have not been successful.

08:31AM THE COURT: All right. And are you telling me that there are no alternative witnesses to proffer the same testimony? I mean, it sounds to me like -- just based on what I've heard so far in the trial, there are these group chats going on and group discussions going on. So I suspect that

08:32AM many of these conversations were witnessed by other people as

well, so in my view you could have potentially other witnesses who --

MR. PORTNOY: It could be. Your Honor, I haven't had time to look into that as to whether there's other people who can do that. These were the people that we have been known about. As you know, you heard the motion on the witnesses, and that they would be only allowed as impeachment witnesses. We accepted that. And they can't impeach if they're not willing to testify, so...

08:32AM THE COURT: Understood.

MR. PORTNOY: Anyway --

THE COURT: All right. Anything, Mr. Adams, about those suggestions that I made? Any objection to either of those?

08:32AM MR. ADAMS: No, Your Honor.

THE COURT: Okay. All right. Then we will start with the jury back on the stand.

Let me let the attorneys know that Mr. Owens, juror number one, has brought his own ear pods to assist in his hearing. So, if you see him with ear pods in, that's what he's doing, he's not listening to something else. All right.

MR. ADAMS: I think that's a great idea.

THE COURT: Okay.

MR. PORTNOY: Your Honor, I just have one other thing. We need time to deal with this. I'm not saying we don't put on

the two defendants, but before either Amanda or Haley testify, I think that we need to have this resolved if there's any alternative or not. And you know, I understand, I need to talk to them. I need -- I need to get in touch with someone who is on the Mainland. I need to see if there's an alternative witness.

08:33AM

I'm just advising you that it might be we're going to need a little bit of time --

THE COURT: Okay.

08:33AM

MR. PORTNOY: -- before they testify, not -- not the defendants.

THE COURT: How much time are you asking for?

MR. PORTNOY: An hour?

THE COURT: Okay. I'll give you that if we get to the point where it's needed.

08:33AM

MR. ADAMS: Now he's interfering with my case-in-chief and witnesses that have traveled here for mine. And this is something that they created, we had nothing to do with.

THE COURT: I understand.

08:33AM

MR. ADAMS: I have Amanda waiting to testify right after this witness. And if I don't, then she's going to go, and I have three-and-a-half days, Your Honor, that we wasted a whole day Friday on one witness.

THE COURT: We're adding half an hour to a break, that's all we're doing. Okay?

08:34AM

MR. ADAMS: That's fine.

THE COURT: That's all we are doing.

MR. ADAMS: No problem. I should have asked for clarification first.

08:34AM But I'm very concerned now that this is getting into our case-in-chief, which I have all lined up like 747s on the runway, Your Honor.

THE COURT: I hope so.

MR. PORTNOY: Can I make one more comment? I just

08:34AM want to make sure I heard something so the record is clear.

Counsel has suggested now twice that we created this. I -- I just need a record, Your Honor, we may have to go up -- I believe counsel has said that twice.

THE COURT: No, that's --

08:34AM MR. PORTNOY: And you've asked me what evidence I have, but you haven't asked counsel.

So I just want to make it clear that he is now alleging that what occurred, we created. And we will deal with that appropriately. Thank you.

08:34AM THE COURT: You've made your record.

MR. PORTNOY: Thank you.

THE COURT: All right. Let's not start off this week this way. It's only going to get worse. All right?

I understand -- I understand that this is very

08:35AM serious. I understand that there are very serious concerns,

but we can handle this in a way that is more polite than we are handling it. All right? That's what I expect.

We are going to bring the jury in.

I will step off the bench.

08:35AM (A recess was taken from 8:35 a.m. to 8:39 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery Network LLC et al., versus Paula Haygarth et al.

08:39AM This case has been called for jury trial day six.

Counsel, please make your appearances for the record, starting with the plaintiff.

MR. PORTNOY: Jeff Portnoy, Troy Young, and Jenny Tokuoka. Morning.

08:39AM THE COURT: Good morning.

MR. ADAMS: Morning, Your Honor. Joseph Adams and Laura Moritz on behalf of defendants and counter-claimants.

THE COURT: Good morning. You may all be seated.

Welcome back, ladies and gentlemen. I hope you had a

08:40AM restful weekend. It's good to see all of you. And I am thankful that you are always on time, in fact, early from what I hear. So thank you for that.

Today we are going to have one break that's going to be about an hour. I'm not sure exactly when that is going to

08:40AM be. Or I should say I expect we will have one break today that

will be about an hour. If that happens, I will let you know.

At this point, we will have our typical morning recess with a stretch break before then.

So -- and we will probably get out today about 3:15.

08:40AM Okay?

All right. With that, Ms. Horvath, if you could retake the stand, please.

And Ms. Moritz, you may continue your direct examination. Thank you.

08:41AM STEFANIE HORVATH, DEFENDANTS' WITNESS, PREVIOUSLY SWORN resumed direct examination

RESUMED DIRECT EXAMINATION

BY MS. MORITZ:

Q Good morning, Stefanie.

08:41AM A Good morning.

Q I think on Friday we left off discussing the custody arrangement between Byron and Haley around the time that you and Byron moved in together. I think that was the 2018, 2019; is that correct, that timeframe?

08:41AM A Yes, that's correct.

Q All right. Now, from your perspective, how was their coparenting arrangement working out at that point in time?

A At that point of time it was kind of just they would meet in Regina and do the exchange, and we would have Isla for the

08:42AM weekend, and then we would have our weekend and time together,

and then she would meet -- they would meet again in Regina for the exchange for drop off.

Q So you didn't observe any issues or disagreements or concerns?

08:42AM A No, not at that time.

Q Okay. And what were your observations of Byron as a father?

A He's always been a very good father. You know, always laughing and joking. He's a big teaser and big teddy bear at 08:42AM the same time. Yeah, we're always kind of out doing stuff as a family in our community. We have lots of other, I guess, friends in the community that have small children as well, so we're always getting together with our friends. And he's always just been a really good dad.

08:42AM Q At some point in time did the dynamic with Byron and Haley as coparenting Isla, at some point in time that dynamic change?

A Yes. In I think the fall of 2020 is when Haley started to deny some access to Byron.

Q When you say "deny access," you mean she wouldn't deliver 08:43AM Isla for the pickup or drop off or what have you?

A Yes, that's correct.

Q I see. Do you know the reason for that?

A At the time we didn't really know, it was kind of -- seemed out of the blue to us why she was denying access. Now 08:43AM with the information we have, I have a -- an idea. But at the

08:43AM 08:44AM 08:44AM 08:45AM 08:45AM

time we did not really know why she was denying the access.

Q Did you notice anything different or unusual in Isla behavior at that time?

A Isla was starting to talk about strange things with us. I distinctively remember a day where Isla -- we were at the shop and they were going to go into the field. So Isla and I were just hanging out in the coffee room and then she started talking about her mom's butt brews. And I didn't know what she meant by butt brews. So I asked Isla, what on earth is a butt brew? And at the time she told me that there's this long thing that her mom puts in her tummy all the way up to here, and it makes her poop and poop and poop and poop. And at that point I had no idea what that was. Even the reference of butt brew, I had no clue what she meant. And at that point it just seemed weird behaviors.

And that Thanksgiving, which is October, I think in Canada, it's a little bit earlier, we just asked how her Thanksgiving was, and she told us that everybody had their turkey and her nana made all the fixings and treats. And then said that her mom only had her green juice though.

So just weird things that we felt kind of concerning at the time.

Q When did you first learn about Ms. Wilson, also known as Liana Shanti?

A Right around that time she would talk about her mom's

friend Liana. And just that she was always on the phone with her.

Q And when you said "she," you're referring to Isla?

A Isla, yes, that's correct.

08:45AM Q And that was in the fall of 2021, was that the same time period?

A This was in 2020, in the fall, yeah.

Q At some point did your concerns about Haley's care of Isla escalate in any way?

08:46AM THE COURT: If you could restate that, please, just a little bit louder? Thank you.

MS. MORITZ: Is that better?

THE COURT: Yes. Thank you.

BY MS. MORITZ:

08:46AM Q At some point did your concerns increase about Haley and Isla?

A Our concerns did increase when we started to not get time with her, and she made some wild accusations towards Byron. I remember driving home from work and Byron calling me in tears 08:46AM saying that he wasn't going to -- she wasn't going to bring Isla. And he asked me what he should do. And I said, you should just call your lawyer.

Q At some point did you look at -- you mentioned that you first heard about Ms. Wilson in 2020. Did you look at her 08:47AM Instagram page or look into her at all or make any kind of

investigation?
A Not in 2020. We really didn't know much about her at all. It was in the fall of 2021 when we received a phone call from a mutual friend of one of the students, and said that she just left basically in the middle of the night, and told us that Haley is involved with the same woman, and basically just to be aware of this.
So a phone call to protect us, to make sure that Isla wasn't in that same position.
And then at that point is when we started kind of looking into who this person was, because of the fear that we had and the warning that was provided to us.
Q Who was the person that you said fled during the night, as you said?
A The person who called us was Lindsey Irwin, was the person who left, and it was a mutual friend of Lindsey Irwin and Byron's.
Q That called you?
A That called us, yes.
Q So what did you do next?
A At that point we started looking into who this person was. I started looking at this person's Snap -- or not, sorry, Instagram stories to see what was going on.
We contacted the police at that point and our lawyer to get the border flagged, because we were really concerned

08:49AM
08:49AM
08:49AM
08:49AM
08:50AM

that Haley would take Isla in the middle of the night as well.

MS. MORITZ: Let's pull up, please, for the witness Exhibit 1171.

THE COURT: You may.

MR. ADAMS: It's up.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q Ms. Horvath, are these screenshots that you took from the @LianaShanti Instagram account?

A Yes, they would be.

Q Okay. I see at the top of the page there's some additional language. Is that something you typed separate from the screenshots?

A Yes, this would have been something we provided to our lawyer.

Q Okay. So you took these screenshots and organized them for your attorney; is that accurate?

A Yes.

Q Okay. Let's take a -- if you would take a moment to look through the pages, briefly, and just confirm that you did not alter or doctor these screenshots in any way?

A No, I have never.

Q Okay. And do you recall when you took these screenshots?

A It would have been in December of 2021, and that's when we received that phone call warning us about what was going on.

Q Okay. Thank you.

MS. MORITZ: Move to Exhibit 1171 into evidence, please.

THE COURT: Any objection?

08:50AM MR. PORTNOY: As to authenticity or admissibility, Your Honor? I'm sorry.

THE COURT: Either.

MR. PORTNOY: Yeah, I think it totally irrelevant.

THE COURT: What's your proffer as to relevancy?

08:50AM MS. MORITZ: The screenshots, once we take a look at them, are going to demonstrate the statements that Ms. Wilson was making to the people on her Instagram account about leaving Canada, and her reasoning for that.

THE COURT: All right. Does this -- I'll admit 1171, 08:50AM as it relates to some of the issues regarding the accusations of the defamation committed by Ms. Horvath.

1171 is admitted.

(Defendants' Exhibit 1171 was received in evidence.)

MS. MORITZ: Thank you.

08:51AM If we could turn down to Page 3, I believe, and could see the bottom middle --

THE COURT: I'm sorry, please publish this.

MS. MORITZ: Oh, apologies. Thank you.

BY MS. MORITZ:

08:51AM Q And you can see there -- am I reading this correctly,

08:51AM Stefanie, that it says: Ask me anything. Where is the safest place to move to?

Response: There are many safe places. I can help more when you give me specifics you are thinking about and I can confirm.

MS. MORITZ: We can go down again, to the next page.

And the next, please.

BY MS. MORITZ:

08:52AM Q And at the top middle square -- and just to confirm, that is a screenshot that you took from Ms. Wilson's account?

A Yes, that's correct.

Q Where it states: In good conscience I can't recommend anywhere in Canada.

THE COURT: Let's slow down, please.

08:52AM MS. MORITZ: My apologies.

THE COURT: This is very normal to read quickly when you're reading, but if you could be aware of that, please, Ms. Moritz. So let's start over.

BY MS. MORITZ:

08:52AM Q Just confirming, Ms. Horvath, that this is an accurate screenshot that you took with your phone?

A Yes.

Q And there it states: In good conscience, I cannot recommend anywhere in Canada.

08:52AM A Yes.

MS. MORITZ: And if we could go down to the last page, please.

I see in the last -- excuse me, the page before. I apologize. In the last -- nope. There you go.

08:52AM BY MS. MORITZ:

Q The lower right square. That is also an accurate screenshot that you took?

A Yes.

Q And it appears to be a text message of someone showing --

08:53AM making statements about crossing the border?

A Yes.

Q Thank you.

MS. MORITZ: We can take that down, please.

BY MS. MORITZ:

08:53AM Q Ms. Horvath, you testified about flagging the border because you were concerned about Haley leaving the country. Did she at some point do that?

A We did find out that she tried to take Isla across the border in -- I think in the middle of the night. But later on,

08:53AM like, I think in 2022, I believe, is when she attempted to take Isla across the border.

Q Do you remember approximately when in 2022?

A I think it was in March of 2022.

Q When did -- by the way, when did you and Byron get

08:54AM married?

08:54AM

A We got married on February 19th, 2022.
Q Okay. So right around the time all of this was happening?
A Yes.
Q Did -- after Haley tried to leave Canada with Isla, what happened next?
A Well, once we were told about the warning in December of 2021, we talked with our lawyer, and she wanted to make sure that we had information provided to the court. We were quite fearful of Isla being, essentially, taken in the middle of the night and not having any connection to us or her mom's family as well.
So we worked with our lawyer to write affidavits of what has happened. And then we filed an application to ensure Isla safety.
Q And just --
A Within the court system, sorry.
Q No, that's okay. You anticipated my next question, which is I just wanted to confirm that those were affidavits you filed in Byron's Family Court proceeding, correct?
A Yes, that was all private confidential applications.
Q Okay. Thank you.
And besides Byron and -- I don't know, did you submit an affidavit as well?
A I did, yes.
Q You did. I presume Byron did as well?

A Yes.
Q Did anyone else submit an affidavit in support of what you were -- of the relief you were seeking in the Family Court?
A Haley's family did. Her mom, her dad, her sister. Wade did as well.
08:55AM
Q Wade, you're referring to --
A Oh, sorry, Wade Martin.
Q And that's Paula's spouse, correct?
A Yes.
08:56AM
Q And did Wade work with you directly on that or did he or with someone else?
A No, Wade worked directly with our lawyer to write that affidavit.
Q Okay. And what happened with that custody proceeding?
08:56AM
A We filed that custody proceeding, and then the judge looked at all the information provided, and he made a recommendation that said Isla was not -- not in the best interest of Isla to stay with Haley because of Haley's involvement with a quasi-religious group.
08:56AM
Q Let's -- let's shift gears a little bit and talk about the basis for your counterclaim against Ms. Wilson and the defamatory statements she made about you online.
When did you first become aware of the online attacks against you from the @LianaShanti Instagram account?
08:57AM
A It happened right after the application was put in and

Isla became into our custody, which would have been April of 2022.

Q Did you start to follow the @LianaShanti Instagram account when the online posting started?

08:57AM A I don't think I actually followed the account, but I would check the stories quite often, and take screenshots for documenting evidence of the attacks that were happening against us.

Q What sort of comments did you see made about you?

08:57AM A There were so many. There was -- I think it was probably -- there's, you know, hundreds of thousands of posts against us. Talking about us being demons and satanic. And, you know, they were attacking our lawyer, all of our family members. So all of Byron's family members were being attacked, 08:58AM our lawyer was being attacked online, saying that we're demons and satanic and, you know, said they're doing a prayer, but the prayer actually to me was very threatening. So to me it was, you know, making all these statements and then saying, oh, but it's a prayer. But to me it's, like, very awful things that 08:58AM they were saying.

They were talking about our sex life. They were talking about my appearance. They were saying I was trying to become Haley because essentially I was married to Byron. So there were statements, you know, about us -- me being in the 08:58AM marital bedroom, where -- when we, me and Byron moved in, our

house had two bedrooms. So to me I wasn't going to make my husband buy a new house because he was previously married, right? So was I supposed to sleep on the couch because they're making comments that we had the same bedroom that he had when he was married to Haley?

08:59AM

They made fun of me for drinking milk. They actually found a copy of our wedding video, and demonized us and my appearance on our wedding video, and analyzed photos of me, taking pictures of my eyes and saying I have dark, demonic eyes.

08:59AM

It was -- there's this countless things that they did to me. It's just so awful.

And then she would post things and all of her students would comment on it and then she would repost everything every single thing her students commented.

08:59AM

She started attacking a friend of mine online. She attacked all of Byron's family members. It just hideous, hideous things.

Q You used the word "they" several times. I just want to confirm, you're talking about the @LianaShanti Instagram account, correct?

09:00AM

A Yes.

Q Okay.

What -- what does it feel like, Stefanie, to have someone post things like that about you on social media?

09:00AM

A I was actually very, very scared. It got to the point where I went to the local police because I was so scared, because I didn't know what her followers and herself were capable of. I filed a police report. I was scared to travel

09:00AM to Regina in case people ran into us. I feel like Regina is a small community, everybody knew what was going on. I was petrified.

I started taking screenshots to provide to our lawyer. And from the stress, my hair started falling out. I had a big

09:01AM chunk of hair, big, huge bald spot like this I had to cover up from the stress of trying to collect evidence. And it was to the point where I was wanting to leave Byron because I was being attacked just for being married to somebody who was previously married. They were taking away all the beautiful

09:01AM moments in our life.

I had my first baby during these attacks. And then they were commenting about my son's health online. And he's had no medical issues. They were talking about just everything that's deeply personal. And, you know, those good moments in

09:01AM your life that you should be able to celebrate, they've taken them and made them demonic.

Q Stefanie, remind me, how big is the town that you live in?

A Raymore maybe has 600 people.

Q 600 people.

09:02AM How did all this affect your life and your community?

A Everywhere we went there was people whispering behind our backs all the time. For a long time I didn't want to leave the house, and that's why we went to the police. I just -- it just seemed like everybody knew what was happening in our lives.

09:02AM Q Yeah. And did you -- did you end up -- I mean, did you continue to take screenshots of these posts?

A No. Byron came home and I was basically having a panic attack and packing a bag. Byron is, like, I love you so much we need to figure out a plan.

09:03AM So at that point we contacted our lawyer, and our lawyer started monitoring the page of every single time she spoke about us so she could document it for us.

And at that point I made boundaries of anybody who would talk to me about it. I did not want to talk about it. I

09:03AM just made boundaries that I just couldn't deal with any of it. And after that is when my hair actually started growing back --

Q Okay.

A -- was after we had somebody else collecting the evidence for us.

09:03AM Q I see. Well, I'm going to ask that we do look at one of the posts that you collected before you turned over that responsibility.

MS. MORITZ: If we could pull up Exhibit 1052.

THE COURT: You may.

09:03AM MR. ADAMS: It's up.

MS. MORITZ: 1052.
MR. ADAMS: It's up.
MS. MORITZ: Oh, thank you.
For the witness, please.
09:03AM BY MS. MORITZ:
Q Stefanie, do you recognize this post?
A I do.
Q And is this a screenshot that you took?
A It would have been, yes.
09:04AM Q Okay. Do you recall approximately when you would have taken this screenshot?
A I do not.
Q No. You --
A It would have been in 2022, I would assume, because that's
09:04AM when the attacks started.
Q And that was before you turned over the duties to your counsel?
A Yes.
Q And did you alter this screenshot in any way?
09:04AM A No.
MS. MORITZ: I would move Exhibit 1052 into evidence.
THE COURT: Any objection?
MR. PORTNOY: My objection is we don't know when she viewed it and when she photographed it.
09:04AM THE COURT: She testified that it was in 2022. It

goes to weight rather than admissibility.

1052 is admitted and may be shown to the jury.

(Defendants' Exhibit 1052 was received in evidence.)

MS. MORITZ: Thank you, Your Honor.

09:05AM BY MS. MORITZ:

Q And Stefanie, I see here it reads: The almost year long attacks, lies, defamation, threats, flying monkeys, smear campaign, intent to cause harm, deliberate interference with business relationships, and sick, vial abusive behavior of

09:05AM Paula Haygarth, Byron Horvath, Stefanie Vogt.

Is that you, Stefanie Vogt?

A That is, yes.

Q And then going down, skipping over some other names: And all the other deranged, manipulative high-level abusive

09:05AM narcissist have been well documented. And the damage they have created for many families is extensive.

Do you remember how you felt when you saw this post?

A I just looked at it and I couldn't even believe my name was on a public profile. I've always been very private. I

09:06AM don't have any public social medias of any kind. So to have somebody broadcasting names with wild accusations was just -- yeah, it was just one of those additional stressors when you read something like that that's not true.

MS. MORITZ: We can take down Exhibit 1052, please.

09:06AM BY MS. MORITZ:

Q You've mentioned -- you mentioned your own social media account. So you're on social media as well?
A I was. I have now deactivated my accounts, because I don't feel safe to be able to share information online.
09:06AM Q But when -- but you when you did have social media accounts, were those accounts public or private?
A They were private.
Q You mentioned you saw photographs of yourself in posts on Ms. Wilson's account. Do you know how she could have gotten
09:07AM photographs of you?
A Some of them, I think, were from a Facebook picture where your -- I don't know, the background picture. I think those were public and I was not aware of that at the time. I think you had to go in and make those all private after the fact.
09:07AM And then there was pictures of us from our wedding video, which our photographer had posted.
So, I believe that's how they got pictures of me.
MS. MORITZ: I see. Let's take a look at Exhibit 1054, please.
09:07AM MR. ADAMS: It's up.
BY MS. MORITZ:
Q Stefanie, do you recall seeing this document before?
A I have.
Q And do you recall, are there statements about you in this?
09:07AM Do you know what this is?

A This would have been something submitted by our lawyer as an exhibit in our Family Court case.

MS. MORITZ: Let's scroll down to where it discusses Stefanie, please.

09:08AM BY MS. MORITZ:

Q Do you recall reading about yourself in this article?

MS. MORITZ: Oop -- next one, sorry.

BY MS. MORITZ:

Q Was that a photo of you on the prior page?

09:08AM A That was a photo of me. That was in our engagement photos.

Q And then -- that was your engagement photo?

A Yes.

Q And do you have any idea how someone would get a copy of

09:08AM that?

A I do not, no.

MS. MORITZ: The next page, please.

BY MS. MORITZ:

Q It reads: Stefanie Horvath is the new wife of Haley

09:08AM Winter's ex-husband, Byron Horvath. Stefanie has radically changed her appearance when she began dating Byron to appear more and more like Haley. According to what Haley has shared, this woman has been leading the charge to remove Haley's little girl Isla from her?

09:09AM Is that true, Stefanie, were you leading the charge to

remove Haley's daughter from her?
A No, it was the judge's decision.
MS. MORITZ: Thank you.
We can take down that exhibit.
09:09AM MR. PORTNOY: No objection.
THE COURT: Do you want the exhibit admitted or not?
MS. MORITZ: Oh, I'm sorry. I actually thought it was already in evidence, so that's my mistake.
THE COURT: It was not.
09:09AM Any objections to it? No objection?
MR. PORTNOY: No.
MS. MORITZ: Okay.
THE COURT: This exhibit, which I believe is 1054, is admitted.
09:09AM (Defendants' Exhibit 1054 was received in evidence.)
MS. MORITZ: Thank you.
And may we publish it to the jury?
THE COURT: You may.
MS. MORITZ: Thank you.
09:09AM BY MS. MORITZ:
Q Just to read it, that is the photo of you there, Ms. Horvath, and then on the next page is the language about you that I just read, correct?
A Yes.
09:10AM Q Okay. Thank you.

At some point, Stefanie, did you become aware of an account on Instagram known as the Liana Shanti Cult Recovery Group?
A Yes, I did.
09:10AM Q How did you learn about that account?
A I learned about that through Elise, which is Haley's sister.
Q I see. So Haley 's sister told you about that account?
A Yes.
09:10AM Q Did you start to follow that account, or just what did you learn on that account?
A I never followed it at all. We just watched the stories.
Q Okay. Do you know who was running that account when you started checking it?
09:10AM A I do not.
Q Do you know who runs it now?
A I do not.
Q Did you ever post anything under that account?
A Never.
09:11AM MS. MORITZ: We can take down that exhibit, if it's still up.
THE COURT: You may.
BY MS. MORITZ:
Q Thank you.
09:11AM So, just to confirm, Stefanie, did you ever post the

statement, "Liana is a fake con artist, master manipulator, filtered avatar puppet, master cult leader" on the Liana_Shanti_Cult_Recovery_Account?

A I did not.

09:11AM Q Did you ever post the statement, "Ms. Shanti is making money and is abundant in a very 3D way extortion" on the LianaShanti_Cult_Recovery Instagram account?

A I did not.

Q Did you ever post the statement, "Liana coaches other
09:12AM women on how to claim sexual physical abuse against their partner" on that account?

A No, I did not.

Q Did you ever post the statement, "Liana really does encourage false police reports" on that account?

09:12AM A No, I did not.

Q What about the statement, "Ms. Shanti funneled investors' money out of Canada into Florida where they're using a state tax loophole to fund their mansion and cult"?

A No, I did not.

09:12AM Q And just to confirm, you do not know who posted these?

A I do not.

Q Do you have an account on Reddit?

A No.

Q Have you ever had an account on Reddit?

09:12AM A No.

Q So, you didn't publish an article on Reddit entitled The Shanti Summary?
A I did not.
Q Do you know who runs the Reddit account,
09:13AM you/Liana_Shanti_Cult369 account?
A No, I do not.
Q Do you know who operates or runs the Salt-Health6213 account on Reddit?
A No, I do not.
09:13AM Q Just to confirm, you did not post a statement on Reddit which read, "Ms. Shanti literally robs her students and thrives from making sure her students stay stuck. Her programs are all copied and none of the content is hers. It's stolen material from other people. She expects people to worship her, and if
09:13AM they don't, she kicks them out of her groups and still takes their money"?
A No, I did not.
Q Did you ever post the statement on Reddit, "The possible crimes committed by her followers as a result of Liana's
09:13AM narratives and coaching techniques online deem her a potential accomplice"?
A No, I have not.
Q Do you know who runs or operates the account Alarmed_Aspect1678 on Reddit?
09:14AM A No, I do not.

Q And just to confirm, you did not post the statement, "Ms. Shanti was working on scamming and manipulating a person out of all his money and then take off somewhere. The B, star, star, star, uses the kids to manipulate him and then accuse him

09:14AM of the worst possible things with the kids"?

A No, I have not.

Q Are you familiar with a website called The Cult Education Institute?

A I think I might have seen that.

09:14AM Q So you may have seen it?

A I might have.

Q Okay. Do you have an account on that website?

A No, I do not.

Q All right. So, you've never posted anything on that

09:15AM website under the username LianaRecovery?

A No, I have not.

Q You never made a statement on that website stating, "Ms. Shanti created plagiarized a number of health protocols"?

A No, I have not.

09:15AM Q And you never posted a statement on The Cult Education -- excuse me, The Cult Education Institute website stating, "Ms. Shanti's programs are heavily rooted in traditional psychology, but use thought programming and undue influence, social pressure and side groups to extort women"?

09:15AM A No.

Q Thank you.

And did you post a statement stating, "Ms. Shanti influences women to leave their husbands, file for sole custody, and go no contact with them or any other family member. We have been inundated with stories from fathers of their wives and ex-wives violating custody orders and preventing them from seeing their children." Did you post that?

A No.

09:16AM Q And did you post -- I just want to confirm that you did not make these statements. I know it's a bit tedious, but I think it's important.

A Okay.

Q Did you post the statement that Liana has influenced at least two-dozen women and their children to pick up and leave their state countries and families regardless of custody decisions and move primarily to the United States. We know of at least one woman who attempted to kidnap her children and cross the border from Canada into the United States.

09:16AM Did you make that statement?

A No, I have not.

Q Did you ever post a statement on the Cult Education Institute, "An expert we consulted has called us on online version of human and child trafficking"?

09:16AM A No, I have not.

Q Did you ever post the statement, "Liana cherry picks her cult psychology from Jonestown, Heaven's Gate and Waco"?
A No.
Q Did you ever post anything under the username White Knight
09:17AM on the Cult Education Institute?
A No.
Q So it's correct that you never posted the statement: Once a follower has been removed from the group, there have been instances of public shaming by rereleasing personal details to
09:17AM humiliate that individual and intimidate others. Liana makes false and outrageous claims regarding having personal IP information revealing location details for her critics, end quote?
A No, I have not.
09:17AM Q Thank you.
And just to confirm, do you have any idea who did make these statements online that we've gone through?
A No, I do not.
THE COURT: It might be a good time for a stretch
09:17AM break. So let's just take a very quick stretch break, ladies and gentlemen, and then we will have our recess at 10:00.
(Pause in the proceedings.)
THE COURT: All right. You may continue, Ms. Moritz.
MS. MORITZ: Thank you.
09:18AM BY MS. MORITZ:

Q I believe you testified a short while ago that you learned about the Liana Shanti Cult Recovery Group on Instagram and looked at that account from time to time. Was there ever a time when you were contacted by the group directly?

09:19AM A Yes. I received a direct message from that group on Instagram.

Q And do you recall approximately when that was?

A Sometime in the spring of 2023, I believe.

Q And is it correct that your husband Byron had already been 09:19AM sued by Ms. Wilson at this point in time?

A Yes, he was.

Q So you received a direct message. What was the communication between them?

A I'd have to see it to know what it exactly said, but it 09:19AM had something to the extent of -- saying that there was some kind of hearing and asked if we would participate in a Zoom meeting to learn about what was going on.

Q Okay. And did you participate in a Zoom meeting?

A We did, yes.

09:19AM Q Okay. Tell me a little bit about that. What happened during the Zoom call?

A Well, we did ask our lawyer prior to, because at this point there was an agreement in the custody case that no information regarding the custody case should be shared with 09:20AM third parties because of all the attacks online and making a

mockery of the court system.

09:20AM So we asked our attorney if it was okay to listen in to this phone call. So we did listen on the Zoom call, but we got on it late. I think it was in the spring, maybe. So, we got the Zoom call late and were able to listen in where they said something about Liana being on probation and there was a court case, or something to that effect.

Q Mm-hmm. Did they ask you to do anything?

09:20AM A They asked if we would be willing to write an impact statement to what our experience was with Liana.

Q And did you do that?

A We contacted our lawyer to ask if that would be okay. And she thought that would be fine, as long as we didn't discuss our custody.

09:21AM Q Okay.

MS. MORITZ: Let's pull up Exhibit 1156 for the witness, please.

THE COURT: You may.

09:21AM 1156 was previously admitted and may be shown to the jury.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q Stefanie, is this the statement that you -- that Byron made in the proceeding with Judge Mollway?

09:21AM A Yes, that would be.

Q Okay. Thank you. I just wanted to confirm that. I don't need you to review it again.
At some point -- well, let me ask you this: Did you stay in touch with -- did you continue to receive
09:22AM communications from the Liana Shanti Cult Recovery Group?
A Once we did this impact statement, we had our lawyer review it to make sure that it was okay. We -- or I myself e-mailed it to the e-mail that was provided. And then after that we kept on receiving e-mails -- or sorry, I kept receiving
09:22AM e-mails about the status of what was going on from that e-mail account.
Q From the Liana Shanti Cult Recovery e-mail account?
A Yes, that's correct.
Q Okay. And did you ever find out who was running that
09:22AM account?
A I did not, no.
Q Uh-huh. And at some point in time -- I mean, how often would you receive e-mails from them?
A I don't know. Every -- periodically when something would
09:22AM happen in that court case, I believe, is when we received e-mails.
Q Did you ever respond to those?
A No. I just always forwarded them to our lawyer.
Q And at some point did the communications from that account
09:23AM cease?

A Yes, they did.
Q They did.
Do you know what prompted that?
A There was an e-mail about this court case, and I forwarded it to our counsel, so to you. And you responded for us on our behalf.
Q And then the communication stopped?
A That's correct.
Q I want to go back and talk about the effect that the online posts had about you. I know you testified about it quite a bit earlier.
Can you -- can you -- did you engage in any counseling or get any kind of medical --
THE COURT: There's an exhibit on the screen right now.
MS. MORITZ: Oh, we can take that down. Thank you.
THE COURT: Okay.
MR. ADAMS: It was 1156 that was up there, Your Honor.
THE COURT: Okay. Thank you.
09:24AM MS. MORITZ: Oh, I'm sorry, yeah. Thank you.
BY MS. MORITZ:
Q Did you -- while you were going through this you described the distress that it caused you, these online posts. At any point did you get any counseling or seek any help?
09:24AM A We did do some counseling for it. However, we felt that

the biggest thing that we had to do was get somebody else to monitor the page for us, which was a financial burden for us, because our lawyer was doing it. And as we all know, lawyers have fees. However, we needed to do that because our own mental health was not great.

09:24AM

I was -- at the time I remember having to quit work early because I wasn't able to do my job anymore. I remember sitting in my vehicle crying and then trying to compose myself to go work with students, and I wasn't able to do it.

09:25AM So I had to leave work early for maternity leave. And then I wasn't able to return back to work for a length of time.

We have had several lawyers be involved with this to make sure that everything was done correctly. And because of the financial strain, you know, we can't have put money away

09:25AM for our kids for their futures because all our money is going towards legal fees.

It just -- we did counseling. We actually got Isla into counseling right away because of the accusations too. We wanted to make sure Isla had an outlet to have discussions

09:25AM about what was going on in her life in a safe place.

It was -- yeah, it just seemed that everything we could do we tried to do, but the biggest thing was to get somebody else to monitor the Instagram page for us.

MS. MORITZ: Let's -- for the witness take a look at

09:26AM Exhibit 1063.

MR. ADAMS: It's up.

MS. MORITZ: It is up. I don't know why there's not a stamp on the bottom, but I know it is marked.

BY MS. MORITZ:

09:26AM Q Stefanie, do you recognize this document?

A Yes.

Q It's a receipt from Cultivate Wellness Counseling and Therapy. Is this something you provided to your attorneys?

A Yes.

09:26AM Q And is it an accurate copy of your receipt?

A Yes.

Q And this counseling and therapy that you received, this session, do you know what this was relating to?

A Well, it would have been with regards to our relationship.

09:26AM Q Yours and Byron's relationship?

A Yes.

Q Okay.

MS. MORITZ: Move Exhibit 1063 into evidence.

THE COURT: Any objection?

09:26AM MR. PORTNOY: None.

THE COURT: 1063 is admitted and may be shown to the jury.

(Defendants' Exhibit 1063 was received in evidence.)

BY MS. MORITZ:

09:27AM Q I see it's a receipt for $140. Is this the only time you

guys sought counseling?
A I think we went a couple of times.
Q Okay.
And then you mentioned you also got counseling for Isla as well?
09:27AM
A Yes, that's correct.
Q Okay. Thank you.
MS. MORITZ: No further questions at this time.
THE COURT: Thank you.
09:27AM Cross-examination.
MS. MORITZ: Did I move that last exhibit into evidence? I'm sorry.
THE COURT: It is in evidence.
MS. MORITZ: Okay. Thank you.
09:27AM

CROSS-EXAMINATION

BY MR. PORTNOY:
Q Good morning.
A Good morning.
Q So what social platforms did you use previously?
09:28AM A I had Facebook and Instagram.
Q And you don't have them anymore?
A I deactivated them.
Q So you have no present social media accounts?
A Oh, no, I do have a Facebook account, but I strictly use
09:28AM to follow Marketplace in our community, so I can sell things if

I need to.
Q You have a Facebook account now?
A Just for Marketplace, yes.
Q And your testimony is you never at any time have ever posted anything anonymously about my client; is that correct?
A That's correct.
Q Do you know who did?
A I do not.
Q You don't know a single person that ever posted anything about my client that was negative?
A I do not.
Q You never made an inquiry as to who's posting these things about Liana?
A I have not, no.
Q Never asked Paula whether she knew?
A No.
Q Ever asked Byron?
A No.
Q Never asked anybody at the Liana Shanti Cult Recovery Group?
A I have not, no.
Q Never had any interest at all as to who was posting all these things about you?
A Our lawyer said basically to not get involved with anything.

Q Don't get involved -- I'm sorry?
A With anything. She basically said all the posts about us and everything that's going on online, she basically said just ignore it.
09:29AM Q But you had her collect all those posts.
A Yes, we were collecting evidence.
Q And she showed them to you, right?
A No, she didn't, actually.
Q And what was the purpose of collecting them?
09:29AM A To collect evidence because of us being sued here.
Q And so you saw them when they were submitted as evidence somewhere?
A I would have saw whatever she attached to affidavits at our custody hearing.
09:30AM Q And you never asked her, for example, do you know who sent any of these things? Do you have any evidence?
MS. MORITZ: Objection. Confusing as to what post he's referring to.
THE COURT: Overruled.
09:30AM BY MR. PORTNOY:
Q Did you ever -- did you ever ask your lawyer, what evidence do you have that the documents that you're submitting came from my client?
A Her assistant, Paris, was checking the accounts daily to complete screenshots.
09:30AM

Q But what evidence did your lawyer tell you that even her assistant had proof that any of these alleged posts from my client actually came from her?

MS. MORITZ: Objection, that it calls for attorney-client communications.

09:30AM

MR. PORTNOY: Your Honor --

You want me to respond?

I mean, counsel asked all these questions about communications with her lawyer.

09:31AM THE COURT: Sustained.

BY MR. PORTNOY:

Q You testified earlier that Isla made, quote, wild accusations against Byron. Do you remember that?

A I never said Isla made accusations.

09:31AM Q You deny earlier today you said Isla made, quote, wild accusations against Byron?

A If I said anything about accusations, it would have been Haley making accusations, not Isla.

Q Haley made. Okay.

09:32AM What were the wild accusations that Haley made against Byron?

A The accusations that I know about would have came from Child Protective Services that she contacted about Byron.

Q But what were they? What were the wild accusations? Not who she contacted.

09:32AM

A There was bruises on Isla's bottom, and as well as there was an accusation about Isla being locked in her room.

Q And so you became aware that Haley publicly made those accusations, correct?

09:32AM A I don't think making a report to Child Protective Services is a public thing.

Q Did you ever say Haley made those same statements online?

A I have not seen Haley make any statements online.

Q Are you aware that Haley communicated those and other

09:32AM statements directly to my client?

A I would assume that, because her client -- or your client was posting about these statements.

Q And the posts that you say my client made about what Isla alleged -- that Haley was saying about what Isla was doing or

09:33AM saying came from Haley, right?

A I would assume.

Q I'll ask it again.

Do you admit that Haley was making accusations against Byron about situations with his daughter, correct?

09:33AM A Correct.

Q Haley was making those, yes?

MS. MORITZ: Asked and answered.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

09:33AM Q And Haley made those in a statement to the court?

A To Child Protective Services.
Q Okay. And do you have reason to believe that Haley also made those statements directly to my client?
A I don't know the communication between Haley and your client.
09:34AM
Q And you called them "wild accusations." Do you have proof that what Haley was saying was happening to Isla was false?
MS. MORITZ: Objection. Vague.
THE COURT: Overruled.
09:34AM THE WITNESS: I can answer that?
Yes. The accusations were investigated, as well as unsubstantiated as well.
BY MR. PORTNOY:
Q Didn't Donna Winter, Haley's mother-in-law, and her sister-in-law, Elise Winter, report Byron for child abuse to CPS?
09:34AM
A I don't know for sure about that.
Q What do you mean, you don't know for sure?
MS. MORITZ: Objection. Calls for speculation.
09:35AM THE COURT: Overruled. She can explain.
THE WITNESS: I know there was a phone call that we received to come to investigate our house. I don't know the steps that led to that phone call.
BY MR. PORTNOY:
09:35AM Q But do you know who made those accusations?

A Not exactly. The only information I have was what your client has posted online about them.

Q So you say you have no knowledge that Donna Winter and Elise Winter reported Byron to CPS?

09:35AM MS. MORITZ: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Did Haley go to Florida alone with Isla?

A I don't know.

09:35AM Q Did Drew go with her?

A I don't know.

Q Well, who was living in Florida when you learned that Haley and Isla were in Florida, who else was in the family unit?

09:35AM MS. MORITZ: Objection. Confusing. Vague. Assumes facts.

THE COURT: She can explain if --

Did you know -- did you believe at some point that Haley Winter was in Florida?

09:36AM THE WITNESS: No, we had the border flagged and Haley was turned around at the border.

BY MR. PORTNOY:

Q When Amanda moved to Florida, did she move with her husband at the time?

09:36AM A I would assume. I don't know for sure.

Q Are you aware that Haley wrote a letter to Judge Mollway telling a federal judge that the decision to attempt to move to Florida was hers alone and Liana had nothing to do with it?

MS. MORITZ: Objection. Best evidence.

09:36AM THE COURT: It's hearsay as well. Sustained.

BY MR. PORTNOY:

Q Have you seen the letter that Haley wrote to Judge Mollway?

A I think I might have.

09:37AM Q Do you remember what it said about whose decision it was to move to Florida?

A I don't recall the details of the letter.

Q Do you remember seeing in the letter anything about -- Haley saying anything about whether Liana had anything to do with her move to Florida? 09:37AM

MS. MORITZ: Objection. Confusing. Calls for hearsay.

THE COURT: Sustained.

BY MR. PORTNOY:

09:37AM Q What do you remember about the letter?

A It was a long time ago. I just remember -- I think I've only seen the letter in this court proceeding here. Yeah, I'm not sure exactly what she said in that letter.

Q Do you know that Byron was deposed in this case?

09:37AM A Yes.

Q Have you ever read the transcript?
A I think after I was added into this case I did.
Q Do you recall reading that Byron testified that nobody in his town believed any of the posts?
09:38AM A I don't remember that exact detail.
Q But your testimony is the whole town was talking about it?
A I would say more the community of Regina was talking about it.
Q But you don't recall Byron saying nobody believed any of
09:38AM it?
A I don't recall all the details of his testimony.
Q Do you know how the Liana Shanti Cult Recovery Group got your name?
A I would assume because your client was posting about us at
09:38AM that time.
Q And was my client posting your e-mail address?
A No, I don't think so.
Q Do you know how they got your e-mail address?
A When they requested that Zoom call, there was some intake
09:39AM form to complete that I provided my information, on the advice of our lawyer in Regina.
MR. PORTNOY: Your Honor, I move to strike that answer. It concerns attorney-client communication.
THE COURT: Overruled.
09:39AM BY MR. PORTNOY:

Q How did they get your e-mail for the first e-mail, before you filled out the form?

MS. MORITZ: Objection. Misstates testimony.

THE COURT: Overruled.

09:39AM THE WITNESS: I received a message request on Instagram.

BY MR. PORTNOY:

Q I'm sorry?

A A message request on Instagram.

09:39AM Q Can you explain that to me, please?

A On Instagram people can send you messages. I have a private Instagram, so there's a section where it says message requests that you can look at messages that people send you that aren't friends with you. And I happened to see that

09:40AM message request in my direct message on Instagram.

Q And you testified that you received, even after this initial Zoom call and you wrote the letter, several subsequent e-mails --

A Yes.

09:40AM Q -- from this group advising you as to what was going on, right?

A Yes.

Q Okay.

So, let's start with Exhibit 48.

09:41AM THE COURT: 48 maybe shown to the witness but not the

jury.

BY MR. PORTNOY:

Q Do you see 48?

A I see it on the screen, yes.

09:41AM Q Is that the first e-mail you got from the Liana Shanti Cult Recovery Group regarding the Zoom meeting?

A I'm not sure.

Q Have you seen this before?

A I can't see the whole e-mail.

09:41AM MR. PORTNOY: Oh, scroll down, please.

THE WITNESS: I think that would be the first e-mail received.

MR. PORTNOY: Your Honor, move Exhibit 48 into evidence.

09:42AM THE COURT: Any objection?

MS. MORITZ: No objection.

THE COURT: 48 is admitted and may be shown to the jury.

(Plaintiffs' Exhibit 48 was received in evidence.)

09:42AM BY MR. PORTNOY:

Q So that may or may not be the first one, but that's the one telling you about the meeting, right?

A Yes.

Q Okay.

09:42AM MR. PORTNOY: Let's go to 52, please.

THE COURT: 52 was previously admitted and may be shown to the jury.
BY MR. PORTNOY:
Q That's the one that thanks you for being on the call?
09:42AM A That's what it says in the first line.
MR. PORTNOY: 43, please.
THE COURT: Exhibit 43 has not yet been admitted.
MR. PORTNOY: Thank you, Your Honor.
BY MR. PORTNOY:
09:43AM Q Is that a e-mail you received from the same group?
A I don't know for sure. It doesn't have my e-mail on there at all.
Q Well, neither do the other ones that we already introduced into evidence.
09:43AM A Oh, well --
Q Right? They don't have your e-mail on them? They read Liana Shanti Cult Recovery Group to Liana Shanti Cult Recovery Group, same as this one?
A Okay. I know might have seen this one, I'm assuming if
09:44AM that's what I provided.
Q Do you have any reason to think you didn't see it?
A Most e-mails I just directly forwarded to our lawyer, Roxanne.
Q Right. But in order to do that, you have to see what it
09:44AM is, right?

A I usually just skimmed them and forwarded them.
Q Without reading them?
A Not in full detail. At this point I was trying to not be involved with anything with regards to this, based on our lawyer's advice.
09:44AM
Q But this appears to be the first one, because it says: We have been asked to contact any affected party who wish to file grievances.
Read it, please. And doesn't this appear to be the initial one, inviting you to participate in the Zoom call, which was the next one?
09:44AM
MS. MORITZ: Objection. Misstates prior testimony. Best evidence.
THE COURT: Let's just ask her, do you recall receiving this e-mail?
09:45AM
THE WITNESS. I'm thinking I probably did.
THE COURT: Okay.
MR. PORTNOY: I move 43 into evidence, Your Honor.
THE COURT: Any objection?
09:45AM MS. MORITZ: No objection.
THE COURT: 43 is admitted.
(Plaintiffs' Exhibit 43 was received in evidence.)
MR. PORTNOY: Thank you.
THE COURT: It may be shown to the jury.
09:45AM MR. PORTNOY: Can you put up 44, please?

THE COURT: 44 has not yet been admitted. It may be shown to the witness.

MR. PORTNOY: 44? Thank you.

BY MR. PORTNOY:

09:46AM Q Take a look, please --

MR. PORTNOY: Put the whole thing on, please. Yeah, slowly.

BY MR. PORTNOY:

Q It's kind of a longer one. Take your time.

09:46AM Have you seen 44 before?

A This is the first time I've actually read any of this.

Q You've never -- you never read this before?

A No. I recognize the first part that I forwarded to our counsel.

09:48AM Q So the first -- sorry, the first page --

A The first page I would recognize as something I would have forward to our counsel.

MR. PORTNOY: Your Honor, I move the first page of Exhibit 44.

09:48AM THE COURT: Ms. Moritz?

MS. MORITZ: No objection.

THE COURT: All right. So, Page 44, the first page is admitted and may be shown to the jury.

And I'll ask Ms. Cortez to make sure what goes back to

09:48AM the jury is just Page 1. Thank you.

(Plaintiffs' Exhibit 44 was received in evidence.)
BY MR. PORTNOY:
Q And this is a report from the team on what occurred at the status conference, right?
09:48AM A Sorry, can you say that again?
Q Yeah, this is a report from the team: Some good news for you Friday. Please find attached a briefing outline, et cetera, et cetera, right? This is a report of what happened by the team.
09:49AM A I guess it's just the information they sent out. I don't know.
Q I'm sorry?
A I don't know what it's really referring to.
Q Well, second paragraph, right? Please find attached a
09:49AM briefing outlining a significant development in the defamation case involving convicted felon, et cetera, et cetera.
You don't know what it was?
A I think this is in reference to this case.
Q Okay. And it says: With federal oversight now in effect,
09:49AM those who have come forward or, continue to do so, whether as whistleblowers, witnesses, or affected individuals, may now be eligible for protection under the federal witness statutes.
Are you one of the people who has come forward?
A No.
09:50AM Q Was there a reason why you didn't come forward?

A This e-mail was just forwarded to me and I forwarded it to my counsel.

MR. PORTNOY: Okay. 54, please.

THE COURT: I'll ask Ms. Cortez to hand the witness Exhibit 54 in a hard copy, please.

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: 54 may be shown to the witness only.

BY MR. PORTNOY:

Q This is another e-mail from the Liana Shanti Cult Recovery team. Have you seen this before?

A I believe so.

Q And it's about a Jennings Brown video concerning my client?

A That's what it looks like, yes.

Q And you know who Jennings Brown is?

A I have heard of him, yes.

Q Didn't you talk to him?

A I did not talk to him. He talked to us, actually.

Q Okay. You didn't talk to him -- you had a conversation with him?

A No. He told us information and we listened.

Q You never said anything to him in the phone call?

A Just pleasantries, basically.

Q Did he introduce himself?

A Yes.

Q Did he say how he got your phone number?
A He messaged Byron directly on Facebook.
Q And Byron -- do you know if Byron then told him to call?
A Byron spoke to our lawyer. And we did not respond. And then I believe he asked again, and our lawyer said that it wouldn't be an issue to talk to him.
Q So you did talk to him?
A Well, he told us information. We never talked to him about anything in our life, though.
09:52AM Q Did he ask you for any comment?
A He did not, no. He said off the record.
Q And you're saying you never told him anything during the call, you or Byron?
A No.
09:52AM Q He just talked the whole time and then you said thank you? I'm just trying to understand.
A He called us.
Q Yes.
A To say, I've seen your name a lot online. And he went into how he talked to a former student and that former student is now out of the group from Liana, and how she almost ended up in a mental hospital because of the accusations she was made to believe happened to her.
Q Did he tell --
09:53AM A And he --

Q Sorry. Go ahead.
A He went on about this ex-student's life and basically said, you should be careful.
Q And did he tell you why he was calling you?
09:53AM A I think he was telling us to provide us information.
Q To what? I'm sorry.
A Just to provide us with information, because online he saw our name blasted all over your client's Instagram account.
Q So your testimony is you never told him anything? That's all I'm trying to understand.
09:53AM
A That's correct.
Q Did you ever read any stories that he posted?
A I believe I read one or two of his stories, yes.
Q And nothing in there came from either you or Byron?
09:53AM A That's correct.
Q Okay. How did you get copies of his stories?
A Just online.
Q Did you watch the video which is referenced in this exhibit?
09:54AM A I don't think so, no.
Q The LSCR team, who are they?
A I don't know.
Q So I just want to understand, all these e-mails, communications, the phone call, your testimony is you never have ever asked or learned the identity of any other person
09:54AM

involved?

MS. MORITZ: Objection. Misstates prior testimony.

THE COURT: Sustained.

BY MR. PORTNOY:

09:54AM Q Have you learned the identity of any other person involved in the LSCR team?

A No. These were just e-mails that I received that I just forwarded to our lawyer.

Q Weren't you interested in learning from other people the
09:54AM experiences you've testified to that they had gone through that were similar to what you were going through?

A Our lawyer always advised us to not listen to other people's stories.

MR. PORTNOY: Objection, Your Honor. Attorney-client
09:55AM privilege.

THE COURT: Overruled.

BY MR. PORTNOY:

Q What did your attorney tell you?

A Our attorney could see how much emotional strain this has
09:55AM put on us, and she basically advised us to set strong boundaries and not listen to the noise and just focus on what we're doing as a family.

Q But you wrote the letter to Mollway, right, you and your husband?

09:55AM A We did, yes.

MR. PORTNOY: And then 62.

THE COURT: 62 has not been admitted.

BY MR. PORTNOY:

Q Have you seen that before, e-mail --

09:56AM THE COURT: It may be shown to the witness.

MR. PORTNOY: Sorry.

THE WITNESS: I believe I have, yes.

MR. PORTNOY: Move 62 into evidence.

THE COURT: Any objection?

09:56AM MS. MORITZ: No objection.

THE COURT: 62 is admitted and may be shown to the jury.

(Plaintiffs' Exhibit 62 was received in evidence.)

BY MR. PORTNOY:

09:57AM Q That's another e-mail that you got from the Cult Recovery Group?

A Yes.

Q Okay.

And this one does provide a summary of what happened 09:57AM with Judge Mollway, correct?

A It appears to be, yes.

MR. PORTNOY: 74, please.

THE COURT: 74 may be shown to the witness only.

MR. PORTNOY: I'm sorry, I'm not sure, did I move 62? 09:57AM I think I did, Your Honor.

THE COURT: You did.
MR. PORTNOY: Thank you.
THE COURT: 62 is admitted.
MR. PORTNOY: 74.
09:57AM BY MR. PORTNOY:
Q This is now in May of 2024. So now you've been getting these e-mails -- well, I'll get to that in a minute.
Do you remember seeing this e-mail?
A I believe so.
09:57AM Q Okay.
MR. PORTNOY: Your Honor, I move 74 into evidence.
THE COURT: Any objection? Ms. Moritz?
MS. MORITZ: No objection.
THE COURT: 74 is admitted and may be shown to the
09:58AM jury.
(Plaintiffs' Exhibit 74 was received in evidence.)
MR. PORTNOY: So -- I'll wait for a minute. Thank you.
(Pause in the proceedings.)
09:58AM MR. PORTNOY: Your Honor, while that's going on, Mr. Young has reminded me that he doesn't believe that I moved 54 into evidence.
THE COURT: That's correct.
Ms. Moritz, any objection to 54?
09:58AM MS. MORITZ: If I could just confirm what the document

is. I don't believe I have an objection.

MR. ADAMS: That was the one with the video.

MS. MORITZ: Yeah, no objection.

THE COURT: All right. 54 is admitted and will go back to the jury.

09:58AM

(Plaintiffs' Exhibit 54 was received in evidence.)

THE COURT: Thank you, Mr. Young.

BY MR. PORTNOY:

Q So, according to the exhibits, the e-mails from the Liana Shanti Cult Recovery Group to you began in April of 2023 and lasted for about a year; is that correct?

09:59AM

A I think so.

Q Okay. And you never once ever tried to find out who is this, who are they?

09:59AM A No.

Q Just turned it over to your lawyer?

A That's correct.

Q Never learned from any source who any of the people might be, right?

09:59AM A That's correct.

Q Okay. Go back to the supper that you had, that you've testified about. I believe yesterday Paula testified that Liana's name came up as the common denominator. Was that -- did you hear that?

10:00AM A Yes, I did hear that yesterday.

Q And then I asked what facts did anybody have at the supper that Liana was in any way involved with either of these custody disputes. And I believe Paula said, Only that they were both students. You heard that?

10:00AM A I think so, yes.

Q Did you have any additional fact to suggest that somehow Liana was involved in any of these discovery problems, other than both of the mothers were her students?

A What do you mean by "discovery problems"?

10:00AM Q Other than the fact that Liana was the teacher or, quote, Amanda and Haley were her students, at the dinner when you guys discussed and concluded that somehow Liana was responsible for Amanda moving and Haley trying to move, did you have any facts other than they were both students?

10:01AM A At this point, that's when we already received a phone call warning us about all past students who were -- I know from our experience with Haley, started selling things online. So at this point when we had that meeting, other people warned us that they seen other students who were involved with your 10:01AM client, that they've taken off and left.

Q Who were they?

A Sorry?

Q Who were the other students?

A The student was -- more or less warned us about.

10:01AM Q Did you mention that at the dinner to Paula, because she

said the only thing she knew was that they were both students. She didn't say anything about other students contacting her.

MS. MORITZ: Objection. Misstates prior testimony.

THE COURT: Overruled.

10:02AM THE WITNESS: "Overruled" means to answer?

THE COURT: Yes.

MR. PORTNOY: I'm sorry, go ahead.

THE WITNESS: I don't know if we discussed any other students at that point. It was just information we had been told already.

10:02AM

Also, Haley's family reached out to us about concerns about Haley's behavior.

THE COURT: Mr. Portnoy, now is about the time for the morning break.

10:02AM MR. PORTNOY: Just about done, but --

THE COURT: Okay. Let's have you finish, and that might make sense, so that our next break will be the hour-long break that I mentioned.

Thank you, Mr. Portnoy.

10:02AM MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q You remember I took your deposition?

A Yes.

Q On April 25th, 2025?

10:03AM A I don't remember the exact date, but I remember.

Q And you had a chance to review it and make any corrections or modifications, correct?

A I believe I would have, yes.

Q Remember I asked you about the dinner and how you guys concluded that somehow Liana was involved?

10:03AM

A I don't recall.

MS. MORITZ: Objection. Best evidence.

THE COURT: Overruled.

MR. PORTNOY: Please show the witness her deposition, please.

10:03AM

THE COURT: All right. What -- where is it?

MR. PORTNOY: You want to take the break, Your Honor, we can.

THE COURT: Okay. Yeah, why don't we do that.

10:03AM

MR. PORTNOY: Okay.

THE COURT: But, Mr. Portnoy, I just want to confirm with you this is the hour-long break that we talked about before the jury came in?

MR. PORTNOY: Okay.

10:04AM

THE COURT: Is that fine with you?

MR. PORTNOY: If you give me five more minutes, I can complete this so the witness doesn't -- unless there's going to be redirect, so --

THE COURT: Okay. Why don't we do this, why don't you folks stretch for a bit. Let me talk to the attorneys at

10:04AM

sidebar just about logistics. Thank you.

(Sidebar on the record:)

THE COURT: Why don't we do this, let's go ahead and recess. You can figure out the deposition stuff and then take the hour-long break that you had requested, for the next witness. Is that okay?

MR. PORTNOY: So we're going to take a break?

THE COURT: Yeah.

MR. PORTNOY: Okay.

10:04AM THE COURT: So you can get the deposition figured out.

MR. PORTNOY: Sure.

THE COURT: It's going to be the hour-long break for you to deal with the second to the next witness.

MR. PORTNOY: Okay.

10:04AM THE COURT: Thank you.

(End of sidebar.)

THE COURT: All right. Ladies and gentlemen, we're going to take the hour-long break now that I mentioned earlier. So we are going to be in recess until 11:05.

10:05AM We're going to finish up with this witness shortly thereafter. All right? And then move on to the next witness.

This is going to be the equivalent of your lunch break today. So this is going to be the longest break you're going to have today. The rest of the breaks are going to be shorter.

10:05AM And as I said, we're going to finish about 3:15 today.

All right. Don't talk about the case with anybody. Don't do any research. Try your best to just relax, have a snack or lunch, and we will see you at 11:05. All right? Thank you.

10:05AM (At 10:05 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you, everyone. We are in recess until 11:05.

You may step down.

11:06AM (A recess was taken from 10:06 a.m. to 11:06 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Thank you, ladies and gentlemen.

11:06AM Our next break, as I mentioned, will be shorter, and we will take it probably around 12:30, something like that. All right? And we'll have a stretch break before then.

You may continue.

MR. PORTNOY: Thank you, Your Honor.

11:06AM BY MR. PORTNOY:

Q So when we took the break I was asking you about the dinner, and about the suspicion that somehow Liana was the common denominator. And I asked you to take a look at your deposition, you admitted that you recall it, and I cited you to

11:07AM Page 15, Lines 15 to 22.

Have you had a chance to look at that?

THE COURT: I was expecting you to give -- somebody give her a copy over the break, but we can give it to her now.

MR. PORTNOY: Oh, I'm sorry. Not me.

11:07AM THE COURT: All right. Can you tell us again, so that she finds the right page and line, please?

I have it as Page 15, Lines 15 to 22; is that correct?

MR. PORTNOY: Correct, Your Honor.

THE COURT: All right. So if you could look at that page, ma'am.

11:07AM

BY MR. PORTNOY:

Q And so while -- go ahead, let me know when you're done.

A Oh, sorry, what line was it?

Q 15 to 22.

11:08AM A Okay.

Q Yeah. So did you see it during the break?

A No, I have not.

Q Okay. What I'm trying to understand is, Paula said at the dinner, you heard the testimony yesterday, that the only

11:08AM connection that you guys discussed as to why Liana might be involved in the two custody matters was that both Amanda and Haley were her students.

And when I asked you why you brought up alleged conversations you had had with other women prior to the dinner

11:08AM about some experiences they had had regarding custody, correct?

A I just spoke about how somebody called Byron to warn him.
Q Okay. But that involved that person allegedly mentioning Liana as being involved?
A Yes.
11:09AM Q Okay. So when I asked you at your deposition on Line 15:
And what was your situation that you discussed with them?
Meaning Paula and Wade -- quote: We were discussing how Haley was asking to move to the U.S. and how we did not 11:09AM agree with that. We made the connection that they were both involved with following Liana, and they were concerned -- well, I guess we as a group were concerned about the influence of her with the decisions to move.
Was that your testimony then?
11:09AM A Yes.
Q Okay.
And did you indicate anywhere else in your deposition that other than they were both students, someone had called Byron to tell him about another prior incident involving my 11:10AM client? Did you testify to that anywhere else in your deposition?
MS. MORITZ: Objection. Improper refreshing of recollection.
THE COURT: Overruled.
11:10AM THE WITNESS: I was never asked any question like

that. This question just asks what the situation was that was discussed.

BY MR. PORTNOY:

Q Both involved with following Liana, did I quote that correctly, as the reason you gave at your deposition for believing it was my client who was involved?

A When we met as a group, we were concerned that our kids are going to be taken across the border. When we did speak with Paula and Wade, at that point we were already aware from Haley's family that Haley had started to isolate Isla. And at that point Haley asked Byron, if you give up full custody -- or full child support if she could have full custody. And then Haley also asked Byron if she would move to Florida with Isla, that he could come, too, and explained that he could farm in Florida.

MR. PORTNOY: Yeah, I move to strike. The only question I asked was: Did you indicate in that -- in your deposition anywhere that the reason there was this suspicion that my client was involved was anything other than they were both students of my client? That's the question.

MS. MORITZ: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I haven't read this deposition since.

BY MR. PORTNOY:

Q Okay.

A So I'm not sure. I just answered the questions that you asked.
Q Do you know someone by the name of Paul Thompson?
A I heard of the name, yes.
11:11AM Q When did you first hear that name?
A He reached out to me after that Zoom call.
Q And what was that about?
A He asked if we would write an affidavit for his. And we talked to our lawyer and our lawyer said to not get involved.
11:12AM Q How did he know you were on the Zoom call since everyone was anonymous?
A That I don't know.
Q Somehow he knew that you were involved in the Zoom call?
A When I was asked to be part of the Zoom call, there was an 11:12AM in take form that was sent to me where I included my e-mail address and my phone number.
Q Everyone else, you assume, did that, too?
A I don't know.
Q Okay. And so he reached out to you and asked what? I'm 11:12AM sorry.
A He asked if we would write an affidavit for his custody concerns, and we spoke to our lawyer and, again, our lawyer said, don't get involved.
Q Did he mention anything about my client being involved in 11:13AM his custody problem?

A I believe he would have.
Q Do you remember if he did or he didn't?
A I believe he would have, yes.
Q You said "he would have." Do you remember what he said?
11:13AM A I don't. That was such a long time ago. I don't remember the exact details of what he said.
Q Do you know if he's involved with the Liana Shanti Cult Recovery Group?
A I don't know.
11:13AM Q You only had that one call with him?
A Yeah.
Q Did you see him in the courtroom over the last few days?
A He was identified by the Court here.
Q Was that the first you knew he was here was this morning?
11:13AM A Pardon me?
Q Was that the first you knew he was here this morning?
A No, he identified himself to our counsel earlier today -- earlier this week.
Q Did you overhear the conversation?
11:14AM A No.
Q How do you know he identified himself to your counsel?
A Because our counsel told us.
Q Were you told who he is, why he's here?
A No.
11:14AM Q You know if he's part of the Liana Shanti Cult Recovery

Group?

A I don't know.

Q Let me ask you an internet question. When a group e-mail is sent, like the ones we showed the jury, it says: From Liana Shanti Recovery Group, to Liana Shanti Recovery Group, do you know that you can just push "to" and find out everyone's e-mail?

A I was not aware of that.

Q No one ever told you that, that you could identify every single person by just pushing the to"?

MS. MORITZ: Objection. Assumes facts.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q Are you aware of that?

THE COURT: Sustained.

BY MR. PORTNOY:

Q You're not aware?

MS. MORITZ: Objection. Lacks foundation and it assumes facts.

THE COURT: Sustained. And asked and answered, in any event.

MR. PORTNOY: That's all I have. Thank you.

THE COURT: All right. Thank you.

Redirect.

MS. MORITZ: The witness may be excused, Your Honor.

THE COURT: Thank you.

Ma'am, you may step down.

THE WITNESS: Thank you.

(Witness excused)

11:15AM THE COURT: The defense may call their next witness.

MR. ADAMS: May I go get the next witness, Your Honor?

THE COURT: You may.

MR. ADAMS: Thank you.

MR. PORTNOY: May we approach the bench, Your Honor?

11:16AM THE COURT: One second. Let wait a second for counsel to come back.

MR. PORTNOY: Oh, I'm sorry.

(Pause in the proceedings.)

THE COURT: Mr. Adams, if we could hold on just a

11:16AM second before calling in the witness. Mr. Portnoy asked for a sidebar.

So, ma'am, if you wouldn't mind just standing in the back of the courtroom for just a few moments. Thank you.

Mr. Portnoy.

11:16AM MR. PORTNOY: Thank you, Your Honor.

(Sidebar on the record:)

MR. PORTNOY: So the Court knows that Aaralyn Shiri is the one that is going to impeach Amanda. She just showed up. So I don't know whether you want to question her, but this is

11:17AM the whole problem if Amanda starts. If you want to --

THE COURT: She shouldn't be in the courtroom.

MR. PORTNOY: Well, she just showed up this second because she knew that you wanted -- she agreed that she would talk with you.

11:17AM THE COURT: Could you take a moment to have Mr. Young take her outside?

Do you guys have a witness room?

MR. PORTNOY: Yes.

THE COURT: Have him take her outside in the witness room.

11:17AM

MR. PORTNOY: Then you will deal with it after the direct, is that it?

MR. ADAMS: I mean, she's here, his problems are gone, so.

11:17AM MR. PORTNOY: My problems aren't gone, she's refusing to testify.

MR. ADAMS: Why is she sitting in the courtroom?

MR. PORTNOY: She just showed up.

THE COURT: I was told that they were going to testify after all; that's not correct?

11:17AM

MR. PORTNOY: That's not correct.

THE COURT: Okay.

MR. PORTNOY: Just so you know, Aaralyn is here because she agreed that she would talk to you, but she's told me she's not going to testify.

11:18AM

THE COURT: Okay. Let's have Mr. Young take her in the witness room and we'll deal with this later.

MR. PORTNOY: Okay.

(End of sidebar.)

11:18AM THE COURT: Okay. The defense may call their next witness, please.

MR. ADAMS: Thank you, Your Honor.

The defense called Amanda Brady.

AMANDA BRADY, DEFENDANTS' WITNESS, SWORN

11:18AM THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your full name and spell your last name.

THE WITNESS: Amanda Dawn Brady, B-R-A-D-Y.

THE COURT: Ms. Brady, if you could give us just one second.

11:19AM Mr. Portnoy, if you could make happen what we talked about at the sidebar, please.

MR. PORTNOY: It's done.

THE COURT: Oh, okay. The person is not in the courtroom?

11:19AM MR. PORTNOY: Yes.

THE COURT: Okay. Thank you. I apologize.

You may proceed.

DIRECT EXAMINATION

BY MR. ADAMS:

11:19AM Q Good morning, Amanda, thank you for coming?

A Good morning.
Q Where did you travel from?
A From Regina, Saskatchewan.
Q Canada?
11:19AM A Yes.
Q Have you been in town a few days?
A I have.
Q Why don't you tell the jury a little about yourself, where you were born and grew up.
11:19AM A I was born in Saskatchewan, Canada, in a really small town. Grew up in a small town of about a thousand people. And then lived in a city called Regina for a number of years, before moving to Florida. And then returning to Regina for the last year and a little bit, I've been there.
11:19AM Q And where do you live now?
A I live in Regina.
Q Is Regina the capital of Saskatchewan?
A Yes.
Q How big of a town is Regina?
11:20AM A I think it's about 350,000 people.
Q Okay.
A Yeah.
Q Did you go to high school -- where did you go to high school?
11:20AM A I went to high school in a town called Radville,

Saskatchewan, and that had about a thousand people.
Q And at some point in time you were married to a gentleman named Wade Martin; is that right?
A That is correct.
11:20AM Q Where did you meet Wade?
A Wade and I went to school together.
Q High school?
A Yes.
Q And then eventually what happened with you and Wade, did
11:20AM you get married?
A We did.
Q When did you get married?
A 2005.
Q Did you have any kids?
11:20AM A We have two wonderful daughters, yeah.
Q What are their names?
A London and Ellis.
Q How old is London?
A London is 18.
11:20AM Q And how old is Ellis?
A Ellis is telling everyone that her 16th birthday is arriving in a couple of weeks.
Q And do you have any other children?
A I do. I have two sons, Foster and Able.
11:21AM Q And how old is foster?

A Foster is 11.
Q And how old -- I didn't catch the youngest son.
A Able.
Q Able. How old is Able?
11:21AM A He's nine.
Q And Able and Foster have a different dad?
A They do, yeah.
Q And who is Able and Foster's dad?
A His name is Drew.
11:21AM Q So at some point in time did you and Wade split?
A We did, yeah, we got divorced.
Q You married in 2005. What year did you split?
A 2012.
Q So about seven years after marriage?
11:21AM A Yeah. Correct.
Q Were you living in the same town after you split?
A No. No.
Q What happened there.
A He was living in Radville, actually back in Radville, and I was in a little suburb outside of Regina.
11:21AM
Q Did you, after divorcing Wade, have to get into a formal custody agreement?
A No. We had aligned things in a separation agreement, but I don't believe either of us actually ever signed. It was very amicable.
11:22AM

Q So when you got divorced in 2012, I believe you said, things were amicable?
A Yeah. They were -- there was hurt, obviously, but we were -- we coparented very well.
11:22AM Q Coparented Ellis and London?
A Yes.
Q And the custody agreement was informal between you and Wade?
A Yeah. Before they were -- before London started
11:22AM kindergarten, we were kind of week on, week off. And then when London started kindergarten, we were, every few days we would switch off. It was a pretty even 50/50 split at that point.
Q And you know Paula Haygarth, right?
A I do.
11:22AM Q How do you know Paula?
A She is the stepmother to my children.
Q She is now married to Wade?
A Yes.
Q Your ex?
11:22AM A Correct.
Q Okay. When you did first meet Paula Haygarth?
A I met Paula, it would have been in 2013 or 2014.
Q You were already divorced?
A Correct.
11:23AM Q And how did you meet her?

A I went to her for a body talk Reiki session.
Q What's body talk?
A It's a energetic healing modality.
Q Can you describe it a little further for the jury? Yeah.
11:23AM A Sure. It's a type of healing where the practitioner will use their hands, and they'll kind of hold them over your body and feel different energy and find out where you're stuck and stagnant and things that you need to heal.
Q And you became friends with Paula also?
11:23AM A We did. We became very quick friends, yes.
Q So you were first a client and then a friend?
A Yeah.
Q And we've heard some testimony that she was in your wedding; is that right?
11:23AM A She was in my wedding to Drew, yes.
Q To Drew?
A Yes.
Q And Drew is the father of Foster and Able?
A Correct.
11:23AM Q Okay. And at some point in time did you learn -- when she was in your wedding, she wasn't dating Wade; is that right?
A No. She actually saw Wade for the first time the day of our wedding.
Q Okay.
11:24AM A When he came to my house to drop the girls off.

Q And eventually did you learn that she and Wade were dating?
A She told me that.
Q Did that cause a little distance?
11:24AM A It didn't cause distance initially. I was very hurt and very devastated, but I kept that largely to myself because everyone around us was very excited.
Q And did you knew -- did you know at that point when she started dating Wade that she'd be with Wade when Wade had your
11:24AM kids?
A Yeah.
Q So Paula would be part of Wade's coparenting; is that fair?
A Yeah, my kids had already known her because she was
11:24AM friends with me and they had been around her.
Q At that point in time did you have any problems with Paula's personality, her friendship, or her ability to take care of your kids?
A Our friendship definitely suffered because she was dating
11:25AM my ex-husband, yes.
Q Did that affect your belief in how she cared for the kids, though?
A Not at that time. No.
Q Do you know Liane Wilson, also known as Liana Shanti?
11:25AM A I do.

Q How do you know Liana Shanti?
A I was a member of her community for a number of years.
Q Have you ever been in the same room, other than today, with Ms. Shanti?
11:25AM A No.
Q How many times have you spoken to her live before today?
A Countless.
Q Thousands?
A I wouldn't say thousands, but a lot.
11:25AM Q Hundreds?
A More than I could count.
Q Were you a student of hers?
A I was.
Q How did you learn of her?
11:25AM A I learned of her through my friend Kiana.
Q Kiana?
A Correct. Yup.
Q Does Kiana have a different name as well?
A Her born name was Lindsey Irwin.
11:26AM Q Okay. But your friend Kiana had introduced you to Ms. Shanti's teachings?
A That is correct.
Q And you started taking them?
A I did, yup.
11:26AM Q Tell me about that. How did it start out?

A I started with Mother Wound, that was the first program that I took. It was the first program that she launched after Kiana was telling me about her experience taking Life Bath.
Q You said Mother Wound?
11:26AM A Yes.
Q What's Mother Wound?
A So it was a program -- or is a program of Liane's where you work through the various types of wounding in your childhood, the various types of wounding that show up as you
11:26AM parent and as you mother. It was a wonderful program.
Q What's the first year you took a class from Ms. Shanti?
A January of 2017 is when I started.
Q January of 2017?
A Yes.
11:27AM Q When was the last time you took a class with her?
A An actual class?
Q Sure. A paid for class, yeah.
A Would have been one of the rounds, the last rounds of Magnetic Money Manifesting, sometime early in 2024.
11:27AM Q So from January --
A Early 2025. Sorry.
Q Early 2025?
A Yeah.
Q So for about eight years you were a regular student of
11:27AM Ms. Shanti's purchasing her courses?

A Yes.
Q Can you estimate for me how much total you spent on Ms. Shanti's courses?
A Somewhere in the neighborhood of about 60,000.
11:27AM Q How did you pay for that?
A Some was cash, some was credit card.
Q Did you go into debt for her classes?
A I did, yeah.
Q How many of the $60,000 in courses, how many of her
11:28AM courses do you think you took? Did you take them all?
A There was only a couple that I didn't do. I didn't do the Last Quantum Mind Body Therapist certification course. There might have been one or two others that I didn't do, but I did most of them.
11:28AM Q What's your estimate, is it above 90 percent?
A Yeah, that'll be fair.
Q So during the courses -- the jury's already heard something what's called like a live session, where at some point in time there's live sessions with Ms. Shanti and there's
11:28AM a chat room that happens, sometimes?
A Yeah.
Q Can you describe for the jury what happens there? How do you get into a life session?
A So in the early days we would chat inside Facebook
11:28AM Messenger. And then that transitioned to an app called Signal.

And from there those chats transitioned into her own app.

Q And when you'd go into a live session, what did that involve?

A So if it was a class on -- she used Instant Teleseminar,

11:29AM which is where you would dial in and listen to her teaching. And then when she was done teaching whatever that session, or whatever that class was on, then she would patch people in to ask questions. So it was live in the aspect of you would go in, you would ask your question, she would teach on that

11:29AM relevant to your life experience and how that related to the course.

So those live calls in the course were different than the Q and A or the chats inside Facebook Messenger.

Q So let's stick with the chats then. During the chats,

11:29AM would the students be able to pose questions to Ms. Shanti?

A Yup.

Q And she'd answer them live?

A Yeah. It was all sorts of conversations going on in there.

11:29AM Q How many students on average would be in these classes?

A I would say maybe around a hundred.

Q And so each one would get their opportunity to ask a question in the chat?

A Mm-hmm.

11:30AM Q Yes?

A Yeah, not every person was on every call. So it kind of just depended on who was there.
Q What kinds of stuff -- what kind of questions were asked of Ms. Shanti in these chats?
11:30AM A It ranged such a wide range. Personally I asked things about health, about whatever cleanses I was doing at the time. I would ask questions about my kids. I would ask questions about my business, my work. All sorts of questions that came up in those chats. And a lot of times it would be relevant to
11:30AM what we would be learning about at that time.
Q Did Ms. Shanti claim to have supernatural powers, being psychic?
A Oh, psychic, yes.
Q How about being clairvoyant?
11:30AM A I attribute that to being the same thing as being a phychic.
Q Same thing?
A Yes.
Q Okay. So Ms. Shanti -- and it's your testimony here in
11:30AM front of the jury that Ms. Shanti claimed to be psychic?
A Absolutely.
Q Did she do this once, one time?
A No, all the time. That's why we would ask her questions, because she could see what we couldn't.
11:31AM Q That's the purpose of the chats, is that she would tell

people she was psychic, ask your questions, and she would give you the answer?

A Yes. And she would a lot of times do those questionnaires live on her Instagram stories, where she would put up a question box so you didn't even have to be in her group. You could ask a question and then she would answer it in the proceeding stories.

Q What types of questions did you -- well, you already talked about what you said. What other types of questions would people ask her?

A Oh, gosh. Sometimes it would be silly questions, like, is OJ Simpson really Khloe Kardashian's dad? And is the Queen of England still alive? Things like that. And then it would go all the way over to more serious questions, about, you know, what level of narcissist is my ex-husband? What level of narcissist is my dad? What level of narcissist is my sister? All the way over to, I think I might have been abused as a child, did that happen to me?

Q And would she respond?

A She responded, yes.

Q What was your understanding of where she was finding this information?

A She was psychic.

Q She said that?

A Yes.

11:32AM

Q Repeatedly?
A Repeatedly.
Q And the narc levels. Tell me about narc levels. What does that mean? What's a narc level?
11:32AM A Oh, gosh. So these -- every once in a while in these chat groups we would get on a track of the same question, where one person would ask a question and then everybody would want to find out how that related to them. And the questions relating to the narcissism was related to a scale of one to ten on how
11:32AM strong of a narcissist the person in your life was.
And so the questions would be, am I a narcissist? Is my mom a narcissist? Is my dad a narcissist? Is my friend over here a narcissist? And she would answer, she would give them a number.
11:32AM Q And then what was your understanding people were to do with those numbers?
A They could do with those what they wanted, but if you were doing the work, if you were doing the healing work of her program, then in her narcissism course she would teach on how
11:33AM you handled dealing with the narcissist, and usually that was no contact.
Q And the higher the narcissist level, the more urgent it was to get that narcissist out of your life. Is that fair?
A Oh, yeah.
11:33AM MR. PORTNOY: Objection, leading.

THE COURT: Sustained.

Ask an open-ended question.

BY MR. ADAMS:

Q What was your understanding that the teachings taught the students were to do with narcissists?

11:33AM

A So, the main thing is you cut them off. You don't -- and that's not necessarily just Liane's teaching, that's in general psychology teachings of how you teal with narcissists.

Q So people would throw out, is my whomever a narcissist, she'd give a number, and if that number was high enough, the teachings said, cut that person off; is that right?

11:33AM

A Yeah. And you were free to do what you wanted with that information. There was no written set of rules that said, to be in this group you have to do X, Y and Z.

11:34AM

MR. ADAMS: Can I show the -- well, it's already been published. Can we pull up -- I have it on my screen. Can we publish Exhibit 22, please? It's been admitted into evidence, Your Honor.

THE COURT: You may. 22 may be shown to the jury.

11:34AM

MR. ADAMS: It's on mine. I'm sorry. Yeah. My laptop. Yeah. Thank you.

BY MR. ADAMS:

Q You see this page in Exhibit 22?

A I do, yup.

11:34AM

Q Do you see this bubble that's at the top?

A Yes.
Q You just got done testifying about questions that were posed in these live group chats. Does this look familiar to that type of thing?
11:34AM A It does, yes.
Q You see Ms. Shanti's photo in the corner there?
A Mm-hmm.
Q Yes?
A Yes.
11:35AM Q Is that a yes?
A Yes.
Q You said "mm-hmm," that's why -- I just want to make sure the record is clear.
And just for the record, this Exhibit 22, the question 11:35AM is reading: Was I sexually abused? And if so, at what age and by who?
And then you see the response is: You have experienced sexual abuse, yes. You'd uncle and a brother, both.
11:35AM Is that the type of things that you'd see?
A Yes.
Q Is this an isolated incident, based on your experience?
A No.
Q Did that happen repeatedly?
11:35AM A Yes.

Q Did you -- did that happen to you?
A It did. She told me my son Foster was abused.
Q How old was Foster at the time?
A He would have been two.
11:35AM Q You asked Ms. Shanti in one of these chats, has my son Foster -- who's not Wade's child, this is Drew's child, correct?
A Yes.
Q You asked her in a chat if he was sexually abused?
11:36AM A I actually asked her in a DM. It wasn't inside of a chat.
Q And what did she tell you?
A She said he was.
Q What did you do?
A We cut off contact with that friend.
11:36AM Q Did you ever find out that it was not true?
A No.
Q You just never went back to that friend?
A And part of it was we were living in Florida, so we were not in Regina anymore.
11:36AM Q She gave you a new name, too, didn't she?
A She did, yeah.
Q What name did Ms. Shanti give you?
A Malie Oriana.
Q How long did it take you to get that name?
11:36AM A I got it in 2021. So, four years or so.

Q How did it happen?

A I got it from her via a DM. She messaged that it had come through to her that I was ready for it. And she does it in a little voicemail so you can hear the pronunciation.

11:37AM Q Is that a way that she sort of picked out specific followers, was to give them a name?

A There wasn't -- from my view, there wasn't too much of a rhyme or reason who got their name when. I understood that it was when you were ready to embody that name. But yet, some

11:37AM people we were told that they got their name because they needed it, because they were teetering on the edge.

Q How did you get a Hawaiian name, do you know?

A I -- we were told that she reads them from the Akashic records.

11:37AM Q So when you were given Malie -- which I think I called you Maile at first?

A You did, yes.

Q Do people confuse for Mylie?

A The name gets mispronounced all the time, constantly.

11:37AM Q When she gave you the name Malie, she said that this is an Akashic name?

A Mm-hmm.

Q Yes?

A Yes.

11:38AM Q What was your understanding -- what did that mean,

Akashic?

A So the names were supposed be to a name that embodied a frequency that aligned you to your highest self.

Q I'm going to have you look at Exhibit 1003.

11:38AM THE COURT: This has not yet been shown to the jury.

MR. ADAMS: It has not.

THE COURT: Pull that up for the witness only, please.

BY MR. ADAMS:

Q 1003 is an 18-page compilation. Do you recognize

11:38AM Exhibit 1003?

A I do.

Q What is 1003?

A This is a record of my Facebook private messages with Liane.

11:38AM Q Did you gather these?

A I did.

Q When?

A I downloaded my Facebook multiple times over the years, but most recently after April of 2025.

11:39AM Q And did that date -- why does that date stick out in your mind, April of 2025?

A When I was removed from her community.

Q What had you done in this case immediately prior?

A That was the day of my deposition.

11:39AM Q We'll get to that. We'll get to her talking to you during

your deposition. But let's move on to --

MR. PORTNOY: Objection, Your Honor. Counsel's statement.

THE COURT: Sustained. That comment about what happened in the deposition shall be stricken.

11:39AM

BY MR. ADAMS:

Q There's 18 pages. There's some highlighting on there. What's the highlighting?

A Oh, just when you search a name within your document, it highlights all the instances that that comes up.

11:39AM

Q And what name did you search here?

A I was searching Paula.

Q Why were you searching for Paula?

A Because I was looking for the relevant messages where Liane and I were speaking of Paula.

11:40AM

Q And Paula is my client, Paula Haygarth?

A Correct.

Q And so when we you look at this Exhibit 1003, the highlighting for Paula is -- was why? Why is it on there?

A I searched her name.

11:40AM

Q So it's just part of the search?

A Yes, correct.

Q Did you edit or manipulate or change any of these messages in any way?

A No.

11:40AM

MR. ADAMS: Your Honor, I'd move 1003 into evidence.

THE COURT: Any objection?

MR. PORTNOY: No.

THE COURT: 1003 is admitted and may be shown to the jury.

(Defendants' Exhibit 1003 was received in evidence.)

BY MR. ADAMS:

Q First page I want to look at is actually at the bottom. It's a 17-page document -- 18-page document. I'm going to go to the bottom of Page 17. Okay? It's up there for you.

And just describe for the jury what's your understanding the chronological order that these are in.

A Oh, they read from the bottom to the top.

Q And you can see that because they're time stamped, right?

A Correct.

Q And so on this page, that bottom text is a text from you to whom?

A To Liane.

Q Okay. Now, this says on here that the other person you're communicating with has a different name, it says Liana Robert?

A Yeah, that was her profile on Facebook.

Q You're certain?

A Positive.

Q You know that at this time when you're speaking with the person named Liana Robert, that that is Liana Shanti?

A Correct.
Q And at the bottom, this is August 8th of 2018, right?
A Yes.
Q Do you know that this lawsuit was filed over four years later?
11:41AM
A Yes.
Q So four years before she even filed this lawsuit about my client, Ms. Shanti is talking to you about Paula, right?
A Correct.
11:42AM
Q What did she say here? What did -- what did you say here on August 8th, 2018?
A Do you want me to read it out loud?
Q Yes.
A Sure.
11:42AM
Ellis just spent ten days with Wade and Paula. This morning we were chatting about her week and what they did. She said she that sent a -- spent a couple of days with Wade at work, but then a lot of time with Paula doing healing work on herself. Paula said she was giving her magical powers to make anything she wanted happen in her mind. Can you check and see if she actually did anything.
11:42AM
Q What were you asking her to check?
A To check Ellis' energy field.
Q How?
11:42AM
A Psychically.

Q So you believed at this point in time, in 2018, that Liana Shanti, Ms. Liana Robert, could psychically look into your daughter's brain?
A Absolutely.
11:42AM Q And what does Ms. Shanti say in response?
A OMG.
Q And?
A Yes, I will look.
Q And you thank her, correct?
11:43AM A Yup, correct.
Q What else do you ask?
A I said, she also told me this afternoon that Paula was asking her a lot of questions about Foster.
Q Then what does Ms. Shanti say about --
11:43AM A She said she did do some energy implanting, and is looking to create health issues with Foster.
Q And then what do you say up here at the top?
A I said, okay, let me know what you have for available times to get that cleared away.
11:43AM Q And what does that mean?
A To book a one-on-one phone call session with her at that time.
Q And then was that free?
A No.
11:43AM Q You paid for that session?

A Yes.
Q So here she's telling you she has these psychic results, and that if you pay for another session she'll tell you about them?
11:43AM A Correct.
Q She said she has time next week?
A Yes.
Q And then what does she say here at almost 1:00 in the morning your time, on August 9th, 2018?
11:43AM A There was an energy implant in the left side of her head.
Q What's your understanding of who she was talking about there?
A Ellis.
Q So you reached out to her that morning?
11:44AM A Mm-hmm.
Q Asking her to take a look?
A Mm-hmm.
Q About 12 hours later, sometime late that night she responds and says that there's an energy implant in the left side of her head. What did you understand that to mean?
11:44AM (line 20)
A At the time my understanding was that Paula had put that there using some sort of Reiki or energy work.
Q As you sit here today do you believe that to be true?
A No.
11:44AM Q Do you believe Paula did anything to implant bad energy or

demons or spirits into either your kids?
A No. I believe she was probably doing energy work, because that's what she's trained in, but not in a malicious way.
Q Just like you talked about the body talk?
11:45AM A Yes.
Q At some point in time you decided to move out of Canada, right?
A Correct.
Q And that was a decision that you made, right?
11:45AM A Yes. Drew and I made that decision.
Q How did you come to discover that Florida was an option?
A Liane had provided a list of safe states and not safe states of where people could go if they were going to move out of Canada or Australia, or even within in the U.S. if they were 11:45AM in a state that was not good.
Q Was Canada not good, according to Ms. Shanti?
A Correct, Canada was awful.
Q Why?
A It was going to be -- she likened it to the Handmaid's 11:46AM Tale.
Q Describe for -- what your understanding what that means?
A An awful, awful state, and women being taken to be used for creation of life, and just complete total authoritarian state.
11:46AM Q Did she encourage you to take your kids to Florida?

A She did.

MR. ADAMS: I'd like to show the witness what's been marked for identification as Exhibit 280. It's not in evidence, Your Honor, but I would like to show the witness.

11:46AM THE COURT: You may.

BY MR. ADAMS:

Q Do you recognize this?

A I do, yup.

Q I'm sorry. Speak up for me.

11:47AM A Yes, I do.

Q And what is Exhibit 280?

A It's a Signal message.

Q It's a screenshot of a Signal message you made?

A Yup.

11:47AM Q That's by Amanda Brady, right?

A Yup.

Q Is this a true and accurate copy of the post that you made?

A I believe so.

11:47AM Q And the date up there is March 10th, 2022. Do you see that?

A Correct, yes.

Q Does that date line up with what your thoughts are on Florida?

11:47AM A Yeah, this was when we were buying our house.

MR. ADAMS: Your Honor, I'd move to admit Exhibit 280.
THE COURT: Any objection?
MR. PORTNOY: No.
THE COURT: Admitted. And may be shown to the jury.
11:48AM (Plaintiffs' Exhibit 280 was received in evidence.)
BY MR. ADAMS:
Q And you're telling people in this group -- do you know who Emily Thigpen is up at the top?
A She was a student in Liane's community.
11:48AM Q So you do recognize that name?
A Yes.
Q And she was part of this group?
A She had to have been if that's her photo up there.
Q And that's your photo -- I don't know what color that, is
11:48AM bright peach?
A Yes, the coat.
Q This is a post that you made, right?
A Yup.
Q About the Florida house?
11:48AM A Yeah.
Q You even gave it a name, Destiny Manor?
A Yes, we did.
Q Home of the Water Tiger? Where did that come from?
A That actually came from Riley, my friend.
11:48AM Q And then at the bottom you say, yes, it's beautiful. It's

a beautiful home that we were able to purchase that will be home to my family.
A Mm-hmm.
Q Kiana Asherah.
11:49AM A Yeah.
Q Who is that?
A Kiana, that's Lindsey Irwin.
Q Is she a student of Ms. Shanti's?
A Yes.
11:49AM Q Who is Michelle Wellbrook?
A Another friend of ours from Saskatchewan.
Q Did Kiana and Michelle end up move to Florida?
A They did.
Q Did they bring their kids?
11:49AM A They did.
Q And then Riley Lawson, who is that?
A Riley Lawson is a friend of mine. She was my nanny at the time we moved.
Q Did she move to Florida?
11:49AM A She did.
Q Did she bring her children?
A She doesn't have any children.
Q Okay. And then it says -- the last sentence says: And Haley Winter and their kids and fur babies. Right?
11:49AM A Yes. "Their kids" meaning the group of kids. Haley only

has one child.
Q Okay. So the "their kids" means Kiana, Michelle, Riley and Haley?
A Would be Kiana, Michelle and Haley. Riley's kids are four legged.
Q Thanks.
And you know who Haley Winter is, right?
A I do.
Q And you understand that Haley Winter was married to my client, Byron Horvath, right?
A I do.
Q What's the name of their daughter together?
A Isla.
Q How old was Isla at that time?
A I can't be certain.
Q How did you know that Haley and Isla were coming down to Florida?
A That was her ultimate goal.
Q How do you know?
A Because it was talked about very regularly in the group, and talked about with me and Kiana and Michelle and Riley.
Q Do you have an understanding that Wade, the mother [sic] of Ellis and London, didn't like you guys moving down to Florida?
A He absolutely did not.

Q And was he -- did he let you know that he objected to that?
A After we were down there, yes.
Q And did you initially tell him you were going to go for a month vacation?
11:51AM
A So that was for Drew and I, that was our initial plan.
Q I understand. And that you were going to go for a month and then opportunities arose; is that fair?
A Yeah, because we weren't naive enough to believe that we were going to love -- like, what if we didn't like it? What if we couldn't get a visa? What if it didn't work out? Drew still had a full-fledged business in Canada, right, he can't just walk away from that. It was never our full intention to just run away with our children.
11:51AM
Q Did you ever tell Wade that you were going to move to Florida?
11:51AM
A So I told Wade in, I believe it was February when I called him -- and that was when we were doing the visa application, because at the time you could not cross the border between Canada and U.S. without a visa.
11:51AM
Q When you told him you were already in Florida, correct?
A Correct, yes.
Q So as far as Wade's perspective, he thought you were going to go to Florida for a month?
A Correct.
11:52AM

Q Over Christmas?
A Yes.
Q And then in February you called and said, we're actually going to stay?
11:52AM A Yup.
Q Do you remember his reaction?
A He was so mad at me.
Q Do you remember what he did, if you know?
A I got a letter from his lawyer at that time, Roxanne, I
11:52AM believe.
Q Were you involved in chats where Liana Shanti encouraged other women to leave in the dark of night?
A So she was very careful about what she --
MR. PORTNOY: Objection, Your Honor. It's
11:52AM argumentative.
THE COURT: Rephrase, please, counsel.
MR. ADAMS: Sure.
BY MR. ADAMS:
Q Were you involved in other live group sessions where
11:52AM Ms. Shanti would encourage women to leave without telling the parents, the other parent of children?
A She didn't explicitly ever say in the group, steal your children.
Q Just tell me about that. What do you mean by that?
11:53AM Explicitly say, Steal your children. What would she say?

A So she would never say, you know, Kidnap your kids and take them across the border, but she would say things like, If it was me and my family, I wouldn't be caught dead living there.

11:53AM And, you know, she would talk regularly about the need to not be living in the countries of Canada and Australia. And so from that, then the peer pressure or the group policing comes into play, where your own peers and your own members are going, why haven't you guys left yet? Why haven't you done

11:53AM what you needed to do to get out of there?

Q Did you at some point learn that Ms. Shanti was posting messages about my clients online?

A Yes.

Q Did you see -- are you familiar with the Instagram handle

11:54AM @LianaShanti?

A Yes.

Q Who do you understand that to be?

A Liane's Instagram.

Q And how long had she had that Instagram, as far as you

11:54AM know?

A As long as I've known her.

Q The eight years you were a student, she had that Instagram handle?

A I believe so. She was more active on Facebook when I

11:54AM started with her, but then transitioned to Instagram. I

believe Facebook was more popular than Instagram back then, too.
Q That makes sense.
A Mm-hmm.
11:54AM Q And then did you see the types of comments she was making about -- well, let me back up.
Did you know that she was posting about your situation in Florida online?
A Can you clarify what you mean by --
11:54AM Q Yeah, did you ever see any things that you shared in group chats posted by Ms. Shanti online?
A Yes.
Q Did you give her permission to post those?
A Not explicitly.
11:55AM Q Did any of the women -- do you know, was there like a -- in part of the groups did they say, yes, please publicize this on your Instagram?
A Not that I remember, no.
Q And did you see posts about you on her Instagram?
11:55AM A Yes.
Q Did you see posts about Byron Horvath on her Instagram?
A Yes.
Q Did you see posts about Stefanie Vogt Horvath on her Instagram?
11:55AM A Yes.

Q And did you see posts about Paula Haygarth?
A Yes.
Q And part of the information that she used on those posts came from you, do you agree?
11:55AM A Yup.
Q And then you've seen, not just my clients, but she'd post about other students in her group, right.
A Yes.
Q And that was part of what she would do is take information in a group and then post about it?
11:56AM
MR. PORTNOY: Objection. Leading.
THE COURT: Sustained.
BY MR. ADAMS:
Q Is that something she'd do?
11:56AM A Yes.
MR. PORTNOY: Objection, Your Honor.
THE COURT: Sustained.
MR. ADAMS: Okay.
BY MR. ADAMS:
11:56AM Q Tell us about what would happen after these group sessions.
A That's a really broad question. Sorry.
Q Sure. There's posts -- you understand you were in group sessions where Haley was discussing her situation about Isla, right?
11:56AM

A Yes.
Q Okay. And then you saw those group discussions on Liana Shanti's Instagram afterwards; is that true?
A I would say it's more true that they were direct DMs to Liane than they were necessarily group posts.
Q Okay. And then the information that she -- is it true that the information that she learns in those sessions she'd post about on Instagram?
A Oh, if she's mad at you, absolutely, yes.
Q Describe, what does that --
A As a retaliatory measure.
Q Describe that.
A If somebody is removed from her group, if somebody leaves her group, the retaliation aspect is massive.
Q Did that happen to you?
A Absolutely it did --
Q When.
A -- to the tune of about 300 Instagram slides about me, and a four-hour live inside her app about me.
Q And that was only after you -- your deposition in this case?
A Correct.
Q Let's talk about your deposition in this case. You remember giving that?
A I do.

Q And that is by -- that was by Zoom?
A Correct.
Q So nobody was in the room with you, right?
A Correct.
11:57AM Q Did Ms. Shanti text you while you were under oath in that deposition?
A Via Instagram, yes.
Q What did she say?
A When I stated that I did not think I made a comment about
11:57AM Paula, she sent me a message with a bunch of screenshots saying, I have all of the screenshots, so everything that you're being asked that you said, I have proof of.
Q What was your understanding she was asking you to do?
A In those messages, she was literally telling me that she
11:58AM had proof of what I had just said I didn't say. And I responded that I would correct that.
Q On the record?
A Yes.
Q That -- what do you mean, you'd testify like she wanted?
11:58AM A No, like that if there was a screenshot that I said what Laura was asking me if I said, then I would correct the record that I did say that.
Q Did you, during your deposition, give answers favorable to Ms. Shanti because you understood she wanted you to?
11:58AM A Absolutely I did.

Q Why did you believe she wanted you to give those favorable answers?

A I asked her in her deposition how specific questions were answered, and she provided what she said.

11:58AM Q Did you ever tell Ms. Shanti that Byron was a rich farmer and that his parents just sold land for $16 million?

A I don't know that I gave her the number, but I did chat with her about the fact that their family sold the farm, yeah.

Q Do you believe -- do you have any information that she

11:59AM sued Byron because she thinks he's rich?

A Just an assumption.

THE COURT: Why don't we take our stretch break now.

MR. ADAMS: Sure.

THE COURT: We'll -- we're taking stretch breaks, so

11:59AM we're just going to take a quick, brief stretch break, and then we'll be going until 12:30. So half an hour more before the next recess. Thank you.

(Pause in the proceedings.)

THE COURT: All right. You may continue.

12:00PM MR. ADAMS: Thank you.

Can we show the witness Exhibit 315? It's not in evidence, Your Honor.

THE COURT: You may.

BY MR. ADAMS:

12:00PM Q Do you recognize Exhibit 315?

A I do, yup.
Q What is 315?
A A message thread between Liane and I.
Q What is the date?
12:01PM A It looks like it says April 17, 2022.
Q So that's months before this lawsuit was filed, like eight months before this lawsuit was filed? If you know. Do you know?
A Correct. It was days after the anonymous Instagram account was started.
12:01PM
Q And what's your understanding of what she's trying to do here?
A We were just trying to lay out who's who of who we thought was involved and who was connected to Haley.
12:01PM Q As you look at Exhibit 315, is it a true and accurate copy of your text exchange with Ms. Shanti?
A Yeah, it looks like it.
Q Has it been changed or edited in any way other than the numbers put on it for the exhibits?
12:01PM A No, it looks like it's accurate.
MR. ADAMS: I move to admit 315, Your Honor.
THE COURT: Any objection?
MR. PORTNOY: No.
THE COURT: 315 is admitted and may be shown to the jury.
12:02PM

(Plaintiffs' Exhibit 315 was received in evidence.)
BY MR. ADAMS:
Q Now, these -- these text messages are actually in chronological order?
12:02PM A Yes.
Q From the oldest on the top?
A Top to bottom.
Q So the blue is -- as you can see, this is from the Ms. Shanti's phone down at the bottom?
12:02PM A Yes.
Q And you know that because you're up at the top, right?
A Correct.
Q And that's the photo you used for your profile in April of 2022?
12:02PM A No. That photo is from last year.
Q Okay. So does that indicate to you then that this was captured after the date?
A Absolutely it was, yeah.
Q And she's asking you what kind of business does Byron
12:02PM have?
A Yup.
Q And you tell him he's a farmer?
A Correct.
Q Did you know why she was looking into it?
12:02PM A Because we were trying to piece together who everyone was.

Q Why?
A Because there was an anonymous Instagram account started that was attacking myself and my husband and Liane.
Q And then you write back -- you said: Okay what about Brian -- or she says: Yes. Okay. What about Brian?
Who is Brian?
A Brian is Haley Winter's dad.
Q And then you respond here: Huge farmer. He and his parents sold a portion of it for 16 mill a few years ago.
Did you write that?
A Yup.
Q Who is "he and his parents"?
A Byron.
Q My client?
A Yes.
Q Does this refresh your recollection that you told Ms. Shanti that his parents were -- had just sold a portion of the farm for 16 million?
A Yes, it does.
Q And then Brian is Haley's dad?
A Correct.
Q What's Winter Well Servicing?
A That's one of her dad's businesses.
Q And is he well known in the community, if you know?
A It would appear so.

Q Take a look at exhibit --

MR. ADAMS: Can we show to the witness -- it's not been admitted can we show to the witness Exhibit 317?

THE COURT: You may.

12:04PM MR. ADAMS: Thank you, Your Honor.

BY MR. ADAMS:

Q Do you recognize Exhibit 317?

A Yup.

Q Is this another text between you and Ms. Shanti?

12:04PM A It is, yup.

Q From April of 2022?

A Yes.

Q So I think this is just the day prior, correct?

A Or the -- a few days after. I believe the other one was

12:04PM the 17th.

Q Was it on the 17th? Okay. Thanks.

Is this a true and accurate copy of the text exchange you had?

A Yup.

12:04PM Q Has is it been manipulated in any way or changed?

A No.

MR. ADAMS: Your Honor, I move to admit 317.

THE COURT: Any objection?

MR. PORTNOY: No.

12:04PM THE COURT: 317 is admitted. It may be shown to the

jury.

(Plaintiffs' Exhibit 317 was received in evidence.)

BY MR. ADAMS:

Q Is this you sending a photograph of Byron and Stefanie?

12:05PM A It is, yup.

Q Why would you do that?

A We were in full on detective mode trying to figure out who was behind this attack, the people that were attacking us. And so we were pulling all the information that we could about who

12:05PM we knew.

Q And you were giving this to Ms. Shanti?

A Correct, yup.

Q And you have an understanding that she took this photograph here at the top and posted it on her Instagram?

12:05PM A I don't know that I ever seen her post that on her Instagram. I can't say for certain.

Q Okay. That's fair.

Did you see pictures of the Horvaths' wedding video --

A Yes.

12:05PM Q -- online?

A Yes.

Q Who posted those?

A Liane.

Q Do you know how she got them?

12:05PM A I assume Haley.

Q So you assumed. Do you know?
A I don't know.
Q So Haley would have given the video, or somebody gave the video to Liane from their wedding, and then what did Ms. Shanti do with it?
A Posted it on her Instagram repeatedly.
Q And what kind of comments were on there?
A A lot of disparaging comments about Stefanie, comparing her to Haley.
Q Including things like, she's sleeping in their marital bed. Do you remember that?
MR. PORTNOY: Objection. Leading.
THE COURT: Sustained.
BY MR. ADAMS:
Q What statements do you remember being said about Haley and their relationship?
A I remember specifically just the comparison.
Q Stefanie and Byron, sorry.
A Yes. I remember specifically the comparison between -- how Liane would compare how Byron's body language was with Haley's versus how it was with Stefanie, and she would constantly compare how light filled and beautiful Haley was versus Stefanie.
Q So there was a point in time for years you were working with Ms. Shanti to try and uncover who was behind the anonymous

posts against her, correct?
A That is correct.
Q Do you have any particular skill or knowledge of identifying anonymous online posts?
12:07PM A No.
Q And you didn't personally ever discover that information, did you?
A No.
Q And then you even gave a deposition where you said you
12:07PM were trying to give favorable testimony; is that a fair statement?
A Absolutely.
Q Why did you do that?
A Because I would have done anything that I could to protect
12:07PM her.
Q What do you mean?
A Well, for the previous four years, ever since April 14th, I believe the day the account started, 2022, I was made to believe that this was my fault. Haley and I brought these dark
12:07PM people and attacks into her life. It was our fault. So, I was the one who provided the majority of the screenshots of the articles and the posts and what was being shared on the anonymous account. We were providing that information to her, because we wanted it to be over.
12:08PM Q And then at some point in time after you wouldn't continue

to lie for her under oath, she cut you off; is that right?

MR. PORTNOY: Objection, Your Honor.

MR. ADAMS: I'll withdraw it.

MR. PORTNOY: Leading. Argumentative.

12:08PM THE COURT: Sustained.

BY MR. ADAMS:

Q At some point in time she cut you off after your deposition?

A Correct.

12:08PM Q Tell me about that.

A Myself and a group of women were removed all at the same time. A list was posted in the app of names of who had -- was now whatever list of darkness, whatever it was called. And then that night there was a four-hour live called Unholy
12:08PM Thursday where she did what she's done repeatedly in the past when someone gets removed and gets out in front of the narrative and just absolutely smears the people.

Q Do you have any information that my clients posted anything online anonymously about Ms. Shanti?

12:08PM A I do not.

Q You gave some statements under oath, and you're going to be shown some statements that are contradictory to your testimony today. How do you explain those?

A Can you tell me which ones?

12:09PM Q Well, for example, if you testified at your deposition

that Ms. Shanti did not encourage you to go to Florida, how would you explain that?

A Got you. Okay.

At the time of my deposition I was still very much in a place of wanting to protect her, because I loved her and I thought -- I believed I was her friend. And I would do anything to make sure that she was no longer harmed. And that included putting myself and my integrity on the line.

Q Are you being paid to be here today?

12:09PM A I am not being paid to be here today. In fact, it's costing me a lot of money to be here today.

Q Are my clients paying you in any way?

A No.

Q Are they giving you any favors, nonmonetary favors?

12:09PM A No.

Q When is the first time you met me, talked to me ever in your life?

A I met you Thursday, I think it was, the day after I got here.

12:10PM Q A week, less than a week?

A Yes.

Q Before that you and I had never spoken in your life?

A On a Zoom call we did speak.

Q When was that?

12:10PM A The week prior.

Q So about two weeks you've known me?
A Yup.
Q Did I ask you to lie in this case and come in and testify?
A You said the exact opposite.
12:10PM Q Why are you here?
A Because my involvement with that woman and her community brought harm to a large group of people, including my own family, including the people sitting behind you. And it's the least I can do to tell the truth, so the harm stops and no one
12:10PM else is hurt.

MR. ADAMS: Thank you, Your Honor.

No further questions at this time.

THE COURT: Thank you.

Cross-examination, please.

12:11PM CROSS-EXAMINATION

BY MR. PORTNOY:

Q Good morning.
A Good morning.
Q When did you first speak with the lawyers for the
12:11PM defendants?
A The day of the deposition, after the deposition.
Q Who took your deposition?
A Laura.
Q The defendants' counsel?
12:11PM A Correct.

Q And that was because you remembered talking to me and said that you were looking forward to having them question you so you could support Liana?
A I do remember saying that, yes. And that is genuinely how I felt.
12:12PM
Q So up until your deposition, you and Liana were completely together on the things that were being said about you and her by these anonymous people, correct?
A I would say that that is true, yes.
12:12PM Q Okay. That was for several years, correct?
A Correct.
Q And you were providing Liana your thoughts as to who might be involved?
A Oh, we had several conversations over who might be involved.
12:12PM
Q And what did you tell Liana you thought who the people were that were posting these defamatory statements about her? Who did you tell her back before your deposition you believed were making those anonymous statements?
12:12PM A I believed it was a group of people.
Q And individuals?
A I can't recall the exact names.
Q Sorry. Do you deny telling her you believed telling her that Byron was responsible?
12:13PM A No, I don't deny that, at all.

Q So you told Liana when you would talk to her before your depo, that you believed the people making these anonymous statements about her included Byron, correct?
A Included a lot of people tied to Haley, yes.
12:13PM Q Let's start with Byron.
A Sure.
Q And why did you tell her that?
A Because they were all so angry that Haley tried to leave Canada with his daughter. And my ex-husband and my daughter's
12:13PM stepmom and others wrote affidavits, along with Byron and Stefanie. So they became the group. Sorry.
Q We'll talk about the group in a little while.
Who is the first person, you or Liana, to tell the other person, I think one of the people behind these statements
12:14PM about you, Liana, is Byron Horvath?
A I don't know.
Q Wasn't it you who first brought it up?
A I can't remember. It was a long time ago, and there was a lot of conversations about that man.
12:14PM Q Well, this is a pretty important issue, so why don't you take a second and let me know. Are you telling the jury you don't remember -- you admit that you thought Byron was involved, correct?
A Yes. Yes, I did think Byron was involved for a long time.
12:14PM Q But you're saying you don't remember whether you first

told Liana, I think it's this guy Byron Horvath?
A Correct, I don't remember if I told her first or if she told me first.
Q Could have been you?
12:14PM A Could have been, yeah.
Q Okay.
Who else?
A Elise Winter.
Q Who else?
12:14PM A Haley's father.
Q Who else?
A Haley's brother.
Q Who else?
A I'm not sure who else was on that list.
12:15PM Q Did you mention Stefanie at all?
A Probably because she was married to Byron and her friends were following that Instagram account.
Q Do you recall whether you told Liana first that you thought Stefanie Horvath was behind some of these anonymous --
12:15PM A I do remember that, yes.
Q Okay. And you remember telling my client that you thought Paula was absolutely behind it?
A No. Actually, I remember messaging Liane on Signal when the account started and asking her if I needed to message Wade
12:15PM or if their energy was anywhere around it, and she said it was

not. Paula didn't come into play until the Sourced Intelligence report.

MR. ADAMS: Move to strike as violative of the order, Your Honor.

12:15PM THE COURT: That last statement about a report will be disregarded.

BY MR. PORTNOY:

Q Well, without mentioning any specific report, did there come a time when you retained a company to try to see who might 12:16PM be behind the anonymous posted?

MR. ADAMS: This is improper given the Court's order, Your Honor.

THE COURT: Sustained.

BY MR. PORTNOY:

12:16PM Q What reasons did you believe, other than what you've already testified to, that Byron and Stefanie and/or Paula might have been involved or were involved in the anonymous posts? What other information did you have?

A I didn't have information, other than my own opinions and 12:16PM my own beliefs. And Haley had tried to leave Canada with Isla. And we were all already down in America. So understandably that group of individuals was very upset.

And Haley's sister lives in a very small town called Moose Jaw, and an IP address for Moose Jaw was all over Drew's 12:17PM website the day before the Instagram account started. And the

first posts on the Instagram account were about his business.

MR. ADAMS: Move to strike given the Court's order, Your Honor.

THE COURT: All right. Why don't we do this, let's take a recess right now, ladies and gentlemen. It's a little bit earlier than expected, but we'll take a recess until -- let's see, it will be about 20 minutes. So if I'm doing my math correctly, kind of close to 12:45 but before then. All right?

So it will be a 20-minute recess. Thank you.

(At 12:17 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Ma'am, you may step down.

THE WITNESS: Thank you.

THE COURT: Let's do this at sidebar, I think it's going to be better to do it such that the witnesses can't hear.

(Sidebar on the record:)

MR. PORTNOY: Your Honor, I have to prove a circumstantial case. One of the reasons why my client believed who was involved -- a case in which they're hiding behind anonymity -- is what Amanda told her about information she received. I cannot be forbidden to do that. That's part of what she told my client.

THE COURT: How -- let me ask you this: Are you not offering it for the truth, though?

12:19PM

MR. PORTNOY: No, I'm not offering it. You already made a ruling on that. But I'm offering it to show what she believed and why. It doesn't mean it's true or not. I just -- I only have certain things, and this is critical. I don't -- I don't care about Sourced Intelligence. She testified at her depo about a report and why she believed what she believed. You can give -- you've already indicated you're going to give a limiting instruction as to the truth.

THE COURT: Okay.

12:19PM

MR. ADAMS: He keeps tying to revive what is a deficient report. This witness can't do it. As much as he wants to try and kind of skirt around this and talk about it, it's been excluded because it's unreliable. And so you can't use it -- it's almost like fruit of the poisonous tree, it can not be now used to try to revive her or move on. It has been excluded. You can't move to the next level --

12:19PM

THE COURT: I'm going to take this under advisement and when I come back on the bench, I'll come back before the jury and I'll make a ruling.

12:20PM

MR. PORTNOY: Okay. Thank you, Your Honor.

(End of sidebar.)

THE COURT: We'll be in recess.

Ms. Cortez, I'll come back on to the bench before the jury returns.

12:20PM

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Thank you.

(A recess was taken from 12:20 p.m. to 12:41 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

12:41PM THE COURT: All right. Let me go through with everyone what my view is with regard to the report.

The report I have excluded for -- both under Daubert and for discovery reasons.

The question of what Amanda Brady told the plaintiff 12:42PM about who she thought the anonymous posters were seems irrelevant to me.

This is not a question about what the plaintiff reasonably believed to be true. It's a question of the identity of the anonymous posters, which is different, in my 12:42PM mind.

So because we're dealing with the plaintiffs' case here, the claims here are that these defendants made these postings. The fact that she may have reasonably believed that they were the ones to make the postings is not part of the 12:42PM elements in this case.

So I'm going to sustain the objection.

MR. PORTNOY: I don't understand the Court's ruling.

THE COURT: You don't understand what?

Come closer to the microphone, please.

12:42PM MR. PORTNOY: Oh, I'm sorry.

12:43PM The defendants are hiding behind anonymity --

THE COURT: That's --

MR. PORTNOY: -- in our view. We have to be able to put a circumstantial case together.

12:43PM THE COURT: Okay.

MR. PORTNOY: And there are reasons why this witness believes it was them.

THE COURT: What she believes is irrelevant. What this witness believes as to who made the postings is irrelevant
12:43PM to the question of whether or not these defendants were the anonymous posters. That's a question for the jury to decide.

MR. PORTNOY: Yes, but they have to hear why.

THE COURT: No, they don't. She's not an expert. The plaintiff had every opportunity to hire an expert in this case
12:43PM to tie these anonymous posts to these defendants through IP addresses. What you relied on instead was a report that this witness had obtained in the course of her child custody proceedings. And what she believes as to who posted these things is irrelevant.

12:44PM So I'm going to ask you, Mr. Adams, to please advise your client -- excuse me, your witness that I've made this ruling and that she's not to talk about the report.

MR. ADAMS: I will do that. May I take a moment to do that?

12:44PM THE COURT: You may.

12:44PM MR. ADAMS: Thank you.
And then shall I call her on the stand?
THE COURT: Yes, please.
And I will step off the bench while we call the jurors.
MR. ADAMS: Thank you, Your Honor.
(A recess was taken from 12:44 p.m. to 12:47 p.m.)
THE COURT: Thank you.
12:47PM Ladies and gentlemen, we will go until about 2 o'clock when we'll have another short break, very short break. And there will be a stretch break between now 2:00 two. All right? Okay.
Mr. Portnoy.
MR. PORTNOY: Thank you.
12:47PM BY MR. PORTNOY:
Q Before the break you said you went into, quote, full-on detective mode trying to see who was posting anonymously. What did you do to go into full-on detective mode?
MR. ADAMS: Your Honor, improper give the ruling.
12:48PM THE COURT: Sustained.
MR. PORTNOY: Put up Exhibit 115, please.
THE COURT: You may. 115 has not yet been admitted.
BY MR. PORTNOY:
Q Is this a letter you wrote to Federal Judge Susan Mollway
12:48PM on April 28, 2023?

A Correct.
Q I want you to read the document, because I'm going to move to introduce it into evidence.
Read it to yourself, not out loud.
12:48PM A Oh, read it to myself? Not out loud.
Q Unless you agree this is the letter you wrote.
We can scroll down.
A I do agree it's the letter I wrote, yeah, I recognize it.
MR. PORTNOY: Move 115 into evidence.
12:49PM THE COURT: Any objection?
MR. ADAMS: No, Your Honor.
THE COURT: 115 is admitted and may be shown to the jury.
(Plaintiffs' Exhibit 115 was received in evidence.)
12:49PM BY MR. PORTNOY:
Q I'm going to have you read it. Let me just ask you: Why did you write this?
A I wrote this in support of Liana at the time when she explained about her federal bankruptcy case and that there were
12:49PM letters being written accusing her of various things.
Q You wrote this on your own?
A I did write this on my own, yup.
Q It's all your words?
A Correct.
12:49PM Q Was all your belief and opinion and -- at the time?

A Absolutely, it was my belief and opinion at the time.

MR. PORTNOY: Let's take a minute for the jury to read it.

THE WITNESS: (Perusing document.)

12:53PM MR. ADAMS: Is there a question pending, Your Honor?

MR. PORTNOY: I'm waiting for the jury to be finished, Your Honor.

THE COURT: All right.

MR. PORTNOY: If they are, I'm happy to move on.

12:53PM THE COURT: All right. Let's move on.

BY MR. PORTNOY:

Q You mentioned the name of Riley Lawson a little while ago.

A Yes.

Q Did she -- I'm sorry. Did she work for you?

12:53PM A She was our nanny in Canada, yes.

Q Did she also work at one of your retail stores in Jacksonville?

A She was not an employee of my retail store in Jacksonville. She did graphic design work and she helped me there via her Canadian business, yes.

12:53PM

Q Did she get paid?

A Yes.

Q And as a nanny did she get paid?

A No, not as a nanny.

12:54PM Q She did that for free?

A When we were in Florida, yes, she did not get paid. She lived in our house without rent.

MR. PORTNOY: Put up Exhibit 9, please.

THE COURT: You may.

12:54PM BY MR. PORTNOY:

Q Have you ever seen Exhibit 9 before?

A This is not familiar to me, no.

Q Okay. It's from the cult, Liana Shanti Cult. You never saw it before?

12:54PM A No, I don't recognize the logo at the top, I don't recognize what this is.

Q Okay. We can move on.

Do you remember telling Liana that Paula burned lots of bridges that's why she had to move?

12:55PM A Yes, I do remember saying that.

Q And where did you get that information from?

A From my daughters and from two friends.

Q And did your daughters tell you where they got that information, that Paula burned a lot of bridges and that's why she had to move?

12:55PM

A No.

Q Do you remember telling Liana that -- these were your words -- Paula abandoned her own son?

A I remember the discussion with Liana about Paula giving up custody of her son, yes.

12:55PM

Q Did you use the word "abandon"?
A I believe I did, yeah.
Q So that information came from you?
A Yeah.
12:55PM Q What happened to your relationship with Paula that was a good one for a while and then you indicated ended -- or Paula indicated it ended?
A It sure did, yeah. So our relationship drifted apart, obviously, when she started dating my husband. We went from 12:56PM having a friendship, a very close friendship, to not talking a whole heck of a lot. And then when I got involved in Liane's community is when Liane first told me that Paula was doing black magic on my family.
And from there on it just deteriorated. And I would 12:56PM get messages from Liane saying just, you know, checking in on your family's energy. It looks like -- it looks like Paula is doing some stuff today. And then I would book a session to have her clear those things.
Q Did you ever explain that to Paula?
12:56PM A No. Paula and I did not speak for a very long time.
Q Did there come a time in Florida where you had to get an injunction against one of the defendants?
A I did.
Q Tell the jury about that.
12:56PM A So I obtained a temporary injunction against Mr. Horvath.

It was a Friday afternoon, May long weekend, 2022, and I was sitting at my desk doing some work and my phone rang. And we had just -- we were fresh to Florida, so I had my Canadian cellphone and I had my new U.S. cellphone. And my phone rang.

12:57PM MR. ADAMS: I move to strike as -- everything after this as nonresponsive, Your Honor. Ask a new question. And also --

THE COURT: Sustained.

Ask another question.

12:57PM MR. ADAMS: -- bordering on an issue that has been excluded.

MR. PORTNOY: It's sustained for what reason, Your Honor? I'm not sure, there were multiple comments.

THE COURT: It was sustained as to nonresponsive. So

12:57PM ask another question.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

Q Let's start from the beginning. Did there come a time when you obtained an injunction against Mr. Horvath?

12:57PM A Yes.

Q And why?

A Stalking.

Q What facts did you have that he was stalking you that led you to obtain an injunction?

12:57PM A I received death threat phone calls, four of them in a

row, and on the last one the caller failed to hide their number, so the number came through. And the gentleman's phone that it was attributed to was the brother-in-law of Haley Winter. And Haley asserted that that was Byron's voice on 12:58PM those calls.

Q How did Haley know about the call?

A I told her about the call.

Q And you obtained the injunction?

A A temporary injunction, yes. It never actually went 12:58PM through.

Q And a temporary injunction was to do what? What were you asking the Court to do regarding Mr. Horvath?

A Protection from him being around me or being near me.

Q Did you tell Liana about all this?

12:58PM A Of course I did.

Q Do you recall texting her about it?

A Yes.

Q Did the voice on the unknown number say, quote, I will find you, Amanda, and I will kill you?

12:59PM A That's exactly what it said.

Q Did the caller say, quote, I will find you and your kids?

A Not on mine. It just said, I will find you, Amanda, and I will kill you.

Q You reported it to the police?

12:59PM A I did.

Q Do you remember posting on May 11th, quote: Paula is going ham on Reddit now. Leasing the crusade to, quote, expose you, close quote, and rescue as many people as she can from you.
12:59PM Do you remember sending that to Liana?
A Yup. Yup.
Q What did you mean by Paula "is going ham on Reddit now"?
A Going ham is an expression meaning posting a lot.
Q Meaning what? I'm sorry.
01:00PM A Posting a lot.
Q So what you meant is Paula is posting a lot on Reddit now leading a crusade to, quote, expose you, close quote, and rescue as many people as she can from you. Correct?
A It was who I assumed Paula was operating was on Reddit.
01:00PM Q I understand. I just wondered what you meant by "ham."
A Mm-hmm.
Q Okay. You also made some posts about an arrangement you learned about between Byron and Haley regarding their daughter's custody arrangement. You remember commenting on
01:00PM that?
A I'm sure I did. There was a lot of conversation about Byron and Haley.
Q Do you remember saying words to the effect that Haley made a deal with the devil?
01:01PM A Yes.

Q Explain to the jury what you meant when you posted that and sent it to Liana.
A When Haley settled before her custody trial with Byron, I believed that she, instead of going into court and fighting for
01:01PM her daughter, that she ducked out early and made a deal with the devil and didn't fight for her.
Q And did you learn that part of that deal was to attempt to take back all the things she had earlier told Liana about what was going on?
01:01PM A Yes. I'm aware she wrote an affidavit, yes.
Q And what do you recall that affidavit said?
A I don't know that I've ever read it.
Q Okay. But it was your understanding that in order to get partial ability to see her daughter, she had to turn against
01:01PM Liana; is that correct?
A I -- I don't know if I believe that to be true.
Q Why did you think she made a deal with the devil?
A I wanted her to fight for her daughter, to get custody back of her daughter.
01:02PM Q And do you know why she didn't?
A I do not know why she didn't. I don't know the details of why she settled, because I actually didn't speak with her after that day.
Q You don't know why. That's all.
01:02PM A No.

Q Okay. You remember sending an e-mail to Liane that said: I have never told my girls that you said Paula was dark. I said that me, in capital letters.
A Can you repeat that?
01:02PM Q You went on to say: My opinion was that she was dark.
A Can you repeat the first part? I'm sorry.
Q Sure. Do you remember sending a message to Liana that says, quote: I have never told my girls that you said Paula was dark, I said that me, in capital letters?
01:02PM A Oh, yes.
Q So that was your opinion?
A Yes. At that time, absolutely.
Q Do you remember conversation that went on online between you and Liana as Paula was being deposed, where Liana said, she 01:03PM just said under oath that she has never said anything negative about me to London and Ellis, she has only defended herself and said, quote, what Liana says about me isn't true, close quote.
And you responded: Ellis -- that's your daughter -- just lost her mind. She said that's the biggest lie she's ever 01:03PM heard.
A Correct.
Q So Ellis was saying Paula was lying during her deposition about having never saying anything negative, correct?
A Ellis' recount is -- or Ellis' understanding is that she 01:04PM did speak negative of me, yes.

Q Do you remember getting an e-mail in June, or a note, message from my client: So odd that your ex-husband's wife is targeting me.

And your response: Very odd. Especially when I've had zero contact with her since 2015. But I do think that when Byron reached out to Wade for the affidavit, she saw the entire situation as a chance to jump in on the train. She's friends in Weyburn with a lot of Haley's old friends also.

Do you remember saying that?

01:04PM

01:05PM A Can you repeat the name from the very beginning of that?

Q Very odd. Especially when I've had zero contact with her since 2015.

Is that what you wanted me to read?

A I want to know who the context of this is.

01:05PM Q Oh, there was a message from my client: So odd that your ex-husband's wife is targeting me.

A Oh, "so odd." Sorry, I thought you said a name.

Q No problem. And then you were responding. Do you remember that?

01:05PM A Yup.

Q Do you remember saying: It's like the entirety of the city of Weyburn is, in capital, obsessed with the whole thing?

A Correct. It consumed everyone.

MR. PORTNOY: Lastly, can we put up Exhibit 430, please?

01:06PM

THE COURT: You may.

MR. PORTNOY: It's a lot of pages.

THE COURT: Let's have Ms. Cortez hand it to her then.

MR. PORTNOY: Oh, sorry.

01:06PM THE COURT: Could I have a copy of it, please? I don't have a copy of it.

No, I'm sorry, I do, yes. Okay. I'm sorry, I do. Thank you.

BY MR. PORTNOY:

01:07PM THE COURT: You may continue.

BY MR. PORTNOY:

Q It's a lot of pages.

A Mm-hmm.

Q Can you scroll through it at your leisure? And then I'm
01:07PM going to ask you if you remember writing this, along with all these exhibits -- I mean, the attachments. Just make sure it was one document.

MR. ADAMS: Your Honor, this isn't Bates stamped. Has this been produced in discovery? Where did this come from?
01:07PM It's clearly multiple different pieces of 20 different correspondences.

THE COURT: I agree, Counsel. What portion are you planning on using? This is --

MR. PORTNOY: Your Honor.

01:07PM THE COURT: -- 49 --

01:08PM

MR. PORTNOY: That's fine, Your Honor. Let me short circuit this.

Can you put up 321 -- show the witness Exhibit 321.

You can put this one away.

01:08PM MR. ADAMS: Are you moving on from 430?

MR. PORTNOY: I am.

MR. ADAMS: What was the exhibit? I'm sorry, counsel.

MR. PORTNOY: 321.

MR. ADAMS: Thank you.

01:08PM MR. PORTNOY: Which is the exact same document with a Bates stamp showing it was produced in discovery, without all the attachments.

BY MR. PORTNOY:

Q So 321. Take a look.

01:08PM A I don't have that one in my book.

Q And it's a lot less pages because it doesn't have all the --

MR. ADAMS: It's not the same document, Your Honor.

THE COURT: Let -- let's just treat this as a new document. All right? So she's now looking at Exhibit 321.

01:08PM

MR. ADAMS: Then move to strike the comment that it's the same document.

MR. PORTNOY: It's fine.

THE COURT: That is stricken.

01:08PM BY MR. PORTNOY:

Q Take a look at 321, called Affidavit in Support. And it's 16 pages.

(Pause in the proceedings.)

THE WITNESS: Okay.

01:10PM BY MR. PORTNOY:

Q Did you write this?

A I did write this.

Q Has it been altered in any way?

A It doesn't look to be, no.

01:11PM MR. PORTNOY: Okay. Your Honor, I move 321 into evidence.

THE COURT: Any objection?

MR. ADAMS: Yes, it doesn't comport with Your Honor's ruling with regard to redactions Page 25-24 at the bottom, Your 01:11PM Honor.

THE COURT: Sustained. And additionally it contains hearsay.

MR. PORTNOY: I'm sorry, Your Honor?

THE COURT: I am sustaining the objection, and it also 01:11PM contains hearsay.

MR. PORTNOY: She wrote it.

THE COURT: She --

MR. PORTNOY: I'm --

THE COURT: -- has statements in it about what other 01:11PM people told her, which is hearsay.

It also is not redacted in the way that counsel indicated it should be.

MR. PORTNOY: Your Honor, there's a lot in here other than this alleged redaction. So I'm trying to understand --

01:11PM THE COURT: All right. Well, what you can do is you can make an attempt to redact it.

MR. PORTNOY: Well, I'm not sure what it is that he wants redacted. Much of this he's already gone into.

THE COURT: Well --

01:12PM MR. PORTNOY: I'm happy to redact something if I knew or look at what he would like redacted.

Can we have a sidebar to see what he wants redacted?

THE COURT: Yes. Let's have a sidebar.

MR. PORTNOY: Okay.

01:12PM THE COURT: Ladies and gentlemen, let's have you folks stretch if you want to while we are at sidebar. Thank you.

(Sidebar on the record:)

MR. ADAMS: Talking about her death threats is fine. Talking about the death threats of others is not, it's been excluded. 01:12PM

MR. PORTNOY: What? I can't hear.

MR. ADAMS: Talking about death threats received by her is fine. Talking about death threats received by others has been excluded.

01:12PM MR. PORTNOY: Okay. Where would you like it --

THE COURT: What page is that?

MR. ADAMS: 24, Your Honor.

MR. PORTNOY: 24? Okay. Take out the word "Liana Shanti and her husband Robert Beard." Okay.

01:13PM THE COURT: No. We're not going to go into any of the --

MR. PORTNOY: This is a phone call to her. There's been no Motion in Liminé order about any other phone calls.

THE COURT: It says that --

01:13PM MR. PORTNOY: I'm happy to take out -- yeah.

MR. ADAMS: Take out the whole thing.

THE COURT: Right. It would have to be the whole thing.

MR. PORTNOY: No. Phone calls were also placed to her

01:13PM office in Regina. Not the whole thing. We can take out -- I mean I -- it was a completely different phone call. So I'm happy to take out --

THE COURT: It's an anonymous voicemail.

MR. PORTNOY: Fine. I agree.

01:14PM What else? In the last sentence?

MR. ADAMS: It's gotten put forth here.

MR. PORTNOY: I am happy to delete -- I tried to get in but it was objected to.

THE COURT: Well, what is your purpose of asking this

01:14PM question?

MR. PORTNOY: Because she -- exactly what testify -- she wrote before she changed her testimony. It goes definitely to impeachment.

THE COURT: What is she saying here that's not accurate, not consistent with what she's testified to today? She's testified today to receiving death threats.

MR. ADAMS: Going to be cumulative to show more.

THE COURT: She's already testified to this. So what --

01:14PM MR. PORTNOY: She's talking about Haley Winter in relationship to crossing the border. They made a big deal of it. He spent 30 minutes talking about how they crossed the border because --

MR. ADAMS: Ask the question. Why does he need this?

01:15PM THE COURT: You don't need this document. You can ask her, isn't it true you said X previously? And if she says no then you can use this to impeach her.

MR. ADAMS: I haven't objected for the last 20 minutes on these type of questions.

01:15PM THE COURT: Understood. Appreciate it.

(End of sidebar.)

BY MR. PORTNOY:

Q Did you write an affidavit in support of my client on August 5th, 2024?

01:15PM A I did.

Q Okay. And who did you intend that to go to?
A To this Court for this case.
Q This case?
A Yes.
01:15PM Q Okay. And were you asked to do that?
A Not overtly, no.
Q You volunteered to do it on your own?
A Sure, I did.
Q And that was in support of my client?
01:15PM A Yes, it was.
Q And in what ways were you supporting my client when you wrote the affidavit? What information did you want the receiver to have -- or the reader?
And do not talk about any phone calls that were made
01:16PM to Hawaii. Okay? Ignore that completely.
A Correct. So what I was trying to do at the time was to paint a clear picture of why Liane needed support, why I felt that the group was attacking her. And it outlined my relationship, the timeline of my relationship with my
01:16PM ex-husband and with Paula. And it outlined who I am as a mother. It talked about my children. And putting all of those things together, I believed was going to help her because I truly thought that that was my job.
Q Did you say, quote: The allegations that have come
01:17PM against Liana Shanti, myself, my husband and other women in

Liana's community from the former friends and family of Haley are a deplorable false narrative spread to discredit our reputations and support systems. It has been a thinly veiled tactic by Paula, Byron Horvath, and several other ex-husbands and their friends and family members to distract any attention from their own malfeasance.

Did you write that?

A Absolutely I did.

MR. PORTNOY: No further questions. Thank you.

THE COURT: Thank you.

Redirect?

REDIRECT EXAMINATION

BY MR. ADAMS:

Q The temporary injunction in Florida, that didn't -- got dismissed, right?

A Yes.

Q You voluntarily withdrew it?

A Correct.

Q Why?

A I was out of money.

Q What's that?

A I was out of money.

Q You were out of money?

A And it had already been in place for a year at that time, and it was delay after delay after delay, and it was quite

silly to just keep going. I didn't feel unsafe.
Q You're in the courtroom with him now, do you feel unsafe?
A Not at all.
Q You've changed your mind?
01:18PM A Absolutely I have.
Q Do you know -- do you know who created the website Exposing Family Abuse?
A Liane did.
Q How do you know?
01:18PM A Well, she talked about it a lot in the beginning. She messaged Riley Lawson about doing a logo for the website. She messaged me about any information I had --

MR. PORTNOY: Excuse me, Your Honor. I object it goes beyond the cross -- beyond direct.

01:18PM THE COURT: Sustained.

BY MR. ADAMS:
Q Do you believe Liana Shanti runs a cult?

MR. PORTNOY: Again --

THE WITNESS: I do.

01:18PM MR. PORTNOY: Your Honor, objection. It was never asked by me on cross, any questions about that.

THE COURT: Sustained.

BY MR. ADAMS:
Q You were asked about your motivations for making
01:19PM statements under oath that you're now retracting. Do you

recall that?
A Yes.
Q Why were you making statements under oath that you've now retracted?
01:19PM A For four years when my family was in a new country trying to establish a new life and under attack by a group of people online, it was very traumatizing. It was traumatizing for my family, it was traumatizing as a member of Liane's community. It was a feeling of death. It was a feeling of complete and
01:19PM utter panic if all of these things that were being asserted about her were true, were actually true.
And so I went in the opposite direction and I dug in. And I believed the guilt that was placed on me for bringing these quote/unquote dark people into her life. I believed that
01:20PM it was my obligation to do whatever I could. And I leveraged the state of my relationship with Paula and my relationship with Wade as a means to provide information to her. I leveraged the hearsay of information about Byron and Stefanie that I received from Haley as a way to leverage information for
01:20PM her in support.
Q While you were doing that, did you feel like you were special?
A I always felt like I was special, yes. I believe Liane made her whole community feel like they were special. That's
01:20PM one of the -- that's one of the things about her group, we were

light workers, it was us against everyone outside. And of course I was special.

MR. ADAMS: Nothing further, Your Honor.

THE COURT: May this witness be excused?

01:20PM MR. ADAMS: Yes.

THE COURT: You may step down, ma'am. Thank you.

(Witness excused)

THE COURT: You may call your next witness.

MR. ADAMS: May I step outside?

01:21PM THE COURT: Yes.

MR. ADAMS: Ms. Moritz is going to do the exam. So --

THE COURT: All right. Thank you.

Ladies and gentlemen, since you took a stretch break during the sidebar I'm not going to give you another one. I

01:21PM don't see why. Just let me know.

MR. ADAMS: A point of clarification. The witness is no longer excluded from the courtroom?

THE COURT: Yes, unless someone expects to call her as an impeachment or rebuttal witness.

01:21PM MR. ADAMS: We do not.

MR. PORTNOY: No.

THE COURT: All right. She may stay.

Ms. Winter, if you could please approach.

HALEY WINTER, DEFENDANTS' WITNESS, SWORN

01:22PM THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your full name, spelling your last name for the record.

THE WITNESS: My name is Haley Winter. My last name is spelled W-I-N-T-E-R.

01:22PM THE COURT: Ma'am, I'm going to ask you to pull the microphone just a little closer to you. Thank you.

Ms. Moritz, you may proceed.

MS. MORITZ: Thank you, Your Honor.

DIRECT EXAMINATION

01:22PM BY MS. MORITZ:

Q Hi, Haley.

A Hi.

Q Thanks for being here today.

You were formerly married to Byron; is that correct?

01:23PM A I was, yes.

Q Well, before we get into that, let me ask a little bit about yourself.

Where -- when were you born and where did you grow up?

A I was born in Weyburn, Saskatchewan, Canada. And I was

01:23PM born on March 13th, 1989.

Q And I just want to make sure we can hear her okay, the court reporter can hear.

A Yup.

Q And what were you into when you were growing up in

01:23PM Weyburn?

A What did I enjoy?
Q Yeah.
A I played piano my whole life. I just loved kind of doing hair and being a very girly girl.
01:23PM Q Okay. And what do you do for a living now?
A I'm a hairstylist.
Q So we've -- you said you were formerly married to Mr. Horvath.
A Yes.
01:23PM Q When did you split up?
A We split up in 2016.
Q Do you have any children with Mr. Horvath?
A We have one child.
Q Okay. Were you ever a student of Ms. Wilson, the
01:24PM plaintiff in this case?
A I was.
Q Okay. And for how long were you a student of Ms. Wilson?
A I was a student for about three years, two-and-a-half.
Q What courses did you take?
01:24PM A I took all of them, Mother Wound, Father Wound, Narcissistic Abuse, Lemurian Mystery School, her business school, yeah.
Q Did you take -- to the best of your knowledge, did you take all of the courses that were available to you?
01:24PM A I did, yeah.

Q And were they free or did you pay for them?
A I paid for them.
Q How much did you pay her for all those courses?
A I think in the end it was about $15,000.
01:24PM Q Okay. And were you permitted to complete all those courses that you paid for?
A No.
Q Okay. And why did you not complete them?
A Because I did something she didn't approve of.
01:24PM Q Okay. And then what happened after that?
A I was removed from all of her platforms.
Q Okay. Did you get a refund of any kind?
A No refund.
Q What did you do that she did not approve of?
01:25PM A I chose to get my daughter back after losing custody of her.
Q Okay. We'll talk about that in a bit.
Did you at one point do a mentorship of any sort with Ms. Wilson?
01:25PM A I did, yeah.
Q Okay. What kind of mentorship was that?
A It was for a business I had started making skin care.
Q Okay.
A Yup.
01:25PM Q How much did the mentorship cost?

A It was $10,000.
Q Okay. What did the mentorship involve?
A She was going to make a business plan for me, and then there was going to be two phone calls, and then over the course
01:25PM of some months e-mail support.
Q Okay. What did you actually receive from her?
A I received one phone call and about an 11-page business plan.
Q Did you use that business plan?
01:26PM A No.
Q Why didn't you use it? You had paid $10,000 for it.
A It was mainly things I was already doing. And I did not like the logo she created or the colors.
Q Okay. Did the business plan that she gave you, did it
01:26PM have any information that you had not given her already?
A Not really. It wasn't anything really that new that I was doing.
Q Okay.
A Perhaps maybe more of a structure, but other than that, I
01:26PM was basically doing it all.
Q Okay. Did any of the courses, the business mentorship or any of the other courses that you took from Ms. Wilson, did they involve direct interaction with other students and/or Ms. Wilson herself?
01:26PM A Yes. There was Signal chats where everyone would discuss.

Q What would they discuss?
A Some things were personal and some things were business related, depended on which chat you were in.
Q Okay. Give me an example of some of the chats you would
01:27PM participate in.
A There was a Facebook group to begin with, and women in there would just share about their life and what was going on, and a lot of women were going through a lot of hard things --
Q Mm-hmm.
01:27PM A -- in there.
Q Like what sort of hard things?
A They were just dealing with -- a lot of the mothers were dealing with divorce and things like that.
Q Okay. And in these chat groups these mothers would share
01:27PM personal information about their lives?
A Yes.
Q We just got to make sure not to talk over each other as best we can for the sake of the court reporter. I will try to do my best, too. Thank you.
01:27PM Approximately how many of these groups were you in?
A I think it was, like, two or three, like the Facebook group was ended and then we went into Signal.
Q Okay. The Facebook group, was that the Lemurian Mystery School group?
01:28PM A That was.

Q Okay. Tell me about that group. What was that group about?
A On the Facebook group?
Q Mm-hmm.
01:28PM A Yeah, it was just -- I don't know, I think it was about 100 women in there, maybe. We would ask questions in there. There was a weekly Q and A, you could ask Ms. Wilson anything that you wanted and she would answer.
Yeah, it was just kind of more of like a support
01:28PM group.
Q Okay. What kind of topics would come up in that Facebook Lemurian group?
A Just a lot of, like, spiritual stuff would come up, and we would discuss personal things that were going on.
01:28PM Q Was there ever any discussion about the Akashic Records?
A Oh, yes. Yes.
Q Okay. Tell me about that.
A Liane Wilson claimed she was the only one who could see your Akashic Records, which is basically the story of your
01:29PM life.
Q The Akashic Records, to your mind, it's the story of your life?
A Yes.
Q Okay. Is there any -- could you expand on that
01:29PM explanation just a little bit more so we can make sure we

understand?
A Yeah. So basically she could see into your life to give you ways to better live your life. And she could see, like, where you were going to be going wrong in certain areas or things of that nature.
01:29PM
Q Okay. So is it fair to say women would ask her advice in these --
A Yes, because she knew the answers.
Q And how did she know the answers?
01:29PM A She claimed she was psychic.
Q Did she make any other claims -- did Ms. Wilson make any other claims about her abilities in these chats?
A Yes. She claimed she was reincarnated as Jesus Christ in this lifetime.
01:30PM Q Okay. How did -- how did -- how did these chats make you feel?
A At the time it was intriguing, I guess. I guess I was looking for a support system. I was going through a lot in my life, and there was just -- I knew some women from the area that I lived, and I guess it felt safe at the time.
01:30PM
Q So you learned about her community from women that you knew in your community, your hometown?
A Yup.
Q Okay. And this timeframe that we're talking about, this is the years after you had separated from Byron; is that
01:30PM

correct?
A Yes.
Q Did -- in these chats, did Ms. Wilson ever discuss the communities you lived in?
01:31PM A She claimed at one point that where we lived was dark.
Q And can you talk a little bit more about that?
A Yes.
Q What do you mean by dark?
A She believed that we were going to be put in concentration camps and that we should leave.
01:31PM
Q Wow. Okay. What year was this?
A This would have been in 2021.
Q Okay.
A And closer to the end of 2021.
01:31PM Q Do you know what she meant by "concentration camps"?
A I guess we were just going to all be locked up.
Q Why is -- why would that be?
A Because we were not vaccinated.
Q I see.
01:31PM Did you ever share any personal information about yourself with Ms. Wilson in either this chat group or another one?
A I did, yeah.
Q What sorts of things did you share with her?
01:31PM A I was just going through a very difficult divorce. I was

highly sensitive to what my daughter had been through in her life. And so, yeah, I shared quite a bit about my personal life, mm-hmm.
Q So you would share personal things about all those topics --
01:32PM
A Yes.
Q -- in the chat group, to be clear?
Did she ever give you a new name?
A I did get a new name, yes.
01:32PM Q Did you ask for that?
A Yes, I think I had -- like I think it was, like, a given that most people were going to get a name at some point within that group.
Q I see.
01:32PM Do you recall how many -- how long you had been part of the community when she gave you the name?
A I think it was near the end of being in this -- so in 2023.
Q Oh, okay. And what was the name that she gave you?
01:32PM A It was Kailea Haunui.
THE COURT: Let's ask her to spell that, please, for the court reporter.
THE WITNESS: K-A-I-L-E-A, H-A-U-N-U-I.
MS. MORITZ: Thank you.
01:33PM BY MS. MORITZ:

Q Are you familiar with Ms. Wilson's Instagram account?
A I am.
Q Okay. And do you know the handle that she uses for that?
A I do.
01:33PM Q Okay. Is it @LianaShanti?
A Yes.
Q Okay. Are you aware of statements that Ms. Wilson has made about my clients on that Instagram account?
A I am aware.
01:33PM Q I'm sorry?
A I am aware.
Q Okay. And what are some of the statements that you are aware of that she made on that?
A She claimed that Byron is dark and evil. That -- she did
01:33PM a lot of claiming that -- she compared my wedding with Byron and Stefanie's wedding. There was a lot. It was daily that she would go on there and speak about my life and Byron and Stefanie's life.
Q Daily. And this is in what time period?
01:34PM A She started that in 2022, probably. Yes.
Q Okay. 2022?
A Mm-hmm.
Q What other things do you remember reading -- seeing on her Instagram page about my clients?
01:34PM A That they were abusers of user supporters. Yeah, it was

just all very chaotic and cruel.

Q Did -- you mentioned your wedding. Tell me more about what she posted about your wedding?

A One evening she -- I don't know how she found my wedding video to Byron, but she did. And she was playing clips of that, and then as well as she got access to Byron and Stefanie's wedding video and she was comparing them. It was really awful.

Q How did that make you feel at the time?

A It was shocking, actually, because I didn't even have that video anymore.

Q Okay. So she didn't get it from you?

A She did not, no.

Q And you don't know where she got it?

A No.

Q And you didn't have the wedding video even?

A No, I didn't.

Q Did you ever find out how she got it?

A No.

Q Did she ever ask you permission to post your wedding video on her Instagram account?

A No.

Q Do you remember anything else that you had observed about my clients on that account?

A She posted just -- it was like daily, how dark and evil

01:36PM they were and the things that she said they did, because she could psychically see some things. And, yeah, it was just horrible.
Q Did she ever tell you that she saw things psychically about your life?
A Yes.
Q Like what?
A She saw time timelines saying that Byron wasn't going to be in my life. She saw -- because she believed that he was so dark and abusive. And at the time I believed -- I believed that. It was a very difficult divorce we went through. I struggled greatly with separating from my daughter.
Yeah, it was very painful and I just really struggled at that time.
Q When the -- when the two of you separated, what was the arrangement you had with Isla in the beginning?
A Yeah, she would go with her dad every other weekend, stay till Sunday.
Q And she was with you most of the time?
A She was.
Q And how old was she at this time?
A Well, I left Byron in 2016. So she was one.
Q Okay.
A And then we did that all the way through till 2022.
Q And did you have any issues initially in 2017 with sharing

custody?
A I did. I was -- I was just very sensitive. My daughter had -- had two open heart surgeries. I was, just -- I guess I just always wanted to know that she was being treated well.
01:37PM When you -- a child goes back and forth it can be very challenging. There's a lot emotion there. I guess I was quite traumatized from her birth, and just everything was really hard. It was -- I found it very difficult.
Q So I just want to make sure I understood you right. She
01:38PM had two open heart surgeries before she was one?
A Yeah, before she was six months old.
Q Before she was six months old. Wow.
A Mm-hmm.
Q Has she had any surgery since that time?
01:38PM A She had another surgery in 2019.
Q And that was another heart surgery?
A Yes, another open heart surgery.
Q Okay. How is her health now?
A She's doing really well, actually. You would never know.
01:38PM Mm-hmm.
Q Were you ever concerned about Isla while she was in Byron's care or Byron and Stefanie's care was it?
A I had concerns. I think I was just very sensitive, and I really didn't know Byron as a parent. Because when I left she
01:39PM was just a baby and I did everything. And, I mean, he was

there, but, like, to leave her with him I -- it wasn't, like, something that happened often.

Q Were you still breastfeeding at the time?

A I was, yeah.

01:39PM Q So it was difficult to share?

A Yeah, yeah, just the separation really was very hard on me. I really trusted no one with her.

Q And do you recall how old Isla was when you started taking the courses with Ms. Wilson?

01:39PM A She would have been -- sorry -- five.

Q Thinking back to the Instagram account, the @LianaShanti Instagram account, did you ever see any posts accusing Mr. Horvath of being a pedophile?

A I did, yeah.

01:40PM Q Did you tell Ms. Wilson that you believed him to be a pedophile?

A Not in so many words, no. I think I spoke to concerns that I had.

Q What kind of concerns?

01:40PM A Just -- well, not the pedophile, but like she just had bruises one time coming home. But I understand what those are from now. And again, very highly emotional at the time.

Q So you were concerned about bruises that she had, but you didn't accuse him of being a pedophile?

01:40PM A No.

Q Okay. And to be -- I just want to make sure I heard your testimony correctly, did you tell Ms. Wilson that --
A I did, yeah.
Q -- that he was, what specifically?
01:40PM A That I suspected neglect and abuse, yeah.
Q Did you ever accuse Byron of sexually abusing Isla?
A No.
Q And you never told Ms. Wilson that you believed he was sexually abusing Isla?
01:41PM A I don't believe I did.
Q Okay. So, you mentioned that your -- I think you alluded to the bruises, you said. Where do you think those came from?
A I think they were on a quad or something, and Isla is on blood thinners, so she does bruise very easily.
01:41PM Q Just so we all know, what's a quad?
A A quad is like a four wheel, like -- it's all terrain, like. I don't know how to describe it. It's like a motorbike kind of thing.
Q Okay.
01:41PM A But it has four wheels.
Q So she was doing a lot of outdoor activities with Byron?
A Yeah, they did a lot of outdoor activities.
Q Okay. And you mentioned that she is on blood thinners and bruises easily?
01:41PM A She is.

Q Yeah. Did you ever tell Ms. Wilson that you believed Byron or Stefanie were unhinged and dangerous?
A No.
Q Did you ever tell Ms. Wilson that Byron or Stefanie were
01:42PM enlisting felony kidnappers and abusers?
A No.
Q Did you ever tell Ms. Wilson that Byron or Stefanie were conspiring with a felony kidnapper?
A No.
01:42PM Q Did you ever see a post by Ms. Wilson where she made comments about Byron and Stefanie's intimacy, their sex life?
A I saw a post.
Q And do you have any idea where she would have gotten that information from?
01:42PM A No.
Q You didn't tell her anything about that?
A I did not.
Q Did you ever tell Ms. Wilson that Byron can't be -- excuse me.
01:42PM Did you ever tell Ms. Wilson that Byron can't stand to be around his wife?
A No.
Q Did you ever tell Ms. Wilson that sex only happens between Byron and Stefanie under the influence of alcohol?
01:43PM A No.

Q Did Ms. Wilson ever counsel you about where you should live?
A Yes.
Q Tell me about that. What did she tell you?
01:43PM A When -- in 2021, when she was saying that Canada was turning into a communist country and we were going to be put in concentration camps, that we should move to Florida.
Q Did you ever hear her provide similar advice to other students?
01:43PM A I did, yeah.
Q Okay. And were those discussions orally or were they written down?
A They were in, like, a chat. I can't remember whether it was Facebook or Signal.
01:43PM Q Okay. Did Ms. Wilson advise you to leave Canada with Haley -- I'm sorry, with your daughter Isla?
A She did, yes.
MS. MORITZ: Okay. Let's take a look at Exhibit 1124, please.
01:44PM THE COURT: You may.
MR. ADAMS: It's up.
MS. MORITZ: Okay. Thank you.
For the witness.
BY MS. MORITZ:
01:44PM Q Let's take a look at that, Haley.

Do you recognize this document?
A I do.
Q Okay. I know it's several pages.
MS. MORITZ: Maybe we can scroll through just so she
01:44PM can take a look and make sure it's something she's familiar with.
THE WITNESS: Yes.
(Pause in the proceedings.)
BY MS. MORITZ:
01:45PM Q Okay. You got through it? Okay?
So, this is a document you prepared with the exhibits?
A It is, yes.
Q Okay. Has it been altered in any way that you --
A No.
01:46PM MS. MORITZ: Okay. Move Exhibit 1124 into evidence.
MR. PORTNOY: No objection.
THE COURT: I'm sorry?
MR. PORTNOY: No objection.
THE COURT: 1124 is admitted and may be shown to the
01:46PM jury.
(Defendants' Exhibit 1124 was received in evidence.)
MS. MORITZ: Okay. Let's turn to page -- the PDF
Page 8 of the document, please.
BY MS. MORITZ:
01:46PM Q Is this a direct message discussion with Ms. Wilson?

A It is.
Q And let's -- just to be clear, whose are the blue bubbles and who's the darker color?
A I am the blue bubble.
01:46PM Q Okay. And you recognize this direct message that you had with Ms. Wilson?
A I recognize it.
Q Okay. Let's see here. It says here: Is there anything I can do that will persuade Byron to give up custody, child
01:46PM support?
And her response to you was?
A Child support is a huge potential to get him to go away.
Q Okay. And the next thing you asked him was: How do I tell him that we are going to the US, and is it our highest
01:47PM path to be there?
Do you remember that?
A I do.
Q What were you talking about there?
A Well, there was so much pressure to leave Canada. And it
01:47PM really was -- there was no possible way, because Ms. Wilson is psychic and can see different timelines, I did ask this question because I was very fearful at the time.
MS. MORITZ: Let's look at the next page, please.
BY MS. MORITZ:
01:47PM Q And what did she write in response to that, at the top of

the page there?

A It is your highest path to be there.

Q I see the word "today" is superimposed with the word --

A The highest path to be there, that's what that would say.

01:48PM Q Now, below that, she writes to you: You can tell him you are taking a vacation.

What is that referring to?

A Leaving and going to Florida.

Q But misrepresenting the purpose of the trip to your
01:48PM ex-husband?

A Absolutely. Yes.

Q I'm sorry?

A Yes.

MS. MORITZ: Let's go to the next page, please.

01:48PM BY MS. MORITZ:

Q And I see you write about a third of the way down the page: Could I have a conversation about why leaving Canada is the best? My plan was to get an appointment with a cardiologist for Isla in Montana so we can get across.

01:48PM What was her response to that?

A That's a great plan.

MS. MORITZ: Keep going down, please.

Next page, please.

Next page.

01:49PM BY MS. MORITZ:

Q And if we go down, she says to you: Have other reasons that are diversions.
What is that referring to?
If you need to read --
01:49PM A Yeah. Just don't make the trip about the vaccine.
Q Don't make the trip about seeing a doctor or getting a vaccine or --
A Right, yes, about seeing a doctor. Sorry. Yes.
Q Okay. And then it looks like you write below: Okay. So
01:49PM don't tell him we are seeing a -- then go to the next page -- oh -- cardiologist.
MS. MORITZ: And we can go to the next page.
BY MS. MORITZ:
Q And looks like you write: Or do you see --
01:50PM Do you know what that word is below?
A Needing a reason to get across. So the reason I would be giving. Because I knew I would never get across the border.
Q Okay. So you would need Byron's consent to cross the border?
01:50PM A Of course, yes.
Q All right. And I can see here she says that: I believe you will need his consent legally.
A Yes.
Q Tell the Border Patrol that you are seeing a cardiologist
01:50PM is good, but I'm not seeing that as being -- I'm not seeing

that as being complete enough for Byron.
What did you write?
A I know that. So I need to tell Byron more. Byron would not like that I'm taking her to see a cardiologist in the states. Do I have to tell him that part?
Q And she says: No. I wouldn't.
MS. MORITZ: Let's look at the next page -- oh, I'm sorry. Yeah, that's right.
BY MS. MORITZ:
Q So going to the top of the next page, what does that say at the top Ms. Wilson wrote to you?
A That's why I suggested going on a vacation or suggested vacation idea.
Q She suggested the vacation idea?
A Mm-hmm, yes.
Q Okay. And your response was: Just going to Montana for Christmas, and then I just never come back?
A And she said: Yes and yes.
Q When did you ultimately try to go to Canada with your daughter?
A It was March 20th, 2022.
THE COURT: Go to Canada?
MS. MORITZ: Excuse me.
BY MS. MORITZ:
Q Go to the United States.

A It was March 20th, 2022.
MS. MORITZ: Thank you. Apologies.
BY MS. MORITZ:
Q And what happened when you tried to go to the United States on March 20th?
01:51PM
A We were turned away.
Q Okay. And what happened in the aftermath of that?
A I really then fell apart after I got home. The fear that I felt was so intense, and I knew that it was so -- I knew it was so wrong. It was just the -- I felt so dumb that I would attempt to do something like that, that I would think that that was okay. And that I was -- I really believed there was danger. And there was so much pressure within the group, and it was just -- it was a lot to handle.
01:52PM
Q Outside of the community you were in with Ms. Wilson, did you have was anyone encouraging you to move to Florida?
01:52PM
A Yeah.
Q Like who?
A Multiple women in the group would really encourage me to leave.
01:52PM
Q Okay. But outside the group, outside, were you communicating with your friends and family?
A No.
Q Did you ever discuss the idea with them?
A No.
01:52PM

Q No?
A No.
Q But within the group you felt a lot of pressure to go?
A I did, yes.
01:53PM Q Okay. And then what happened after you got back with your custody arrangement with Byron?
A Then it was -- well, April 14th of 2022, a few weeks later, I was served multiple affidavits that I was losing custody of my daughter.
01:53PM Q And after that Byron had custody of Isla?
A He did.
Q Let's switch gears.
Do you know anything about a website operated by Ms. Wilson called Exposing Family Cults or Exposing Family
01:53PM Abuse?
A Yes.
Q What do you know about that?
A She decided that she was going to advocate for mothers and expose abuse on a website.
01:53PM Q And she talked about that in chat groups or courses, or what was the context?
A That was, like -- I guess it was on her Instagram page.
Q Did you ever look at that website?
A I've seen it, yes.
01:54PM Q Was that something Ms. Wilson was proud of in the chats

that she had with all of you?
A Oh, yes, very proud of that.
Q Tell me more about that.
A She was going to save all the mothers. She was going to
01:54PM just really champion and come together and help them. That was her goal, apparently.
Q And she took credit for that website?
A Well, no, she didn't say she made it, but she was the champion for mothers.
01:54PM Q Okay. And she promoted that website to all of you?
A She did, pretty much daily.
Q So, you lost custody of Isla?
A I did.
Q What happened next. Tell me what happened in the months
01:54PM following that experience.
A Shortly after I lost custody of Isla, I -- I then was in serious panic attacks every single day. I, like, couldn't think at all at that point. It was pretty much, I thought I was going to die at points.
01:55PM Q Take a minute. That's fine. Yeah. Take your time. There's tissues right behind you, too, Haley. Sorry, I know -- I know this is upsetting.
A But, so Isla was taken, and then I was removed from all of her groups and everyone blocked me, and I was dark because I
01:55PM didn't follow the law.

Q So after Isla was take -- after you lost custody of Isla you were removed from all the groups or were you still in the groups?
A No, I was removed from them at that point.
01:56PM Q So not only did you lose Isla, but these --
A Yeah, I lost every -- everyone. There was a few people that still talked to me, but I was -- that was like the most alone I've ever been.
Q Okay. Were you still taking courses or anything --
01:56PM A I was still listening to her stuff, yes.
Q Okay. And were you still communicating with Ms. Wilson?
A No.
Q Okay.
A No, because a I was cut off for my own safety, I think is
01:56PM what she said at the time.
Q Cut off from the courses and the chat groups for your own safety?
A I still had the courses at that time, but I was kicked out of her chat groups.
01:56PM Q Okay. The courses, these were downloaded; is that correct?
A Yes.
Q So you already had those, but you couldn't participate in any discussions with the --
01:56PM A Exactly.

Q -- community.
And at the time you -- what about your own family?
A I was not speaking with my family. I wasn't speaking with my family.
01:57PM Q Okay. So this was in -- this was April -- or after -- after April 2022?
A Mm-hmm.
Q What -- what happened with the custody arrangement in the following months?
01:57PM A I had lost custody of my daughter, and I had to be supervised to see her. And that was, like, Saturday and Sunday every other weekend.
Q Okay. And that was because you had tried to cross the border and there was concerns that you would try to do that
01:57PM again?
A Yes. And also that I was in a cult.
Q I see. Was that part of the custody -- did that --
A That was a big part, I think. It was a threat -- I was a threat to flee, and the cult narrative was really strong. And
01:58PM I didn't fully understand that at the time.
Q Okay. When you said the "narrative was really strong," you're referring to what was being discussed in your custody proceedings?
A Yes.
01:58PM Q Okay. Tell me more about that.

A Well, it was like many pages all about Ms. Wilson, and how she is a cult leader and all the things that are -- she does in her groups, the things she says. It's been a very long time since I've read those documents, but it was mainly about her.

01:58PM Q Did the court make any findings as to that issue, do you recall?

A Well, I lost my daughter. So at the end I -- I did not have custody of my daughter, and I had to be supervised to see her.

01:58PM Q Did that change at some point?

A That changed in December of 2023.

Q What happened there?

A We had our trial date set and we came to an agreement and I was going to regain custody of Isla.

01:59PM Q Okay. What was the agreement you came to?

A That I would not be supervised anymore, and that we were going to gradually go -- move up to three weekends a month, which felt like absolutely the right thing. She was settled into a school where she was living, and I would see her freely 01:59PM and have holidays. And I was going to be a mother again.

Q And that was in, I think you said, December of 2023. Okay.

With respect to Ms. Wilson and her community, after that arrangement was made, what happened next?

02:00PM A Then I was really dark. That was the darkest thing you

could possibly do was get your child back after a horrifying year. And yeah, she called me -- I guess I was Judas then. I became a very dark person, and she was going to educate people on me.

02:00PM Q What do you mean, educate people about you?

A Because I had chosen to align with darkness, I believe that's what she was saying online.

Q What was dark about getting custody of your child back?

A I truthfully do not know.

02:00PM Q So, she was upset that you --

A She was upset. She wanted me to go to trial.

Q What would have happened if you had gone to trial, do you think?

A Well, I would have done the trial. I was not strong 02:00PM enough to do a trial at that time. I -- it would have been probably over a year before a decision, so I would have to continue to be supervised to see my daughter.

And ultimately, my attorney advised me to do this. And it absolutely was the right thing to do.

02:01PM Q So you don't have any regrets about making that arrangement?

A Absolutely not.

Q Okay.

A It was probably one of the most joyful days of my life.

02:01PM Q Tell me what -- what's your relationship -- what's the

coparenting relationship like now with Mr. Horvath?

A It's very peaceful, actually. And we just have our schedule and we love Isla. And that's the goal.

Q What kind of dad is Byron for Isla now?

02:01PM A I actually think he's a great dad.

MS. MORITZ: No further questions at this time.

THE COURT: Okay. Thank you.

Ladies and gentlemen, we're going to take a 15-minute break right now. So we will be back, let's say about 2:15.

02:02PM So don't talk about the case, don't do any research. You know the drill. And we'll see you at about 2:15. Okay? Thank you.

(The following proceedings were held in open court out of the presence of the jury:)

02:02PM THE COURT: All right. We are in recess until 2:15. Thank you.

(A recess was taken from 2:02 p.m. to 2:17 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

02:17PM MR. PORTNOY: Oh, it's me? Okay.

THE COURT: Mr. Portnoy, your witness.

MR. PORTNOY: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PORTNOY:

02:17PM Q Good afternoon.

I'm going to read you something. Quote: Last year I attempted to leave Canada with my daughter. This was a decision I made on my own. Liana never once encouraged me to take my daughter out of the country. In fact, she has spoken

02:18PM many times to follow the legal process 100 percent. I failed to follow that advice and I have paid the price for that.

Who wrote that?

A I wrote that.

Q You wrote that to a federal judge, didn't you?

02:18PM A I didn't understand at the time what -- who I was writing this letter to, to be honest.

Q Well, it says Honorable Judge Susan Oki Mollway.

A I didn't know why I was writing that letter.

Q Judge of the United States District Court of Hawaii, 300

02:18PM Ala Moana Boulevard, C388, Honolulu, Hawaii 96850. Your Honor: I have dealt with being abused by Byron Horvath for 13 years. He abuses my daughter.

Who wrote that?

MS. MORITZ: Objection. Hearsay.

02:18PM THE COURT: Overruled.

BY MR. PORTNOY:

Q Who wrote that?

A I wrote that.

Q On March 7 I picked Isla up from being with Byron and

02:19PM Stefanie, his then fiancée. That night when I was helping Isla

put her pajamas on, I noticed three bruises on her body. One on her leg, a large one on her tailbone, and another on her waist. I asked her how she got them. I recorded the conversation about the bruises. She told me that her dad spanked her and locked her in her room. She stated in the recording that her dad says, quote, children should be spanked, close quote. She told me she was locked in her room for hours. She also told me that her dad spanks her when he is playing and when he is mad.

02:19PM

02:20PM Who wrote that?

A I wrote that.

Q And you wrote that all in a letter to a federal judge, correct?

A I did.

02:20PM Q Isla has come home from visits with Byron many times with very red private parts. I have taken pictures when it was particularly bad.

I am a victim of sexual abuse at the hands of my father, Brian Winter, and had often had very red and private parts as a child.

02:20PM

Who wrote that?

A I wrote that.

Q In closing, I want to make it clear that Liana had nothing to do with my decision to attempt to leave Canada with Isla. I made that choice all on my own. Liana's work has changed my

02:20PM

life in a very deep and profound way. It has empowered me to step away from my very abusive family and hale from a deeply traumatic childhood that was filled with sexual, physical, emotional, and financial abuse. Byron Horvath, as well as my
02:21PM father, Brian Winter, are not a fan of Liana only because they no longer have any control over my life and I am speaking the truth loudly.

Who wrote that?

A I wrote that.

02:21PM Q And you signed it on April 29th, 2023, correct?

A That's correct.

Q Did you also send a number of text messages to -- or DMs, whatever you'd like to call it, over the course of many months to my client outlining the abuse you believed Isla was
02:22PM suffering at the hands of Brian Horvath?

A Byron Horvath, you mean?

Q I'm sorry?

A You said Brian Horvath.

Q I meant Byron. Sorry.

02:22PM A I had at the time, yes.

Q How many?

A I don't know.

Q Okay. Did you once DM my client and said, quote: Because Isla was being locked in a room for so long that she peed on
02:22PM the floor, close quote?

A Yeah.

Q You said that to my client, didn't you?

A I said that to your client.

Q Yeah.

02:22PM Did you ever tell my client that you believed that Byron was using drugs?

A I did.

Q I left Byron on August 2nd, 2016, when Isla was one year old. He had spent that entire weekend partying and I realized 02:23PM he was using cocaine. When I asked what the white stuff was in his nose, he told me it was, quote, paint chips, close quote. We had a fight that day, and he exploded in a full-blown rage at me.

He took an essential oils diffuser and smashed it on 02:23PM the floor in front of me. I was holding Isla and he was screaming in my face. I did not feel safe. I got him to leave the house, and when I saw him through the window, I could see him smashing the steering wheel in his truck. It was very scary. I left that day and went to my parents' house?

02:23PM Did you write that?

A I wrote that.

Q In a letter to a federal judge?

A Yes.

Q Let's talk for a minute about the custody hearing in 02:24PM December.

MR. PORTNOY: Can you put 158 up, please?

THE COURT: You may.

BY MR. PORTNOY:

Q Do you see Exhibit 158?

02:24PM THE COURT: It should it be on the screen.

MR. PORTNOY: I'm sorry.

THE COURT: Just one moment.

MR. PORTNOY: Sure. No problem.

THE COURT: Now it's on the screen, for the witness only.

02:24PM

BY MR. PORTNOY:

Q Oh, one last question. I think you told the jury a few minutes ago that when your daughter showed you a bruise, you testified that -- you testified today that you thought it came in a playground incident. Remember that?

02:24PM

MS. MORITZ: Objection. Misstates prior testimony.

THE COURT: Sustained.

BY MR. PORTNOY:

Q What did you say you thought had caused it today?

02:25PM A I didn't say it happened in the playground.

Q What did you say caused it?

A I had said she was playing on a quad or a Ski-Doo.

Q That's your testimony today?

A Yeah, because I understand what happened now.

02:25PM Q That wasn't in your letter to the judge?

A That letter to the judge, I had written a previous, it was a paragraph long, and Ms. Wilson demanded I put more detail, and I was very hesitant to do that. I felt like I had to write that stuff in that document.

02:25PM Q You had to?

A I felt like I had to.

Q Did you write it?

A I wrote it.

Q Okay.

02:26PM 158. Can you take a look at it, please?

A I see that.

Q Okay. Is this a DM that you sent to my client on December 10th of 2023?

A My picture is at the top.

02:26PM Q Sorry?

A My picture is at the top.

Q That's a yes?

A Looks like it.

MR. PORTNOY: Your Honor, I move it into evidence,

02:26PM please.

THE COURT: Any objection?

MS. MORITZ: Objection. The year is not on the screenshot, and we're not seeing the complete document. I don't know what's --

02:26PM THE COURT: Let's scroll down.

THE WITNESS: Yeah, I don't see the whole thing at all.

MR. PORTNOY: Oh, sure.

THE COURT: He laid the foundation it's December 10th, 2023.

02:26PM

BY MR. PORTNOY:

Q You wrote this, right?

A (Perusing document.)

I don't know the date on this, actually. Is there, like, the year?

02:27PM

Q It says Sunday, December 10.

Did you write this or not, regardless of whatever year it might have been? And then we'll talk about the year.

A I might have wrote it.

02:27PM

Q Are you denying that you wrote this?

A I'm not denying it, I'm just -- I -- I don't know what this was written on or -- it just looks kind of confusing to me.

Q What's confusing about it?

02:28PM

A Just the way this is presented.

Q What about the way it's being presented is confusing? It's five small paragraphs. What's confusing?

A I guess, was this on Instagram?

Q Did you write this or not? That's the simple question.

02:28PM

MS. MORITZ: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I must have written it. I don't -- I really don't remember this, but...

MR. PORTNOY: Your Honor, I move 158 into evidence.

02:28PM THE COURT: Any objection?

MS. MORITZ: Yes. We object. The witness has not authenticated it. There's no date.

THE COURT: I think it goes to weight rather than admissibility.

02:28PM So objection is overruled. It may be shown to the jury.

(Plaintiffs' Exhibit 158 was received in evidence.)

BY MR. PORTNOY:

Q When was your divorce hearing scheduled?

02:29PM A In 2019.

Q No, no, the last one, the custody one. I'm sorry, my bad.

A 2023.

Q In what month?

A December.

02:29PM Q Who's Jane?

A Jane is my lawyer.

Q Okay. Jane is having a call with Roxanne in two and a half hours.

Who's Roxanne?

02:29PM A Byron's lawyer.

Q I can have Isla 50/50 by August if I send you, Liana, a cease and desist letter.

MS. MORITZ: Objection. Assumes facts.

THE COURT: Overruled. He's simply just reading from
02:29PM the exhibit.

BY MR. PORTNOY:

Q Who did you mean by "you"?

A Liane.

Q So in order for you to get custody of some sort with Isla,
02:30PM you had to agree to send a cease and desist letter to my client, correct?

A Yes.

Q And the letter to Mark Nammar, 11/11/24, is part of that deal, correct? In order for you to get partial custody of Isla
02:30PM in December of 2023, you agreed to turn on my client, correct?

A I was supposed to agree to that at that point, yes, if I wanted Isla back.

Q That was the deal. If you want Isla, you'd take back everything you had previously dealt -- told my client and
02:30PM renege that you never made those statements that Byron never abused your daughter in order to get custody in December of '23, partial custody, correct?

MS. MORITZ: Objection. Misstates prior testimony.

THE COURT: Overruled.

02:31PM THE WITNESS: Can you repeat the question?

BY MR. PORTNOY:

Q The question is that you made a deal because you had to in December 2023.

A I didn't make a deal at this point.

02:31PM Q Well, that was when the arrangement was agreed to, that you would have partial custody on the weekends, right? Let's start with that.

A We were negotiating before the trial. Yes, we were.

Q And part of those negotiations were, Byron said, if you

02:31PM want to see your daughter, you need to renege on everything -- you have to take back everything you ever said about Liana and say that she made you do it, she forced you to do it, et cetera. Isn't that the arrangement?

A I needed to cease and desist to tell her to stop posting

02:32PM about Byron and Stefanie online, and my family.

Q And you also had to say, I am going to write a letter to the U.S. Attorney and say that everything that I had previously said is either untrue, made up, forced upon me, et cetera, correct? Wasn't that the deal? Yes or no.

02:32PM A Can you say that again?

MR. PORTNOY: No further questions.

THE COURT: Let's let her answer that question.

MR. PORTNOY: Oh, sure.

THE COURT: And you also had to say I'm going to write

02:32PM a letter to the U.S. Attorney and say that everything that I

had previously said is either untrue, made up, forced upon me, et cetera, correct? Wasn't that the deal? Yes or no.

THE WITNESS: I don't really remember right now actually, how the -- details of what they wanted me to say.

02:33PM MR. PORTNOY: Okay. No further questions. Thank you.

THE COURT: All right. Redirect.

MS. MORITZ: Thank you.

REDIRECT EXAMINATION

BY MS. MORITZ:

02:33PM Q The letter that Mr. Portnoy was just reviewing with you, Haley, we don't need to look at it, but Exhibit 158, is that the original letter that you drafted?

A No.

Q First of all, who asked you to write a letter?

02:33PM A Ms. Wilson did.

Q She asked you directly to write a letter?

A She did.

Q Did she provide context for why she wanted you to write a letter?

02:33PM A No.

Q Okay. So what did she tell you? You had no context?

A She just needed this for a probation officer, I believe.

Q Did you know she had a probation officer?

A I did not know that.

02:33PM Q Did you ask why she had a probation officer?

A No, I didn't ask questions.
Q Did you feel you couldn't ask her that question?
A No, I didn't feel I could ask her that question.
Q Why is that?
02:34PM A Because she might get very angry.
Q Had she gotten angry with you before?
A Yes.
Q Can you explain more about that?
A There's been times where she -- if you don't do what she 02:34PM says, if you don't follow her advice to a T, she'll use you as an example to the students of why you wouldn't do something and go against what she thinks is right.
Q When you said, make an example to the other students, is that in the private chats or is that public on her Instagram 02:34PM page?
A Both. Both. She could definitely use -- she's used students, many of them, who have questioned her or, you know -- yeah, just questioned her in general. And then if she doesn't like it, then she will be very angry, remove you from her 02:35PM groups, and kind of make fun of you.
Q And so that's the reason you were afraid to ask why she was on probation?
A Yeah.
Q But you felt compelled to write a letter?
02:35PM A Yes, because it would be dark not to.

Q And tell me about the original letter that you wrote.

A The original letter was about a paragraph long and very -- no details at all about my life.

Q What -- what did it contain, if you recall?

02:35PM A Just -- right now I can't remember what it said. It was just about, like -- I can't remember.

Q That's okay.

But it was a paragraph long, you said?

A It was a paragraph, it was very simple, and there was no

02:35PM personal details in there.

Q Did you provide her that letter?

A I did.

Q And what was -- how was it received?

A It wasn't received well at all. And she said to rewrite

02:36PM the letter with more detail, and about abuse.

Q Did she tell you what to say?

A She just wanted the details of what I had shared with her.

Q Okay. Well, if you had been told by -- as we looked in that chat we looked at earlier in your direct examination where

02:36PM she had told you to leave Canada to -- to say it was a vacation.

A Mm-hmm.

Q If she had told you that, then why did you write otherwise in your letter to Judge Mollway?

02:36PM A I felt I had to do that, because she said she follows the

02:36PM law to a T. And to -- and she, from the beginning, claimed she never advised me to leave Canada.

Q But that wasn't true, was it?

A It wasn't true.

Q Does she follow the law to a T?

A I don't believe she does.

Q Has -- you also mentioned in the letter that Mr. Portnoy reviewed with you, Exhibit 158, something to the effect that Ms. Wilson had changed your life in a dramatic way. Was that true?

A My life was changed in a dramatic way.

Q How do you feel about that now, in what way?

A I lost everything by following her advice; my home, my daughter, my security. Many of my relationships were damaged. I lost many friendships. I was -- it was probably one of the worst things that could happen to a person.

MS. MORITZ: No further questions, Your Honor.

THE COURT: Thank you.

May this witness be excused?

MS. MORITZ: Yes.

THE COURT: All right. You may step down, ma'am. Thank you.

(Witness excused)

THE COURT: The defense next may call its next witness.

MR. ADAMS: Thank you, Your Honor.
The defense calls Byron Horvath.
All right. Thank you.
Mr. Horvath, step forward, please.
02:38PM MR. PORTNOY: Your Honor, could we have a very brief meeting?
THE COURT: Yes.
MR. PORTNOY: Very brief.
THE COURT: Okay. This is going to be brief, ladies
02:38PM and gentlemen, so if you want to stretch, you can.
But let me go ahead and have a sidebar with counsel.
(Sidebar on the record:)
MR. PORTNOY: Just a scheduling thing. We have two of the witnesses that have been here since about 11:00 or 12:00.
02:38PM I just wanted to check as to when you want them. We can either send them --
THE COURT: My goal was to deal with them at 3:15.
MR. ADAMS: The 747s are lining up.
MR. PORTNOY: I just wanted to know.
02:38PM Thank you, Your Honor.
THE COURT: Yup.
(End of sidebar.)
BYRON HORVATH, DEFENDANTS' WITNESS, SWORN
THE COURTROOM MANAGER: Thank you. Please be seated.
02:39PM Please state your full name and spell your last name

for the record.

THE WITNESS: Sure. My name is Byron David Horvath, H-O-R, V as in Victor, A-T-H.

DIRECT EXAMINATION

02:39PM BY MR. ADAMS:

Q Good afternoon, Byron.

A Good afternoon.

Q Where were you born?

A I was born in Regina, Saskatchewan.

02:39PM Q That's in Canada?

A You bet ya.

Q Tell us a little bit about yourself. What do you do in Regina, Saskatchewan.

A Well, I was born in Regina, but I now live in Raymore, 02:39PM which is an hour north of Regina. It's a small community of about 550 people. And I farm for a living.

Q What's Raymore like? What's the area like?

A It's a farming community. The whole town is kind of all agriculture related in some way, shape, or form, it seems.

02:40PM Q Is it flat, hilly?

A You can see your dog run away for miles. That's what they say. It's flat, yes.

Q You have a Canadian accent, so let's slow down for everybody.

02:40PM A Sorry about that.

Q Ey, Ey.
A Ey, yeah.
Q Are you a hockey fan?
A I'm a huge hockey fan, yes.
02:40PM Q Who's your team?
A I'm an Edmonton Oilers fan.
Q Tell us about your family.
A I'm married to Stefanie. We have three beautiful children. We have Isla, Bowen, and Blakely.
02:40PM Q How old is Isla?
A Isla is 11.
Q How old is Bowen?
A He's going to turn four. He's three. And Blakely is three months old.
02:41PM Q Who is the mother of Isla?
A Haley is.
Q Did we just hear from Haley?
A Yes.
Q Who is the mother of Bowen and Blakely?
02:41PM A That would be Stefanie.
Q Tell us about the farming that you do. How many acres do you farm?
A I farm about 6500 acres. But I'm in -- I farm with a best friend of mine, and he farms about the same. So in total we
02:41PM farm about 13,000 acres, 1200 -- yeah, about 13,000 acres. But

myself personally, about 6500 acres.
Q Tell us about farming, other than planting seeds and picking the crops. What does farming involve?
A It's -- it's a lot of work. It's a lot of hours. It's -- 02:41PM it's all I've ever really known, it's all I ever done. I haul grain in the wintertime. I seed the crop in the spring, we usually start in May. We spray all season, like all summer, so you're spraying for disease and pesticides and bugs and all stuff. And then we usually start harvest as soon as I get home 02:42PM from here. So we're gearing up to harvest probably in the next two weeks.
Q What do you farm?
A I farm canola, wheat, and red Lentils.
Q Did you grow up on a farm?
02:42PM A Yes, I grew up on a farm. Yup.
Q Where did you grow up?
A It's six miles south of a small town called Quinton. It's about 15 minutes from where I live now. I live in town, and I bought a piece of property just on the edge of town and that's 02:42PM where my shop and my bins and everything is set up for the farm now.
Q Does the business have a name?
A No. No. It's just -- no.
Q And you mentioned that when you go back it's going to be a 02:42PM busy time. What's the busy time right now?

02:43PM
A The busy time is harvest. So that's when you harvest the crop and -- yeah, it's -- it's payday for a farmer. That's what you look forward all year. You nurse the crop all year, and then you get to harvest it and bin it and sell it to make a living.
Q Has it been difficult to be here during that important time?
A Yeah, it's been -- it's been hard. We're trying to communicate things back home to get ready, because that's
02:43PM
usually my job. I'm a big hands-on fixer, getting everything ready to go person. So, yeah, I'm putting a lot of trust and faith in people back home that the job is getting done so when I get home we can start harvest.
Q Tell me about your family growing up. You grew up with
02:43PM
your mom and dad?
A Yup, I grew up with my mom and dad. I have two sisters, I have an older sister named had Heather and a younger sister name Holly. I'm the middle child.
Q And it was a family farm. Did you all work on the form?
02:44PM
A No. Both my sisters left the farm after graduation. So there's just me, and I farmed with my dad early on, but now he's retired and it's just me and my business partner. Oh, and my wife, she helps lots, too.
Q And when did you meet Stefanie?
02:44PM
A Oh, a long time ago. We were -- we met, I want to say in,

like, 2009, like way back in the day. We just met and, yeah.
Q Did she live in the same small town?
A No, she didn't. No. She grew up in Odessa. But we met through mutual friends.
02:44PM Q Let's talk about your oldest daughter, Isla.
A Mm-hmm.
Q Tell us about Isla.
A Oh. Sorry.
(Pause in the proceedings.)
02:45PM A She made me a dad when she was born.
Q When was she born?
A Sorry. She was born in 2015.
Q When she was born, was everything okay?
A No. She was -- she was born with double left ventricle
02:45PM with pulmonary atresia. She had an upside down heart with three chambers instead of four. Sorry.
Q So when she was born there was complications, I take it?
A Yes.
Q Were you guys worried?
02:45PM A Yeah. We were very worried.
Q Did she have to be specially cared for after birth?
A Yes. She was taken away from her mother the day -- the night she was born, and she was put in an incubator and taken to the children's hospital in Edmonton, and -- I have -- sorry.
02:46PM And I went there and I held her that whole night. She

went into surgery the next morning.

Sorry. This is just really hard.

Q It's okay. We're going to power through, okay? Or plow through, to use a farming analogy.

02:46PM A Oh, I need to get some water here.

Q Yeah, yeah, get some water.

When you're getting the water, I want you to let me know -- obviously, I can tell from your emotions, but what strain did having a sick daughter put on your relationship with 02:47PM Haley?

A It was really hard. It was hard on her, it was hard on her, it was hard on me. Shortly after Isla was born Haley got a blood infection, so she was sick in one side of the hospital and my daughter was sick in -- it was just really hard on us. 02:47PM It was.

Q Eventually it was so hard you split up?

A Yeah. We did. Yeah, yup.

Q How old was Isla when you and Haley split up?

A She was a little over one years old.

02:47PM Q And at that time what was the custody arrangement?

A When she left -- or when Haley decided to leave, she told me that she wanted to go live with her mom and dad in Weyburn and figure things out, and that we would see what happens from there. And that was -- from Raymore it's about two-and-a-half 02:48PM hours.

So, she went there, and I thought she was living with her mom and dad, which I think she was at the start, but then her dad bought her a house. And she called and told me that she's going to stay in Weyburn. And so then I -- I talked to 02:48PM my attorney about custody, and he basically told me that in Saskatchewan if you're more than an hour away, 50/50 is not an option because of travel for the children. And that he didn't advise me to -- there was really nothing we could do. Once she was living there, that -- the best I could do was every second 02:48PM weekend with my daughter.

So, for years I -- I did that. And I never showed up late once. I never missed a weekend.

Q So let me just get this clear. You -- you and Haley make the difficulty decision to split up, or maybe it was an easy 02:49PM decision, and you were living in Raymore at that time?
A Yes, correct.
Q And she moved back home to her parents where they were living in Weyburn?
A Correct, yes.
02:49PM Q And Raymore, where your farm is --
A Yes.
Q -- and Weyburn is about two-and-a-half hours away?
A Yes. Yup.
Q And you can't move because you're tied to the land, right?
02:49PM A That's right.

Q Yeah. And so your -- as a farmer, you can't just pick up your business and go to Weyburn, can you?

MR. PORTNOY: Objection, Your Honor. It's not a question, it's testifying.

02:49PM THE COURT: Ask a non-leading question.

BY MR. ADAMS:

Q You couldn't move your farm to Weyburn, is that your --

A No, I could not, no.

Q And so you were stuck driving?

02:50PM A Right. Yup.

Q But you didn't realize it was going to be a permanent thing, is that your testimony?

A Yeah. When she left it was that we were -- I didn't really know. She wanted to work things out or wanted to see -- 02:50PM she wanted space, and she wanted to be with her support system, which I granted, yes, go there, hoping that maybe we could make it work, yup.

Q And so that was all still informal; is that right?

A Correct.

02:50PM Q You didn't need to go to any Family Court in Canada at that time?

A No. No.

Q And we've heard testimony that you eventually had to go to a Family Court. We'll get to that.

02:50PM Before that time, when you were sharing custody with

Isla, were you driving two-and-a-half hours; is that right?
A No. We would meet in Regina. There was -- we had a spot on Chuka Boulevard that we met at the co-op and we did the transfer.
02:51PM Q So Regina is somewhere in between Raymore and Weyburn?
A It's exactly halfway for both of us, yes.
Q And that proceeded for a while?
A Yes.
Q When did -- did things change at some point?
02:51PM A Yeah. I started being accused of some awful things, and I was denied time with my daughter.
Q What happened?
A I was accused of drugs and being abusive and some really awful things.
02:51PM Q Did somebody show up at your door one day?
A Yes.
Q Tell us about that.
A CPS showed up at my door and asked if they could come in and interview Isla and myself in the home.
02:51PM Q Did you have any forewarning of that?
A No.
Q So it was a surprise visit?
A Yes. Yup.
Q Did they give any information as to who made the
02:52PM complaint?

A I don't remember that part, to be honest with you. No, I don't remember.

Q Do you remember when that was?

A I don't. I'm bad with dates and times and all that kind of stuff.

02:52PM

Q Well, let's try and work back a little bit.

What year did you separate from Haley?

A In 2019.

Q And so it was after 2019?

02:52PM A Yes.

Q Okay. And it's before today?

A Yes.

Q Okay. And in that -- did it happen more than once?

A I had CPS at my house three, for sure, times. Maybe four. I think it was three, though.

02:52PM

Q Let's talk about the first time.

A Okay.

Q What happened?

A They came in and they asked if they could interview Isla. And I said absolutely. And then they interviewed me and Stefanie. And then they started looking at her room and the house and a bunch of other things -- or not a bunch of other -- they just -- observed the house. They interviewed Isla by herself and they interviewed us.

02:53PM

02:53PM Q And then did they leave?

A And then they left, yeah.
Q Did you have an understanding of what was going to happen next?
A No. It was the first time something like that's ever happened. I didn't really know what was going on, to be honest with you.
02:53PM
MR. ADAMS: I've put up on the screen and I would like to publish to the witness Exhibit 1004, Your Honor.
THE COURT: You may.
02:53PM MR. ADAMS: It's on mine, Carla. Thanks.
BY MR. ADAMS:
Q You recognize what's been marked for identification as Exhibit 1004?
A Yes.
02:54PM Q What is it?
A It's a letter from child and family -- CPS, I believe, and it just basically says that the --
Q And it's to you?
A Yes.
02:54PM Q What's the date on it?
A April 7th, 2021.
Q Is this a true and correct copy of a letter you received from Child and Family Services in Canada?
A Yes.
02:54PM Q Has this been altered in any way, based on when you

received it?
A No.
MR. ADAMS: Your Honor, I'd move to admit Exhibit 1004.
02:54PM THE COURT: Any objection?
MR. PORTNOY: Well, I think the letter itself is hearsay. The fact that he received it is not objectionable.
MR. ADAMS: It's from a government agency, official document.
02:54PM THE COURT: Right. Okay. So I'll admit it.
1004 is admitted and may be shown to the jury.
MR. ADAMS: Thank you, Your Honor.
(Defendants' Exhibit 1004 was received in evidence.)
BY MR. ADAMS:
02:55PM Q This is a letter from the government of Saskatchewan, Ministry of Social Services, correct?
A Yes.
Q And based on this date -- so they're advising you: I'm writing this letter to advise a child protection investigation
02:55PM was conducted in regards to alleges of physical abuse?
A Correct.
Q And those are the questions they were asking when they came and showed up on your door?
A Yes.
02:55PM Q And this investigation -- this letter says: The

investigation has been concluded and the allegations were unsubstantiated.

Right?

A Yes.

02:55PM Q But it didn't end there, did it?

A No, it did not, no.

Q They came again?

A At least two more times.

Q Do you remember the next visit?

02:55PM A I do. Well, they all kind of just -- it was all just -- seemed like the same thing over and over again, it was just a different -- this -- I know the one time they came and they -- they checked Isla's room for her door frame for a lock, because I was being accused of locking her in her bedroom.

02:56PM And, yeah, they came, they interviewed her. They asked her a bunch of stuff again. And then they interviewed us. And they asked if they could look at the door frame. And I said, you can look at whatever you want. And they looked and -- yeah. They were looking for some sort of lock because I 02:56PM was being accused of locking her inside her bedroom.

Q The second time they showed, was that unannounced as well?

A Yes.

Q And I'd like you to take a look --

MR. ADAMS: May I publish to the witness Exhibit 1007, 02:56PM Your Honor, just to the witness?

THE COURT: You may.

MR. ADAMS: It's up on my screen, Carla. Go into full screen.

BY MR. ADAMS:

02:56PM Q You recognize what's been marked for identification as Exhibit 1007?

A I do.

Q December 15, 2021, letter from that same Ministry of Social Services?

02:57PM A Correct.

Q Is that the address where you lived?

A 619 Second Avenue, yes.

Q This is addressed to you?

A Yes, it is, yup.

02:57PM Q True and accurate copy of the letter that you received?

A Yes.

MR. ADAMS: Permission to publish 1007, Your Honor.

THE COURT: Any objection?

MR. PORTNOY: No.

02:57PM MR. ADAMS: Permission to admit?

THE COURT: It is admitted. It may be shown to the jury.

(Defendants' Exhibit 1007 was received in evidence.)

MR. ADAMS: Thank you, Your Honor.

02:57PM BY MR. ADAMS:

Q This is December 15th. If you'll remember, Exhibit 1004 was in April of 2021?
A Right.
Q This is another eight months later?
02:57PM A Yup.
Q And you're again being cleared after the investigation; is that right?
A Yes, yup.
Q But that didn't end there, did it?
02:58PM A No, it did not.
Q Did they come again?
A They sure did.
Q Showing you --
MR. ADAMS: Can I publish to the witness Exhibit 1035,
02:58PM Your Honor?
THE COURT: You may.
MR. ADAMS: It's up on the screen.
BY MR. ADAMS:
Q Do you recognize this document?
02:58PM A Yup.
Q This is a true and correct copy of a letter you got in June 28th of 2022?
A Correct. Yup.
Q Is this an accurate depiction of what you received?
02:58PM A Yes, it is, yes.

Q Did you alter it in any way before giving it to me?
A No, I did not.
MR. ADAMS: Permission -- or I would move to admit 1035, Your Honor.
02:58PM THE COURT: Any objection?
MR. PORTNOY: Same objection I made previously.
THE COURT: All right. Under 803(8) it is admitted. It may be shown to the jury.
(Defendants' Exhibit 1035 was received in evidence.)
02:59PM BY MR. ADAMS:
Q And this is referring -- this is a June 28 letter, so now it's another year and a half after the first one, a year and two months after the first one, correct?
A Correct.
02:59PM Q Another seven months after the December 1.
And this is alleging that there was sexual abuse, correct?
A Yes.
Q And this -- the investigation found -- has concluded and
02:59PM the allegations were unsubstantiated, correct?
A Correct.
Q And they even highlighted "unsubstantiated" in the letter, didn't they?
A Yes, they did.
02:59PM Q And this is June of 2022. Had you -- at this time had

Haley tried to take Isla over the border?
A Yes.
Q And what did you do when you had learned -- well, how did you learn that Haley was trying to take Isla over the border?
03:00PM A We were on our honeymoon, and we got a message from Haley's sister saying that she had received a message that Haley tried crossing the border.
And I took that information and I sent it to my lawyers in Regina. And that's when I got custody of Isla.
03:01PM Q When's the first time you heard of the plaintiff counter defendant Liane Wilson?
A I heard about her through Isla. When we had Isla she would say her mom has a new friend named Liana.
Q That's how you knew?
03:01PM A Yeah. And that's the first I heard of it, yeah.
Q Are you on social media?
A I am, yeah.
Q What do you have?
A I have Facebook and Instagram.
03:01PM Q Do you have a Reddit account?
A I do not have a Reddit account, no.
Q Have you ever been on Reddit?
A First I heard of -- no, I've never been on it, no.
Q Have you ever created any posts on Reddit?
03:01PM A I have never posted on -- never posted anything on there,

no.

Q Instagram, is your account public or private, or do you know?

A I would assume it's private. I'm not a big social media guy, to be honest. I do have it, but it's not -- I'm just not a real big Instagram Facebook guy. I do market book [sic] on Facebook probably the most buying and selling stuff. I would -- I -- I'm pretty sure it's private, my Instagram, yes.

Q At some point in time you found -- you came to believe, whether true or not, you came to believe that Ms. Wilson was encouraging Haley to take Isla over the border?

MR. PORTNOY: Objection. Leading.

THE COURT: Sustained.

MR. ADAMS: Thank you, Your Honor.

BY MR. ADAMS:

Q Was there some point in time that you learned about Ms. Wilson's involvement in your custody issues?

A Yes. After -- everything I've known or heard about this woman was through my wife. I have never -- I don't -- I remember her telling me that this woman is attacking us for sure, yeah.

Q And did you see the screenshots or the posts?

A Yeah, yeah, she would show me that, yeah.

Q And at some point in time were you trying to reach out to others for help?

A Yeah. Absolutely. We -- once things started getting -- how do I explain it? Once -- there was people reaching out to me with concerns about Haley possibly fleeing with my daughter. And then at that point, yes, we did reach out to Paula and Wade.

03:03PM

And we were just looking to gather whatever information we could about this to keep my daughter safe. That was my main goal the whole time, I'll do -- I need to keep Isla safe. So, yes, we exhausted every avenue we could to figure out what exactly is going on.

03:04PM

Q And you had a meeting at Formosa restaurant?
A We did, yeah.
Q Where is Formosa?
A It's in Regina, on the east end of Regina.
03:04PM Q Regina?
A Yeah.
Q Who selected that?
A Out of the four, I couldn't tell you. I could tell you it wasn't me, though. I don't like their pizza.
03:04PM Q Is it a place you've been before?
A I've never been there, no.
Q It's the only time?
A Yes.
Q And what was your understanding that meeting was for? Before you even went to it, what was your understanding?
03:04PM

A My understanding was my wife and I were going there to gather information. We wanted to know every possible thing we could about this woman so that we could, again, protect Isla and keep her safe. Because there was -- Wade, being one of

03:05PM the -- had already lost his children. And I was not going to let that happen to me. I was -- as a father, your duty is to protect your kids at all costs, and that's what I was doing.

Q So I want to be clear, before you went to Formosa to meet with Wade and Paula, you were informed in some way that Wade

03:05PM had already lost his daughters?

MR. PORTNOY: Objection. Leading.

THE COURT: Sustained.

BY MR. ADAMS:

Q Well, is it true -- so when you went to this meeting in

03:05PM Formosa, you had already -- what information did you already have?

A Haley's sister-in-law, Shannon Winter, they owned a company that Wade -- somebody worked for. I'm trying to piece this all together here. Just give me a second.

03:06PM Sorry. Shannon Winter's son worked for Wade. And she knew what happened to Wade, and she called us and said, You may want to talk to these people because I feel like Haley's heading down the same road that Amanda went down. And you just better pay attention to what's going on with your daughter and

03:06PM your ex-wife.

Q So you had the meeting in Formosa?
A Correct.
Q Do you remember what was discussed?
A It was -- I just asked -- Stefanie and I just asked
03:06PM questions about signs, and if there was signs and what to look for, what to -- who else we could talk to. And then I just -- I asked him if he would write an affidavit for us.
Q And what's your understanding of what an affidavit is?
A An affidavit is something -- something you write and,
03:07PM like, kind of like a testimony -- I don't -- you write this letter saying this is my knowledge of the situation.
Q And you submit it to court?
A And you submit it to court.
Q Did you ask Wade to do one on your behalf?
03:07PM A I did, yes.
Q And did he?
A Yes, he did.
Q And that was submitted where? Here in this court? In United States?
03:07PM A No, in -- in Saskatchewan.
Q In what type of proceeding?
A In a court -- in our custody -- or court proceedings back home.
Q Your proceedings that Haley talked about?
03:07PM A Yes.

Q At that time was Paula part of the -- that affidavit?
A Um --
Q Did she sign it or did Wade sign it?
A Wade signed it for sure, yeah.
03:08PM Q Not Paula?
A I'm not sure if Paula did or not.
Q After you submitted that affidavit, what happened next with respect to Instagram posts? Or after Wade submitted that affidavit, excuse me.
03:08PM A I -- I -- I don't really remember, to be honest with you.
Q Okay.
A I didn't really -- I don't really know.
Q At some point in time did you hear in the community that your name was being posted on Instagram?
03:08PM A Yes.
Q How did you learn about that?
A Well, my wife did show, you know, me what was being said about us and myself and stuff. And then it spread like wildfire. In a small town it -- it spread like wildfire. It
03:09PM was -- it was the only thing anybody wanted to talk about. And it was embarrassing, and it was --
Q Hang on. We'll get there.

Before Wade submitted the affidavit, do you have any information that you were being posted about online?
03:09PM A No. Not to my knowledge.

Q Your understanding is that the posts about you occurred after Wade submitted the affidavit in Canada?
A Yes.
Q And then tell me about what posts your wife showed you.
03:09PM A There was so many, that to pinpoint one, I really couldn't, or two even. But I just know it was just awful things said about me, my family, my wife, my kids -- or Isla, I should say -- or things I did to Isla, I guess I should say. And just personal, gross, false accusations.
03:10PM Q Did the posts, if you recall, call you an abuser?
A Yes, they did.
Q Do you deny that?
A I absolutely deny that, yes.
Q It's not true?
03:10PM A Not at all.
Q You've been cleared three times?
A Possibly four. Three for sure, possibly four.
Q And you said that there was all about in the community like wildfire. What do you mean by that?
03:10PM A Well, where I live and farm, it's a town of 550 people. It's -- you know everybody. There's not one person in that town you don't know. So everybody was either asking me about it or, you know, talking amongst themselves about it. And then it travels to Regina. And because it's people -- we know
03:10PM people there. So it's -- it -- it just traveled around fast.

And it was -- it was just -- it's all anybody wanted to talk about, because in a small town where I come from, this stuff doesn't happen. You don't do this. You don't treat people like that. It's just not something that you would ever see, hear, encounter, anything. It's just -- it's -- it brought me here. It's a big deal. It's -- it's gross accusations and very humiliating and very personal. And --

03:11PM

Q How did it affect your marriage with Stefanie?

A She's amazing. She -- she took it upon herself to start documenting everything, and it got to the point where she couldn't take it anymore. It was just -- it was too much and she wanted to leave me. She said, I didn't marry you to get involved in this. And she had a bag packed. I came home one day, she had a bag packed, she wanted to leave. She said, I can't do this any more, Byron. And I said, I know. I said, We need to come up with a game plan.

03:11PM 03:12PM

So I convinced her to stay and we decided that we were just not going to look at this stuff anymore, we weren't going to engage in it, we're not going to look at it. We're just going to try to live our lives as best we could. I had to hire my attorney in Regina to monitor this thing every day for however long to gather information in case something like this came -- like if it ever come to this point. And I'm so glad I did, because it just -- and it saved our marriage. Her hair grew back, and she --

03:12PM 03:13PM

Q Did it have any physical effect on Stefanie?
A Yeah. She was diagnosed with alopecia. She lost her hair. Her hair was falling out from the stress. She was pregnant with our child at the time, our first child. It was really hard on her.

03:13PM THE COURT: About one more question before we recess for the day.

MR. ADAMS: This may be a good time, I was going to switch.

03:13PM THE COURT: Okay.

MR. ADAMS: Yeah.

THE COURT: All right. All right, ladies and gentlemen, we are done for today. Tomorrow show back up at 8:30.

03:13PM Tomorrow we will not be staying later than 3:15 at the very latest. Otherwise, I think the schedule will be pretty much the same, other than we won't have that long break. I don't anticipate, at least. Hopefully we won't have that long break.

03:13PM We will see you all tomorrow. Get a good night's rest. Thank you for paying attention. Follow the rules. Thank you.

(At 3:14 p.m., the jury was excused, and the following proceedings were held:)

03:14PM THE COURT: All right. Mr. Horvath, you may step

down.

Let me just have everybody take a seat. I do have another hearing at 3:30, but I think I can get this done now.

Let me start by mentioning to the lawyers that we will deal with verdict forms tomorrow, sometime tomorrow.

03:14PM

MR. ADAMS: Yeah, I think that's what was on the calendar.

THE COURT: Well, that's in the afternoon. That's a good point. We can just do in the afternoon. We can do it at the same time.

03:15PM

MR. PORTNOY: Your Honor, I do have a conflict tomorrow at 4:00 in an arbitration that follows this trial, it's a pre-arbitration hearing that could take 30 minutes.

THE COURT: At 4:00?

03:15PM

MR. PORTNOY: 4 o'clock is what it was set for.

THE COURT: How much more do you have, counsel?

MR. ADAMS: 15 minutes.

THE COURT: And do you have any witnesses after that?

MR. ADAMS: We have two more witnesses. Your Honor.

03:15PM

THE COURT: Okay. How long --

MR. ADAMS: We have Wade Martin and Paris. And then we will -- so two more. I just want to make sure. We went through a lot of witnesses today. Paris is the one that's remote, and then Wade, Paula's husband, he's here. And then we are done.

03:15PM

THE COURT: How long do you think that all -- just your direct examinations?

MR. ADAMS: An hour.

THE COURT: Total or each.

03:15PM MR. ADAMS: An hour and -- hour-and-a-half total, direct.

THE COURT: An hour-and-a-half total for both?

MR. ADAMS: Yes. An hour for Wade on mine and a half hour for Paris.

03:15PM THE COURT: Okay. All right. There is a chance then that we will be able to let the jury go early tomorrow and start working on jury instructions immediately thereafter. That way, Mr. Portnoy, you won't miss your 4 o'clock.

We're also -- I'm assuming, then, that the defense 03:16PM will rest tomorrow. There's a decent chance of that.

MR. ADAMS: Yes.

THE COURT: Which means we are arguably moving a little bit faster than expected. So we have time. I'm not worried, Mr. Portnoy. In other words, you can definitely make 03:16PM your 4 o'clock.

MR. PORTNOY: Okay. I just wanted to let the Court know.

THE COURT: I appreciated that.

MR. ADAMS: I'm not worried either, anymore.

03:16PM THE COURT: Okay. Could we bring the women in then

please, Mr. Portnoy, so I can speak to them? Thank you.

MR. PORTNOY: We still can't get in touch with the one who left Hawaii. There's been phone messages, but my client's been in here.

03:16PM THE COURT: Which witness is that?

MR. PORTNOY: Joan -- Joni Abbott.

THE COURT: Okay.

MR. PORTNOY: Apparently we'll be able to get her -- talk to her after we adjourn for today.

03:17PM THE COURT: Okay.

MR. ADAMS: I couldn't hear that. I'm sorry, Your Honor. What did he say?

THE COURT: He said they have not been able to get in touch with Ms. Abbott.

03:17PM And counsel, just in terms of the jury instructions, I'm going to try to circulate updated ones tonight. I'm going to try really hard.

MR. PORTNOY: So your plan is to do that before I put on my defense to their case?

03:17PM THE COURT: No, my plan is to do that as scheduled, which is at the end of the day.

MR. PORTNOY: Okay. So we'll just go into my --

THE COURT: Yeah. Tomorrow -- if you want to put on witnesses tomorrow, you can. So, if they rest -- let's say

03:17PM just for the sake of argument they rest --

MR. PORTNOY: Right.
THE COURT: -- at noon, you can put own your case. And then we will talk about jury instructions after that.
MR. PORTNOY: So you want me to start my case tomorrow or you don't?
03:17PM
THE COURT: Yes.
MR. PORTNOY: Okay.
THE COURT: Thank you for asking that. I was not clear on that.
03:17PM
MR. PORTNOY: Okay.
THE COURT: My understand -- Mr. Portnoy, if you could just put on the record, please, the names of the two women who are now in the courtroom who you have told me are not willing to testify.
03:18PM
MR. PORTNOY: Well, the ones that are in court right now are Aaralyn Shiri and Cahira Noelani. We have been unable to reach Joni Abbott who left Friday night or Saturday morning as a result of the issues we're discussing.
THE COURT: All right. Thank you.
03:18PM
And I see Ms. Noelani. Is Ms. Shiri seated -- right there.
Okay. Thank you.
Thank you so much for being here. I wanted to share with you as witnesses what I've done to, in my mind, protect you. And I just want you to listen to me. You don't have to
03:18PM

say anything. I'm not going to ask you to say anything in open court. But I want to make the following representations to you so that you know what your options are.

03:19PM I have banned Mr. Thompson from the courtroom and the courthouse. I have ordered him to have no contact with you or any other witness in this case. I have ordered him not to take photos of you or any other witness in this case. And I have ordered him not to post anything on the internet about any witnesses in this case.

03:19PM The court security officers in the courtroom have been advised of all of this.

We're also conducting our own independent investigation to look at what the cameras on the courthouse caught.

03:19PM I also want you to know that I am giving both of you the opportunity to testify remotely via Zoom so that you would not need to be in the courtroom when you testify. You can testify from the comfort of whatever location you wish. All right.

03:19PM So I wanted to share that with you so that you can make an informed decision having heard from me exactly the efforts that I have taken to make sure that what happened yesterday doesn't happen again.

03:19PM He was in the courtroom this morning. He showed up a little late, and I told him all of this. And I have advised

him that if he wanted to regain access to the courtroom he could seek leave of the Court to do so by filing a miscellaneous case number. But I advised him that it may be in his best interest to seek an attorney before doing so, since what he has been accused of, at least right now, is arguably -- again, I don't know all of the details and I'm not making any credibility findings, but what he is being accused of is arguably a federal crime.

03:20PM

So I have done all of those things. I want you both to know that. And you can make whatever decision that you wish. I'm not going to require you to do anything. But I want let you know that that is what I have done. All right?

03:20PM

Okay. I think with that we will be adjourned until tomorrow at 8:30 in the morning.

Again, I'm going to try to circulate a revised version of the jury instructions, and possibly get a sense from you folks this evening, if you could, your thoughts on the verdict form that I sent to you via e-mail yesterday afternoon.

03:20PM

All right. We are in recess until my next hearing at 3:30. Thank you.

03:21PM

(The proceedings concluded at 3:21 p.m., August 10, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 10, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC