IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/ Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/ Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 11, 2026<br><br>JURY TRIAL - DAY 7 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/ Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/ Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

I N D E X


| EXAMINATIONS | PAGE |
|---|---|
| BYRON HORVATH........................................ | |
| RESUMED DIRECT EXAMINATION BY MR. ADAMS........... | 5 |
| CROSS-EXAMINATION BY MR. PORTNOY.................. | 23 |
| WADE MARTIN.......................................... | |
| DIRECT EXAMINATION BY MR. ADAMS................... | 38 |
| CROSS-EXAMINATION BY MR. PORTNOY.................. | 61 |
| REDIRECT EXAMINATION BY MR. ADAMS................. | 67 |
| PARIS MCIVOR......................................... | |
| DIRECT EXAMINATION BY MS. MORITZ.................. | 78 |
| JONI ABBOTT.......................................... | |
| DIRECT EXAMINATION BY MR. PORTNOY................. | 96 |
| CAHIRA NOELANI....................................... | |
| DIRECT EXAMINATION BY MR. PORTNOY................. | 104 |
| CROSS-EXAMINATION BY MR. ADAMS.................... | 115 |
| LIANE WILSON......................................... | |
| DIRECT EXAMINATION BY MR. PORTNOY................. | 126 |
| CROSS-EXAMINATION BY MR. ADAMS.................... | 172 |


E X H I B I T S


| | PAGE |
|---|---|
| Plaintiffs' Exhibit 426 was received in evidence.... | 164 |
| Defendants' Exhibit 1024 was received in evidence... | 9 |
| Defendants' Exhibit 1060 was received in evidence... | 82 |
| Defendants' Exhibit 1058 was received in evidence... | 83 |
| Defendants' Exhibit 1064 was received in evidence... | 85 |
| Defendants' Exhibit 1067 was received in evidence... | 86 |
| Defendants' Exhibit 1068 was received in evidence... | 87 |
| Defendants' Exhibit 1069 was received in evidence... | 91 |
| Defendants' Exhibit 1077 was received in evidence... | 91 |
| Defendants' Exhibit 1083 was received in evidence... | 92 |
| Defendants' Exhibit 1100 was received in evidence... | 93 |
| Defendants' Exhibit 1102 was received in evidence... | 93 |
| Defendants' Exhibit 1115 was received in evidence... | 93 |
| Defendants' Exhibit 1187 was received in evidence... | 132 |
| Defendants' Exhibit 1189 was received in evidence... | 134 |
| Defendants' Exhibit 1189 was withdrawn.............. | 137 |

TUESDAY, AUGUST 11, 2026 8:32 A.M.

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery LLC et al. versus Paula Haygarth et al. This case has been called for a jury trial, day seven.

08:32AM Counsel, please make your appearances for the record, starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor, Jeff Portnoy Troy Young, and Jenny Tokuoka for the plaintiff.

THE COURT: Good morning.

08:32AM MR. ADAMS: Good morning, Your Honor. Joseph Adams and Laura Moritz for the defendants and counter claimants.

THE COURT: Good morning.

And good morning, ladies and gentlemen of the jury. Welcome back. Yesterday I told you that we would go no later 08:32AM than 3:15. We're actually going to end probably before that today. So just wanted to keep you aware of that.

We're definitely on time. I have no concerns about finishing this on time, as I told you during the jury selection process.

08:32AM And we will have a recess today, as we usually do, around 10 o'clock and we will have a stretch break between.

All right. You may continue.

MR. ADAMS: Thank you, Your Honor.

May I have a moment to set up?

08:33AM THE COURT: You may.

BYRON HORVATH, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

MR. ADAMS: And Carla, can we publish what's already been admitted as Exhibit 1004?

Your Honor, may I publish it to the jury?

08:33AM THE COURT: You may. You may.

MR. ADAMS: Thank you, Your Honor.

RESUMED DIRECT EXAMINATION

BY MR. ADAMS:

Q Good morning, Mr. Horvath.

08:33AM A Good morning.

Q Are you prepared to continue on today?

A I am, yes.

Q Okay. When we left off yesterday, we were just talking about the year-and-a-half long inquiries you had from CPS; do

08:33AM you remember that?

A I do, yes.

Q And we were looking at Exhibit 1004. What's the date that it started?

A April 7th of 2021.

08:33AM Q And then do you remember how long it lasted? How many times --

A Well, three times in about a year and a half.

MR. ADAMS: So may I publish, Your Honor, Exhibit 1035?

08:34AM THE COURT: You may.

BY MR. ADAMS:
Q So this is the third letter you got, which is then June 2022. So about a year and a half of dealing with CPS?
A Correct, yes.
08:34AM Q How did that make you feel?
A It was infuriating. It was scary. It was -- I mean, nobody wants to hear all these fake, false accusations said about them continually. And it -- yeah, it was horrible.
Q When you say they're fake and false, what do you mean?
08:34AM A It's exactly what they are. They're fake and false accusations, as I said yesterday.
Q You were exonerated, yeah?
A Pardon me?
Q You were -- you were found not to be -- they were
08:34AM unsubstantiated?
A All three times.
MR. ADAMS: Your Honor, I would like to publish for the witness Exhibit 1024, which is an order from the Queen's bench for Saskatchewan.
08:35AM THE COURT: All right. And this would be to the witness only.
MR. ADAMS: Just to the witness, Your Honor.
THE COURT: Yes, you may.
BY MR. ADAMS:
08:35AM Q Do you recognize Exhibit 1024? It's up on the screen

there, Byron.
A Yes, I do. Yup.
Q And tell the jury what -- what you did with respect to -- in Canada, what legal proceedings you had with Haley.
08:35AM A Like what do you mean? Sorry.
Q Did you have to go to court --
A Yes.
Q -- with Haley?
A Yes, we did. Yup.
08:35AM Q Tell us about that.
A We had to go to court for -- well, obviously our divorce. And then there was this -- when all these accusations were made and become false, then we got custody of Isla.
Q Did you believe that Haley was being influenced?
08:36AM A Absolutely she was being influenced.
Q Why?
A Because I believe Ms. Wilson was making every -- she was just making her go so many -- trying to attack me in so many different ways. And one of them was by getting all these CPS 08:36AM reports, fake, false CPS reports by Haley's mom, by Haley's sister. And later once, further on down the road, they came to me and said, like, Haley was begging them to do this, to write these letters for her, because she was being pressured by her, Ms. Wilson, to have CPS come to my door continually on false, 08:36AM fake accusations.

Q Did the Canadian court make a ruling on your custody with Haley?
A They did.
Q Let's take a look at Exhibit 1024. It's in front of you.
08:36AM A Mm-hmm.
Q Do you recognize this order from the Queen's bench? Take a look.
A Yes.
Q It's a couple pages.
08:37AM And down at the bottom, is that the judge signature.
A Yes, it is, yup.
MR. ADAMS: Your Honor, I would move to admit --
BY MR. ADAMS:
Q Well, is this a exact -- an exact replication of the order
08:37AM that you received in this court -- in that Canadian court?
A It is, yeah.
MR. ADAMS: Your Honor, I would move to admit Exhibit 1024 into evidence.
THE COURT: Any objection?
08:37AM MR. PORTNOY: Your Honor, I don't see any official court stamp or any indication that it's been filed or anything.
THE COURT: One second. Let me take a look.
MR. PORTNOY: Yeah. It's not a certified copy.
MR. ADAMS: 803(6), I don't think he's established
08:38AM that it's unreliable or in any way been doctored.

THE COURT: All right, one second.

MR. ADAMS: It has a wet signature.

THE COURT: All right. The objection is overruled.

(Defendants' Exhibit 1024 was received in evidence.)

08:38AM MR. ADAMS: May I publish it to the jury, Your Honor?

THE COURT: You may.

BY MR. ADAMS:

Q This is the order from the Queen's Bench -- well, tell me what this is. This is the -- what happened? How did you get

08:38AM this?

A The court sent it to us -- to my lawyer.

Q After a trial?

A After a trial, yup.

Q And in this, it confirms that Haley attempting to relocate

08:39AM Isla to Florida without notification to Byron is something no one anticipated, right?

MR. PORTNOY: Objection, Your Honor. The document speaks for itself.

THE COURT: It's leading. Let's ask another question.

08:39AM MR. ADAMS: Sure.

BY MR. ADAMS:

Q Is it your understanding that this order found -- what did this order find?

A It basically just said that, yeah, when Haley tried to

08:39AM cross the border and they found out, and multiple other things,

that the court deemed Haley was unsuitable to parent Isla under the quasi-religious group that she was involved with, and it was in Isla's best from to live with me.

Q And in fact, it mentions Ms. Shanti in this order, right?

08:39AM A Absolutely.

Q Couple of times?

A Multiple times.

Q Have you -- and you have an understanding in talking with other men that this has happened to them?

08:40AM MR. PORTNOY: Objection. Hearsay.

THE COURT: Sustained.

BY MR. ADAMS:

Q Do you have an understanding that this has happened to other men?

08:40AM A Absolutely.

Q What's your understanding based on?

MR. PORTNOY: Objection. Hearsay.

THE WITNESS: Wade Martin --

THE COURT: Sustained.

08:40AM BY MR. ADAMS:

Q You have met Wade Martin?

A I have, yup.

Q And he submitted an affidavit in this case?

A Absolutely.

08:40AM Q What did his affidavit say?

A Exact same thing, that -- yeah.

MR. ADAMS: Your Honor, I'd like to show the witness what's been marked as Exhibit 1206.

THE COURT: You may.

08:41AM MR. ADAMS: I'd also like to ask the Court to take judicial notice of 1206, Montana Supreme Court decision issued last week in the Supreme Court of Montana.

THE COURT: One second.

MR. ADAMS: It should be in Your Honor's updated

08:41AM binder.

THE COURT: This is one that was submitted on the exhibit list overnight?

MR. ADAMS: Correct.

Only showing the witness one page, but I will ask that

08:41AM the Court admit the entire opinion.

THE COURT: I'm sorry, say that again.

MR. ADAMS: I am going to be showing the witness one page, but I am going to be asking the Court to admit the entire exhibit into evidence under judicial notice 803(8), official

08:42AM record, public act.

THE COURT: All right. What's your position, Mr. Portnoy?

MR. PORTNOY: I strenuously object.

THE COURT: All right. Let's do this --

08:42AM MR. PORTNOY: I mean on -- go ahead.

THE COURT: All right. Tell me the grounds.

MR. PORTNOY: One, it's completely unrelated matter having nothing to do with the parties in this case.

Two, it says right on it, shall not be cited and does
08:42AM not serve as precedent on Paragraph Number 1. So it's a violation of the order of the Montana Supreme Court, that it cannot be used for any other purpose.

And an attempt to bring in a Montana Supreme Court decision in a totally unrelated matter, we object to, under any
08:43AM rule.

THE COURT: All right. I will ask you to look at Paragraph 37 on Page 19, and tell me how you would respond to why this isn't relevant.

MR. PORTNOY: Just got it like two minutes ago, Your
08:43AM Honor -- I mean, ten minutes ago.

THE COURT: Okay.

MR. PORTNOY: So I have not had an opportunity -- what paragraph? 37?

THE COURT: 37 on Page 19.

08:43AM MR. PORTNOY: It's --

THE COURT: Let do this. We will, at the end of his direct examination, take a break to address this outside the presence of the jury.

And so I'll ask you, Mr. Adams, to proceed with your
08:43AM direct examination, and then we'll take a short break to

address this.

MR. ADAMS: Okay. Sure.

BY MR. ADAMS:

08:44AM Q After you won your custody battle in Canada, what happened?

A The online attacks started.

Q What do you mean "online attacks"? By who?

A Ms. Wilson.

Q What did they --

08:44AM A And all her students and everything -- well, it would come through her Instagram or whatever it was. But, yeah, it was just horrible accusations that were made and said about me, false accusations about me and my family and my daughter and multiple other people.

08:44AM MR. ADAMS: Your Honor, I'd like to show the witness what's been -- I'd like to publish what's already been admitted into evidence, 1156.

THE COURT: You may.

BY MR. ADAMS:

08:44AM Q I'm showing you pages of the victim impact statement you prepared. You recall preparing?

A I do, yup.

Q And what was that in connection with here in the United States?

08:45AM A Per -- what was that -- her bankruptcy fraud case. Yeah.

Q The probation proceeding?
A The probation proceedings. That's the word I'm looking for.
Q That's okay.
08:45AM A Sorry.
Q So prior to filing that victim impact statement, did you receive attacks online?
A Not that I'm aware of, no.
Q Take a look at the -- before the impact statement.
08:45AM A Okay.
Q Take a look at it.
A Yup.
Q You see those pictures there, yeah?
A Yeah.
08:45AM Q And then on the next page, who's that a picture of?
A That's a picture of my wife.
Q So this is in the victim impact statement, right?
A Correct.
Q So the attacks happened before?
08:45AM A Right. Yeah.
Q Okay.
A Yeah.
Q Just you --
A Sorry, I'm really bad with timelines, but yeah.
08:46AM Q Okay. They couldn't have happened after you submitted

this because they're in it.
A Right.
Q Okay. So we're clear?
A Yes.
08:46AM Q Where is this picture from that's on -- that's showing on this page, it's Bates at the bottom BH000903, which is part of 1156, what's that picture from?
A Our engagement photos.
Q Do you know how it was gotten -- how it was obtained?
08:46AM A I don't know.
Q Was it online?
A Yeah, I think it was. Yeah.
Q Did you give her permission to take your photo and use it?
A Absolutely not.
08:46AM Q Your wife's photo?
A No.
Q Let's go to the next one above. This one came online before you submitted your statement?
A Yes.
08:46AM Q You see where it says: Jesus, we ask you to intercede immediately, to delete and remove all demonic activity in this cluster of darkness in Saskatchewan? You see that?
A Yes, I do, yeah.
Q And do you recognize some of the people in this?
08:47AM A I recognize every one of them.

Q Those are friends of yours and family members?
A Yup.
Q What did you think about that with the delete and remove?
A Disgusting. It's hurtful, it's harmful.
08:47AM Q But you're a tough guy, you can handle it, right?
A Yeah. It -- it did break, though, yeah.
Q When did it cross the line, for you?
A When Ms. Wilson decided to take it upon herself to tell a story for my daughter that was false, faked. And just -- I
08:48AM went into full dad mode. I want my daughter to tell her own story, not for her to tell her story. I want her to be her own voice.
Q This is a -- take a look at another screenshot of a Liana Shanti post.
08:48AM THE COURT: What Bates page is this, please?
MR. ADAMS: I'm sorry, it's the last page, Your Honor. Let me get a Bates for you. That's 904.
THE COURT: Thank you.
MR. ADAMS: Last page of Exhibit 1156, for the record.
08:48AM BY MR. ADAMS:
Q You see this?
A I do, yeah.
Q You were made aware of this, that was posted online?
A Yes.
08:48AM Q And then Ms. Shanti was going to prepare a website so that

when Isla became 18, she could see this, all these fake allegations against you?
A Yes.
Q What did you do in response when you saw this?
08:49AM A Yeah, I -- exactly what I said. This is when I started going. This is when I knew I need to do whatever it takes to get my daughter her own voice, and get her name off the internet, and do whatever I could to protect her.
Q And you submitted this statement as part of that, right?
08:49AM A Correct.
Q Go to the front page. That's your name, right?
A That's my name.
Q You submitted this by yourself?
A Yup.
08:49AM Q Did you mean every word of it?
A Absolutely.
Q Now, there was some talk that before this got filed there was a Zoom call?
A Yup.
08:49AM Q Do you remember that?
A I do.
Q What's the name of the group? Do you remember the name of the group?
A Cult Recovery Group or something.
08:50AM Q Liana Shanti Cult Recovery?

A Yup.
Q Did you create that group?
A I did not.
Q You know anybody who did?
08:50AM A I do not.
Q You participated in the call?
A I did.
Q How is it possible that you don't know anybody that was on the call and arranged that?
08:50AM A Because I never asked. And they contacted my wife asking if we wanted to join a Zoom call. And at this point, yeah, we want to collect every piece of evidence and information we can about this woman to protect my daughter.
Q What was your intent when you filed this victim impact
08:50AM statement?
A Just to protect my daughter, and just make sure that I was doing whatever I could to keep her safe.
MR. ADAMS: I'd like to show the witness what's been previously admitted as Exhibit 1076.
08:51AM THE COURT: You may.
MR. ADAMS: May I publish it to the jury, Your Honor? It's been admitted.
THE COURT: You may.
MR. ADAMS: Thank you.
08:51AM BY MR. ADAMS:

Q Did you see this post?
A I have, yup.
Q What we are doing in this Jesus-led community in calling out these people. See that?
08:51AM A Mm-hmm. Yup.
Q And then the next page calls -- lists you, right? You see yourself down at the bottom?
A Yes, I do.
Q Calling you a pedophile or a pedo?
08:51AM A Yes.
Q What did you understand a pedo to mean?
A Abusing young children, sexually probably.
Q Are you a pedophile?
A I am not a pedophile.
08:52AM Q Have you ever abused your children?
A No.
Q You also got called a drug addict, right?
A Yes.
Q You admitted in your deposition you've used cocaine,
08:52AM right?
A I have, yes.
Q You proud of that?
A Absolutely not.
Q Any medical professional ever told you you're an addict?
08:52AM MR. PORTNOY: Objection, hearsay.

THE COURT: Sustained.

BY MR. ADAMS:

Q Did you ever go to rehab?

A I have never been to rehab, no.

08:52AM Q Your wife ever tell you to go to rehab?

A My wife has never told me to go to rehab, no.

Q Do you know what it means to be a victim blamer?

A Not overly, no. But -- no.

Q Did you ever blame any victims?

08:53AM A No.

Q What was your purpose in -- you said it before, the purpose in your filing Canadian custody matter and the matters in the probation, what was that for?

A To protect our daughter.

08:53AM Q Have you spent some -- have you lost some time on the farm responding to these claims?

A I have. I have lost lots of time, yes.

Q Do you know have much money?

A No. I can't even begin to imagine.

08:53AM Q Have you spent some money on therapy?

A I have, yup.

Q How much?

A I couldn't put a dollar on it, to be honest with you. Between my wife and I and my daughter, I couldn't tell you.

08:54AM MR. ADAMS: Your Honor, I'd like to show the

witness -- it hasn't been admitted -- but Exhibit 1125.

THE COURT: You may.

MR. ADAMS: This is just for the witness.

BY MR. ADAMS:

08:54AM Q Do you recognize this?

A I do.

MR. PORTNOY: Can we get a second to get it, please? Thank you.

MR. ADAMS: I apologize, Your Honor.

08:54AM MR. PORTNOY: No problem.

MR. ADAMS: It's 1125.

MR. PORTNOY: It just takes a while.

Okay. Thank you.

BY MR. ADAMS:

08:54AM Q What is that?

A That's a receipt for Isla to go to therapy.

Q Your family went, but you also took your daughter?

A I did.

Q Tell us about that.

08:54AM A I just wanted Isla to have a safe place to talk about whatever she wanted to talk about, and just give her skills to deal with all of this drama that she's went through in her life, between her heart surgery and a divorce, this awful case. And just, if one day this -- she does see her name on the

08:55AM internet, I just want her to have all the skills to deal with

all this.
Q Did you ever make an anonymous post talking about Ms. Shanti online?
A I have never.
08:55AM Q Anything?
A Nothing, zero.
Q Do you believe she encourages people to make fake police reports?
A Yeah, I know she does. Haley said it yesterday here.
08:55AM Q Do you believe she encourages women to take their kids away from their fathers?
A Absolutely.
Q What do you want to see at the end of this trial?
A I just want to see, obviously, this all go away. I want 08:56AM my daughter's name off the internet. I want her to have her own voice. I don't want any other families to have to go through what I've been through, and Paula and Wade. I just want -- I just want peace. I want a normal life.

MR. ADAMS: Nothing further, Your Honor.

08:56AM THE COURT: All right. Thank you.

Ladies and gentlemen, let's take a stretch break while I meet with counsel at sidebar. I don't think I need a recess after all.

So let me talk to the attorneys at sidebar for just a 08:56AM few moments, please. Thank you.

(Sidebar on the record:)

MR. ADAMS: I think I --

THE COURT: I'm sustaining the objection at least with regard to this witness. I think -- when I saw what you had submitted on your amended exhibit list, I thought that was going to be on cross-examination, which would make more sense to me. I think it would be prejudicial to ask this witness about a Montana Supreme Court decision.

MR. ADAMS: This says exactly what happened to him. This is a pattern of practice that shows -- if you look at Exhibit 37 -- or Paragraph 37 -- excuse me, Paragraph 27. This is exactly on point. This was what I --

THE COURT: I understand, but he's not the witness to do that through. So the objection is sustained.

MR. ADAMS: Okay. Thank you, Your Honor.

THE COURT: Yeah.

(End of sidebar.)

THE COURT: All right. Cross-examination, please.

MR. PORTNOY: Excuse me, Your Honor, I'm putting some documents away.

THE COURT: All right.

(Pause in the proceedings.)

CROSS-EXAMINATION

BY MR. PORTNOY:

Q Good morning.

A Good morning.
Q Let's work backwards for a minute. Have you ever submitted a single document in any form, tax return, invoices, that demonstrate any alleged economic loss because of the actions of my client?
08:58AM
A I haven't. I farm. So, I -- I have to sell grain, and grain prices go up and down.
MR. ADAMS: Your Honor, that also calls for a legal conclusion.
08:59AM
THE COURT: Overruled.
THE WITNESS: So I -- I had to sometimes sell grain at low prices when I needed.
BY MR. PORTNOY:
Q So --
08:59AM
A But I don't have any documentation, no.
Q Okay. So the answer is no?
A No.
Q Do you have to file tax returns in Canada, even for farmers?
08:59AM
A Yes.
Q Have you produced any in this case to support any claim of an economic loss?
A I'm not sure.
Q Well, we haven't seen any yet. Have you, in this courtroom?
08:59AM

A I haven't, no.
Q You remember telling -- you remember your deposition was taken in this case?
A Say that again?
08:59AM Q Yes?
A Say that again.
Q Do you remember your deposition was taken in this case?
A I do, yup.
Q Do you remember telling me that no one in your town
09:00AM believed any of the things that were being said about you?
A I do, yup.
Q So, no one that you know in your town thinks any less of you as a result of my client's alleged posts, correct?
MR. ADAMS: Speculation. Assumes facts. Lacks
09:00AM foundation.
THE COURT: It is speculative. Sustained.
BY MR. PORTNOY:
Q Well, that's your belief, right?
A Um --
09:00AM Q That's what you testified to at your deposition, right?
A Yeah, yeah.
Q Okay. Who made the complaints to CPS?
A Elise Winter and Donna Winter and I believe Haley.
Q And the first two people that you mentioned, are they
09:00AM somehow associated with my client?

A No, but their daughter was, and she had a big influence on them doing it.
Q Who had a big influence on who doing it?
A Haley went to her mom and dad begging them, because
09:01AM Mrs. Wilson told her to get as many of these people at his door as possible.
Q How do you know that?
A Because Elise and Donna told me that Haley told them.
Q They're not witnesses in this case for you, are they?
09:01AM A Absolutely not. But you asked.
Q Did you testify about those two at your deposition, that they were involved in --
A Sorry. I don't recall.
Q Okay. Do you deny that much of what you allege my client
09:02AM said about you online came directly from Haley?
A Say that again, sir.
Q Do you deny that much of what my client said about you online came directly from Haley?
MR. ADAMS: Vague as to "came directly."
09:02AM THE COURT: Overruled.
BY MR. PORTNOY:
Q Just calls for a yes or no. And you can explain if you'd like.
A No.
09:02AM Q On what basis do you deny that Haley was providing my

client with information, posts regarding, let's start with the abuse of Isla?

THE COURT: The original question was a little confusing.

09:02AM THE WITNESS: Yeah.

THE COURT: So your original question was: Do you deny that much of what you allege my client said about you online came directly from Haley? And his response to that was: No.

09:03AM MR. PORTNOY: Okay. I understand, Your Honor.

BY MR. PORTNOY:

Q So let's put it more positively so it's not confusing.

MR. ADAMS: Double negatives that he agreed with.

THE COURT: We don't need your input. I've made a

09:03AM ruling.

MR. ADAMS: Okay.

THE COURT: Go ahead.

MR. PORTNOY: I'll ask it again, Your Honor.

BY MR. PORTNOY:

09:03AM Q Do you admit -- let's make it positive -- that much of what you're claiming my client posted online about you came from your former wife?

A Yes, I do. Yup.

Q Can you tell me which statements that you saw online you

09:03AM believe did not come from Haley to my client originally?

A I can't think of any off the top of my head.
Q Okay. It's true, isn't it -- we've heard for multiple days -- that you and Haley were in a very contentious child custody dispute?
09:04AM A Absolutely not. No. It was -- we had -- it never even went to court. It was just, she had her every -- Isla every second weekend, until it came to the point where she got involved with the group of your client.
Q Okay.
09:04AM A And then -- yeah, then it didn't never -- it never really got heated. It was just done. It was, I had her.
Q Let me see, maybe I'm not phrasing it correctly.
Are you saying that you and Haley didn't have multiple disputes regarding -- wait -- regarding who would have custody 09:05AM of Isla at various times?
A There was -- yes, there was a couple times where there was some false accusations made, and I had time held back from me. Which once they were deemed unsubstantial, I got all that time made back up to me.
09:05AM Q And Haley was making various accusations about child abuse to various entities, governmental entities, to my client, right?
A Yes, she was, yup.
Q Okay. Have you ever seen videos of Isla describing the 09:05AM abuse that she claims to have undergone?

A I have heard them, yeah.
Q What did she say in her own voice on those videos, about abuse?
A I don't recall the whole thing. I just remember hearing it.
09:06AM
Q You don't remember any of the abuse she described on these videos?
A She said that I would spank her.
Q Okay. Anything else? Lock her in a room?
09:06AM
A Yeah. Yup.
Q Other things?
A Not that I recall. I -- I don't remember hearing them, to be honest. I just -- it was so -- I just tuned it out. It was gross, disturbing, fake, false accusations --
09:06AM
Q I understand --
A -- that I believed to be --
Q Go ahead.
A -- somebody coaching her to say it.
Q I understand you believe they're false. My question is: You've seen Haley -- Isla in her own voice describe the abuse, right?
09:06AM
A Coached by her auntie, I believe, yes.
Q Coached by who?
A Her auntie Elise.
09:06AM
Q I can't --

A The one taking the video.
Q No, I'm sorry, coached by who?
A Isla's Auntie Elise, the woman that was recording the video. The one that later then reported me to CPS, that Haley asked her to do.

09:07AM

Q Right. Not Liana?
A Well, yeah. Haley said Liana did do that, told her to get as many people to my door as possible.
Q I'm talking about the video. You say this other person --

09:07AM

A Yes.
Q -- you just testified took the video?
A Mm-hmm.
Q Yes?
A That's one of them I heard, yes.

09:07AM

Q And I'm just simply asking you, do you have any evidence that my client was participating in Isla telling on video what abuse she claims to have sustained at your hand?
A No.
Q Was there, to the best of your knowledge, discussion in the community about Haley trying to leave Canada to go to the United States?

09:08AM

A Yes, there was. Yup.
Q And what was that?
A I just -- I got a phone call one time from a friend of mine that her friend had fled Canada in the middle of the

09:08AM

night. But leading up to that, there was selling of the beds, selling of stuff off. And that's -- that's when I first started learning about it.

And then Haley followed that same trend. She was selling Isla's bed. She was selling all this stuff online. And that's when the talk started in the community that Haley is planning to flee the country.

09:09AM

Q How much of that came from Haley herself, do you know?
A Well, none, I don't think.

09:09AM

Q I'm sorry?
A None, I don't think.
Q You don't think Haley talked to anybody in the community about wanting to leave?
A She isolated herself totally from everybody.

09:09AM

Q Oh, Haley isolated herself?
A Mm-hmm, from her family and her friends and everybody.
Q But she didn't isolate herself online, did she? She was telling -- go ahead, first question.
A I don't know.

09:09AM

Q Well you know she was telling --
A I don't -- I don't follow her online.
Q Well, Stefanie was collecting all these things, right?
A Right. But that's not me. I didn't -- I didn't follow her online.

09:10AM

Q Did Stefanie show you what Haley was telling the world on

the internet in public, Instagrams about what was going on in her life and her daughter's life?
A Yes, she showed what Ms. Wilson was sharing. She shared with Ms. Wilson.
09:10AM Q That's not isolating herself, that's telling everybody.
A No, that's telling Mrs. Wilson and then Ms. Wilson told everybody.
Q No. Are you saying that Haley never posted anything to anyone other than my client?
09:10AM A She could have.
Q You talked to Jennings Brown?
A He called my wife, yup.
Q I know that. Did you --
A Yeah.
09:11AM Q Did you talk to him?
A No. I listened, but I never -- I never said a word to him, no.
Q You listened to both sides of the conversation or just --
A There was really only one. He was just -- I don't
09:11AM remember all the details, but I just remember him calling and sharing what he knew about some students. And we just basically said we're not willing to talk about our end or anything. It was just a one-sided conversation basically, yeah.
09:11AM Q Was it on the speaker phone?

A It was, yup.
Q And what did you hear him say?
A I don't recall. It was so long ago and there's so much stuff in this case that if I had to remember it all I would have to be a genius.
09:11AM
Q Before this lawsuit was filed, did you ever read the articles?
A I have never read an article in my life.
Q Do you know that the Jennings articles that are in the record here came from you?
09:11AM
A Nope.
Q Do you know that they were produced under your name?
A I did not know that.
Q So you still claim you never saw 'em?
09:12AM
A Yeah. I -- not to my -- to the best of my knowledge, I don't remember seeing them, no.
Q Did you ever hear of a group called Hockey Dads?
A I heard it for the first time in this case, yes.
Q Never heard of them before?
09:12AM
A Not a clue.
Q Do you know who they are?
A Hockey dads.
Q Do you know who the individuals are?
A I have no idea who Hockey Dads are, no.
09:12AM
Q Did you ever hear of the group Hands Across the Water?

A Nope.

Q Do you know of any other fathers who have been involved in custody disputes in which you believe Liana somehow -- in Canada and in your community --

09:13AM A Wade Martin.

Q Wade. Anybody else?

A No.

Q Okay.

And you testified that you have no knowledge of any of

09:13AM the other people who were involved in the letter writing campaign to Judge Mollway, other than one of the other defendants?

A Absolutely not, no.

Q And you've never made any effort to find out who they are?

09:13AM A No.

Q And why is that?

A Because I was only worried about myself and my daughter.

Q Right. But wouldn't having allies in this effort to protect your daughter from these -- what you say are false

09:13AM statements, wouldn't it be helpful --

A I'm sure -- I'm sure if they wanted me to know who they were, they probably would have told me. But they didn't offer the information and I didn't ask.

Q I understand. I'm trying to find out why you didn't say,

09:14AM hey, I've got a similar problem, maybe --

A Because --
Q Can you help me? Can you write a letter for me?
A No, I just -- I just listened and I just took all the information in I could.
09:14AM Q Are you aware that your wife continued to get subsequent e-mails, many of them from the group?
A That's what she said, yup.
Q Had you heard that before yesterday?
A Yeah, I remember her mentioning some stuff about it, yeah.
09:14AM Q Did you read those?
A No, I did not.
Q Do you have any knowledge of Liana posting anything defamatory about you on the Exposing Family Abuse website?
A I -- I don't look at that stuff too often, but yeah, I
09:15AM think I do remember some -- I don't know the details of it, but yeah. Yup.
Q You remember telling me at your deposition that you have no knowledge of Liana posting anything defamatory about you on the Exposing Family Abuse website?
09:15AM A If that's what I said, then -- like I said, my knowledge on this kind of stuff is --
Q Well --
A I relied on my wife for lots of this stuff. I would put my head down and go to work and she would deal with lots of
09:15AM this stuff.

Q I got it. But I'm trying to understand, is what you said at your deposition the accurate statement?
A At that point it was to my best -- to the best of my knowledge.
09:15AM Q Okay. Thanks. Thanks. Thanks.
You did have a Facebook, Instagram and Twitter account back in 2021, '22?
A Definitely a Facebook and Instagram. I think I may have Twitter still. I've never logged on Twitter. I don't want it.
09:16AM Q Okay. Did you ever post anything on Instagram, anything?
A Nope.
Q Why do you have --
A Pictures of my wife --
Q Sorry.
09:16AM A -- and family, that would be about it.
Q Say it again.
A Picture of my wife and my family or something to do about the farm, that would be about it. But I can't even remember the last thing I posted on anything on any social media
09:16AM platform.
Q You never posted anything about the problems that were going on with your former wife?
A No, not that I remember, no.
Q You know what the word "anonymous" means?
09:16AM A I do.

Q What does it mean?
A Hiding behind -- just hiding your image, identity.
Q And you're aware, are you not, that every single negative post about my client that's come out in this trial so far has
09:16AM been posted by somebody or some group anonymously, correct?
MR. ADAMS: Misstates.
THE COURT: Overruled. He can answer the question.
THE WITNESS: Yes, I believe so, yup.
BY MR. PORTNOY:
09:17AM Q And you're aware that every post that you folks are alleging is defamatory that was posted by my client was posted under her name, so people would know who was making those statements, correct?
A Correct.
09:17AM Q Have you ever seen a post negative of you that you believe my client posted anonymously?
A Not that I know of.
Q What do you think about people who post anonymously online negative comments about a restaurant, a movie, a person?
09:17AM A I -- I don't like it. I think if you have something to say, put your face to it.
MR. PORTNOY: No further questions. Thank you.
THE COURT: Any redirect?
MR. ADAMS: No further, Your Honor. We ask this
09:18AM witness be excused.

THE COURT: All right. He may be.

Mr. Horvath, you may step down.

(Witness excused)

MR. ADAMS: If I could go get my next witness?

09:18AM THE COURT: You may.

If you could state for the record who it is, please.

MR. ADAMS: Wade Martin.

THE COURT: Thank you.

MR. ADAMS: Can I be excused?

09:18AM THE COURT: You may.

All right. Mr. Martin, you may approach.

WADE MARTIN, DEFENDANTS' WITNESS, SWORN

THE COURTROOM MANAGER: You may be seated.

Please state your full name and spell your last name

09:19AM for the record.

THE WITNESS: Wade Jonathan Martin, M-A-R-T-I-N.

MR. ADAMS: I just need one moment, Your Honor, please.

(Pause in the proceedings.)

09:19AM DIRECT EXAMINATION

BY MR. ADAMS:

Q Good morning, Wade.

A Morning.

Q Do you want to give a quick introduction to yourself? The

09:19AM jury has heard your name a lot, so tell them who you are.

A I am Wade Martin. I am Paula Haygarth's husband.
Q And where were you born?
A I was born in Radville, Saskatchewan.
Q We've heard names like Raymore and Weyburn and Regina. Is that all in the same area?
09:20AM
A Yeah, it's about half an hour from Weyburn, actually. It's a small town with a thousand people.
Q Farming community?
A Yeah.
09:20AM Q Oil fields?
A Yup.
Q Where did you go to high school?
A In Radville.
Q Do you know a woman who now goes by Amanda Brady?
09:20AM A I do.
Q When -- when did you meet Amanda?
A I believe I actually met Amanda in grade four.
Q Fourth grade?
A Yeah.
09:20AM Q She grew up -- you went to school together?
A We did, yeah.
Q What was her last name then?
A Scott.
Q Amanda Scott?
09:20AM A Yeah.

Q You and Amanda Scott go to high school together?
A We did.
Q You eventually -- what happened?
A We kind of always hung out in the same friend group. We were close, but we actually didn't get together until after high school.
Q After high school what did you do?
A After high school I worked in the oil field for a little bit, and then Amanda actually went to school in a nearby community called Moose Jaw. So we moved to Moose Jaw and I got a job with the railroad as a laborer and eventually worked my way up to welder.
Q Did you learn to weld at the railroad?
A Yeah. I mean, we -- growing up on the farm you always had to fix your own stuff, so you had to figure it out. So I was taught at a young age. But, yeah, professionally as a welder, yeah.
Q So you work with your hands?
A Absolutely, yeah.
Q What do you do now?
A Well, I'm a part owner in a small fabrication company in British Columbia.
Q What does that mean, fabrication? What are you doing?
A Well, we -- we have a few services. We sell products in the summertime. We specialize in charcoal drum smokers,

outdoor fire pits and cooking equipment. And in the wintertime we build after market snowmobile accessories.
Q And where are you living now?
A We're living in Creston, British Columbia.
09:22AM Q So you moved from Saskatchewan to British Columbia?
A Correct.
Q When was that?
A When was that? Sorry?
Q When, yeah. Do you remember?
09:22AM A It was in the summer of 2023.
Q It's been about three years?
A Yeah.
Q Tell us about Amanda.
A Well, I --
09:22AM Q You met in fourth grade?
A Yeah.
Q What happened? Yeah. And then you went and worked in the oil fields?
A Yup.
09:22AM Q Eventually did you get together?
A When I worked in the oil field we were actually together.
Q Tell me about that.
A We -- and then we ended up moving to Moose Jaw together. We got married. We had two amazing children. We were together
09:23AM for -- I think, married for seven years, together for nine.

And eventually we did get divorced. We're -- I think we got married young, and I think we just kind of grown up and we were just kind of maybe heading in different directions. And I just -- I don't think neither one of us was happy anymore, and I think we just kind of drifted apart.

09:23AM

Q You mentioned you had two kids?

A Two daughters, Ellis and London.

Q We've heard about Ellis and London during this trial. How old are they?

09:23AM A Sorry?

Q How old are they?

A Ellis is just about 16, and London is 18.

Q How do you remember them? Did you get them memorialized on your arms?

09:23AM A Yeah.

Q Want to show the jury what you have?

A Yeah, there's London right there, and that's Ellis. I got them when they were very young.

Q What does it mean to be a dad to Ellis and London?

09:24AM A They're my everything. They're -- they're my little girls, you know? I don't really know how else to describe them. I love them more than -- I can't even put it to words.

Q I think you have.

Eventually you said you divorced Amanda. So you had to deal with coparenting the kids; is that right?

09:24AM

A Yeah, yeah.
Q Tell me about that.
A We -- I thought we handled it pretty well. You know, we always tried to do what's best for the kids, and we shared custody. I mean, we obviously didn't agree on everything. You know, we're divorced and trying to figure this all out separately. But I think we did a pretty good job of it.
Q And then eventually did she get remarried?
A Yes, she did, yes.
Q And who did she marry?
A Drew Brady.
Q Did you know Paula at that time?
A I don't believe I met Paula at that time, no.
Sorry, when they were -- when they got married, I had known Paula, yes.
Q It was right around the time of that marriage?
A Yes.
Q Did you go to her wedding with Drew?
A I did not, no.
Q Okay. Shortly around the wedding, you met Paula?
A I think not long after.
Q So was there a point in time when you and Paula were on the one side and Drew and Amanda on the other coparenting London?
A Correct.

Q How did that go? Tell us.
A It seemed fine at first. We could -- we could be civil and we could -- like I said, just kind of put the kids first, and it was all working.
09:26AM Q What year period of time was that? If you can give an estimate for us.
A I would say -- well, I met Paula in the fall of 2014. So from then for the next three or four years it seemed fine.
Q So until about 2018. And what happened in 2018?
09:26AM A Our -- the relationship with the kids became strained. Mostly with Paula and the girls. But, I mean, I was definitely in the middle of it.
Q What do you mean "got strained mainly with Paula and the girls"?
09:26AM A Well, at that time my ex-wife Amanda was taking classes from Liana Shanti, and the girls would -- they would tell us things when they'd come on the weekends that were just heartbreaking. Like, I remember a specific conversation with our daughter London sitting at our table and she told us that 09:27AM they wouldn't stop until they ruined Paula's life. And of course, that's -- the girls were so close to Paula, but they were being taught to hold their love from her. And it was just really tough to be in the middle of all that.
Q So did the girls keep making statements as well over time?
09:27AM A Yeah.

Q Did they ever comment about their friends, how -- what kinds of friends they were going to have?
A They were living in Regina, Saskatchewan at that time and, you know, they had lots of friends. They were going to school,
09:27AM doing activities. And there was a point in time where they were made to cut friends out of their lives, certain friends, because they were vaccinated.
Q And what were -- what did you understand was the -- what would happen if you hung around a vaccinated person?
09:28AM A I think it's called "shedding." So basically they would -- I don't exactly know how it works. One way I can explain it is one morning my oldest daughter, London, I was going to bring her to their grandparents, Amanda's mom and dad. And I went down to her room she was bawling because she was
09:28AM terrified to go to her grandparents' house, who she loves, because she had been told that if you hang around with vaccinated people they would shed. And London -- she was told she wouldn't be able to have kids some day because she would be around these people. And it's heartbreaking.
09:28AM Q Did you ever learn where she heard that?
A Her mother.
Q And her mother heard it where?
A I believe Liana Shanti.
Q Why do you believe that?
09:28AM A Because she was taking courses from Liana Shanti, and all

of this behavior, this new behavior, all kind of happened at the same time. It all --
Q Did she start going by a new name, Amanda?
A She did, yes.
09:29AM Q Malie?
A Yes. I'm not sure how to pronounce it, yes.
Q What did you call her?
A Amanda.
Q At some point in time you were informed that they were
09:29AM going to take a trip to Florida?
A Correct.
Q Tell us about that.
A It was November 2021. It was getting close to Christmas, and it was my Christmas with the girls, so obviously excited.
09:29AM And Amanda called me and said that she had booked a trip to Disney for a month and she wanted to take the girls. She had already told the girls. And I was upset, because it was -- it was my Christmas, but I didn't want to take that opportunity away from my kids. So I let them go for a month. And they
09:30AM were gone for over two years.
Q That was Christmas 2021?
A Correct.
Q Leading up to that, did you have any suspicion that they were going to be leaving for Florida?
09:30AM A No, none at all.

Q Everything was fine?
A Yeah.
Q Do you believe Amanda was lying to you about the vacation?
A Yes.
09:30AM Q And she stayed, didn't she?
A She did.
Q What happened after the month was gone, in Florida?
A She had called me and basically said that they weren't ready to come home yet. They were -- they were having too much fun or -- they weren't ready to come home. And I flat out asked her, I said, are you moving to Florida. And she told me she didn't know. And that was kind of that.
Q But she did move to Florida?
A She did.
09:31AM Q She stayed?
A She stayed.
Q For how long?
A Total, I believe, around four years, I think.
Q Until just recently?
09:31AM A Yes.
Q What did you do? How did that make you feel?
A Awful. I -- I lost a part of myself. I've -- I cried more than I could even imagine was possible. It was terrible. I lost -- I lost some of myself and I couldn't get it back. I couldn't -- I couldn't give my kids a hug. I couldn't tuck

them in. It was really painful.
Q What did you do?
A We contacted just about everybody that I could think of, we talked to the Weyburn City Police. We contacted the
09:31AM Canadian RCMP. We -- I talked to the FBI. I talked to U.S. Immigration. I talked to the Jacksonville police. And we talked to our local MLA, like our elected official. And nobody was really willing to help. Nobody ever took it seriously.
Q Were you going to come to the U.S. and get them back?
09:32AM A I wanted to, but I was told by the Jacksonville police that if I did that I would be under Florida law. And if Amanda then said that I was kidnapping the kids, I could be put in jail. So that scared me to -- I didn't want it do that.
Q How desperately did you want to come take them back?
09:32AM A Every part of me did.
Q But you couldn't?
A I couldn't.
Q And then at some point in time you got a call from the Horvaths?
09:32AM A Correct. Yes. Paula did, but yes.
Q Paula did?
A Yes.
Q You and Paula got a call?
A Yes.
09:32AM Q And the Horvaths were going through the same thing, or

worried they were going to, is that --
A Yes. A lot of what was -- a lot of what happened to me, us, was beginning to happen to them.
Q And you -- do you remember when, what year -- so if she went to Florida in Christmas of 2021, she called you a month later in early 2022, do you remember when you were contacted by the Horvaths?
A It was the spring of 2022. April, I believe.
Q So you were in the thick of losing your kids to Florida?
A Yeah.
Q You were feeling it?
A It was pretty fresh.
Q So what did you do with the meeting? Where did you meet them?
A Well, we decided to meet with the Horvaths, and we basically just had dinner, and we shared each side of our story and -- and they were extremely similar.
Q Did you guys bond?
A Yeah. I mean, I was -- I was definitely cautious because this is such a personal thing for me, and I'm not a -- I'm a pretty private person. So, I mean, yeah, it was nice. We listened to what they had to say. And I just kind of -- you know, I had to -- I had to process and --
Q It's hard for you to talk about personal things, yeah?
A Yeah.

Q But you did for Byron, right?
A We did.
Q Why?
A I didn't -- I didn't want anybody else to go through the pain that I was going through. I -- I used my own judgment, I guess to form my own opinion. And I felt like they're just good, hardworking Saskatchewan people, and that's where I'm from. And I decided if I could try to help them, I would.
Q At the meeting did they mention Liana Shanti?
09:35AM A I believe so, yes. Yup.
Q Did that worry you?
A Absolutely, yeah.
Q Why?
A Why? Sorry.
09:35AM Q Why? Why did it worry you when they mentioned that they were dealing with her, too?
A Well, just because then we kind of understood how serious it was. Like, I was already without my kids, and here's another family being kind of threatened with the same thing by the same person, all the same moves.
Q And so what did you do following that dinner at the pizza place?
A I wrote an affidavit in support of Byron.
Q In his case?
09:35AM A Yes.

Q In Canada?
A Yes.
Q Did Paula sign that?
A I don't believe so. I think it was just from me.
09:35AM Q It was your own personal story?
A Yeah.
Q About losing Ellis and London?
A Correct.
Q After you submitted that affidavit in the Canadian case,
09:36AM you understand that Byron got custody?
A Correct.
Q Yup?
A Yes.
Q Then what happened online with respect to attacks?
09:36AM A My wife Paula and Byron and Stefanie were just viciously attacked online with just saying all kinds of hurtful things to just try to ruin them. And I -- the only thing I could think of is, the only intent behind these posts is just to hurt. I don't - I can't describe it any other way.
09:36AM Q Do you have any explanation for why they came after -- she came after Paula and not you?
A Paula was made out to be a bad person by Amanda and Liana, that she was trying to ruin our family. So they -- they attacked her.
09:37AM Q Why do you believe that?

A My children told me.

Q What did that -- what kind of -- before Amanda fled to -- before Amanda moved to Florida, had -- had there been problems with your relationship because of the things that the girls were saying?

09:37AM

A Yeah, absolutely. Paula and I actually decided that -- well, Paula actually had moved out on two separate occasions, not to break up with me, but the only time that we were essentially left alone from all of this is when Amanda thought we weren't together. So we made the choice that she would actually get a different apartment.

09:38AM

And then, you know, we would kind of think things are going well again and she would move back in and then it ended up happening again. It's just -- we would just get attacked. The time with the girls was just so strained, and it was -- it was really -- it was difficult.

09:38AM

Q When you're saying "attacked," this isn't online, this is through the kids?

A Yeah, just the things that the kids were told and the things that the kids would hear, of course, they would tell us and they're just extremely hurtful and hard to hear.

09:38AM

Q Like what? Tell the jury.

A Well, it's kind of like what I mentioned before on how, you know, they won't stop until they ruin Paula's life.

Q And so at some point in time you and Paula had to fake

09:39AM

being broken up so it would stop?
A Correct, yeah.
Q So you would tell the girls, hey, we've broken up, tell Amanda?
09:39AM A It just kind of -- we wouldn't tell them that, but the girls would just put it together, because every time the girls were there, Paula wasn't there.
Q And then eventually at many some point in time you were invited -- after you submitted an affidavit in Byron's case,
09:39AM you were invited to participate in a Zoom call?
A Correct.
Q Do you remember the name of the group that was sponsoring that Zoom call?
A I don't. No.
09:39AM Q The Liana Shanti Cult Recovery, does that sound familiar?
A Yeah, yeah.
Q Did you create that?
A I did not.
Q Do you know who did?
09:39AM A I do not.
Q Why not?
A I -- I'm not even sure how to answer that. I don't know who did it.
Q Why did you participate in a Zoom call if you don't know
09:40AM who was setting it up?

A We were desperately looking for answers. My kids were gone, and all I wanted to do was -- was get them back. So, we attended.

Q So you participated in the Liana Shanti Cult Recovery Zoom

09:40AM call?

A Correct.

Q And then following that, what happened?

A I believe we were asked to write -- I forget what it was called -- basically letters, basically saying our side of the

09:40AM story and what had happened to us.

Q Do you remember submitting that affidavit?

A I do.

Q And did you do it together with --

A Paula?

09:41AM Q -- Paula?

A Correct.

MR. ADAMS: I'd like to show the witness what's been previously identified as Exhibit 1085, Your Honor. It's already been admitted into evidence.

09:41AM THE COURT: One second.

You may. It has been admitted and can be shown to the jury.

MR. ADAMS: Thank you, Your Honor.

BY MR. ADAMS:

09:41AM Q Wade, if you want, this is on the screen, but it's also in

the binders there. It's 1085 if you want. It's a multipage document. So it goes from PH00326 [sic] to PH000333. So it's a six-page document. Do you see that?
A Yup.
09:42AM Q Eight-page document. I miscounted.
Do you recognize this?
A I do, yup.
Q Is this a statement that you and Paula gave in a -- to a federal judge here in this courthouse?
09:42AM A I believe so.
Q And why? What was your motivation for filing this?
A I just wanted to get my girls back. It's been my whole motivation the whole time, and I -- like I said, we were kind of coming up empty on -- on people helping us, and we were
09:43AM just -- we thought if it could help get my girls back that we were willing to do it.
Q And I want to be clear on the timeline here. When you have wrote this and submitted this to this federal courthouse, your girls were where?
09:43AM A In Florida.
Q Without your consent?
A Correct.
Q Did you believe that violated the law?
A I did, yeah.
09:43AM Q You still believe it violated the law?

A I do.

Q And was -- do you have an understanding that Amanda was encouraged by Ms. Wilson to do that?

A I do, yes.

09:43AM Q You say here -- here's some the statements that your daughters were making. You say here that every weekend the daughters would come home and share stories, right? Do you see that?

Does this refresh your recollection of some of the

09:43AM stories that they told that you haven't testified about already?

A Yes. Yup.

Q Including that your house is dark, right?

A Yeah, yeah, dark -- dark energy was -- was thrown around a

09:44AM lot.

Q Had you ever heard that Ms. Shanti was telling Amanda that Paula was implanting energy in your daughters' brains? Did you ever hear stuff like that?

A Yeah, trying to harm our daughters, yeah.

09:44AM Q Did that scare you?

A Yeah. Yeah.

Q How did that make you feel?

A Violated, I guess. It -- it --

Q Do you believe that there's any medical science behind

09:44AM that?

A No.
Q - sounds fake?
A Yes, very fake. Yeah.
Q Fake psychic?
09:44AM A Yeah.
Q You believe she's a fake psychic?
A Yeah.
MR. ADAMS: You can take down that exhibit.
BY MR. ADAMS:
09:45AM Q Are you on social media?
A I am.
Q What -- what social media are you on?
A Facebook and Instagram.
Q And here's a question for you, you may or may not know.
09:45AM Do you know if it's public or private, either one of those?
A I believe public.
Q What's your -- what's your Instagram name?
A I think it's just Wade Martin.
Q Your name?
09:45AM A Yeah.
Q You ever posted anything on it?
A I think a couple things, yeah. Years ago.
Q You ever posted anything about Ms. Shanti?
A No.
09:45AM Q You ever posted anything anonymously on Reddit?

A No.
Q How about anonymously on Instagram?
A No.
Q Do you know what Reddit is?
09:45AM A I've heard of it, yeah.
Q Do you have a Reddit account?
A I do not.
Q Never?
A No.
09:46AM Q You ever posted anything on Reddit?
A Never.
Q Do you know anybody who is behind any of the postings on Reddit behind Ms. Shanti that were anonymous?
A No, I have no idea.
09:46AM Q Did you ever ask Paula if she was behind the anonymous?
A I did not.
Q Why not?
A Because I trust her with my life and -- and I know her. She's not that type of person.
09:46AM Q How has this affected Paula, on your own eyes? What have you seen?
A Paula had -- when I met Paula, she had this energy and this bright light inside of her that -- it would just attract people. It always blew my mind, people would just come up talk
09:46AM to her and have conversations. And she's always been so brave

and courageous, and she would like to travel by herself. And you know, there's been times where she's been scared to leave the house. She's been scared to go get groceries.

She's just been viciously attacked, and the pain that she's gone through, and how she's -- how she's still here, I don't really understand.

09:47AM

Q Was she anxious when you were living in Saskatchewan?
A Yeah.
Q Is it better now?
09:47AM A Somewhat.
Q In British Columbia?
A Yeah. It's still something that we have to deal with seemingly every day.
Q Let's talk about her son Austin, Paula's son.
09:47AM A Yeah.
Q Are you a stepdad to Austin?
A Yeah.
Q What's Austin like?
A What a great kid. Just very calm, very mature, very likable. Just -- he's just -- he's -- you know, he was 14, I believe, when Paula and I got together, and now he's a young man. He's a great human being.
09:48AM
Q What's his and Paula's relationship like?
A Oh, their relationship is great. They talk on the phone all the time. They're very open with each other. They have
09:48AM

a -- they got a really special connection.
Q Did you see how it affected her when Ms. Shanti, Ms. Wilson, posted to thousands of people that she had abandoned her son?
09:48AM MR. PORTNOY: Objection. Leading.
THE COURT: Overruled.
BY MR. ADAMS:
Q Did you see that?
A Yeah.
09:48AM Q How did that affect her?
A She was devastated. There's -- her son that -- yeah, I don't even know how to describe it. I can't put it into words. But she was devastated. She was hurt. It was -- it was -- her heart was broken.
09:49AM Q She said she had a hard time conceiving. Is that your understanding?
A Yeah.
Q So he was a miracle baby?
A Yeah.
09:49AM Q Must be hard. Did you know that?
A Yeah, I knew that, yeah.
Q Did it make it harder to deal with the abandonment issue?
A I'm not sure that that ever crossed my mind. Like I said, just the connection that I knew that they had, because I've
09:49AM seen it with my own eyes for years, and just to say something

like that, it was extremely hurtful.

Q You're not a party to this, but what do you want to see at the end of this trial?

A I want to see -- I want to -- I want to be able to start rebuilding our life. This has been crippling. I want to see Liana Shanti not to be able to ever hurt another single person. And I want to see those three people over there get fairly compensated for the pain and the heartache and the trauma that they've had to go through because of this.

09:49AM

MR. ADAMS: Thanks, Wade.

09:50AM

Pass the witness, Your Honor.

THE COURT: All right. Cross-examination.

We will take a break in about ten minutes, Mr. Portnoy, just to let you know.

09:50AM

CROSS-EXAMINATION

BY MR. PORTNOY:

Q Good morning.

A Good morning.

Q You're aware that your wife posted a video on her Facebook and on her Instagram account in which she said, quote, she took part in some bullying things and ugly things online, close quote?

09:50AM

A I am aware that my wife reposted a post, but other than that, I'm not sure.

Q Yeah, no, this was her own video.

09:51AM

A Okay.
Q Have you seen it, in which she said, quote, she took part in some bullying and ugly things online, close quote?
A I don't recall.
09:51AM Q Have you ever seen any videos your wife has posted on Instagram and on Facebook?
A I have.
Q Have you seen any in which she references her involvement in this whole dispute matter?
09:51AM A No, I don't recall.
Q So, in the videos you saw, you didn't see her saying what I just quoted?
A No.
Q You ever see her post any videos about my client?
09:51AM A No.
Q Do you know who testified in this courtroom admitted that she told my client that Paula had abandoned her son?
MR. ADAMS: That was confusing. Vague.
THE COURT: Sustained.
09:52AM BY MR. PORTNOY:
Q Do you know who told my client that Paula had abandoned her son?
A No, I do not know with any certainty, no.
Q Would it surprise you that Amanda admitted to that?
09:52AM A Well, yeah, I do find that surprising.

09:53AM
Q Up until a year ago, what was the recent relationship between Paula and Amanda?
A Up to a year ago? Sorry.
Q Yeah, up until about a year ago.
A There really -- there really wasn't one.
Q Pleasant?
A There wasn't a relationship.
Q Oh. You're aware that Amanda was communicating with my client providing all kinds of information about Paula to my client? Comments about Paula is the question.
A Yeah, okay.
Q Yes.
A Yeah.
Q And you're aware they were almost all negative?
A Yeah.
Q You're aware of my client doing anything regarding Paula that did not come directly from Amanda?
A Sorry, can you repeat that?
Q Yeah. Are you aware of any postings my client made about Paula that originally did not come to my client from Amanda?
A I'm not aware of any posts or where any of it came from.
Q Well, you know, because you testified, that you saw posts about Paula that you claim my client posted, right?
A (No response.)
Q Or have you not seen any of those posts?

A I have seen posts that were put online about my wife Paula.
Q By who?
A Liana Shanti.
09:54AM Q And do you know where my client got the -- the information, the statements that she was -- that you saw, do you know where she received that information from?
A I have an idea, but I do not with any certainty know.
Q What's your idea?
09:54AM A From my ex-wife Amanda.
Q Okay.
Do you know if Liana ever said anything about Paula that didn't come from Amanda?
A I have no way of knowing that.
09:55AM Q There's a lot of testimony about Amanda breaking the law. Has Amanda ever been arrested?
A Not that I know of.
Q Was she arrested in Florida for kidnapping?
A Not that I know of.
09:55AM Q Was she arrested when she came back to Canada?
A No.
Q So she hasn't broken any law, has she?
A I guess not.
Q Do you have any --
09:55AM MR. ADAMS: Lacking foundation for a legal opinion.

THE COURT: Sustained.
That last question and answer will be stricken.
BY MR. PORTNOY:
Q No authorities have attempted to arrest her, either in the United States or Canada, at any time concerning her move to Florida, correct?
A Not to my knowledge.
Q Do you have an understanding of whether Amanda has ever, up until a year ago, stated that her decision to move to Florida was in any way influenced by my client?
A Can you repeat that?
Q Sure. Do you have any evidence that up until a year ago, had Amanda ever said in any form that my client in any way influenced her decision to move to Florida?
A I guess the only evidence I have is what my children have told me.
Q You have no other evidence?
A No.
Q Okay.
When you had your dinner, that kind of started this whole thing, Liana's name came up?
A I believe so, yes.
Q And who brought it up?
A I don't recall.
Q And how did it come up?

A I believe it came up because Byron was going through the same things that I was going through. And we believe it was because of the teachings of Liana Shanti.
Q Based upon what? What teachings came up at the dinner?
09:58AM A I'm not necessarily sure what teachings, but --
Q Okay.
A -- the actions of these mothers, these wives, trying to take these children out of the country, along with many others doing the same. So it's quite alarming.
09:58AM Q Yeah, I heard that many times over the last few days. But what connection did Liana have to that that was discussed at the dinner?
MR. ADAMS: Asked and answered.
THE COURT: Overruled.
09:58AM BY MR. PORTNOY:
Q For example, we've heard testimony that the only connection, actually it came from Paula, was that they were both students of Liana and that was it.
Do you recall any other reason that Liana's name was 09:59AM discussed at the dinner, other than that the two women that were being talked about were students?
THE COURT: That question is somewhat confusing.
So let's take a break now, and you can --
MR. PORTNOY: Well, I'm almost done, Your Honor, if 09:59AM you would like.

THE COURT: All right.

MR. PORTNOY: Let me rephrase the question.

THE COURT: Okay.

MR. PORTNOY: Okay.

09:59AM BY MR. PORTNOY:

Q Your wife testified that the only reason Liana's name came up at the dinner was a discussion that both Amanda and Haley were students of Liana. Did you hear any other reason why Liana's name was brought up at the dinner?

09:59AM A I don't believe so, no.

MR. PORTNOY: Okay. Thank you. No further questions.

THE COURT: All right. Redirect.

MR. ADAMS: One question.

THE COURT: Okay.

10:00AM <u>REDIRECT EXAMINATION</u>

BY MR. ADAMS:

Q What's your understanding of why Amanda wasn't arrested when she came back over the border in Canada?

10:00AM Didn't you have a conversation with the local authorities there?

A Where? Sorry.

MR. PORTNOY: Objection. Leading.

BY MR. ADAMS:

10:00AM Q Why -- what is your understanding of why Amanda didn't get

arrested when she came back to Canada?
A I'm not really sure.
MR. ADAMS: Okay. Nothing further, Your Honor.
THE COURT: All right. May this witness be excused?
10:00AM MR. ADAMS: Yes.
THE COURT: All right. Thank you. You may step down, Mr. Martin.
(Witness excused)
THE COURT: Let me go ahead and excuse the jury for a
10:00AM 20-minute break.
We will be back at 11:20. And in the meantime I will figure out some timing questions with the lawyers and I will have an update for you after the break. All right? Thank you.
(At 10:01 a.m., the jury was excused, and the
10:01AM following proceedings were held:)
THE COURT: All right. Thank you. You may be seated.
Let me ask how much is left of the defense case at this point. This is a timing conversation, I'm not concerned about anything other than timing at this point.
10:01AM MR. ADAMS: 30 to 45 minutes.
THE COURT: Okay. And then, Mr. Portnoy, you'll be ready to put on a rebuttal case at that point?
MR. PORTNOY: Yeah. But we have an issue with the next witness.
10:02AM THE COURT: Which is who?

MR. PORTNOY: We might as well bring up with you now, so we don't interrupt the jury.

THE COURT: Thank you.

MR. PORTNOY: She's allegedly going to testify as to multiple posts, none of which are included in the counterclaim. And so we're going to object before she even begins to do it. We've gone over the counterclaim. We've looked at all these alleged posts that this paralegal is going to testify to as being actionable. And there's not --

10:02AM THE COURT: Okay.

MR. PORTNOY: So I just wanted to let you know so we don't do it one by one by one.

THE COURT: That's a fair point. I appreciate that.

MR. PORTNOY: Thank you.

10:02AM THE COURT: Let me ask, first of all, is this witness a paralegal, is that accurate?

MR. ADAMS: Yes.

THE COURT: Okay. Let's have Ms. Moritz bring the microphone closer to her, since it's her witness.

10:02AM MR. PORTNOY: Oh, sorry.

THE COURT: Not you, Ms. Moritz.

Is Mr. Portnoy correct what she will be testifying to is posts that are not alleged in the counterclaim.

MS. MORITZ: The counterclaim alleges that -- many

10:03AM types of posts, in addition to the ones we specifically

articulate, that there are additional posts which were defamatory. So these were fall under that category under the general allegation.

THE COURT: How did they have notice of it? I mean,

10:03AM have they received --

MR. PORTNOY: No.

THE COURT: -- this in discovery?

MS. MORITZ: Yes, they have been produced in discovery, absolutely.

10:03AM THE COURT: Okay. You know, this is a question I've been wondering myself because of the way this case has been handled up until now, which is, does either side intend to seek to claim defamation for statements that were not alleged either in the counterclaim or in the first amended complaint? And it

10:03AM sounds like the defense is.

Mr. Portnoy, are you seeking --

MR. PORTNOY: No. We understand pleading. We put down the statements that we believe are actionable.

THE COURT: All right. I think Mr. Portnoy has got

10:03AM the better argument on this. I am going to look at some of this over the next 15 minutes and I'll come back on the bench before the jury returns.

MR. PORTNOY: One other --

MS. MORITZ: May I --

10:04AM MR. PORTNOY: Sorry, Your Honor.

MS. MORITZ: I just wanted to point out one additional matter, Your Honor, is that many of these posts were made after the pleading was -- was filed. So the dates -- the posts have been made continuously over time. So it's difficult to keep up with the pleading, if you will. Which is why I have the paragraph in the counterclaim, sort of a catchall referring to similar posts that continue to be made.

THE COURT: Okay. And you didn't seek leave to amend?

MS. MORITZ: We did amend one time, Your Honor.

THE COURT: Okay. What exhibit numbers are going to be offered through this witness?

MS. MORITZ: Exhibit 1055, 1058, 1060, 1061, 1062, 1064, 1066, 1067, 1068, 1069, 1070, 1072, 1076, 1077, 1079, 1083, 1086, 1096, 1100, 1102, 1104, 1107, 1112, and 1115.

And I'll just note, Your Honor, 1104, 1107, and 1112, those posts will be coming in for a different purpose, not for the counterclaims.

THE COURT: All right. You had one other thing, Mr. Portnoy?

MR. PORTNOY: Yeah. I think we've had a prior discussion, not recently, but it's going to become relevant fairly soon. Our view is that statements that one side or the other would argue are hyperbole or opinion are matters for the Court to rule. They're matters of law. And so we haven't had that discussion yet.

THE COURT: So I've been looking at this, and I think what the law suggests, and I will confirm this at our jury -- I will confirm this, and I think I can do it at the jury instruction discussion, but you can tell me if you want me to confirm it earlier than that, is that where there is some gray as to whether something is hyperbolic, for example, or opinion, I think that is left for the jury. That's my take on what the law suggests. But is it okay with you if we address that with the jury --

10:06AM

MR. PORTNOY: Oh, sure. I just wanted to raise it now, Your Honor, when we had a minute. Thank you.

10:07AM

THE COURT: Okay. All right. Ms. Cortez, if we can tell the jurors that we'll be back at 10:30, that we're taking an extra ten minutes, I think that would be helpful.

THE COURTROOM MANAGER: Yes, Your Honor.

10:07AM

MR. PORTNOY: And you asked me when would we be ready. Do you want to -- it depends what you do with this next witness, but we have a witness that we will put on.

THE COURT: Right. But you will be able to put somebody on immediately?

10:07AM

MR. PORTNOY: Yes. It's going to be by Zoom, so we have to work out the logistics with the Court.

THE COURT: Okay. All right.

MR. ADAMS: It also dawned on me after yesterday's discussion late it court, I should have raised it yesterday

10:07AM

afternoon, but Ms. Noelani has been in the courtroom since her testimony.

THE COURT: Should have raised it yesterday, counsel. I just noticed it this morning and thought, well, that ship has
10:07AM sailed. They could have raised it, and they didn't.

MR. ADAMS: Is she going to be allowed to testify despite being in the courtroom? Okay.

THE COURT: Whoever cross-exams her can ask her about that, but she sat here and watched all of this. So to me
10:08AM that's fodder for cross-examination.

MR. ADAMS: Thank you, Your Honor.

THE COURT: All right. We are in recess until 10:30.

(A recess was taken from 10:08 a.m. to 10:31 a.m.)

(The following proceedings were held in open court out
10:31AM of the presence of the jury:)

THE COURT: All right. So, here is what I'm going to do with regard to the exhibits that Ms. Moritz listed just now -- I will say that a couple of them were previously admitted, for example, 1055 and 1076.

10:31AM I think all of them are at least relevant to credibility, as well as motivation, which I think is relevant in terms of what the defense/counterclaimants have alleged here.

1061, I don't find particularly relevant or helpful.
10:32AM However -- so that one I don't think we're going -- I would

exclude that.

Now, as to whether or not there will be verdict forms related to these statements, I need some briefing on this.

And so the parties are going to have time to brief that this evening. I'll give you until 6 o'clock to brief whether or not the verdict forms should include these statements.

The briefing should definitely include a declaration outlining how it was or why it was that this was produced in discovery. So in other words, what was the question that the plaintiffs asked that you -- resulted in the defense/counterclaimants producing it. That might have some influence over whether or not I think it makes it into the verdict form.

So, that will be due by 6 o'clock tonight, no more than seven pages.

MR. PORTNOY: I have an additional argument, Your Honor.

THE COURT: Yes.

MR. PORTNOY: There's been no testimony by the defendants regarding any of these exhibits.

THE COURT: I --

MR. PORTNOY: So I just don't -- I don't understand. They're done. They never testified to any of these, other than the ones you just mentioned, as having been read or having been

defamatory. There's no evidence at all.

THE COURT: I would assume --

MR. PORTNOY: So --

THE COURT: Well, Ms. Moritz, why don't you make a 10:33AM proffer with regard to that.

MS. MORITZ: Well, Your Honor, the witnesses have testified about these statements. All of them. About what was stated on social media about them.

Ms. Horvath, for instance, testified it was so 10:33AM stressful for her to look at the account they had their paralegal start to document what was being stated about them online. Paula did authenticate some of the statements, but there are additional statements that were made about her which were documented by the paralegal. But they all testified about 10:34AM what they saw online.

THE COURT: All right. I also think that for the purposes of the defamation elements, because one of the defamation elements allows for damages per se -- excuse me, allows for defamation per se to be a form of damage. They 10:34AM don't need to necessarily have to prove what injury they suffered as a result of these particular statements.

Again, I haven't decided yet if these statements are going to go to the jury as part of the verdict form, but I think that that would cover it. And looking at these 10:34AM statements, I think that's a reasonable way to interpret them.

Okay.

MS. MORITZ: Thank you.

MR. PORTNOY: So are these now going to be read, every one of them, to the jury? Is that the purpose of the next witness?

10:34AM

THE COURT: Assuming they can lay the foundation, yeah. I think it's relevant to the credibility of your client. I think it's relevant to her motivations here. And I think that the jury is entitled to see them.

10:34AM

You can object now, if you want to, Mr. Portnoy, maintain your objection in this fashion so you don't need to do it in front of the jury? Would you prefer to handle it that way?

MR. PORTNOY: If I would prefer to what?

10:35AM

THE COURT: Would you prefer to just object now to the admission of all of these exhibits?

MR. PORTNOY: Yes, I would.

THE COURT: All right. So you don't have to do that in font of the jury. Although I note that the authenticity of them still has not yet been established.

10:35AM

Okay. With that, let's go ahead and bring the jury back. I'll step off the bench while you're obtaining them.

(A recess was taken from 10:35 a.m. to 10:37 a.m.)

(The following proceedings were held in open court in the presence of the jury:)

10:37AM

THE COURT: Thank you, ladies and gentlemen. I'm sorry that took longer than expected. I try to avoid that from happening, give you a heads-up, but we were dealing with some issues that don't -- you don't need to worry about now.

10:37AM The next witness and another witness later today are going to be appearing remotely, which I have allowed for. You should treat their testimony the same way you would treat the testimony of any other witness. So the fact that they're attending remotely should not affect your view of them, other 10:38AM than what is stated in the jury instructions that you will get at the end of the case.

I anticipate that we will have another recess again kind of shortly after noon. That will be about half an hour. And I will check in with you again about what the rest of the 10:38AM day looks like. And we will have a stretch break before then. All right. So we'll probably go until about 12:10, something like that.

All right. You may call your next witness.

MS. MORITZ: Thank you, Your Honor.

10:38AM The defense calls Paris McIvor by Zoom.

THE COURTROOM MANAGER: Hi, Ms. McIvor, can you hear me?

THE WITNESS: Yes, I can hear you.

THE COURTROOM MANAGER: Please raise your right hand.

10:39AM PARIS MCIVOR, DEFENDANTS' WITNESS, SWORN

THE COURTROOM MANAGER: Please state your full name and spell your last name for the record.

THE WITNESS: My name is Paris McIvor. Last name is M-C, capitol I-V-O-R.

10:39AM THE COURT: You may proceed.

DIRECT EXAMINATION

BY MS. MORITZ:

Q Hi, Paris.

A Hi.

10:39AM Q Sorry for mispronouncing your name.

A No worries.

Q Paris, where are you currently located right now?

A I am in Regina, Saskatchewan, Canada.

Q And Paris, where do you work?

10:39AM A I work at McKercher LLP.

Q Who do you work with at that firm?

A I work with Roxanne Ouellette, as well as other junior lawyers, and assist other people in the firm as needed.

Q Okay. And Ms. Ouellette -- I hope I'm pronouncing that 10:40AM correctly -- she's counsel for Mr. Horvath, Ms. Horvath and Ms. Haygarth, the defendants and counterclaimants in this action, correct?

A Yes.

Q Okay. And you assist Ms. Ouellette with her 10:40AM representation of those clients?

A Yes.
Q Okay. You are familiar with an Instagram story and an Instagram post?
A Yes, I am.
10:40AM Q Okay. Can you describe some of your duties with respect to Ms. Ouellette's representation of the Horvaths and Ms. Haygarth with respect to the @LianaShanti Instagram account?
A Sorry. Can you repeat --
10:40AM Q I probably made that more complicated than it needed to be.
As part of your job at the firm, do you have a particular responsibility with respect to monitoring the Instagram account known as @LianaShanti?
10:41AM A Yes. I monitor and screenshot and catalogue any posts that were related to any of the -- Mr. Horvath, Mrs. Horvath, and Ms. Haygarth.
Q Okay. So you monitor the account and look for posts that pop up about them, correct?
10:41AM A Yes.
Q Okay. And when you see one you take a screenshot in real time when you see it?
A Yes.
Q And catalogue it for your records, correct?
10:41AM A Yes, that's correct.

Q Okay. And then when did you start monitoring that account?
A It was about October 2022.
Q Have you stopped at any time?
10:41AM A It has slowed down, but it hasn't stopped.
Q Okay. Well, let's start going through some of the posts that you documented.
THE COURT: Ms. Moritz, I'm sorry. I forgot to ask the witness a couple questions that I need to ask her since
10:41AM she's appearing remotely.
MS. MORITZ: Of course.
THE COURT: I'm sorry, ma'am. Can you confirm that you are not with anybody else in the room that you are in?
THE WITNESS: Yes. No one else is in the room.
10:42AM THE COURT: Okay. And can you confirm that you are not utilizing your cellphone at this point?
THE WITNESS: Yes, I don't have it.
THE COURT: Okay. And nobody is chatting with you over any computer device during the course of your testimony?
10:42AM THE WITNESS: No.
THE COURT: Okay. Thank you. Apologies.
You may continue.
MS. MORITZ: Not at all. Thank you.
I have Defendant's Exhibit 1060. For -- for -- excuse
10:42AM me, to show the witness, please.

THE COURT: Is there a way we can pull it up so that just the witness can see it?

MR. ADAMS: It's on my -- it's on this one here, Carla.

10:42AM THE COURT: Okay. Is there a way, Ms. Cortez, that --

THE COURTROOM MANAGER: Yes, Your Honor.

THE COURT: Thank you.

BY MS. MORITZ:

Q Paris, is this a screenshot that you collected?

10:43AM A Yes.

Q Do you recognize this exhibit, 1060?

A Yes.

Q And do you recognize it as a capture from the @LianaShanti Instagram account stories?

10:43AM A Yes, I do.

Q Do you know what date you captured it, approximately?

A I think it was around December 2022.

Q Does it accurately and fairly depict the screen from the @LianaShanti Instagram account you saw in or around 10:43AM December 2022?

A Yes. This was a screenshot of a story she posted.

Q Has it been doctored or altered in any way?

A Not from what I can tell at all, no.

Q Okay.

10:44AM MS. MORITZ: Defendants move Exhibit 1060 into

evidence.

THE COURT: 1060 is admitted and may be shown to the jury.

(Defendants' Exhibit 1060 was received in evidence.)

10:44AM MS. MORITZ: I accidentally skipped one.

Let's please pull up Exhibit 1058 for the witness only. 1058?

MR. ADAMS: Yeah.

MS. MORITZ: Okay.

10:44AM MR. ADAMS: It's up.

MS. MORITZ: Okay. Thank you.

BY MS. MORITZ:

Q Paris, do you recognize Defendant's Exhibit 1058 for identification?

10:44AM A Yes, I do.

Q And what is it?

A It is a screenshot of a -- of a story from Liana Shanti Instagram.

Q Go ahead and take a look. It's a couple pages, I believe.

10:45AM A Oh, okay.

Q Do you know what -- excuse me. Do you know what date you captured it?

A Around November, December 2022, I believe.

Q And does it fairly and accurately depict the screens from

10:45AM the @LianaShanti account as you saw it on that date?

A Yes.
Q Has it been doctored or altered in any way?
A No, not as -- not as far as I can tell.
Q Okay.
10:45AM MS. MORITZ: Defendants move Exhibit 1058 into evidence.
THE COURT: Any authenticity objection?
MR. PORTNOY: Other than what I indicated before, no.
THE COURT: All right. 1058 is admitted.
10:45AM (Defendants' Exhibit 1058 was received in evidence.)
MS. MORITZ: Okay. Could we skip down to exhibit -- defendants' --
MR. ADAMS: You want to publish it to the jury?
MS. MORITZ: Oh, yes. I'm so sorry.
10:46AM May we publish it to the jury, please.
THE COURT: You may.
MS. MORITZ: And let's just scroll through them page by page for a moment to let the jury take a look.
(Pause in the proceedings.)
10:46AM MS. MORITZ: Thank you. I think that's the last page.
For the next exhibit let's look at --
MR. ADAMS: Did you want to post 1060.
MS. MORITZ: Excuse me?
MR. PORTNOY: Your Honor, I -- I --
10:47AM THE COURT: 1060 was already shown to the jury, so

let's move on to the next --

MR. ADAMS: I apologize.

MS. MORITZ: Yeah, we can move on.

THE COURT: -- exhibit.

10:47AM MS. MORITZ: I have Exhibit 1064 for identification for the witness, please?

MR. ADAMS: Its up.

BY MS. MORITZ:

Q Paris, do you recognize Exhibit 1060 for identification?

10:47AM A Yes.

Q Okay.

THE COURT: I'm sorry, 1064?

MS. MORITZ: Yes, 1064.

THE WITNESS: Yes, I do.

10:47AM BY MS. MORITZ:

Q Do you recognize it as a capture from the @LianaShanti Instagram account stories that you took?

A Yes.

Q Do you know what date you captured it?

10:48AM A I would say probably around December 2022.

Q Does it fairly and accurately depict the screen from the @LianaShanti Instagram account as you saw it at that time?

A Yes.

Q Has it been --

10:48AM A Yes.

Q Okay. Thank you.
Has it been doctored or altered in any way?
A No, not as -- not from what I can tell at all, no.
MS. MORITZ: Okay.
10:48AM Defendants move Exhibit 1064 into evidence, please.
THE COURT: Any authenticity objection? As to authenticity only.
MR. PORTNOY: No.
THE COURT: 1064 is admitted and may be shown to the
10:48AM jury, please.
(Defendants' Exhibit 1064 was received in evidence.)
THE COURT: Let's publish. Thank you.
MS. MORITZ: Let's move on to Exhibit 1067 for the witness only.
10:48AM THE COURT: You may.
MR. ADAMS: 1067 is up.
MS. MORITZ: Thank you.
BY MS. MORITZ:
Q Paris, do you recognize Exhibit 1067?
10:49AM A Yes, I do.
Q And do you recognize it as a capture from the @LianaShanti Instagram account stories?
A Yes.
Q And do you know what date you captured it?
10:49AM A I believe this was in January of 2023.

Q And does it fairly and accurately depict the screen from the @LianaShanti Instagram account as you saw it at that time?
A Yes.
Q Has it is been doctored or altered in any way?
10:49AM A No, not as far as I can tell.
MS. MORITZ: Okay. Defendants move Exhibit 1067 into evidence, please.
THE COURT: Any objection as to authenticity only?
MR. PORTNOY: Yeah. Part of it is blacked out. So
10:49AM somebody has altered it.
THE WITNESS: That was blocked out when it was saved, I believe.
BY MS. MORITZ:
Q So it -- it was -- that's how you took the screenshot, it
10:50AM was already redacted?
A Yeah, the story was posted with that redaction.
MS. MORITZ: Thank you.
THE COURT: Any further objection?
MR. PORTNOY: No.
10:50AM THE COURT: 1067 is admitted and may be shown to the jury.
(Defendants' Exhibit 1067 was received in evidence.)
MS. MORITZ: Let's let the jury take a moment to look at it. Thank you.
10:50AM (Pause in the proceedings.)

MS. MORITZ: Go to the next page.

And the next page. Thank you.

Okay. Let's move on to the next exhibit for identification to the witness, Exhibit 1068.

10:51AM Thank you.

BY MS. MORITZ:

Q Paris, do you recognize Exhibit 1068 for identification?

A Yes.

Q Do you recognize it as a capture from the @LianaShanti
10:51AM Instagram account stories?

A Yes.

Q Do you know approximately when you captured it?

A I believe in January 2023.

Q Okay. Does it fairly and accurately depict the screen
10:52AM from the @LianaShanti Instagram account as you saw it at that time?

A Yes.

Q Has it been doctored or altered in any way?

A No, not that I can tell.

10:52AM MS. MORITZ: Okay. Defendants move Exhibit 1068 into evidence, please.

THE COURT: Any objection as to authenticity?

MR. PORTNOY: No.

THE COURT: 1068 is admitted.

10:52AM (Defendants' Exhibit 1068 was received in evidence.)

MS. MORITZ: Moving on to Exhibit 1069 for the -- sorry.

MR. ADAMS: You want to publish it?

MS. MORITZ: Oh, yes. Publish, thank you. I apologize, Your Honor.

10:52AM

MR. PORTNOY: Your Honor, I object to the interaction going back and forth.

THE COURT: It's -- it's --

MR. PORTNOY: I mean, we have one counsel. That's my objection.

10:52AM

THE COURT: All right. The objection is overruled.

Let's publish 1068, please.

(Pause in the proceedings.)

MS. MORITZ: The next exhibit we'll show the witness, please, is Exhibit 1069.

10:53AM

MR. ADAMS: Okay.

MS. MORITZ: Thank you.

BY MS. MORITZ:

Q Paris, do you recognize Exhibit 1069 for identification?

10:53AM A Yes, I do.

Q And do you recognize it as a capture from the @LianaShanti Instagram account stories?

A Yes, I do.

Q And do you know what date approximately that you captured it?

10:53AM

10:53AM

A This one was in January 2023.
Q Okay. And does it fairly and accurately depict the screen from the @LianaShanti Instagram account as you saw it on that date?
A Yes.
Q Has it been doctored or altered in any way?
A Not that I can tell, no.
MS. MORITZ: Okay. Thank you.
Defendants move Exhibit 1069 into evidence and to publish, please.

10:53AM

THE COURT: Any objection, as to authenticity only?
MR. PORTNOY: Yeah, my objection is not --
Could we have a quick sidebar, Your Honor, very quick?
THE COURT: Okay. Ladies and gentlemen, you may stretch.

10:54AM

MR. PORTNOY: Thank you.
(Sidebar on the record:)
MR. PORTNOY: I don't think the jury knows the difference between authenticity and admissibility. I would ask that you give them an instruction that -- what the difference is, because it's being shown to them so they assume it's in evidence. That's all.

10:54AM

THE COURT: I just assumed you didn't want to object if you didn't have to.
MR. PORTNOY: No, I know.

10:54AM

THE COURT: Okay.

MR. PORTNOY: I'm happy to stipulate to authenticity to all of them, but I don't think the jury understands that it's not evidence at this point. It's just --

10:54AM THE COURT: What do you mean it's not evidence?

MR. PORTNOY: You said only as to authenticity. We haven't even got to admissibility.

THE COURT: What? No, that's not what happened.

MR. PORTNOY: Go ahead. Go ahead.

10:55AM THE COURT: I said that she could admit -- I have been admitting all these.

MR. PORTNOY: Yes.

THE COURT: So it is evidence.

So, if you're stipulating to authenticity I will stop

10:55AM asking you if you object to authenticity. But your objection earlier, I thought, was to admissibility.

MR. PORTNOY: It is.

THE COURT: Yeah, so you've maintained that objection and I've overruled it.

10:55AM MR. PORTNOY: Oh.

THE COURT: Yeah.

MR. PORTNOY: Okay.

(End of sidebar.)

MR. PORTNOY: Your Honor, I'm -- I'm happy to avoid

10:55AM all these questions on authenticity so that you don't need to

go through them one by one.

THE COURT: All right.

MR. PORTNOY: For the Court's and the jury's benefit.

THE COURT: Thank you for that. I very much appreciate that, Mr. Portnoy.

So, let's then go to 1069. And it is admitted and may be shown to the jury.

MS. MORITZ: Thank you.

(Defendants' Exhibit 1069 was received in evidence.)

(Pause in the proceedings.)

MS. MORITZ: And the next exhibit would be 1077.

THE COURT: 1077 is admitted.

(Defendants' Exhibit 1077 was received in evidence.)

MS. MORITZ: Thank you.

May it be published to the jury, please?

THE COURT: It may.

(Pause in the proceedings.)

THE COURT: Let's have her lay foundation as to what the date is for this, however, please.

MS. MORITZ: Great idea. Thank you.

BY MS. MORITZ:

Q Paris, do you recall the date that you captured this post, Exhibit 1077?

A Yes. I believe it was in January of 2023.

Q Thank you.

And it has not been doctored or altered in any way?
A No.
Q Thank you.
MS. MORITZ: Let's move on to -- I believe I heard
10:57AM Your Honor say it was admitted into evidence, correct?
THE COURT: Yes.
MS. MORITZ: Okay. Thank you.
THE COURT: The jury has seen it.
MS. MORITZ: Okay. Let's move on to Exhibit 1083,
10:57AM please.
THE COURT: We can show this to the jury.
I'll ask you to still ask her as to timing.
(Defendants' Exhibit 1083 was received in evidence.)
BY MS. MORITZ:
10:58AM Q This is a two-page capture. Paris, do you recall the approximate date that you captured this post?
A Yes. I believe it was in April 2023.
Q Thank you.
MS. MORITZ: The next Exhibit 1100, one-one-zero-zero.
10:58AM Single page.
Thank you.
BY MS. MORITZ:
Q And Paris, go ahead and take a look at that, familiarize yourself with it, and let me know do you know what date you
10:58AM captured this post?

A Yes. It would have been in August of 2023.

THE COURT: This can be shown to the jury.

MS. MORITZ: Thank you, Your Honor.

THE COURT: 1100 is admitted.

10:59AM MS. MORITZ: Thank you, Your Honor.

(Defendants' Exhibit 1100 was received in evidence.)

MS. MORITZ: We can move on to 1102, please.

THE COURT: 1102 is admitted and may be shown to the jury.

10:59AM (Defendants' Exhibit 1102 was received in evidence.)

BY MS. MORITZ:

Q Paris, do you recall approximately when you captured the post shown as Exhibit 1102?

A Yes, I believe it was in August 2023.

10:59AM Q Thank you.

And I believe my last exhibit that I will ask you about, Paris, is 1115.

This post that talks about murder suicide candidates who are a risk to society. Do you recall --

11:00AM THE COURT: I'm sorry. One second.

This may be shown to the jury and it is admitted.

(Defendants' Exhibit 1115 was received in evidence.)

MS. MORITZ: Thank you.

BY MS. MORITZ:

11:00AM Q Paris, do you recall when you captured this post?

A Yes, I believe it was in December of 2023.
Q Thank you, Paris.
Paris, did you collect any additional screenshots from the @LianaShanti Instagram account about any of the defendants in this action?
11:00AM
A Yes.
Q Approximately how many, do you know?
A Hundreds, maybe thousands. I would average, in reviewing my records, there were days where I saved 30 to 40 posts a day.
11:01AM MS. MORITZ: Thank you. No further questions.
THE COURT: Thank you.
Cross-examination?
MR. PORTNOY: None.
THE COURT: All right. Thank you.
11:01AM May this witness be excused?
MS. MORITZ: Yes, please. Thank you.
THE COURT: Thank you, ma'am. You may sign off now.
THE WITNESS: Thank you.
(Witness excused)
11:01AM THE COURT: The defense may call its next witness.
MR. ADAMS: Your Honor, the defendants and counterclaimants rest.
THE COURT: Thank you.
Any rebuttal testimony from the plaintiffs counterclaim defendants?
11:01AM

MR. PORTNOY: Yes.

THE COURT: You may call your first witness, rebuttal witness.

MR. PORTNOY: I think we have one witness that is waiting by Zoom, but I don't know.

11:01AM

THE COURT: Okay. What is her name?

MR. PORTNOY: Joni Abbott.

THE COURT: Ms. Cortez, can we let Ms. Abbott in?

THE COURTROOM MANAGER: Yes, Your Honor.

11:01AM

MR. PORTNOY: If not, we can proceed with a different witness, if somehow she's not --

THE COURTROOM MANAGER: Hi, Ms. Abbott.

THE WITNESS: Hello.

MR. PORTNOY: Okay. We're good. Thank you.

11:02AM

THE COURT: Okay. Go ahead, Ms. Cortez.

JONI ABBOTT, PLAINTIFFS' WITNESS, SWORN

THE COURTROOM MANAGER: Thank you.

Please state your full name and spell your last name for the record.

11:02AM

THE WITNESS: Joni Abbott, A-B-B-O-T-T.

THE COURT: Ms. Abbott, before we begin, I want to confirm a few things with you.

Can you confirm that no one else is in the room that you are in right now?

11:02AM

THE WITNESS: Correct. Yes.

THE COURT: And can you confirm that you are not using your cellphone or any computer device to chat with anyone?

THE WITNESS: Correct. Yes.

THE COURT: Okay. Thank you.

11:02AM You may proceed.

THE WITNESS: Thank you.

MR. PORTNOY: Thank you.

DIRECT EXAMINATION

BY MR. PORTNOY:

11:02AM Q Hi, Joni.

A Hello.

Q Where are you right now?

A I'm sitting in my living room.

Q But where? Where?

11:03AM A Where? At home In Iowa.

Q I think you froze there for a minute. Can you repeat?

A In my home in Iowa.

Can you hear me okay?

Q Yes. Your picture is freezing on and off, but we can hear
11:03AM you.

A Okay.

Q And what is your occupation?

A Right now I work as a medical practice representative for a physical therapy clinic for a local hospital. And I'm also a
11:03AM certified holistic health coach.

Q Have you ever been a paralegal?
A Yes.
Q When were you a paralegal?
A I was a paralegal between 2020 and 2023.
11:03AM Q What type of cases did you deal with?
A I worked with a plaintiffs' attorney for jury trials for medical malpractice, wrongful death, and I had one workers' comp. violation case.
Q Okay. You're no longer a paralegal?
11:04AM A No. I'm not currently practicing in that manner.
Q How do you know Haley Winter?
A Haley was a student in the community of Liana Shanti's.
Q Did you ever get involved directly with Haley Winter on any custody issue that she was dealing with?
11:04AM A (Inaudible.)
Q Hold on. You broke up. Go ahead.
A Okay. I was asked to help her prepare for trial as I had done for many other clients in the work that I did for jury trial preparation with the attorneys. So I utilized those 11:05AM skills to help her prepare for trial. I had one phone call with her on November 30th, 2023.
Q Who asked you to assist her?
A Another student named Carrie Bradley who was helping her more directly.
11:05AM Q And this was --

A I had been helping Carrie --
Q This was the custody hearing that was going to take place in December, correct?
A Yes. December of 2023. Yes.
11:05AM Q This is the hearing in which a final agreement was reached, right, regarding custody, the last agreement?
A Yes, to my understanding, yes.
Q But at the time you were asked to help her prepare for the actual trial?
11:06AM A Yes. To help her be less nervous, since testifying in trial can be quite nerve-racking. She already was very traumatized and very nervous about that, so she wanted the additional help to help prepare her to help feel a little bit more confident and comfortable in being asked questions on the
11:06AM stand.
Q And your communication with her on November 30th was by phone?
A Yes, it was by phone.
Q You didn't travel to Canada?
11:06AM A No, I did not.
Q Okay. How long did the phone call take?
A It was about two-and-a-half or three hours. It was in the evening.
Q And did Haley tell you a number of things in that phone
11:06AM call regarding --

A Yes, she did.
Q Why don't you tell the jury the things Haley told you as you prepared with her for that trial.
MR. ADAMS: Hearsay.
11:07AM THE COURT: I assume it's offered for impeachment.
MR. PORTNOY: Yes.
THE WITNESS: May I proceed?
MR. PORTNOY: Yeah.
THE COURT: You may.
11:07AM THE WITNESS: Okay. So Haley and I discussed her upcoming trial with her ex-husband Byron. She talked a lot about being in fear of him. Many -- during like the middle of our conversation, the one thing that has stuck with me since that phone call was that she was being followed and stalked for over a year. There was a silver truck parked outside of her house all the time.
THE COURT: I'm going to sustain the objection as to that testimony. There was no testimony regarding that.
So ask her a more direct question. I will allow you to lead her to address impeachment specifically.
MR. PORTNOY: Okay.
THE COURT: That testimony will be stricken.
MR. PORTNOY: Okay. Thank you, Your Honor.
BY MR. PORTNOY:
11:07AM Q Did she tell you that she was verbally abused by Byron?

11:08AM

MR. ADAMS: Same objections.

THE WITNESS: Yes, she did.

THE COURT: Sustained.

The answer will be stricken.

11:08AM MR. PORTNOY: I thought --

BY MR. PORTNOY:

Q What else did she tell you?

MR. ADAMS: Same objections, Your Honor. This goes to Haley's veracity, not statements that have not been put into

11:08AM the record.

THE COURT: Right.

So, Mr. Portnoy, if you can recall what Haley testified to --

MR. PORTNOY: All right. All right, Your Honor.

11:08AM THE COURT: -- and ask questions addressing that testimony.

BY MR. PORTNOY:

Q Did Haley tell you that -- did you talk to her after that one phone call at any time?

11:09AM A After -- we had -- we attempted a second phone call on December 1st of 2023, for another follow-up preparation, but she was really not in a good space to do that so we didn't really talk about anything significant. Just to -- you know, ideas to help her stay grounded and calm during the trial

11:09AM process. It really wasn't a very long call.

Q Haley testified that Byron was a great husband. Is that what she told you?
A She did not tell me that.
Q What did she tell you?
11:09AM A In fact, she -- she told me that she called her mom either on the honeymoon or shortly thereafter stating that she made a mistake. She would tell her family about verbal abuse, screaming in her face when she was holding the baby, throwing things, going on tirades, cocaine benders. And how her mom
11:10AM said that even her own father would never, ever treat her like that, the mom meaning.
MR. ADAMS: Move to strike the last sentence about what the father said.
THE COURT: That last statement about what the mother
11:10AM said about her father is stricken.
BY MR. PORTNOY:
Q Did Haley -- sorry.
There was evidence of Haley being offered a arrangement where she would say nasty things about Liana, send
11:10AM her a cease and desist letter, if she wanted to see Isla. Did she talk to you about that?
MR. ADAMS: Argumentative as to the characterization.
THE WITNESS: She did not.
MR. ADAMS: Nasty.
11:11AM THE COURT: It's sustained as to that word.

But let's re-ask the question.
MR. ADAMS: Going outside. Improper rebuttal.
THE COURT: Sustained.
BY MR. PORTNOY:
11:11AM Q Did you reach any impression after your discussion with her as to what you thought her plans were as far the trial?
MR. ADAMS: Improper rebuttal.
THE COURT: Overruled.
THE WITNESS: Can you repeat that question, please?
11:11AM BY MR. PORTNOY:
Q Did you receive any impression from your conversation with her as to what you thought her plans were as far as going forward with the custody trial?
A Yes. The last time, that's what I was preparing her for
11:12AM when we were on the phone stairs. As far as I knew she had every intention of going forward with the trial and moving forward to get custody, or at least unsupervised visitation with her daughter. She desperately missed her daughter and wanted to be a full-time mom.
11:12AM Q Did Liana have anything to do with you meeting with her to prepare and assist her in her trial testimony?
A No. Not at all.
Q Do you know if Liana even knew that you were going to meet with her?
11:12AM A No.

Q No, she didn't, or you don't know?
A No, she did not know. To my knowledge she did not know.
MR. ADAMS: Move to strike as (indiscernible).
THE COURT: Overruled.
11:13AM MR. PORTNOY: No further questions.
THE COURT: Cross-examination?
MR. ADAMS: I don't have anything for this witness.
THE COURT: All right. Thank you, ma'am, for appearing. You are excused. And so I will ask you to sign off
11:13AM right now.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: The plaintiffs counterclaim defendants may call its next witness.
11:13AM MR. PORTNOY: Cahira Noelani, please.
THE COURT: Ms. Noelani is not in the courtroom right now. If we could bring her in, please.
Ladies and gentlemen, why don't we take a stretch break while we're waiting for our next witness.
11:14AM (Pause in the proceedings.)
THE COURT: All right. Everyone may be seated.
CAHIRA NOELANI, PLAINTIFFS' WITNESS, SWORN
THE COURTROOM MANAGER: Thank you. Please be seated.
Please state your full name and spell your last name
11:15AM for the record.

THE WITNESS: Cahira Noelani, N-O-E-L-A-N-I.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Morning.

11:15AM A Good morning.

Q Cahira, you testified a few days ago, correct?

A I did.

Q I'm going to be asking you a bunch of questions that have come up during the trial, responses, to get your recollections.

11:15AM A Okay.

Q Yesterday Haley Winter said that the letter she wrote to Mollway began as a one-paragraph letter. And she testified under oath that she was then told to send it to Liana, who then rewrote the entire letter for her. And that's what she 11:16AM submitted. Is that true?

MR. ADAMS: Lacks foundation. That's improper impeachment. How would this witness know?

MR. PORTNOY: First of all, she's not an impeachment witness, Your Honor.

11:16AM THE COURT: Let's --

MR. PORTNOY: That's my argument.

THE COURT: Okay. Let's slow down.

MR. ADAMS: Rebuttal.

THE COURT: Let's start off with just how she would 11:16AM know this.

MR. PORTNOY: Sure.

THE COURT: Okay.

BY MR. PORTNOY:

Q Do you know the circumstances behind the letter that Haley wrote to the Court? Yes or no.

11:16AM

A Yes.

Q How do you know?

A Because at that time I had put in one of our groups that if anybody -- because people would ask me, how can we help Liana --

11:16AM

THE COURT: Slow, slow, slow.

THE WITNESS: Okay. Sorry, Your Honor.

THE COURT: That's okay.

THE WITNESS: People had been asking, how can we help support Liana? She's being attacked online. And so I said -- had the idea that we could write letters in response to the attacks that had been made, the letters that had been written against her. I said, why don't we write letters to support Liana.

11:16AM

11:17AM

So I had posted in the group that -- in one of our groups, that if anybody wanted to write letters to support Liana, that they could send them to me and then I would collect them and put them into PDF sign, and then people could officially sign them. And then I gathered all those and put them in a Dropbox folder and sent the whole folder to Liana who

11:17AM

I believe just forwarded them to her attorney. So there was no other communication going on.

BY MR. PORTNOY:

Q Did Liana in any way edit the letter?

11:17AM A No, she didn't edit them at all. I sent the final ones to her when they were signed.

Q So the entire letter that was sent to Mollway was written by who?

A By Haley.

11:17AM MR. ADAMS: Foundation. Calls for speculation.

THE COURT: Sustained.

BY MS. MORITZ:

Q Do you have any reason to believe that anybody else besides her wrote the letter?

11:18AM A No, I do not.

Q Did it start as one paragraph and then somebody added additional paragraphs?

MR. ADAMS: Lacks foundation. Calls for speculation.

THE COURT: Sustained.

11:18AM BY MR. PORTNOY:

Q You collected the letters, right?

A I did.

Q Did you see a one-paragraph letter?

A I did not. Not from Haley, no.

11:18AM Q You have the ability to, quote, take people out of the

community?
A Yes, I do.
Q Did you take Amanda out of the community?
A I did.
11:18AM Q You did?
A I did, yes.
Q Did Liana have anything to do with that?
A No, she did not.
Q Why did you take Amanda out of the community?
11:18AM A Because after -- around the time of the deposition, when she had a deposition, then Liana had messaged -- and I'm just going to -- Liana had messaged in one of our work groups that Amanda had lied under oath, and it was, like, no big deal. And I was like, oh, that's weird, I wonder why she did that. And 11:19AM maybe, like, five or six days later we started getting -- I started getting messages from people saying that Amanda was telling them, like, weird stories about Liana, and that she had told them to -- she had told her to lie, strange things.

And then I went on the Liana Shanti Cult Instagram 11:19AM page to look at it. And I monitored it, maybe every couple weeks because my -- my ex-husband and his wife were following it. And I saw that Amanda --

MR. ADAMS: Move to strike as nonresponsive and outside of the -- the rebuttal.

11:19AM THE COURT: Overruled.

THE WITNESS: So, I saw that Amanda was following the Liana Shanti Cult Recovery page, and I removed her immediately. And then I told Liana.

BY MR. PORTNOY:

11:20AM Q Did Liana have anything to do with it?

A No, I did that, and then I told Liana what I had seen and that I had removed her.

Q Do you have the ability to do that?

A Yes, I do.

11:20AM Q Does Liana remove people also, other people?

A Occasionally she does.

Q And do you know why she removes people?

A It's her business, she can remove people for whatever reason she wants.

11:20AM Q When Haley was facing litigation regarding Isla, was there a GoFund?

MR. ADAMS: Outside -- improper rebuttal. Lacks foundation.

MR. PORTNOY: Is what?

11:20AM MR. ADAMS: This is a completely new topic.

MR. PORTNOY: This is not a rebuttal witness. She was listed as a witness. We're putting on our defense to their counterclaim.

THE COURT: That's fine.

11:21AM MR. PORTNOY: Thank you, Your Honor.

MR. ADAMS: Understood. Thank you.

BY MR. PORTNOY:

Q Tell the jury about the GoFund page. Who set it up?

A My friend Aaralyn, who is also a student of Liana, because Haley was under a lot of distress and, you know, was telling all of these really heartfelt stories about how much abuse her daughter was going through from Byron, which she said started in 2016.

11:21AM

And she, you know, was wanting to protect her daughter, and she said she didn't have any money for an attorney. So Aaralyn set up a GoFundMe that we all contributed to to help support her so she could get an attorney and help fight for her daughter.

11:21AM

Q Did Liana have any encouragement or suggestion about the GoFund page?

11:21AM

A No, that was all -- all students and friends of Haley's who set that up.

Q Do you know happened to those funds?

A I believe she was then to hire an attorney. That was the purpose was. She did have an attorney shortly after that.

11:22AM

Q Was Liana supportive of Haley's efforts to try to get custody of Isla around this time?

A Yes. We were all supportive of Haley trying to regain custody, because she had custody of Isla.

11:22AM

Q She had custody?

A She originally had custody, yes.
Q When was that?
A When we first -- when I -- when Haley first came into the community she had custody.
11:22AM Q Do you know how -- thanks.
A Mm-hmm.
Q And what were Liana's efforts to help Isla -- I'm sorry -- help Haley in her efforts to get custody of Isla around this time when the hearing was coming up?
11:23AM A I don't know that she did anything directly with that. We were just all supportive of her as a person. We did the Go Fund Me. We were doing prayer vigils. We did a lot of that, we did a lot of prayer vigils for her because she had said that somebody she didn't even know, like, wrote a deposition against
11:23AM her in the child custody case. There was just a lot of weird stuff going on that caused them to -- you know, her to lose custody of her daughter very abruptly. And you know, she was -- it was very, very heartbreaking.
Isla had drawn this picture at school of all she
11:23AM wanted for Christmas was her mom. Really hard to see, too. So we were doing prayer vigils, we were doing GoFundMes, just supporting her however we could. It was mostly students. I mean, Liana was organizing prayer vigils and stuff, but the GoFundMe, it was all student led, friend led.
11:24AM Q Do you know when the first time was that Liana posted

anything about the three defendants?
A It wasn't until nearly a year after, maybe like eight months after, like, all of the defamation and slander against her came out online. Because I wanted her to defend herself or 11:24AM to say something, and she was, like, no, I'm just going to ignore it for a very long time, it was probably like eight months to a year.
Q Just so I understand, you had a conversation with her in which you said all these things are being posted about you, do 11:24AM something. And she said no, until seven or eight months later. Is that what your testimony is --
A That is correct. In fact, I started defending in my own name on Reddit some of the stuff, because I was so appalled at the lies that were being spoken about Liana, and I wanted to do 11:25AM something.
Q What were those lies?
A They were saying things like she was a child trafficker and human trafficker, which is the exact opposite of who she is. It was just outrageous. That she was a cult leader, which 11:25AM I've been in her community now for like 13 years or so, and like never heard anything like that before. So all of these crazy things that she controls people. You know, like the whole cult narrative, which is just the opposite of -- you know, I was raised in a cult so I know what it's like. To me 11:25AM it was insane that people were just making up complete lies

about her, and I was very upset about it.

Q You ever have of any discussion -- let me go back to the -- did you talk her into actually starting the post in retaliation or response or defense?

11:25AM A I don't think anyone talks Liana into anything. She makes her own choices.

Q Okay. During that seven-month period between these statements that you say you saw, that you've explained, and by the time Liana responded, did you have any discussions with her

11:26AM about who might be posting these things?

A Initially, yes, we were -- we were -- you know, initially it's, like, who's saying this? You know, everybody was pretty shocked and confused. And then people started identifying family members. You know, they could tell by -- even anonymous

11:26AM counts, you can kind of tell by the way people write or things that they know, you know, stuff that they're aware of that people could say, oh, this is my family member, a lot of them said, this is my dad. So people occasionally said this was her, you know, her dad or her ex.

11:27AM So we started to be able to identify through people in the community, they started to identify their family members.

Q Did any names come up?

A Yes. And then Amanda -- Amanda said that Paula -- that Paula was the one who started one of the main Reddit accounts.

11:27AM Q Okay. Amanda said that?

A Amanda said that, yes.
Q Did any other names come up?
A For which ones?
Q Well, all the ones that you had seen seven months earlier that led to the discussion.
11:27AM
A Yeah, Paula -- Paula was the main one, yes, that was brought up as --
Q Okay.
A -- Amanda --
11:27AM Q And Amanda mentioned that?
A Amanda, yes.
Q Have you ever seen any videos of Isla?
A I have, yes.
Q What have you seen?
11:27AM A They're heartbreaking. I've seen two. One is Isla at five years old talking about how her dad Byron had folded her in half. She said her feet were up by her head. And held her and she didn't like it. And she was panicking and that he didn't stop even when --
11:28AM MR. ADAMS: Hearsay, Your Honor.
THE WITNESS: -- Stefanie --
THE COURT: Sustained. The entire description of what this child said is hearsay and should be disregarded by the jury.
11:28AM BY MR. PORTNOY:

Q How did you get the videos?
A Haley had shared them.
Q To who?
A She shared them with the group. She shared them with Liana and she shared them with multiple other people for safekeeping.
11:28AM
Q So Haley showed how many people the video? Do you know how many people were watching at the time, or did it stay online? How does that work?
11:29AM A Well --
THE COURT: We're not going to get into the videos. Let's move on from the videos. They're not exhibits. They haven't been offered as exhibits. And I've stricken the testimony about what was said in them. So let's move on to something else.
11:29AM
BY MR. PORTNOY:
Q Haley talked publicly in the group about her custody issues?
A She did, yes.
11:29AM Q And there were a number of people listening or involved in the chat?
A Yeah. At the time there were about 145, 150.
Q Did she say anything about, what I'm saying doesn't go beyond the 145?
11:30AM A No.

Q Did you ever see her post anything about Isla publicly?
A Yes, she was posting --
Q Just yes?
A Mm-hmm.
11:30AM Q Okay.
A Yes.
MR. PORTNOY: That's all I have. Thank you.
THE COURT: Cross-examination, please.

CROSS-EXAMINATION

11:30AM BY MR. ADAMS:
Q You mentioned a woman named Acacia. That's a Akashic Jensen, right?
A Yes.
Q What's her Akashic name given by Ms. Shanti?
11:30AM A I believe it's Alihana.
MR. ADAMS: Your Honor, I'd move then back to -- returning to 1206, the Montana state decision that you've been --
THE COURT: You may show 1206 to the witness but not
11:31AM the jury.
MR. ADAMS: You have the binders there. You want to pull out 1206 while I get the -- for some reason it's not popping up, but it will.
For some reason it's blank on my screen all of a
11:32AM sudden, so I'm going to have to get a different version of it,

Your Honor.

THE COURT: Okay.

MR. ADAMS: Okay. It's up on this screen, Carla, if we can show that to the witnesses.

11:32AM And can you go to the first page, please?

Right there. All right.

BY MR. ADAMS:

Q So you recognize this, that's Acacia Jensen who you just talked about, right?

11:32AM A Yes.

Q Alihana, what's her what's her Akashic name, Alihana what?

A I'm not sure.

MR. ADAMS: You want to go to the second page.

BY MR. ADAMS:

11:32AM Q And see if that refreshes your recollection that her Akashic name is Alihana Malakai?

THE WITNESS: Okay.

BY MR. ADAMS:

Q Does that refresh your recollection?

11:32AM A Yes.

Q And that's a friend of yours, right?

A She's a student of Liana's, she's not a friend of mine.

Q A follower, right?

A She's a student of Liana's.

11:33AM Q Yeah. And you know her?

A I know who she is, correct.
Q And she had some legal problems just like Byron and Wade did with custody of her kids, right?
MR. PORTNOY: Objection, Your Honor. This witness only said that this person helped set up a GoFund page.
THE COURT: She testified that it was basically outrageous, that the defendants were posting particular statements about Ms. Shanti related to child trafficking and cult-like behavior. So I will allow him to cross-examine the witness on this.
MR. ADAMS: I'd move 1206 into evidence and request to publish to the jury.
THE COURT: Let me see if a foundation has been laid.
All right. Let's lay more of a foundation. I mean, you can treat it as a document for impeachment purposes as well, if that's easier.
BY MR. ADAMS:
Q Yeah. So you recognize this as a Montana Supreme Court case involving your -- the woman that you know to be Acacia Jensen, correct?
A I don't know what this is.
Q Okay. Take a look. Read it. Go ahead. That's your friend, Acacia Jensen, right?
A No.
Q It's your -- it's Liana's follower who you know by the

first name Acacia, right, Ms. Noelani?

MR. PORTNOY: Your Honor, it's getting argumentative and hostile to the witness.

THE COURT: Overruled.

11:34AM BY MR. ADAMS:

Q This is Acacia Jensen's custody dispute in Montana that went all the way up to the Montana Supreme Court, right?

A It says Supreme Court.

Q And it got issued last week, didn't it, August 5th, 2026?

11:34AM MR. PORTNOY: Your Honor is this testimony? I don't --

THE COURT: It's cross-examination. He's asking her if it was issued last week.

MR. PORTNOY: Give her a chance to read it. It's 20

11:34AM pages.

MR. ADAMS: It's the first page. Right on the first page there, ma'am.

THE COURT: Let's -- okay. Everyone calm down.

MR. ADAMS: The first page.

11:35AM THE COURT: Let's calm down just a little bit. Okay?

Ma'am, I will give you time to read the first page.

Can you tell us if you can tell whether or not this was issued last week on August 5th of 2026?

THE WITNESS: It was not.

11:35AM BY MR. ADAMS:

Q I misstated. It's August 4th, right?
A Correct.

MR. ADAMS: Your Honor, I would move it be admitted into evidence under 803(8) and published to the jury.

11:35AM THE COURT: Mr. Portnoy.

MR. PORTNOY: I object for any number of reasons, not the least of which it says, shall not be cited and does not serve as precedent. That's in the decision by the court.

It's completely, in my view, irrelevant. And if we 11:35AM want to open up all the circumstances of this particular situation, I will reserve my right to redirect this witness, because it's totally unrelated to this case.

THE COURT: All right. I'm allowing it in for impeachment under 1206 -- excuse me. Exhibit 1206 is admitted 11:36AM for impeachment purposes.

MR. ADAMS: Thank you, Your Honor. May I publish?

THE COURT: Yes.

And for the record, although the document does says it shall not be used as precedent, I assume that the Montana 11:36AM Supreme Court meant for purposes of citing it as case law.

MR. ADAMS: That's how I understand it, too, Your Honor. And I'm not using it in Montana, I'm using it here in Hawaii.

You may publish Paragraph 27, Page 13 of the document.

11:36AM BY MR. ADAMS:

Q I'm just going to read this into the record, and you follow along, the findings of another follower of Ms. Shanti.

Second, significant evidence exists in the record to imply a finding that continued exposure of the Jensen children to the teachings of Liana Shanti is harmful.

11:36AM

The Montana Supreme Court found that, didn't they?

A I don't know what this is.

Q Did Liana tell you that a big Supreme Court ruling came out last week?

11:37AM

A No.

Q She didn't mention it to you at all?

A No.

Q She didn't post about it online?

A No.

11:37AM

Q You're sure?

A No.

Q You're not sure?

A I'm not sure.

Q Okay. You don't know? Okay.

11:37AM

You were so definitive, but you're not sure. But that's okay.

Let's go down to the middle -- let's go down to the middle.

Tim, that's Acacia's husband, right? I should say a third of the way down. It says: Tim offers.

11:37AM

Tim offers through an exhibit attached to his affidavit that these courses maintain a consistent through line of encouraging listeners to uncover, quote, repressed memories of abuse. Then in parens it says, traumas of your inner child, close paren. And to isolate themselves from family and from others who are, quote, toxic.

11:37AM

Did I read that correctly?

A That's what Tim says.

Q Yeah. And that's what it says here in the Supreme Court case, right?

11:38AM

A That's what Tim says.

Q Right.

It says: Shanti is known to readily inform followers as to the details of both their own and their children's repressed memories of sexual abuse under the auspices that she can access Akashic Records of all of the information in the universe.

11:38AM

She said that to you, right, that she can access the Akashic Records, right?

A Akashic Records, yes. The programs --

11:38AM

Q Hang on. Hang on.

MR. PORTNOY: Wait, wait. Objection. She's trying to answer the question.

THE COURT: He's allowed to ask another question.

MR. PORTNOY: Is she not --

11:38AM

BY MR. ADAMS:
Q Next sentence is what I --
THE COURT: Mr. -- Mr. Portnoy, no comments, please, at this point. Let's let Mr. Adams ask questions. He can
11:39AM proceed with another question if his question is answered.
You will have an opportunity to come up here and ask this witness follow-up if you want.
Mr. Adams.
MR. ADAMS: Thank you.
11:39AM BY MR. ADAMS:
Q Continuing on Exhibit 1206, the Montana Supreme Court in a published opinion last week said: Alihana's on-record behavior corresponds with such a pattern. She's repeatedly accused Tim and her own parents of abusive behavior.
11:39AM Did I read that correctly?
A That is what the sentence says.
Q Then the next sentence says: Psychological experts in Child Protective Services discovered no evidence of abuse. The court found the accusations meritless.
11:39AM Is that what that says?
A That's what the sentence says.
Q And that's exactly what happened to Byron Horvath, right?
A No.
MR. PORTNOY: Your Honor --
11:39AM BY MR. ADAMS:

Q Three CPS's orders, right?

THE COURT: Stop.

THE WITNESS: No.

THE COURT: This is argumentative at this point.

11:39AM BY MR. ADAMS:

Q You were here in the courtroom. You saw the three different CPS letters from Byron, right, where he was cleared on all three of those?

A I did not see those.

11:40AM Q You didn't see those? You weren't in the courtroom then?

A No, I wasn't in the courtroom yesterday because Byron's friend Paul chased me down the sidewalk.

THE COURT: Stop.

Okay. Ladies and gentlemen, we're going to take a 11:40AM recess. I think it's a good idea to take a recess right now. So we're going to do that.

We're going to let everybody take a break, to calm down. When you get back, everybody is going to behave, including me.

11:40AM So with that, please, we will take a half hour recess right now and you can go have your lunches, have your snacks. And don't talk about the case, even though it might be tempting to. Don't do any research. We'll see you in half an hour. All right? Thank you.

11:41AM (At 11:41 a.m., the jury was excused, and the

following proceedings were held:)

THE COURT: All right. Everybody, let's calm down. Take a half hour break, take a breather, have something to eat, have some water. Let's do this professionally. Okay?

11:41AM I mean, I want to be clear that this is not my circus, it's yours. So if you want to make yourselves and your clients and your witnesses look like they're out of control, that's entirely up to you.

We're in recess for half an hour.

12:19PM (A recess was taken from 11:41 a.m. to 12:19 p.m.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Thank you.

Welcome back, ladies and gentlemen.

12:19PM I expect the attorneys will be professional out of respect for you.

And you may continue with your cross-examination.

MR. ADAMS: Thank you, Your Honor.

Before we begin, can I have the Court look at the last 12:20PM question and answer? And I'd move to strike everything after, No, I was not.

THE COURT: One second, please.

(Pause in the proceedings.)

MR. ADAMS: Particularly in reference to a person's 12:20PM name.

MR. PORTNOY: Your Honor, we don't have it on the screen. So, thank you.

THE COURT: He's asking for -- the last question then was: You didn't see those, you weren't in the courtroom then?

12:20PM And it was: No, I wasn't in the courtroom yesterday because Byron's friend Paul chased me down the sidewalk.

MR. ADAMS: Move to strike everything after, No, I wasn't in the courtroom yesterday.

THE COURT: The jury is to disregard everything that

12:21PM was stated after, I wasn't in the courtroom yesterday.

MR. ADAMS: Thank you.

THE COURT: You may continue.

BY MR. ADAMS:

Q Ms. Noelani, can you read the Akashic Records?

12:21PM A Not that I'm aware of.

Q But Ms. Wilson can?

A Yes.

Q She's psychic?

A Yes, she is.

12:21PM MR. ADAMS: Nothing further.

THE COURT: All right. Redirect.

MR. PORTNOY: No.

THE COURT: All right. Thank you, ma'am. You may step down.

12:21PM You may call your next witness.

MR. PORTNOY: Okay. Call the plaintiff.

THE COURT: All right. Ms. Wilson, you may take the stand, please.

LIANE WILSON, PLAINTIFFS' WITNESS, SWORN

12:21PM THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: Liane Wilson, W-I-L-S-O-N.

THE COURT: And ladies and gentlemen, I failed to

12:22PM mention that we will have another short break at -- in about an hour from now. So around 1:30 we'll have a 15-minute break. Okay?

MR. PORTNOY: You mean 1:30?

THE COURT: Right around 1:30 we'll take a 15-minute

12:22PM break.

MR. PORTNOY: Okay.

DIRECT EXAMINATION

BY MR. PORTNOY:

Q Well, Liane, it seems like a month ago to the Court and

12:22PM the jury and everybody else since you were on the stand.

A Yeah.

Q We've heard a lot of testimony since then.

And we're going to give you an opportunity to question and to respond. I want to start with how the

12:22PM defendants, each one of them, ended their testimony.

Why did you bring this lawsuit?

A I brought this lawsuit because I realized that the attacks against me weren't going to stop. I waited for seven or eight months hoping it would burn out, thinking it would burn out, like most things do, and it didn't, it just got worse and worse and worse. And being called a child trafficker, being called someone who harms women and children, which for me personally is one of the biggest horrific things because I dedicated an enormous part of my life to helping women and children. And it was devastating to me. But, again, I restrained because I felt like this is internet crap, it's going to go away. It didn't, it got worse.

And I began to do a lot of research into why, what's the motive here, why would random people in Saskatchewan -- I've been in business 15 years, very successful business, never had a problem with an actual student, no problem with any of my programs, building, growing, increasing my customer base.

Out of nowhere in April of 2022, I start getting attacked by nine men who, I didn't know exactly who they were at the time, but we knew somewhat, based on what Amanda had shared, that she felt Paula was involved and Wade and, of course Haley and Byron, which was like the epicenter of this whole quake.

And I felt like this is very weird, because I really don't have that much to do with these people. I don't -- my

business has a hundred thousand people and --

MR. ADAMS: Strike as nonresponsive and calls for a narrative.

THE COURT: Sustained.

12:24PM Let's ask another question, please.

MR. PORTNOY: She's explaining.

THE COURT: It was getting to be a narrative.

So ask another question. You can ask another question, Mr. Portnoy, that's fine.

12:24PM MR. PORTNOY: Yes, Your Honor.

BY MR. PORTNOY:

Q What do you hope to achieve by having brought the lawsuit?

A I hope to achieve precedent in case law in the United States that people can no longer hide behind anonymity.

12:24PM Everything I've ever done I do in my own name. I stand behind everything I've said.

THE COURT: Okay. Slow down, please, slow down.

BY MR. PORTNOY:

Q We're going to be here, so just slow down.

12:25PM A The New York is coming out.

I am always willing to put my name on anything I have to say, and I don't expect everybody to like it. Nobody likes everything any of us says, but I stand behind what I say.

And I feel very strongly about people that abuse

12:25PM children, beat children, and weaponize the Family Court system.

And that is what has happened here. And I've done extensive research over the past four years on exactly what the crisis is, so bad that the United Nations is addressing it. And in over 32 states there's legislation to change Family Court law, because the person with the money, could be the mom, could be the dad, is the one who gets the custody.

12:25PM

Q Okay. Did you ever make a post with information about the defendants that you did not learn from either Amanda or Haley?

A No, I did not. 100 percent of what I ever posted came directly from Amanda. And I've got thousands of screenshots to prove that. And from Haley as well. Her entire life story, her abuse, her situation with Byron, texts between her and Byron, phone calls recorded --

12:26PM

Q Slow down, please.

A -- between her and Byron, photos of Isla with bruises, videos of Isla talking about having to urinate on her floor, all of the beatings, red raw vagina, photos --

12:26PM

MR. ADAMS: Move to strike as nonresponsive. It's been excluded as well.

THE COURT: All right. Sustained.

12:26PM

Let's ask another question.

The comments about what the child may or may not have said are to be disregarded by the jury.

BY MR. PORTNOY:

Q We're going to go into each of these later on. Okay?

12:26PM

A Okay.
Q All right. Online have you ever used any other name other than your own, particularly a name that the defendants kept bringing up, Liana Roberts?
12:26PM A No. I'm Liana Shanti.
I will say there's a lot of fake accounts, there's about probably one hundred -- it's some weird spam thing, if you have a big account, people will create accounts spoofing off of your name, and it will do like a variation of your name.
12:27PM And they were going into my student's DMs, and saying, I will do a psychic reading for 99 bucks. Luckily my students know I don't do that. But I've never used any other --
MR. ADAMS: Move to strike as nonresponsive. Hearsay.
THE WITNESS: -- name.
12:27PM THE COURT: Sustained.
The question -- original question was: Have you ever used any other name other than your own, particularly a name? That the defendants kept bringing up, Liana Roberts.
The answer is, no, I'm Liana Shanti.
12:27PM Ask another question, please.
MR. PORTNOY: Thank you.
BY MR. PORTNOY:
Q Have you ever posted anything about the defendants anonymously?
12:27PM A Never.

Q Have you always put -- ever made any effort to hide anything you have posted about the defendants?
A No. I think that's obvious.
Q Do you stand behind everything you've posted about the
12:28PM defendants?
A I do.
MR. PORTNOY: Can we have 1187, please?
THE COURT: You may.
1187 has not yet been admitted.
12:28PM MR. PORTNOY: Yes, that's correct, Your Honor.
BY MR. PORTNOY:
Q Have you seen this before?
A Yes, I have.
Q And what is it?
12:28PM A This is the initial -- I believe this is the initial complaint that I filed in state court on Kauai with Judge Watanabe.
Q And that case got moved here?
A The defendants moved it, mm-hmm.
12:29PM Q So that's the case we're here for?
A Yes, sir.
Q Okay. And did you review it before it was filed?
A I did.
Q And did you ratify everything as being accurate?
12:29PM A I did.

MR. PORTNOY: Your Honor, I move 1187, which is the first amended complaint filed in the Circuit Court of the Fifth Circuit, State of Hawaii.

THE COURT: Any objection?

12:29PM MR. ADAMS: Isn't it part of the record already?

THE COURT: It's not an exhibit. So do you have a problem with it --

MR. ADAMS: I don't have a problem making it an exhibit, but it is part of the record for the jury already,

12:29PM isn't it?

THE COURT: It usually -- that's -- whether or not it's handed to the jury is usually up to the judge. So we will make is it an exhibit.

Exhibit 1187 is admitted and may be shown to the jury.

12:29PM (Defendants' Exhibit 1187 was received in evidence.)

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q Do you have it in front of you?

A I have the first page. I don't think I can scroll on

12:30PM this.

MR. PORTNOY: You can go to Page 4, please.

BY MR. PORTNOY:

Q Paragraph 16: On April 28, 2022, defendants, under anonymous username LianaShanti_Cult_Recovery, stated in a

12:30PM series of Instagram stories, in bracket, Liana is a capital

fake con artist, master manipulator, filtered avatar, puppet master cult leader.

Are you a fake con artist, master manipulator, filtered avatar, puppet master cult leader?

12:30PM A No.

MR. ADAMS: Your Honor, if this is defense of the complaint then this is irrelevant.

THE COURT: It's -- I'll allow it.

The answer will stand.

12:31PM BY MR. PORTNOY:

Q What did it mean to be called a fake con artist, master manipulator, filtered avatar, puppet master cult leader to you?

A I think the main narrative that the abuser group has been calling me is cult -- the cult narrative I think is the main, 12:31PM because it's a big red herring, it's a big distraction. It makes it about, oh, it's a cult, it's a cult, instead of what did we do? What are our children and wives accusing us of? If they can have a red herring that it's a cult, then everybody says, ooh, ah, cult, it must be a cult.

12:31PM So to me when I read this, the most compelling thing, con artist, master manipulator, all goes to feeding the false cult narrative, because that gets people's attention. It's sensationalized. And there's documentaries on actual cults. And that seems to have been their goal from the beginning to 12:32PM distract from the abuses that their wives and children were

disclosing publicly before I even came around.

Q Paragraph 18: On April 28th, the same day, defendants under anonymous username LianaShanti_Cult_Recovery stated in a series of Instagram stories: Ms. Shanti, quote, is making money and is abundant in a very 3D way extortion.

MR. ADAMS: Irrelevant and cumulative from the defense already put on. This is the -- this is her counterclaim.

THE COURT: Sustained.

MR. PORTNOY: What's the question that's being sustained? I haven't asked a question yet, Your Honor.

THE COURT: Well, the issue that counsel is having and that I am having is that you are bringing things up related to your case-in-chief rather than rebutting their case-in-chief with regard to their counterclaim.

So let's move on from her claims to their counterclaims.

MR. PORTNOY: Okay.

Can you put up on the board 1189, please?

THE COURT: You may.

1189 has not yet been admitted.

MR. ADAMS: No objection.

THE COURT: 1189 may be shown to the jury and it is admitted.

MR. PORTNOY: Thank you.

(Defendants' Exhibit 1189 was received in evidence.)

MR. ADAMS: For completeness, you may need to admit 1188, because it's referred in --
THE COURT: All right. You can do that on cross-examination if it's helpful.
12:33PM MR. ADAMS: Thank you. Okay.
BY MR. PORTNOY:
Q This is defendants Paula Haygarth, Byron Horvath and Stefanie Horvath's first amended counterclaim, correct?
A Yes.
12:34PM Q You understand when you sued them, they decided to sue you?
A Yeah, they never sued me before this, but --
Q Let me ask the question, please.
A Okay.
12:34PM Q Is that right, when you sued them they decided to sue you in return, right?
A Well, not right away. They didn't even answer the complaint for like four or five months, and then when they did they were past the deadline. We gave them an extension to file 12:34PM because they couldn't find attorneys that would represent them. Then they filed --
THE COURT: Ma'am. Okay. You need to just answer the question before you. We don't need a commentary about the procedures that have led us to here today. Just listen to your 12:34PM attorney's question. You're going to help him if you listen to

his question and answer his question. All right?

THE WITNESS: Okay.

THE COURT: Without the commentary about not being able to find attorneys and whatnot.

12:34PM That answer will be stricken. Okay?

Mr. Portnoy, ask another question, please.

MR. PORTNOY: Thank you.

BY MR. PORTNOY:

Q So getting back to just the answer -- the question. This

12:34PM is a counterclaim that they filed after you sued them, correct?

A Yes.

MR. ADAMS: Misstates the document. If he's looking at 1189, it's not a counterclaim. It's an answer.

THE COURT: Sustained.

12:35PM MR. PORTNOY: Sorry. It's an amended counterclaim; is that right?

THE COURT: No, it's an answer.

THE WITNESS: It says first amended counterclaim. Am I on the wrong page?

12:35PM THE COURT: No, it says plaintiffs' answer. That's what's on the screen.

If you look at 89, Mr. Portnoy.

MR. PORTNOY: I am looking right at it.

THE COURT: It says plaintiffs' -- if you go to the

12:35PM first page, it says plaintiffs' answer, which is what it looks

like it is. It's not an amended counterclaim.

The amended counterclaim is later in this document, if it's the same document that I'm thinking of that I've looked at previously.

12:35PM MR. PORTNOY: Hold on one second, Your Honor.

Apologize, Your Honor. We had the wrong number. Sorry. It happens.

THE COURT: All right.

MR. PORTNOY: Let's have 1188, please.

12:36PM THE COURT: Let me just confirm, do you still want 1189 admitted or --

MR. PORTNOY: No need.

THE COURT: Okay. So we're not going to admit 1189.

MR. PORTNOY: Right.

12:36PM THE COURT: We'll take 1189 out.

(Defendants' Exhibit 1189 was withdrawn.)

THE COURT: And you said 1180 --

MR. PORTNOY: 88.

THE COURT: Okay. Let's show the witness 1188,
12:37PM please.

1189 is withdrawn. The witness is now looking at Exhibit 1188.

BY MR. PORTNOY:

Q And this is the first amended answer -- answer to the
12:37PM first amended complaint and the first amended counterclaim,

right?
A Yes.
Q Okay. There are a number of allegations here about posts you made about the defendants?
12:37PM A Do you want to scroll? I can only see the cover page.
Q Let's move to Page 3.
A I only see page --
Q Paragraph --
A Sorry.
12:38PM Q Sorry for the mistake here. We have different --
A Page 3 has Paragraphs 16 through 19 on my --
Q Go to Page 12, please.
MR. PORTNOY: Can you scroll to Page 12, please?
Stop right there. Go back. Thank you.
12:38PM BY MR. PORTNOY:
Q Do you see Paragraph 13 there on Page 3?
A I do.
Q Okay. Can you read that?
A Meet Paula Haygarth. We haven't forgotten about her.
12:39PM She's one of the lead people traced directly through IP addresses and known e-mails to Reddit and the other fraud websites in the 30 plus --
MR. ADAMS: Move to strike as nonresponsive, Your Honor, and violative of the Court's prior order.
12:39PM I didn't realize that he was going to read in --

THE COURT: Okay. So this exhibit has not yet been admitted, so she can't read from it. Exhibit 1188 has not yet been admitted.

MR. PORTNOY: All right. Well, then that's fine, Your Honor.

12:39PM

THE COURT: Nor has it been identified.

So let's have her identify it.

MR. PORTNOY: Okay.

BY MR. PORTNOY:

12:39PM

Q What is 1188?

A I believe this is the counterclaim from the defendants.

Q Okay. And have you read it before?

A Yes, I have, several times.

MR. PORTNOY: I move 1188 into evidence, Your Honor.

12:39PM

MR. ADAMS: Can we have a sidebar?

THE COURT: You may.

All right, ladies and gentlemen, if you want to stretch, you can.

(Sidebar on the record:)

12:40PM

MR. ADAMS: He's clearly taking one more attempt to try and get the IP addresses in.

THE COURT: Yeah.

MR. ADAMS: His witness --

THE COURT: Right.

12:40PM

MR. ADAMS: -- just said it again after -- after eight

days, this is -- enough is enough.

12:40PM THE COURT: Okay. So not we're going to -- I'm not going to admit this exhibit. It is clearly being offered to introduce the IP addresses. I understand that it's their counterclaim, but move on from this exhibit.

MR. PORTNOY: But that's not what it's being used for.

THE COURT: What is it --

MR. PORTNOY: These are allegations against my client. She has a right to tell the jury why they're not true.

12:40PM THE COURT: I don't find that credible, Mr. Portnoy.

MR. PORTNOY: I mean, she can't respond to what --

THE COURT: You can talk about what they are without mentioning the IP addresses.

MR. PORTNOY: That's fine.

12:40PM THE COURT: You don't need the exhibit to do so.

MR. ADAMS: She better not either, though. That's the thing --

MR. PORTNOY: Please? Come on.

12:40PM THE COURT: You're making it harder for me than you need to, both of you are.

MR. PORTNOY: I'm not --

THE COURT: So don't respond to each other at sidebar, just respond to me. Clearly you guys aren't getting along, so just respond to me. Okay?

12:41PM You can raise -- you can say what's in there doesn't

relate to the IP addresses.

MR. PORTNOY: Fine. I agree.

MR. ADAMS: I trust Mr. Portnoy. I don't trust his witness, is my point, and that's why I said it directly to him.

12:41PM THE COURT: I understand.

MR. ADAMS: I apologize, Your Honor.

THE COURT: If she says something, I will admonish her in front of the jury, and that will be to her detriment.

MR. ADAMS: Thank you.

12:41PM (End of sidebar.)

BY MR. PORTNOY:

Q Let me just ask you about some statements --

A Okay.

Q -- that you made about the -- allegedly made about the

12:42PM defendants. Okay?

A Okay.

Q Did you ever call Paula Haygarth a dark Reiki practitioner who has practiced extensive black witchcraft on Malie's daughter?

12:42PM A I did.

Q And why?

A Because she's -- she posted about Reiki on her Facebook, said she was a Reiki practitioner and a priestess. And to me, in my beliefs, that is very dark. And Amanda Brady had shared

12:43PM with me over a multitude of years that every time Ellis and

London would go to her house she would practice.

MR. ADAMS: Object as nonresponsive and hearsay.

THE COURT: Sustained.

THE WITNESS: Well, I got that information from Amanda Brady.

12:43PM

MR. ADAMS: Your Honor, no question pending.

THE COURT: Ma'am, once I've ruled on something, don't speak. Give your attorney an opportunity to ask another question.

12:43PM THE WITNESS: Okay. Sorry about that.

BY MR. PORTNOY:

Q Did you ever make a post with a photograph of Ms. Haygarth saying, Jesus, we ask you to delete and destroy all toxic lies from the Satan servant, Paula Haygarth?

12:43PM A Probably. I -- if I see something, I can confirm for sure. But I definitely have said that, absolutely.

Q And why?

A Because I -- my community prays a lot, and to me when you pray to Jesus and you ask him to delete and destroy dark

12:43PM energy, demonic energy, people who are abusing children, I frequently post about that. And when I have seen that someone has abused children, that's something I would definitely have posted, for sure.

Q Have you ever posted about any of the defendants, What we

12:44PM are doing in this Jesus-led community calling out these people,

Paula Haygarth, this vial group of pedos, pedo supporters, pedo aligners, victim blamers, Paula Haygarth?

A Yes. The whole community that they associate with includes convicted pedophiles, like Anton Hien. And then people who support them and people who blame victims instead of trying to find out why --

MR. ADAMS: Move to strike as lacking foundation. Hearsay. Speculation.

THE COURT: He can go into why she believes that.

MR. PORTNOY: Thank you.

THE WITNESS: This group of people who has all the nine men, the nexus who wrote the letters, they all support this same group of people who have weaponized the court system and who are associated, in fact, with a convicted pedophile, Anton Hien, in this group of people that they have used to write a letter against me, somebody completely unrelated, that is one of the kidnappers, Joe Szimhart, that we discussed the other day.

And so as a group they have made a concerted conspiracy to harm me, connecting with people who had one goal in common. And they are, to me, a group of people who are -- among many of those things, some are victim blamers, some are actual pedophiles, some are supporters of pedophiles. And I don't remember what the other terms are. But, yes, these people actually associate together and have made their

associations very well known.

BY MR. PORTNOY:

Q Did you intend to state that Paula Haygarth was a pedophile?

12:45PM A Absolutely not. I do not think she's a pedophile. And I never said she was.

Q What did you mean when you included her in that --

A She's a victim blamer.

Q Okay. Did you ever accuse Byron Haygarth of being a

12:46PM pedophile?

A No, I did not.

Q What did you mean by including him in that statement?

A He's also a victim blamer.

Q A what?

12:46PM A He blames victims.

Q What is a victim blamer?

A Somebody -- when a child or a abused woman or an abused man comes forward and has disclosed abuse, and then you flip it around, it's called DARVO, and it's deny accountability and

12:46PM reverse victim and offender. It's a known tactic of abusers, and they flip the narrative around and then start blaming the victim, as if the victim is problem, taking the spotlight off of their actual abuses.

So this whole group of people is engaging in blaming

12:46PM every one of the victims that has come forward against these

people and saying they're the problem.
Q Did you ever write, Who's Paula? A bitter aging woman with a bleak future with a broke husband desperate to get her claws into the Brady's wealth by gaining custody of her husband's children. Who is Austin? The son -- excuse me -- she abandoned as a baby?
A I'll give you a minute.
Q Abandoned as a baby.
A I don't ever remember at all writing the accumulation of that. I know Amanda Brady told me she did, in fact, abandon her baby and give up custody of her son to go to priestess school. But I don't remember writing that whole collection of what you just said.
Q Did you ever publish a statement that Byron pays for Paula's attorney in exchange for a falsified affidavit?
A I did.
Q And where did you get that information from?
A From Haley Winter.
Q Did you ever say: Paula's a washed-up failed energy healer who gave up custody of her own son, went through multiple relationships, and all of us who have seen her in action know that she cycles through friends like toilet paper in every town she has lived in. She has cycled through so many friends because she is manipulative and dishonest and people catch on quick.

12:48PM

A No, that sounds like something exactly Amanda Brady has said, and could have been a screenshot from Amanda Brady. But I don't know anything about Paula at all, who she cycles through, who her friends are. I couldn't name one of her friends or what she does. So I would have no information about that at all.

Q Did you ever publish a statement that Paula Haygarth, black magic practitioner -- Paula Haygarth is a black magic and Reiki practitioner who is a lead figure in the defamation and smear campaign against a person she doesn't even know?

12:48PM

A Yes, I did say that.

Q Why did you say that?

A Because I had a multitude of reasons to, after seven months of staying silent, believe that Paula was the lead person in this defamation campaign. And she has publicly admitted that she does Reiki.

12:49PM

And in addition, Amanda shared a lot of information with me about the black magic that she does and how demons appears when she does her black magic. I think Amanda testified to that in her deposition, that during a black magic ceremony a demon appeared and Paula laughed about it.

12:49PM

MR. ADAMS: Calls hearsay.

THE COURT: The statements about what was said in deposition are stricken as hearsay.

12:49PM

You may ask another question, Mr. Portnoy.

MR. PORTNOY: Thank you, Your Honor.

BY MR. PORTNOY:

Q Did you ever say on Instagram about Byron Horvath: So we have one CPS reports against Byron for locking Isla in her room after Isla tells grandma. Two, stalking --

Well, let's just go to one.

A Yes. Haley informed me that there were multiple CPS reports filed by the child's grandmother and aunt, many of which happened before Haley was even a student of mine. So I definitely was aware of that.

Q Did you ever post, quote: When Shannon and Byron and Brian and Paula and all the other wetiko infected evildoers started their attacks and conspiracy against me and Malie and Drew, they had zero facts, zero proof?

A Yes.

Q Why did you make that statement, that they had zero facts and zero proof?

A Because there was no proof to anything they were saying. There still isn't to this day. It's just is a narrative. So, I mean, there has been no proof, ever, in the four years they've been attacking me.

Q Did you ever encourage Amanda to move to Florida?

A No, I did not. In fact, I thought it was a crazy idea to move in with 15 kids, most of whom were teenagers, three women and only one guy in the house. I'm like -- I, in fact, told

her at one point that's a recipe for disaster. I'm like -- but it's what she wanted to do, she wanted community, and they bought a house that had a second house on the property.
Q So did you actually advise her against moving?
12:51PM A No, I didn't advise her, but she said, isn't this a great idea? I said, honestly, I would never do that in a million years. But I just live with my own nuclear family. And again, 15 kids and a bunch of teenagers and three women plus her nanny, and then Drew Brady being the only guy in that house.
12:51PM I'm like, I do not think that this is a good idea. But she did it anyway. I mean --
Q Did you ever have a discussion with her about whether it might be viewed as, a word we heard earlier, kidnapping her kids and taking them out of the country?
12:51PM A No. In fact, she showed me letters from her lawyer Reginald something, that she had custody of the kids, and she took them to Florida because she was allowed to do that. And that was her prerogative.
Q Did you ever advise anyone in a custody dispute to take
12:52PM their child out of the country they were in to another country?
A Never. And I have countless times said to people, for their benefit, not to do anything illegal, because I've seen it bite them in the ass. Every single time somebody tries to do something that is against the law, a child ends up with a
12:52PM parent that is the less qualified parent. It doesn't help you.

You know, my goal is to help women --
Q So the answer is no?
A No.
Q Okay.
12:52PM A Absolutely not.
Q Did you make the following statement, on Instagram: Please remove all fog and uncertainty from their space so that they immediately see through the dark lies and deceptions of Byron Horvath and his sinister servants?
12:52PM A Sorry. Can you read at that again?
Q Sure.
Please remove all fog and uncertainty from their space so that they immediately see through the dark lies and deceptions of Byron Horvath and his sinister servants.
12:53PM A Yeah, it sounds like -- I'm wondering whose space I was talking about asking Jesus to clear fog. But definitely one of my biggest prayers is always, for truth to be seen you have to clear out all the fog, all the lies, all the narratives. I prayed that prayer a lot, I just don't know -- that sounds like 12:53PM it's sort of a second part of a longer series of posts, maybe.
Q Well, these are the allegations that have been made against you --
A Right.
Q -- that the defendants claim have defamed them. That's 12:53PM why I'm asking.

A Got it. Got it.
Q By the way, all of the things that I've been asking you about, they started when, these posts, in November you said?
A Seven to eight months after they were slandering me.
12:53PM Q You had never posted anything about the defendants prior to this time?
A No, not a single time.
Q Did you post something on Instagram that said: Their situation is dire. Isla is still with the man Byron Horvath
12:54PM who this little girl repeatedly says abused her in the recordings, hit her, locked her in the room for hours when she had to pee on the floor, wrestled a small child who had a serious heart condition with a panic attack.
Did you post that?
12:54PM A I did.
Q Where did you get that information from?
A Isla and Haley.
Q Okay.
Did you post at another time on Instagram: It has
12:54PM been heartbreaking to watch beautiful people like Malie and Drew receive such satanic vomit into their lives from Paula Haygarth, Brian Winter, Byron Horvath, and others?
A Yes.
Q What did you mean by that?
12:54PM A Originally the cult account was aimed at the Bradys, it

was called the Brady Bunch Downfall. And Drew Brady lost about 80 percent of his business in Canada. He was a financial adviser.

MR. ADAMS: Move to strike as nonresponsive, lacking foundation.

12:55PM

THE COURT: Sustained.

BY MR. PORTNOY:

Q When you wrote that, who provided the information about Drew receiving satanic, as you called it, vomit into their lives?

12:55PM

A Can you read the question again or can you read that post again, please?

Q It has been heartbreaking to watch beautiful people like Malie and Drew receive such Satanic vomit in their lives from Paula Haygarth, Brian Winter, Brian [sic] Horvath and others?

12:55PM

A Yes, I said that.

Q Where did you get that information from that led you to that statement?

A From Amanda Brady. She shared everything that was happening to their business in Canada from the defendants.

12:55PM

Q Another allegation is that you posted, quote: Yet this loving and protective mother is now the subject of a gag order intended to silence her from any further disclosures about Brian's abuse of Isla.

12:56PM A Byron?

Q Did you write that?
A I'm sorry, Jeffrey, does it say Byron's abuse?
Q Yes, it does.
A Okay. I misheard you. I thought you said Brian. And then her dad's name is Brian.
Q Byron.
A Byron.
And your question is?
Q Did you post that?
12:56PM A Yes.
Q And why?
A Because Haley was given a gag order in the Family Court to stop talking about Byron and the abuse. She had been posting prolifically on her own account about all of the things she witnessed with Byron. And he took her to court to get her to not be able to talk about what was happening to her. So that -- that actually happened.
Q Another post: Byron Horvath and his wife Stefanie Vogt have been preventing Isla from seeing her protective, loving mother. Byron has repeatedly reported -- Byron has been repeatedly reported to CPS by Haley and Elsie [sic] and others, and no investigation has been done.
Where did you get that information?
A From Haley, direct messages from her.
12:57PM Q Did you ever call Mr. Horvath a violent man?

A Yes.
Q And where did you get that information from?
A From the cocaine rages and abuse --
Q Where did you get the information --
12:57PM A Oh, from Haley directly.
Q Did you ever call Byron a child abuser?
A Yes.
Q Where did you get that from?
A From Isla, from her videos where she talks about his abuse of her and the bruises on her body.
12:57PM

MR. ADAMS: Objection as nonresponsive in violation of repeated orders.

THE COURT: Sustained. The jury is to disregard the statement about what the child may or may not have said, and the answer will just remain that she got the information from Isla.
12:57PM

BY MR. PORTNOY:
Q Did you ever watch any videos of Isla?
A Yes, I have.

12:58PM MR. ADAMS: Objection, Your Honor, improper question given the orders.

THE COURT: Let's let him ask another question.

MR. PORTNOY: That's the question. Thank you.

BY MR. PORTNOY:
12:58PM Q Did you ever call Byron a drug addict?

A No. I said he's a cocaine user. I've never called him a drug addict.

Q Never used that term?

A No.

12:58PM Q Let's move on to Stefanie, the allegations that they claim you made about her that they claim are actionable.

Stefanie has radically changed her appearance when she began dating Byron to appear more and more like Haley. According to what Haley has shared, this woman has been leading

12:58PM the charge to remove Haley's little girl Isla from her.

Did you make that statement?

A I did.

Q Where did you get that from?

A Haley.

12:58PM Q Anything in there your own statement?

A Well, I saw the pictures of Stefanie from when she first fell in love with Byron, but he married Haley instead, and she had dark black hair and a completely different appearance. You saw Haley yesterday. Blonde hair, and her certain type of

12:59PM appearance. And Stefanie morphed her appearance to look like that. So I have seen pictures.

Q You've been alleged to have said that she and Mr. Horvath only have sex when they are drunk, and stating that the child was conceived while under the influence of drugs and alcohol.

12:59PM Did you make that statement?

A I did.
Q Where did you get that from?
A Haley shared that.
Q Any of that come from you?
12:59PM A I didn't know anything about their sex life. She just said the child was conceived in drugs and alcohol, they're always drinking and drugging, so...
Q You didn't know any of the defendants --
A No.
12:59PM Q -- back then?
A No.
Q Did you ever call Ms. Vogt Horvath a pedophile?
A No.
Q You did ever called her a child abuser?
01:00PM A No.
Q Is she a child enabler?
A A child enabler? No. No.
Q You then said at some point that Stefanie has deliberately sought to infringe on the custody rights of Mr. Horvath's
01:00PM ex-wife Haley Winter.
Where did you get that from?
A Haley.
Q Did you ever post something that said: As if it couldn't get any more twisted, sick and evil, Stefanie Horvath, the
01:00PM woman desperate to become Haley by morphing herself to look as

much like her as she could, moving into Haley's marital home in bed, and even leaving Haley's wedding gift of a picture up on the wall, the woman whose own mother said on the wedding video that Stefanie wanted desperately to be with Byron for 13 years,
01:01PM who Haley said was depressed when Byron fell madly in love with Haley and chose her, not Stefanie?

Where did that come from?

A That came 100 percent from Haley.

Q Hundred percent?

01:01PM A Yes.

Q There's a statement that they claim is also by you and actionable: Stefanie posts this public photo on her Facebook page pretending to be a happy family, when the reality is far from it because the little girl you see -- we've been through
01:01PM that before.

Did you post something about pretending to be a happy family?

A I shared Haley's message to me that said that. And I remember it having a photo of --

01:01PM Q Did you -- did you post it?

A It would have been Haley's, but yes.

Q Okay. Did you know anything about their family?

A I knew nothing until this whole situation happened.

Q Okay. You remember posting -- or did you post: This
01:02PM cancerous cluster of abusers thought that the massive effort

they put into writing false letters about me would work to silence the truth, but as Jesus always does, he turned their -- excuse me -- shit to pure gold in that every ounce of energy they put towards their false narrative only served to amplify and show everyone their sick abuse of women and children?

01:02PM

A Absolutely.

Q Is that your opinion?

A Yeah, I believe that Jesus does help you turn bad situations into good, and that's exactly what happened, because my voice got more amplified in advocating for women. And the irony of them wanting it silenced is louder than ever now. And that's part of this trial as well, is to have this be more widespread.

01:02PM

Q Did you ever post: The only focus of Byron and Stefanie Horvath and another individual and the abusers was one thing, silence the victims?

01:03PM

A Could you read that again?

Q Did you ever post: The only focus of Byron and Stefanie Horvath and another person, whose name is in here, and the other abusers was one thing, silence the victims?

01:03PM

A Yes.

Q Who are the victims?

A Isla, Haley, and all the other children connected to the nine men in their conspiracy group.

Q There were a number of questions about articles about the

01:03PM

defendants that were written, particularly one article called Evil in Saskatchewan. Did you write that?

A No, I did not.

Q Did you have anything to do with that?

01:03PM A No, I did not.

Q Do you know who wrote it?

A I can't -- I believe it's Amanda Brady, just based on the knowledge that's in there. The Canadian vernacular words spelling like colour, O-U-R, kind of Canadian linguistics.

01:04PM But -- and it's all about the Bradys. It's like, hey, the Bradys were harmed. So it's my belief that it was Amanda, but I definitely can't say that for sure. I don't know who actually authored it.

Q How do you spell color?

01:04PM A C-O-L-O-R.

Q Have you ever spelt it C-O-L-O-U-R?

A No.

Q Isn't that the way it's spelled in that article?

A It is. I mean, when you read through it, it's clearly by
01:04PM someone from Canada. Again, that doesn't make it Amanda. That's what I believe.

Q It's not you?

A No.

MR. ADAMS: Move to strike as lacking, clearly written
01:04PM by someone from Canada.

THE COURT: Overruled.

BY MR. PORTNOY:

Q I guess -- I want to ask, since this whole thing has happened, first, what involvement, if any, did you have in either the Haley or Amanda custody situations?

A No involvement in their custody situations. I was advocating -- well, Amanda there was no situation, so that's a non-issue.

Q Well, the moving situation as well.

A Yeah, I had nothing to do with the moving.

Haley, I was trying to give her support, give her resources. Our whole community came together, raised money for her, and prayer vigils. And I would give Haley, like, you know, friend emotional type support and help her keep going when she was -- she was in a really bad place where I was worried she was suicidal at one point.

Q Are you sorry you did?

A Not in the least.

Q Why not?

A I -- I believe that because I have a voice and I'm not afraid to use it, and even put my entire life on public display here, to be ripped apart, doing the right thing for me, is always more important than anything else, regardless of outcomes, regardless of opinions. What I did was right. It was a woman and a child in crisis. She was on the brink of

suicide. She was being abused. I chose to believe her based on all the evidence she shared with me. And because I am a -- I have a platform and I have a voice -- and I'm not afraid. I'm being attacked, and you know what, I'm still doing the
01:06PM right thing by even having this public case. And I don't regret it at all.

Q What did you hope to accomplish by posting articles, comments about the defendants? What did you hope to accomplish?

01:06PM A First, it was mostly defending myself. I had been attacked for eight months, and I was hurt, I was sad, I was devastated. And I decided to defend myself and say, this is the truth this. Is what's actually happening. These are the people behind it. Their whole goal is to silence their
01:07PM victims. And then that works, they got gag orders, so now they're trying to silence me. And that's not working, and it's not going to work and it can't work because I'm a free person. And I'm going to keep disclosing and exposing what took place.

So that was my secondary goal, after defending myself,
01:07PM which was important to me at the time.

Q Are you sorry you did it?

A Not at all.

Q For the reasons you just gave?

A Correct.

01:07PM Q I just want names. Okay?

Who has told you that one or more of the defendants posted any of the defamatory statements that brought you to court?

MR. ADAMS: It's been asked and answered in response to specific questions. And also hearsay.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Who do you believe are the people responsible for the posts that are involved in this litigation?

MR. ADAMS: It's the same objections, Your Honor. This is just one way to try and get around it.

THE COURT: Overruled.

THE WITNESS: Who do I believe --

BY MS. MORITZ:

Q Yes.

A -- is responsible for the postings?

Q Yeah. You sued these three defendants. So why?

A I believe that the genesis was --

Q And just -- yeah, go ahead.

A -- Paula. Paula and Stefanie, both the step mothers, both the new wives, both have long -- decade-long disputes with the other woman. So Haley left Byron and Stefanie and Haley had a dispute. Amanda left Wade and then Amanda and Paula had a dispute. So these two women had a decade-long hatred for each other, Haley and Stefanie and Paula and Amanda.

And then we saw Paula got together with Stefanie and said, how can we get together, and step in as the new moms and show these husbands that we're the better wife. That's to me what it was always all about. It was the "pick me" wife. It's I'm as good as the first wife. And that corroborates why they were the ones who started it, and are the genesis of all of the slander and defamation against me.

Q There's been all this talk about you getting involved in private matters that you had no right, I think that's the word that was used, to get involved in. Why -- do you view these as private matters?

A No, I didn't get involved in anybody's private matters. Haley brought to me years of abuse and asked for help. And I advocated for her. They only want to say it's private because they think that a child can be abused behind closed doors, and nobody has any business advocating for that child. I completely disagree with that.

MR. ADAMS: Move to strike as lack of foundation, speculation, as to what my clients think.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Haley was posting about all of these things in a public forum, correct?

A Two forums. On her own Instagram page she had a multitude of posts calling out Byron's abuse, and also in our group.

Q Okay. You heard testimony that she now claims she never gave you the right to post anything about her daughter. Is that true?

A No, it's not. I have letters from her where she's thanking me for doing it.

Q Did she ever tell you to stop?

A Never. Well, excuse me. That's not true.

Q Well, up until --

A She -- she -- for two-and-a-half years she was giving me stuff to post and asking me to post it. And then when she made a deal with Byron and he weaponized the child, made her a pawn, she suddenly said, Okay, if you post anything now I'm going to have to send you a cease and desist letter. But she also said, But that doesn't mean you have to stop, I just have to tell you to stop.

MR. PORTNOY: Can I have 426, please?

THE COURT: You may.

BY MR. PORTNOY:

Q Have you seen 426 before?

A I have.

Q What is it? Just what is it?

A It's a -- excuse me -- it's a direct message from Haley to me.

Q Dated when?

A December 12, 2023.

Q Is this a screenshot you took?
A Yes.
Q Have you altered it in any way?
A No.
01:12PM MR. PORTNOY: Your Honor, I move 1223 -- I move this exhibit into evidence, please.
MR. ADAMS: No objection.
THE COURT: 426 is admitted and may be shown to the jury.
01:12PM (Plaintiffs' Exhibit 426 was received in evidence.)
BY MR. PORTNOY:
Q This is two days after her custody settlement, correct?
MR. ADAMS: Lacks foundation. Calls for speculation. Leading.
01:12PM THE COURT: Well, sustained.
Why don't you just ask her if she knows the date of the settlement.
MR. PORTNOY: She already told --
BY MR. PORTNOY:
01:12PM Q The date is December 12th, right?
A The date of this message was December 12th, yes.
Q What's the December 10th date above it, do you know?
A That was -- that relates to the message previous to that. And I believe that was a day that she signed the deal.
01:12PM Q Okay. Can you read it to the jury?

01:13PM
A It is done. Prayer hands. Thank you, Liana, for all you have done for me and Isla from the bottom of my heart. Your impact on my life has been profound, and you don't deserve anything I brought to your life through my evil family. I am deeply sorry. I hope to never be a source of -- I hope to never be a source for any pain in your life again.

Sorry.
Q There's more.
A I know.
01:13PM
Q Yeah, take your time.
A We settled. And now if I share anything new with you about Byron, Isla, or his family, and you share it on social media, Byron can let me know and I have to e-mail you to take it down. What you do with that is obviously up to you. I made a choice that I felt was in the best interest of Isla.
01:14PM
Q Did you solicit this post?
A No, I did not.
Q You know that -- you were in court when Haley said you talked her into all of the things that she did and said, and that you were the reason all of her problems happened, correct?
01:14PM
A I was here.
Q How do you square that with this exhibit written two days after she made a deal, because we've heard about it, an arrangement, to say that everything she had said about you -- everything she had said prior to that you made her say?
01:14PM

MR. ADAMS: Objection. Vague as to how you square that.

BY MR. PORTNOY:

Q How do you resolve the two things, her testimony and this exhibit?

A Well, for two-and-a-half years and well over 6 or 700 messages and e-mails, she shared accounts of abuse and asking for help and being in a crisis. And not just me, our whole community galvanized to help her raise money and support her and pray. And then even her last message to me -- this is the last communication I ever had with Haley. And even then she was still saying, I'm so sorry this happened.

And then a year later -- so it was a year later after this in 2024, she suddenly wrote a letter of recanting to -- in my probation case saying, everything I've said for the past two-and-a-half years was not true.

I don't know how she accounted for the photos and the videos, but what I do know is that she was forced -- she's an abused woman, just like women who call the police for rape --

MR. ADAMS: Move to strike as nonresponsive and calling for expert opinion, Your Honor.

THE COURT: Sustained.

The jury is directed to disregard the statement that what I do know is that she was forced. She's an abused woman so on and so forth.

BY MR. PORTNOY:
Q You had nothing to do with this message, it came unsolicited?
A It was unsolicited.
01:16PM Q When you read "You don't deserve anything I brought to your life through my evil family. I am deeply sorry. I hope to never be a source of any pain in your life again," what did you think she meant?
A I know what she meant, because many times throughout the
01:16PM year, year and a half prior, she would say, I'm so sorry that you're dealing with this, that you're being attacked, your business is being --
MR. ADAMS: Foundation. Speculation.
THE COURT: Sustained.
01:17PM BY MR. PORTNOY:
Q What did you think?
MR. ADAMS: Cumulative.
BY MR. PORTNOY:
Q How did you receive the information?
01:17PM MR. ADAMS: It's cumulative.
THE COURT: Sustained.
BY MR. PORTNOY:
Q Did you reach an impression as to what she was talking about when she said "You don't deserve anything I brought to
01:17PM your life"?

A Yeah, absolutely.
Q Was it this attacks that you were getting?
A Yeah. She apologized a lot.
Q Okay.
01:17PM A Yeah.
Q Were you surprised to hear her testimony in this courtroom?
A No.
Q Why not?
01:17PM A She's an abused woman. I mean, she's recanting to keep her child.
MR. ADAMS: Nonresponsive. Expert opinion. Lacking foundation, Your Honor.
THE COURT: Sustained.
01:17PM The jury should disregard the statement that she's an abused woman.
MR. PORTNOY: Yeah, okay.
BY MR. PORTNOY:
Q But were you surprised to hear her testimony?
01:17PM A I was not.
Q Okay. Did you believe it was because she had entered this custody resolution?
A I know -- I know that's why.
MR. ADAMS: Asked and answered. Cumulative.
01:18PM Speculation.

THE COURT: Sustained.

BY MR. PORTNOY:

Q Would you do it again?

A Which part? Would I do what again?

01:18PM Q Get involved again in some other person's custody issues?

A I -- at this point I'm advocating on a bigger level with a bigger platform, because these individual families are dangerous and violent. And for my own safety and the safety of my family -- we were chased down the street the other day.

01:18PM MR. ADAMS: Your Honor, strike as nonresponsive.

BY MS. MORITZ:

Q Would you do it again?

THE COURT: Sustained.

THE WITNESS: I would not in this way, not to the level that I did.

01:18PM

BY MS. MORITZ:

Q Because?

A Because it brought -- mainly because it brought a lot of pain to my children.

01:19PM Q You used what I would call some colorful language on occasion. Do you recall?

A What kind -- I mean, I don't know what you mean by "colorful." I'm pretty direct. I don't candy coat things and I say what I actually think and I stand behind it. But you have to give me an example for me to be able to --

01:19PM

Q Did you in these posts that you're allege to have defamed them, were any of them your opinion based upon the facts you were getting from Haley and Amanda?
A Yeah, they were all my opinion. I mean, it's all my
01:19PM opinion, because Amanda and Haley would give me what they experienced.
Q That's fine.
A Yeah.
Q Were you basing your opinion on the information you were
01:19PM getting from others?
A Hundred percent.
Q Do you believe you have a right to publish your opinion based upon information you receive from others?
A I do. I think that's the First Amendment.
01:20PM Q You know what the word hyperbole means?
A Hyperbole?
Q Yeah.
A Yeah, I do.
Q What does it mean to you?
01:20PM A Overexaggerated and sort of theatrical kind of language that's beyond the, you know, norm. Not vanilla.
Q Did you use some hyperbolic language in some of your posts?
A I am known to use hyperbole quite a bit.
01:20PM Q And why do you use it?

A It's -- it's part of my personality. I mean, when I'm advocating for something that I'm really passionate about, I use language that I feel makes an impact.

MR. PORTNOY: That's all I have. Thank you.

01:20PM THE COURT: Cross-examination, please.

MR. ADAMS: Yeah. Do you want to keep up Exhibit 188, please? The counterclaim.

THE COURT: You may. Let me just double check to make sure that was --

01:20PM MR. ADAMS: Turn to it, if you want in your book, it's 188. It's the one with all the quotes.

THE COURT: Let me just make sure it's been admitted.

MR. ADAMS: It hasn't been admitted. This was my answer and counterclaim where he was reading all the quotes.

01:21PM THE WITNESS: Mr. Adams, did you say a book? The book I have here is not that one.

THE COURT: One second. Ms. Cortez will bring it to you.

THE WITNESS: Okay.

01:21PM THE COURT: And I'm sorry, did you say 1188?

MR. ADAMS: Let me just confirm. Yeah, 1188, Your Honor. It's my client's --

THE COURT: Got it.

MR. ADAMS: It's the one he was reading from.

01:21PM THE WITNESS: The binder came apart.

THE COURT: Ms. Cortez, can you help the witness, please.

THE WITNESS: I'm sorry, the binder came apart. Sorry.

01:21PM THE COURT: And Mr. Adams, we've got about ten minutes.

MR. ADAMS: I'm going to be quick.

THE COURT: Okay.

So you think you will be done before our break, is

01:22PM that what you're saying?

MR. ADAMS: (Nods head up and down.)

THE COURT: Okay.

THE WITNESS: Thank you, Carla.

CROSS-EXAMINATION

01:22PM BY MR. ADAMS:

Q Turn to the second Page 10.

The reason I call it the second Page 10 is because you're going to go through ten pages, there will be a first Page 10, then it starts over after 12.

01:22PM A Okay. What am I looking at first? What is this?

Q I want you to go to the second Page 10, it's paragraph --

A Now, what is this document? I'm asking you.

Q This is the counterclaim that your client -- your counsel was reading, did you state this and you said yes, or you said

01:22PM no.

A Okay. This document says defendant's answer to first amended --
Q Keep reading -- keep reading from that same caption.
A Okay.
01:22PM Q It's the counterclaim, which is page -- the second Page 10.
You got it?
A Mm-hmm.
Q Starts with Paragraph 48 at the top then 49?
01:23PM A Okay.
Q Let's look at 49. This is the one where you admitted that you made the statement Byron Horvath and his wife, Stefanie Vogt, had been preventing Isla from seeing her protective, loving mother. Byron has repeatedly reported to CPS --
01:23PM MR. PORTNOY: One second, Your Honor. It's not on my screen. I apologize.
MR. ADAMS: Oh.
MR. PORTNOY: That's okay. I don't know where it comes from.
01:23PM MR. ADAMS: It's up here, so if you want to -- to just the people. It's not admitted.
MR. PORTNOY: No, no, I can't --
THE COURT: Okay. One second.
MR. PORTNOY: No, no, problem.
01:23PM THE COURT: Yeah, yeah, yeah. I'm not upset. I just

want to make sure that we're getting everything right. The jury doesn't get to see this, Mr. Portnoy does. So if we can make sure it's on Mr. Portnoy's screen.

MR. PORTNOY: It's now on my screen.

01:24PM MR. ADAMS: It's also 1188 in his binders.

BY MR. ADAMS:

Q All right. Paragraph 49. You admitted in response to your own counsel's question that you made that statement.

You remember stating that?

01:24PM A No, I didn't admit to this. This says on the website --

Q Hang on. On we're getting there. I want the statement only. Okay?

You admitted under examination from your attorney that you made this statement.

01:24PM A I have made that statement.

Q Yeah. Statement says: Byron Horvath and his wife, Stefanie Vogt, have been preventing Isla from seeing her protective, loving mother. Byron has been repeatedly reported to CPS by Haley and Elise and others, and no investigation has 01:24PM been done.

Right?

A Yes. Haley shared that with me.

Q And that -- what paragraph -- where does it say in this that that was published, that you admitted to making? Where 01:24PM does it allege?

A This is something I said on my Instagram, that's why I said I didn't agree to this paragraph. I agreed to that statement, because I've actually said that a number of times.
Q Okay. This says it was made on the website Exposing Family Cults.
01:25PM
A That's false.
Q Okay. So you -- you take it back, you didn't make that statement on that website?
A My attorney didn't read that part of it, if you go back and listen to the transcript.
01:25PM
Q I know he didn't read that part of it.
A Right.
Q But you admitted to making this statement.
A I have made that statement on my Instagram.
01:25PM A lot of what the people took on the website, they took from my Instagram. So I would post things, they would screenshot it, and put a lot of it on that website. So that is something I've definitely said, but I didn't put anything on that website because it's not my website.
01:25PM Q You heard your husband testify that he's the one that registered that domain name for somebody he doesn't know that's a follower of yours?
A It's a bunch of students that made that website, and he initially purchased the domain.
01:25PM MR. PORTNOY: Could we, please?

She's in the middle of an answer, Your Honor.

THE COURT: All right.

MR. ADAMS: One more question, Your Honor. Or a series of questions.

01:26PM BY MR. ADAMS:

Q Paragraph 53 on the same page, you admitted to making that statement, too, about Stefanie has radically changed her appearance, right?

A Again, on my Instagram, yes.

01:26PM Q Yes or no?

A On my Instagram. I'm not saying yes to this because you're trying to get me to say that I posted it on Exposing Family Abuse and I did not.

Q No.

01:26PM A So when my attorney read these statements -- he didn't read that.

THE COURT: Hold on, hold on.

MR. ADAMS: I know he didn't.

THE WITNESS: Okay.

01:26PM THE COURT: Hold on. We're not in a debate, we're in a court hearing.

So the question was, did you make that statement about Stefanie Horvath changing her appearance? That's a yes or no question.

01:26PM THE WITNESS: Yes.

THE COURT: Okay. Next question.

BY MR. ADAMS:

Q And it says here that it was made on the ExposingFamilyAbuse.com website, doesn't it?

01:26PM A That's your counterclaim, it's a lie.

Q I'm asking you if that's what it says here in the same paragraph, that that statement was posted on that website?

A That's what you're alleging, yes.

Q You admit that you made that statement originally, didn't

01:26PM you?

A I don't know if it was originally, but I have said it on my Instagram, absolutely.

Q And you have no remorse for any of the statements you have made, that's -- you what testified here today, right?

01:27PM A First of all, nobody asked me about remorse. But I absolutely stand behind what I said, because what I said is absolutely my opinion based on facts.

Q No remorse, correct?

A What do you -- what do you want -- what are you talking

01:27PM about with remorse?

Q Do you have any remorse? You know what the word means, right?

A I know what remorse means. But do you mean about getting involved with Haley? Yes, I have remorse for that because this

01:27PM got brought into my life. Do I have remorse for standing up

for victims of child abuse? Absolutely not, zero. Nor would I.
Q And you don't have any remorse about posting anything about Isla online, right?
01:27PM A Her mother asked me to, and I was -- yes.
Q Please answer my question, please.
Do you have remorse about posting anything about Isla online?
A I have no remorse for posting about child advocacy, none.
01:27PM Q And you will continue to do it, won't you, after this trial?
A Of course.
MR. ADAMS: Thank you.
No further questions, Your Honor.
01:27PM THE COURT: Any redirect?
MR. PORTNOY: Nope.
THE COURT: All right. You may call your next witness.
MR. PORTNOY: That's it. We rest.
01:28PM THE COURT: Any further witnesses from the defense?
MR. ADAMS: No, Your Honor.
THE COURT: Okay. Ladies and gentlemen, good news. We're done earlier than expected, totally.
And I'm going to let the witness stay on the stand
01:28PM until I excuse you for the day to explain to explain what's

going to happen next.

So we're ending earlier than expected. The trial -- the evidence is done.

What has to happen next is that I need to read you jury instructions, and that's what the attorneys and I are going to be working on.

After I read you the jury instructions, then we will proceed to closing argument.

Because we're going to be working on jury instructions today and try to get that done, and because folks have other hearings going on, I'm going to ask you to return to the jury room tomorrow at 10 a.m. 10 a.m. tomorrow. Okay?

So, you're done for today. And you're done for the rest of -- I'm sorry, you're done for today. Come back tomorrow at 10 a.m. That will give us enough time to get everything figured out in terms of the jury instructions, and give you copies of the jury instructions, because you will have copies of the jury instructions with you.

I will read the jury instructions to you. And again, then you will hear closing argument. And then after that you will be left to deliberate.

One thing I never said, I realized, is that there are no alternate jurors in civil cases in federal court. So all of you will be deliberating, assuming that you stay healthy and are able to show up. Okay?

All right. With that then, ladies and gentlemen, please do not talk about the case. Do not do any research about anybody in this courtroom or anything related to this case or anybody whose names you've heard about in the course of this case. Please turn your attention to focusing on yourself and your own personal lives for the rest of this evening. And we will see you tomorrow at 10 a.m. All right?

Thank you everyone.

(At 1:29 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right, ma'am, you may step down.

(Witness excused)

THE COURT: Let me ask if the parties -- excuse me, attorneys would feel they would benefit from having more than a 15-minute break before we start talking about jury instructions would you like more than a 15-minute break before we start talking about jury instructions?

MR. PORTNOY: I would.

THE COURT: Okay. How much time would you like, Mr. Portnoy?

MR. PORTNOY: I think we could be done in a half hour. It's only a couple of us, but a half hour, Your Honor.

THE COURT: Okay. You want a half hour break or you think we'll be done with jury instructions --

MR. PORTNOY: No, no, I'd like a half hour break to

get organized. I think it will go more quickly, from our end.
THE COURT: Okay. That's very much appreciated.
Okay. So we will be in recess until 2:00.
When we do come back, I would like to know from both sides the length of their anticipated closing argument.
What I anticipate doing is, plaintiffs will go first, followed by the defense, followed by plaintiffs' rebuttal, followed by defense rebuttal. So give me the total time you want. There's a decent chance I will reduce that time, just to warn you. But I want to give you the opportunity to tell me how much time you think you need.
So we will be in recess until 2:00 p.m.
I am being asked by jury if we think the jury will be given the case before lunch tomorrow. I don't think that's --
MR. ADAMS: When's lunch?
THE COURT: Yeah.
MR. PORTNOY: Yeah.
MR. ADAMS: Not 12 noon, given if they come in at 10:00, yeah.
THE COURT: Yeah. I will say probably not.
MR. ADAMS: We already -- already got a question from the jury.
THE COURT: No, no, from the jury coordinator.
MR. ADAMS: Oh.
THE COURT: So I will chat with her and figure out

what lunchtime is. And I'm sure she's listening to me saying this right now. So I'll chat with her.

Okay. Thank you.

MR. PORTNOY: Okay. Thank you.

01:32PM MR. ADAMS: Thank you, Your Honor.

(A recess was taken from 1:32 p.m. to 2:03 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: All right. I forgot to ask our court

02:04PM reporter if it would be helpful for her to have a copy of the jury instructions.

Yeah? Okay. For this hearing or -- okay. For tomorrow. Thank you.

And before I forget also, I wanted to put on the

02:04PM record that we had representations from Mr. Portnoy that the three witnesses that had said they weren't going to testify were willing to testify after all, and he did not call one of them.

MR. PORTNOY: No, one was not willing.

02:04PM THE COURT: Which one was that?

MR. PORTNOY: What's her name? Oh, yeah, that's right. No, they were willing. Yeah. I forgot. Yeah.

THE COURT: Okay. Thank you. I just wanted to make sure we had a record of that.

02:04PM All right. Let's turn to the jury instructions first.

You should have also received from Ms. Cortez a proposed kind of sample of what the verdict form might look like here.

And we're now operating from the Court's proposed jury
02:05PM instructions version two. And we will do the exact same thing as we did the other day.

So, instruction number one, there were no objections previously.

Number two, there were no objections previously.

02:05PM Number three, there were no objections previously.

Four, there were no objections previously.

Five, no objections previously.

Six, no objections previously.

Seven, no objections previously.

02:05PM And obviously interrupt me if I'm saying something that is inaccurate.

Eight, no prior objections.

Nine, no prior objections.

Ten, no prior objections.

02:05PM 11, no prior objections.

12 and 13 are obviously gone at this point.

One second.

14. I took out punitive damages. Any objection to 14?

02:06PM MS. ING: No. No, Your Honor.

THE COURT: Mr. Portnoy, any objection to the change to 14?

MR. PORTNOY: Because?

THE COURT: I just took out Count 5.

02:06PM MR. PORTNOY: No, I know. Because? There's no such count or ruling on it? I'm just not sure why you took it out.

THE COURT: One of the -- I took it out because I thought last -- at our last hearing you conceded that Count 5 is not a separate claim, it's a request for damages.

02:06PM MR. PORTNOY: Yeah, that's fine. I just wanted to understand. That's fine. Okay.

THE COURT: Right. And I added the word "counter" to "counterclaims."

MR. PORTNOY: Yup.

02:06PM THE COURT: 14 then will remain the same.

15. So we tweaked a little bit the joint proposed instruction that was, I think, partially joint.

Any objection to 15?

MR. PORTNOY: Yes.

02:07PM THE COURT: Tell me what your objection is, please.

MR. PORTNOY: It conflates multiple claims and multiple types of damages. I think they have to be separate. There should be an instruction on what the damages are for defamation, and what the damages are for defamation per se,

02:07PM because they're different. And they require different levels

of proof. And in fact, defamation, you can award nominal damages. And we had an instruction on that, but it's not in the stack.

So, this conflates the two in a single instruction, and I just find it very confusing. I don't think it's wrong as it relates to defamation, which is the title, but it doesn't relate to defamation per se.

THE COURT: Okay. Let's walk through the instruction so that I understand what your objection is.

02:08PM MR. PORTNOY: Okay. My objection is that it conflates two different types of claims and two different types of damages.

THE COURT: Okay. Let's start with that. So your objection is to the fourth element?

02:08PM MR. PORTNOY: Yes.

THE COURT: Okay.

MR. PORTNOY: But only part of the fourth, because part of it refers to defamation.

So it would start, for the existence --

02:08PM THE COURT: Tell me how you would propose revising this.

MR. PORTNOY: I would like two separate instructions, one on defamation, and explain the damages that are available, including nominal, and then one on defamation per se, which is

02:08PM not required -- for example, it presumes damages, doesn't

require a showing of special damages.

THE COURT: Okay. So there are instructions defining defamation per se and special damages. I mean, it says that in element four.

02:09PM MR. PORTNOY: Where? Sorry, Your Honor.

THE COURT: And let me make sure I can find where that is. One second.

(Pause in the proceedings.)

MS. ING: Probably thinking about 30, Your Honor.

02:09PM MR. PORTNOY: We didn't get past 24, so -- 25.

THE COURT: Okay. So 20 -- excuse me. 30 defines special damages.

MR. ADAMS: 32 is per se.

THE COURT: And 32 is damages per se.

02:09PM MS. ING: Mm-hmm.

THE COURT: And my understanding is that defamation per se is not a separate claim. It is a form of --

MR. ADAMS: It's a stage in the proof.

Sorry, I interrupted you.

02:10PM THE COURT: Right. It's -- it's a way to show damages.

So any objection to 32? Let's --

MR. PORTNOY: Oh, let me see. Okay. As I said, we didn't have time to get through it all, but we're looking at it now. Which one, Your Honor, 32?

THE COURT: Mr. Portnoy, I don't mind if you need more time. You want 15, 20 more minutes to take a look?

MR. PORTNOY: That would help.

THE COURT: Let's do that. Okay. I don't have a problem about that.

02:10PM

MR. PORTNOY: We got about two-thirds of the way through.

THE COURT: Okay. Just let me know when you are ready.

02:10PM My understanding is you have a hearing at 4:00?

MR. PORTNOY: Yes.

THE COURT: Where?

MR. PORTNOY: Well, it would have to be in my office, it's only ten after 2:00.

02:10PM THE COURT: Okay, great. Take your time. Let Ms. Cortez know when you're ready and then we'll regroup.

MS. ING: And Your Honor, if I could say something about that, because -- just for Jeff to think about. But the cases here -- you know, there's two stages, yes. But this section talks about elements, and then later on we have a whole section on different types of damages. But the elements, if you look back at the cases, do talk about the fact that you normally with a regular defamation you go need to show special damages, but when it's defamation per se, special damages --

02:10PM

02:11PM MR. PORTNOY: Yeah, but -- but just take four as it's

written it doesn't make sense, because you know, meaning either -- and I'm looking at the word "existence." We're conflating the word existence with damages with existence of defamation per se. The word "existence" is used first for damages and then for a claim. So --

02:11PM

THE COURT: Well, defamation per se is not a claim, though.

MR. PORTNOY: But it says -- I'm sorry, Your Honor, it says existence of.

02:11PM

THE COURT: Choose a different noun.

MR. PORTNOY: Okay. Maybe that's what I need to do.

THE COURT: Let me know what noun you prefer.

MR. PORTNOY: Got it.

THE COURT: So we'll recess until you're ready.

02:11PM

MR. PORTNOY: Thank you. I'll let the Court know.

THE COURT: All right. Thank you.

MR. PORTNOY: Thank you.

(A recess was taken from 2:12 p.m. to 2:26 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

02:26PM

THE COURT: All right. Mr. Portnoy, you may proceed with your objection.

I will start by noting that the original version of this had more legalese in it, and we attempted to make it more accessible to the jury. If you prefer the original version, we

02:26PM

can go back to it.

MR. PORTNOY: My suggestion, in light of 30 -- sorry.

My suggestion in light of 30 to 32 is to put a period after "damages."

02:27PM MS. ING: 32?

MR. PORTNOY: 30 to 32 explains the elements of damages, including defamation per se.

I would suggest to the Court, it also has nominal, it also has general, special. I would suggest that just say

02:27PM damages. And then it's explained later on in great detail.

THE COURT: Well, except that -- so you're saying that you want element four to just end at "damages"?

MR. PORTNOY: Yes.

THE COURT: The problem with that is that I don't

02:27PM think the jury is going to understand why they're getting instructed on defamation per se.

But let me one -- second let. Me look at that instruction.

MR. PORTNOY: Sure.

02:27PM THE COURT: What instruction number was that again?

MR. PORTNOY: Well, there were three on damages. Let me get the exact one.

32, Your Honor.

THE COURT: Okay. Thank you.

02:28PM Ms. Ing, what's your thought on that solution?

MS. ING: My thinking is, because I had to look at these cases so much over the weekend, is that *Gold versus* -- and *Rodriguez*, both, and a whole bunch of other cases, do talk about there being four elements of damages, and how the fourth element damages means either you need to if -- it's defamation per se, then special damages are presumed. But if it's not defamation per se, then one needs to prove special damages as an element of showing defamation. Then you could get to damages.

02:28PM THE COURT: All right. I think she's right on that.

I will note your objection, Mr. Portnoy, but I'm going to overrule it.

Let me ask you, Ms. Ing, are you fine with the revisions that we made to 15?

02:29PM MS. ING: Yes. I'm fine with those?

THE COURT: Okay. 16. Any objection, Mr. Portnoy?

We tried to -- actually I think you folks tried to make this better, which I think you did.

MR. PORTNOY: That's fine.

02:29PM THE COURT: Ms. Ing, any objection to 16?

MS. ING: No, it looks good in this formulation.

THE COURT: Okay. 17?

MR. PORTNOY: No objection.

THE COURT: Ms. Ing, any objection to 17?

02:30PM MS. ING: No objection.

THE COURT: 18?
MR. PORTNOY: No objection.
MS. ING: No objection.
THE COURT: 19?
02:30PM MR. PORTNOY: No objection.
MS. ING: No objection.
THE COURT: 20?
MR. PORTNOY: None.
MS. ING: No objection.
02:30PM THE COURT: 21 -- excuse me. 20A.
MR. PORTNOY: No.
THE COURT: Okay.
MS. ING: None.
THE COURT: All right. 20B?
02:30PM MR. PORTNOY: No --
MS. ING: None, Your Honor.
MR. PORTNOY: -- objection.
THE COURT: 21.
MR. PORTNOY: No objection.
02:30PM MS. ING: None.
THE COURT: 22.
MR. PORTNOY: No objection.
MS. ING: None.
THE COURT: 23.
02:30PM MR. PORTNOY: No objection.

MS. ING: None.

THE COURT: 24.

MR. PORTNOY: Yes.

THE COURT: Okay. Let's hear what --

02:30PM MR. PORTNOY: We want our paragraph of the Hawaii law that we submitted to the Court inserted: When a civil conspiracy is established, everything said or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been so said or done by all and may 02:31PM be proved against each other whether said and done in the presence of the others or not. A civil conspiracy may be proven by circumstantial evidence.

And that's a Hawaii case.

THE COURT: Okay. I don't see a need to include 02:31PM circumstantial evidence particular to this count because the circumstantial evidence instruction --

MR. PORTNOY: That's fine.

THE COURT: -- applies to all counts.

Ms. Ing, let me hear your response to his objection, 02:31PM please.

MS. ING: Okay. I wasn't quite sure what your position is. I see your instruction. Are you thinking of adding it?

MR. PORTNOY: Yeah, adding that paragraph with the 02:31PM sentence the Court has indicated is unnecessary.

THE COURT: When a civil conspiracy is established that sentence is the one he's suggesting.

MS. ING: You're talking about your form of 31?

MR. PORTNOY: 24.

02:32PM THE COURT: Yeah, we're on 24.

MS. ING: Okay. I'm sorry. I'm just not getting what you want to add.

MR. PORTNOY: I just read it. It's in what we gave you. I just read -- you want me to read it again just so you

02:32PM know?

MS. ING: Okay.

MR. PORTNOY: You should have a copy of it.

THE COURT: Let's just have you read it slowly, just --

02:32PM MR. PORTNOY: Yeah.

THE COURT: -- for her benefit, please.

MR. PORTNOY: When a civil conspiracy is established, everything said or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been

02:32PM said or done by all and may be proved against each other, said or done in the presence of the others or not.

MS. ING: Yeah, I don't think I have a --

MR. PORTNOY: Here (handing document.)

MS. ING: No, I don't --

02:33PM MR. PORTNOY: You want to read it?

MS. ING: Yeah, let me look at it.
MR. PORTNOY: That's fine.
MS. ING: I'm pretty sure I'm okay with it, I just want to make sure.
02:33PM I'm not sure where this came from.
MR. PORTNOY: I think the Court has our briefing on it. The docket is 212. The case is *Kazuo Hashimoto*, 40 Hawaii at 354. It's an exact quote.
MS. ING: Okay. I don't believe we have an objection.
02:33PM MR. PORTNOY: Okay.
THE COURT: All right. Just one second.
Okay. So we will include that. Where do you want me to include it, in which paragraph?
MR. PORTNOY: I think after the word "defendant" in
02:33PM the second paragraph as a separate paragraph.
THE COURT: Okay right.
MR. PORTNOY: Thank you.
THE COURT: All right. We will fix that.
Okay. 25, derivative claims.
02:34PM MR. PORTNOY: We object.
THE COURT: Tell me what you object to.
MR. PORTNOY: Because we have claims other than defamation that will survive for IED.
THE COURT: Okay.
02:34PM MR. PORTNOY: The conspiracy claims, et cetera. So,

to say that if we can't prove defamation all of our claims are gone, it's just not accurate.

We have claims arising out of just, for example, the letter writing campaign, which we've spent some time on in the court trial, both sides.

02:34PM

THE COURT: Okay. So in your view, the letter writing campaign is the basis for which claims?

MR. PORTNOY: For an IED -- IIED claim, emotional infliction of a mental distress.

02:35PM

MS. ING: But your -- the formulation of the letter writing claim is also based on defamation. It talks about the false statements in the letter being for an unrelated purpose. That's how you articulated it in his derivative claim brief. So it sounds like defamation.

02:35PM

But, you know, what we are proposing in this derivative claim language is that -- to make the statement of the principle and then to give some examples of what claims would fail if certain things are not proven.

MR. PORTNOY: It's not true that if plaintiffs'

02:35PM

defamation claim fails, because the alleged posts were not defamatory, then all of our other claims fail. They're not -- they're separate. They're not -- the whole case doesn't rest on the post. I understand that that's part of our claim.

MS. ING: Right. And with respect to civil

02:36PM

conspiracy, you have to have more than just people that got

together, they have to have committed an underlying tort.

MR. PORTNOY: But that's not what --

MS. ING: -- defamation.

MR. PORTNOY: You can engage in conduct which causes IIED.

02:36PM

MR. ADAMS: Okay. But that's the underlying tort, right? The IIED is the underlying tort.

THE COURT: All right. Let's get a microphone, please.

02:36PM

MR. PORTNOY: Go ahead.

MR. ADAMS: No, I just -- Ms. Ing can perfectly handle this. I don't need to --

MS. ING: Well, I think the principle is right, that if there are certain claims that arise because you have -- you know, there's been an underlying wrong, then those claims are going to be derivative. And, for instance, the way that plaintiffs have formulated some of their claims, like IIED or -- well, actually with all of them, is that it's premised on the existence of a false statement, which -- is basically it's premised on defamation.

02:36PM

02:37PM

THE COURT: I think what Mr. Portnoy is saying is that the letter writing, which I had already said was not defamatory, is a basis for these other claims.

Is that what you're saying?

02:37PM

MR. PORTNOY: Yes.

MS. ING: Okay. When I saw his brief, I mean, the way he formulated that claim, though, was still that the letter writing was -- made untrue statements for an unrelated purpose. And that was the basis for his civil conspiracy claim.

02:37PM THE COURT: One second.

MS. ING: And my concern about this argument that it's just the letter writing, you know, is that that takes it out -- it sort of removes it from any sense that there has to be an underlying wrong that's been done.

02:38PM MR. ADAMS: I will join in on this. He's in a bit of a Catch-22. If the letter writing campaign is itself immune from defamatory, then the letter writing campaign must be connected to some other underlying tort that has to be alleged, whether it's IIED or false light. But the letters are not --

02:38PM the letter writing campaign can't be the tort, it has to be something else, because the tort -- that letter writing campaign is immune.

MR. PORTNOY: If you want, Your Honor, we can brief it.

02:38PM THE COURT: You have briefed it. I'm looking at your brief right now.

MR. PORTNOY: Yeah, I thought we had, yeah.

THE COURT: You briefed it at 213.

MR. PORTNOY: Right.

02:39PM THE COURT: I mean, I think you acknowledge in that

brief that in order for a civil conspiracy claim to be valid an underlying tort claim must be shown. I think the same would be true for an IIED here.

02:39PM And because I've held that the letter writing is not defamatory, I'm going to stick with this instruction, and the objection is overruled.

Any other -- any objection, Ms. Ing, otherwise?

MS. ING: No objection, Your Honor.

THE COURT: Okay. Instruction number 26?

02:39PM MR. PORTNOY: Same problem I have with 15, they're exactly the same.

THE COURT: All right. The objection is overruled for the same reasons.

I assume 26 is okay with the defense?

02:40PM MS. ING: It's fine, Your Honor.

THE COURT: All right. The names I wrote in are incorrect. I need to fix that. I got the last names switched.

MS. ING: Oh, yes.

THE COURT: I will fix that.

02:40PM MS. ING: I didn't notice that. Thank you.

THE COURT: 27, any objection to the negligence definition?

MR. PORTNOY: No.

MS. ING: No, Your Honor.

02:40PM THE COURT: 28?

MR. PORTNOY: No.
MS. ING: No.
THE COURT: 29?
MR. PORTNOY: You have to change the words. You have plaintiff and defendant in there all of a sudden.
02:40PM
THE COURT: On 29?
MR. PORTNOY: Yeah.
THE COURT: Okay. One second. Yeah, I see that. Thank you for catching that.
02:40PM MS. ING: What was the request? I'm sorry.
THE COURT: The paragraph that starts with "reckless disregard" means the plaintiff must --
MS. ING: Oh, yes.
THE COURT: I need to switch those. Okay. Thank you for that.
02:41PM
Any other --
MR. PORTNOY: No.
THE COURT: Ms. Ing?
MS. ING: No, Your Honor.
02:41PM THE COURT: Okay. Now we're getting to the damages, and what I'd like do is I'd like to walk through each of the damages instructions and then talk about the order.
So, any objection to the substance of 30?
MR. PORTNOY: No.
02:41PM MS. ING: None.

THE COURT: 31?

MR. PORTNOY: No.

MS. ING: None.

THE COURT: 32?

02:41PM MR. PORTNOY: No.

MS. ING: None.

THE COURT: 33?

MR. PORTNOY: No.

MS. ING: None.

02:41PM THE COURT: 34?

MR. PORTNOY: No.

MS. ING: None.

THE COURT: 35?

MR. PORTNOY: No.

02:41PM MS. ING: Nope.

THE COURT: 36 is -- 36, 37, 38 and 39 all, I think, kind of clarify the damages instructions. Any objections to those?

MR. PORTNOY: No.

02:41PM MS. ING: No, Your Honor.

THE COURT: Okay. Mitigation of damages we'll reach next, because I think the order of the -- these we can address now before we turn to instruction number 40.

So, what is the order in which the parties want to

02:42PM give these damages instructions?

Let me hear from you first, Ms. Ing.

MS. ING: Did she ask -- were you asking me first, Your Honor?

THE COURT: Yes, please.

02:42PM MS. ING: Oh, sorry.

THE COURT: Because I think I saw you filed something about the order.

MS. ING: Right. I think what we had suggested is that there would be, you know, a state -- that number 34 would

02:42PM go first. I don't have my brief in front of me.

THE COURT: Okay.

MS. ING: Because it states -- well, actually -- well, because of the way the -- no. Anyway, what I said in my brief was that --

02:43PM THE COURT: This is ECF 210.

MS. ING: -- we go with the damages, 34. And then discuss general damages, which then has other explanations. 36, 37, 38. Then address special damages.

Oh, but did I leave out per se somewhere?

02:43PM Defamation per se. Okay.

All right. So, I think the formulation we had suggested was to go with 34 first.

THE COURT: Okay. So 34, one second, is --

MS. ING: Is just damages.

02:44PM THE COURT: Damages. Okay.

MS. ING: I think actually, logically speaking, because, you know, that we did talk about the final element number four, that actually after that should come a discussion of per se, 32. And then 30, which is special.

02:44PM THE COURT: Okay. So it would -- so, let's just pause there for a moment.

So it would be damages, 34. Per se, 32. Special, 30 -- number 30. Okay.

All right. Then where would you put general damages?

02:45PM MS. ING: General I would suggest putting next, 35.

THE COURT: And then emotional distress would be 36?

MS. ING: Emotional distress would be 36. Pain and distress, 37.

Somewhere we have to put loss of future profits.

02:45PM Let's see. How does that say?

Look -- it seems as if 31 and 38 deal kind of with the calculating of damages.

THE COURT: Right.

MS. ING: And so 31, 38, and 39, which is, you know,

02:45PM another standard reasonable compensation.

THE COURT: Okay. I think that's all then. Let me just check.

Oh, we missed 33. 33 is --

MS. ING: Oh, nominal.

02:46PM THE COURT: Nominal damages.

Should we put that before 38? Or after 39?

MS. ING: I would say after 39.

THE COURT: Okay. All right. So the order would be -- and Mr. Portnoy, I'll obviously ask your thoughts on this
02:46PM after I say this.

So damages, 34.

Per se, 32.

Special damages, 30.

General damages, 35.

02:46PM Emotional distress, which is mentioned in 35, would be next, which is 36.

Pain and distress, 37.

Loss of future profits, 31.

Calculating damages, 38.

02:47PM Reasonable compensation, 39.

And nominal damages, 33.

Any objection to that order?

MR. PORTNOY: No.

THE COURT: Okay. All right. Let me just make sure
02:47PM that I don't lose track of this.

Let's turn next to mitigating damages, which is --

MR. PORTNOY: No objection.

THE COURT: -- 40.

MS. ING: No objection.

02:47PM THE COURT: 41.

MR. PORTNOY: No objection.
MS. ING: None.
THE COURT: 42.
MR. PORTNOY: No objection.
02:48PM MS. ING: No objection.
THE COURT: 43?
MR. PORTNOY: No objection.
MS. ING: No objection.
THE COURT: 44?
02:48PM MR. PORTNOY: No objection.
MS. ING: No objection.
THE COURT: 45, I'll fill that in if -- after we talk about the verdict forms.
Okay. So I have a proposed instruction that I had not
02:48PM thought of until working on this last night, which was whether or not we need some overarching instruction explaining who the plaintiffs and counterclaim defendants are.
Any objection to that? 46.
MS. ING: Good idea.
02:48PM THE COURT: It would obviously go earlier.
MR. PORTNOY: No. No objection.
THE COURT: Okay.
MS. ING: I would just -- one little correction under the first paragraph. Liane Wilson is her legal.
02:48PM THE COURT: Great. Thank you. Okay.

MR. PORTNOY: Your Honor, I want to get back to the conspiracy one.

THE COURT: Okay.

02:49PM MR. PORTNOY: Because you are essentially saying that if we can't prove defamation we have no claim.

THE COURT: What --

MR. PORTNOY: Wait, wait, let me just explain is it so you'll know.

THE COURT: I think I know, but go --

02:49PM MR. PORTNOY: The letter writing is one element. There are the conversations with The Daily Beast. There are the subsequent e-mails that came from the group.

Now, the jury may or may not think that that is sufficient for IIED, but they're entitled to hear it.
02:49PM Defamation is not our only claim. The defendants have admitted they talked to The Daily Beast. They say that nothing they said made it into the articles, but that's for the jury. We have the subsequent e-mails coming every month for the next year.

02:49PM THE COURT: Are you saying that The Daily Beast was -- article was defamatory?

MR. PORTNOY: It doesn't have to be defamatory.

THE COURT: Then what's the harm?

MR. PORTNOY: It's the participation in a group effort
02:49PM to injure my client.

THE COURT: To injure with what tort?

I mean, my understanding is that there needs to be a tort that they conspired to commit. And I might be getting the elements language wrong, but just getting together and talking to a newspaper is not a tort.

MR. PORTNOY: How about getting together to decide that we're going to say things about somebody that causes them emotional distress?

THE COURT: That's defamation. I mean -- but the cause of emotional distress is the result of defamatory statements. Right?

MR. PORTNOY: Not necessarily. But I think we disagree on this, so I'm just making a record.

THE COURT: Okay. Ms. Ing, did you want to say anything?

MS. ING: Again, I think the problem in his client's formulation of conspiracy is that anytime someone gets together and says something it's a conspiracy. And it's sort of unanchors it from the whole fact that you need an underlying wrong.

THE COURT: Yeah, I think the case law is pretty clear on that.

Okay. Let's talk about the Uriyama case -- excuse me, the *Uyemura* case.

I'm not inclined to give the instruction with regard

to -- that the defendants are asking for with regard to attorney's fees.

So, I'll let you make a record on that, Ms. Ing, and then I will explain my reasoning.

02:51PM MR. ADAMS: May I, Your Honor?

THE COURT: You may.

MR. ADAMS: Thank you.

We had seen the ruling either last night -- I saw it this morning and so I didn't put the evidence on the bill, so

02:51PM we disagree with the Court's ruling with *Uyemura*, but we accept it, so we just didn't move forward.

THE COURT: Great. Thank you for that.

I will say that if you look at *Uyemura*, which is 57 Hawaii 102 at 108, it outlines some elements for recovery of

02:52PM attorney's fees, including whether the fees were the natural and necessary consequence of the defendants' act, since remote, uncertain and contingent consequences do not afford a basis for recovery.

In my mind this is one of the reasons why this

02:52PM instruction wouldn't be given. The tortious act here is defamation. And I don't see how the act of defamation alleged here would have resulted in the natural consequence of involvement with regard to the child custody issue.

So that's not going to be given. All right.

02:52PM MS. ING: Your Honor, could I just say something --

THE COURT: Sure.

MS. ING: -- on that?

And I would just put on the record that our contention is otherwise, that Ms. Wilson has testified that whole purpose of her doing all this is to advocate for different family -- you know, to advocate for families that are going through custody battles. So the whole purpose of her saying all these things about people was to goad people into -- it just made, you know, the Family Court process much more expensive because of the fact that she was egging people on to fight in Family Court on baseless grounds.

THE COURT: All right. Understood.

Okay. Let's turn next to the question of verdict forms.

You should have been given by Ms. Cortez a sample, potential verdict form, which is a combination of the two options that I had e-mailed you -- I can't remember when at this point.

But before we get to this template, I have two big picture questions. And one I know which way I'm leaning on and the other one I'd really like to hear from the parties about.

The first is, I think that at least with regard to the defendants, it makes sense to have separate verdict forms for each of them for the first amended complaint. I think that makes sense.

But my dilemma for that, and with regard to the plaintiffs as counterclaim defendants, is I don't know how to treat the plaintiffs, period.

So, for example, would we have a separate verdict form for each plaintiff for the counterclaims? Would we have a separate verdict form for each plaintiff and each defendant for the first amended complaint?

And the reason why I'm asking that is I believe there was testimony that Ms. Wilson made on the stand that she and Life Mastery are one and the same. And I'd like to be able to treat them as one and the same, but I don't know what the parties' positions are on that. And the reason why I'm asking that is I think it really matters for how the special verdict forms look.

So let me ask you, Mr. Portnoy, what's your view on how we handle your clients in these verdict forms.

MR. PORTNOY: I think we can handle them as one in the same.

THE COURT: Okay. So, what I will propose then is that the verdict forms reflect that.

So I could, in instruction number 46, which is the new one that I proposed, add a sentence after the first paragraph, it says: In these instructions the terms "plaintiffs" and "counterclaim defendants" refer to Liane Wilson and Life Mastery LLC. You are to treat -- excuse me. You are to treat

Ms. Wilson and Life Mastery as one in the same.

I don't know if I need to say that here or what, but I can -- I can do that.

Would that make sense to the parties or not really?

02:56PM MR. ADAMS: Certainly with respect to her being a sole proprietorship, which she testified to on the 5th, which is on page 3-19 of the transcript from the 5th.

Are you a sole proprietor of Life Mastery, right?

Yes.

02:57PM So certainly for that, that she is one in the same because it's a sole proprietor, it's a dba.

THE COURT: Okay. Any objection, Mr. Portnoy?

MR. PORTNOY: No.

THE COURT: Okay. So the proposed instruction 46 will

02:57PM say: You are to treat Ms. Wilson and her LLC -- or I'll make it clearer, Life Mastery LLC, as one in the same. Okay.

All right. So that makes the verdict forms easier in my mind.

So with regard to the verdict forms then, I think that

02:57PM we would have -- let's focus on the first amended complaint. We'd have special verdict forms for each defendant with regard to the first amended complaint. Okay?

With regard to the counterclaims, do we need special verdict forms by counterclaimant?

02:58PM MR. ADAMS: I think what we had done is have the box,

right, to check with the three on there, is that what --

THE COURT: So maybe it makes more sense to talk about the verdict form now instead of -- okay. So if you could look at what I handed out to you. This is kind of what I envisioned being a template for the verdict forms. And so let's walk through that, because I'm not sure I've entered this on the record.

02:58PM

So right now it would say, for example: The following question pertains to the statement in Exhibit 2 that Liane or Liana really does encourage false police reports. And "really does encourage false police reports" will be in quotation marks.

02:58PM

The first question is did: Defendant Paula Haygarth make this statement? Yes or no.

If you answered yes, proceed to the next question. If you answered no, proceed to question number blank. And question number blank would obviously be the next allegedly defamatory statement.

02:58PM

Question two is: By making that statement did defendant Paula Haygarth commit the tort of defamation? In other words, have plaintiffs proven the elements of defamation for that statement? Yes or no.

02:59PM

If you answered yes, proceed to the next question. If you answered no, proceed to question number blank, which would, again, obviously be the next allegedly defamatory statement.

02:59PM

The third question is: Has defendant Paula Haygarth proven the statement is true? Yes or no.

If you answered no, proceed to the next question. If you answered yes, proceed to question number blank.

02:59PM So, I know I had originally talked about doing boxes of defamatory statements, but I think it gets a little bit too cumbersome, because I do think we need to have a verdict as to the affirmative defenses for these.

So let me ask Mr. Portnoy, as to this template, what

03:00PM are your thoughts?

MR. PORTNOY: This is where we have an issue on who determines whether a statement is opinion or hyperbole. Because my reading of the law is it is a question of law. It's been stated by our Supreme Court and courts all over the

03:00PM country.

And I believe the Court -- I don't have it in front of me, but I can get it. In the motions that defendants filed for summary judgment, you actually said that you found several statements to be either opinion or hyperbole, impossible of

03:00PM being proven true or false, but we hadn't filed a Motion for Summary Judgment. I appreciate that.

But I believe that there needs to be two additional questions.

One, is the statement opinion? And there's earlier

03:01PM instruction on what opinion -- it doesn't use the word

"opinion," but what opinion is.

THE COURT: What instruction number is, that if you can refresh my --

MR. PORTNOY: I think it's on the elements of defamation. Let me find it, please.

03:01PM

Yeah, whether the statement in question is susceptible of being proven true or false. And then you have the whether the parties figuratively or hyperbolic language.

MR. YOUNG: Number 16.

03:01PM MR. PORTNOY: Yeah, 16.

But that's not in the verdict form. The jury is not given a chance to determine that. I mean, I don't think it's a jury question anyway, but if the Court feels it is, then I think it needs to be there. Because if this case goes up on 03:01PM appeal, which is quite likely, one of the things the appellate court is going to have to decide is whether the jury was given the option of determining that a statement, although potentially defamatory, is not susceptible of relief because it's opinion or it's hyperbole. And so they're not given that 03:02PM option. And that's a critical defense, to both sides, frankly. So --

THE COURT: All right. Let me hear, Ms. Ing, your thoughts on this.

MS. ING: Just a second, Your Honor.

03:02PM THE COURT: I mean, I think, you know, one of the

things that this instruction 16 covers --

MR. ADAMS: That's what we were thinking is that it should be in the instructions, which is then referenced in the verdict form.

03:03PM THE COURT: Right. So instruction 16 tells the jury that a statement must imply an assertion of objective fact that covers figurative or hyperbolic language, right? So, you know, that's one of the things they consider, and whether the question is susceptible to being true or false.

03:03PM MS. ING: Your Honor, I think my assumption was that it was going to be part of the jury's decision-making when they decide whether there has been defamation, or if defamatory meaning has been met.

THE COURT: Right.

03:03PM And so -- and this is from *Cahill versus Hawaiian Paradise Park Corp.*, 56 Hawaii 522, 527. If the publication considered as a whole is susceptible to both an innocent and defamatory meaning, it is for the jury to determine the sense in which it was understood.

03:04PM And I'm sorry, the case that was citing to *Cahill* was *Thompson versus Saint Louis School*," 125 Hawaii 242, which is a ICA case. And also *Beamer versus Nishiki*, 66 Hawaii 572 supports this.

So in my mind, when I said earlier today that if there

03:04PM was some gray area, it is left to the jury, I think this is

what I had in mind. That if a publication concerted as a whole -- considered as a whole, it's susceptible to both an innocent and defamatory meaning, it is for the jury to determine the sense in which it was understood.

03:04PM And I think that instruction number 16 tells the jury that to be false and defamatory, a statement must imply an assertion of objective fact. Which in my mind means not an opinion.

To determine whether statement -- whether a 03:05PM statement -- I need to fix that -- implies an assertion of objective fact, you may consider whether the general tenor of the work, the entire work, negates the impression that the party was asserting an objective fact, whether the party used figurative or hyperbolic language that negates that impression, 03:05PM and whether the statement in question is susceptible of being proved true or false.

So in my mind these instructions cover your -- the plaintiffs' concern and can be easily argued to the jury.

MR. PORTNOY: But it doesn't, because what you just 03:05PM read indicates that there are three determinations, and this just -- then why are you asking the jury to determine whether the statement is true?

THE COURT: Because that's an affirmative defense. I'm treating that as an affirmative defense, that the opposing 03:06PM party needs to prove by a preponderance.

MR. ADAMS: Versus hyperbole, which makes it non-defamatory.

MR. PORTNOY: You indicated in what you read from the case you were reading from, there are three elements; truth, 03:06PM opinion, and hyperbole. We're asking the jury to determine whether this statement is true or not.

THE COURT: It's not truth, it's whether the statement is susceptible of being proved true.

MR. PORTNOY: I made my record, Your Honor. No reason 03:07PM to beat it to the ground.

THE COURT: Okay.

MR. PORTNOY: I still believe, you know, the record will reflect that I believe that, even the Court suggested at an earlier time, looking at specific statements which are now 03:07PM before the jury, were not susceptible of being proven true or false were opinion or hyperbole.

And I do believe that the preliminary decision on that is a legal one. But you've indicated you're going to send it to the jury. But I'm making my record, that if it does get 03:07PM sent to the jury, I think they are -- they should be ruling on that in their verdict form so that an appellate court can determine whether that was or was not considered by the jury.

But that's my record. And we can move on.

THE COURT: All right. Let me ask you what you're 03:08PM asking -- let's put aside for a moment the additional findings

you want me to ask the jury to make.

Are you suggesting that I enter legal conclusions at this point about whether things -- statements that the parties are saying are defamatory are legally opinion? Do you want me to do that?

03:08PM

MR. PORTNOY: Well, I -- you know, it's a legitimate question. I just want to make sure that the law is -- and if you're reading law that says that you find that they are for the jury, that's fine. I understand that. You know, you don't have to find, even if you agree with me that it's a question of law, that the particular statement falls into one category or another.

03:09PM

But I think the question is, and is that issue a question of law or fact? And if you're determining it's a question of fact, I understand.

03:09PM

THE COURT: But I guess that's what I'm asking, because I'm not totally sure what -- putting again aside for the moment --

MR. PORTNOY: Right.

THE COURT: -- the question of the actual finding of it --

03:09PM

MR. PORTNOY: Right.

THE COURT: -- are you telling me that you think it is a question of law that I should be deciding and not the jury as to whether some of these statements are opinion, for example?

03:09PM

MR. PORTNOY: Yes, I do. But I mean -- the short answer is yes. But I'm happy to go back and look at this, and you've already -- you know, and submit a short brief on that one way or the other and go from there.

03:10PM I know it's a lot of work for the Court, and it's also a lot of work for the jury. But I think what you're saying is, it's a jury question, and they don't have to be asked it specifically. It's something they should infer from the instruction.

03:10PM THE COURT: It's not something they should infer, it's something that they are told. And I'm not saying it's always --

MR. PORTNOY: Okay.

THE COURT: I'm not saying it's always a jury

03:10PM question, what I'm saying is under Hawaii law that it seems to me when a statement is susceptible -- again, let me read that passage.

MR. PORTNOY: Sure.

THE COURT: When a statement as a whole is susceptible

03:11PM to both an innocent and a defamatory meaning, it is for the jury to determine the sense in which it was understood.

MR. PORTNOY: Right.

THE COURT: And so in my mind --

MR. PORTNOY: But that -- go ahead.

03:11PM THE COURT: -- it is for the jury to decide whether a

03:11PM statement is defamatory.

MR. PORTNOY: An opinion -- or opinion or hyperbole? I don't think those words were used in what you just read. Whether it's susceptible or defamatory meaning is a different issue. It could be, arguably -- well, it's not going to be fact, but it could be a statement that is not provable of being true or false, but still be defamatory.

THE COURT: No. It can't be. Give me an example.

MR. PORTNOY: Well, there were lots of statements in this case that are on their face, without any interpretation of it.

THE COURT: Give me an example. Help me think of one.

MR. PORTNOY: Witch. Someone is a witch. Just to use one.

THE COURT: Okay.

MR. PORTNOY: I mean, can the jury determine whether that's defamatory or not, or whether that's opinion, or hyperbole?

THE COURT: Are you saying that the statement "witch" -- there's a legal answer to that question of whether or not that's defamatory?

MR. PORTNOY: I think that someone has to decide whether that is an actionable, let me use that word, statement or not. I think when we start throwing around these other words it gets a little clouded.

So, my -- my position is, and using the word witch, someone calls someone a witch, who decides whether that is not actionable because it can't be proven true or false?

MS. ING: I would argue --

03:13PM MR. PORTNOY: But --

MS. ING: -- that it really does depend on the case. In this case, for instance, we have a client who was doing counseling, life -- and if someone calls her a witch, you know, that could be damaging.

03:13PM MR. PORTNOY: I -- I understand what the Court -- I'm just making a record.

THE COURT: I understand.

MR. PORTNOY: The Court has decided that the issue of whether a statement is capable of being actionable is up to the

03:14PM jury. So let's segment that separately. Okay?

THE COURT: I don't -- I think --

MR. PORTNOY: Go ahead.

THE COURT: I don't -- I think that's somewhat unfair and oversimplifying.

03:14PM Let's start by saying that there have been no plaintiffs' motions on this at all. Okay?

MR. PORTNOY: Sure.

THE COURT: So, let's start with that.

I'm not saying that whether a statement is actionable

03:14PM is for the jury to decide. What I am saying is that when there

is a statement that is subject to more than one interpretation, the jury gets to decide how to interpret that.

MR. PORTNOY: Okay.

THE COURT: And that's what the context that they are given of what's happened in the case and the other parts of the statement.

So you've made your record. You know, depending on how this turns out, there could be post-trial motions on this, obviously. But that's -- that's my ruling.

Okay. So returning then to the verdict format.

MR. PORTNOY: Just so the record is clear, Your Honor.

THE COURT: You've made your record.

MR. PORTNOY: No, no, no, but very quick.

The second part of my objection, just so it's there, is that if it is, in fact, in your view a jury question, the jury should be asked that on the jury form. I'm done.

THE COURT: Okay. I don't think the jury needs to be asked it on the jury form because they're instructed as to what a defamatory statement is.

Okay. Now, Ms. Ing, what are your thoughts on my proposed verdict form as a template?

MR. ADAMS: We like it.

MS. ING: Yeah, it's -- the proposed one looks fine, looks good to us.

THE COURT: Okay. So let's talk about the verdict

forms then.

You folks have sent to me, at my request, the statements that you believe should go to the jury. What I'm going to ask you to do is that you meet and confer and come up with a jointly proposed verdict form utilizing this template. Okay?

03:16PM

I understand it's going to be long, because there are a lot of statements. But I would like a proposed verdict form using this as a template. You can file it as late tonight as you want. I would like to look at it first thing tomorrow morning. So, I will get to work super early tomorrow just to start taking a look at it. But it should look quite a bit like this template.

03:16PM

So there should be one special verdict form for the --

03:16PM MR. ADAMS: Plaintiff. Plaintiffs.

THE COURT: Sorry. No, there should be three special verdict forms for the first amended complaint. One for each defendant. Okay?

For the counterclaims, I think there should be three special verdict forms, one for each counterclaimant. Okay?

03:17PM

So a total of six special verdict forms, with the template outlined here.

I am going to have my cellphone close to me all night. So if in the course of communicating with each other you reach a roadblock and you need to get in touch with me, go ahead and

03:17PM

e-mail me and let me know the best way to get in touch with you, and I will make that happen. And then we can make a record of it tomorrow morning.

MR. ADAMS: Get in touch with you through Otake orders?

03:17PM

THE COURT: No, you can use my e-mail address that I ask that you do not share with any of your clients, please. [redacted].

MR. ADAMS: [redacted] --

03:18PM MS. ING: [redacted].

MR. ADAMS: Thank you.

THE COURT: So I would suggest that you do start working on that before anything else. Well, except that you have the briefing obviously on the -- I've already lost track. One second.

03:18PM

Oh, on the statements, which statements can be included in the verdict form.

So, obviously there's going to be some disagreement on that.

03:19PM Okay. Is there anything else that needs my attention before we talk about closing arguments?

MS. ING: I don't believe so, Your Honor.

THE COURT: Okay. Thank you.

Let's talk next then about the length of closing arguments.

03:19PM

Mr. Portnoy, how much time do you want combined for your closing and your rebuttal?

MR. PORTNOY: Why don't you tell me how much time you're going to give me, save us a lot of trouble.

03:19PM THE COURT: Well, honestly, if you were going to ask me for an hour and 15, I was going to give you an hour 15.

MR. PORTNOY: No, I don't need an hour 15.

THE COURT: All right.

MR. PORTNOY: Give me an hour and I won't use it.

03:19PM THE COURT: All right. Wise man, wise. Okay.

MR. ADAMS: Same.

THE COURT: Well, okay. That's not that I was expecting, not that I wasn't expecting you guys to be wise, but I've just had many lawyers for much more time than they need.

03:19PM An hour each total, it is.

I will ask if you have PowerPoint slides that you plan on using, that you obviously show them to each other sooner rather than later.

I am expecting that we will need to go on the record 03:20PM before the jury shows up tomorrow. So be in the courthouse possibly around 9:00 just to be safe. Unless you think that -- unless you think that you really have resolved everything this evening, which I think is unlikely.

So we'll see everybody -- I will be here ready to go 03:20PM at 9:00. And we'll figure out from there what needs to be

addressed? Okay?

All right. Thank you, everyone.

MR. PORTNOY: Thank you.

THE COURT: See you at 9 o'clock.

03:22PM (The proceedings concluded at 3:22 p.m., August 11, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 11, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC