IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIFE MASTERY NETWORK LLC, a Nevada limited liability company dba LIANA SHANTI ENTERPRISES and LIANE WILSON, also known in the Community as LIANA SHANTI,<br><br>Plaintiffs/<br>Counterclaim Defendants,<br><br>vs.<br><br>PAULA HAYGARTH, BYRON HORVATH, STEFANIE HORVATH, JANE DOES 2-10, and JOHN DOES 1-10,<br><br>Defendants/<br>Counterclaimants. | CIVIL NO. 25-00297JAO-RT<br><br>Honolulu, Hawaii<br>August 12, 2026<br><br>JURY TRIAL - DAY 8 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JILL A. OTAKE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs/ Counterclaim Defendants: | JEFFREY S. PORTNOY, ESQ.<br>TROY C. YOUNG, ESQ.<br>Cades Schutte<br>1000 Bishop Street, Suite 1200<br>Honolulu, Hawaii 96813-4212 |
| For Defendants/ Counterclaimants: | JOSEPH B. ADAMS, ESQ.<br>LOUISE K.Y. ING, ESQ.<br>LAURA P. MORITZ, ESQ.<br>Dentons US LLP<br>1001 Bishop Street, Suite 1800<br>Honolulu, Hawaii 96813 |

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X

| | PAGE |
|---|---|
| Closing argument by Mr. Portnoy..................... | 42 |
| Closing argument by Mr. Adams...................... | 60 |
| Rebuttal closing argument by Mr. Portnoy........... | 89 |
| Rebuttal closing argument by Mr. Adams............. | 98 |

WEDNESDAY, AUGUST 12, 2026 9:52 A.M.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery LLC, et al., versus Paula Haygarth, et al. This case is being called for jury trial, day eight.

Counsel, please make your appearances for the record, starting with the plaintiff.

MR. PORTNOY: Good morning, Your Honor. Jeff Portnoy, Jenny Tokuoka, and Troy Young for the plaintiffs.

THE COURT: Good morning.

MR. ADAMS: Good morning, Your Honor. Joseph Adams, Laura Moritz and Louise Ing for defendants and counterclaimants.

THE COURT: Good morning. You may all be seated.

Ms. Cortez is handing out to you a template for the special verdict form. And I thank everyone for burning the midnight oil to get me their drafts.

What I would like to do is I would like to walk through this with you, and then decide if this template works for everyone as the method by which we will do all of the verdict forms. And my staff and I will do all of the verdict forms.

So, let me also say that what we will do after this conference is, we will bring the jury in, we will read them the

jury instructions, we will recess for two hours to finalize the verdict forms, and then we will proceed to closing argument. Okay?

So let's start with the verdict form template that you have in front of you, which is titled Special Verdict Form as to Paula Haygarth's Counterclaims Against Plaintiffs.

So let's go through statement one as an example.

So, you will see that I mostly used the defense template, but there are some changes to it. So, for example, it would say: By making the following statement, did plaintiffs commit the tort of defamation against counterclaimant Paula Haygarth? In other words, has Paula Haygarth proven the elements of defamation for that statement?

The statement is then outlined with an exhibit number, yes or no.

If you answered yes, please go to the next question.

If you answered no, please go to the questions under the heading: Statement two.

So if they answered yes, they would go to the next question, which would be, Have plaintiffs proven the statement is true? Yes or no.

If you answered no, please go to the next question.

If you answered yes, please go to the questions under the heading: Statement two.

So if they answered yes, then they'd go to the false

light question, which says: By making that particular statement, did plaintiffs commit the tort of false light against Paula Haygarth? In other words, has Paula Haygarth proven the elements of false light with respect to that statement?

09:55AM

And then they would go to the next question.

So rather than in the defendant's template, which said please go to question blah, blah, blah, I think this makes it a little easier for me to use as a template so that I'm not filling in question numbers as we go along.

09:55AM

So then we do the same thing for the following statements. And it says, for example: By making the following statement, did plaintiffs commit the tort of defamation against Paula Haygarth? In other words, has Paula Haygarth proven the elements of defamation for that statement?

09:55AM

And then we include the statement again, and we go through the same process.

We do this for statements one, two, three, four, five, and six.

09:56AM

You will see on Page 8, I have basically included, I think, what the defendants had proffered in their proposed verdict form.

So 19, question 19, which would be for any or all of the statements one through six for which you found that the tort of defamation was proved, and that the statements were not

09:56AM

true, which of those statements, if any, did you find to be defamation per se?

And then there would be the statement numbers.

And then, if you filled in any of that in, please go to the next question.

And Ms. Cortez, if you could grab the jury instructions, please. Thank you.

If you did not, please go to the questions under the heading: Damages for defamation that is not defamation per se.

09:57AM All right. So that's the process for that.

And then we do the same thing with regard to false light.

And so let me -- before we move any further, let me ask if there are any problems with this so far.

09:57AM MS. ING: No, Your Honor.

MR. PORTNOY: Same objection I raised yesterday, Your Honor, that I believe there needs to be a question as to whether the statement is opinion or hyperbole, but the Court's already ruled but I need to make a record that I think that's a critical question to ask. And we made our argument yesterday.

THE COURT: Okay. So noted.

And next then we will have the defamation per se statement seven.

Ms. Ing, I will need the exhibit numbers for those. We found the others on our own, but if you could give those to

Ms. Yamasaki at the end of this hearing while we're waiting for the jury, that would be helpful.

MS. ING: Yeah, no problem.

THE COURT: Okay. And so then it will say, obviously, 09:58AM what is listed here. I condensed the passages that you had included, so that it's only addressing the statements about the abandonment. And then the punitive damages question.

Any issue with that so far, those additional points?

MS. ING: No, Your Honor.

09:59AM THE COURT: All right. Thank you.

Mr. Portnoy?

MR. PORTNOY: No.

THE COURT: Okay.

MR. PORTNOY: Other than what I just stated.

09:59AM THE COURT: Okay. A couple things that I wanted to check.

One was for -- I think it was the punitive damages. The defense had separated them out by plaintiff. I didn't do that because yesterday there was an agreement that the -- that 09:59AM the plaintiffs are one in the same. And so I just wanted to note that, make sure that you saw that.

MR. PORTNOY: Correct.

THE COURT: Okay. A couple of things.

This is a minor nit where we have per se italicized in 09:59AM some places and not others. So we're going to fix that.

This is a bigger issue -- this next issue is a bigger issue.

One is that statement number five, which is Exhibit Number 1077, it's all in plain sight hash tag pedos, hash tag 10:00AM kidnappers. You'll recall that that exhibit has a bunch of photos beneath it. We did not see a photo of Mr. Horvath in that exhibit. And so for that reason we don't intend to include that statement number five in his verdict form. Is that fine?

10:00AM MS. ING: Yes, Your Honor.

MR. ADAMS: Can we confirm that he's not?

THE COURT: You can do that during the break.

MR. ADAMS: Okay. Thank you.

THE COURT: I didn't --

10:00AM MR. ADAMS: I think you're right, I just wanted to make sure he didn't shave his beard or something.

THE COURT: No, that's a fair point. He may have looked different in a photograph than he appears in court. So I'll let you look at that.

10:00AM MR. ADAMS: Thanks.

THE COURT: And then finally, for the "Jesus we ask you to delete and destroy," there was -- on statement number two, "Jesus we ask you to delete and destroy all evil within and emitted from black magic Reiki which Paula Haygarth, Paula 10:01AM Haygarth."

Paula Haygarth's name does appear both times in that exhibit. Do you have a problem with me taking out that second one just so that it's cleaner looking?

MS. ING: No, Your Honor.

10:01AM THE COURT: Okay. All right. So that's going to be the template that I am -- my staff and I are going to use during the two-hour break to create the verdict forms. You will have a chance to look at them before they go back to the jury.

10:01AM So, again, we're actually -- that took less time than expected. So hopefully Ms. Parker in the jury room is listening and we can bring the jurors up to read the jury instructions.

MR. PORTNOY: I have one question --

10:01AM THE COURT: Yes.

MR. PORTNOY: -- on procedure, I guess, on what's going to happen.

If the closings end 3:00, 3:30, are you going to keep the jury here? I mean, I just need to know where to go. Or 10:02AM you're going to have them come back start deliberating tomorrow?

THE COURT: What I will do is send them back to the jury deliberation room and let them make that decision.

So they've already been informed that they should 10:02AM expect to be here until around 3:30 or 4 o'clock today.

So the short answer is, I don't know.

MR. PORTNOY: That's fine. Thank you.

THE COURT: Anything else?

MR. PORTNOY: No.

10:02AM THE COURT: Okay. Everybody should have received the Court's jury instructions last night.

When we bring the jurors in, I am going to tell them what the plan is for today. Explain to them that everybody was up quite late working on this, and that we think it's going to

10:02AM be most efficient for them to take a two-hour break.

Lunch is going to be on the court today, so they are going to have lunch brought to them. And obviously I will tell them not to engage in any discussions until they're actually deliberating.

10:03AM MR. PORTNOY: One other thing I mentioned to your staff, I don't know if they mentioned to you. My hip is acting up today, and I had asked the staff to ask you whether if I need to I can do my closing, or at least part of it, sitting down.

10:03AM THE COURT: That's fine.

MR. PORTNOY: Is that fine?

THE COURT: That's fine.

MR. PORTNOY: Okay. Thank you.

THE COURT: And they did tell me that.

10:03AM And so then I will walk the jury through the logistics

for the day. I'll read them the instructions. We're going to recess for two hours, and then we're going to come back two hours after that for closing arguments. Okay?

MR. PORTNOY: Yes.

10:03AM THE COURT: All right. I'll step off the bench while we bring the jurors in.

MR. ADAMS: Thank you, Your Honor.

(A recess was taken from 10:03 a.m. to 10:06 a.m.)

(The following proceedings were held in open court in

10:07AM the presence of the jury:)

THE COURTROOM MANAGER: Civil Number 25-00297JAO-RT, Life Mastery Network LLC, et al., versus Paula Haygarth, et al. This case has been called for jury trial, day eight.

Counsel, please make your appearances for the record

10:07AM starting with the plaintiff.

MR. PORTNOY: Morning, Your Honor. Jeff Portnoy, Troy Young, and Jenny Tokuoka for the plaintiffs.

THE COURT: Good morning.

MR. ADAMS: Morning, Your Honor. Joseph Adams, Laura

10:07AM Moritz, Louise Ing on behalf of defendants and counterclaimants.

THE COURT: Good morning.

You may be seated.

Welcome back, ladies and gentlemen. Thank you for

10:07AM your patience. I know I had told Ms. Parker we were running a

half hour late and then we weren't. So I appreciate that. We've been kind of, you know, giving you a little bit inconsistent information this morning.

Before I read to you jury instructions, let me tell you what the plan is for today.

10:08AM

So we're going to go -- I am going to read you the jury instructions, and I will ask that you follow along with me, but don't turn the page ahead of time. Okay?

I'm going to try to read them as slowly as I can so that they are digestible and so that you can understand them.

10:08AM

After we are done with the jury instructions, we're going to take a two-hour break. And the reason why is because we are finalizing some paperwork that you will need. I can assure you that the attorneys and their staff and myself and my staff were up quite late last night just to get as much done as we could. There are a few final things that we want to get done and we think the two hours will give us that time.

10:08AM

The good news is, number one, lunch is on us today. So you get lunch paid for by the court.

And two, if you want to leave the courthouse and walk around during those two hours, you can. So I'm sorry that you're going to be waiting for a bit, but hopefully it's not going to be uncomfortable for you or expensive for you.

10:08AM

And then after that, you will come back in and we will proceed with closing arguments. Both sides have been given an

10:09AM

hour total, and we will start with the plaintiffs, then the defense, and then they both get rebuttal. And that hour timeframe is for both their full closing and their rebuttal.

And then after that, depending on what time it is, you

10:09AM may choose to go back into the jury room and start your deliberations, or you will go back into the jury room and just tell us that you're going to come back tomorrow to deliberate. Okay?

So that's the plan for today.

10:09AM We will have a short break during the closing arguments just so that you can use the restroom and whatnot. So after the plaintiffs' closing argument we'll take a stretch break, then we'll hear the defense closing argument. And then we'll take probably about a ten-minute break before the

10:09AM rebuttals. Okay?

That's a lot of information I've thrown at you. I will try and reiterate some of that as we proceed through the day so it's not confusing.

I also know Ms. Parker is listening to me as I speak

10:10AM and she will remind you of what the schedule is if you have any questions for her. Okay.

So with that, if you could turn to the first page, instruction number one. It's technically the second page, but it has Page 1 at the bottom. And if you could follow along

10:10AM with me as I read the instructions to you, please.

And let me get myself some water, just because I know I'm going to need it. One second. Thank you. Okay.

Members of the jury: Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not. You must decide the case solely on the evidence and the law. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. You will recall that you took an oath promising to do so at the beginning of the case.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

Instruction number two. Some of you took notes during the trial. Whether or not you took notes, you should rely on

10:12AM

your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes, or those of other jurors.

Instruction number three. The evidence you are to consider in deciding what the facts are consists of:

One, the sworn testimony of any witness;

Two, the exhibits that are admitted into evidence;

Three, any facts to which the lawyers have agreed; and

Four, any facts that I have instructed you to accept as proved.

10:12AM

Instruction number four. In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

10:13AM

(1) arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

10:13AM

(2) questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of

10:13AM

evidence. You should not be influenced by the objection or by the Court's ruling on it.

(3) testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered. In addition, some evidence may be received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

(4) anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

Instruction number five. Rules of evidence control what can be received into evidence. During the course of trial, when a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer may have objected. If I overruled the objection, the question was answered or the exhibit received. If I sustained the objection, the question was not answered and the exhibit was not received.

Whenever I sustained an objection to a question, you must not speculate as to what the answer might have been or as to the reason for the objection. You must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken from the record; such matter is to

be treated as though you had never known of it.

Instruction number six. Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as the testimony by a witness about what the witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

Instruction number seven. In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see

or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

10:17AM

(5) the witness's bias or prejudice, if any.

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

10:17AM

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

10:17AM

10:17AM

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

10:18AM

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

10:18AM Instruction number eight. When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

10:18AM You should base your decision on all the evidence, regardless of which party presented it.

Instruction number nine. When a party has the burden of proving any claim by clear and convincing evidence, it means that the party must present evidence that leaves you with a 10:19AM firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

10:19AM Instruction number ten. Certain testimony has been read into evidence from depositions. A deposition is testimony taken under oath before the trial and preserved in writing. You are to consider that testimony the same as if it had been given in court.

10:19AM Instruction number 11. You should decide the case as

to each party separately. Unless otherwise stated, the instructions apply to all parties.

10:20AM Instruction number 12. In these instructions, the terms "plaintiffs" and "counterclaim defendants" refer to Liane Wilson and Life Mastery Network LLC or Life Mastery. Unless otherwise indicated, you are to treat Ms. Wilson and Life Mastery as one and the same.

The terms "defendants" and "counterclaimants" refer to Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath.

10:20AM Instruction number 13. Plaintiffs/counterclaim-defendants, Liane Wilson and Life Mastery, assert the following claims against defendants/counterclaimants Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath:

10:20AM Count 1, defamation.

Count 2, false light.

Count 3, intentional infliction of emotional distress.

Count 4, civil conspiracy.

Liane Wilson and Life Mastery have the burden of proving these claims. 10:21AM Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath deny these claims.

Defendants/counterclaimants, Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath assert the following counterclaims against plaintiffs/counterclaim defendants, Liane Wilson and Life Mastery: 10:21AM

Count one, defamation.

Count two, false light.

Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath have the burden of proving these counterclaims. 10:21AM Liane Wilson and Life Mastery deny these counterclaims.

Instruction number 14. Plaintiffs claim that each of the defendants made false and defamatory statements about them. To prevail on a defamation claim against a defendant, the plaintiffs must prove the following elements against that 10:22AM defendant:

1. A false and defamatory statement by the defendant concerning the plaintiffs;

2. An unprivileged publication of the statement by the defendant to a third party;

10:22AM 3. Fault amounting to actual malice; and

4. Damages, meaning either the existence of special damages caused by the publication or the existence of definite defamation per se, which presumes damages and thus, does not require a showing of special damages. There are also 10:22AM instructions defining defamation per se and special damages.

Plaintiffs must prove elements one, two, and four by a preponderance of the evidence against each defendant, and must prove element three, actual malice, against each defendant by clear and convincing evidence.

10:22AM Instruction number 15. A communication is defamatory

when it tends to harm the reputation of another as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her.

10:23AM Whether a communication is defamatory depends on the social climate, current public opinion, and local setting.

To be false and defamatory, a statement must imply an assertion of objective fact. To determine whether a statement implies an assertion of objective fact, you must consider:

10:23AM (1) whether the general tenor of the entire work negates the impression that the party was asserting an objective fact; (2) whether the party used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false.

10:24AM Instruction number 16. "Publication" for a defamation claim means a communication to some third party other than the person allegedly defamed.

Instruction number 17. Online speech stands on the same footing as other speech.

10:24AM Instruction number 18. Actual malice consists of deliberate falsification of facts or reckless disregard of the truth of the statement; in other words, it requires that the defendant acted with knowledge that the statement was false or with reckless disregard of whether it was false or not.

10:25AM Reckless disregard means the plaintiff must demonstrate that

the defendant in fact entertained serious doubts as to the truth of his or her publication or acted with a high degree of awareness of probable falsity. An investigative -- an investigatory failure alone on the part of the defendant, without a high degree of awareness of probable falsity, does not amount to actual malice. However, actual malice would exist from reckless publication by a defendant despite a high degree of awareness harbored by the defendant of the probable falsity of the published statements.

10:25AM Actual malice must be proved by clear and convincing evidence and must be proven separately by plaintiffs against each defendant.

Instruction number 19. You have heard evidence that each of the defendants/counterclaimants submitted letters in the criminal proceeding United States versus Liane Wilson, Case 1:19-CR-00105-SOM. The Court has already determined that none of those letters can form the basis of a defamation claim for reasons that you should not speculate about and that are particular to the treatment of such letters under the law. It is up to you to decide -- it is up to you to decide whether the letters offer circumstantial proof of the identity of the authors of the anonymous social media postings that plaintiffs allege defendants made.

Instruction number 20. False light. Plaintiffs' count two.

10:27AM Plaintiffs claim that each of the defendants committed the tort of false light against them. To prevail on a false light claim against a defendant, the plaintiffs must prove the following elements against that defendant by a preponderance of the evidence:

1. The defendant placed the plaintiffs before the public in a false light;

2. The false light in which the plaintiffs were placed would be highly offensive to a reasonable person; and

10:27AM 3. The defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiffs would be placed.

Reckless disregard means the plaintiffs must demonstrate that the defendant in fact entertained serious

10:27AM doubts as to the truth of his or her publication or acted with a high degree of awareness of probable falsity.

Instruction number 21. Intentional infliction of emotional distress, plaintiffs' Count 3.

Plaintiff Liane Wilson claims that each of the

10:28AM defendants intentionally inflicted emotional distress upon her. To prevail on a claim of intentional infliction of emotional distress against a defendant, plaintiff Liane Wilson must prove the following elements against that defendant by a preponderance of the evidence:

10:28AM 1. That the act allegedly causing the harm was

intentional or reckless;

2. That the act was outrageous; and

3. That the act caused;

4. Extreme emotional distress to another.

10:28AM An act is "outrageous" if it is made without just cause or excuse and beyond all bounds of decency. Extreme emotional distress constitutes, among other things, mental suffering, mental anguish, nervous shock, and other highly unpleasant mental reactions.

10:28AM Instruction number 22. An act or omission is a legal cause of an injury or damage if it was a substantial factor in bringing about the injury or damage.

One or more substantial factors such as the conduct of more than one person may operate separately or together to 10:29AM cause an injury or damage. In such a case, each may be a legal cause of the injury or damage.

Instruction number 23. Civil conspiracy. Plaintiffs' Count 4.

Plaintiffs claim that the defendants engaged in a 10:29AM civil conspiracy against them. A civil conspiracy is a combination of two or more persons or entities that work together to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.

10:29AM When a civil conspiracy is established, everything

said or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said or done by all and may be proved against each whether said or done in the presence of the others or not.

10:30AM A civil conspiracy claim is derivative of other wrongs. There can be no claim based upon a conspiracy alone, so the plaintiffs must prove an underlying actionable claim against each defendant.

To prove a claim for civil conspiracy against a 10:30AM defendant, the plaintiffs must prove:

1. The formation of a conspiracy between a defendant with one or more other defendants and/or with third parties;

2. Wrongful conduct by that defendant in furtherance of the conspiracy; and

10:30AM 3. Damage caused to each plaintiff by the conspiracy.

Instruction number 24. You have heard evidence that after the defendants became aware of this lawsuit on January 7, 2023, by being served with the complaint, they communicated with third parties about one or more of the plaintiffs in this 10:31AM case. Such communications are not per se unlawful. For example, if you find that such communications were for the purpose of learning about plaintiffs, or to gather facts about claims, counterclaims, and defenses in this lawsuit, such communications were not unlawful or for an unlawful purpose.

10:31AM However, it is up to you to decide whether such communications

offer circumstantial proof of the civil conspiracy alleged by the plaintiffs in Count 4.

Instruction number 25. You have heard evidence that Paula Haygarth re-posted on her personal Facebook page a sub-Reddit article entitled "The Shanti Summary" with commentary about plaintiff Liane Wilson. The Court ruled prior to trial that this Facebook post is not defamatory for reasons that you should not speculate about. Nevertheless, it is up to you decide whether the re-posting and/or commentary offer circumstantial proof of whether a conspiracy existed as alleged by plaintiffs/counterclaim-defendants in Count 4. It is also up to you to decide whether the reposting and/or commentary offer circumstantial proof of the identity of the authors of the anonymous social media postings that plaintiffs allege defendants made.

Instruction number 26. If plaintiffs are unable to prove the elements of their claim for defamation, all claims that are derivative of their claim for defamation must fail.

For instance, if plaintiffs' defamation claim fails because defendants did not author the anonymous posts, plaintiffs' claims for false light and intentional infliction of emotional distress fail because those claims are premised on defendants having authored defamatory posts about plaintiffs. Similarly, if defendants' defamation counterclaim fails, their false light counterclaim also fails.

10:33AM

If plaintiffs' defamation claim fails because the alleged posts were not defamatory, then all of plaintiffs' other claims fail, including civil conspiracy, because those claims are premised on the making of posts that defamed plaintiffs.

Instruction number 27. Defamation. Counterclaimants Count 1.

10:33AM

Counterclaimants, Paula Haygarth, Byron Horvath, and Stefanie Vogt-Horvath claim that the counterclaim-defendants made false and defamatory statements about them. To prevail on a defamation claim against the counterclaim-defendants, a counterclaimant must prove, by a preponderance of the evidence, the following elements:

10:34AM

1. A false and defamatory statement by the counterclaim-defendants concerning that counterclaimant;

2. An unprivileged publication of the statement by the counterclaim-defendants to a third party;

3. Fault amounting to negligence; and

10:34AM

4. Damages. Meaning either the existence of special damages caused by the publication or the existence of defamation per se, which presumes damages and thus, does not require a showing of special damages. There are also instructions defining defamation per se and special damages.

10:34AM

Instruction number 28. Negligence is doing something which a reasonable person would not do or failing to do

something which a reasonable person would do. It is the failure to use that care which a reasonable person would use to avoid injury to himself, herself, or other people or damage to property.

10:35AM In deciding whether a person was negligent, you must consider what was done or not done under the circumstances as shown by the evidence in this case.

Instruction number 29. For both plaintiffs' Count 1 and counterclaimants' Count 1, truth is an absolute defense to 10:35AM defamation and must be proved by the party asserting truth as a defense by a preponderance of the evidence.

The literal truth of every word or detail of the challenged statement is not required; the statement need only be substantially true. With respect to whether a statement is 10:35AM substantially true, it is sufficient if the substance, the gist, the sting, of the matter is true.

Instruction number 30. False light. Counterclaimants' Count 2.

Counterclaimants claim that the 10:36AM counterclaim-defendants committed the tort of false light against them. To prevail on a false light claim against the counterclaim-defendants, a counterclaimant must prove the following elements by a preponderance of the evidence:

1. The counterclaim-defendants placed that 10:36AM counterclaimant before the public in a false light;

2. The false light in which that counterclaimant was placed would be highly offensive to a reasonable person; and

3. The counterclaim-defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which that counterclaimant would be placed.

10:36AM

Reckless disregard means the counterclaimants must demonstrate that the counterclaim-defendants in fact entertained serious doubts as to the truth of her publication or acted with a high degree of awareness of probable falsity.

10:37AM

Instruction number 31. If you find for any of the parties on the issue of liability, the party is entitled to damages in such amount as your judgment will fairly and adequately compensate him or her for the damages which he or she suffered. In deciding the amount of damages, you should consider:

10:37AM

1. The extent and nature of the damages he or she received, and also the extent to which, if at all, the damages received are permanent; and

2. The pain, emotional suffering, and disability which he or she has suffered and is reasonably probable to suffer in the future because of the damages, if any.

10:37AM

Instruction number 32. For both plaintiffs' Count 1 and counterclaimants' Count 1, if you find that a party defamed another, and that the defamatory statements (1) impute to the

10:38AM

person the commission of a crime, (2) injure him or her in their office, profession, calling or trade, or (3) hold him or her up to scorn, ridicule, contempt or loathing, or otherwise impair him or her in the enjoyment of society, then the party 10:38AM or parties defamed have proven defamation per se and are also entitled to what is called per se damages or presumed damages. You are therefore not required to hear evidence of a specific dollar amount of financial loss in order to find that they have been defamed and can be awarded damages.

10:38AM Instead, you may award an amount that, in the exercise of your judgment and common sense, is fair and just compensation for the injury to such defamed party or parties' reputation and humiliation and mental anguish caused by the party that defamed them.

10:39AM Instruction number 33. For both plaintiffs' Count 1 and counterclaimants' Count 1, special damages are those damages which can be calculated precisely or can be determined by you with reasonable certainty from the evidence.

Instruction number 34. General damages are those 10:39AM damages which fairly and adequately compensate a plaintiff or counterclaimant for any past, present, and reasonably probable future disability, pain, and emotional distress caused by the damages sustained.

Instruction number 35. Emotional distress includes 10:39AM mental worry, anxiety, anguish, suffering, and grief, where

they are shown to exist.

Instruction number 36. The parties are not required to present evidence of the monetary value of their pain or emotional distress. It is only necessary that the parties prove the nature, extent and effect of their pain and emotional distress. It is for you, the jury, to determine the monetary value of such pain or emotional distress using your own judgment, common sense and experience.

Instruction number 37. For both plaintiffs' Count 1 and counterclaimants' Count 1, a party claiming loss of earnings in a defamation case must provide admissible evidence that the defamation was material in causing actual economic damage. The damages must be ascertainable in some manner other than by mere speculation, conjecture, or surmise. In other words, loss of future profits must be shown with reasonable certainty.

Instruction number 38. The law gives you no way to mathematically calculate items of damages and leaves them to be fixed by you as your common sense and good judgment dictate, based on the nature and extent of the party's damages under the evidence in this case.

Instruction number 39. Compensation must be reasonable. You may award only such damages as will fairly and reasonably compensate the plaintiffs and/or counterclaimants for the injuries or damages legally caused by the other party.

10:42AM You are not permitted to award a party speculative damages, which compensation for loss of -- you are not permitted to award a party speculative damages, which compensation for loss or harm which, although possible, is conjectural or not reasonably probable.

10:42AM Instruction number 40. For both plaintiffs' Count 1 and counterclaimants' Count 1, the law that applies to this case authorizes an award of nominal damages if they have established defamation per se. If you find for the plaintiffs or counterclaimant on the defamation claim or counterclaim but you find that the plaintiffs or that counterclaimant has failed to prove damages as defined in these instructions, you must award nominal damages. Nominal damages may not exceed $1.

10:42AM Instruction number 41. Any plaintiff or counterclaimant claiming damages resulting from the wrongful act of the other party has a duty under the law to use reasonable diligence under the circumstances to mitigate or minimize those damages.

10:43AM If you find any plaintiffs or counterclaimants suffered damages, the party claiming damages may not recover for any damages which the claiming party could have avoided through reasonable effort. If you find that the party claiming damages unreasonably failed to mitigate or lessen that party's damages, you should not award those damages which the claiming party could have avoided.

10:43AM

You are the sole judge of whether the party or parties claiming damages acted reasonably in mitigating the party's damages. A party claiming damages may not sit idly by when presented with a reasonable opportunity to reduce that party's damages. However, a party claiming damages is not required to exercise unreasonable efforts or incur unreasonable expenses in mitigating the party's damages. The defending party has the burden of proving the damages which the party claiming damages could have mitigated.

10:43AM You must consider all of the evidence in light of the particular circumstances of the case in deciding whether the defending party has satisfied the party's burden of proving that the claiming party's conduct in mitigating damages was not reasonable. The standard of proof for each finding in this instruction is by a preponderance of the evidence.

Instruction number 42. If you award any damages to a party, then you may consider whether you should also award punitive damages to that party. The purposes of punitive damages are to punish the wrongdoer and to serve as an example or warning to the wrongdoer and others not to engage in such conduct.

You may award punitive damages against a particular party only if the party claiming damages has proved by clear and convincing evidence that the particular responsible party acted intentionally, willfully, wantonly, oppressively or with

gross negligence. Punitive damages may not be awarded for mere inadvertence, mistake or errors of judgment.

The proper measure of punitive damages is:

(1) the degree of intentional, willful, wanton, oppressive, malicious or grossly negligent conduct that formed the basis for your prior award of damages against that responsibility; and

(2) the amount of money required to punish that responsible party considering his, her or its financial condition. In determining the degree of a particular responsible party's conduct, you must analyze that responsible party's state of mind at the time he, she, or it committed the conduct which formed the basis for your prior award of damages against that responsible party. Any punitive damages you award must be reasonable.

An act is "willful" when it is premeditated, unlawful, without legal justification, or done with an evil intent, with a bad motive or purpose, or with indifference to its natural consequences.

An act is "wanton" when it is reckless, heedless, or characterized by extreme foolhardiness, or callous disregard of, or callous indifference to, the rights or safety of others.

An act is "oppressive" when it is done with unnecessary harshness or severity.

An act is "malicious" when it is prompted or

accompanied by ill will or spite.

Gross negligence is conduct that is more extreme than ordinary negligence. It is an aggravated or magnified failure to use that care which a reasonable person would use to avoid injury to himself, herself, or other people or damage to property. But gross negligence is something less than willful or wanton conduct.

Instruction number 43. Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, via text messaging, or any internet chat room, blog, website or application, including but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that

you have been ordered not to discuss the matter and to report the contact to the Court.

10:48AM Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, although I have no information that there will be news reports about this case; do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not 10:48AM visit or view any place discussed in this case, and do not use internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved -- including the parties, the witnesses or the lawyers -- until you have 10:49AM been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on the evidence that has been presented here 10:49AM in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by 10:49AM inaccurate, incomplete, or misleading information that has not

been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you 10:49AM have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If 10:50AM any juror is exposed to any outside information, please notify the Court immediately.

Instruction number 44. If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you. No member 10:50AM of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult the lawyers before answering it, which may take some time. You 10:50AM may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone -- including the Court -- how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

10:51AM Instruction number 45. Before you begin your

deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

10:51AM You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and

10:51AM listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades

10:52AM you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Instruction number 46. Special verdict forms have

10:52AM been prepared for you. Please go through each form carefully, following the instructions regarding which questions to answer. Your answers to each question must be unanimous. After you have reached unanimous agreement on all of the special verdict forms, your presiding juror should complete the verdict forms

10:52AM according to your deliberations, sign and date them, and advise

10:52AM 10:53AM 10:53AM 10:53AM 10:54AM

the clerk that you are ready to return to the courtroom.

All right. Ladies and gentlemen, just a couple things regarding the timing of your deliberations.

I leave it up to the jurors to decide when they want to show up to deliberate collectively and decide when they want to leave for the day collectively during your deliberations. However, I ask that you not show up any earlier than 8:30 and that you deliberate until at least 2:30 every day. You can deliberate up to 4:30 if you want to, but I will leave it up to you to make that decision as to your own schedule.

And secondly, as mentioned in the instructions, if you ask a question, it's going to take me some time to respond because we need to gather the attorneys.

Also, if you are able to reach a verdict, please give us sometime to gather because there are a lot of people obviously involved. All of us have other hearings going on. So once you reach a verdict, please don't expect to show up in the courtroom immediately. It may take quite a bit of time for everybody to get back here, especially if we have other hearings going on. Okay? So I just wanted to share that with you.

And with that, ladies and gentlemen, you are going to go back to the jury lounge for your two-hour recess. We will see you back here at 1 o'clock.

Do not talk about this case. Follow the instructions.

You are not in deliberations yet. So these instructions about not talking to anyone, not doing any research, not talking to each other about the case, are in -- are applying right now because you have still not started your deliberations. Okay?

10:54AM And with that, we will see everyone at 1 o'clock. Thank you.

(At 10:54 a.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. Thank you, everyone. We are

10:55AM in recess until 1:00.

Ms. Ing, if you could consult with Ms. Yamasaki, please. Thank you.

(A recess was taken from 10:55 a.m. to 1:23 p.m.)

(The following proceedings were held in open court in

01:23PM the presence of the jury:)

THE COURT: All right, ladies and gentlemen. I just wanted to apologize for taking longer than expected. And because we were gone for so long, my computer is not working, just to let my staff know. So -- but I don't need it right

01:23PM now.

So with that, please turn your attention to Mr. Portnoy who will be doing the closing argument for the plaintiffs.

MR. PORTNOY: Thank you, Your Honor.

01:24PM I'm not a big fan of the term "closing argument."

This case has had a lot of argument. I like to call it a conversation. Unfortunately, it can't be two ways. It can only be one way.

01:24PM So, I have an hour for my first discussion. And then I'll have an opportunity to talk again after my opponent has his opportunity.

01:25PM First, I want to thank you for eight days of sitting in this courtroom. It hasn't been easy for anybody. Not for the parties, not for the Court, and I can tell you not for me, not for counsel. These are hard.

01:25PM What it all comes down to in the end is the eight of you meeting, talking, discussing, not what I said or will say, but what you heard from the witness stand, what you saw in exhibits, and what you saw in body language by the people who sat in that chair.

01:26PM You know, lots of people in the public have an impression, maybe from television or movies, that cases are won and lost by how skilled or unskilled the attorneys are. That's not true. It gives us too much credit. Cases are won and lost by the evidence. And that's why I don't use the term "argument." I can sit here and argue all day. It means nothing at the end of the day.

01:26PM The judge has already read you the instructions, which emphasized that we're not the ones who decide the case. We're not the ones who should be influencing your decision. It's the

folks that sat in that chair and the instructions that the judge gave you.

You won't decide the law. That's the judge's job. But you have an unbelievable job, an important job of deciding the facts.

01:27PM

And, folks, there's going to be a winner and a loser. That's the reality. There's no overtime. It's not -- not football or soccer. We don't get to kick at the goal post five times if you tie.

01:27PM

So, I just want to start by emphasizing again, what I'm going to say is how I view the case. But at the end of the day, I'm not going into the jury room with you, and you can -- you can totally disagree with my view of the case.

Cases aren't won by, as I said, lawyers. Cases aren't

01:28PM

won or lost by courtroom theatrics. Cases are won and lost by jurors like you who gave up two weeks of your life, including some of you who flew here and back. And so we're just going to put this case in your hands.

I'm going to try to go over what I think was

01:28PM

important, critical, make some observations, but I won't be hurt if you decide that my recollection of what occurred doesn't match yours. I hope it does. It's what I'm paid to do.

I looked at you guys on and off, and I'm sure you

01:28PM

looked at me on and off. And my observation was, you were an

extraordinarily attentive jury, through a lot of difficult, difficult testimony, hearing about lots of things that are not all that pleasant at the end of the day. And many of you took unbelievable notes, because I could see your hands moving. 01:29PM Some of you didn't. That's -- that's not a big deal. But it just shows me how attentive everybody was.

So I have complete confidence, absolute confidence that you're going to do the best job you can.

And what job do I want you to do? What job are you 01:29PM required to do? Three words. To be fair. That's it. To be fair.

Someone in this case is going to walk out of here when you're done happy, thankful. Somebody's going to walk out being disappointed. That's life. In our society we put cases 01:30PM in court in the hands of you guys.

So, again, in advance, no matter what happens, my client and I thank you from the bottom of our hearts for what you've done over the last two weeks.

This case has a couple of themes. The number one 01:31PM theme is anonymity. Should people be allowed, on the internet, in newspaper articles, in conversations online with people you know or don't know, be able to hide behind anonymity, or should people who have opinions, whether you agree with them or not, have the guts to do it publicly. That's the major theme in 01:31PM this case.

You're going to hear a lot of talk -- you heard eight days of testimony about custody battles, and who's married to who, and who left the country, and who told people to leave the country. And that's not what this case is ultimately about. 01:32PM It's a back story. You go to the movies, first 90 minutes are a back story. And then in the last 30 minutes, if you're still there, you get a resolution.

This is about anonymity. This is about allowing people to say things about other people they don't have the 01:32PM courage to say publicly, versus someone who has the courage to say what they feel and believe publicly.

And you heard all the evidence. You took notes. Only one party in this courtroom made public posts. And what I mean by that, in their name, in her name.

01:33PM How hard is it for someone to get on the stand and say, I didn't post this. I didn't post this. Pretty easy. Takes courage to say, yeah -- you heard my client yesterday. You may not like everything she said. You may not like every way she said it. I got it. But she had the guts to say it in 01:33PM her own name, so people knew who was saying it.

We didn't have that luxury. We have to guess. We have to put on circumstantial evidence. And you'll get -- you already heard the judge's instruction. We don't have to have absolute proof. It's impossible. The internet protects folks 01:34PM who don't have the guts to put their name to what they post.

If it's a restaurant review, it's about a failed relationship, they have the ability right now and for the past several years of hiding behind what they post.

And that's the crux of this case.

01:35PM Now, you heard testimony from their witnesses, not ours. Remember, Amanda and Haley, and you'll hear more, turned on my client. Haley because she made a deal with Byron. She's admitted it. And we read to you, and I'm going to read to you later, her apology two days later to my client. I'm sorry for what I had to do to see my daughter. I'm not criticizing that. No one did. But stand up. Tell the truth. Tell this jury that for four years Liana was one of your major supporters in helping you deal with horrible issues. And then you had to make a deal with the devil. It's understandable, but it's wrong.

Haley wrote two letters to the court, which I'm going to read to you again, and which you already heard, about how much my client meant to her as she went through this horrible situation. Child abuse, interpersonal problems, a really ugly custody battle. And who was there to support her? My client. To help her, to empower her, to say, Don't be bullied by a guy that owns 13,000 acres, whose parents have millions of dollars. Yes, you have nothing, you have no money, but you're the mother. You had custody before you ever even met Liana, and then Byron took custody away. Power versus the powerless.

Except there was one person willing to stand up publicly, put herself -- you heard argument, why did you -- or evidence and argument, why do you get into a private matter? You live in Kauai. They live in Canada. What are you doing? 01:38PM You saw a map where Saskatchewan is, and a little line, like a plane, flying from Saskatchewan to Kauai. Why? How much evidence did you hear about why? Not just from Liana, but from other witnesses.

And what does she get for standing up to a woman who 01:38PM was battling against unbelievable odds to help her get some custody over her daughter? She gets this counterclaim.

And that brings me to another point. The defendants tell you how their lives were ruined. How they couldn't leave the house. How everybody was talking about them. Although you 01:39PM heard Byron admit nobody believed it. Not one person in this community of, how many, 550 I think we heard. He admitted on the stand not one person who knew about it, and we don't know how many, but he said lots, not one believed it. So what kind of damage can you have? None. He put on no evidence of 01:39PM damage. What do you get?

Well, who filed suit? Which of these parties brought this lawsuit to stop the stuff that was being written about them? Not those guys. How horrible this was. Their life was a complete mess. They couldn't leave the house. Everybody 01:40PM hated them. Of course, that's not true, you heard that. Cried

01:40PM on the stand, every one of them, multiple times. Did they do anything publicly to stop it? Did they file suit claiming everything they're now claiming? They have the money to file suit. They have the resources to file suit. They have the ability to file suit.

No. One person filed suit to say stop it. I'm going to go into a public courtroom and I'm going to hopefully get a jury to say, you hurt me, you tried to destroy me.

Why didn't they do it?

01:40PM So what do they do? Oh, we'll just file a countersuit. A good defense is a good offense, any of you play sports, and I know some of you do.

They didn't start this. They didn't try to stop it. Only one person tried to stop what was going on.

01:41PM And Amanda? Who brought her to this courtroom? Not us. You heard the letter she wrote to the court about how much Liana meant to her. When she was being challenged, I'll use a nice word, for going to Florida, who stood up for her? One person.

01:42PM Now, look, you've heard a lot of argument and you're going to hear a lot more about the posts that my client made. But remember why. She was being brutally attacked for seven months before she posted a single thing. Don't forget that's a fact. This isn't an argument. It's a fact. She waited seven months.

01:42PM

Does that show a vindictiveness? Does that show a hatred? That shows a person who's willing to wait and hope that the horrible things that are being said about her stop. And they never did. What was she supposed to do, folks, after seven months of anonymous posts?

01:43PM

Now, we haven't claimed every one came from the defendants. We have a pretty good idea because we know about the letters that were written to Judge Mollway. How many other fathers didn't want anyone interfering in their power to get control of their children?

01:43PM

Amanda said to Liana, you know who's posting the posts? Paula. Liana didn't come up with that. Paula.

Well, circumstantial evidence. Anonymous posters.

And you heard from Paul -- from Amanda why she thought it was Paula. And that's one reason, a really important reason why Liana believes it's Paula. It's not personal. It's put your name on it.

01:44PM

Now, Paula did repost a post and then added some comment, once. Anonymity.

01:44PM

Let's talk about credibility. You're the judge of which witnesses you think were credible. Not me. Not the judge. And I'm not going to pretend that I'm going to tell you who you should think was more credible. Not from crying on the stand, but from what was said. What words, words. That's all that matters.

01:45PM

And you can determine that. But you can also look at, how do I determine credibility? Who changed their position? Who consistently said, Liana is one of the best things that ever came into my life. I can't thank you enough. Thank you for supporting me when nobody else would. Thank you for helping me in a very ugly custody battle.

And then who came into this courtroom and said, ah, I didn't mean any of that. Or, or I was brainwashed. Or, Liana told me everything to say. Or, taking it a step further, I'm not able to think on my own. Whatever Liana tells me to do or to say, I'm the puppet and she's the puppet master. Because you know why? She's a cult leader. Just like Jamestown, or whatever it was called, where they killed everybody with Kool-Aid. Did you hear any evidence of Liana's Kool-Aid? I don't think so.

What evidence is there, other than the statements that were made, that she runs a cult?

And nobody has any question that calling somebody a cult leader is one of the worst things you can do. Particularly with people knowing about other cult leaders and what's happened.

So let's do that. Let's say that anybody, anybody who says nice things about my client has been brainwashed. Has no free will. They're robots. All 150 that were in the chat room are robots. They can't think for themselves. They write what

Liana tells them to write. They say what Liana tells them to say.

Why did they change their position? Well, we know why Haley did. She made a deal with the devil. She was told, you 01:48PM want to see your kid again, you not only disown your relationship with Liana, but you take back everything you ever said, and said you never meant to say it, and she made you say it.

You heard the thing about the letter. You heard her 01:48PM say under oath, I wrote one paragraph. And then they gave it to Liana and she rewrote it, and she rewrote the next two pages.

And then you heard Cahira. That's not what happened. Liana didn't touch the letter at all.

01:49PM Credibility, please. Try to see what people have said at different times.

Did you hear Liana not admit what she posted? And why? Did she try to make up a story? She came in here because she wanted -- she filed suit because she wanted -- she wanted 01:49PM to stop what was happening.

And yeah, did she want some money? Yeah. But you heard her, that's not the primary reason. Her business lost over a million dollars. You saw the tax returns. She got cross-examined and her husband got cross-examined for 01:50PM 30 minutes. Well, how many different companies do you have,

and where -- how did this all work out? And where's all these other documents?

By the way, did you see a single document other than a few alleged bills from any of the defendants? I didn't. See Byron's tax returns? Oh, no, no. Did you see Stefanie's employment records showing that she had to give up her business and go into a shell for two months? Did you see Paula's economic damages? No. You saw a few bills for counseling. By the way, you didn't see the results of the counseling, what it was about.

And then they rely on testimony from adult kids. Where were they? How hard is it to say, oh, I was told by my child that Liana is saying bad things about me. One of them is 18. They didn't have any trouble getting Amanda here. You think they would have brought the child who is now an adult to confirm it? It's anonymity.

We have a tough burden. I don't -- I don't shy away from it. I'm willing to tell you, we have a tough burden. We got to put the snow on the ground overnight. But unlike the sprinkler example, you know, you wake up and the ground is wet, and as the judge showed you in the instruction, maybe there was a sprinkler that went on overnight.

There's no sprinkler with snow. It snowed overnight. You don't have to be up watching it snow to know that it snowed.

Oh, no. We never posted anything. No, all we ever did was write a letter, which we were asked to write, after a Zoom call with X number of unidentified anonymous people on the phone call.

01:53PM And although, testimony is, we knew they were in a similar situation with us, and we were looking for people to help us -- remember Wade's affidavit, or letter -- they never once attempted to find out who's in a similar situation. Because maybe they could get some help.

01:53PM And then they kept getting e-mails for over a year. From who? Anonymous people. Think about it. Think about you. Think about your friends. Think about a failed relationship where somebody posts, but you need --

Thank you.

01:54PM Letting me know how much time I have. I appreciate that.

Think about it. Think about whether you're going to allow people to say the horrible things they said about my client and get away with it. Think about what that means.

01:54PM I might get criticized after this trial. Somebody sat back here said, Boy, he is horrible. Put your name on it. Don't post it anonymously. Give me a chance to respond directly to the person who posts.

Let's talk a little bit about defamation, just a
01:55PM little bit.

The judge read you the instruction of what the elements are. One critical element is that it has to be able to be proven true or false. Otherwise it's called an opinion, and the law is that opinions are not actionable.

01:55PM So, give you an example. I actually thought about it, came to me in the middle of the night. I want to find it because I want to make sure I read it exactly the way I wrote it down.

Remember, opinion is not actionable, unless it's based 01:56PM upon a false fact. Okay.

So what's an example of an opinion? Nothing personal to the President of the United States, I'm just using it as an example. Somebody says, the President is a monster. Can't prove that true or false, can you? That's clearly an opinion. 01:56PM You can agree with the opinion, you can disagree with the opinion. But as you heard and will read in the instruction, it's not actionable.

And much of what my client posted not only came -- almost everything came from their witnesses. Remember this 01:57PM when you go into the jury room. You heard the testimony, almost everything that she's been accused of posting verbatim, the facts, whether it's child abuse or the relationship between Stefanie and Byron, all came from who? Two people. Both brought here by the defendants. I think it was a big mistake, 01:57PM but I don't plan their case.

My client didn't post anything that she didn't learn from one of the two of them. Should she have reposted it? You can decide that yourself. But she didn't make any of it up.

Now, what's not an opinion? President is a rapist.

01:58PM You could argue it's an opinion, but you got to have facts. That can be proven true or false. See the difference? One can't be proven true or false. It's protected. It's an opinion. One can argue it's an opinion, but it's not, because you have to have facts.

01:58PM So let's just take one quote here, because I want to show you as you go into the jury room and look at all the statements, just take one. A soldier for Satan. They're suing that that's defamatory. I challenge anyone in the world to say that's not an opinion. It's clearly an opinion. You can't

01:59PM prove that true or false.

And the second protected allegedly defamatory statement is what you heard hyperbole. A lot of people really don't each use the word very much, but that's an exaggerated statement. That's clearly exaggerated to any reasonable

01:59PM listener or reader.

Hyperbole. Yeah, I might not use that word, there was probably a better word, but it's just an exaggeration. It's just a colorful word.

And Liana's posts are filled with both opinion -- and

02:00PM you're going to be given the statements so you're going to be

able to decide collectively, eight of you, can that be proven true or false, or is that an opinion?

02:00PM And yeah, you know, might have been a better word Liana could have used. But hey, sometimes all of us use colorful language. You watch the news? You watch public figures, what they say? There's another way to say it. May not be as effective, but it's clearly an exaggerated speech.

So I am going to reserve what's left. I'll have a chance to rebut what my opposing counsel tells you.

02:00PM But I want to end this the way I started. You can ignore everything I've said. I'll be okay. Because I think the evidence in two ways is overwhelming. What my client did publicly and why. You heard hours of testimony, and I can go back into it if I need to about what was going on with Haley.

02:01PM How much testimony did we hear?

By the way, how did my client ever get involved in the first place with these guys, in their mind? What -- they went to dinner to figure out, how do we stop her? How do we stop her from helping two women? How do we stop her? How do we get

02:02PM Amanda forced back to Canada? How do we get Haley not to leave?

Who filed the first complaint against Byron at CPS? You know, you saw that they didn't find anything. What does that mean? I'm just asking, who filed the first complaint?

02:02PM Who started the discussion about whether Byron was or was not

abusing Isla?

Not my client. She wasn't even involved.

Haley's relatives. So how did my client get -- where did -- at dinner in discussion you heard Paula admit it, I

02:02PM asked her over and over and over and over again, how did -- how did Liana's name came up? How was she -- why are you going to write a letter? Why do we need a letter? She can talk about the merits. That's fair, you know. Is Haley trying to leave the country or not.

02:03PM But what -- what was, by their own admission, the common denominator in their minds that led them to this vicious assault month after month after month about my -- of my client? One thing. They were both students. And so let's destroy her. She's a successful woman with a very successful business and

02:03PM thousands of people, thousands, all, I guess, brainwashed. I'd be scared. I'd be scared. Watch out, Liana may brainwash the whole world because she's got this incredible ability to brainwash hundreds if not thousands, primarily women, to be empowered against overwhelming opposing forces.

02:04PM So thank you for listening. I'll be back. Thank you.

THE COURT: All right, ladies and gentlemen. I had failed when I brought you back in to tell you what the plan was, after telling you I was going to tell you what the plan was.

02:04PM So we're going to take a stretch break now. And we're

then going to hear from defense counsel. And then we will have a fuller break where you can use the restroom, unless anybody need to use it now. I'm happy to recess so that you can do that. It's important to me that you are paying attention and not distracted. Does anybody need a restroom break? No.

02:05PM

Okay. Let's take a quick stretch break and then we'll hear from defense counsel.

(Pause in the proceedings.)

THE COURT: All right. Mr. Adams, let us know when you want your screen published to the jury, please.

02:05PM

MR. ADAMS: Just one moment, Your Honor.

THE COURT: Okay. And Ms. Cortez, if you can let Mr. Portnoy know at the break how much time he has left, please.

02:06PM

THE COURTROOM MANAGER: Yes.

THE COURT: Thank you.

All right. Mr. Adams, do you want your screen --

MR. ADAMS: Please.

THE COURT: -- accessible to the jury?

02:06PM

All right. We will make that happen.

You may proceed.

MR. ADAMS: Good afternoon. And thank you all. On behalf of my clients Paula, Byron, Stefanie, I want to thank you. Thank you for your time. It's been a long couple of weeks. There's been a lot of evidence. A lot of information.

02:06PM

And we really want to the thank you for being so attentive and
being part of what is the most important part of being a
citizen in this country. Thank you so much.

THE COURT: Mr. Adams, if you're going to be walking
02:07PM away from the podium, we're going to give you a microphone.

MR. ADAMS: I'll take a microphone.

THE COURT: Okay. Thank you.

MR. ADAMS: Testing.

When I stood up here last Monday, I told you this was
02:07PM a case about accountability. And I asked you to hold me
accountable for the things that I promised you'd hear. The
evidence that I promised would come in and prove my clients'
case against the plaintiff, but also to defend my clients
against the claims that Ms. Wilson brought.

02:07PM And what you heard was two totally different sides.
On the one side you have Ms. Wilson, by her own attorney's
words, a very successful multimillionaire business online,
hundred thousand followers on Facebook, 34,000 plus on
Instagram. She's a health, wellness, spiritual online teacher.
02:08PM Sells over a hundred thousand programs across 90 countries
across the world.

She's a public figure. It's been determined by this
Court.

My clients: Paula, the life coach, mother, small
02:08PM business owner, stepmother to Ellis and London, wife to Wade.

And Byron and Stefanie, husband and wife, mothers, father, farmer and father to Isla, stepmother to Isla, and parents to Blakely and Bowen.

These are ordinary people from Canada. Farmers and 02:09PM teachers. Not public figures selling their life online to hundreds of thousands. These are private people. Not public figures.

And these ordinary people's lives were shattered by Ms. Wilson when she used her massive online platforms to defame 02:09PM them. And for what? They told you, they each got up here and testified. Yeah, they cried about it. They tried to get their kids back. That's the side you didn't hear. Trying to get their kids back. Their blood.

And she wanted to get likes and clicks and reposts on 02:10PM some of the hardest things that a human could go through. Exploiting mothers in a custody battle with their kids. That's what she did.

She's not accountable to anybody. She told you. She has no remorse what she did. And she will continue to do it. 02:10PM She testified to that yesterday. I was shocked. No remorse. Will do it again. Will continue to do it again.

And what did my clients, every one of them, even Wade, who is not a client, but a witness, they just want it to end. They just want it to stop.

02:11PM She has no license anywhere. She's not accountable to

a medical board. She's not accountable to a law license. She's not accountable as a therapist. She's not even a realtor anymore.

She's accountable to you, each and every one of you 02:11PM here today. Today it stops. And you get to hold her accountable, finally.

We'll come back to that, but I do want to start with how we got here. Because we got here because she filed the lawsuit. The one with 100,000 followers, she filed the 02:11PM lawsuit. She can't take statements about her online.

And my clients published those, they're not defamatory the one that Paula republished. She admitted to that. The only ones that she has at issue in this case, the only statements that she claims are defamatory, they're not attached 02:12PM to any individual. They are all anonymous. That's her burden to prove that my clients made those statements.

But you heard that there are hundreds, it's her own testimony, there's hundreds of people online that don't like her, that are displeased with what she does, that think that 02:12PM she is a scammer. And you heard it. She claims to be psychic. She'll tell you your life's story. She's the only one. She'll tell you your life story that are in the Akashic Records, stored in the bottom of the ocean traveled by whales. She sat up there and told you that. And for 999, thousand dollars, 02:13PM $2,000, maybe it's just $20, she'll tell you what they say

about you.

And so she has three problems with her claims. The first is that she cannot attribute to any of my clients. There is no evidence. There is not a single shred that attributes these anonymous posts to my clients. And they each got up there and denied it state to your face.

She said, well, it's impossible find out.

We found out that her husband created the Exposing Family Abuse website. He said it was Briana123, a student he didn't know, that was too poor to pay the $15. You remember that? It's because he knew we had the subpoena that showed that he created it. So he made up what I called a story and blamed it on an anonymous student that he doesn't know the name of. They're the ones that apparently created the Exposing Family Abuse. No accountability. Somebody else. Some anonymous Briana123.

A second hurdle she has on all the claims against my clients is that she's a public figure. As a public figure, just like the President of the United States, just like Michael Jordan, Shohei Ohtani, these people are so -- live themselves so much in the public that it actually requires a higher standard of proof to prove that they have been defamed. And for her she has to show actual malice by clear and convincing evidence.

So that's the second hurdle, she's got to prove that

my clients did it, which she has none. She's got this higher burden of proof, the clear and convincing actual malice.

02:15PM The third problem is the truth. And we didn't make the statements that they were made online. The reason they're made online is because there's hundreds of people around the world, maybe even more, that believe that what Ms. Wilson is doing is wrong.

02:15PM And you heard what my clients did, the reason and the motivations for what they did, to expose what she's doing, is they wanted to get their kids back. And apparently so do a lot of men across the country. You saw that in Montana Supreme Court case. That came out last week. You might think, well, the luck of the timing. It's not luck in timing. It's because there's a groundswell moving. It's picking up. Because the

02:16PM more and more people that are exposed to her teachings and the methodologies, and we'll get into them, the more and more people that are doing that are filing cases in court.

02:16PM That Montana Supreme Court case you get, it's admitted into evidence, it's Exhibit 1206, when you get to look at that, you're going to see how many years that father went through the pain that he went through, the exact same thing that Byron did.

02:16PM And so we're going to go through the claims right now, we're going to go through the claims that she says my clients made the statements that she said my clients made anonymously, we're going to go through them because I'm going to show you

that they're actually true. I'm not going to show you that they're actually true just because it's a defense if you do find that my clients actually made those statements, which they didn't, but if you do find that, the truth is a defense.

02:17PM I'm not just going to go through each of them to show you they're true because it's a defense, I'm going to go through each one of them to show you that actually it shows you the damages for my client are necessary. Here's why.

So the first case that we skipped over -- sorry to 02:17PM skip over a slide for you. But truth is an absolute defense, right?

Let's look at the first statement that is at issue that she's a fake con artist master manipulator. I believe the evidence pretty much showed that every one of those statements 02:17PM is true. She claims to be psychic, and that for a fee she'll clear the energy. That's pretty manipulative.

You saw Exhibit 1004, which is the string of text messages between Amanda and Ms. Wilson. And Amanda, who's years into the courses that she's taking, Amanda says, hey, I 02:18PM think maybe Paula's doing something, some bad energy into Ellis's head. Can you take a look?

And what does Ms. Wilson say? Yeah, she implanted bad energy in the left side of her brain. Let's -- let's set up a session.

02:18PM It's the session next day, is the session in an hour?

No, she's got to wait a whole week, next week you can have a session. Well, my gosh, the anxiety must have been so much, right, for Amanda. And what she testified to when she came up on the stand, she testified that she had to pay for that next session.

02:19PM

So think about this, she's psychic, she's the one that can tell you what's going on in your mind, in your life, there's bad energy that's been implanted in your child, and for a fee I'll remove it. That's pretty fake. That's a con artist, and that's a master manipulator.

02:19PM

So those statements, based on what you heard, are true.

And the height of the manipulation you heard is this giving of the names, right? Because if you have a name, you're a special one. If you've been given a name, if you spent enough money, you get a name. And multiple witnesses came up here. Ms. Noelani, plaintiff herself, her son. They said, well, no those names, she doesn't give them to them. But when you dig down -- and I wouldn't let -- I would accept that answer. I wouldn't accept that answer for you. And I dug down and they said, well, no, my mom goes and she looks in the Akashic Records and she gives those names to people. She just sees them. Multiple people said that. Manipulation. If you're good, if you stay, you get a name.

02:19PM

02:19PM

02:20PM

Once you get a name, well then, you do what she says.

And I think Ms. Noelani was a great example of that. She got up here and said all of the things that are about Ms. Wilson are just wrong, they're crazy. Are they? In the end she said that she's working for her because she's psychic. 02:20PM That's what she said under oath. That she's here, believing in Ms. Wilson because Ms. Wilson is psychic. I think that's manipulation.

The next statement that is alleged to be defamatory made by anonymous person online is that her programs, these 02:21PM online programs, use undue influence societal pressures in private groups to extort women.

Well, you heard the evidence, that's true, too. You heard about the private chats and what goes on in the private chats. And we saw some really sick stuff. I got to tell you, 02:21PM it was -- I've never seen anything like that. A woman asking have I been sexually abused and if so by who? And then what does she say? Yeah, you have. Your uncle and your brother. That's disgusting. It's disgusting. To claim that you're psychic and identify someone's uncle and brother as a sexual 02:21PM predator, online?

So yeah, and then like I said, she's implanted, oh, I see energy, bad energy in your kid, pay me a session and we'll get is it out. That's extortion. She's extorting women. Plain and simple. True fact.

02:22PM Let's keep moving on, because this is really

important. It's really important for a pattern to show -- because she's going to try and say that what she said was true. This is truth, I heard it from Amanda and Haley.

But she encourages people to make fake police reports.

02:22PM And to take -- and so she tells her minions to divorce husbands and take kids. Well, we heard testimony that that's what she does. Not only that, you have the Montana Supreme Court decision that says exactly that. That Montana State Supreme Court -- the Supreme Court decision, followers of Liana Shanti,

02:23PM Exhibit A, significantly higher than average incident of recovery of suppressed memories, which corresponds to a significantly higher than average rate of accusations of abuse against spouses and family members.

And then it goes on to say that Alihana -- that was

02:23PM her Akashic name. Her real name was Acacia Jensen, the name on her birth certificate. And Alihana was give a name, but in the end she ended up giving -- making false allegation to the Missoula -- that's a city in Montana -- the Missoula police.

It's a fact that she was influenced with these fake

02:23PM sexual abuse memories, and then reported them to her husband.

And you know who exactly that happened to in this case? Byron. You saw those three letters for a year and a half because his wife -- his ex-wife was a -- was a follower of Ms. Wilson's. She made false claims for over a

02:24PM year and a half, and every time -- they'd show up unannounced.

They wanted to see if he had a lock on the door. Every time they came by, he got a letter afterwards. And you saw each and every one of those letters. Unsubstantiated. Just like in Montana.

So she does really encourage fake police reports. You saw that quote where she said, am I sexually abused? Yeah, you were.

Amanda Brady witnessed it in the private group chat. She testified at great personal expense to her.

There's a lot of talk about Amanda Brady and Haley and their different stories. Credibility. But think about this: When they were supporting Ms. Wilson, they were in her groups, they were the ones trying to be the best, trying to get their names, trying to please her under her manipulation, under her spell. They didn't want to go away. What if -- what if somebody was putting bad energy in one of their kids and the only way they could find out was through Liana. Of course they'd do anything for her.

That's the story they want you to believe, that those were the true statements of them.

And to disregard them flying from Canada, coming out here, staying for days and getting up on that stand under oath and looking you in the eye and say that when I made those statements I was being manipulated, and that here's the real truth. The real truth is I made is it up and that Byron is a

good dad.

02:26PM And the real truth is that Amanda was encouraged to go to it Florida and take her kids away from Drew and Paula -- I'm sorry, Wade and Paula. That's the facts. That's what the evidence proved.

And you even saw some texts. This is one from Haley on the left, Exhibit 1124. How do I tell him -- that's Byron, "him" is Byron -- how do I tell him we're going to the U.S.? And is it our highest path to be there?

02:26PM Yes, it's your highest path to be there.

I knew that. Had to ask.

You can tell him you are going on a vacation.

Just like Amanda did. Amanda told Wade and Paula that she's going on vacation to Florida and never came back.

02:27PM And remember while she was down there, while Wade didn't have his kids and his wife Paula, the stepmother to these kids, during that time he testified, they couldn't do anything to get them back. Nobody would help them. The local police in Florida wouldn't help. The local police in Canada

02:27PM wouldn't help. And then they get a call out of the blue. And it's the Horvaths calling Wade and Paula going, hey, we think we have something in common. And they did. Haley and Amanda. Students of Ms. Wilson's.

And they're tried to make some thing like, oh, that's

02:27PM enough. Why not? Why isn't that enough? It's certainly

enough.

And look at what happened. They were right. Haley tried to leave. She tried to cross the border into Canada [sic] and got turned around. And she stood up here at great 02:28PM personal expense to her. She came and traveled from Canada and testified to you that listening to Ms. Shanti cost her everything. Everything. And it was the worst decision in her life.

On the right is the -- is the e-mail that -- or the 02:28PM text that Amanda sent, that's Exhibit 280, where they're setting up the house in Florida. On the left is statements, here is the one where: You said I have several narcs around me, at least four. Can you tell me who they are, is what I believe they're asking.

02:28PM Your mom and dad, Jason, all three for sure.

So that's narc, you'll remember, that's narcissist.

So getting back to how Ms. Wilson plays on vulnerable women. Right there.

And then you heard what Amanda said you have to do if 02:29PM you live with a narcissist. You got to cut 'em out of your life.

So this is -- on its face seems -- well, it's interesting, what's a narc? The implications of this is that now whoever is asking that question, that poor woman, she's now 02:29PM going to have to cut out her mom, dad and Jason.

Imagine if you were mom, dad or Jason, what you'd do. Well, there's mom, dad and Jason right there, Paula, Stefanie and Byron. And what did they do? They signed letters. They heard that she was on probation here in Hawaii, for fraud, bankruptcy fraud. As I said on the first day in my opening statement, bankruptcy fraud it's a crime of deceit. Deception. Trying to trick people. That's what she's doing here, tricking people, selling it.

But what she does then is that she uses it, posts it online, and says, well, my followers told me that. Did you see one e-mail showing that either Haley or anybody, Haley, Amanda, anybody gave her permission to post intimate details in these private chats? No, because they didn't produce any. She just said she had hundreds of public posts from Haley about this abuse and Haley is posting it herself. We didn't see one. We saw a lot of posts.

If that's her defense that, in fact, she had permission because these are out in public, where's the proof?

So those are the -- those are the statements. Those are the defamatory statements. And if you find that none of them are defamatory, if you find that she's a public figure and hasn't met her burden, if you find that there's truth, none of those are defamatory.

And if there's no defamation, she cannot get intentional infliction of emotional distress, and she cannot

get false light.

So your -- the claims that she has with the defamation, false light, intentional infliction of emotional distress, they all rest, they all rely on the defamatory statements. So if they're not defamatory, there's no false light, there's no intentional infliction of emotional distress.

So that leaves them with civil conspiracy. And it is like criminal conspiracy. When multiple people get together, that's not a crime. But when multiple people get together for the purpose of doing a crime, then the crime and the conspiracy, they can get hit with both. And that's the theory here, is that there was some civil conspiracy going on among my clients. That more than one person, when they got together, they were going to commit a crime or a tort. The tort of defamation, the tort of false light, the tort of intentional infliction of emotional distress.

He has to prove -- they have to prove that the conspiracy was for the purpose of committing that act. That wrongful act. And they can't. Because the civil conspiracy that they claim, the only thing you heard about was a chat group, a Zoom call, right? And then the submittal of letters in her probation. The Court's already determined those letters are non-defamatory. But they all testified that's why they got there. They had the meeting to try and figure out information, and a few weeks later they got the call, hey, she's on

probation, we should write some letters. And each one of them testified that they got on that call and they got together and talked about her for the purposes of submitting those letters. And the purpose of submitting those letters was to get their kids back, every one of them. Not to defame Ms. Shanti.

But they had no other avenue. You heard they tried to make a complaint to the therapist board here in Hawaii. That went nowhere because she's not a licensed therapist. No accountability.

They tried to call the New York Bar because they heard that she was a lawyer in New York. She advertises she's a Wall Street lawyer. She's not actually, she's suspended. No license as an attorney. No accountability there either.

They went to the realtor board. They heard that she had a real estate license and made a complaint. And that was a -- she testified -- Ms. Wilson testified that she relinquished that real estate license after getting complaints.

No accountability, again. Except here she is, she's accountable to you. You all can have the determination of whether, in fact, she's accountable for what she's done.

So lets move on. One of the claims in the civil conspiracy is that there was this Zoom call, right? And how could you get on a Zoom call if you don't know the identity of the people? Well, they did. They ignored their own -- Ms. Wilson and her attorney ignored their own exhibits, 50 and

52. Those are from the Liana Shanti Recovery Group. There's three names on the first one; Jenny Rose, Shannon he oy and Jennings Brown. By the way, those names are listed after they say, Thanks so much for joining us on the call.

02:35PM Those three people aren't named in this lawsuit. Why not? There's no lawsuit against them. Jennings Brown is the reporter that wrote The Daily Beast article, three Daily Beast articles.

And then there's the other e-mail. It was dated

02:35PM April 20th, 2023. Thank you, Shannon. We heard Shannon, that's a friend of Stefanie's. And it's signed off Thomas. A fourth name. Thomas isn't named in this lawsuit either.

So this idea that we are somehow the Liana Shanti Recovery Group is just totally false. There's no evidence of

02:35PM that. And in fact, it looks like it's these four people.

I want to round out one thing about financials in this case. She's asking for business -- loss in business income. That's why she was required to produce tax returns. We're not making a claim. We just simply said that this is costing us

02:36PM time and money away from our farm. We're not making a claim for lost business. That's why there's no tax returns. We don't have to prove that. She does. She's making the claim that her businesses were injured by those statements that you saw.

02:36PM And you'd think that if you were going to make that

claim, you'd produce as much as you could. But she didn't. And yeah, I did question her for like a half hour on it because it didn't make any sense. She said that in 2022 her businesses were all one sole proprietorship and she made like $2 million. 02:36PM Then she said she split them into two, and we saw only one of them made a million dollars. Where's the other company? There's no explanation. You cannot compare apples and oranges.

But, she actually did prepare monthly financials. Remember that? She testified to it. Her husband tried to walk 02:37PM it back saying, well, that was a long time ago. It doesn't matter how long ago it was, there was monthly financials being required to be produced, prepared and produced and submitted to the probation officer in her felony probation. Monthly. During 2022, 2023 when she's claiming that she lost money. 02:37PM Wouldn't that be the easiest, simplest way? You could even -- since it's monthly, you could even coordinate it. Oh, here, here's this post from May 2022. And here's my results from the summer of 2022. Look how much I lost after this post came out. Isn't that the best way. But they didn't want to give you 02:37PM their financials. Why? It's because they're not real. They're fake. There's no other explanation, otherwise we'd have tons of them, right? She makes millions. Millions. Selling online tools. And she can't produce her financials.

And in fact, you can always tell a person like what 02:38PM they post online, right? She posted online -- when she's

saying she lost millions, instead she's posting online -- and the one on the left is from December 2022. At first I thought it would just be a great place to catalogue everything about Haley's situation with Isla. I don't know why, but that's what she says.

02:38PM

This next one is, Jesus has turned a tiny pile of shit into a massive gold mine.

And that was in 2022. At the end of 2022. Remember this is the year that she says it was terrible for her, she was curled up in a ball in her in her home and couldn't work. She's not saying that online.

02:39PM

Then almost a year later, nine months later, she's talking about the massive growth I've had this year across every part of this legacy of love. "Legacy" is misspelled, but that's all right, we know what it means.

02:39PM

And so what she's posting online doesn't square up with the two random tax returns you got, that are not even tax returns, they're like one page each. It was like the cover pages to a tax return. But that's what she's saying online, she is saying she's making money.

02:39PM

Now the shit comment was talked about as oh, she uses colorful language. Okay. Colorful language is one way to describe it. I think that's called profanity.

So let's talk about how this all plays into our claims then. Because we have a counterclaim. And we didn't start

02:40PM

this fight, but we're here to finish it. And we're asking you to help us with accountability.

There's two claims. It's defamation and false light, invasion of privacy. I'll explain those.

02:40PM But the defamation -- here this is your definition -- and you're going to have these in your jury instructions. You have these.

It's defamatory when it tends to harm the reputation of another, as to lower him or her in the estimation of the community, or deter third persons from associating or dealing with him or her.

02:40PM

And then your determination is whether a communication is defamatory depends on the social climate, current public opinion, and local setting.

02:40PM Well, she's not local. She's worldwide. Right? So her standard, I would submit to you, is a worldwide standard and what's proper and what's appropriate. But you also have to remember there's people in Saskatchewan reading this, people in Canada, people in other parts of the world that may not feel the same that talking the word Jesus and shit in the same sentence is just colorful language. Some people might be pretty offended by that.

02:41PM

So here's some of the statements that were made about Paula. And these -- you're going to see these on your verdict form.

02:41PM

And these aren't just statements that are made, you know, in a small town, in a room of a group of people. These are posted online to tens of thousands of people.

Jesus, we ask you to delete and destroy all toxic lies from this Satan servant, Paula Haygarth, who is campaigning to invalidate truths of child abuse to cover up her own misery.

02:42PM

Now remember when you were asked by counsel, oh, how can you say Satan's soldier or Satan's servant is defamatory? Well, read it in context. I don't think people want to be associated with Satan. As far as I know everybody thinks Satan is bad. How is that how is that ambiguous that being referred to Satan is, oh, that's okay. And it's in the same sentence to delete and destroy her. What does that mean? When I delete something on my computer, it's gone. Is that what that means? It sounds like it.

02:42PM

02:42PM

The next one has already been determined to be defamatory per se. This is the one -- and you'll see this on the verdict form because it's not just once, it's like six times she posted this, at least. And it said, Paula Haygarth, her name, once again, full first and last name, abandoned your child so you have free time to attack other people's children. And then she puts a little emoji, like it's cute, like it's fun.

02:43PM

It's not cute. It's not fun. It's been determined by this Court to be defamatory per se, and she's owed money

02:43PM

because of it. And we're going to be asking you to give her money for that, for the pain and suffering. She got up there and she sobbed about what it cost her. Abandoning her son. That was really painful. She had a hard time conceiving that 02:43PM baby, Austin. And for her to bring this up and not even know her?

And remember, she said this all started against Paula because she posted stuff about me. Not true.

Amanda came in here and showed us the text chain. 02:44PM It's Exhibit 1004. And the text chain showed that Ms. Wilson's telling Amanda in 2018, four-and-a-half years before this lawsuit was filed, that Paula was bad, evil, dark. Four years before she's talking about Paula.

So this isn't some response to, oh, Paula's defaming 02:44PM me online. This is a directed attack on someone that she had in her sights for years. And you should consider that when you consider damages, too.

There's the statements about Byron. What we are doing in this Jesus-led community in calling out these people, Paula, 02:45PM Stefanie, Byron, this vial group of pedos, pedo supporters, pedo aligners, victim blamers.

And then there's -- she posted -- so she's posting their names. And keep in mind this is in -- in Paris McIver, the paralegal in Canada said that there was sometimes 30 posts 02:45PM a day. 30 posts a day. Jeez, if you slept, that's like four

an hour. That's a lot. That's an attack. It's an onslaught. And God, this would -- this would blow my blood if I had anybody to say this about my kids.

02:46PM The next one on the right: Their situation is dire. Isla is still with the man Byron Horvath -- again her full name, his full name, thousands of followers -- who this little girl repeatedly says abused her in the recordings, hit her, locked her in a room for hours where she had to pee on the floor, wrestled this small child who has a serious heart condition into a panic attack. 02:46PM

Totally false. Totally fake repressed memory that she tried to goad out of the mother -- the child's mother, and then use and weaponize online for her own clicks and likes. That's sick. That's disgusting. It's defamation.

02:46PM Here's what they say about Stefanie -- this is what she said about Stefanie -- you will see these -- this is just a snippet of the ones you're going to see on the verdict form, and you will be asked if this is defamatory or not.

I'm just checking my time.

02:47PM Stefanie Vogt was after Byron since 2013, and dyed her hair blonde, after being almost jet black hair. Haley is blonde. Stefanie also created a winter wedding almost identical to Haley and Byron's, as seen in multiple videos. And kept Haley and Byron's marital bedroom exactly the same, 02:47PM including leaving art works on the wall. At the end she says,

all indicative of obsession.

02:47PM How cruel, how mean to talk about someone's marital bedroom online with no knowledge. She's testified -- Ms. Wilson testified she didn't know these people. She knew their exes, who were paying a lot of money to be part of the group, to be liked by her.

02:48PM You're going to see another claim that the defamation that's related to all these statements, it's called false light. And it's a little stranger, because it's, like, well, what's defamation and what's false light? I'm going to try and explain it to you, but the jury instructions are the best.

02:48PM But it says here that she had -- that we have to prove that Liane Wilson placed them in the public in a false light. And the false light in which they were placed would be highly offensive to a reasonable person.

In other words, she puts it out there publicly, and it makes them look bad for something that's not true. Doesn't even have to not be true, it just has to be, what do they say, highly offensive.

02:48PM Well, I would say that talking about someone's marital bed, that's pretty -- that's highly offensive. Using their -- I'm showing you these two exhibits. This is 1156 on the right and on the -- I'm sorry, these are both from 1156, these are snapshots from 1156. And on the left is their engagement photo

02:49PM that she took. And then she puts across, This is a very

powerful exorcism. That's false light right there, using a engagement photo and calling it an exorcism. That's the example here.

02:49PM And we'd ask that you find that not only defamatory but a violation of their right of privacy and false light.

On the right, this is another with you of those ones, man. I'd have a hard time controlling myself if somebody wrote this about me, my kids. But the one on the right is the one that Byron said really spurred him into action. This is the 02:49PM one he wasn't going to let stand. And it's Ms. Wilson telling the world that she's creating a website to post all this nonsense about, so that she can really get 'em. And so that Isla, when she turns 18, can finally see all of this nonsense. Fake repressed memories used to try and split her from her 02:50PM parents.

That's the text on the right that Byron said he knew he had to act.

And there's more. It just keeps going. But on the right is the ExposingFamilyCults.com, that's the one that they 02:50PM claim a student posted that, a student created that website. No, it didn't. The website comes back to the husband, and he admitted that.

And stuff was posted on Exposing Family Cults in their name talking about all of the same defamatory statements, all 02:51PM of it taken from private group chats of students.

Here's another one, again, thinking of false light and defamation. We have a photo that you take, a public photo you take, and then you type this stuff on. I know you younger jurors that have Instagram, you know exactly how this works. 02:51PM It was a little muddled when the testimony came out, but you know how you can take a screenshot and then you can type on it. And there's what guess on here. This is defamatory, it's also false light.

And you heard, the truth is a defense. I said it. 02:51PM They said it. It's true, truth is a defense.

But where did the truth come from? Comes from crap like this. This is from Exhibit 22. This is the Jennings Brown article. Jennings Brown was one of the people that signed off on the Liana Shanti Cult Recovery. He got that text 02:52PM from someone. That's not from our any of our clients. Look down at the bottom of that says. This one is just attributed to a follower. But it's a Signal conversation between Liana and a follower. And we heard that that's how they communicated was through Signal.

02:52PM So if she's going to be relying on this stuff that her -- and remember, it all came from Haley and Amanda, every single defamatory statement made against my clients.

And so she can't use truth as a defense because she's creating those fake memories. That's not truth. I don't get 02:53PM to tell you, hey, I'm a good guy, you tell it back to me and

it's true. That's not how this works. That's not how truth as a defense works.

The Montana Supreme Court agreed last week: The evidence in the record makes it clear that Liana Shanti and her group are known to encourage followers to discover and act upon false repressed memories of abuse.

That was years in the making. Last week Montana came out and said that. They said, well -- a few minutes ago I said, what luck. It's not luck. It's because this groundswell of problems with -- that fathers are having, that started way out there years ago, this groundswell is picking up. I'm a surfer, so I'm going to use an analogy, now it is hitting that outer reef and it is big and it is going to come wash over Ms. Shanti, because it has to stop. And in Montana they're holding her accountable as best they could.

And so this is what we ask of you today. The first, we want you to find is for the defendants on all of plaintiffs' claims.

Second, we're asking you for the counterclaimants, Paula, Byron and Stefanie, to find for them on their defamation and false light.

Third, award compensatory damages.

I want to talk a little bit about this. You saw the therapy bills. You've seen the actual cost this has had. All they need is $1 in compensatory for you to move on and find

pain and suffering, all of those types of things, and put a dollar on those. They do not have to show you that they spent $300 on their pain and suffering for them to get 300. They have to show they spent $1 on their pain and suffering, and you decide what to compensate for that pain and suffering.

02:55PM

How much would it cost you to go through years without your kid? How much would you be willing to take for somebody to take their kid away from you over the border. You can't go get them. And then have to read about it online, while she spams your IG trying to call you a bad person. How much would that cost you? How much would you want for that.

02:55PM

Man, I don't even know if any money in the world would compensate me for that.

And fourth, we want you to award punitive damages. And you heard what punitive damages are. And I'm going to read it for you, because it's important here. It's probably the most important decision you're going to have to make.

02:55PM

The proper measure of punitive damages -- this is instruction 42. The proper measure, what you're supposed to do, is you got to calculate -- figure two things. One, is the degree of how willful and wanton and oppressive and malicious the acts were.

02:56PM

There is nothing more malicious than taking advantage of a woman going through a custody battle, spamming that all over the internet for likes and clicks. Nothing more

02:57PM

disgusting. And the evidence shows that that happened repeatedly about my clients.

But the second factor is the amount of money required to punish the responsible party, considering her financial condition.

Well, we saw the financial -- the small financials that she has. It looks like she's making -- one of the companies is making a million bucks a year.

Okay. If we're going to punish her, how many millions would it take?

You have the power to do that. It's the law. You get to punish her. That's not just about punishment. It's about punishment. The biggest thing for punitive damages in this case and what we're asking for is to deter. To make it stop. And the only way you can do that is with money, is to put her out of business. How much money would put her out of business, when she makes millions? If issue $10 million, that's a couple of years, she's going to be back online.

So you're going to go see this question on the verdict form. Did Paula and Byron, Stefanie, any one of them -- they're going to be separated out. It's not going to be kind. I'm just doing this for you so I can only show you one slide -- did they prove by clear and convincing evidence that Ms. Wilson acted intentionally, willfully, wantonly, oppressively, or with reckless disregard for their rights? And we believe the answer

is yes, and you will have the opportunity to check that box.

And if you do check that box yes, you're going to see this next question. What are the damages? How much? How much to cut the head off the snake? How much to put down and stop all of this nonsense?

02:59PM

And it's not just for these three. It's for the father in the Montana Supreme Court decision. It's for the fathers that aren't here. It's for this groundswell that's coming up, showing that she interferes with families. How much? Because we want it to stop.

02:59PM

And my clients got up there and cried that when they ask -- I asked each one of them, what you want out of this at the end? I asked Wade, too. They want it to stop. They didn't say they wanted money. Wade said, well, I want them to be compensated, too. But not one of the defendants or counterclaimants said they wanted money. They said they want it to stop.

02:59PM

You have the power to make it stop, by law you get to. That's the beauty of a jury. You can hold her accountable, finally.

03:00PM

And we think it's going to take $50 million. There's no other way to do it. Thank you.

THE COURT: All right, ladies and gentlemen. We are going to take the recess that I promised.

03:00PM Let's -- let me confer for one moment with Ms. Cortez

to find out how much time total is left between the lawyers.

(Court and courtroom manager conferring.)

THE COURT: We're going to take a ten-minute break, and during that time, obviously, have something to eat if you need it, use the restroom. And we will see you at 3:10. All right. Thank you.

03:00PM

Do not start your deliberations. Don't talk about the case. Don't do any research. And we'll see you in ten minutes. Thank you.

03:01PM

(At 3:01 p.m., the jury was excused, and the following proceedings were held:)

THE COURT: All right. We will be in a ten-minute recess. Thank you.

(A recess was taken from 3:01 p.m. to 3:13 p.m.)

03:13PM

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Thank you, ladies and gentlemen.

We have less than a half hour left for the closing arguments. So if you could please pay attention to the rebuttal argument of Mr. Portnoy.

03:14PM

MR. PORTNOY: Thank you.

Well, I guess opposing counsel heard a different case than I did, and lucky we're not going in the jury room, the two of us, to decide the case. We'd never reach a result.

03:14PM

What was the theme of that argument? Besides all the

theatrics and, you know, throwing up the hands, what was the theme? A continuing brutal, defamatory attack on my client. It just continues.

Quote, crap like this. That's what you just heard ten 03:14PM minutes ago. Crap like this. Is that opinion, by the way? Is that colorful language?

It's disgusting. Talking about my client. She's disgusting. Opinion? Continued attacks.

And what did we hear for the first time today from 03:15PM counsel? We didn't know who made the phone call to the Real Estate Commission. Remember? We just knew somebody made a complaint. He just admitted it was his clients. He just told you his clients made the call to the Real Estate Commission. Snow is on the ground.

03:15PM It's one attack after another. She claims to be a lawyer, she's not a lawyer. One attack after another. Real Estate Commission. Bankruptcy. What did that have to do with the custody battle? I don't care if she's accused of bank robbery and they're having a hearing.

03:16PM Don't you see what is going on even ten minutes ago? Personal attacks with no facts.

Encouraging people to make police reports? Did you hear one witness, any of their people, any of their nonparty witnesses say one thing about encouraging a police report?

03:17PM Let's take a fact. The very first complaint made

about Byron being a child abuser was made before Haley became a student of my client. Think about it. They want you to believe my client manufactured, promoted, brainwashed students to bring false child abuse claims. The very first claim made against Byron by Haley's relatives was before Haley even knew who Liana Shanti was.

03:17PM

You can attack my client all you want.

What's their theme? Let's compare the two themes. Talking about accountability.

03:18PM

Our theme is my client, after being attacked for seven months, for nothing she did, she hadn't posted a thing, constant attacks, constant attacks, hadn't posted a thing. Then posts in her own name to support two women.

What's their theme? I'm going to quote it because I heard it four times. She did it to get likes. That's their theory. She needed likes? She's got tens of thousands of people either buy her product or follow her, before this ever happened.

03:18PM

Yes, she said it has benefited her in a very weird way, because now all these women who have been afraid to come out and fight for their children, now know they have a partner.

03:19PM

Fake con artist, master manipulator is one statement that you're going to have before you that they made about her. Fake. Con artist. Master manipulator.

Their theory is my client has brainwashed hundreds if

03:20PM

not thousands of women, almost all of whom she's never even met, until she met some of them who flew here to support her in the back of the courtroom. She never even knew who they were, their names.

03:20PM And how many times did he tell you was all she wants to do was sell her program? Yeah, that's why she put herself out to get all these slanderous, defamatory statements, to sell a few programs, like she needs to.

Folks, they were angry that somebody with resources 03:21PM and the ability to connect with others would try to support women in a custody dispute. And a custody dispute arising out of admittedly, by the child herself, abuse. We'll get her back.

Now, they say to you, let's send a lesson. Let's give 03:21PM our clients, I think he said, $50 million. I might have misheard it. Certainly well into the millions. Let's stop her. Well, you know what? I like that argument the other way.

Let's award my client punitive damages to stop Liana Shanti Cult Recovery and Cult Education Institute, who posts 03:22PM every day and continue to post to this day. Let them get the message, because they're part of it. No dispute. They're part of it. They participated in the Zoom call. Forget about the letters.

Send a message. Unfortunately you have to send it 03:22PM through them, you want it to stop.

Who's going to stop the culture, the Liana Shanti Recovery Group and the Cult Education Institute if you don't? Send a message.

And there are some people involved in that that have been in this courtroom. They're not parties. They have flown all the way here to sit and watch this trial. And they post. Because they're not under any restrictions. And I understand that. Who's stopping them? How do you sue an institute? How do you sue and pursue anonymity?

03:22PM

Byron Horvath's testimony yesterday. I asked him, essentially, what is anonymity, what does it mean?

03:23PM

Hiding behind -- just hiding your image, identity.

What do you think about people who post anonymously online negative comments about a restaurant, a movie, a person?

Answer: I don't like it. I think if you have something to say, put your face to it.

03:23PM

Every single post Liana Shanti made, she put her face to it. Every single post that's been put by these defendants and by their conspirators in Liana Shanti Cult Recovery and Cult Education Institute, anonymous. Who's hiding?

03:24PM

You've heard no evidence that anything that was on Exposing Family Cults was posted by my client. Forget who created it. They want to imply that somehow Liana was involved. You heard her husband admit that he got it, he bought the domain name, for a student. It's irrelevant.

03:25PM

What's relevant is who posted on it. Not her. There's not a single piece of evidence that she ever posted a single thing, and you're going to see alleged defamatory statements that they're claiming they should be compensated for that were made by somebody not in this courtroom.

03:25PM

And then I want to get to the fake repressed memories. How many times did you hear that in the last hour?

I didn't know that counsel had picked up a degree in psychiatry, psychology, whatever degree you need to be an expert in fake repressed memories. Because that's their only argument as to why their two nonparty witnesses changed their mind. Because they are robots. And everyone Liana talks to, she gets them to come up with fake repressed memories.

03:26PM

Did they bring an expert to the stand to testify about my client's ability, ability to force people, through some kind of thing, to come up with fake memories? Like Isla, who's on video? Or her mom? Where's the expert on fake repressed memories?

03:26PM

By the way, just as a sideline, I don't know if you know who Tulsi Gabbard is. She was our Congresswoman for a while and then she went to work for the President. She's been accused of being a member of a cult. Anybody can say it.

03:27PM

They accuse the President's followers of being in a cult. I am sure some of you may have read it. The MAGA people are in a cult. They can't think for themselves. They have no

03:27PM

free will. They'll say what the President tells them to say and believe what the President tells them to believe. Just like my client is being claimed.

03:28PM They talked to Jennings Brown. You want a conspiracy? They didn't need to. They didn't want to be involved. They don't want anybody to know who they are. They don't want any repercussions. We'll tell you everything you want to know and then don't print one word. You heard them say that. They talked to the guy, one of them, three times. But don't print 03:28PM one thing we tell you.

Credibility? How believable is that? They wanted their stories out. They didn't want their names attributed to it. There's no other way to resolve that. You don't talk to the media if you don't want your information out to the world.

03:29PM Oh, but Liana, all she wanted was a click, a like. Didn't see her talking to Jennings Brown. And if she did, you know she would have done it publicly, attributable to her.

You want to believe that they talked to this guy, gave him all this information, but made a deal that not only 03:29PM wouldn't he use their name, but he wouldn't use what they told him. Why? I don't know why. Doesn't make sense to me.

Going to talk to the media, that's part of the conspiracy. Not only do we talk and post and write, but we try to do it anonymously. They couldn't do it anonymously to the 03:30PM federal court. As you heard, my client believes that was the

thing later on that convinced her that what she believed, what she had been told by Amanda, was true. Finally. Finally I got some proof. God, finally got the proof who's been posting.

Do we have -- I got to come back to this because 03:30PM they -- they say because our three clients came up here and said they never did it, end of case, let's go home. Just give our client $50 million, don't give her a nickel, because you heard all three of our clients, never did it. No? What a shock. I expected them to get up here and say, oh, you know, 03:31PM I've been telling you I never did it, but I did it. It was me.

Is that something to be expected?

But fortunately for their two primary nonparty witnesses, we have exhibits.

Exhibit 110 -- by the way, I don't have the fancy 03:31PM stuff. I'm old. I don't have all that fancy stuff, so I can't post it. But I hope you don't decide the case on what's been posted.

This is a letter to Mollway, Judge Mollway in April of 2023. I'm just going to read a couple sentences.

03:32PM I have endured years of abuse from Byron, both during our marriage and then after we separated.

It's a letter written by Haley to a federal judge.

Was there abuse our not? You going to believe him when he says I never abused my child? You going to believe the 03:32PM mom who wrote to a federal judge, said she has endured years of

abuse and then later on the child? Who are you going to believe?

In closing, I want to make it clear that Liana had nothing to do with my decision to attempt to leave Canada with Isla.

Who are you going to believe? These people who have concocted a story about how my client was responsible for Haley trying to leave, or you going to believe Haley?

Oh, I know, Liana mixed up the wires in her brain and made her say something she never said or believed. Oh, okay, I'll just tell a federal judge this.

I made the choice all on my own. Liana's work has changed my life in a very deep and profound way. It has empowered me to step away from my very abusive family and heal from a deeply traumatic childhood that was filled with sexual, physical, emotional and financial abuse.

The final sentence is the critical one. Why? Why did they attack someone they never knew?

THE COURT: You have less than 20 seconds, Mr. Portnoy.

MR. PORTNOY: How much?

THE COURT: Less than 20 seconds.

MR. PORTNOY: Oh, I better read fast.

THE COURT: Not too fast.

MR. PORTNOY: Byron Horvath as well as my father Brian

03:34PM 03:34PM 03:34PM 03:35PM 03:35PM

Winter are not a fan of Liana, quote, only because they no longer have any control over my life. And I am speaking the truth loudly.

Folks, we have put in evidence of damages. She has sustained enormous pain and suffering, you heard from her children. All I want you to do is be fair.

Thank you for everything, for sitting through this. Thank you.

THE COURT: All right. I'll give you an extra 30 seconds, counsel.

MR. ADAMS: I don't need it.

THE COURT: Okay.

MR. ADAMS: But thank you.

I think other than the praying on vulnerable women, the thing that bothers me most about this case is the lack of personal responsibility. You sat here for days, and you remember, the law license, not her fault. Something must be wrong in New York.

The real estate license, not her fault. Remember, the husband was renewing automatically without her knowing it, making false statements on her behalf. Not her fault.

Therapy license, she doesn't need a therapy license, that's -- what are you guys talking about?

The bankruptcy, remember, not her fault, it was the ex-husband's business debts, not her fault.

The fraud, an overreaction. Come on. Well, she pled
guilty to a felony. Is that an overreaction?
The husband stood up there and laughed. Well, they
had guns pulled at my head and I said, well, doesn't that tell
03:35PM you how serious it is? And they just laughed it off.
No personal responsibility on the bankruptcy fraud
either.
And then the posts. Oh, it's Haley's and Amanda's
fault that I'm posting this stuff. No personal responsibility.
03:36PM Always, always somebody else's fault.
It ends today. Hold her responsible.
THE COURT: All right. Thank you. Ladies and
gentlemen, it is 3:36. And so what you will do now is, we need
to swear in a court security officer who will be in charge of
03:36PM making sure that your deliberations proceed without outside
interruption. And so we can do that now.
If the court security officer will approach, please.
(The court security officer was sworn to take charge
of the jury during deliberations.)
03:37PM THE COURT: Thank you.
And ladies and gentlemen, if you could please follow
the officer to the jury deliberation room. It is your -- once
you get there, you can decide whether or not you want to select
a foreperson today or if you want to put that off until
03:37PM tomorrow and come back tomorrow.

I just ask that you let us know through the proper channels what your decision is as to what time you're leaving today and what time you're coming back tomorrow. You don't need to tell us -- actually, don't tell us what you've done other than the time you're leaving and the time you're coming back. Okay?

03:37PM

Thank you so much, very much for your attention. You folks have been amazing. I've been hearing from the courthouse staff how lovely all of you are. And sincerely, it means a lot to all of us. So thank you.

03:37PM

And you may now retire to the jury deliberation room.

(At 3:38 p.m., the jury retired to commence its deliberations.)

THE COURT: All right. Thank you, everyone. You may be seated.

03:38PM

I understand Ms. Ing caught a typo in the verdict forms. Thank you for catching that. That has been fixed, and so the corrected verdict form is going to back to the jury. It was just a pronoun error on our part.

03:38PM

And I will ask the attorneys to please make sure that Ms. Cortez has your contact information. We use text messaging as a way to notify people as to when the jury arrives and when the jury leaves. That information is going to be sent to the lawyers. And if the attorneys could make sure to be available to return to the courthouse in a reasonable timeframe.

03:39PM

I do have some scheduling issues for myself on Friday, but I am going to myself try to be as readily available as I can. Tomorrow I'm here all day.

MR. ADAMS: Does the Court have a -- like, do you want us within 30 minutes, within 60 minutes, or is it --

THE COURT: I mean, how far away is your office? I don't know.

MR. ADAMS: It's like 15, but getting through security will take takes 30. So, yeah, 30 to 35 minutes would probably be reasonable.

THE COURT: Okay. 30 to 45 will be fair.

MR. ADAMS: We're going to be right there.

THE COURT: I don't think it makes sense to have you camped out in the courthouse, so...

All right. Thank you, everyone.

MR. PORTNOY: Thank you.

THE COURT: We are adjourned.

(The proceedings concluded at 3:40 p.m., August 12, 2026.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, August 12, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC